WAYNE A. COLEMAN

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - -x

ARTURO MORENO, JR., et :

al., : No. 05-14210C

Plaintiffs, : (Judge Firestone)

vs. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - -x

30(b)(6) DEPOSITION OF WAYNE A. COLEMAN

Washington, DC

Thursday, November 2, 2006

REPORTED BY:

DONALD R. THACKER

WAYNE A. COLEMAN

**Q John Ehrbar?**

A And in addition to there were two other people, Alethea Smalls, we have already mentioned and Fred Tingley, last name T-i-n-g-l-e-y, and he has since retired.

**Q And what were Alethea Smalls' and Fred Tingley's titles?**

A They were pay specialists also.

**Q And was Rick Hastings involved in this at all?**

A We advised, we provided him our advice on this, yes. I mean the question came down, are these employees entitled to overtime pay for that attending basic training on the 6th the day and our advice was, no, we can't find any provision in the regulations that would allow us to do that.

**Q And you gave that advice to Rick Hastings. Was it Rick Hastings who made the decision not to pay them overtime?**

A Probably in conjunction with the Executive Associate Director for Administration, yes, which would have been his supervisor.

**Q And who, executive -- give me that title again?**





**WAYNE A. COLEMAN**

A I think it is Executive Associate Director.

**Q For --**

A Administration.

**Q That would have been Rick Hastings' report?**

A Yes. We mentioned that earlier. I don't remember his name.

**Q But that person was within INS is that right?**

A Yes, that is correct.

**Q Anyone else, would anyone else have been involved in the decision not to pay the overtime?**

A Well, I am sure that the director of the training staff for INS was involved in it.

**Q Do you know who the director of the training staff was?**

A No, I don't.

**Q Could you find that out?**

A I believe so.

MR. PEASE: Same objection as before.

MR. SWEENEY: I will ask the court reporter at these requests to mark these requests and after the deposition is over I will send you a





WAYNE A. COLEMAN

copy of the requests that we have, so that you have them.

MR. PEASE: That would be great.

BY MR. SWEENEY:

**Q So, there are three people who made the decision, is that right; Rick Hastings, the Executive Associate Director of Administration to the INS and the Director of Training for the INS.**

A Those would be the three people that I am aware of, yes. Now, if I am -- yes, those would be the three people I am aware of.

**Q And they made this decision based on advice that you, Fred Tingley, Alethea Smalls and John Ehrbar passed to them, that is right?**

A That is right.

**Q And did Fred Tingley and Alethea Smalls have any expertise in overtime?**

A Actually Fred is the one who taught me about overtime, and so yes, I would say he has quite a bit of expertise.

Alethea was a new employee, she had just come from the private sector and had an understanding of compensation from the private sector, with respect to -- but was learning the





WAYNE A. COLEMAN

rules and regulations of how we do premium pay and other pay setting, other pay issues in the federal government.

**Q So, did she have much input into this recommendation?**

A Not a lot, she was part of the discussions but --

**Q Is it fair to say that you and Mr. Tingley were the ones, at least on the pay specialist level, that drove the advice that people should not be paid overtime?**

A That is correct.

**Q And did Mr. Ehrbar become involved in that discussion or did he just take your advice?**

A Oh, yes. No, he was involved in the discussion as well. He also has had a long number of years working with the federal pay issues and so was aware of the provisions as well.

**Q And did Mr. Ehrbar have any special overtime specialty?**

A He had worked in the area of pay and pay setting for quite a long number of years prior to my coming to work for him. He had worked with the Immigration and Naturalization Service sometime in

WAYNE A. COLEMAN

**the documents that were asked for in this Request for Production of Documents?**

MR. PEASE: Objection; speculation.

THE WITNESS: You asked if I knew if there had been any other documents collected or if there had been anybody else involved in checking documents?

BY MR. SWEENEY:

**Q Well, I asked you before if there has been any documents collected since?**

A Right, and I said no to that, but then you asked me a question and I haven't answered it yet.

**Q That is right. The question is, was there anybody else involved in searching for these documents in response to this request other than you?**

A I believe Alethea Smalls probably was involved.

**Q Did you ask her to look for documents in response to this?**

A I did not, no.

**Q Did someone ask you to look for documents in response to this?**

MR. PEASE: Objection; attorney-client





WAYNE A. COLEMAN

privilege.

BY MR. SWEENEY:

**Q Don't tell me if your lawyer asked you to. Was there anyone else?**

A No.

**Q Would you explain to me the search that you made to find documents in response to this request?**

A I went back to assure that the document that I mentioned in the declaration were still available, were still out there; beyond that I don't believe that we had any other documents. I would have looked through the files that I maintained and they are now at Customs and Border Protection to see if there was anything else besides that that we had relied on.

**Q Do you remember producing any other documents other than the ones that were attached to your declaration?**

A No, I don't.

**Q Did you search your computer for any e-mail correspondence with respect to the request?**

A No, the problem was when we moved from ICE to Customs and Border Protection we moved from one





WAYNE A. COLEMAN

computer system to another, and we no longer had access to the electronic documents that we had at ICE. And, the documents that we had collected or that might have been at CBP should have been available. I am assuming Alethea probably pulled those together.

**Q Is the information that you had on the system with ICE destroyed or was it just you didn't have access to it?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: I really can't answer that. I am assuming that when my account was closed that anything that was mine was deleted. I can't say that for certain. I don't know.

BY MR. SWEENEY:

**Q Do you know if anyone made a search for those documents?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: No, I really don't know.

BY MR. SWEENEY:

**Q Would your account, if you will, on the ICE system, would that have had any information with**





WAYNE A. COLEMAN

**respect to this Request for Production of Documents?**

MR. PEASE: Objection; vague.

