# GETMAN LAW OFFICE

9 Paradies Lane
New Paltz, NY 12561
845-255-9370
fax 845-255-8649

Attorneys:
Dan Getman
Tara Bernstein
Michael J.D. Sweeney
Garry G. Geffert*
Edward Tuddenham*
*Of Counsel

Paralegals:
Anibal R. Garcia
Janice Pickering
Carolyn Mow
Kathy Weiss

December 15, 2006

Jeffery S. Pease
United State Department of Justice
Commercial Litigation Branch-Civil Division
1100 L Street, NW
Room 12018
United State Department of Justice
Washington, DC 20530

Re: *Moreno v. United States; No. 05-142 (Fed. Cl.) (Judge Nancy B. Firestone*)

Dear Mr. Pease:

The Plaintiffs previously asked that the Defendant produce certain information that was identified during the 30(b)(6) deposition in this matter on November 2 and 3, 2006. You responded that you "require a formal discovery request" to address production. The information that the witness identified is responsive to formal document requests already propounded on the Defendant and expounded upon at length in my September 18 letter to you. See for example, Document Requests 1, 4, 8, 9, 10, 13, 14, 15, 18, 19, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31. It should have been produced before the deposition. Given the Defendant's failure to produce the information in response to those formal requests, propounded in May 2006, it is difficult to understand what another formal request would accomplish other than waste time and resources.

If searches have been made for the information and all responsive material produced or listed in a privileged log, please state that. If the searches have not been made, please let me know when they will be made and that all responsive material will be produced or listed in a privilege log. If the Defendant has a specific objection to conducting a search or producing specific information, please make that objection so that we can bring it to Judge Firestone and get the matter resolved quickly. As the discovery deadline is fast approaching, please respond as soon as possible.

Thank you.

Sincerely,

/s

Michael J.D. Sweeney

Attachments

GETMAN LAW OFFICE

9 Paradies Lane
New Paltz, NY 12561
845-255-9370
fax 845-255-8649

Attorneys:
Dan Getman
Tara Bernstein
Michael J.D. Sweeney
Garry G. Geffert*
Edward Tuddenham*
*Of Counsel

Paralegals:
Anibal R. Garcia
Janice Pickering
Carolyn Mow
Kathy Weiss

December 15, 2006

Jeffery S. Pease
United State Department of Justice
Commercial Litigation Branch-Civil Division
1100 L Street, NW
Room 12018
United State Department of Justice
Washington, DC 20530

Re: *Moreno v. United States; No. 05-142 (Fed. Cl.) (Judge Nancy B. Firestone*)

Dear Mr. Pease:

At the deposition of Vicki L. Draper on November 30, 2006, the Plaintiffs requested that she identify the person in the pay and leave administration group that maintains the "pay list server". She indicated that she would find out that name and provided to us through her attorneys. Please let me know when you will provide that name to us. Given the impending discovery deadline, please produce the name as quickly as possible.

Ms. Draper also identified information that should have been produced in discovery prior to the deposition. The information that Ms. Draper identified has already been requested in formal document requests–the Plaintiffs' original document requests and the revisions set forth in my September 18, 2006 letter to you. See, for example, Document Requests 18, 19, 20, 21, 22, 23, 24, and 25. We again requested production of the information at the deposition. I am reiterating those requests in this letter by attaching those portions of the transcript that requested the production.

If searches have been made for the information that Ms. Draper identified and all responsive material produced or listed in a privileged log, please state that. If the searches have not been made, please let me know that they will be made, when they will be made, and that all responsive material will be produced or listed in a privilege log. If the Defendant has a specific objection to conducting a search or producing specific information, please make that objection so that we can bring it to Judge Firestone and get the matter resolved quickly.

Thank you.

Sincerely,

/s

Michael J.D. Sweeney

Attachments

VICKI L. DRAPER

right?

A Right.

Q Was the CPM typically more detailed than a Q and A?

A Yes.

Q Was it typically more detailed than a fact sheet?

A Yes, it could be.

THE WITNESS: Can we take a stretch break?

MR. SWEENEY: Absolutely. In fact, it is a great time to do it. I am just checking off all the things we have done so we can go on to the next one.

(Recess.)

BY MR. SWEENEY:

Q Ms. Draper, just to clear something up, I think earlier when I asked you about the case, I had mentioned the Porta case but, indeed, this is not the Porta case, this is the case of Moreno versus the United States.

A Okay.

Q Is that your understanding?

A Yes.

Q And, indeed, that is the case.





VICKI L. DRAPER

A Okay.

Q Just want to follow up on a couple of things that we discussed before the break. When OPM -- when you are called for advice and give advice, do you disseminate that advice to anyone other than the person that called you seeking advice?

A No.

Q If someone sends you an e-mail seeking advice and you respond to that e-mail, do you disseminate that advice to anyone other than the person that sought the advice from you?

A No.

Q When OPM gets a letter from an agency seeking guidance or advice and OPM responds to that letter, does OPM disseminate that letter to anyone other than the party that sought the advice?

A No.

Q If OPM wants to disseminate advice more broadly than just to the agency or individual that sought the advice, how do they do that?

A A CPM memo --

Q Okay.

A -- or guidance on our Web site in the form





VICKI L. DRAPER

of a fact sheet or a question and answer.

Q And how is a CPM memo disseminated?

A It is e-mailed -- are you talking about the time frame during the case?

Q Again, we are still in this January 1st, 2002, to the fall of 2003.

A Okay. At that time I believe they were still mailed to the agencies.

Q So a hard copy was mailed to the agency?

A Hard copy was mailed.

Q And when you say, "agency," are you talking again that the hard copy would have been mailed to the Department of Homeland Security?

A Correct.

Q Would it have been mailed to any bureaus within the Department of Homeland Security?

A No.

Q Okay. So dissemination within the Department of Homeland Security would be left to the Department of Homeland Security; is that correct?

A I don't know. I would assume so, yes.

Q Okay.

A It is not done by OPM.

Q And how many agencies does OPM serve?





VICKI L. DRAPER

A All executive departments.

Q Do you know how many that is?

A I don't know a number, no.

Q Okay.

A All agencies that are covered by Title 5, basically.

Q Okay. Is there any other way that a CPM memo is disseminated from OPM?

A Back then?

Q Yes.

A No.

Q Posted on the Web site?

A Yes.

Q Okay. And when it was posted on the Web site, was there any notice of the posting that was disseminated?

A No.

Q So you said another way that OPM could disseminate guidance was via the Web site; is that right?

A Right.

Q So you could do a fact sheet or a Q and A on the Web site?

A Right. Just remember, we have a pay list

VICKI L. DRAPER

server. It is a list server that sends out guidance to certain agencies that have subscribed to it. We have quite a few subscribers. I don't know the exact number. But we also send out our guidance, whether it be the fact sheet or the Q and A or the memo, via the list server.

**Q Okay. And was this list server up and running in January of 2002?**

A Yes.

**Q Okay. And who maintains the list server?**

A I don't know.

**Q It is OPM's list, though?**

A Yes. Yes.

**Q And do you know what office maintains it?**

A Well, it is our list server.

**Q Okay.**

A The Pay and Leave Administration Group's list server.

**Q And do you know who in your group maintains the list?**

A I don't know.

**Q Can you find that out for us?**

A Yes.

**Q Okay. I would ask you to find out who**





VICKI L. DRAPER

**that person is and, through your attorneys, supplement that name, if you can find it.**

A Okay. You mean the person that actually sends the information?

**Q The person that maintains the list, so the person that would maintain the people that are on the list served. If someone requests to be on the list, puts that name in there, someone requests to be off the list, takes the name off the list. What we are really -- what I am really looking for is to try and find out who is on the list. So my hope, at least, is that whoever maintains the list is someone that might be able to provide that information.**

A Okay.

**Q Do you know if Mr. Wayne Coleman is on the pay list served?**

A I don't know.

**Q Do you know if Alethea Smalls -- well, let me do this again.**

**Again, we are talking about this period from January 1st, 2002, to 2003. Do you know if Mr. Coleman was on the list server during that period?**

A I don't know.





VICKI L. DRAPER

**Q Do you know if Ms. Alethea Smalls was on the list server during that period?**

A I don't know.

**Q Do you know if Mr. Fred Tingley was on the list server during that period?**

A I don't know.

**Q Do you know of any specific people that are on the list server?**

A No.

**Q And do you ever send an e-mail to that list served directly from your computer?**

A No.

**Q Who would send it out?**

A It is sent out by Kevin Kitchelt of our staff.

**Q And Kevin --**

A Did I list him before? Hopefully.

**Q No, I don't think Mr. Kitchelt is one of the people that you listed before.**

A Okay. I forgot him.

**Q Okay. So he is one of the other Human Resources --**

A Kevin Kitchelt; it's K-i-t-c-h-e-l-t.

**Q And is he one of the other Human Resources**





VICKI L. DRAPER

**specialists?**

A Yes.

**Q That works in your group?**

A Yes.

**Q So if you had something that you wanted to send out over the list server, you would send that to Mr. Kitchelt and Mr. Kitchelt would send it out; is that right?**

A Ms. Perrini is the only person who has the authority to direct what goes out over pay list server.

**Q Okay. So Ms. Perrini has to approve whatever it is to be sent out of the pay list server; is that right?**

A Correct.

**Q And Mr. Kitchelt actually does the sending; is that right?**

A Correct.

**Q And are you on the pay list server?**

A Yes, I am.

**Q So if something goes out, you receive it; is that right?**

A Yes, I do.

**Q And when you receive something from the**

VICKI L. DRAPER

A In our office?

**Q Yes.**

A Oh. No, I don't recall.

**Q Do you know what the guidance was that was given in response to that request?**

A It was the same guidance we gave to Mr. Wilson.

**Q And do you know what agency that guidance was?**

A State Department.

**Q And do you know the general time frame as to when that guidance went out?**

A I don't remember. I don't recall.

**Q And were you consulted?**

A No.

**Q Do you know of any other agencies that requested guidance on the issue?**

A I don't recall any others.

**Q At the time of Mr. Wilson's call, did you know that other agencies had people at FLETC going through a sixth day a week basic training?**

A No.

**Q Did you ask Mr. Wilson whether the sixth day a week schedule was a FLETC imposed or whether**





VICKI L. DRAPER

**it was a Forest Service?**

A He told me it was FLETC imposed.

**Q So was it your understanding that all the groups that were doing basic training at FLETC were going to a sixth day a week training?**

A All the law enforcement officers, yes.

**Q So was it your understanding that people from organizations other than the Forest Service were going through the sixth day a week training at the FLETC?**

A Yes.

**Q Did you do any research as to how the other agencies that were sending people for the sixth day a week training at FLETC were compensating?**

A No.

**Q Do you know if any other organizations that were sending people to FLETC for basic training were actually paying overtime for the sixth day of work?**

A I don't know.

**Q Did you know at the time?**

A No.

**Q Do you know now?**





VICKI L. DRAPER

A I believe they are paying it but I don't know.

**Q Do you know as you sit here today if during that period, January of 2002, there were other organizations that were paying their employees overtime for the sixth day of basic training at FLETC?**

A I did not know that and I don't know.

**Q Do you know if the State Department's request for guidance was a written request?**

A I don't know. No, I'm not sure.

**Q And you don't know who it went to?**

A I don't recall.

MR. SWEENEY: Okay. We have made a request for OPM documents with respect to any request for guidance on this issue, so if there are any documents that had to do with guidance on this issue from the State Department -- certainly Ms. Draper has testified that there are no documents with respect to Mr. Wilson's request --

THE WITNESS: Right.

MR. SWEENEY: -- but for the State Department request, those are documents that we would expect production of, indeed, have requested





VICKI L. DRAPER

the production of. If you are not going to produce them, please tell us. If they don't exist, please tell us. If you are going to raise an objection to them, please tell us that, too. We think that they are relevant and would like to get ironed out any problems with the production of them as quickly as possible.

And, again, that same instruction; if you would mark on the transcript where these requests are made.

While we are at it, I would also request any documents in the filing cabinet that Ms. Draper described that have historical documents for the OPM. I think there were CPM memos and letters from -- Civil Service Commission letters, right, were kept in those files.

BY MR. SWEENEY:

**Q What do you call those files?**

A Subject matter files.

**Q Subject matter files.**

A Uh-huh.

MR. SWEENEY: Okay. I would ask the production of any documents in the subject matter files that have to do with Part -- Section 551.423,

VICKI L. DRAPER

Section 551.421, and Section 610.111, all of Title 5 of the Code of Federal Regulations. Again, those are documents that I believe would fall under the initial document request. If those are documents that you are not going to produce, please let us know and let us know the basis of not producing them so, again, we can get that ironed out and get that discovery taken care of.

MR. RAYEL: Again, just to reiterate, in all of these requests, they need to be part of an unobjectionable formal discovery request.

MR. SWEENEY: I appreciate that. These requests have been made in the original discovery requests and, as far as I know, there has not been objections raised to these. If there are objections raised to them, please specify them and let us know so that we can bring any issues to the judge and get it ironed out as quickly as possible.

BY MR. SWEENEY:

**Q Prior to Mr. Wilson raising the issue with you, are you aware of whether OPM had ever addressed the issue of whether regularly scheduled overtime during basic training should be compensated as FLSA overtime?**





VICKI L. DRAPER

A I don't know. I have no knowledge of that.

**Q Did you at any point make a search of the resources available to you to determine whether OPM had ever addressed the issue before?**

A No.

**Q Do you know if anyone in your office has made a search of the resources available to OPM to determine whether the issue had been addressed by OPM before?**

A During that time period?

**Q At any time.**

A Subsequent to that, yes.

**Q Who made that search?**

A Mr. Baker.

**Q Okay. And do you know what the result of his search was?**

A No.

**Q Do you have an understanding as you sit here today as to whether or not prior to January 1st of 2002 OPM had ever issued guidance on the specific issue of whether a regularly scheduled overtime during basic training was compensable under the FLSA?**





VICKI L. DRAPER

A Not to my knowledge.

**Q I think you said before that Mr. Baker later developed an understanding that the sixth day of training at the FLETC should be compensated as Fair Labor Standards Act overtime; is that right?**

A Yes.

**Q Do you remember when he developed that understanding?**

A Not exactly, no.

**Q Do you know generally when he developed the understanding?**

A It was sometime during 2002 but I do not remember exactly what month.

**Q Okay. Do you know if it was summertime?**

A I don't recall.

**Q Do you remember if it was long after -- how long after you gave the advice to Mr. Wilson?**

A I really don't remember.

**Q Do you remember how Mr. Baker developed the understanding?**

A In reviewing the regulation as part of our -- what we call a plain language rewrite project, he was looking at Part 551, specifically the FLSA hours of work issues, and he realized that





VICKI L. DRAPER

"regular working hours" was defined in 551.421 and determined that it meant training hours, as well as working hours.

**Q And at some point did he tell you about his findings?**

A Yes, he did.

**Q And that was sometime in 2002?**

A Yes, I believe it was.

**Q Okay. And when he told you, did you call Mr. Wilson back?**

A I don't recall. I think I did.

**Q On the phone?**

A I don't recall, to be honest.

**Q Did you take any other action as a result of discovering that your prior advice was incorrect?**

A I sent that e-mail to Gary Wilson telling him that I had made a mistake and gave him the right interpretation. I believe you have a copy of it.

**Q I do. If I can, I'll give you a copy of a document that's been Bates stamped Moreno 135 through 139, and would you take a look at that and let me know if you recognize that document.**

A Yes, I do.

**Q And is that the e-mail that you just**

GETMAN LAW OFFICE

9 Paradies Lane
New Paltz, NY 12561
845-255-9370
fax 845-255-8649

Attorneys:
Dan Getman
Tara Bernstein
Michael J.D. Sweeney
Garry G. Geffert*
Edward Tuddenham*
*Of Counsel

Paralegals:
Anibal R. Garcia
Janice Pickering
Carolyn Mow
Amanda K. Niknam

November 22, 2006

Jeffery S. Pease
United State Department of Justice
Commercial Litigation Branch-Civil Division
1100 L Street, NW
Room 12018
United State Department of Justice
Washington, DC 20530

Re: *Moreno, Jr. v. United States; No. 05-142 (Fed. Cl.) (Judge Nancy B. Firestone)*

Dear Mr. Pease:

At his deposition on November 2, 2006, Mr. Coleman, testifying as the Defendant's representative, identified several documents that should have been produced in discovery prior to the deposition. We requested production of the documents at the deposition. I am reiterating that request in this letter and attaching those portions of the transcript that requested the production. As these documents are long overdue, please produce them immediately.

Sincerely,

/s

Michael J.D. Sweeney

Attachments

WAYNE A. COLEMAN

E X H I B I T S (Continued)

| EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| Plaintiff's Exhibit No. 14 | 247 |
| Plaintiff's Exhibit No. 15 | 249 |
| Plaintiff's Exhibit No. 16 | 253 |
| Plaintiff's Exhibit No. 17 | 254 |
| Plaintiff's Exhibit No. 18 | 259 |
| Plaintiff's Exhibit No. 19 | 264 |

REQUEST LOG

| PAGE | LINE |
|---|---|
| 55 | 20 |
| 109 | 23 |
| 120 | 15 |
| 134 | 9 |
| 151 | 23 |
| 152 | 13 |
| 172 | 4 |
| 174 | 6 |
| 174 | 20 |
| 204 | 7 |
| 206 | 2 |
| 249 | 3 |
| 264 | 12 |

A I think it is Executive Associate Director.

Q For --

A Administration.

Q That would have been Rick Hastings' report?

A Yes. We mentioned that earlier. I don't remember his name.

Q But that person was within INS is that right?

A Yes, that is correct.

Q Anyone else, would anyone else have been involved in the decision not to pay the overtime?

A Well, I am sure that the director of the training staff for INS was involved in it.

Q Do you know who the director of the training staff was?

A No, I don't.

Q Could you find that out?

A I believe so.

MR. PEASE: Same objection as before.

MR. SWEENEY: I will ask the court reporter at these requests to mark these requests and after the deposition is over I will send you a

copy of the requests that we have, so that you have them.

MR. PEASE: That would be great.

BY MR. SWEENEY:

Q So, there are three people who made the decision, is that right; Rick Hastings, the Executive Associate Director of Administration to the INS and the Director of Training for the INS.

A Those would be the three people that I am aware of, yes. Now, if I am -- yes, those would be the three people I am aware of.

Q And they made this decision based on advice that you, Fred Tingley, Alethea Smalls and John Ehrbar passed to them, that is right?

A That is right.

Q And did Fred Tingley and Alethea Smalls have any expertise in overtime?

A Actually Fred is the one who taught me about overtime, and so yes, I would say he has quite a bit of expertise.

Alethea was a new employee, she had just come from the private sector and had an understanding of compensation from the private sector, with respect to -- but was learning the

respect to this Request for Production of Documents?

MR. PEASE: Objection; vague.

THE WITNESS: I don't believe so.

BY MR. SWEENEY:

Q Wouldn't have had any notes that you may have taken with respect to the issue of paying overtime for a 6th day of training at FLETC?

A No.

Q Would it have had any e-mails that contained any reference to the issue of paying overtime for the 6th day of training at FLETC?

A That is possible.

Q And who did you e-mail with, regarding the issue?

A Mostly the people that we have already discussed this morning.

Q So, might there exist an e-mail discussion on this issue between you and some of the other people that we discussed in morning?

MR. PEASE: Objection speculation.

THE WITNESS: I really don't know.

MR. SWEENEY: We at this point would make a request that that e-mail account as well as Mr. Tingley's, Alethea Smalls', Phil --

WAYNE A. COLEMAN

THE WITNESS: Seneschal.

MR. SWEENEY: Thank you, Seneschal, and Mr. Ehrbar's accounts be searched for any discussion of the relevant issues here and with respect to the Request for Production of Documents.

MR. PEASE: Again, same objection; if you will put it in writing.

MR. SWEENEY: It will come to you in the transcript.

MR. PEASE: As a formal discovery request.

BY MR. SWEENEY:

Q Do you know if once Mr. Hastings decided not to pay overtime for the 6th day of training if he memorialized that decision in any way?

A No, I am not aware if there was a memo or document created.

Q And again you have no recollection of creating a memo or document with your --

A No, I did not.

Q You testified before that it was your understanding that OPM changed its position with respect to paying overtime for the 6th day of basic training at the FLETC; is that right?

A That is correct.

A I am assuming that it went to the Executive Associate Director for Administration.

Q And that would have been, is that that name we don't have?

A That is a name we don't have, yes. It is not coming back.

Q Would Mr. Hastings have seen it?

A I would assume he would have.

Q Would Mr. --

A Seneschal.

Q -- Seneschal have seen it?

A I am not sure about that.

MR. SWEENEY: We would ask for the production of that memo, if it still exists. It is very relevant. If you can find a copy of it, terrific, or if anyone else has a copy of it?

MR. PEASE: Same in terms of a document request, and it is privileged, and require a request in writing --

MR. SWEENEY: Of course if it is privileged, it will show up in the privileged documents.

MR. PEASE: Privileged documents, exactly.

BY MR. SWEENEY:

itself that the e-mail referred to, so there would be a link from the e-mail to whatever the document was, and again typically that was the CPM.

Q And did you have a name that you gave these types of alerts that came from OPM?

A I am sure OPM does, but I don't remember off the top of my head what it might be.

MR. SWEENEY: We would ask for the production of those e-mail alerts from the period of January 1st of 2002 through the period of January of 2005.

MR. PEASE: Same request, that would be properly brought under the rules.

BY MR. SWEENEY:

Q You also say in your declaration that you conducted a review of the compensation policy memorandum issued during 2003-2004 which were available on the OPM web site?

A That is correct.

Q Do you remember when you did that?

A Probably shortly before writing this.

Q So, you didn't do it in 2003; is that right?

A We would -- as I said, when an alert would

Q Why were you passing this -- well, first of all, did you pass this to anyone else?

A I probably shared it with the folks within my office.

Q Who were they?

A Fred Tingley, Alethea Smalls. Let's see this is 2003, it would still be Phil Seneschal.

Q And Mr. Hastings as well?

A Phil probably would have shared it with him, yes.

Q Would you have shared it with him via e-mail?

A Yes.

Q So, somewhere there may exist a record of your sending this via e-mail to Ms. Smalls, Mr. Tingley and Mr. Hastings and Mr. Seneschal?

A That is possible. I can't really answer that for sure.

Q But to the best of your recollection you he mailed this to them; is that right?

A I believe I did, yes.

MR. SWEENEY: We would ask that Mr. Coleman's e-mail accounts, if they have not been already, are searched to ensure that any

correspondence having to do with the 6th day of training overtime is produced in the case.

MR. PEASE: Same objection with regard to the production of those. I will note that Moreno No. 33 includes an e-mail to those people, forwarding that information.

MR. SWEENEY: We will get there, but again, we are going to reiterate that clearly, clearly e-mails going back and forth on that, and unless there is some representation that those, it has been searched and that information has been produced, we would like a representation of that or a production of everything.

BY MR. SWEENEY:

Q Would you have sent this to anyone else other than the group you just talked about and Mr. Cahill?

A No.

Q As a result of this did you contact anyone at OPM?

A No, we did not.

Q Did you call Ms. Draper and ask her if this policy would apply to INS as well?

A Not that I recall, no.

Q Do you ever remember seeing a draft of it?

A I may have.

MR. SWEENEY: Ask the production of that memo. It doesn't seem to have made it to the production.

BY MR. SWEENEY:

Q Do you know where that memo would be kept?

A I have no idea.

Q Do you know who did the actual drafting?

A No, I don't.

Q Do you know, if you were pushed, who would you say did the, who would you suppose did the drafting of the memo?

MR. PEASE: Objection; calls for speculation.

MR. SWEENEY: He is perfectly capable of speculating, and it is a 30(b)(6) deposition.

Go ahead.

THE WITNESS: I would suspect it is somebody on the compensation team.

BY MR. SWEENEY:

Q On your team?

A Yes, or Fred or Alethea or Phil Seneschal.

Q Seneschal, okay.

WAYNE A. COLEMAN

A Yes.

Q But that isn't the memorandum that would have been attached to this; that is right?

A No.

Q We are looking for production of that memorandum to DOJ.

There also would have been a memorandum from DOJ back to INS in response; is that right?

A I believe that is correct.

Q And that memorandum would not have been attached here necessarily; is that right?

A That is correct.

Q We are also seeking that memorandum in discovery.

And then what this routing sheet is about, it is a memorandum explaining to the management team DOJ's response, is that right?

A That is right.

Q And we are looking for production of that memorandum as well.

Can you tell from this document whether or not the memorandum ever went out?

A I would have to assume it did since George Bohlinger's signature or initials are there and the

WAYNE A. COLEMAN

DHS employees, and so the redaction is the Privacy Act to avoid revealing people in the system, under the Privacy Act, that wouldn't be related to the case.

MR. SWEENEY: Okay. We would ask then that given that is the purpose of the redaction that anyone who is related to the case be unredacted.

So do you know any of the people whose --

MR. RETTINGER: May I? There is only one person on there that might have been related.

MR. PEASE: I am happy to put that on the record. The location that this electronic mail was found was in Fred Tingley's files and, although I don't believe he was in that redacted portion, because it was truncated, that was the one person we know was -- received this.

BY MR. SWEENEY:

Q In the "to" line here there is some thousands of names is what you are saying?

MR. PEASE: In the printed version that we had there were not thousands of names, there were what appeared to be the beginning of a list. I believe started with A, to go forward and the Privacy Act reaction was they were just unrelated

WAYNE A. COLEMAN

MR. SWEENEY: I would be happy with the representation that a DHS Broadcast goes out to all the employees at this time --

MR. PEASE: I think you are better off asking Mr. Coleman about that, since this is a 30(b)(6) that is probably the best way to go about it.

BY MR. SWEENEY:

Q Who does a DHS Broadcast go out to?

A As has been said, all employees.

Q Within DHS?

A Yes, I am sorry.

Q So, would you have received this at this time?

A Yes.

Q Now, this says it is forwarded on behalf of The Human Resources Management?

A Yes.

Q Who is Human Resources Management?

A The Office of Human Resources Management for ICE; by this time it would be ICE.

Q So, this is the human resources for ICE, not for all of DHS?

A No. But what you have to understand is

A That is correct.

MR. SWEENEY: Request production of the final memorandum that went out.

MR. PEASE: Same instruction.

MR. SWEENEY: Appreciate that.

I show you a document that has been marked MOR-47 and 48.

(Plaintiff's Exhibit 15 identified.)

BY MR. SWEENEY:

Q Do you recognize this document?

A Yes.

Q What is this?

A This is a request from Rick Hastings who was essentially director, the title was Workforce Management, but Director of Human Resources for ICE, going to Terance Cook, who was Assistant Director for Justice Management Division at the Department of Justice, requesting that a reimbursable agreement be established to have you USDA National Finance Center compute and pay back overtime, back FSLA overtime to the 6th day training folks.

Q And in here he says, if you look down to the paragraph that begins, "The ICE has a requirement --" the last full paragraph in the page?

WAYNE A. COLEMAN

44 and 45 is a reimbursement agreement?

A Well, it certainly is discussing reimbursable agreement. That is the subject line that is on page Moreno 44.

As to whether or not this is the actual reimbursable agreement, I guess I really can't answer that of my own knowledge. It certainly appears to be one to me, but whether or not there is more to this document or not, I don't know.

MR. SWEENEY: Well, if there is an additional reimbursable agreement, we would like to have that produced, and I believe it would be an important part, as well as the payroll action request.

MR. PEASE: Same instruction, I apologize for interjecting. I just wanted to make sure we are clear, just from looking at the face of the document.

BY MR. SWEENEY:

Q I show you another document that has been marked Moreno 23 and 24. Mark this as Exhibit Plaintiff's Exhibit 19.

(Plaintiff's Exhibit 19 identified.)

BY MR. SWEENEY:

WAYNE A. COLEMAN

C O N T E N T S


| WITNESS | EXAMINATION |
| --- | --- |
| WAYNE A. COLEMAN | |
| By Mr. Sweeney | 284 |


E X H I B I T S


| EXHIBIT NUMBER | IDENTIFIED |
| --- | --- |
| Plaintiff's No. 20 | 327 |
| Plaintiff's No. 21 | 335 |
| Plaintiff's No. 22 | 341 |


REQUEST LOG

| PAGE | LINE |
| --- | --- |
| 313 | 5 |
| 322 | 23 |
| 324 | 6 |
| 334 | 25 |
| 337 | 19 |

WAYNE A. COLEMAN

they were discussing it among themselves, they would share the name, and if somebody else decided they wanted to contact us they would come in that way.

MR. SWEENEY: Based on that we would like the e-mails regarding this issue of back payment.

MR. PEASE: Same instruction.

BY MR. SWEENEY:

Q The employees that contacted you, were some of them -- well, strike that.

Were all of them employees who had trained for the 6th day?

A Typically employees would call while they were at Glencoe or shortly after they returned.

Q Did you ever get called by a supervisor who had been, ever called or contacted by e-mail by a supervisor who was fielding questions from people he was supervising, or she was supervising?

A I don't remember specifically receiving that kind of a call but it wouldn't be unusual.

Q And did you ever, do you remember ever getting a call from the supervisor at FLETC asking about this issue because they were fielding questions from employees?

A We did have calls from folks at FLETC,

WAYNE A. COLEMAN

money the employee was receiving for that particular pay period, a note in the bottom right-hand corner, which would indicate what any additional payments might be.

So, it would be, if that methodology were used, then it would say something to the effect that this represents back overtime for a 6th day of training plus interest on the money owed.

Q And what was the second option?

A Second option would be to have a memo, one page memo included with the leave and earning statement, which would explain essentially the same thing, perhaps in a little more detail, that this was you know, back payment for your attendance at the 6th day of training during the period that you were at FLETC, something to that effect.

Now, as I say, since I was not there at that point I don't know which method was used, but I am assuming that they would have done something. It is not a good thing to send out a payment to an employee and not have them understand what that is.

MR. SWEENEY: We would request at this point, whatever was sent out with the payment, if it was something, a statement, the first option, the

general language is fine, if it was a cover memo, a copy of the cover memo, not for each plaintiff but the language that did go out, I don't think that is included in any discovery.

MR. PEASE: Objection to your request.

BY MR. SWEENEY:

Q Now, you said you would include that with the leave and pay statement; is that correct?

A That is right.

Q What if someone had left INS and received the payment, would they have received the same information?

A Yes, typically they would. One of the things, the way the hard copy checks are issued, they might not have received the check and the notification, however, in the same envelope. There might have been two envelopes.

I know when we have done other payments for back payments of one sort or another, that quite often we have sent the check in one envelope and followed it with or preceded it with a memo that explained why the payment was being sent.

Q Why is it done in that way?

A Because one arm of the government sends

the actual hard copy checks and another one would send the memo, and it is not possible under the current setup to merge those two pieces together in one envelope.

MR. SWEENEY: We would request at this point, if there was a memo that went out to people that were no longer employed by the INS, that a copy of that memo be produced. Again, it doesn't have to be for everybody, but a copy of that memo.

MR. PEASE: Same notation.

(9:55 a.m. -- recess -- 10:05 a.m.)

BY MR. SWEENEY:

Q I would like you to take a look at a document that was produced, not in this case but in the Porta case, and have you take a look at it. Specifically I am going to ask you to look at page 1149; the rest of it may be helpful for context. I only have one copy of it.

MR. PEASE: I can go make some copies.

MR. SWEENEY: If he is comfortable with this we can mark it as an exhibit an then have copies back later.

Really the only part I am going to ask you about is 1149.

WAYNE A. COLEMAN

basic training at FLETC would not have been entitled to the double overtime?

A That is right.

Q This module down in Dallas, is it your understanding there was written material with respect to the module?

A I know there was a module. I don't know exactly what it was composed of, something written or what. It was something we were trying to work with the Dallas office, the Dallas training center, to let -- to get us involved in formatting that and putting it together and in providing them with current information so that they would have more up-to-date information, and some real-life examples of how this might apply in a port, in a Border Patrol station, you know, wherever.

Q Who did you work with doing that?

A I didn't personally. Fred Tingley was the one who was reaching out to the Dallas Training Center.

Q What was the Dallas Training Center?

A They were the part of INS that provided supervisory training.

MR. SWEENEY: I would request the

WAYNE A. COLEMAN

production of that module. If there is a written version of the module or any documentation with respect to it, request production of it.

MR. PEASE: Same objection.

BY MR. SWEENEY:

Q I will ask you to take a look at a document that has been submitted in this case. It has been marked MOR 1, 2, 3. We will have this document marked as Plaintiff's No. 21.

(Plaintiff's Exhibit 21 identified.)

BY MR. SWEENEY:

Q Do you know what this document is?

A The title says declaration of Alethea Smalls.

Q Have you seen this before?

A Yes, I have.

Q When was the last time you saw it?

A Actually, the first time I saw it was probably less than a week ago.

Q How did you get it?

MR. PEASE: Objection; to the extent that it reveals any attorney-client communications or attorney work product.

MR. SWEENEY: Certainly any documents you

WAYNE A. COLEMAN

if you would look back on the 4th page of that, which is your signature on the declaration, is that your signature?

A Yes.

Q What is the date on that, the execution date?

A 14th of October.

Q Is it your understanding that you executed that only the 14th of October 2004?

A Yes, it is.

Q Have you any idea why Ms. Smalls would have listed September 24, 2004 declaration?

A There were a couple of earlier drafts of this and as a result of that she may have been referring to one that I completed on that date, I don't know. That would be the assumption I have, though.

MR. SWEENEY: We would ask for the production of the earlier drafts of Mr. Coleman's declaration?

MR. PEASE: Same proviso as to the request, whether we will produce it or not produce it.

BY MR. SWEENEY: