VICKI L. DRAPER

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x

ARTURO MORENO, JR., :

et al., : Civil Number

Plaintiffs, : 04-0899 (PLF)

vs. :

BUREAU OF U.S. :

CITIZENSHIP AND :

IMMIGRATION SERVICES, :

DEPARTMENT OF HOMELAND :

SECURITY, :

Defendant. :

- - - - - - - - - - - - - -x

DEPOSITION OF VICKI L. DRAPER

Washington, DC

Thursday, November 30, 2006

REPORTED BY:

VICTORIA L. WILSON

VICKI L. DRAPER

letter that I was referring to.

**Q Okay. Let's dig a little bit deeper on the letters that you were referring to. Does OPM keep a file of all the letters it has written giving guidance on issues?**

A Yes.

**Q And where is that file kept?**

A In my office. There are many, many file cabinets.

**Q And are you the keeper of those files?**

A No.

**Q And are those available to the public, generally?**

A No.

**Q Okay. And are those letters organized in any fashion?**

A Yes.

**Q And how are they organized?**

A They are organized -- they correlate to the number in the CFR, the chapter number, the part, like Part 551, Part 550, Part 531, just depends on which part of the CFR the subject or the topic relates to.

**Q Okay. So if a letter had to do with a**





**VICKI L. DRAPER**

**Fair Labor Standards Act issues, it would be under Part 551; is that right?**

A Yes.

**Q Okay. And then are the letters further organized into subdivisions?**

A Yes.

**Q And how are they organized into subdivisions from the part level?**

A Depending on the different subjects within Part 551, the different areas.

**Q So do they follow the same organizational structure as the Code of Federal Regulations does?**

A Yes.

**Q And are they referenced by regulation number?**

A Yes.

**Q Okay. So if you were looking for something that addressed the same issues that were in regulation 551.423, you could go into that file and identify letters that had been written that referenced that regulation?**

A Yes.

**Q And are those letters considered official guidance from OPM?**





**VICKI L. DRAPER**

A Yes.

**Q Okay. And is there a precedential value to them?**

A Yes.

**Q So if you went back and you looked at one of those letters and it was, you know, right on point, you would follow that advice; is that right?**

A Yes.

**Q And are those letters reviewed on a regular basis to see if they are obsolete?**

A No.

**Q So if the regulations changed, for instance, is there some process by which someone would go through and cull out those letters that may have been made obsolete from a change in the regulations?**

A No.

**Q So if you went back to those files to look for letters on a particular issue, do you some way check to see if those letters are addressing the current regulations?**

A Yes.

**Q And how do you do that?**

A I read the current regulation and compare





VICKI L. DRAPER

it to the content of the letter.

**Q Okay. And if you find there is some -- that they don't work together well, what do you do?**

A Then I don't use the letter. It may have been valid at that time when it was written.

**Q Yes.**

A So it is still a valid letter, it is still one of our historical documents that we would want to keep.

**Q And if you have a question about the validity of a letter, is there someone that you go to for guidance?**

A Yes.

**Q And who is that?**

A My supervisor.

**Q And that would be Ms. Perrini?**

A Jo Ann Perrini.

**Q And if she has a question with respect to a prior letter, the content of a prior letter, where would she go for guidance?**

A Bryce Baker.

**Q And if Mr. Baker couldn't resolve the issue, what would be the next place to go for guidance?**

A Yes.

**Q Okay. You have got to let me finish the question. I appreciate you know what it is, we just don't want --**

A Sorry.

**Q It is very typical so don't be sorry at all and I will keep reminding you.**

A Okay.

**Q Okay. Any other criteria as to when you would write rather than call?**

A No.

**Q And when you write to the office, Mr. Green's office, for advice, do you do that in a letter or an e-mail or how do you make the written request?**

A E-mail, primarily.

**Q Okay. Do you ever actually type out a memo and submit a formal written memo to them?**

A Occasionally, we have done inneroffice memos from Donald J. Winstead to James Green.

**Q Okay. And is that a more formal process?**

A It's a little more formal, yes.

**Q And do the memos ever go directly from you to Mr. Green?**







A No.

**Q So if you had an issue and it was worthy of a memo, you would have to go to Mr. Winstead and Mr. Winstead would then go to Mr. Green's office?**

A Formerly Mr. Winstead. He is now retired. But yes.

**Q And as we talk about this, we are going to be talking about this period again between January 1st, 2002, through the fall of 2003. That's really the relevant period here.**

A Okay.

**Q If I go outside that, I will try to make that specific.**

A Okay.

**Q If you ever have a question as to the time period, you let me know and we will resolve that.**

A Okay.

**Q So when you said that you go to Melanie Watson sometimes, was Melanie Watson in the office during that period?**

A Yes.

**Q And do you know why --**

A Excuse me. Let me correct that. I'm not sure if she was in the office that entire period.







Fall of 2003, she was, to my knowledge, but I'm not sure about the January 2002 date, whether or not she was at OPM or not.

**Q Okay. Do you know when the more formal process of a memo is used rather than e-mail or a telephone call?**

A I don't understand the question.

**Q Yes. I think what you just said is that sometimes you call, sometimes you write an e-mail for advice to Mr. Green's office, but sometimes a memo goes from Mr. Winstead to Mr. Green and that that's a more formal process.**

A Right.

**Q What I am asking is when does that more formal process happen as opposed to the informal one of a telephone call or an e-mail?**

A When the managers above me make that decision to do that.

**Q Okay. And are you involved in that decision?**

A No.

**Q Do you know the criteria of how that decision is made?**

A No.







**Q And when you say the managers above you, you are referring to Ms. Perrini or --**

A Ms. Perrini.

**Q -- or Mr. Winstead?**

A Mr. Winstead.

**Q During the relevant time period.**

A Correct.

**Q And are those memos filed somewhere?**

A Yes.

**Q Okay. And they are kept on a file?**

A Yes.

**Q Do you know where they are kept?**

A Yes.

**Q Where is that?**

A In our office.

**Q Okay. And in a filing cabinet?**

A In a filing cabinet, again, on the Code, Part 551, if it is related to that, or --

**Q Okay. So would a memo that had to do with a specific part of the Code of Federal Regulations go into that file that we talked about before?**

A Correct.

**Q So that file would contain letters, it would also contain memos?**

VICKI L. DRAPER

A Correct.

**Q Okay. And if Mr. Green's office responded to the memo in kind with another memo, would that memo go into that file, as well?**

A Yes.

**Q Okay. So we were talking about historical documents and you had talked about previous letters from OPM or the Civil Service --**

A Civil Service Commission.

**Q Civil Service Commission?**

A Uh-huh.

**Q And also these written memos that might go back and forth between your office and the legal department.**

A Right.

**Q Those would be in there, as well; right?**

A Yes.

**Q And those would be historical documents that you could refer to?**

A Correct.

**Q Any other historical documents that you could use in developing your guidance?**

A No.

**Q If you had previously sought advice in an**





VICKI L. DRAPER

**e-mail and advice came back, you had sought advice from Mr. Green's office in an e-mail and they e-mailed you back, would that e-mail go into that filing cabinet?**

A It may or it may just stay with the specialist who is working the case. In my case, I have separate files in my office that I maintain.

**Q Okay. And when that case is done, you resolve whatever the case is, what happens to that file?**

A I keep it.

**Q Okay. So the e-mail -- and do you keep in that file any e-mails that you get from Mr. Green's office --**

A Yes. Yes.

**Q -- with respect to the issue?**

A Yes.

**Q And when do you pass those e-mails -- what's the criteria for whether or not you pass those e-mails from your file to the more general filing system?**

A That would never happen.

**Q Okay. So the filing cabinets that we talked about that have these historical documents in**





VICKI L. DRAPER

**there would not have your e-mails in them; is that right?**

A That's correct. They are only for letters and memos.

**Q Only for letters and memos?**

A Correct.

**Q And are the CPMs kept in there, too?**

A We have a separate file just for CPMs.

**Q Okay. And what about the Q and As that are posted on the Web site, are they -- hard copies kept in the file?**

A No.

**Q And if a Q and A -- well, what about the fact sheets that are kept on the Web site, are those kept in that file?**

A No.

**Q Okay. Are the Q and As kept anywhere other than on the Web site?**

A No.

**Q And if a Q and A changes, does OPM keep a historical copy of the previous Q and A?**

A Not to my knowledge.

**Q Okay. And if a fact sheet changes, does OPM keep a historical copy of the prior fact sheet?**





VICKI L. DRAPER

A No.

**Q So I want to recap here a minute. So I think what you testified to is that if someone called you or e-mailed you seeking advice, someone from an agency, you would do some research in the CFR -- you would do some research, and you had available to you, if you thought you needed to go there, the CFR, the statute, Title 5, the historical documents, you could ask the attorneys for guidance. Any other resources that you had in doing that research to develop guidance?**

A The former FPM guidance --

**Q Okay.**

A -- that has now been sunset.

**Q And would you explain to me what the former FPM guidance is?**

A Okay. OPM used to publish Federal Personnel Manuals and Federal Personnel Bulletins prior to 1994 and they helped agencies understand the regulations. They were -- it is additional guidance to assist agencies in implementing OPM's regulations and they were written in plain English, they were very easy to understand, unlike the regulations in some cases, but they were all sunset

VICKI L. DRAPER

**function; is that right?**

A It is writing the policy, the regulations themselves.

**Q And are the regulations binding on the various agencies?**

A Yes.

**Q So when you draft a regulation, you are drafting binding authority --**

A Correct.

**Q -- on the agencies?**

A Correct.

**Q Agencies are required to follow that; is that correct?**

A Correct, if they are covered by Title 5.

**Q Okay. What I would like to do now is go -- do you understand that this case has to do with claims regarding overtime payments --**

MR. RAYEL: Objection; legal conclusion.

BY MR. SWEENEY:

**Q -- for the sixth day of training during a week at the FLETC?**

MR. RAYEL: Objection; legal conclusion.

THE WITNESS: Yes.

BY MR. SWEENEY:





VICKI L. DRAPER

**Q Okay. What I would like to do now is walk through the process of discussing how any OPM guidance on that issue was developed. I have some documents that I think will help. But I think probably a lot of it took place in other ways that, hopefully, you will be able to talk about.**

**The first thing I would like to ask is do you know if anyone solicited advice from OPM regarding the obligation to pay overtime on the sixth day of basic training of FLETC?**

A Yes.

**Q And do you understand that at some point, the FLETC began implementing a six-day-a-week training schedule for basic training?**

A Yes.

**Q And do you know when that began?**

A I don't know.

**Q Do you have an idea when it began?**

A I believe it began early in 2002.

**Q And, again, did OPM receive a request for guidance on how they should pay for that sixth day of training a week?**

A Yes.

**Q And do you remember when OPM first**





VICKI L. DRAPER

**received a request for guidance on that?**

A January 2002.

**Q And do you know who that request came from?**

A Gary Wilson from the Forest Service.

**Q And do you know who that request came to at OPM?**

A It came to our office.

**Q And when you say, "came to our office," did --**

A It was a phone call. He called.

**Q Do you know who he called?**

A He ended up talking to me.

**Q And do you remember how the conversation went?**

MR. RAYEL: Objection; vague.

THE WITNESS: Not verbatim. That was a little while ago.

BY MR. SWEENEY:

**Q I appreciate that was a little while ago. Your best recollection as to how that conversation went?**

A He asked if the sixth day of training constituted hours of work and whether or not they





VICKI L. DRAPER

were obligated to pay overtime pay.

**Q And did he send anything in writing to you on the issue?**

A No.

**Q Just a telephone call?**

A Right.

**Q And that was in January of 2002?**

A Correct.

**Q And did you respond to him in that telephone call, that first telephone call?**

A Not immediately, no.

**Q What did you say to him in that first telephone call?**

A I told him I wanted to read the regulations and that I would get back to him.

**Q And what, in fact, did you do after that telephone call?**

A I researched in Part 551 and read the regulations that were relevant to that issue.

**Q Do you remember what regulations you read?**

A 5 CFR 551.423(a)(3).

**Q Any others?**

A No.

**Q This may be a surprise to you but I have a**

VICKI L. DRAPER

**copy of 551.423(a) I would like to show you and this has already been marked as Plaintiff's Exhibit 1.**
**(Witness reviewed the document.)**
**Q Is this the regulation that you reviewed after the conversation with Mr. Wilson?**
A Correct; yes, it is.
**Q Okay. And is the only part that you reviewed here 551.423(a)(3)?**
A Yes.
**Q You did not review (a)(1); is that right?**
A Well, I read the entire thing but since he said it was entry level training, (a)(3) was applicable.
**Q Okay. But did you review the entire 423(a) section?**
A Yes.
**Q Okay. Do you know if you reviewed the (b) and (c) sections, as well?**
A I don't recall that I did.
**Q And if you look at 423(a)(3), it references the Veterans Readjustment Act, 5 CFR Part 307. Did you review that in response to Mr. Wilson's call?**
A No, because this was not training under





VICKI L. DRAPER

the VRA.
**Q Okay.**
A So it was not relevant.
**Q It also references Section 410.402(b). Did you review that section?**
A Yes, I did.
**Q Okay. And what does that section refer to?**
A That section refers to the exceptions for paying premium pay, including overtime, during training, while employees are in training.
**Q But those exceptions are not under the Fair Labor Standards Act, are they?**
A No. They are under Title 5.
**Q Which is the --**
A Which is --
**Q Do you know the name of that statute? Is it the Federal Pay and Leave statute?**
A Oh, that's the old name for it. FEPA, Federal Employees Pay Act.
**Q Okay. So regulation 410.402(b) is an implementation of FEPA; is that correct?**
A Correct.
**Q It also references here Section 551.401.**





VICKI L. DRAPER

**Did you review that section when you reviewed (a)(3)?**
A I don't recall.
**Q Do you know what 551.401 refers to?**
A I don't recall.
**Q Did you refer to any other documents or resources in response to Mr. Wilson's call?**
A I don't recall that I did, no.
**Q Do you know if you looked at the statute, Title 5?**
A No.
**Q Do you know if you looked at the Fair Labor Standards Act?**
A No.
**Q Do you know if you looked in the filing cabinet for any historical documents with respect to this Section 551?**
A No.
**Q Do you know if you spoke to anyone else for advice on the issue?**
A I believe I did speak with Jo Ann Perrini and Bryce Baker, yes.
**Q And how long after Mr. Wilson's call did you speak with Jo Ann Perrini and Bryce Baker?**





VICKI L. DRAPER

A That afternoon.
**Q Okay. And who did you speak to first?**
A I don't remember.
**Q And did you speak to Ms. Perrini and Mr. Baker after you had reviewed this regulation section?**
A Yes.
**Q Were you involved in drafting this regulation?**
A No. No.
**Q Do you know if Mr. Baker was involved in drafting the regulation?**
A Not to my knowledge, no.
**Q Do you know if Ms. Perrini was involved in drafting --**
A Not to my knowledge.
**Q And do you remember the gravamen of what you said to Ms. Perrini?**
A I said to her that I didn't believe that it was hours of work under the FLSA, our regulations, and that the only way they could pay overtime pay was to get an exception under 410.402.
**Q What did Mr. Wilson explain to you was the situation with respect to the basic training?**

VICKI L. DRAPER
A Right.
**Q What's your understanding now?**
A That it does constitute regular working hours if it is scheduled in advance of the administrative work week.
**Q And how did you come to that understanding?**
A Actually, it was Mr. Baker's realization.
**Q Okay. And do you know how he came to that realization?**
A He was reviewing Part 551 for a complete rewrite and he happened to realize that in 551.421, "regular working hours" was defined.
**Q And how is it defined?**
A I believe it is defined to mean -- it is part of your regular working hours if the hours are scheduled in advance of the administrative work week, the employee's administrative work week.
**Q And was that a regulation, 421, in effect in January 1st of 2002?**
A Yes.
**Q So if "regular working hours" was defined in the regulations at that time, how did you miss it?**





VICKI L. DRAPER
MR. RAYEL: Objection; argumentative.
BY MR. SWEENEY:
**Q Well, let me ask you this: Did you miss the definition of "regular working hours"?**
A I didn't miss it because it had been OPM's long-standing interpretation that any hours outside the 40-hour work week for entry level training was not part of their regular work schedule. It was outside the regular work hours.
**Q And --**
A That had been a long-standing interpretation.
**Q And how did you find out about that long-standing interpretation?**
A The old FPM letters.
**Q Okay. And which old FPM letter states that?**
A I believe it is 551-17.
**Q Surprise you again. I'm going to ask you to take a look at a document that's been designated as Plaintiff's Exhibit 2 in this matter and I'm going to ask you to go back to the fifth page. And is this --**
A Exhibit 1?





VICKI L. DRAPER
**Q Is this the FPM letter that you are referring to?**
A Yes, it is.
**Q Can you show me in this letter where it says that regular working hours are limited to 40 hours?**
A Not verbatim, no. It is not going to be spelled out in plain English like that.
**Q But it was spelled out in the regulations, though, wasn't it, that regular working hours includes any regularly scheduled hours even if they are over 40; is that right?**
A Well, it actually says that it is hours of work as scheduled under Part 610, and then you have to go to part 610 of the CFR and that's where it says that it is regularly scheduled work, and "regularly scheduled work" is defined in Part 610 to mean work that is scheduled in advance of the administrative work week.
**Q That's right. I think that's right. And, in fact, if you look at 610, also includes a specific reference to plus the period of regular overtime work, if any, required of each employee.**
A But this wasn't work. This was training.





VICKI L. DRAPER
See, the difference is training as opposed to work. These employees were not working, they were in training. They were producing no productive products, no productive work products. That's the difference.
**Q And does OPM define "work" to exclude training anywhere?**
MR. RAYEL: Objection; legal conclusion.
THE WITNESS: I think 551.423(a)(3), "provided no productive work is performed during such periods." If you are in training, you are not doing productive work; you are receiving training.
BY MR. SWEENEY:
**Q Okay. And where it says there that -- in (a)(3), it refers to "outside the regular working hours shall not be" -- I'm sorry -- it says, "Time spent outside regular working hours shall not be considered hours of work provided no productive work is performed"; is that right?**
A Right.
**Q Is it your understanding that productive work is part of the definition of regular working hours?**
MR. RAYEL: Objection; legal conclusion.

VICKI L. DRAPER

A In our office?

**Q Yes.**

A Oh. No, I don't recall.

**Q Do you know what the guidance was that was given in response to that request?**

A It was the same guidance we gave to Mr. Wilson.

**Q And do you know what agency that guidance was?**

A State Department.

**Q And do you know the general time frame as to when that guidance went out?**

A I don't remember. I don't recall.

**Q And were you consulted?**

A No.

**Q Do you know of any other agencies that requested guidance on the issue?**

A I don't recall any others.

**Q At the time of Mr. Wilson's call, did you know that other agencies had people at FLETC going through a sixth day a week basic training?**

A No.

**Q Did you ask Mr. Wilson whether the sixth day a week schedule was a FLETC imposed or whether**





VICKI L. DRAPER

**it was a Forest Service?**

A He told me it was FLETC imposed.

**Q So was it your understanding that all the groups that were doing basic training at FLETC were going to a sixth day a week training?**

A All the law enforcement officers, yes.

**Q So was it your understanding that people from organizations other than the Forest Service were going through the sixth day a week training at the FLETC?**

A Yes.

**Q Did you do any research as to how the other agencies that were sending people for the sixth day a week training at FLETC were compensating?**

A No.

**Q Do you know if any other organizations that were sending people to FLETC for basic training were actually paying overtime for the sixth day of work?**

A I don't know.

**Q Did you know at the time?**

A No.

**Q Do you know now?**





VICKI L. DRAPER

A I believe they are paying it but I don't know.

**Q Do you know as you sit here today if during that period, January of 2002, there were other organizations that were paying their employees overtime for the sixth day of basic training at FLETC?**

A I did not know that and I don't know.

**Q Do you know if the State Department's request for guidance was a written request?**

A I don't know. No, I'm not sure.

**Q And you don't know who it went to?**

A I don't recall.

MR. SWEENEY: Okay. We have made a request for OPM documents with respect to any request for guidance on this issue, so if there are any documents that had to do with guidance on this issue from the State Department -- certainly Ms. Draper has testified that there are no documents with respect to Mr. Wilson's request --

THE WITNESS: Right.

MR. SWEENEY: -- but for the State Department request, those are documents that we would expect production of, indeed, have requested





VICKI L. DRAPER

the production of. If you are not going to produce them, please tell us. If they don't exist, please tell us. If you are going to raise an objection to them, please tell us that, too. We think that they are relevant and would like to get ironed out any problems with the production of them as quickly as possible.

And, again, that same instruction; if you would mark on the transcript where these requests are made.

While we are at it, I would also request any documents in the filing cabinet that Ms. Draper described that have historical documents for the OPM. I think there were CPM memos and letters from -- Civil Service Commission letters, right, were kept in those files.

BY MR. SWEENEY:

**Q What do you call those files?**

A Subject matter files.

**Q Subject matter files.**

A Uh-huh.

MR. SWEENEY: Okay. I would ask the production of any documents in the subject matter files that have to do with Part -- Section 551.423,

VICKI L. DRAPER

Section 551.421, and Section 610.111, all of Title 5 of the Code of Federal Regulations. Again, those are documents that I believe would fall under the initial document request. If those are documents that you are not going to produce, please let us know and let us know the basis of not producing them so, again, we can get that ironed out and get that discovery taken care of.

MR. RAYEL: Again, just to reiterate, in all of these requests, they need to be part of an unobjectionable formal discovery request.

MR. SWEENEY: I appreciate that. These requests have been made in the original discovery requests and, as far as I know, there has not been objections raised to these. If there are objections raised to them, please specify them and let us know so that we can bring any issues to the judge and get it ironed out as quickly as possible.

BY MR. SWEENEY:

**Q Prior to Mr. Wilson raising the issue with you, are you aware of whether OPM had ever addressed the issue of whether regularly scheduled overtime during basic training should be compensated as FLSA overtime?**





**VICKI L. DRAPER**

A I don't know. I have no knowledge of that.

**Q Did you at any point make a search of the resources available to you to determine whether OPM had ever addressed the issue before?**

A No.

**Q Do you know if anyone in your office has made a search of the resources available to OPM to determine whether the issue had been addressed by OPM before?**

A During that time period?

**Q At any time.**

A Subsequent to that, yes.

**Q Who made that search?**

A Mr. Baker.

**Q Okay. And do you know what the result of his search was?**

A No.

**Q Do you have an understanding as you sit here today as to whether or not prior to January 1st of 2002 OPM had ever issued guidance on the specific issue of whether a regularly scheduled overtime during basic training was compensable under the FLSA?**





**VICKI L. DRAPER**

A Not to my knowledge.

**Q I think you said before that Mr. Baker later developed an understanding that the sixth day of training at the FLETC should be compensated as Fair Labor Standards Act overtime; is that right?**

A Yes.

**Q Do you remember when he developed that understanding?**

A Not exactly, no.

**Q Do you know generally when he developed the understanding?**

A It was sometime during 2002 but I do not remember exactly what month.

**Q Okay. Do you know if it was summertime?**

A I don't recall.

**Q Do you remember if it was long after -- how long after you gave the advice to Mr. Wilson?**

A I really don't remember.

**Q Do you remember how Mr. Baker developed the understanding?**

A In reviewing the regulation as part of our -- what we call a plain language rewrite project, he was looking at Part 551, specifically the FLSA hours of work issues, and he realized that





VICKI L. DRAPER

"regular working hours" was defined in 551.421 and determined that it meant training hours, as well as working hours.

**Q And at some point did he tell you about his findings?**

A Yes, he did.

**Q And that was sometime in 2002?**

A Yes, I believe it was.

**Q Okay. And when he told you, did you call Mr. Wilson back?**

A I don't recall. I think I did.

**Q On the phone?**

A I don't recall, to be honest.

**Q Did you take any other action as a result of discovering that your prior advice was incorrect?**

A I sent that e-mail to Gary Wilson telling him that I had made a mistake and gave him the right interpretation. I believe you have a copy of it.

**Q I do. If I can, I'll give you a copy of a document that's been Bates stamped Moreno 135 through 139, and would you take a look at that and let me know if you recognize that document.**

A Yes, I do.

**Q And is that the e-mail that you just**

VICKI L. DRAPER

**described?**

A Uh-huh. Yes.

**Q I would like to mark that document as Plaintiff's Exhibit 23. It is the same one that's the prior Moreno exhibit. I think we are up to 23. That's what my records show. You wouldn't know.**

MR. SWEENEY: But, Art, my understanding is that we are at Exhibit Number 23 in Moreno. Do you have any reason to doubt that?

MR. RETTINGER: I didn't bring the --

MR. SWEENEY: I just wanted to make sure you had no reason to doubt that. Let's leave it at 23.

MR. RETTINGER: Or 23A if it needs it.

MR. SWEENEY: Thank you.

(Plaintiffs' Deposition Exhibit 23 identified.)

BY MR. SWEENEY:

**Q Ms. Draper, this document is actually a series of e-mails; is that right?**

A Yes. Yes, it is.

**Q And the first e-mail, if you go back to page 137, begins an e-mail from a Claude Stribling. Did you ever speak to Mr. Stribling?**





VICKI L. DRAPER

A I don't recall whether I actually spoke to him or not.

**Q Do you have an understanding as to who Mr. Stribling is?**

A Based on this e-mail, he is a law enforcement officer at Hot Springs, North Carolina.

**Q Do you have any other basis for knowing who he is?**

A No.

**Q This was your only interaction with Mr. Stribling?**

A Yes.

**Q And Mr. Stribling originally sent his e-mail to a Shirley Bracey. Do you know who Shirley Bracey is?**

A I believe she works in OPM in one of our regional offices. Yes. It says, "Office of Personnel Management."

**Q And she is a Human Resources specialist; is that right?**

A That's what it says here, yes.

**Q But she doesn't work in your office?**

A No. She has an area code 919, so I'm not sure what region that is.





VICKI L. DRAPER

**Q And she recommended that Mr. Stribling contact the pay policy people in D.C.; is that right?**

A Correct.

**Q Is that you, your group?**

A My office, my group, correct.

**Q And, indeed, did Mr. Stribling send an e-mail, if you look on 136, to Pay Leave at OPM.gov?**

A Right.

**Q And do those e-mails eventually end up in your office?**

A That is a -- that used to be, it is now closed down, but that e-mail address came directly to our office.

**Q Okay.**

A It was like a general e-mail box.

**Q And somebody would monitor that?**

A Correct.

**Q And then divide out the requests that came in?**

A Correct. Correct. Yes.

**Q And did this request come to you?**

A Yes, it did.

**Q And do you know why it came to you?**





VICKI L. DRAPER

A Because it involved overtime pay.

**Q Okay. And you were the go-to person for overtime pay?**

A Yes.

**Q Do you remember receiving this e-mail?**

A Not really.

**Q Okay. It is dated December 17th, 2002. Do you remember responding to Mr. Stribling?**

A Yes, I do.

**Q And your response here is different than the response you gave to Mr. Wilson; is that right?**

A That's correct.

**Q How is it different?**

A It is different in that our interpretation changed based on Mr. Baker's review of the regulations and analysis of them and based on the fact that these -- the sixth day of training constitutes regular working hours because it was scheduled in advance of the administrative work week.

**Q Okay.**

A And so, then, overtime pay would be payable for the sixth day.

VICKI L. DRAPER

**Q Do you remember prior to this e-mail to Mr. Stribling ever sending advice to someone that the sixth day of overtime was compensable -- sixth day of training was compensable as FLSA overtime?**

A No.

**Q This was the first time that you offered this advice?**

A Yes. Yes.

**Q Do you know chronologically where this advice fell with respect to when Mr. Baker told you that he had discovered the regulations that would change the interpretation?**

A Not exactly, no. I just know it happened sometime in 2002. I cannot tell you the exact month or time frame.

**Q Well, could it have been February of 2002?**

A I don't recall.

**Q You have no specific recollection --**

A I do not. I do not.

**Q -- of when it happened?**

A No.

**Q But at least in December, on December 17th of 2002, you knew that that sixth day of basic training was compensable as FLSA overtime?**





**VICKI L. DRAPER**

A Yes.

**Q And before this time, you hadn't told anybody else, given anybody else guidance that they should be paying overtime for the sixth day of basic training at the FLETC?**

A No one asked.

**Q So you had knew that advice you had given prior to this was incorrect but you didn't tell anybody because they didn't ask; is that right?**

A No other agencies asked.

**Q Well, but the Forest Service had called you and asked in January of 2002; is that right?**

A Correct.

**Q And here we are 12 months later and, for the first time, you are giving guidance telling someone from the Forest Service that your prior advice was wrong.**

A Correct.

**Q Is it possible that Mr. Baker had told you in February that the prior advice was wrong and that you didn't let the Fire Service know until December?**

A No.

**Q Why not?**

A I would not have done that. I would have





VICKI L. DRAPER

called him immediately.

**Q Okay. So you then forwarded this e-mail -- well, okay. You responded to Mr. Stribling.**

A And he works for the Forest Service.

**Q And you copied Mr. Wilson on this; is that right?**

A Yes, I did.

**Q Okay. Is it your understanding that in copying Mr. Wilson on this, that this was the first time that you had let Mr. Wilson know that the interpretation had changed?**

A Yes.

**Q Okay. So would you assume that this was around the time that Mr. Baker had let you know that the interpretation was wrong?**

A Yes.

**Q Okay. So you probably wouldn't have known about this a lot earlier on?**

A Right.

**Q Okay. When you received Mr. Stribling's e-mail, did you tell Ms. Perrini about it?**

A I don't recall.

**Q Do you know if you told Mr. Baker about**





**VICKI L. DRAPER**

**it?**

A I don't recall but I must have.

**Q Do you know if you told anybody else about it --**

A No.

**Q -- prior to responding to it?**

A No.

**Q At the time that you learned that the initial interpretation was wrong, did you think that was a big deal?**

A Yes.

**Q Okay. And why?**

A Because it was a reversal of our interpretation.

**Q Okay. And do you know if Mr. Baker thought it was a big deal?**

A Yes, he did.

**Q Do you know if he had informed Mr. Winstead about it?**

A Yes, he did.

**Q Do you know if Mr. Winstead had informed anybody about it?**

A I personally do not know that.

**Q Okay. Do you have an understanding that**