IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ X

ARTURO MORENO, JR., )
individually and on behalf)
of others similarly )
situated, ) No. 05-142C
) Judge Firestone
)
Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )

Defendant.

------------------------------ X

Telephonic Deposition of Jerome Mikowicz
Thursday, January 11, 2007
Washington, D.C.

Job No.: 9926
Pages 1 - 297
Reported by: Kathy Savich, RPR

And the intervention of not only that he said that "I approve it" or "I clear it," and he said it's a draft, "I have reviewed and approved the draft," it now has to go through further steps.

And one of those steps became -- maybe not planned, but it became -- that there would be discussions with the major agency that had some issues, which we don't know, but had issues or concerns.

And so the process would be, "Let's see what those issues and concerns are, because, again, we want to get it right." So they had to go through that process of -- they chose to go through that process of talking with a major stakeholder in the whole law enforcement community to understand what their concerns and issues were.

**Q. I would like you to take a look at the document that's Bates stamped Moreno 220, if you would. We'll mark this as Plaintiffs' -- are we up to 35?**

MR. PEASE: I think we're 36.

THE COURT REPORTER: 36.

A. I have it in front of me.





(Exhibit No. 36 marked for identification.)

**Q. This document is an email from Bryce Baker to Jo Ann Perrini, Vicki Draper, and Don Winstead and it copies Melanie Watson.**

A. Right.

**Q. I just want to bring you down to the bottom -- well, first of all, it's an email that's talking about the definition of regular working hours; is that right?**

A. Well, I haven't read it right now, so let me just quickly go -- yeah, it's quoting the regularly scheduled administrative workweek, and it gets into the idea of regular schedules and what's considered overtime and within a workweek, yes.

**Q. And it's titled regular working hours; is that right?**

A. Oh, yes, of course.

**Q. Have you seen this document before?**

A. I think I have.

**Q. When?**

A. Well, it would have been in the period between Sunday and last night.

**Q. The last sentence, Mr. Baker says, "I have found the old FLSA history files that**





**OPM (Brown) interpreted the term regular working hours to include regularly scheduled overtime pay as far back as 1976."**

**Who was Dwight Brown?**

A. Dwight Brown was a retired master sergeant who worked at OPM. He was at OPM in 1974 when I started. Ironically, I was hired to work for him on the Fair Labor Standards Act. And when I reported to work three weeks after I accepted the job, I was assigned to the Federal Wage System, because they couldn't wait for me.

So anyway I just provided that information out of interest, but he was a person that had been a staff person who had worked on Title 5 overtime pay.

And then when the Fair Labor Standards Act was passed, he then worked on developing the first OPM -- sorry, that would have been Civil Service Commission, I guess -- information, and then turning it into instructions, and turning it later into rules. I am not sure how long he stayed after that date at OPM, but he was a staff person at that time.





**Q. And what are the old FLSA history files that Mr. Baker refers to?**

A. I don't know, but I could speculate that there were some office files somewhere around, and they might have been incorporated into our filing system, or sometimes when people retire they leave boxes of filing.

We put them in a garage, so to speak, we put them in a filing room, and years later somebody might have reason to start uncovering and looking.

But I'm speculating. I don't know specifically what old FLSA history files are.

**Q. And did you see OPM's -- did you see this old FLSA history file that Mr. Baker refers to in which OPM is interpreting the term regular working hours to include regularly scheduled overtime pay?**

A. No.

**Q. And when you saw this email, did you ask Mr. Baker about those notes?**

A. No.

**Q. And do you know if those notes that Mr. Baker referred to in March of 2003 have since been destroyed?**

A. No.
**Q. Do you know if they're still available?**
A. No.
MR. SWEENEY: I would call for the production of those notes. They are clearly covered under the document request, really relevant, and I would ask them to be produced with all haste.
Mr. Pease, if you have any objection to it, please raise the objection quickly so that we can bring it to the judge, and we can get the issue resolved.
MR. PEASE: We have the same request, that you issue -- that you do a formal document production, and we'll respond in kind.
MR. SWEENEY: Again, these are covered under the formal document requests that have already been propounded. So if you have a specific objection to producing these, we would ask, given the fast-coming discovery cutoff date, that you raise it as soon as possible.
I more or less want to know if they





don't exist anymore so that we can raise it with the judge. I think that's probably fair to all the parties and fair to the judge. If we disagree on the objection, I'm sure she'll be happy to rule on it.
MR. PEASE: And as we have consistently said, if we get a formal production request, we will respond in kind.
**Q. Mr. Mikowicz, do you know if Melanie Watson that's copied in here is an attorney with OPM?**
A. Yes.
**Q. Thank you.**
**I'd take you back, again, just for a moment, to Plaintiffs' 25. That was the email from Winstead to Hausser.**
A. I have that.
**Q. And in here, you pointed this out earlier, it's the second -- I'm sorry, the third sentence, the third and fourth sentence, in which Winstead says, "I think this is the way of covering for the fact that nothing has happened since our policy and legal staffs met with theirs on the issue in March, despite attempts by OPM's general counsel to reach**





**DHS. Steve says they never returned our calls."**
**This is in June, so we're dealing with three months later. Would that be the normal course of things, that OPM's general counsel's calls wouldn't be returned for three months?**
MR. PEASE: Objection, calls for speculation. You can answer.
A. I don't work in the Office of General Counsel, and I have no idea.
**Q. Would OPM hold up guidance that they thought was correct for an agency that was not responding to it?**
MR. PEASE: Objection, calls for speculation. You can answer.
A. It's going to be dependent on the context and the facts of the situation. If OPM, the people that were in charge, had reason to believe a discussion was needed, that a meeting of the minds or a clarification was needed, and this was an important issue, they may decide to let it play out and continue to do that.
Again, the context of this is the





major occupation of the day -- preoccupation of the day was trying to establish a new Department of Homeland Security, and establish a new system, and there probably were a lot of competing priorities.
So it's just hard for me to say. I would just say that I'm convinced that people did the best they could under these circumstances.
**Q. And all the while, people training at the FLETC didn't get paid for their sixth day of work; is that right?**
MR. PEASE: Objection, asked and answered.
A. I can't change the fact that there were people working at FLETC.
**Q. And not getting paid; is that right?**
A. That's correct.
**Q. I would like you to take a look at the document that's been marked Moreno 217 through 219. We'll mark this as Plaintiffs' 37.**
MR. PEASE: Mike, this looks like two different documents, but I'm not --