No. 05-142C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ARTURO MORENO, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# APPENDIX TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARTIN F. HOCKEY, JR.
Assistant Director

MAAME A.F. EWUSI-MENSAH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0503
Fax: (202) 514-8624

Of Counsel:
ARTHUR RETTINGER
Senior Counsel
Office of Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229
Tel: (202) 344-2978
FAX: (202) 344-2950

MELANIE WATSON
Attorney-Advisor
Office of Personnel Management
1900 E Street, NW
Washington, DC 20415
Tel: (202) 606-1700
Fax: (202) 606-0082

December 21, 2007

Attorneys for Defendant

## INDEX TO APPENDIX[1]

**Exhibit 1**
Declaration of Wayne Coleman, Dec. 19, 2007 . . . . 1

**Exhibit 2**
Declaration of Alethea Smalls, Dec. 18, 2007 . . . . 8

**Exhibit 3**
Declaration of Kevin Benit, Dec. 17, 2007 . . . . 12

**Exhibit 4**
Declaration of Bryce Baker, Dec. 19, 2007 . . . . 15

**Exhibit 5**
Declaration of Jerome D. Mikowicz, Dec. 19, 2007 . . . . 17

**Exhibit 6**
FPM Sunset Document (Dec. 31, 1993) . . . . 19

**Exhibit 7**
Declaration of Brenda Evenski, May 23, 2007 . . . . 129

**Exhibit 8**
Declaration of Felicia J. Probert, May 23, 2007 . . . . 130

**Exhibit 9**
Declaration of Lester Davis, May 22, 2007 . . . . 132

**Exhibit 10**
Declaration of Deborah A. Rigden . . . . 134

**Exhibit 11**
GAO Report to Congressional Requesters on the Federal Law Enforcement Training Center (July 2003) . . . . 137

**Exhibit 12**
Wayne Coleman email correspondence (Dec. 12-18, 2003) . . . . 213

**Exhibit 13**
Email from John P. Cahill to Joanne Perrini (Feb. 19, 2003) . . . . 219

**Exhibit 14**
Email correspondence between Steve Cohen and Melissa Allen (Mar. 19, 2003) . . . . 220

---

[1] The accompanying motion is not being filed under seal as, upon review, none of the documents included in the Appendix are confidential.

**Exhibit 15**
Memorandum from U.S. Immigrations and Customs Enforcement to the National Finance Center, USDA (Sep. 10, 2004) . . . . . 224

**Exhibit 16**
Email from John J. Ehrbar to Jill Arndt (Sep. 3, 2003) . . . . . 227

**Exhibit 17**
Memorandum from U.S. Immigration and Customs Enforcement to Justice Management Division, Department of Justice (Feb. 3, 2004) . . . . . 229

**Exhibit 18**
Reimbursement Agreement between National Finance Center, USDA and U.S. Immigration and Customs Enforcement, Department of Homeland Security . . . . . 231

**Exhibit 19**
Department of Homeland Security Fact Sheet: DHS and OPM Final Human Resource Regulations (Jan. 26, 2005) . . . . . 237

**Exhibit 20**
Memorandum (Department of Homeland Security) (June 2002) . . . . . 242

**Exhibit 21**
U.S. Immigration and Customs Enforcement, "About Us," (Oct. 31, 2007)
(available at http://www.ice.gov/about/index.htm) . . . . . 271

**Exhibit 22**
U.S. Customs and Border Protection, "One Team, One Fight" (Mar. 2003)
(available at http://www.cbp.gov/xp/CustomsToday/2003/March/one.xml) . . . . . 273

**Exhibit 23**
U.S. Citizenship and Immigration Services, "About Us"
(available at http://www.uscis.gov/aboutus) . . . . . 279

**Exhibit 24**
National Finance Center, "National Finance Center (NFC) History"
(available at http://dab.nfc.usda.gov/about/na-aboutmain.html) . . . . . 280

**Exhibit 25**
Civil Docket for Moreno v. Bureau of U.S. Citizenship and Immigration Services of the U.S. Homeland Security, et al.,
U. S. District Court for the District of Columbia, No. 1:04-cv-00899 . . . . . 282

**Exhibit 26**
Civil Docket for Moreno v. United States,
U.S. Court of Federal Claims, No. 1:05-cv-00142 . . . . . 285

**Exhibit 27**
Getman Law Office, "Case Information: Moreno v. BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES and U.S.A."
(available at http://www.getmanlaw.com/caseinfo.html?id=55) . . . . . . . . . . . . . . . . . . . . . . . . 299

**Exhibit 28**
Declaration of Wayne Coleman, Sep. 24, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

**Exhibit 29**
Declaration of Alethea Smalls, Aug. 4, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 321

**Exhibit 30**
Excerpts of the Deposition of Vicki L. Draper, Nov. 30, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . 324

**Exhibit 31**
Bryce Baker email correspondence (Mar. 14, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

**Exhibit 32**
Excerpts of the Deposition of Wayne Coleman, Nov. 2-3, 2006 . . . . . . . . . . . . . . . . . . . . . . . . 344

**Exhibit 33**
5 C.F.R. § 610.111 (Jan. 1, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

**Exhibit 34**
Excerpts of the Deposition of Jerome D. Micowicz, Jan. 11, 2007 . . . . . . . . . . . . . . . . . . . . . . 374

**Exhibit 35**
Reorganization Plan Modification for the Department of Homeland Security (Feb. 4, 2003) . 382

**Exhibit 36**
Legislative History of Portal-to-Portal Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| Defendant. | ) | |

**DECLARATION OF WAYNE COLEMAN**

1. I, Wayne Coleman, declare that I am retired from federal civilian service.

2. I was employed as a Senior Compensation Policy Specialist by the United States Bureau of Immigration and Customs Enforcement (ICE) from March 9, 2003 to August 21, 2004. During that time, I reported to the Director, Compensation Policy Staff.

3. As a Senior Compensation Policy Specialist with ICE, my job responsibilities were to provide advice and guidance to managers and employees on the application of federal compensation provisions especially in the areas of premium pay and overtime under the Fair Labor Standards Act (FLSA) and the Federal Employees Pay Act (FEPA).

4. Prior to that time, I was employed as a Senior Compensation Policy Specialist by the former Immigration and Naturalization Service (INS). During that time, I reported to the Director, Compensation Policy Staff.

5. As a Senior Compensation Policy Specialist with INS, my job responsibilities were essentially the same as those during my tenure as a Senior Compensation Policy Specialist with ICE, namely, to provide advice and guidance to managers and employees on the application of federal compensation provisions especially in the areas of premium

pay and overtime under the Fair Labor Standards Act (FLSA) and the Federal Employees Pay Act (FEPA).

6. I have over 17 years of experience in the field of pay for federal employees.

7. The INS required the plaintiffs in this lawsuit to attend basic immigration law enforcement training at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC) in 2002 and 2003.

8. At the beginning of 2002, FLETC implemented a six-day training schedule. Prior to that time, FLETC had operated a five-day training schedule. In my over 15 years of experience at INS/ICE and other federal agencies handling pay matters for FLETC trainees, I had never known FLETC to operate on a six-day training schedule.

9. During the spring of 2002, after FLETC implemented its six-day schedule, several employees contacted me and my colleagues requesting that they receive overtime wages for their sixth-day of training.

10. The FLSA obligations of the INS are set forth in the FLSA statute, the regulations codified at 5 C.F.R. Part 551, and other applicable regulations. Accordingly, in determining whether overtime wages were required to be paid to trainees attending training six days a week at FLETC, I consulted the FLSA statute, the governing regulations promulgated by the Office of Personnel Management (OPM), and guidance published by OPM on its website or in Federal Personnel Management (FPM) Letters.

11. In particular, I consulted the FPM Letter 551-17, entitled "Time Spent in Training as Hours of Work Under FLSA." Although the letter was marked "obsolete" and "retain until superseded," I still consulted it because I understood it to be valid historical guidance from OPM on the issue of overtime wages for training.

12. FPM Letter 551-17 states "time spent in training outside regular working hours is compensable as hours of work under the FLSA if certain stipulated criteria are met." FPM Letter 551-17 also states, "These criteria are specified in section 551.423 of the regulations in Part 551 of title 5, Code of Federal Regulations."

13. The regulation specified in FPM Letter 551-17, namely, 5 C.F.R. § 551.423(a)(3), states:

> Time spent in . . . entry level training . . . outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods.

14. At the time I consulted FPM Letter 551-17 and 5 C.F.R. § 551.423(a)(3), I understood the term "regular working hours" to mean basic 40-hour work week that most federal employees are required to work. This was based upon my experience in the field of federal employee pay and my understanding of historical OPM guidance on the subject. I did not consult 5 C.F.R. § 551.421 as neither 5 C.F.R. § 551.423, FPM Letter 551-17, or any other OPM guidance pointed me to it. I now understand that 5 C.F.R. § 551.421 defines "regular working hours" as "the days and hours of an employee's regularly scheduled administrative workweek established under part 610 of this chapter."

15. I also consulted 5 C.F.R. § 410.402, which prohibits payment of overtime where not specifically authorized by the Federal Employees Pay Act (FEPA) unless it meets one of the exemptions listed in 5 C.F.R. § 410.402(b) or a specific agency exemption is requested from OPM.

16. Based upon my review of the statute, regulations, OPM guidance, and my experience in the field, I concluded that FLSA did not authorize payment of overtime wages to entry-level FLETC trainees attending training six days per week.

17. I discussed the matter with my colleagues on the compensation policy staff, who agreed, and we advised the Director, Compensation Policy Branch and his supervisor, the Director of Human Resources, of our determination.

18. In addition the Director of Compensation Policy Branch and I consulted human resources personnel at the Department of Justice (DOJ), our parent agency, regarding the question whether FLSA authorized payment of overtime wages to entry-level FLETC trainees attending training six days per week. Human resources personnel at the DOJ confirmed our understanding.

19. At the time, I understood that 5 C.F.R. § 551.423 governed INS's obligations regarding payment of overtime to its employees. However, our understanding of standard federal application of this regulation to the factual circumstances of Plaintiffs and other FLETC trainees did not give us authority to pay INS personnel.

20. After it appeared that OPM was changing its guidance regarding FLETC overtime, DHS engaged in consultations with OPM about this issue. During the course of these consultations, DHS and ICE received several inquiries from current and former INS employees regarding the overtime pay issue.

20. Upon issuance of new guidance by OPM specifically pointing to the definition of "regular working hours" in 5 C.F.R. § 551.421, I came to understand that 5 C.F.R. § 551.421 and 5 C.F.R. § 551.423, read together, do authorize payment of FLSA overtime wages to FLETC trainees for their sixth day of training. This new guidance was set forth in the form of a "Q&A" document posted to OPM's website in early summer 2003.

21. Shortly after the issuance of the new OPM guidance, the Department of Homeland Security (ICE's parent agency) directed ICE to make payment to past FLETC trainees of back overtime wages plus interest as calculated pursuant to the Back Pay Act.

22. DHS was officially created in January 2003, but the process was not complete for most of the component agencies until March 1, 2003. During the creation of DHS, I and other former INS pay personnel, as well as pay personnel from other agencies were responsible for handling pay matters for all of ICE, CIS and Customs and Border Protection (CBP, another agency within DHS). Accordingly, we were trying to do a greater amount of work with considerably fewer resources.

23. When DHS was created, I became a Compensation Policy Specialist within ICE, and I and other DHS pay personnel were also engaged with developing a new pay system for DHS, unique in the federal system. This project was time-consuming.

24. At the time the decision was made to make the retroactive payments, there was no central training system that tracked INS or ICE employees as they went through training. Accordingly, to collect the required trainee data, ICE compensation staff was required to find class rosters for each FLETC class. These rosters were not maintained in a central location, and not all were computerized. Rather, some were maintained in the files of individual instructors, some were stored on individual supervisory instructors' computer systems, and some were located in the FLETC training staff central office. This required an extensive search of electronic files and hard copy files.

25. In addition, FLETC training staff were already fully engaged with the process of trying to train more federal law enforcement officers in a shorter period of time. As a result, it was difficult for FLETC to dedicate resources to the task of collecting trainee

data. This meant that over a period of months, on several occasions, we concluded that we had completed collection of all the trainee data only to find out that there were still additional trainees unaccounted for. This further delayed the payment process.

26. Further, due to the creation of DHS, former INS employees had been transferred to three different agencies, namely ICE, CBP, and CIS. Some also retired or left federal service for other reasons. This made the process of collecting trainee data and compiling payment lists even more complex as we were required to determine where the employees were currently located, and to make an effort to find a current address for those no longer on the rolls.

27. In addition, on or about August 22, 2004, ICE Human Resources employees including the Compensation Policy Branch, were transferred to U.S. Customs and Border Protection. This additional transition necessarily placed an additional strain on the resources of the group responsible for processing the retroactive payments.

28. To my knowledge, ICE was not required to seek an additional appropriation when it paid overtime wages to the Plaintiffs for their time spent in training at FLETC. However, coordination of costs also had to be made between the three organizations that were formed from the former INS: CBP, ICE, and CIS. This was a time-consuming process as it was an unanticipated additional task for the budget office which was already experiencing significant turnover at that time.

29. In addition, Department of Justice employees were physically paid by the National Finance Center of the Department of Agriculture through an agreement between Justice and the Department of Agriculture.

30. Therefore, in order to make retroactive payments to the employees, ICE was required to establish an agreement for services with the National Finance Center.

31. ICE was required to engage in lengthy negotiations with NFC as there were several new issues that needed to be resolved, including cost of the service, responsibility for the payment calculations, and other matters arising from the DHS reorganization. These negotiations were complicated by the fact that the ICE/NFC Liaison was not available as a result of the DHS reorganization.

32. To my knowledge, neither INS nor ICE has recognized any obligation to also pay liquidated damages to the legacy INS employees who attended FLETC training for six days per week.

**I declare under penalty of perjury that the foregoing is true and correct.**
**Executed on December 20, 2007.**

Wayne Coleman

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| | ) | |

**DECLARATION OF ALETHEA SMALLS**

1. I, Alethea Smalls, am a Human Resources Specialist with the Department of Homeland Security, US Customs and Border Protection (CBP).

2. I have worked at CBP since August 22, 2004.

3. Prior to that time, I was employed as a Human Resources Specialist with Immigration and Customs Enforcement (ICE) and the former Immigration and Naturalization Service (INS) from March 10, 2002 until August 21, 2004.

4. In mid 2003, pursuant to decisions by OPM and DHS, ICE determined that legacy INS employees who had attended the six-day training schedule at FLETC would receive back overtime wages as well as an interest payment under the Back Pay Act (5 USC § 5596).

5. Beginning with pay period 17-03 (that ran from August 24 through September 6, 2003) non-exempt ICE employees attending basic training began receiving FLSA overtime in their current paychecks in accordance with the new OPM interpretation.

6. Beginning in August 2003, I and other members of the ICE compensation policy staff began the process of coordinating retroactive payments to legacy INS employees who had

attended the six-day training schedule at FLETC.

7. The process of making retroactive payments involved the following steps: collecting data on trainees, compiling payment lists of the trainees, calculating the payments (ICE employees, including myself, did the actual calculations), and then making arrangements for payment through the National Finance Center of the Department of Agriculture.

8. The first step in this process was for ICE to collect, from FLETC, the names of those employees and former employees who attended training between January 1, 2002 and August 23, 2003 and identify the number of days that the employees attended sessions on a regularly scheduled 6th day of training.

9. Over 4,000 ICE (and former INS) employees had attended FLETC during the time period in question.

10. At the time the decision was made to make retroactive payments, the ICE headquarters training division did not maintain a central training system that tracked INS or ICE employees as they went through training. Accordingly, to collect the necessary trainee data, ICE compensation staff were required to find class rosters for each FLETC class. These rosters were located in the FLETC training staff central office and required an extensive search of both electronic files and hard copy files.

11. Further, due to the creation of DHS, former INS employees had been transferred to three different agencies, namely ICE, CBP, and CIS.

12. In addition, Department of Justice employees were physically paid by the National Finance Center of the Department of Agriculture through an agreement between Justice and the Department of Agriculture.

13. Therefore, in order to make retroactive payments to the employees, ICE was required to establish an agreement for services with the National Finance Center.

14. Negotiations with the NFC involved multiple issues (cost of the service, which party would be responsible for the calculations, issues involving the reorganizations, communications) which was further complicated by the fact that due to the reorganizations, the ICE/NFC Liaison was not available to assist us.

15. Moreover, on or about August 22, 2004, ICE Human Resources employees including the Compensation Policy Branch, were transferred to U.S. Customs and Border Protection ("CBP").

16. The subsequent reorganization of INS and the resulting creation of ICE, CIS, and CBP changed the responsibility for pay policy. When I was working at solely at ICE, I provided pay services to ICE. However, after the move of ICE Human Resources to CBP, I was initially required to provide service to CIS and ICE as part of a "Shared Services Agreement," as well as being the pay person responsible for CBP pay issues. Because these payments were an ICE issue, although I was now a CBP employee, this work was still my responsibility.

17. Ultimately, I inherited full responsibility to complete the payment calculations.

18. Coordination of costs also had to be made between the three organizations that were formed from the former INS: CBP, ICE, and CIS.

19. The vast majority of retroactive payments were made to the employees on December 7, 2004, and were completed by June, 2005, with the possible exception of persons who could not be located. To the best of my knowledge, no employee (or former employee) who was on a class list was denied payment because he/she did not make a claim within two years.

20. Retroactive payments to legacy INS employees still employed by the DHS were made via

direct deposit. Retroactive payments to legacy INS employees no longer employed by DHS were made via check sent by mail.

21. To the best of my knowledge, legacy INS employees receiving payments also received a Statement of Earnings and Leave. NFC generated the Statement of Earnings and Leave in connection with the payments.

22. At the present time, all known employees have been paid back overtime wages for the sixth-day training sessions, along with Back Pay Act interest from the date when they attended the sixth-day training sessions until they received payment.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on December 18, 2007.**

Alethea Smalls

IN THE
UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, JR., et al.,<br>Plaintiffs,<br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 05-14210C<br>(Judge Firestone) |

DECLARATION OF KEVIN BENIT

I, Kevin Benit, state the following:

1. I am currently employed by the Department of Agriculture, in the Office of the Chief Financial Officer, at the National Finance Center ("NFC") located at 13800 Old Gentilly Road, New Orleans, LA 70129.

2. The NFC provides the payroll processing for much of the Federal Government, specifically including U.S. Customs and Border Protection ("CBP").

3. I have been employed at the NFC since July of 1987.

4. My current position title is Supervisory Program Analyst and I am the section head for activities involving the Department of Homeland Security.

5. Arthur I. Rettinger, Senior Counsel to CBP, has provided me with the relevant information from Plaintiffs' Exhibit 28, the pay period 2006-15 "Statement of Earnings and Leave" of Mr. Thomas Porta. The Statement of Earnings and Leave is a document generated by NFC in connection with payments to federal employees as part of NFC's payroll processing.

6. I have been asked by Mr. Rettinger to explain the meaning of "03 Liq Damages/Int Backpay" on Mr. Porta's Statement of Earnings and Leave.

7. This particular code and category relates directly to what appears as [code and prefix (even though the prefix appears AFTER the code on the Statement of Earnings and Leave)] "44 05 Comp. Damages (Taxable)."

8. Much of this explanation appears in the public document entitled, **NFC, Special Payroll Processing System SPPS 1.0,** ("SPPS"), available on line at: http://dab.nfc.usda.gov/pubs/docs/sppsnet/sppsnet.pdf and the relevant pages are also attached to this Declaration.

9. On page 107 of SPPS (attached - page "116 of 121" of the PDF version available on line), you will notice, under the "prefix" column, number "05" next to the "trans[action]" column "44." This is the settlement (or "transaction") code used by the NFC for payment of back pay to an employee. Under the "type" column, this code is labeled "Settle/Compensatory Damages – Taxable AND Settle/Compensatory Damages Interest".

10. This coding, "05 44" as it appears on page 107 of the SPPS (or, "44 05" as it appears on Mr. Porta's Statement of Earnings and Leave) is used for the employee's earned income and, consequently would appear on the employee's W-2 tax statement that would result in Income, OASDI, and Medicare taxes.

11. What appears on Mr. Porta's Statement of Earnings and Leave as "03 Liq Damages/Int Backpay" (the 00 "prefix" is not used in this instance) is interest income only, and would be reported on the employee's 1099 statement (instead of

the W-2) for Income tax purposes and should not result in OASDI or Medicare taxes.

12. Because of how the system is established and prints, all non-earned (1099-type) income related to back pay, whether it is "Back Pay Act" interest or liquidated damages, appears on the employees' Statement of Earnings and Leave as "Liq Damages/Int Backpay." That is the only coding currently available in the system.

13. In addition, the Statement of Earning and Leave indicates what deductions are being taken from the employee's back pay and/or interest payments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 18, 2007.

KEVIN BENIT
Tel: 504-426-1537

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| | ) | |
| | ) | |
| Defendant. | | |

**DECLARATION OF BRYCE BAKER**

1. I, Donald Bryce Baker, am Senior Advisor (GS-15) to the Deputy Associate Director for Pay and Leave Administration in the U.S. Office of Personnel Management.

2. I have been employed by OPM since June 1983, and in the pay policy area since February 1991. I have extensive experience with the statutes and regulations governing pay of federal employees.

3. In the fall of 2002, I was reviewing OPM's regulations in 5 CFR part 551 (dealing with Fair Labor Standards Act (FLSA) overtime pay) pay as a part of an agency-wide project to review OPM regulations for possible plain language improvements.

4. In the course of my review of the regulations, I came across 5 C.F.R. § 551.421, which states:

> For purposes of this part, "regular working hours" means the days and hours of an employee's regularly scheduled administrative workweek established under part 610 of this chapter.

5. Previously, in response to an agency's inquiry as to whether the FLSA authorized overtime pay to entry-level trainees on a six day schedule, I agreed that entry-level training hours scheduled on a 6th day were covered by the exclusion rule in § 551.423(a)(3) and agreed with Ms.

Draper's determination that the FLSA did not authorize overtime pay to employees such as Federal Law Enforcement Training Center (FLETC) entry-level trainees who worked a 6th day of training.

6. When I came across 5 C.F.R. § 551.421 and realized the connection to the use of "outside regular working hours" in 5 C.F.R. § 551.423(a)(3), I advised my colleague, Ms. Draper, and informed her that our prior determination that overtime wages were not authorized for FLETC trainees may have been incorrect.

7. In late 2002 and early 2003, OPM personnel discussed the matter internally and with other federal agencies.

8. I recall that, in early 2003, DHS personnel became aware of the OPM pay policy staff position on the 6th day of training issue and raised concerns at the upper management level. Subsequently I recall attending a meeting of OPM and DHS staff where this issue was discussed. I recall that certain DHS representatives at that meeting disagreed with OPM's position and asked for more time to study the issue.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on December 19, 2007.**

Donald Bryce Baker

Donald Bryce Baker

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05-142C |
| v. | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| Defendant. | ) | |

**DECLARATION OF JEROME D. MIKOWICZ**

1. I, Jerome D. Mikowicz, am the Deputy Associate Director for Pay and Leave Administration at the U.S. Office of Personnel Management (OPM).

2. I have been employed by the U.S. Civil Service Commission (OPM's predecessor) and OPM between May 1974 and October 1982 and again at OPM since December 1990, and I have extensive experience regarding OPM's role with respect to other federal agencies.

3. The Office of Personnel Management ("OPM") is the federal agency charged with promulgating regulations regarding the application of the Fair Labor Standards Act ("FLSA") to federal employers and with providing guidance to federal employers regarding personnel matters, including pay..

4. One means by which OPM provided official guidance to federal agencies regarding personnel matters, including pay, was its website, www.opm.gov.

5. The Federal Personnel Manual ("FPM") was formerly published by OPM (and its predecessor the Civil Service Commission) as one means of providing official guidance to federal agencies regarding personnel matters, including pay.

6. On December 31, 1993, OPM issued a "FPM Sunset Document", which abolished the

FPM but "provisionally retained" certain sections through December 31, 1994, as "material that is being retained because it contains process instructions, critical case law, ensures consistency of action throughout Government, or authorizes agency action."

7. Pay personnel at various federal agencies often consulted FPM letters in making determinations regarding pay, even after the publication of the Sunset Document.

8. One of the "provisionally retained" FPM letters was FPM Letter 551-17, entitled "Time Spent in Training as Hours of Work Under FLSA" (January 28, 1981). Pl. Ex. 13 ("retain until superseded").

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on December 19, 2007.**

Jerome D. Mikowicz