THE WITNESS: I don't believe so.

BY MR. SWEENEY:

**Q Wouldn't have had any notes that you may have taken with respect to the issue of paying overtime for a 6th day of training at FLETC?**

A No.

**Q Would it have had any e-mails that contained any reference to the issue of paying overtime for the 6th day of training at FLETC?**

A That is possible.

**Q And who did you e-mail with, regarding the issue?**

A Mostly the people that we have already discussed this morning.

**Q So, might there exist an e-mail discussion on this issue between you and some of the other people that we discussed in morning?**

MR. PEASE: Objection speculation.

THE WITNESS: I really don't know.

MR. SWEENEY: We at this point would make a request that that e-mail account as well as Mr. Tingley's, Alethea Smalls', Phil --

WAYNE A. COLEMAN

THE WITNESS: Seneschal.

MR. SWEENEY: Thank you, Seneschal, and Mr. Ehrbar's accounts be searched for any discussion of the relevant issues here and with respect to the Request for Production of Documents.

MR. PEASE: Again, same objection; if you will put it in writing.

MR. SWEENEY: It will come to you in the transcript.

MR. PEASE: As a formal discovery request.

BY MR. SWEENEY:

**Q Do you know if once Mr. Hastings decided not to pay overtime for the 6th day of training if he memorialized that decision in any way?**

A No, I am not aware if there was a memo or document created.

**Q And again you have no recollection of creating a memo or document with your --**

A No, I did not.

**Q You testified before that it was your understanding that OPM changed its position with respect to paying overtime for the 6th day of basic training at the FLETC; is that right?**

A That is correct.





WAYNE A. COLEMAN

**Q Okay. What made you think they changed their position?**

A In spring of 2003 one of the employees who was attending FLETC faxed a copy or sent us a copy of an e-mail that he had obtained from another trainee at FLETC. That trainee worked for the Forest Service. And in that, there was a discussion that Forest Service had contacted OPM and OPM had directed them to begin paying overtime for their employees who were regularly scheduled for a 6th day of training at FLETC.

**Q So the Forest Service actually took the step of going to OPM?**

A Yes.

**Q To get a determination as to whether or not they should pay overtime; is that right?**

A That is correct.

**Q When they went to OPM, OPM said, yes, you should pay overtime, is that right?**

A They did eventually, yes. The initial guidance that they gave the Forest Service was that, no, they were not, they didn't need to. They were not authorized under the regulation.

But, upon further reflection apparently





WAYNE A. COLEMAN

when the Forest Service went back and asked a second time from somewhere higher in their hierarchy, OPM reconsidered what they had provided in advice, and determined that they had provided incorrect advice.

**Q You said that OPM provided advice to the Forest Service. That they should not pay overtime?**

A Initially that was there determination, yes.

**Q And who provided, who from OPM provided that advice?**

A I really don't know. I did not see the documents that included this. This was based on the discussion I had with the pay specialist from the Forest Service.

**Q Who was the pay specialist?**

A Oh, off the top of my head I don't remember.

**Q What was the specific advice that OPM gave?**

A The initial advice was that under the current regulations there was no provision that would allow Forest Service or any other federal agency to pay their employees for attending a 6th day of regularly scheduled training.





WAYNE A. COLEMAN

**Q And was it your understanding that advice came in a written form?**

A I -- I really don't know. I know that the advice was given. Whether it was in written form or whether it was orally, I don't know.

**Q And you don't know who at OPM gave the advice?**

A No, I don't.

**Q And you don't remember the name of the person at the Forest Service who said they received that advice, is that right?**

A No, but I believe we do, I believe that we could find the person's name, if it is important.

**Q It is important. It may come up later in the deposition that some documents that we have that will remind you of it, so at their point I would request that you fill that name in, soon as you find it.**

**Do you know when OPM gave this alleged advice to the forest service?**

A Not specifically, no. It was, I believe it was in late 2002, but I can't pin it down any closer than that. That was the initial advice, and then the change came, I believe, after the first of

WAYNE A. COLEMAN

**6 days a week should be paid for the 6th day of training?**

MR. PEASE: Objection; argumentative.

THE WITNESS: When I do training on pay, I always talk about two things; logic and equity. The regulations don't necessarily provide for either one of those, and so they guide us as to what we will do.

We didn't necessarily feel, personally, that it was equitable, but we also understood the regulations to tell us what we had to do and what we could not do, and so we would abide by the regulations.

BY MR. SWEENEY:

**Q So, is it fair to say that the HR group being, you are talking about, felt that in an equitable sense that the people training for the 6th day training should have been paid for overtime?**

MR. PEASE: Objection; irrelevant.

THE WITNESS: If there had been a way to do that, yes.

BY MR. SWEENEY:

**Q And indeed you tried to do that, is that right?**





WAYNE A. COLEMAN

A That is correct.

**Q That was by asking DOJ to seek an exemption from OPM; is that correct?**

A That is right.

**Q Did DOJ seek that exemption?**

A No, they did not.

**Q Why not?**

A I can't answer that. I don't know.

**Q Do you know if they ever contacted OPM with respect to these --**

A I do not.

**Q But it is your understanding that they didn't seek the exemption?**

A That is correct. We eventually received a memo back from the Department that said they were not going forward with the request. If there was an explanation in there, I never saw the memo, so I can't tell you what it might have been.

**Q Do you remember when that memo was sent back from DOJ?**

A I think it was in the summer of 2002.

**Q Did you ever see a copy?**

A No, I did not.

**Q Do you know who it went to?**





WAYNE A. COLEMAN

A I am assuming that it went to the Executive Associate Director for Administration.

**Q And that would have been, is that that name we don't have?**

A That is a name we don't have, yes. It is not coming back.

**Q Would Mr. Hastings have seen it?**

A I would assume he would have.

**Q Would Mr. --**

A Seneschal.

**Q -- Seneschal have seen it?**

A I am not sure about that.

MR. SWEENEY: We would ask for the production of that memo, if it still exists. It is very relevant. If you can find a copy of it, terrific, or if anyone else has a copy of it?

MR. PEASE: Same in terms of a document request, and it is privileged, and require a request in writing --

MR. SWEENEY: Of course if it is privileged, it will show up in the privileged documents.

MR. PEASE: Privileged documents, exactly.

BY MR. SWEENEY:





WAYNE A. COLEMAN

**Q So, again, getting back to this idea of OPM putting out an interpretation of whether people should get paid a 6th day of basic training, what was the first time you remember seeing that interpretation?**

A I am not sure I understand the question.

**Q Well, you say in your declaration that in the middle of 2003 OPM provided a new interpretation of employees entitlement to FLETC during basic training specifically with regard to those non-exempt employees attending a regularly scheduled 6th day in the basic training week.**

A Right, okay.

**Q When was the first time you saw that interpretation?**

A Probably right around the time, that time, July, June, July, whenever -- shortly after it was put up on to the OPM web page.

**Q You didn't see it before it went on the OPM web page?**

A No.

**Q Were you aware of it before it went on the OPM web page?**

A No, that is why I referred to that the CPM

WAYNE A. COLEMAN

BY MR. SWEENEY:

**Q You had said before initially in 2002 that the compensation group that you were part of, had come to the conclusion that people should have been paid overtime, and passed it up to Mr. Hastings, and Mr. Hastings and his supervisors agreed people would have been paid overtime at that point, is that right?**

A Yes.

**Q So, if Mr. Hastings' then got an interpretation -- strike that.**

**So that Mr. Hastings, once he got interpretation from OPM saying that people were owed the 6th day, in overtime, he could have begun paying people for that 6th day, is that correct?**

A And I would say that we did.

**Q I am just going to ask, is that correct, that Mr. Hastings at that point, when he got an interpretation from OPM that it was not only proper but mandatory, to pay overtime for that 6th day, could he have started paying people overtime?**

A With the concurrence of the Department, yes.

**Q Okay. Again, just to go back, your**





**WAYNE A. COLEMAN**

**recollection is the first time that you saw OPM's interpretation that people would be owed for that 6th day of overtime was in the middle of 2003; is that right?**

A That is correct.

**Q And the first time you saw it was on their web site in the Q and A; is that right?**

A Yes.

**Q If I can take you back to what was marked as I believe Exhibit 2, which is your declaration, take you back at the end there to the last two pages --**

A Right.

**Q -- is that the Q and A that was posted on the OPM web site that you just referred to?**

A That is correct.

**Q Do you know when this was posted on the OPM web site?**

A I don't have a specific date. I am assuming that based on when I found it it was sometime in June or July of 2003.

**Q When these things go up on the OPM web site does OPM alert agencies that might be affected by it?**





**WAYNE A. COLEMAN**

A If they decide to issue one of these CPM's, yes.

**Q Is this a CPM?**

A No.

**Q This is something of a lesser --**

A This is similar to what you would find on other web sites at FAQ, Frequently Asked Questions.

**Q So, when this went up on the web site OPM wouldn't necessarily have informed agencies of it, is that right?**

A They did not do any kind of broadcast transmission of this to agencies.

**Q Did OPM inform you of when this went up on the web site?**

A No.

**Q If something went up on the OPM web site -- well, let me ask you this. Did you consider this an important interpretation by OPM?**

A Absolutely.

**Q When OPM made such important interpretations would you typically be aware of it?**

A Again, if they had done some kind of a broadcast transmission of them, yes.

**Q Do you do anything to make sure that you**





**WAYNE A. COLEMAN**

**are kept up to date on interpretations like this that might appear in ways other than the CPM?**

A Yes, they have a mailing list in which they notify us of any major changes, what they consider to be major changes in pay policy. And so I periodically receive e-mails from them. They will say something to the effect on such-and-such date we issued the following guidance related to whatever.

**Q Did you ever get an e-mail from OPM --**

A No.

**Q -- that notified you of this interpretation?**

A No.

**Q And do you know who from OPM sent those e-mails out?**

A I have no idea.

**Q But they did come from OPM?**

A Yes.

**Q Do you know what they were entitled?**

A They were just e-mails, as far as I know. I don't know whether they had a specific name or not.

**Q What did you refer to them as?**

A I would normally go back to the document

WAYNE A. COLEMAN

itself that the e-mail referred to, so there would be a link from the e-mail to whatever the document was, and again typically that was the CPM.

**Q And did you have a name that you gave these types of alerts that came from OPM?**

A I am sure OPM does, but I don't remember off the top of my head what it might be.

MR. SWEENEY: We would ask for the production of those e-mail alerts from the period of January 1st of 2002 through the period of January of 2005.

MR. PEASE: Same request, that would be properly brought under the rules.

BY MR. SWEENEY:

**Q You also say in your declaration that you conducted a review of the compensation policy memorandum issued during 2003-2004 which were available on the OPM web site?**

A That is correct.

**Q Do you remember when you did that?**

A Probably shortly before writing this.

**Q So, you didn't do it in 2003; is that right?**

A We would -- as I said, when an alert would





WAYNE A. COLEMAN

come through I would take a look if it was relevant to what I was doing.

**Q But you didn't conduct a review of compensation policy memoranda issued during 2003-2004 before you were asked to write this declaration, did you?**

A As I said, when the e-mail alerts would come through from OPM, I would look at the subject matter of it. If it was something relevant to what I was doing I would take a look. If it was on leave or retirement which I do not deal with, then no, I would not look at it.

So, the ones that were relevant, I was looking at, and then I went back and reviewed to produce this document to be sure that I hadn't missed anything.

**Q You say here that the CPM's, the standard method for notifying federal agencies of an official change in OPM policy, that is right?**

A That is what I understand, yes, sir.

**Q Are there any other methods for notifying federal agencies?**

A Not that I am aware of.

**Q Does OPM put out a regular newsletter**





**WAYNE A. COLEMAN**

**regarding policy interpretations or --**

A None that I am aware of, no.

**Q But in your work you rely on OPM interpretations; is that right?**

A That is correct.

**Q So, how do you keep current on them?**

A I rely on the e-mail alerts, for one, and if there is a specific topic I would then go through and search the OPM web site to see if there is anything I might have missed.

**Q So with this, if this interpretation came out earlier than the middle of 2003, is it your understanding that you should have been informed about it?**

A It certainly -- yes.

**Q And how would you have expected to be informed about it?**

A By the CPM's.

**Q But this wasn't a CPM; is that right?**

A That is correct.

**Q So is it your understanding that this should have, this Q and A should have rather come in the form of a CPM rather than just a Q and A web site posting?**





**WAYNE A. COLEMAN**

MR. PEASE: Objection; argumentative.

THE WITNESS: That would be my personal opinion. What OPM's policies are on that, I have no idea.

BY MR. SWEENEY:

**Q You go on in your declaration to say that "On August 6th, 2003, ICE received authority from the Department of Homeland Security to pay FSLA overtime to legacy Immigration and Naturalization Service (INS) employees who were assigned and attended basic training on a regularly scheduled 6th day during basic training week after January 1st of 2002."**

**I am on your Declaration, 2nd page, 6th paragraph. Once ICE received the authority did they begin paying overtime?**

A We sent out an e-mail to managers that was dated about two weeks later, but we sent out an e-mail at that time saying, yes, you will begin as of, I think it was pay period 17 of 2003, paying employees who are attending regularly scheduled 6th day of training at FLETC for their overtime under the Fair Labor Standards Act.

**Q Now, you found out about this Q and A**

WAYNE A. COLEMAN

**6th day of training; is that right?**

A There was nothing specific that said that, but our understanding of the regulations and the guidance OPM had issued up until this point, government-wide issuances, we understood to say we could not pay.

**Q Is it fair to say that this was the first specific guidance from OPM that you saw with respect to a 6th day of training at FLETC?**

A Yes, I believe it is.

**Q What did you do in reaction to receiving this?**

A Well, I think you can see what I did was I forwarded it on to John Cahill, who is our pay contact at the U.S. Department of Justice.

**Q What is Mr. Cahill's title?**

A I am not sure exactly. I know he was our contact as far as pay issues were concerned. Whether he was a supervisor over there, you know, like a chief of compensation policy or something like that, I don't remember at this point.

**Q And did you consider him a supervisor of yours?**

A No.





WAYNE A. COLEMAN

**Q Why were you passing this -- well, first of all, did you pass this to anyone else?**

A I probably shared it with the folks within my office.

**Q Who were they?**

A Fred Tingley, Alethea Smalls. Let's see this is 2003, it would still be Phil Seneschal.

**Q And Mr. Hastings as well?**

A Phil probably would have shared it with him, yes.

**Q Would you have shared it with him via e-mail?**

A Yes.

**Q So, somewhere there may exist a record of your sending this via e-mail to Ms. Smalls, Mr. Tingley and Mr. Hastings and Mr. Seneschal?**

A That is possible. I can't really answer that for sure.

**Q But to the best of your recollection you he mailed this to them; is that right?**

A I believe I did, yes.

MR. SWEENEY: We would ask that Mr. Coleman's e-mail accounts, if they have not been already, are searched to ensure that any





WAYNE A. COLEMAN

correspondence having to do with the 6th day of training overtime is produced in the case.

MR. PEASE: Same objection with regard to the production of those. I will note that Moreno No. 33 includes an e-mail to those people, forwarding that information.

MR. SWEENEY: We will get there, but again, we are going to reiterate that clearly, clearly e-mails going back and forth on that, and unless there is some representation that those, it has been searched and that information has been produced, we would like a representation of that or a production of everything.

BY MR. SWEENEY:

**Q Would you have sent this to anyone else other than the group you just talked about and Mr. Cahill?**

A No.

**Q As a result of this did you contact anyone at OPM?**

A No, we did not.

**Q Did you call Ms. Draper and ask her if this policy would apply to INS as well?**

A Not that I recall, no.





WAYNE A. COLEMAN

**Q Why not?**

A We expected that John Cahill would take care of that. This is a hierarchical organization. We were a bureau under the Department of Justice. We were not authorized by the Department of Justice to reach out independently to officially ask them for guidance.

We would, as we did earlier, when we submitted a letter to the Department asking them to request OPM to give us an exception under the 410 regulation, submit an official letter to the Department asking for them to ask for that guidance.

We did it informally this time in e-mail, but our expectation was that he would then go forward for the Department, get whatever guidance was appropriate from OPM and then share it with the rest of us in the Department.

**Q You had said before though that you did call Ms. Draper on the telephone from time to time to ask her opinion?**

A That is correct.

**Q You didn't do that in this situation; did you?**

A No, I did not.

WAYNE A. COLEMAN

**you aware of any other times that the INS was required to pay liquidated damages for FSLA violations?**

A Yes.

**Q Does this happen on a regular basis?**

A I wouldn't say a regular basis. It did happen a couple of times in the last few years, yes.

**Q And --**

A But they were related to court cases that had gone before a judge and that there had been a decision made by the court.

**Q Were all those, to the best of your knowledge were all of those cases Court of Claims cases.**

A I believe so, yes.

**Q Are you aware of any agency paying liquidated damages for FSLA claims related to the 6th day of training of FLETC?**

A I am not, no. I think if you will look at the Q & A on the OPM web site, they indicated that agencies should explore the payment of interest on back payments, not liquidated damages.

**Q In the Q & A that was in June, is that the one you are talking about?**





WAYNE A. COLEMAN

A Yes. At the very end of that document. "Agencies may need to recompute an employee's overtime pay entitlement and provide back pay under 5 CFR part 550, subpart H, for overtime hours that occur during regularly scheduled training."

I thought I had remembered seeing this. They indicated interest may be payable as well, but I don't see that here.

**Q So, after refreshing your recollection with the Q & A is it your understanding that the Q & A did not talk about paying interest on the back wages?**

A Yes, they did not. I misspoke.

**Q I show you a document that has been marked Moreno 43 to 44. Mark this document as Plaintiff's Exhibit 18.**

**(Plaintiff's Exhibit 18 identified.)**

**BY MR. SWEENEY:**

**Q Just take a look at that and let me know when you have finished looking it over.**

A Okay.

**Q Do you know what this document is?**

A Well, it appears to be a memo from Chris Greco, who was the Director of Human Resources for





WAYNE A. COLEMAN

ICE in September of 2004 to Mose Lindsay, who was one of the branch chiefs at the USDA National Finance Center in New Orleans, indicating that ICE has a requirement to make back payments, back FSLA overtime payments.

**Q Have you ever seen this before?**

A No, actually I can't say that I have.

**Q I think you are listed as one of the people?**

A Yes, I realized that. I don't know whether it is because it is late in the afternoon, but I simply don't remember seeing this before.

**Q On this memo there is no mention of payments of interest or what the amount of the payments would be, is there?**

A No, it simply says that it is based on the employees -- calculations will be based on the employees number of additional days of overtime owed as identified by Human Resources.

**Q Does that strike you as odd that a memo going to the NFC, who is going to process this whole thing, doesn't include information on what the type of payment will actually be made?**

A I think you need to be aware that there





WAYNE A. COLEMAN

would be, would have been and was, because I spoke with Mose myself, I know Alethea has also, there was a great deal of discussion back and forth with the staff at the National Finance Center about what was needed as far as the calculations are concerned.

This basically was something going from the Director of Human Resources saying, yes, we really need to do this. And I think you will see in the last paragraph there it says, "We expect that additional discussions may be required to move the process forward."

And both Alethea and I had those discussions with him via phone a number of times over the months after September of 2004, to try and move this process forward. And so we would have communicated to him that it would have been the back-up FSLA overtime owed for those 6th days of training, and the interest from the time the employee was not paid until we actually made the payment.

**Q And in the first page there in the third paragraph it says, "Attached is the documentation required to process and pay retroactive overtime under the FLSA."**

WAYNE A. COLEMAN

**It says the documentation includes, and lists four things, but one is Reimbursement Agreement Between Agencies. If you turn over to the pages marked Moreno 44 and 45, is that the reimbursement agreement that they are referring to?**

A That is how I would read this document, yes, sir.

**Q And the reimbursement agreement itself doesn't refer to interest payments or --**

A No, I didn't find any reference to it.

**Q And does that strike you as odd?**

A As I say, there were additional discussions with the folks at NFC and we certainly made it clear in those discussions, even though it is not mentioned here specifically, that we intended that they would pay the interest, because we needed to identify for them what the interest rates were. And, we told them that it would be interest rates that are referred to in subpart H of part 550 of Title 5 of the Code of Federal Regulations.

**Q Do you have any idea why the reimbursement agreement is signed on September 13th, '04, but the memo that purports to attach it is dated September 10th, '04?**





WAYNE A. COLEMAN

A No, I really don't.

**Q Do you know who signed the Reimbursement Agreement on page Moreno 45?**

A I believe since the title there is the Chief, Employee and Labor Relations for ICE, first name is I-l-i-r, last name T-s-u-n-g-u, but I certainly couldn't tell you that from the signature.

MR. PEASE: I don't know if you want to clarify this or not, just to avoid any miscommunication or bad evidence, you might want to suggest to the witness that he look at the remainder of the list on there, and the what the title of the document says. I don't want you to be -- title of the attached document and the listing entry there.

MR. SWEENEY: I am sorry?

MR. PEASE: If you look at where the first Moreno 43, where the listing, where it says documentation includes, the last line of that conclusion appears to match exactly the title of the document attached, I just don't want there to be any confusion. Your choice as to what to ask the witness.

BY MR. SWEENEY:

**Q Well, is it your understanding that Moreno**





WAYNE A. COLEMAN

**44 and 45 is a reimbursement agreement?**

A Well, it certainly is discussing reimbursable agreement. That is the subject line that is on page Moreno 44.

As to whether or not this is the actual reimbursable agreement, I guess I really can't answer that of my own knowledge. It certainly appears to be one to me, but whether or not there is more to this document or not, I don't know.

MR. SWEENEY: Well, if there is an additional reimbursable agreement, we would like to have that produced, and I believe it would be an important part, as well as the payroll action request.

MR. PEASE: Same instruction, I apologize for interjecting. I just wanted to make sure we are clear, just from looking at the face of the document.

BY MR. SWEENEY:

**Q I show you another document that has been marked Moreno 23 and 24. Mark this as Exhibit Plaintiff's Exhibit 19.**

**(Plaintiff's Exhibit 19 identified.)**

**BY MR. SWEENEY:**





WAYNE A. COLEMAN

**Q When you have had a chance to look at that, please let me know.**

A Okay.

**Q Have you ever seen this document before?**

A I can't really say that I have. I really don't know at this point.

**Q Do you know who authored this?**

A No, not really.

**Q If you look at the second paragraph, the last sentence, it speaks in the first person there. Says, "Their interpretation is provided on their web site in the question and answer format, which is undated, but was issued during mid 2003, to the best of my recollection." Does that refresh your recollection as to who drafted it?**

A No, I am sorry, it doesn't.

**Q Okay. I will take you back to the page that is marked Moreno 24, the first full paragraph there in the second to last sentence, that begins "A decision was made in early 2004 -- "**

A Okay.

**Q It describes paying employees both the amount owed for the overtime hours and interest at the standard federal rates as partial compensation**

WAYNE A. COLEMAN

response to respond to the specifics of the employee's question. If they asked, you know, specifically would that be paid under the FSLA or under the Federal Employees Pay Act I would have responded appropriately to that.

I don't know that employees really cared. Their concern was were they going to be paid for that time, and if we were able to respond that it looked like there was going to be a change in policy and that we might be able to do that, we were waiting now for official confirmation of this change, that they wouldn't have particularly cared where the money or how the money was going to be paid. They were just concerned that it would be paid.

**Q Within the compensation group, did you ever have a group discussion about how to respond to these employees that were calling and asking about the overtime for the 6th day of training?**

A I don't know that we had a formal meeting about it. I mean, certainly among ourselves we discussed, you know, the developments as we found them, and that started to change our responses as a result of that.





WAYNE A. COLEMAN

**Q Did anyone tell you how to respond to employees when they called?**

A No, we would have discussed with, I guess at this point in early February it still would have been Phil Seneschal, we would have discussed with him, is it appropriate for us to let employees know that there appears to be some change in this, and that we may be able to make a payment, whereas previously we didn't believe we could? Should we share that with employees?

He felt that was an acceptable thing to do, but to emphasize that, it was kind of an iffy situation. We did not have confirmation from OPM or Justice at this point, but that it appeared that changes were coming; if the changes were actually confirmed that we would then make payments to the employees.

**Q Do you ever remember anything in writing going out to employees expressing that position?**

A Not that I am aware of, there was no broadcast e-mail that had gone out or a broadcast communication of any kind, that I am aware of anyway.

**Q Would you respond to people via e-mail?**





WAYNE A. COLEMAN

A Yes.

**Q And would you express that position when you responded to them via e-mail?**

A Yes.

**Q We don't have any of those e-mails, so we would request that those e-mails be produced as well.**

**And other people within the compensation group, do you know if they would have responded to people in the e-mail?**

A Since we were all receiving inquiries we would have all responded to the inquiries we received, yes.

**Q How did the inquiries come in? Did they come in to Wayne Coleman at --**

A Yes.

**Q How did they know to send it to Wayne Coleman instead of Fred Tingley or Alethea Smalls?**

A It would depend on who they knew in the compensation staff or who one of their colleagues knew. Quite often it was a kind of domino effect. One employee would call in and get one of us and we would respond, and he would let someone else he was close to know, and that person would call in. Or if





WAYNE A. COLEMAN

they were discussing it among themselves, they would share the name, and if somebody else decided they wanted to contact us they would come in that way.

MR. SWEENEY: Based on that we would like the e-mails regarding this issue of back payment.

MR. PEASE: Same instruction.

BY MR. SWEENEY:

**Q The employees that contacted you, were some of them -- well, strike that.**

**Were all of them employees who had trained for the 6th day?**

A Typically employees would call while they were at Glencoe or shortly after they returned.

**Q Did you ever get called by a supervisor who had been, ever called or contacted by e-mail by a supervisor who was fielding questions from people he was supervising, or she was supervising?**

A I don't remember specifically receiving that kind of a call but it wouldn't be unusual.

**Q And did you ever, do you remember ever getting a call from the supervisor at FLETC asking about this issue because they were fielding questions from employees?**

A We did have calls from folks at FLETC,

WAYNE A. COLEMAN

**Q This just went to the managerial staff?**

A This went primarily to the training and the HR staff.

**Q Was this intended at least in part so that the training and the HR staff could field questions from employees on this issue?**

A Yes.

**Q And I think we went over this yesterday, I just want to make clear on this, but Plaintiff's 13, there is no mention here as to the amount that will be paid or whether interest will be paid or liquidated damages will be paid; is there?**

A I believe we went through this yesterday and didn't find that, that is correct.

**Q After this September 3rd of 2003 memo, do you remember the next memo that was sent out to either on a DHS broadcast or to the human resources management explaining the position that INS was going to take or ICE was going to take with respect to payment for the 6th day of basic training?**

A No, I don't. I get the document that we talked about yesterday that I would point to, is this draft memorandum going out which is Plaintiff's Exhibit 14, the draft memorandum for the management





WAYNE A. COLEMAN

teams of CBP, CIS and ICE notifying them that we had received authorization from the Department and from OPM to go ahead and make these payments, and that we would begin computing payment for the back overtime.

**Q And this was dated September 4, 2003, huh?**

A The draft is, yes. Now, again, I don't know, since I was not in the office at this point, I don't know whether this actually went out but I am assuming that it did.

**Q So, it would have been a day after the, if it went out on the day it was dated, it would have been a day after the e-mail that went out from -- to Mr. Hastings and that group; is that right?**

A That is correct.

**Q Exhibit 13. After Plaintiffs' Exhibit 14 do you know if there was another distribution of information on a broad basis regarding the position to be taken with respect to the 6th day of overtime?**

A I do not know.

**Q Do you know if after that, if after the DHS broadcast that was Plaintiff's 11, do you know if there was another DHS broadcast with respect to this issue?**

A Well, I think you just asked me that





WAYNE A. COLEMAN

question and I think I said, no.

**Q Okay. So, if the employees wanted to get information on the payment of overtime for that 6th day of training they would have received this --**

A That is correct.

**Q -- Plaintiff's 11? And then what other ways would they get information with respect to what was happening with the payment?**

A I would say it would be the normal routes. If they were at FLETC it would be to talk to the instructional staff there or if they were back in their port or station it would be to talk to their supervisory staff or perhaps their time keeping staff there. Those people in turn, if they had questions, typically would contact us or the field HR offices that INS maintained.

**Q Do you know whether there was a DHS broadcast or something similar sent out when people were actually paid the back overtime?**

A I know we discussed it within the office. At this point I don't remember if there was an actual broadcast message.

**Q And do you have any knowledge of any other broadcast messages that went out after this 5-6-2003**





**WAYNE A. COLEMAN**

**message, other than one that would have been sent out around the time of payment?**

MR. PEASE: Objection; asked and answered.

THE WITNESS: Not that I am aware of.

BY MR. SWEENEY:

**Q Do you know when people were, received their back pay, did they receive a statement or an accounting of the pay they were receiving?**

A I believe so, yes.

**Q And do you know what was in that statement?**

A No, I don't. By the time the payments were going out I was no longer with CBP and so I was really not part of the final payment process that this involved.

**Q And is it your understanding that people should have received an accounting with the payment when they received it?**

A Yes, I know that there were discussions before the payments went out of the methodology for doing that, and there were two ways possible for doing that, two ways we had used in the past.

One was to put right on the leave and earnings statement, which would show the amount of

WAYNE A. COLEMAN

money the employee was receiving for that particular pay period, a note in the bottom right-hand corner, which would indicate what any additional payments might be.

So, it would be, if that methodology were used, then it would say something to the effect that this represents back overtime for a 6th day of training plus interest on the money owed.

**Q And what was the second option?**

A Second option would be to have a memo, one page memo included with the leave and earning statement, which would explain essentially the same thing, perhaps in a little more detail, that this was you know, back payment for your attendance at the 6th day of training during the period that you were at FLETC, something to that effect.

Now, as I say, since I was not there at that point I don't know which method was used, but I am assuming that they would have done something. It is not a good thing to send out a payment to an employee and not have them understand what that is.

MR. SWEENEY: We would request at this point, whatever was sent out with the payment, if it was something, a statement, the first option, the





WAYNE A. COLEMAN

general language is fine, if it was a cover memo, a copy of the cover memo, not for each plaintiff but the language that did go out, I don't think that is included in any discovery.

MR. PEASE: Objection to your request.

BY MR. SWEENEY:

**Q Now, you said you would include that with the leave and pay statement; is that correct?**

A That is right.

**Q What if someone had left INS and received the payment, would they have received the same information?**

A Yes, typically they would. One of the things, the way the hard copy checks are issued, they might not have received the check and the notification, however, in the same envelope. There might have been two envelopes.

I know when we have done other payments for back payments of one sort or another, that quite often we have sent the check in one envelope and followed it with or preceded it with a memo that explained why the payment was being sent.

**Q Why is it done in that way?**

A Because one arm of the government sends





WAYNE A. COLEMAN

the actual hard copy checks and another one would send the memo, and it is not possible under the current setup to merge those two pieces together in one envelope.

MR. SWEENEY: We would request at this point, if there was a memo that went out to people that were no longer employed by the INS, that a copy of that memo be produced. Again, it doesn't have to be for everybody, but a copy of that memo.

MR. PEASE: Same notation.

(9:55 a.m. -- recess -- 10:05 a.m.)

BY MR. SWEENEY:

**Q I would like you to take a look at a document that was produced, not in this case but in the Porta case, and have you take a look at it. Specifically I am going to ask you to look at page 1149; the rest of it may be helpful for context. I only have one copy of it.**

MR. PEASE: I can go make some copies.

MR. SWEENEY: If he is comfortable with this we can mark it as an exhibit an then have copies back later.

Really the only part I am going to ask you about is 1149.





WAYNE A. COLEMAN

THE WITNESS: Okay.

BY MR. SWEENEY:

**Q Do you know what that document is?**

A Yes, it is a chapter in the administrative manual for the Immigration and Naturalization Service.

**Q Do you know if that is a current chapter?**

A I don't believe it has been superseded at this point.

**Q Do you know, would that have been in effect in January of 2002, to the best of your knowledge?**

A Since it was approved in 1998, yes, I believe it was.

**Q Does that, that section is entitled responsibilities, general overtime, that is right?**

A Yes.

**Q Is that an accurate description of the responsibilities for general overtime?**

A Well, it certainly was the intention when it was signed, yes.

**Q And was that the way it worked at the INS back in January of 2002?**

A As far as I know, yes.

WAYNE A. COLEMAN

not an OPM requirement, so there is no poster, as there is Department of Labor-covered employees, that needs to be posted.

**Q And it is your understanding that it is not posted, is that what you are saying?**

A Well, since there is no requirement to do that, federal employers do not so far as I know. I know that within the INS facilities I have visited personally there is no posting like that.

**Q Have you ever visited the FLETC?**

A Yes, I have.

**Q And do you know if there is a posting of those posters at FLETC?**

A Not that I saw. Now, I would say that the training that supervisors receive typically includes information about overtime and premium pay under the federal regulations. So, the supervisors are made aware of these authorities and the entitlements that employees have.

We would expect in turn that they would share that information with the employees that they supervise. So, it is more of that sort of diffusion of the knowledge rather than something being broadcast in a written format.





WAYNE A. COLEMAN

**Q And do you or are the supervisors charged with disseminating FSLA information to employees?**

A When you say charged --

**Q I am just trying to figure out if there is any way that INS affirmatively tells its employees about its FLSA rights. You just said supervisors are trained in that way. Are they told then to impart that information to their supervisees or is that information simply in case there is a question asked?**

A I don't know that there is a direct order given to these folks to brief their employees on this, but clearly overtime and premium pay is an issue that is of interest to employees. And, along with things like their benefits, for example, supervisors would normally make them aware of that as issues came up.

**Q Would a supervisor make them aware of those rights if the employee didn't ask about them?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: I really can't say. Some supervisors probably did, some didn't. Supervisors vary in their practices across the agency.





WAYNE A. COLEMAN

BY MR. SWEENEY:

**Q Is there a requirement that supervisors tell employees about their FSLA rights regardless of whether the employees ask?**

A No.

**Q When you say the supervisors are trained with respect to the Fair Labor Standards Act, what does that training consist of?**

A I can't speak personally to that. I know that there is some information provided in the basic supervisory course that supervisors go through down in Dallas, and the specifics of it I have not seen, but I understand that there is a module that deals with premium pay and overtime.

One of the things that really isn't relevant here, is the fact that employees under the Immigration and Naturalization Service were entitled to a special separate overtime provision, which provided them a double overtime payment on a basic time period basis, rather than on an hourly basis, and employees were much more concerned with that overtime system than they were with anything else, because it was such a generous system that it kind of overtook all of the other entitlements that they





WAYNE A. COLEMAN

might have had under overtime.

**Q Would you explain the double overtime system?**

A The 1931 act provided for double overtime payment for employees who were performing Immigration Officer work, and it was paid on a period basis. So, for every period there was 2 hours or less, or up to 2 hours in length they were paid for 4 hours worth of overtime.

**Q Would that apply during basic training?**

A If they had performed Immigration Officer work, yes. I mean, there was a definite definition of what that work entailed in the statute that established this provision.

**Q And did people at FLETC doing basic training typically perform that type of work?**

A No, they did not. It would have required that they would have at a minimum been through and passed the basic training before they would have been entitled to perform those duties, number one, have been able to perform those duties, and therefore, begin to earn that kind of overtime.

**Q So, would it be your assumption that the people that are, were training at FLETC during their**

WAYNE A. COLEMAN

**basic training at FLETC would not have been entitled to the double overtime?**

A That is right.

**Q This module down in Dallas, is it your understanding there was written material with respect to the module?**

A I know there was a module. I don't know exactly what it was composed of, something written or what. It was something we were trying to work with the Dallas office, the Dallas training center, to let -- to get us involved in formatting that and putting it together and in providing them with current information so that they would have more up-to-date information, and some real-life examples of how this might apply in a port, in a Border Patrol station, you know, wherever.

**Q Who did you work with doing that?**

A I didn't personally. Fred Tingley was the one who was reaching out to the Dallas Training Center.

**Q What was the Dallas Training Center?**

A They were the part of INS that provided supervisory training.

MR. SWEENEY: I would request the





WAYNE A. COLEMAN

production of that module. If there is a written version of the module or any documentation with respect to it, request production of it.

MR. PEASE: Same objection.

BY MR. SWEENEY:

**Q I will ask you to take a look at a document that has been submitted in this case. It has been marked MOR 1, 2, 3. We will have this document marked as Plaintiff's No. 21.**

**(Plaintiff's Exhibit 21 identified.)**

**BY MR. SWEENEY:**

**Q Do you know what this document is?**

A The title says declaration of Alethea Smalls.

**Q Have you seen this before?**

A Yes, I have.

**Q When was the last time you saw it?**

A Actually, the first time I saw it was probably less than a week ago.

**Q How did you get it?**

MR. PEASE: Objection; to the extent that it reveals any attorney-client communications or attorney work product.

MR. SWEENEY: Certainly any documents you





WAYNE A. COLEMAN

give him to prepare for the deposition.

BY MR. SWEENEY:

**Q I mean I am not asking you for any oral communications or written communications from your counsel, but counsel did give you documents. We went through this yesterday, the documents that you reviewed in preparation for this, those are discoverable, and we would like to know what they are. Is this a document that your lawyer gave you to prepare for the deposition?**

A Yes.

**Q Are there any other documents that your lawyer gave you to prepare for the deposition?**

A No.

**Q This is the only one?**

A This is the only one.

**Q Did you review this document?**

A Yes, I did.

**Q A couple of questions. First, Ms. Smalls, in paragraph 5 talks about your September 24th, 2004 declaration; do you see that?**

A Yes.

**Q Exhibit 2, if you look at Exhibit 2 which is the Declaration that was submitted in this case,**





WAYNE A. COLEMAN

**if you would look back on the 4th page of that, which is your signature on the declaration, is that your signature?**

A Yes.

**Q What is the date on that, the execution date?**

A 14th of October.

**Q Is it your understanding that you executed that only the 14th of October 2004?**

A Yes, it is.

**Q Have you any idea why Ms. Smalls would have listed September 24, 2004 declaration?**

A There were a couple of earlier drafts of this and as a result of that she may have been referring to one that I completed on that date, I don't know. That would be the assumption I have, though.

MR. SWEENEY: We would ask for the production of the earlier drafts of Mr. Coleman's declaration?

MR. PEASE: Same proviso as to the request, whether we will produce it or not produce it.

BY MR. SWEENEY: