# DECLARATION OF BRENDA EVENSKI

1. My name is Brenda Evenski. I am an HR Specialist (Compensation), GS-13, in the Office of Resource Management and Organizational Analysis, Bureau of Human Resources, U.S. Department of State ("Department"), Washington, D.C. I have held this position for three years.

2. My current duties include analyzing proposed legislative or regulatory changes in Civil Service and Foreign Service pay and wage administration; providing expert technical advice and guidance on pay and compensation matters to senior Department management; and, conducting special studies related to compensation involving pay for performance, special rates for designated employees, or the impact of locality pay.

3. My former position until March 2004 was as an HR Specialist in the Bureau of Diplomatic Security. At that time my duties there were focused on the personnel issues for the newly hired DS special agents as they went through their initial basic training (BSAC) which included training at FLETC. Thus, I am familiar with the issue of overtime for trainees at the Federal Law Enforcement Training Center (FLETC) for a sixth day of training.

4. The Department of State Bureau of Diplomatic Security trainees at FLETC are primarily members of the Foreign Service (FS series 2501) and now also include a small number of Civil Service Special Agent (GS series 1811) candidates. Initially when the sixth day of training was mandated by FLETC, the Department only hired Foreign Service series 2501 employees. We now also hire a small number of Civil Service GS-1811 employees. Both Foreign Service and Civil Service trainees attend the Basic Criminal Investigator Course.

5. Based on guidance, applicable statutes and regulations, DS employees initially were not paid overtime pursuant to FLSA for the hours spent in training on Saturdays (the 6th day of training). In the middle of 2003, OPM issued guidance stating that such overtime compensation was due to those trainees. Based on this guidance the Department proceeded to retroactively adjust the pay of all affected trainees who had been at FLETC and not received pay for their sixth day of training.

I declare under penalty of perjury that the foregoing is true and correct.

Brenda Evenski

Brenda Evenski



Confidential-Subject to Protective Order
MOR-3713

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ARTURO MORENO, et al.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES<br>Defendant. | Case NO. 05-142C<br>(Judge Firestone) |

**DECLARATION OF FELICIA J. PROBERT**

I, Felicia J. Probert, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am the Assistant Deputy Director for the Office of Law Enforcement and Security, Bureau of Land Management (BLM), U.S. Department of the Interior, located in Boise Idaho. I have held this position since January 2003. Prior to that I was National Chief Ranger, Office of Law Enforcement and Security, BLM. In both positions I have been responsible for policy issues related to BLM's law enforcement program, including law enforcement pay issues.

2. I am aware that before March 2003, BLM law enforcement personnel who attended six day per week training courses at the Federal Law Enforcement Training Center (FLETC) did not receive overtime pay for hours in excess of 40 per week, including the sixth day. It was our understanding, based on 5 U.S.C. 4109, and 5 C.F.R. 410.402, that BLM law enforcement personnel were not eligible for premium pay while engaged in training activities and were therefore not eligible for overtime pay for the sixth day. Early in March 2003 I became aware of a clarification issued by the Office of Personnel Management (OPM) that indicated, per 5 C.F.R. 551.421, that FLSA non-exempt employees who are scheduled in advance of an administrative work week to attend a regularly scheduled six day training class are entitled to overtime pay for hours worked in excess of 40 hours per week. Based on this new information, I authored, and the BLM's Acting Director of Law Enforcement and Security issued, Information Bulletin No. 2003-077 on March 21, 2003. Addressed to Supervisors of Law Enforcement Officers, Human Resource Offices and Timekeepers, it advised them of the change in policy, instructed them, by April 18, 2003, to correct the timesheets for BLM rangers who had previously



Confidential-Subject to Protective Order
MOR-3710

FJP 5/23/07

attended six day training sessions, and to pay Rangers attending future sessions consistent with the revised direction.

3. The only BLM law enforcement personnel affected by the premium pay issue were rangers who attended National Resource Police Training courses at FLETC.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Felicia J. Probert

Executed on May 23, 2007



Confidential Subject to Protective Order
MOR-3711

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, JR., et al., | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| THOMAS C. PORTA, et al., | ) | |
| and | ) | |
| ANDREW D. BARTH, et al., | ) | No. 05-14210C<br>& No. 05-759C |
| Plaintiffs, | ) | |
| | ) | CONSOLIDATED |
| v. | ) | |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DECLARATION OF LESTER DAVIS

I, LESTER DAVIS, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am currently employed as the Deputy Assistant Inspector General for Investigations in the Office of Inspector General of the United States Department of Housing and Urban Development ("HUD OIG"). I have formally held this position since December of 2005, but from June 2005 through December 2005, I served as Acting Deputy Assistant Inspector General for Investigations for HUD OIG. From January 2003 through December 2005, I served as Special Agent in Charge, assigned to HUD OIG's Region 6,

based in Arlington, Texas. Prior to that time, from 2001 through January 2003, I served as Special Agent in Charge, assigned to HUD OIG's Region 5, based in Chicago, Illinois.

2. Because of my experience as a Special Agent in Charge and Deputy Assistant Inspector General for Investigations, I am generally familiar with HUD OIG's pay practices for its special agents. In addition, I recently consulted HUD OIG's Investigative Support Division (ISD) to determine HUD's pay practices regarding Saturday classes for HUD OIG special agents at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.

3. During the time that HUD OIG special agents attended Saturday classes at FLETC, they were not paid overtime under FLSA. Rather, HUD OIG special agents were permitted to count hours spent in training on Saturdays towards their Law Enforcement Availability Pay ("LEAP").

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Lester A. Da.
Lester Davis

Executed on May 22, 2007





Confidential Subject to Protective Order
MOR-3717

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, JR., et al., | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| THOMAS C. PORTA, et al., | ) | |
| and | ) | |
| | ) | |
| ANDREW D. BARTH, et al., | ) | No. 05-14210C<br>& No. 05-759C |
| Plaintiffs, | ) | |
| | ) | CONSOLIDATED |
| v. | ) | |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF DEBORAH A. RIGDEN

I, DEBORAH A. RIGDEN, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am currently employed as Program Manager for Pay, Attendance, and Leave in the United States Department of Agriculture ("USDA"), Forest Service (FS). I have held this position since March 9, 2003.

2. Prior to his retirement in March 2, 2007 Gary Wilson served as Program Manager for Pay, Attendance & Leave and then the Branch Chief for Classification, Pay and Organization Management in the USDA, FS. I reviewed Mr. Wilson's records to determine USDA's pay practices with respect to the sixth day of training in a six-day training week for Fair Labor Standard Act (FLSA) non-exempt (or covered) Forest



Confidential-Subject to Protective Order
MOR-3714

Service employees who attended basic law enforcement training at the Federal Law Enforcement Training Center ("FLETC") in Georgia.

3. Initially, FLSA non-exempt Forest Service employees who attended entry-level training at FLETC after January 1, 2002 were not paid overtime compensation for attending a sixth day of training in a six-day training week at FLETC. In February 2003, the Forest Service issued a memorandum (attached hereto as Exhibit A) stating that based upon revised guidance from the Office of Personnel Management ("OPM"), FLSA non-exempt Forest Service employees were entitled to overtime compensation for the sixth day of training in a six-day training week at FLETC. In addition, the memorandum stated that FLSA non-exempt Forest Service employees who were not paid overtime compensation earlier for this sixth day of training were entitled to back pay with interest.

4. Based on a review of our records, procedures were provided to our FS offices so that I believe all affected FLSA non-exempt employees who attended a sixth day of training in a six-day training week at FLETC should have now been paid overtime compensation.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Deborah A. Rigden

DEBORAH A. RIGDEN

Executed on May 22, 2007



Confidential-Subject to Protective Order
MOR-3715

United States Department of Agriculture | Forest Service | Washington Office | 14th & Independence SW, P.O. Box 96090, Washington, DC 20090-6090

File Code: 6150[illegible]-1
Route To: (530[illegible]

Date: FEB - 4 2003

Subject: Premium Pay for New Recruits at the Federal Law Enforcement Training Center

To: Regional Foresters, Station Directors, Area Director, and IITF Director

We have received direction from the Office of Personnel Management (OPM) regarding a change in their earlier advice to the Forest Service, and other users of the Federal Law Enforcement Training Center (FLETC), concerning the 6-day training week. Our earlier direction issued March 6, 2002, stated that overtime (premium pay) was not appropriate for trainees under an apprenticeship program as stated in 5 CFR 551.423(a)(3).

The OPM has now given us a different interpretation. The 6-day training week is regularly scheduled training hours, which are considered "regular working hours" and constitute hours of work for overtime pay purposes.

According to 5 CFR 551.423(a)(3), time spent in apprenticeship or other entry level training outside regular working hours shall not be considered hours of work provided no productive work is performed during such periods. However, OPM says, "...because the regularly scheduled training hours on the 6th day are considered to be regular working hours (and the training will not occur outside regular working hours), it is irrelevant that this is an apprenticeship program and no productive work is being performed."

Therefore, based on this latest determination by OPM, all entry level trainees at FLETC who are regularly scheduled to take training on the 6th day of a 6-day training week are entitled to premium pay. Those trainees who were not given premium pay based on our earlier direction are entitled to backpay with interest for the premium pay they were denied.

Questions should be addressed to Gary Wilson at (703) 605-0865 or e-mail to gwilson@fs.fed.us.

JOHN G. LOPEZ
Director of Human Resources Management

cc: Gordon Gregg, Guadalupe Renteria

A136

United States General Accounting Office

GAO

Report to Congressional Requesters

July 2003

# FEDERAL LAW ENFORCEMENT TRAINING CENTER

# Capacity Planning and Management Oversight Need Improvement

GAO Accountability * Integrity * Reliability

A137

July 2003

GAO Accountability•Integrity•Reliability

# Highlights

Highlights of GAO-03-736, a report to Congressional Requesters

# FEDERAL LAW ENFORCEMENT TRAINING CENTER

## Capacity Planning and Management Oversight Need Improvement

### Why GAO Did This Study

The Federal Law Enforcement Training Center (FLETC) provides federal law enforcement training for 75 Partner Organizations (agencies) primarily at four domestic facilities located at Glynco, Ga; Artesia, N. Mex.; Charleston, S.C.; and Cheltenham, Md.. Given the post-terrorist attack security environment, coupled with the increased demand for training, concerns have been raised about FLETC's continued ability to meet this training demand. The visual below demonstrates the sharp increase since the September 11, 2001, attacks. Because of these concerns, GAO was asked to issue a report on (1) how FLETC plans to meet the projected demand for training; (2) FLETC's ability to efficiently coordinate and schedule training activities; and (3) whether oversight and governance structures provide the guidance it needs to address its capacity and planning challenges.

### What GAO Recommends

GAO recommends that the Secretary of the Department of Homeland Security improve capacity planning, periodically assess the condition of training facilities and infrastructure, improve the acquisition process for an automated scheduling system, and enhance the governance and oversight capabilities of FLETC's Board of Directors. The department and FLETC generally concurred with GAO's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-03-736.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard M. Stana, 202-512-8777, Stanar@GAO.gov.

### What GAO Found

FLETC's overall capacity to provide training at the Glynco and Charleston campuses is currently strained, while Artesia has been underutilized, and Cheltenham is being upgraded and cannot operate at full capacity. FLETC is developing a Master Plan to address how to overcome the long-term capacity challenges, but questions exist regarding the assumptions and methodologies used, contingency planning, cost estimation and budgeting, and the need to address capacity shortfalls sooner than planned. Department of Homeland Security officials intend to review the new department's training needs and capacities, and update the plan to reflect its vision for law enforcement training. Within the context of its strained training capacity, FLETC uses a predominantly manual scheduling process that does not ensure the efficient use of training resources and poses internal control risks due to potential loss of scheduling materials and the lack of backup documentation. Although FLETC has begun the process to acquire a fully automated scheduling system, FLETC officials have yet completed important risk management activities and are not using recognized best practices for acquiring commercial off-the-shelf-based systems associated with this type of acquisition. Furthermore, FLETC's solicitation activities have not adequately addressed security requirements. FLETC faces additional challenges regarding its governance structure in that the status of FLETC's Board of Directors is unclear, and its membership, roles and responsibilities, and past practices are not fully consistent with prevailing governance best practices.

**Partner Organization Training Projections Compared to Current Optimum Combined Campus Capacity (in student weeks)**




A138

Source: GAO analysis of FLETC data.

Note: A "student week" is defined as 5 days of training for 1 student.

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| | Results in Brief | 4 |
| | Background | 7 |
| | FLETC's Training Capacity is Strained, and Its Planning for Adding Capacity Raises Concerns | 12 |
| | FLETC's Current Scheduling System Is at Risk and Its Acquisition of an Automated System Raises Concerns | 24 |
| | The Status of FLETC's Board of Directors Is Unclear, and DHS Has Begun to Provide Oversight and Guidance | 34 |
| | Conclusions | 39 |
| | Recommendations for Executive Action | 41 |
| | Agency Comments and Our Evaluation | 43 |
| **Appendix I** | **Objectives, Scope, and Methodology** | 47 |
| | Capacity, Planning, and Coordination | 48 |
| | Scheduling and Coordination of Training Activities | 49 |
| | Governance and Oversight Structure and Guidance | 50 |
| **Appendix II** | **FLETC's 75 Partner Organizations** | 52 |
| **Appendix III** | **Training Programs and Seminars Provided by FLETC** | 57 |
| **Appendix IV** | **Comments from the Department of Homeland Security** | 59 |
| **Appendix V** | **GAO Contacts and Staff Acknowledgments** | 71 |
| | GAO Contacts | 71 |
| | Staff Acknowledgements | 71 |
| **Tables** | | |
| | Table 1: Capacity and Demand at the FLETC Campuses (in student weeks) | 13 |

A139

Table 2: Potential Campus Capacities Following Completion of Phase I Master Plan Projects (in student weeks) 21

## Figures

Figure 1: Various FLETC Training Activities 8
Figure 2: FLETC Fiscal Year 2003 Budget Enactment and Fiscal Year 2004 Budget Request 9
Figure 3: Partner Organization Training Projections Compared to Current Combined Campus Optimum Capacity (in student weeks) 15
Figure 4: FLETC Campus at Artesia, New Mexico 17

### Abbreviations

| | |
|---|---|
| ACMS | Academy Class Management System |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| COTS | commercial off-the-shelf-based systems |
| DHS | Department of Homeland Security |
| FAM | Federal Air Marshals |
| FCI | Facility Condition Index |
| FLETC | Federal Law Enforcement Training Center |
| FTE | full-time equivalent |
| INS | Immigration and Naturalization Service |
| IT | information technology |
| MOU | memorandum of understanding |
| O&M | operation and maintenance |
| OMB | Office of Management and Budget |
| PO | Partner Organization |
| RFP | request for proposals |
| SASS | student administration and scheduling system |
| SEI | Software Engineering Institute |
| TSA | Transportation Security Administration |

This is a work of the U.S. Government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. It may contain copyrighted graphics, images or other materials. Permission from the copyright holder may be necessary should you wish to reproduce copyrighted materials separately from GAO's product.

A140

G A O
Accountability * Integrity * Reliability

United States General Accounting Office
Washington, DC 20548

July 24, 2003

The Honorable Harold Rogers
Chairman, Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The Honorable Jack Kingston
The Honorable Ernest J. Istook, Jr.
House of Representatives

Since its inception in the early 1970s, the Federal Law Enforcement Training Center (FLETC), now a component of the Department of Homeland Security (DHS),[1] has played a vital role in training personnel from federal, state and local, and foreign law enforcement agencies. FLETC is responsible for providing basic, advanced, specialized, and refresher training for law enforcement officers from 75 federal law enforcement agencies.[2] Following the September 11, 2001, terrorist attacks against the United States, FLETC's role and continued ability to provide law enforcement training in a timely manner is critical in the war against terrorism. For fiscal year 2003, according to the Director of FLETC, 65 percent of its projected training workload will come from 9 agencies transferred to DHS.

The sudden influx of the large numbers of law enforcement personnel to FLETC, coupled with the post-terrorist attack security environment, has revived past concerns about the strain placed on its capacity to meet the training demand.[3] Most recently beginning in the mid-1990s, these influxes

[1]FLETC transferred to DHS on March 1, 2003, pursuant to the Homeland Security Act of 2002 (P.L. 107-296, 116 Stat. 2135). Previously, FLETC was part of the Enforcement Division of the Department of the Treasury.

[2]It should be noted that not all federal law enforcement agencies receive their training at FLETC. For example, the Federal Bureau of Investigation and the Drug Enforcement Administration have their own training facilities in Quantico, Va.

[3]For this report, capacity is defined as the resources required, such as instructors, facilities, and equipment, to achieve the optimum level of training. Its measurement depends upon the following factors: type of operation schedule (e.g., 5-day/8-hour schedule), the campus (e.g., Glynco), the time frame (e.g., a given fiscal year), and special considerations (e.g., changes in training priority, mission, or policy).

A141

were the result of increases in the personnel levels of the U.S. Border Patrol;[4] the increases were a function of initiatives to control illegal immigration along U.S. borders. FLETC, in cooperation with the Immigration and Naturalization Service (INS), established a separate, temporary campus in Charleston, South Carolina, in fiscal year 1996 to handle the demand for training Border Patrol agents because the main FLETC campus at Glynco, Georgia, could not accommodate this influx. The current influx has raised concerns also about the relevance, quality, and timeliness of training provided by FLETC. These concerns, in turn, have prompted some federal law enforcement agencies that use FLETC for their basic training to periodically consider establishing their own facilities, tailored to their unique training needs and philosophy. At the same time, however, Treasury and FLETC officials have said that the consolidated approach to federal law enforcement training has provided economy-of-scale savings annually, although these officials could not establish the actual amount of recent savings. According to the FLETC officials, most of the savings accrued from (1) achieving economies of scale that enabled them to charge training participants lower per diem rates at FLETC facilities than those participants would have incurred at their own training facilities and (2) avoiding the need for maintaining redundant or duplicate training facilities elsewhere.

The issue of consolidated federal law enforcement training is of particular interest to you and the Appropriations Committee, which is on record as being fully committed to the principle of such training. This report responds to an April 2002 request by Representatives Istook and Kingston; the House Appropriations Subcommittee on Homeland Security joined the request when it assumed jurisdiction over FLETC in Spring 2003. On the basis of discussions with your offices, we are addressing the following objectives:

- Determine the extent to which FLETC is able to meet the current and projected demand for training, how FLETC is planning to meet the demand, and the associated costs; and the extent to which FLETC coordinates or uses existing, non-FLETC government training assets, and any associated costs.

[4]On March 1, 2003, the border protection functions of the Border Patrol, and the border protection responsibilities of certain other agencies, such as the U.S. Customs Service and INS, were transferred to the Bureau of Customs and Border Protection within DHS. Since they each have their own training programs and academies at FLETC campuses, we use the terms Border Patrol, Customs, and INS to identify these agencies throughout this report.

- Examine FLETC's current organizational structures and processes for coordinating and scheduling training activities and whether FLETC plans any changes to these structures and processes.
- Review FLETC's oversight and governance structures and the extent to which these structures are providing guidance to FLETC as it addresses its capacity and planning challenges during a period of transformational change.

You also asked us to review the final version of FLETC's Master Plan. However, DHS did not give us the final plan for FLETC in time to be included in this report, citing its need to review the plan. Accordingly, we based our analysis of FLETC's planning for future facilities on the final draft version of the plan, submitted to us in April 2003, and the analyses of the other issues on the most recent information available. As agreed with your offices, once the final version of the Master Plan is provided to us (DHS estimated that it might provide the plan in late summer 2003), and the status of the training projections, system acquisition, and FLETC governance becomes more apparent, we will complete our analyses and brief you on any additional observations.

To develop our information, we visited the FLETC campuses in Glynn County, Ga. (commonly referred to as "Glynco"); Charleston, S.C.; Artesia, N. Mex.; and Cheltenham, Md. At the campuses, we observed training activities; met with FLETC managers and officials in charge of training, scheduling, information technology support, and infrastructure facilities, and held meetings with officials from various agencies, known as Partner Organizations (PO)—such as the Border Patrol and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)—that use these campuses. We reviewed relevant documents, including the 1970 memorandum of understanding (MOU) that established FLETC's roles and responsibilities in providing training to law enforcement agencies that are signatories to the MOU; FLETC budget requests and related justifications; PO and FLETC historical training statistics and projections for future training; FLETC's 1989 Master Plan, the 1996 Master Plan update; the 2003 draft final Master Plan for facilities assessment, construction, and renovation; and best practices related to facilities and information technology acquisition and governance and internal and management control. In addition to those we interviewed at the FLETC campuses, we met with headquarters officials at DHS; and the Departments of the Treasury, Justice, and Transportation and their components; and with staff from the Office of Management and Budget (OMB). We also met with a

A143

representative of the architectural and engineering firm in Norfolk, Virginia, retained by FLETC to help with its future planning.[5] We conducted our work from May 2002 through June 2003 in accordance with generally accepted government auditing standards. Appendix I provides more detailed information about the scope and methodology of our work.

## Results in Brief

Fueled initially by the growth in Border Patrol personnel that began in the mid-1990s, and currently by the surge in overall federal law enforcement personnel levels in response to the September 2001 terrorist attacks, the overall 5-day/8-hour capacity to provide training at the Glynco and Charleston campuses is strained, while the Artesia campus has been underutilized, and the Cheltenham campus is being upgraded and is not fully operational (e.g., the U.S. Capitol Police is conducting limited training using classrooms and several physical venues). FLETC has been able to generally meet POs' needs for *basic* training (the training provided to new recruits) by, among other things, operating a 6-day schedule at the Glynco campus and deferring POs' advanced classes (those provided to experienced personnel). POs offered a variety of views about the effect of the strained capacity on the training of their personnel—for example, former Justice POs[6] noted that the quality of the training had suffered; other POs said that although their students and instructors were fatigued and stressed, the quality of the training was still good. FLETC officials disputed the view that capacity constraints had a negative impact on PO training—these officials said that based on FLETC's own data, student scores, for example, had not declined. The strained capacity has had an adverse effect on the condition of FLETC facilities and the infrastructure that supports them. Continued use of these facilities at an accelerated rate without maintenance and renovation would likely lead to further deterioration and exacerbate capacity challenges.

FLETC has worked with an architectural and engineering firm to develop a Master Plan to help address long-term capacity challenges. The planning process raises several concerns about the assumptions and methodologies

[5]The firm, *Clark Nexsen, Architecture and Engineering*, was retained to develop an updated Master Plan and assist in establishing a strategy to analyze existing facilities and programs and handle future growth.

[6]The POs who expressed their opinions to us about the impact of the capacity constraints on their personnel were, at the time of our meetings, still part of the Department of Justice. On March 1, 2003, most of these POs moved to DHS.

A144

used to develop the plan's recommendations, and the extent to which they allow for contingencies, such as potential future surges or declines in demand for training; cost estimating and budgeting; and the extent to which the plan's recommendations would be implemented in time to help alleviate the capacity constraints. DHS officials told us they intend to review the plan, but might not adopt substantial parts of it, as the department is formulating its vision for federal law enforcement training in general and FLETC in particular—these officials said that while useful in some respects (e.g., it contains a comprehensive inventory of the condition of FLETC training facilities), the plan was essentially dated in its assumptions. FLETC does not have a formal contingency plan for addressing its capacity challenges during the period up to when facilities recommended by the Master Plan begin coming on line and, as a practice, has not routinely utilized alternative training assets (e.g., off-site training and e-learning) to provide basic training for POs.

In addition to strained training capacity challenges, FLETC faces a challenge to automate the scheduling of training for its POs. Specifically, FLETC's scheduling process uses a predominantly manual scheduling process that does not ensure the efficient use of training resources and poses internal control risks due to potential loss of scheduling materials and the lack of backup documentation. FLETC has recognized these risks and is in the process of acquiring an automated student administration and scheduling system (SASS) to address them. Although FLETC's plans and activities for acquiring the SASS generally include performance of certain key acquisition management functions, FLETC has yet to address important risk management issues associated with its SASS acquisition.[7] Moreover, with the exception of its SASS solicitation, FLETC's plans and activities do not incorporate recognized best practices for acquiring commercial off-the-shelf-based systems (COTS). Furthermore, FLETC's solicitation activities have not adequately addressed SASS security requirements. Taken as a whole, this means that FLETC's SASS acquisition is currently at risk of not delivering a system solution to best meet its needs. Although FLETC continues to develop documentation for the SASS proposal, at our urging, it is also working with the Border Patrol to determine whether its existing Academy Class Management System (ACMS), which is being enhanced with a scheduling module, can be used

[7]Managing project risk means proactively identifying facts and circumstances that increase the probability of failing to meet project commitments and taking steps to prevent this from occurring.

A145

instead of acquiring SASS. According to FLETC officials, if it chooses ACMS, FLETC could save the cost of the SASS solicitation and the system's estimated $10 million cost over 5 years, while spending considerably less to adopt the ACMS scheduling module.

FLETC faces challenges in its governance structure because (1) the status of its Board of Directors is unclear as FLETC, its individual board members, and DHS consider the Board's future; and (2) the Board's membership, roles and responsibilities, and past practices are not fully consistent with prevailing governance and internal and management control best practices. For example, according to a FLETC official the Board did not meet for a period of 3-½ years, prior to its most recent meeting in November 2002, even though it is required by its own charter to meet at least quarterly; and, according to governance best practices, the "typical" board of directors meets about eight times a year.[8] A DHS official said that DHS has recently assumed responsibility for FLETC and recognizes the need to provide guidance and oversight to FLETC; DHS has begun to work with FLETC to provide guidance related to its demand and capacity challenges. In addition, DHS recognizes the role an effective FLETC board could play in enhancing governance. Without effective internal and external governance and oversight, FLETC could be at risk of not effectively addressing the transformational challenges it faces.

Because of the importance to FLETC's ability to meet its considerable challenges, we are making recommendations to the Secretary of DHS to improve capacity planning, periodically assess the condition of training facilities and associated infrastructure through the use of performance measures, improve the acquisition process for an automated scheduling system, and enhance the governance and oversight capabilities of FLETC's Board of Directors.

We provided a draft of this report to DHS and to the Department of Justice for comment. In its response, from the Under Secretary for Border and Transportation Security, DHS generally agreed with our conclusions and recommendations and outlined actions it either had taken or was planning to take to implement the recommendations. DHS also provided technical comments and clarifications, including updated information on FLETC's SASS acquisition; we have incorporated them in this report where

[8] However, according to our review of Board minutes, the Board did not meet for a period of 5 years (from November 1997 to November 2002).

A146

appropriate. Justice did not submit formal written comments; the Associate Assistant Attorney General for Federal Law Enforcement Training submitted an email with two general comments related to the issues of FLETC training capacity and governance, respectively.

## Background

The September 2001 attacks spurred a significant surge in the numbers of federal law enforcement personnel to respond to the threat posed by terrorism. This surge, in turn, resulted in an influx of a large number of law enforcement personnel into FLETC's campuses around the country, over and above their historical enrollment. Preceding the attacks, in fiscal year 2001, over 21,000 students spent over 101,000 student weeks[9] training at FLETC's domestic campuses. In fiscal year 2002, primarily as a result of the post-attack surge, over 28,000 students spent about 157,000 weeks training at these campuses. Placing the training statistics in historical context, the weeks spent by students at FLETC in fiscal year 2002, for example, represented a *267-percent* increase over the level in fiscal year 1983 (the earliest year for which complete data were available) and a *72-percent* increase from the level of as recently as fiscal year 1999. FLETC's most recent adjusted domestic student training projections for fiscal year 2003 call for about 49,000 students to train for about 259,000 student weeks, with PO projections rising to all-time highs of over 57,000 students and about 283,000 student weeks in fiscal year 2004.

FLETC was established as a consolidated interagency training facility in the Department of the Treasury by a Treasury order dated March 2, 1970. Subsequent to the Treasury order, an MOU between FLETC and its POs was established in September 1970. As of June 2003, FLETC was working to revise its MOU with its POs to reflect the move to DHS, which occurred in March 2003, according to a FLETC official. The original MOU, which was revised in 1977 and again in 1984, states that FLETC is responsible for, among other things, providing recruit (basic), advanced, specialized, and refresher training for designated criminal law enforcement personnel; specialized law enforcement training for state and local government personnel if space is available; facilities and student support services necessary for specialized training conducted at FLETC by a PO; updated

[9]"Student week" is the statistical measure of capacity for training; FLETC has defined a student week as 5 days of training for one student. For example, if 100 students receive training during a fiscal year, of which 25 receive 3 weeks of training, 40 receive 6 weeks of training, and the remaining 35 receive 8 weeks of training, the campus would be providing 595 student weeks of training during that fiscal year [(25 X 3) + (40 X 6) + (35 X 8) = 595].

A147

training methods and curriculum content in response to the common needs of the participating law enforcement agencies; and dormitory space, food service, travel, and support services; and facilities for students trained at FLETC. The original POs were the Departments of the Interior, Justice, State, and Treasury; OMB; the U.S. Civil Service Commission—now the Office of Personnel Management; the U.S. Postal Service; and the Smithsonian Institution. FLETC's original MOU was expanded over time to currently include the training of law enforcement personnel from 75 POs. A list of these 75 POs appears in appendix II.

**Figure 1: Various FLETC Training Activities**



Source: FLETC.

As shown in figure 2, for fiscal year 2003, FLETC had an enacted budget of about $172 million, about 79 percent of which was for salaries and expenses and 21 percent for acquisition, construction, improvements, and

A148

related expenses. That year, FLETC had 878 full-time equivalent (FTE) permanent staff authorized. For fiscal year 2004, the budget request totaled about $146 million, of which about 84 percent was for operating expenses (formerly classified as "salaries and expenses") and about 16 percent for capital acquisition (formerly classified as "acquisition, construction, improvements, and related expenses"). For fiscal year 2004, the budget request calls for 754 FTE permanent staff.

**Figure 2: FLETC Fiscal Year 2003 Budget Enactment and Fiscal Year 2004 Budget Request**




Source: GAO analysis of FLETC data.

[a]"Facilities" refers to "acquisition, construction, improvements and related expenses" in fiscal year 2003 and "capital acquisition" in fiscal year 2004. No funding was requested for major construction in fiscal year 2004.

[b]"Human capital" refers to "salaries and expenses" in fiscal year 2003 and "operating expenses" in fiscal year 2004.

FLETC provides training at four domestic campuses.[10] Specifically, FLETC's largest campus, which also serves as its headquarters, is located in Glynn County, Georgia (referred to as "Glynco"), and was established in 1975. Most of FLETC's POs conduct their law enforcement basic training at the Glynco campus. FLETC's second campus, established in 1989, is located in Artesia, New Mexico. The resident agencies at Artesia are the Border Patrol (for advanced training only), the Bureau of Indian Affairs, Indian Police Academy (basic and advanced), the INS Officers Academy, the Transportation Security Administration's (TSA) Federal Air Marshals

[10]FLETC also has oversight responsibility on behalf of DHS for the International Law Enforcement Academy at Gabarone, Botswana.

A149

(FAM), and the U.S. Secret Service Uniformed Division. FLETC's third campus is a former naval base in Cheltenham, Maryland, that was transferred to FLETC in May 2001. FLETC intends to use the Cheltenham campus primarily as a driving and firearm re-qualification center for POs based in Washington, D.C., and its metropolitan area. At the time of our review, the campus was being upgraded and was not fully operational. According to FLETC officials, the Cheltenham campus will have, among other things, an indoor, 108-point, state-of-the-art firing range, and a multiuse, topographically varied driving course. Currently, over 12 federal, including the U.S. Capitol Police, and state and local law enforcement agencies are using the campus. FLETC officials at Cheltenham anticipate that approximately 61POs will use the campus' firearms and driving re-qualification center. The fourth domestic campus is the Border Patrol Academy in Charleston, South Carolina. FLETC officials said that to date, this academy has not been placed under FLETC's authority; however, FLETC provides technical support to the campus for the Border Patrol training. The campus was established in 1996 at a former naval base as a temporary facility to handle the surge in the number of Border Patrol agent recruits that were the result of a hiring initiative to control illegal immigration along U.S. borders. The existing FLETC campuses could not accommodate the Border Patrol's surge in the resulting demand for training. In October 2002, Public Law 107-248 directed that the Secretary of the Navy transfer administrative jurisdiction of Charleston, in effect, to DHS, although it is not clear whether FLETC would control the facilities.[11] In February 2003, Public Law 108-7 established the Charleston "law enforcement training facility" as a permanent training facility.[12] The campus has been extensively remodeled and outfitted to provide basic training to the Border Patrol's agent recruits; while it was originally scheduled to close in fiscal year 2004, if control of the Charleston facility transfers to FLETC, it intends to keep the campus open to help provide training capacity, regardless of who receives training there. In addition to the training provided directly by FLETC, a number of POs, such as the former Customs and INS, the U.S. Marshals Service, and the Internal Revenue Service, maintain their own "academies" at the FLETC campuses to provide agency-specific instruction to their recruits.

FLETC offers predominantly four types of training programs—recruit (basic), specialized, advanced, and refresher training. Appendix III

[11]Department of Defense Appropriations Act, 2003 (P.L 107-248, 116 Stat. 1519 (2002)).

[12]Consolidated Appropriations Resolution, 2003 (P.L. 108-7, 117 Stat. (2003)).

A150

provides a detailed description of the variations of training programs and seminars FLETC offers. Basic training (i.e., training provided to new recruits) has represented the greatest demand for FLETC's resources of all four types of programs given the increase in Border Patrol and the surge in federal law enforcement hiring since the September 11 attacks. Basic training is mandatory for entry-level federal law enforcement personnel, such as those hired by the Border Patrol, and is usually provided during the first year of employment to familiarize recruits with law enforcement skills and operations. Basic training also extensively uses FLETC's training facilities, including firearm and driver training facilities, in addition to classrooms and other physical education facilities.

For specialized training programs, such as agency-specific basic training programs (i.e., training provided by agencies immediately following FLETC's basic training), FLETC has the responsibility for providing instructors for the parts of the program that are standard to FLETC's curriculum, while the agency provides the part of the curriculum more specific to its mission. For example, FLETC provides the instructors for the Courtroom Testimony Lecture and shares responsibility with the Border Patrol for the Courtroom Testimony Laboratory. ATF and the Environmental Protection Agency, in addition to the Border Patrol are examples of agencies requiring specific programs as part of their basic training program. For the sections of the program that are not designated as a FLETC responsibility, the PO must provide instructors. FLETC also evaluates these programs to ensure that PO training objectives are being met.

Advanced training is usually provided to junior and senior-level law enforcement personnel as part of their continuing professional development. An agency that maintains its own academy at a FLETC campus, such as the Border Patrol, will typically use its own instructors for advanced training. If it has instructors available, FLETC may sometimes assist an academy with advanced training. Advanced training includes (1) training of inspectors or agents to be instructors; (2) "follow-on basic" training, where skills particular to an agency mission are taught; and (3) in-service training, which is typically an intensive seminar on a current issue or the development of a law enforcement or management skill.

FLETC also provides refresher training for its POs. For example, law enforcement personnel in the Washington, D.C., area will be able to receive refresher training in firearms and vehicle operation re-qualification at FLETC's Cheltenham campus.

A151

## FLETC's Training Capacity is Strained, and Its Planning for Adding Capacity Raises Concerns

FLETC's overall 5-day/8-hour capacity to provide training at the Glynco and Charleston campuses is currently strained, while the Artesia campus has been underutilized. The Cheltenham campus is being upgraded and is not fully operational, thus its contribution to FLETC's overall capacity is limited. POs offered a variety of views about the effect of the strained capacity on the training of their personnel—for example, former Justice POs now in DHS believed that the quality of the training had suffered, while other POs said that although their students and instructors were fatigued and stressed, they believed that the quality of the training was still good. The strained capacity has had an adverse effect also on the condition of FLETC facilities and the infrastructure that supports them; further deterioration could exacerbate capacity challenges. FLETC has worked with an architectural and engineering firm to develop a Master Plan to help overcome the long-term capacity challenges, although DHS officials said that the plan might no longer be germane to the department's vision for law enforcement training. The planning process raises several concerns about the assumptions and methodologies used to develop the plan's recommendations, and the extent to which they allow for contingencies, such as future surges or declines in demand; cost estimating and budgeting; and the extent to which the plan's recommendations would be implemented in time to help alleviate the capacity constraints. FLETC does not have a formal contingency plan for addressing its capacity challenges during the period up to when facilities recommended by the Master Plan begin coming on line and, as a practice, has not routinely utilized alternative training assets to provide basic training for POs.

### FLETC's Training Capacity Is Strained at the Glynco and Charleston Campuses

Primarily as the collective result of the surge in Border Patrol personnel levels begun in the mid-1990s and the surge in overall federal law enforcement personnel following the September 2001 terrorist attacks, the overall capacity to provide basic training at Glynco and Charleston is strained. As shown in table 1, the latest available PO-projected demand[13] exceeds the 5-day/8-hour capacity for fiscal year 2003, at these two training campuses. The combined capacity for a 5-day/8-hour workweek at

[13]FLETC uses PO projections of demand for training as part of its capacity planning. In March/April of each year, POs submit to FLETC their projections for training. These projections are generally a function of the need for personnel and expected funding levels. In June of each year, FLETC, in consultation with POs, adjusts the projections, in recent years by less than 5 percent. In addition to the projections they submit, throughout the year, POs may submit requests to add, defer, or cancel classes.

A152

the three FLETC campuses is about 67,000 student weeks short of projected demand, and for a 6-day/8-hour workweek about 28,000 student weeks short of the projected demand.

**Table 1: Capacity and Demand at the FLETC Campuses (in student weeks)**

| Campus | Optimum 5-day/8-hour capacity | Optimum 6-day/8-hour capacity | Fiscal year 2003 projected demand | FLETC estimated actual attendance (as of 4/30/03) | Difference between projected demand and estimated attendance |
|---|---|---|---|---|---|
| Glynco | | | 192,494 | 148,311 | 44,183 |
| November 2002 | 120,000 | 144,000 | | | |
| March 2003 (temporary increase in capacity) | 135,000 | 162,000 | | | |
| Charleston | 37,000 | 44,000 | 41,259 | 33,816 | 7,443 |
| Artesia | 27,000 | 32,000 | 32,095 | 18,556 | 13,539 |
| **Total** | **199,000** | **238,000** | **265,848** | **200,683** | **65,165** |

Source: GAO analysis of FLETC data.

However, also as shown in table 1, FLETC is estimating (as of April 30, 2003) that the actual number of student weeks spent at the three campuses will total 200,683 student weeks, or 25 percent less than the fiscal year 2003 projected levels. A FLETC official said that it is not unusual for actual attendance to fall short of projections because of factors such as recruiting shortfalls, funding reallocations, and classes that begin with less than their full complement. In fact, actual attendance (in student weeks) fell short of projections as recently as fiscal year 2001, when attendance was about 76 percent of the projected level. In fiscal year 2002, actual attendance was about 112 percent of the projected level.

The FLETC official attributed the difference in fiscal year 2003 to three principal factors. First, changes in TSA's projections—TSA originally projected about 49,000 student weeks of training primarily for airport security officers, and for "flight deck officers" (i.e., airline pilots trained to carry firearms in cockpits) and FAMs. However, the TSA projections have not materialized to date, with the estimated actual attendance totaling about 10,000 student weeks. Second, changes to the Border Patrol's projections—the Border Patrol originally projected about 46,000 student weeks of training for agents. However, the estimated actual attendance totals about 33,000 student weeks. Third, changes to the former INS's projections—INS originally projected about 50,000 student weeks of training for inspectors and agents. However, the estimated actual

A153

attendance totals about 40,000 student weeks. A FLETC official cautioned that the final actual attendance for fiscal year 2003 might be different than the estimates based on additional requests, DHS reorganization training guidelines, attrition, and additional hiring budgets. For example, there is a possibility that if funding is restored, TSA may yet end up needing a number of the student weeks it originally projected.

Even if the fiscal year 2003 projections do not ultimately materialize, FLETC's 5-day/8-hour capacity would still be strained. Specifically, the total estimated actual attendance of 200,683 student weeks will exceed the combined 5-day/8-hour capacity of 199,000 student weeks by about 1,700 student weeks. In discussing the capacity strains facing FLETC, we note that "student weeks" provides FLETC with a statistical measure of optimum throughput, or best case, training capacity (see footnote 3). This measure assumes that all of the requisite facilities, instructors, and equipment will be available to provide training when needed. However, capacity is ultimately a function of facilities, instructors, and equipment that are *actually* available to provide training at a point in time. Accordingly, while a number of student weeks may appear to be "available" (for example, as in the case of the Charleston campus, where estimated actual attendance is about 3,000 student weeks below the campus's 5-day/8-hour capacity); at any given time, a number of physical and human "choke points," or training obstacles, either individually or collectively result in capacity constraints. Thus, the choke points essentially reduce the number of available student weeks from the best-case level.

In this regard, a number of choke points are causing the capacity strains that the Glynco and Charleston campuses are experiencing. Specifically, according to FLETC, the principal choke points that are collectively causing the capacity strain at Glynco are the firearms ranges, driving ranges, practical exercise facilities, the dining hall, classrooms, dormitories, and a shortage of instructors and support staff. At Charleston, the choke points include the firearms ranges, driving ranges, and a shortage of instructors—illustrating the effect of choke points on capacity at Charleston, during fiscal year 2003, the Border Patrol had to defer 3 classes of agent training because the campus's emergency response driving range had to be taken off-line for resurfacing. According to FLETC officials, had these classes actually taken place, Charleston's 5-day/8-hour capacity would have been met or exceeded.

On the basis of the latest PO projections for training demand, FLETC's overall capacity strain is expected to continue for fiscal year 2004.

A154

However, for fiscal years 2005 through 2008, PO projections show a relatively stable decrease in demand from fiscal year 2004 peak levels, but projected demand still exceeds FLETC's fiscal year 2003 5-day/8-hour capacity and is approaching the current 6-day/8-hour capacity. Figure 3 shows the difference between combined projected demand and combined current capacity of FLETC facilities for fiscal years 1997 through 2008.

**Figure 3: Partner Organization Training Projections Compared to Current Combined Campus Optimum Capacity (in student weeks)**




Source: GAO analysis of FLETC data.

Note: This graph includes the Glynco, Artesia, and Charleston campuses.

## Artesia Campus Has Been Underutilized

While capacity at the Glynco and Charleston campuses has been strained, the Artesia campus has been underutilized following the completion of FAM's ramped-up training during fiscal year 2002. In this regard, as shown in table 1, Artesia has an annual capacity of 27,000 student weeks for a 5-day/8-hour schedule and 32,000 student weeks for a 6-day/8-hour schedule. In fiscal year 2002, PO trainees spent 19,188 student weeks at Artesia, well short of capacity. Although PO demand projections of 32,095 student weeks initially suggested that the Artesia campus would experience some minor capacity strains in fiscal year 2003, it is not clear that the campus will be fully utilized. Specifically, based on year-to-date attendance data through April 2003, FLETC estimated that 18,556 student

A155

weeks will actually be spent at Artesia, well short of the levels originally projected by POs. As discussed earlier, according to FLETC officials, the shortfall is primarily caused by TSA's original projections for training not materializing—part of this training was to be held at the Artesia campus. FLETC officials cautioned, however, that the final actual attendance might be different than the April 2003 estimate, and could be somewhat closer to the original projection based on additional PO requests, DHS reorganization training guidelines, attrition, and additional hiring budgets.

In addition to Artesia's underutilized housing and firearms ranges, the live-fire shoot houses and three Boeing 727s, specially configured for terrorism training, have not been used since the FAMs completed their training (see figure 4). A FLETC official indicated that it is conducting marketing and other types of activities to attract a number of additional users to the campus. In this regard, several POs told us that they considered Artesia to be too remote of a location to send their recruits and, especially, their instructors for training. The FLETC officials stressed that the Artesia campus could not, as currently configured, and discussed later, handle the transfer of the Border Patrol's basic training from the Charleston campus to Artesia, as proposed in the Master Plan. If the transfer were to occur, the Border Patrol's projected fiscal year 2003 demand for training would exceed Artesia's 5-day/8-hour capacity by at least 6,000 student weeks and up to 14,000 student weeks, depending on the schedule adopted.

**Figure 4: FLETC Campus at Artesia, New Mexico**



Source: FLETC.

## FLETC Has Generally Met PO Needs for Basic Training

Despite its strained capacity, FLETC has nevertheless been able to generally meet its POs' demand for basic training principally by, among other things,

- operating on a 6-day, multiple-shift training week at its Glynco campus to overcome constrained resources;
- deferring some training programs for certain POs that were not originally projected and that were made late in the year—for example, the Secret Service, Customs, and the General Services Administration's Federal Protective Service made such requests;
- canceling or deferring some of the POs' advanced training classes following the September 2001 attacks—FLETC rescheduled about 5 percent of these classes within the fiscal year;
- continuing to schedule and conduct Border Patrol's basic training at the Charleston campus, in cooperation with the Bureau of Customs and Border Protection/Border Patrol;
- rotating instructors to most needed areas of work; and
- converting buildings and trailers that had been previously utilized for office space into training facilities such as raid houses, mat rooms, classrooms, and firearms simulations.

A157

We note that while this approach may have helped mitigate the capacity constraints in the short term, deferring or canceling training may exacerbate any potential future strains on FLETC capacity—this training would likely need to be made up sometime in the future—and result in law enforcement personnel not being available for duty when needed.

## PO Views about the Effect of the Capacity Strains on Their Personnel

POs offered a variety of views about the effect of FLETC's strained capacity on their training, in terms of, among other things, trainee attrition, the quality and timeliness of instruction, and instructor morale and retention. For example, representing the views of Justice POs (prior to their transition to DHS), a senior Justice official said that the strained capacity—and especially the need to train 6 days a week at Glynco—had resulted in higher attrition rates for trainees and fatigue, burnout, and low morale for instructors. In addition, according to this official, the quality of instruction, and thus that of the training received, had suffered. Further, a May 2002 internal Justice report on FLETC training issues noted that one of its component agencies had to cancel all of its "badly needed" advanced training due to the lack of space at FLETC. In commenting on a draft of this report, FLETC said that the PO was actually asked to shift its training within the fiscal year but declined to do so. The Justice report also noted that the 6-day training arrangement caused additional problems for Justice POs, including having to pay overtime and having difficulty in attracting and retaining instructors. Separately, a former Treasury PO reported that FLETC had to defer basic training for 168 agent recruits because of capacity constraints—since they could not be trained, and thus not deployed, these recruits were assigned nonagent, desk work. Basic training for recruits hired by September 2002 was to be completed in about 11 weeks. However, capacity strains caused FLETC to train the recruits in stages, with some not completing their training until February 2003. FLETC officials disputed the POs views that capacity constraints had had a negative impact on training. These officials said that based on FLETC's own data for the period of the capacity constraints, overall student test scores had not declined in a statistically significant manner over time, and student surveys continued to show a high level of satisfaction with FLETC's training services. Regarding the aforementioned example of the Treasury PO deferral, FLETC said that the PO's request was for 240 students and was not initially projected. FLETC also said that it was actually able to accommodate immediately 72 of the students.

Other POs indicated that while their instructors and students generally experienced greater fatigue and stress as a result of FLETC's capacity constraints, the quality of the training had not suffered significantly. For

A158

example, one PO said that although there was a slight decline in student test scores, it was unclear whether this decline could be attributed exclusively to the capacity strain. The same PO reported that the extended hours resulting from the constraints actually allowed its trainees to complete their training in 9 weeks instead of 11, allowing them to be deployed to duty assignments sooner.

## Capacity Strains Have Impacted the Condition of Facilities and Supporting Infrastructure

FLETC's implementation of 6-day, multiple-shift training at Glynco to help alleviate the capacity constraints at that campus has led to the intensive scheduling of its facilities. Such above-average usage of facilities places additional loads and strains on their systems and components, increasing the need for maintenance and repair.[14] Maintenance programs and renovation projects are often deferred, according to FLETC officials, due to the lack of funding or an ability to only schedule facility "down time" for maintenance in the evenings and on Sundays. Cheltenham, for example, has an electrical system that is subject to failure at any time and a chlorination system that has failed, resulting in the need to provide bottled water for drinking. At the time of our site visits, utility upgrades were needed at Glynco, Cheltenham, and Artesia, and road and parking upgrades were needed at Glynco and Cheltenham; many facilities at Glynco are now only available for maintenance during evening hours or on Sundays. Although not quantifiable at this point, continued deterioration of facilities would likely lead to increased capital requirements in the future and adversely affect employee working conditions and retention.[15]

FLETC has considered the degradation issue in some of its internal reports; however, FLETC does not have any immediate contingency plans to address facility degradation. Such planning would be vital to help address the potential impact of facility degradation on FLETC's already strained capacity. Many organizations use periodic facility condition assessments to establish baseline facility data and to aid in planning for short- and long-range facility maintenance and repair needs. Currently, FLETC does not have detailed information about the condition of its facilities. A "Facility Condition Index" (FCI) would help to address the degradation issue by giving measurable performance data about its facilities rather than relying on anecdotal information. An FCI is the ratio

[14]National Research Council, *"Stewardship of Federal Facilities—A Proactive Strategy for Managing the Nation's Public Assets,"* (Washington, D.C.: National Academy Press, 1998).

[15]Ibid.

A159

of the cost of maintenance and repair deficiencies to the facility's current replacement value. A FCI value of less than 0.05 is generally considered to represent a "good" facility condition.

The draft final version of the Master Plan concluded that although FLETC had done a commendable job in handling the ever-increasing demand for training, it had done so at a price. Part of this price has been the degradation of its facilities—funding has been focused on building new facilities to alleviate choke points, while maintenance and renovation have been continuously deferred due to the lack of funding. Echoing our own concerns about this issue, the firm that developed the plan concluded that continuation of this cycle will eventually result in building element or critical infrastructure failures and made recommendations for renovations and expansion as part of its broader three-phase approach for improving and expanding FLETC's capacity.

## FLETC Master Plan Intended to Help Alleviate Capacity Constraints

The Master Plan's recommendations for renovation and expansion of existing, and the construction of new facilities are arrayed in three, partly overlapping, 5-7 year construction phases for each of the campuses (except Charleston, which FLETC had, at the time the Master Plan was being developed, assumed would close by 2004). The first phase of construction extends at maximum from 2006 to 2011, the second from 2009 to 2015, and the third from 2013 to 2019. Each phase includes a mix of renovation and expansion projects, as well as the construction of new facilities. According to FLETC, the extent of additional capacity, in terms of student weeks, would depend on the completion of the construction projects, the programmatic mix, and other factors (e.g., the requisite staffing being available). As shown in table 2, if the plan's prioritized list of construction projects for phase 1 were to be completed, and the programmatic mix and other factors did not change, the capacities of Glynco and Artesia would increase as follows: for Glynco, 193,500 student weeks for the 5-day/8-hour schedule, 232,000 student weeks for the 6-day/8-hour schedule, and 278,000 student weeks for the 6-day/12-hour schedule; for Artesia, 55,000 student weeks for the 5-day/8-hour schedule, 66,000 student weeks for the 6-day/8-hour schedule, and 79,000 student weeks for the 6-day/12-hour schedule. The Cheltenham campus is not included since it is being upgraded and FLETC currently does not intend to use the campus as a residential facility.

A160

**Table 2: Potential Campus Capacities Following Completion of Phase I Master Plan Projects (in student weeks)**

| Campus | 5-day/8-hour | 6-day/8-hour | 6-day/12-hour |
|---|---|---|---|
| Glynco | 193,500 | 232,000 | 278,000 |
| Artesia | 55,000 | 66,000 | 79,000 |
| **Total** | **248,500** | **298,000** | **357,000** |

Source: GAO analysis of FLETC data.

The April 2003 final draft of the plan estimates the combined cost of the three phases to be about $907 million; the estimate includes costs for construction and furnishings and fixtures but excludes operation and maintenance (O&M) costs. O&M costs are estimated separately for the period of 2008 through 2040 from the project costs and total about $269 million.

## FLETC's Planning to Address Its Capacity Constraints Raises Concerns

The FLETC Master Plan's assumptions and methodologies in particular, and FLETC's plan to address its capacity constraints in general, raise a number of concerns. First, the plan assumes that the Border Patrol will shift its basic training from the Charleston campus to the Artesia campus and that the Charleston campus will close.[16] However, as indicated earlier, the Consolidated Appropriations Resolution, 2003 (Public Law 108-7), established the Charleston "law enforcement training facility" as a permanent training facility. While the Department of Defense Appropriations Act, 2003 (Public Law 107-248) directed the Secretary of the Navy to transfer administrative jurisdiction of the Charleston law enforcement training facility to, in effect, the DHS, it is not clear whether FLETC will be the entity within the department to assume responsibility of the facility, and which FLETC POs, if any, will receive training there.

[16]There were, in the past, some congressional committee expectations that the temporary training facility at Charleston would close. In 1998, for example, a House Appropriations Committee report, citing a commitment to the principle of consolidated federal law enforcement training through FLETC, expressed an expectation that the administration would strive to close the temporary training facility at Charleston. H.R. Rep. No. 105-592 (1998). In March 2000, the then Director of FLETC testified before the Senate Committee on Appropriations, Treasury and General Government Subcommittee, that plans, at that time, called for Charleston to be closed by the fiscal year 2004 time frame, once the training requirements for the new Border Patrol hires were completed and/or new facilities became available to accommodate the training at FLETC's permanent locations. S.Hrg. 106-712 at 152 (March 30, 2000).

A161

Second, the Master Plan assumes that the training schedule at Glynco will return to a 5-day/8-hour week, but a FLETC official acknowledged that a return to such a shift for basic training is unlikely in at least fiscal year 2004, given the current and projected demands for training at the campus. Third, the plan assumes a set of baseline projections of future demand for training for each of the campuses from which future facility needs are generated. These Master Plan projections are lower than the latest projected attendance levels that FLETC is currently facing. Specifically, while several baseline workload scenarios were originally considered, only one was actually utilized to estimate the future need for facilities. Using a single baseline is questionable because it excludes accounting for possible future increases or decreases in the demand for training that would render the original baseline obsolete.

Fourth, the plan assumes constant (or straight-line) growth rates in projecting the need for additional facilities at each FLETC campus. However, these growth rates are based on historical precedent and do not fully take into account recent events such as today's new security environment and the resulting surge in the demand for training of law enforcement personnel, and do not take into account future events such as potential further surges, or declines, in training demand, or changes in the attrition of federal law enforcement personnel. Finally, the plan does not assume potential efficiencies that might result from FLETC's planned automation of its system for scheduling training (discussed below). Use of such an automated system could result in more efficient scheduling of facilities. The firm that developed the plan acknowledges that if efficiencies were to be achieved through the automation of scheduling, the plan would need to be revised.

Concerns about FLETC's planning also involve the Master Plan's cost estimates and future budget requests for construction and the extent to which the plan's phase 1 recommendations would be implemented in time to begin alleviating the capacity constraints. Regarding the cost estimates, the Master Plan's estimates should be treated with considerable caution. Specifically, although we did not analyze the plan's estimates in detail, we note two broad concerns. First, because the plan's recommendations have not proceeded beyond the conceptual or early design stage, the cost estimates are likely to be very "soft," with considerable potential upside tendency—at the conceptual stage; costs are likely to vary by as much as 50 percent. Second, the plan's recommendations and their design may be altered by DHS as part of its ongoing review of the plan (discussed later), thus changing the estimated costs. Further, a FLETC official said he identified a number of cost errors as part of his review of the April 2003

A162

version of the final draft of the plan—these errors involved life cycle-costs, O&M costs, and architectural and engineering fees. We also found, and brought to FLETC's attention, cost discrepancies between the 90-percent and final draft versions of the plan's phase 1 construction totaling over $100 million. For the entire plan, the discrepancies totaled over $200 million. A FLETC official concurred that there were discrepancies and told us that FLETC was working to resolve them. In terms of future budget requests for construction, the estimated costs for the first phase of the Master Plan are more than five times the total appropriated amounts for new facilities and renovations for fiscal years 2001 through 2003 and the request for fiscal year 2004. A FLETC budget official said that in terms of lead time to fund the plan's recommendations, FLETC, in keeping with its past practice, would likely request the entire amount up front for all approved projects. Based on capital acquisition best practices, this approach is not unusual in the construction field. In this regard, a DHS official said that a request for construction expenditures for training facilities was not expected until the fiscal year 2005 budget cycle.

In terms of the timely implementation of the Master Plan's recommendations, construction of the projects recommended in the plan's first phase would not begin to be completed until 2008 at the earliest, leaving a gap of at least 5 years of continued strained capacity that would need to be addressed through other means.

## FLETC Does Not Have a Contingency Plan to Address Capacity Constraints and Has Not Routinely Utilized Alternative Assets to Provide Basic Training

Adding to the long-term challenge of addressing its capacity constraints, FLETC does not currently have a formal written training contingency plan independent of the Master Plan for addressing its immediate training capacity challenges, or the challenges leading up to when the plan's recommendations are expected to come on line in 2008. FLETC officials said that although they would like to have a written training contingency plan, and had been developing a contingency planning process, they were operating in an essentially reactive mode to address the more immediate issue of responding to continuing surges in the demand for training. In this regard, a FLETC official said that in this regard it would consider adding more shifts to the Glynco campus if needed.

Further, FLETC neither has, as a routine practice, utilized alternative training assets to provide basic training for its federal POs (including off-site training locations, e-linkages, and satellite communications), nor does it have a formal plan for doing so. FLETC officials indicated that these measures were to be given more consideration in the future as a means of addressing campus capacity strains. FLETC officials explained that they

A163

had been reluctant to provide PO training in facilities they did not own because they could not control the training schedule, given the absence of ongoing arrangements with the owners of such facilities. Instead, according to FLETC officials, on a limited and informal basis, FLETC facilitated the use of alternative training facilities by some law enforcement agencies when it could not immediately accommodate their training needs. A FLETC working group initiated by DHS is currently reviewing the extent to which training assets—in addition to the FLETC campuses—owned by DHS component agencies can be used for training.

### DHS Is Reviewing FLETC's Master Plan, but Considers It of Limited Future Use

DHS officials said that the department was in the process of reviewing the Master Plan, to be followed by an OMB review. Without offering details, they also said that although useful in some respects, the plan might not be germane as the department develops its vision of law enforcement training for FLETC. These officials said they considered the plan useful as a tool in identifying the condition of existing FLETC facilities and the need for expansion. However, they did not view the plan as a roadmap for the future. A DHS official expected the review process of the plan to be completed by mid July 2003.

In concert with its review of the Master Plan, DHS has tasked FLETC to chair a working group—the Training Academy Charter Committee—comprised of department component agencies to inventory their training assets and develop a coordinated strategy so that these assets are used effectively to provide training. FLETC's specific task is to develop a survey instrument, collect and analyze the survey results, and play a role in developing recommendations. A FLETC official expects the committee's work to be completed by July 2003.

## FLETC's Current Scheduling System Is at Risk and Its Acquisition of an Automated System Raises Concerns

Within the context of strained training capacity, FLETC's scheduling process poses internal control risks. FLETC relies on a predominantly manual scheduling process that does not ensure the efficient use of training resources and poses internal control risks due to potential loss of scheduling materials and the lack of backup documentation. FLETC has recognized these risks and is in the process of acquiring an automated system, SASS, to address them. Although FLETC's plans and activities for acquiring SASS generally include performance of certain key acquisition management functions, FLETC officials have yet to address important risk management issues associated with its SASS acquisition. Moreover, with the exception of its SASS solicitation, FLETC's plans and activities do not incorporate recognized best practices for acquiring commercial off-the-

A164

shelf-based systems. FLETC's solicitation activities have not adequately addressed SASS security requirements. Taken as a whole, this means that FLETC's SASS acquisition is currently at risk of not delivering a system solution to best meet its needs. While FLETC continues to develop the SASS request for proposals (RFP)—at our urging, it is also working with the Border Patrol to determine whether its existing ACMS can be used instead of acquiring SASS.

## Current Scheduling System Places the Delivery of Training Services at Risk and Does Not Maximize Use of Existing Facilities

FLETC's current system for scheduling training places efficient delivery of training services at risk. FLETC's scheduling system is predominantly manual and only partly automated. The manual part of the system involves, among other things, the use of large desk calendars, colored markers, and color-coded post-it notes to schedule things such as student classes, student housing, classrooms, instructors, language and computer laboratories, firing ranges, driving ranges, and mat rooms. As schedules change, for example, the notes are moved on the calendar to different dates; cut-and-pasting is also used to change schedules. Markers are used to color blocks of dates for training by particular POs. FLETC's scheduling subsystems at three of the four[17] campuses are also predominantly manual systems that require labor-intensive corrections if even one course is changed. In addition, the scheduling subsystems do not interface with one another, thus requiring time-consuming efforts to communicate.

The paper-intensive nature of the system raises issues of internal control. FLETC's ability to adequately schedule training for most of its 75 POs at its campuses is further hampered by its reliance on certain key schedulers to keep the system functioning. The campuses in Charleston and Artesia each have a single scheduler to handle all of the scheduling, without any backup. Further, at the Glynco campus, the loss of key scheduling documents that are currently kept in a single "master binder" without a backup could significantly hamper FLETC's scheduling. FLETC schedulers said that if this binder were to be lost or destroyed, they would have to undertake a time-consuming process to manually recreate most of the training schedules by soliciting relevant information from affected POs. In this regard, according to the Comptroller General's standards for internal

[17]At FLETC's fourth campus, in Cheltenham, Maryland, the Capitol Police reports its daily student throughput to FLETC's Cheltenham Scheduling Office and schedules use of buildings and grounds.

A165

control,[18] vulnerable assets, in this case the master binder, should be subject to secure physical control in order to be safeguarded against loss; in addition, a disaster recovery plan helps recover from a loss. The standards also call for the accurate and timely recording and documentation of transactions and significant events, in this case the scheduling of training. According to the standards, documentation of transactions and events needs to be complete and accurate to facilitate tracing from initiation to completion.

FLETC has acknowledged the manual scheduling system's shortcomings and its implications for efficiency and risk management. FLETC officials told us that its scheduling system does not provide for the optimal use of existing facilities, especially for sequencing classes. For example, only one class can use a 4-course driving range at any given time; while the class completes one course, the other three remain idle. More efficient scheduling would enable four classes to rotate through the driving range's courses. The Master Plan's analysis also suggests that automating the scheduling could help gain efficiencies in the use of existing facilities.

FLETC officials have recognized the need for a fully automated system that can address FLETC's vast scheduling needs, including quickly incorporating any changes once a schedule has been prepared. In this regard, FLETC listed in its draft SASS RFP the challenges, and their effects, associated with its manual system. The draft RFP stated that current business processes in support of FLETC's student administration and scheduling were complex, not integrated, and were often performed manually. Historically, according to the draft RFP, this has resulted in (1) FLETC schedulers reacting to ever-changing training projections; (2) a manual, paper-laden, and slow student scheduling and registration process requiring student information to be entered into multiple data systems; and (3) inconsistent student information processed throughout the system and numerous changes caused by ever-changing projections in the demand for training. A FLETC official also said that a manual recalculation and distribution of class schedules each time a change is made to a single class.

[18]See U.S. General Accounting Office, *Internal Control Standards: Internal Control Management and Evaluation Tool*, GAO-01-1008G (Washington, D.C.: Aug. 2001).

A166

## Background on the SASS Acquisition

The SASS acquisition project began in 1999, when Congress provided FLETC with $350,000 to begin planning for automating its scheduling process. After completing requirements definition in December 2000 and its market research activities in December 2001, FLETC decided to expand the project to provide a training management system, rather than just a scheduling system. In researching SASS alternatives, FLETC officials determined that utilizing commercially available components or products was its preferred alternative. Accordingly, FLETC decided to pursue a COTS. FLETC began developing its request for vendor proposals in 2001 and in May 2002 FLETC issued a request for proposals, a solicitation package that included background on the project, project objectives, system requirements, and other information. However, according to FLETC officials, vendors were concerned about the time and expense required to submit an adequate proposal as well as the criteria proposed to evaluate potential solutions. As a result, FLETC withdrew the solicitation and is currently revising it to address these concerns. According to a FLETC official, issuance of the SASS RFP has been delayed, pending the outcome of an effort to determine whether a similar system being developed separately by the Border Patrol, Customs, and INS can be used by FLETC. This effort is discussed in the following sections.

FLETC plans to implement SASS within a 1-year period after signing a contract, and officials estimate an approximate 5-year cost of $10 million (1 base-year and 4 option-years, including maintenance). SASS is a subproject within an overall FLETC information technology (IT) modernization project. Because FLETC intends to encourage vendors to be innovative in offering possible solutions, the system requirements to be included in the solicitation are for information purposes only. For example, FLETC officials said that SASS may or may not be physically located at FLETC's Glynco campus, depending on the selected solution, but all four facilities should have access to the system.

## FLETC Has Yet to Address Important SASS Acquisition Issues

FLETC's plans and activities for acquiring SASS generally include the performance of certain key acquisition management functions, such as acquisition planning, solicitation, requirements management, and project management. However, first, FLETC has yet to focus on another key acquisition function—risk management. Second, with the exception of solicitation, FLETC's attempt to obtain a COTS-based system lacks some acquisition best practices. These practices call for continuous tradeoff among such interdependent acquisition variables as system requirements, commercially available system products and components, cost and schedule constraints, and the architectural environment within which the

A167

system will operate. Third, FLETC solicitation activities have not adequately addressed SASS security requirements. Taken as a whole, this means that FLETC's SASS acquisition is currently at risk of not delivering a system solution to best meet FLETC's needs.

## Certain Acquisition Functions Are Being Performed

Carnegie Mellon University's Software Engineering Institute (SEI), recognized for its expertise in acquiring software-intensive systems, has published an acquisition management model that defines key acquisition functions and assigns them to five incremental stages of maturity.[19] According to SEI, the following acquisition functions are part of a minimum set that need to be practiced in order for software-intensive systems to be acquired in a repeatable, effective manner: acquisition planning, solicitation, requirements management, and project management.

On its SASS acquisition, FLETC is performing these functions in a manner that is generally consistent with SEI's maturity model, as described later. According to FLETC officials, these functions are being performed because they are following agency IT guidance that specifies processes and procedures for acquiring and managing IT investments. By performing them, FLETC is providing a margin of assurance that SASS will be effectively acquired.

*Acquisition planning*. The purpose of acquisition planning is to ensure that reasonable planning for the acquisition is conducted and that all elements of the project are included. Among other things, this involves assigning project responsibilities and documenting an acquisition strategy that specifies, for example, acquisition objectives and methods, project constraints, contract types and terms, and schedule and cost estimates. For SASS, FLETC is performing these activities. Responsibility for the acquisition has been assigned to IT and contracting personnel. FLETC has also documented an acquisition strategy that defines acquisition objectives and methods (e.g., maximum use of commercial products) and project constraints (e.g., FLETC's right to inspect all services provided). FLETC has also defined a contract type and terms, (5-year, fixed cost with award fee), and it estimates that the selected system will be implemented within 1 year of contract award and cost about $10 million over the 5-year contract period.

[19]Software Engineering Institute, *Software Acquisition Capability Maturity Model® Version 1.03*, CMU/SEI-2002-TR-010 (Pittsburgh, PA: March 2002).

A168

*Solicitation.* The purpose of solicitation is to prepare a documentation package that identifies acquisition needs and selects the best provider and solution to meet those needs. Examples of solicitation practices include educating end users and others about the planned solicitation and engaging them in developing a solicitation package that includes objectives; technical and other product evaluation criteria; and contract acceptance procedures, criteria, and payments. FLETC has done this for the SASS acquisition. The SASS project office has engaged FLETC's training divisions in developing the package and educated them about business process changes that may need to accompany the system's implementation. Further, the solicitation package[20] (i.e., RFPs) contains FLETC's objectives for the overall acquisition; evaluation criteria; and acceptance procedures, criteria, and payment methods.

*Requirements management.* The purpose of requirements management is to establish a common and unambiguous definition of requirements that is understood by users, the project team, and suppliers. Requirements management includes, among other things, establishing the project scope, assigning specific responsibilities for managing the requirements, collecting end-user input, and establishing a baseline set of requirements before releasing the solicitation. FLETC has done this. For example, FLETC has defined the project scope to be a total system solution for student registration and scheduling. FLETC has also assigned requirements management responsibilities to an integrated process team, obtained user input by canvassing FLETC training divisions and having them verify the system requirements, and established a baseline requirements set in a December 2000 software requirements specification.

*Project Management.* The purpose of project management is to manage project office activities and support units to ensure a timely, efficient, and effective acquisition. Examples of project management practices are defining project responsibilities, engaging user organizations, and identifying project costs and schedules. FLETC has performed each of these. Namely, an IT project manager, supported by a staff project office, is in place, training division heads are participating in the project, and cost and schedule estimates have been developed.

[20]FLETC issued a SASS RFP in 2002. However, because of vendor complaints about the potential costs involved in preparing their respective proposals, FLETC withdrew the request and is now revising it.

A169

## Acquisition Risk Management Is Not Being Performed

SEI's acquisition model also recognizes the need to manage acquisition risks. Moreover, many software acquisition experts consider risk management to be one of the most important acquisition areas. The purpose of risk management is to identify risks as early as possible, manage those risks, and develop and implement a risk management process. Risk management includes identifying risks and categorizing them based on probability and impact, developing risk mitigation strategies, implementing the strategies, and tracking and reporting on progress.

During our review, FLETC officials told us they had yet to begin risk management activities, or establish any type of risk management function, and they did not plan to begin such activities until they receive the vendors' proposals. Following our inquiry, officials told us they (1) recognize that risk management is important to overall project success; (2) have a rough draft of a risk management plan; and (3) in May 2003, developed a project risk assessment plan for SASS. FLETC has not provided us with these documents, and not having completed these actions at this point is not consistent with SEI guidance, which advocates early and continuous management of risks so as to minimize the chances of risks becoming actual problems (i.e., system cost, schedule, and capability shortfalls). By waiting to manage risks, FLETC is not proactively mitigating known SASS risks; such as those that SEI reports to be inherent in a COTS-based acquisition (e.g., volatility of the commercial market and organizational resistance to business process changes required by a COTS-based solution). The result is a reduced probability of delivering promised SASS capabilities on time and within budget.

## Approach to Performing Acquisition Functions Lacks Two Key Elements

Notwithstanding the fact that FLETC is performing key SASS acquisition functions, it is deficient in its performance of these functions in two ways. First, its solicitation package does not adequately address system security. Second, with the exception of solicitation, FLETC has not adequately provided for the use of COTS-based system acquisition best practices in performing these functions. According to FLETC officials, the former is an oversight that they have hired a security manager to address, and the latter is a byproduct of their focus to date on solicitation activities. They added that they plan to incorporate COTS-based system acquisition best practices in their performance of other SASS acquisition function as soon as the solicitation is released. Until they do, the SASS acquisition is at risk of not delivering FLETC users with a secure, long-term, cost-effective system to support FLETC's mission needs.

A170

*Security*. Since 1997, we have designated information security as a governmentwide, high-risk area because of significant and pervasive agency weaknesses in controls over computerized operations, due, in part, to the government's increasing reliance on commercially available information technology.[21] Addressing these risks requires that agencies ensure that adequate security controls are part of every new system acquisition and deployment. In the case of SASS, this means that FLETC needs to, among other things, adequately specify its security requirements in the SASS solicitation package. However, FLETC has not done so. For example, the SASS security requirements reference the Computer Security Act of 1987[22] but do not specify relevant National Institute of Standards and Technology guidelines.[23] These guidelines, for example, specify authorization and access controls. After we brought this to the attention of FLETC officials, they said that this was an oversight, that they have hired a security manager to address this area of concern, and that the revised solicitation package will include missing security requirements. If it does not, FLETC risks acquiring and deploying a system that will not be secure.

*COTS-based System Acquisition Practices*. SEI research shows that the market-driven capabilities embedded in commercial products and components necessitate that organizations not be overly requirements focused when acquiring COTS-based systems. Rather, SEI advocates that organizations plan and execute these acquisitions in a manner that recognizes the competing interests—and necessary tradeoffs—among four acquisition variables: system requirements, the organization's architectural environment (current and future) that the system needs to operate within,

[21]U.S. General Accounting Office, *High Risk Series: Protecting Information Systems Supporting the Federal Government and the Nation's Critical Infrastructures*, GAO-03-121 (Washington, D.C.: Jan. 2003).

[22]The Computer Security Act of 1987, as amended, (P.L.100-235, 101 Stat. 1724 (1988) requires federal agencies with computer systems that process sensitive information to identify and develop security plans for the systems and to provide periodic computer security training to personnel managing, using, and operating these systems. The Act defines sensitive information as any information that if lost, misused, or accessed or modified without proper authorization could adversely affect either the national interest or conduct of federal programs, or the privacy to which individuals are entitled under the Privacy Act of 1974 (P.L. 93-579).

[23]See, for example, National Institute of Standards and Technology, Guidelines to Federal Organizations on Security Assurance and Acquisition/Use of Tested/Evaluated Products: Recommendations of the National Institute of Standards and Technology, NIST SP 800-23 (Aug. 2000) and Guide For Developing Security Plans for Information Technology Systems, NIST SP 800-18 (Dec. 1998).

A171

the cost and schedule constraints that limit the system acquisition, and the commercially available system products and components (current and future).[24] According to SEI, analyzing and understanding the tradeoffs among these variables are vital to informed decision-making and thus should be addressed early and continuously throughout a project's life cycle. As such, provision for performing this fundamental tradeoff analysis and decision-making should be embedded in each acquisition function, including the ones that we reviewed for SASS.

To FLETC's credit, its solicitation plans and activities provide for employing these COTS-based system practices. For example, the solicitation does not prescribe a solution that is based upon customized, "must-have" requirements. Rather, FLETC provided "information-only" requirements, intended to provide an understanding of the nature of its scheduling process needs and environment so as to maximize the flexibility afforded vendors in proposing approaches to meet these needs.[25] However, FLETC's SASS acquisition planning, requirements management, and project management efforts do not similarly provide for performing these COTS-based system acquisition practices. For example, the SASS acquisition strategy does not describe how FLETC will evaluate the tradeoffs among the four acquisition variables. Also, the SASS requirements document, although specifying requirements in a manner to provide prospective offerors flexibility, does not address the FLETC architectural environment (current and future) that the SASS solution will need to operate within. According to FLETC officials, they have not addressed this variable because they want the proposed SASS solution to drive this environment. Last, SASS project management planning does not include, for example, designated resources or a specific analytical approach and tool for performing the tradeoff analysis. Following our inquiries, FLETC officials told us that they have yet to incorporate these COTS-based system best practices into each SASS acquisition function because they have focused on the solicitation function. However, they added they recognize the need to address these issues and plan to complete them after the solicitation package is released. They also noted

[24]Software Engineering Institute, *Evolutionary Process for Integrating* COTS-*Based Systems* (EPIC): *An Overview*, CMU/SEI-2002-TR-009 (Pittsburgh, PA: July 2002).

[25]FLETC's solicitation utilizes a performance-based statement of objectives methodology that provides high-level business needs and describes the objectives that prospective offerors will be expected to achieve. FLETC officials said that this is intended to allow offerors to prepare their own statements of work and to propose innovative and cost-effective approaches.

A172

that while they had followed the best acquisition practices as defined by the SEI's Software Acquisition Capability Maturity Model®, they had not documented these efforts, but would do so in the future. We agree that FLETC has followed some, but not all of these best practices. As we stated earlier, FLETC has not followed software acquisition risk management best practices. In addition, SEI has issued best practices for acquiring COTS-based systems that FLETC is not following. Until they do, the SASS acquisition will be at risk of not meeting its cost, schedule, and performance commitments.

## FLETC Is Exploring the Use of an Existing Automated Scheduling System

During our work, we learned that the Border Patrol Academy, in conjunction with INS's Immigration Officers Academy and the Customs Academy, were in the process of adding an automated scheduling module to their ACMS. The Border Patrol and Immigration Officer Academies currently use this system for processing non scheduling-related class management activities. We asked a Border Patrol Academy official, who brought the acquisition of the ACMS scheduling module to our attention, whether the module the academy was acquiring would potentially duplicate the scheduling functions of the proposed SASS that FLETC was about to acquire. The Border Patrol official said he did not know whether there would be any duplication between the systems. He also said that the Border Patrol Academy was acquiring its own system because it did not want to wait until FLETC acquired its system, suggesting that this process was moving too slowly. Furthermore, he said that the three academies had found an economically feasible way to add an automated scheduling module to ACMS.

We encouraged academy officials, and a FLETC official involved in FLETC's SASS acquisition, to meet and discuss the feasibility of FLETC using the ACMS scheduling module instead of acquiring its SASS. Although FLETC stated that it evaluated ACMS two years ago, these officials met and according to one FLETC official, agreed FLETC could, instead of potentially spending over $10 million in the cost of implementing SASS, invest considerably less to merge FLETC's requirements into the ACMS automated scheduling module, which is still under development. Separately, according to FLETC, as a result of a request of the DHS Chief Information Officer, a FLETC-chaired working group looking at capacity issues within DHS was tasked to seek input on the SASS from its participants. That review was to obtain input toward identifying an enterprise-wide solution to training scheduling for all of the DHS. Another FLETC official said that the FLETC-chaired working group was

A173

considering whether to recommend SASS as the standard training scheduler, or, possibly, use ACMS as the standard.

As of late July 2003, FLETC was in the process of obtaining its procurement and legal approvals to conduct a benchmark test on ACMS's scheduling module, once it is completed and tested, to determine whether ACMS's module could provide at least about 80 percent of the functions that the proposed SASS system could provide.[26] If ACMS was able to provide the needed functionality, FLETC would cancel its SASS RFP and merge into ACMS's automated scheduling system, thus saving money while also meeting FLETC's considerable training scheduling needs of its 75 POs.

## The Status of FLETC's Board of Directors Is Unclear, and DHS Has Begun to Provide Oversight and Guidance

The status of FLETC's Board of Directors is unclear. Further, the Board's membership, roles and responsibilities, and past practices are not fully consistent with prevailing governance and management control best practices. Moreover, given its recent transition into DHS, FLETC needs guidance and oversight to address its transformational challenges. A DHS official said that DHS has recently assumed responsibility for FLETC and has begun to work with its officials on ways to address these challenges. The official also said DHS also recognizes the role an effective FLETC Board could play in enhancing governance.

### The Status of the FLETC Board of Directors Is Unclear

Prior to its most recent meeting in November 2002, FLETC's Board of Directors had not met for 3-½ years, according to a FLETC official. However, according to our review of Board minutes, the Board had not met for a period of 5 years prior to its November 2002 meeting (the last recorded meeting was held in November 1997). According to the agenda of its November 2002 meeting, the Board was to address, among other things,

[26]According to a FLETC official, ACMS's scheduling component does not have two elements that SASS would provide; he also said that the absence of these functions could either be overcome or were acceptable to FLETC. The first element is a "conflict resolution" capability to help resolve the sequencing of classes. According to the FLETC official, this could be resolved by using ACMS's "priority" capability, under which schedulers would be able to schedule classes and facilities by placing them in priority order. For example, legal classroom training would have a higher priority than the subsequent mock courtroom training and, accordingly, would be scheduled before the courtroom training. The second element is speed—ACMS is not as fast as SASS would be. The FLETC official said that ACMS's slower speed was acceptable because it was still faster than the current paper-intensive process.

A174

its roles and responsibilities, the fiscal year 2003 and 2004 budgets, and FLETC's Master Plan. The draft minutes from that meeting indicate that the Board discussed, in broad terms, Justice Department concerns about FLETC's training services, including the availability of on-campus dormitory space. The Board also discussed the status of the FLETC MOU and the Master Plan, respectively, but did not discuss budget matters. Subsequent to the November meeting, a FLETC official who attended the meeting informed us that within the context of debating the Board's roles and responsibilities, the matter of whether the Board would continue as an ongoing entity became unclear.

In June 2003, a DHS official said an effective FLETC Board was important to the overall governance of FLETC activities. He also pointed out that DHS was in the process of determining how the training mission was to be managed in the new department. Issues under consideration include how PO training needs would be identified, where training would be offered, and how capacity and demand issues would be addressed. Determining the status, roles and responsibilities of the FLETC Board will be done within this context. Nevertheless, the DHS official acknowledged that having an effective Board would help FLETC to address its challenges.

## Board's Membership, Roles and Responsibilities, and Past Practices Are Not Fully Consistent with Prevailing Governance and Management Control Best Practices

Notwithstanding the uncertainty surrounding its status, the Board's membership, roles and responsibilities, and past practices are not fully consistent with prevailing best practices for governance and internal and management control.[27]

*Membership*. Regarding the size of a board, prevailing governance best practices consider smaller boards to be often more cohesive and to work more effectively—in this regard, the FLETC Board is composed of eight members. Specifically, FLETC's Board presently has five term-representatives who are voting members (one of whom has a 2-year rotational term) and three nonvoting members. FLETC's Director serves as the nonvoting Executive Secretary of the Board. As of June 2003, the

[27]To identify the relevant prevailing best practices, we relied primarily on the May 2002 *Principles of Corporate Governance* by the Business Roundtable, an association of chief executive officers of leading U.S. corporations; GAO's 2001 Internal Control *Standards: Internal Control Management and Evaluation Tool*, (GAO-01-1008G, Washington, D.C.: Aug. 2001); and OMB's 1995 *Circular No. A-123*, *Management Accountability and Control*. We also drew from our August 2002 report (unnumbered correspondence), on the governance of the U.S. Capitol Police, titled *Information on Capitol Police Board Roles and Responsibilities*, *Operations*, *and Alternative Structures*.

A175

Board's five voting members were DHS's Under Secretary for Border and Transportation Security, Justice's Acting Assistant Attorney General for Administration, the Department of the Interior's Deputy Assistant Attorney for Law Enforcement, the General Services Administration's Inspector General, and the Administrator of TSA. The three nonvoting members of the Board are the Office of Personnel Management's Senior Advisor for Learning and Knowledge, OMB's Associate Director for General Government Programs, and the U.S. Capitol Police Board's Chairman.

Regarding the composition of the Board's membership, there are two departures from governance best practices. First, the Director of FLETC is not a member of the Board, but, rather, its nonvoting Executive Secretary. Under governance best practices, the head of the organization being overseen by a board of directors is a full member of that board and, in fact, in many cases also serves as the chair of the board. There is currently a strong debate about this point. On the one hand, the Business Roundtable best practices view this dual role as serving as a bridge between an organization's management and its board, ensuring that they both act with a common purpose. On the other hand, the Conference Board Commission on the Public Trust and Private Enterprise[28] recommends splitting the role of chief executive and chairman of the board to ensure an "appropriate balance" between the board and chief executive.

Second, there is not a substantial degree of independence of FLETC Board members from its operations. As currently configured, all Board members are either related to a FLETC PO (e.g., TSA and Capitol Police) and/or have a role in reviewing and/or setting its budget (OMB) or policies (Office of Personnel Management). Governance best practices stress that a substantial part—in most cases, a majority—of a board's membership should be independent of the entity it is overseeing. Such independence could help avoid, among other things, potential conflicts of interest. Further, independent board members, knowledgeable of information about the organization they are overseeing, can provide a useful perspective on the significant risks and challenges facing that organization

[28]See, for example, a report by The Conference Board Commission on Public Trust and Private Enterprise titled *Findings and Recommendations*, New York, New York, January 2003. The Conference Board is a leading business network that creates and disseminates knowledge about management and the marketplace. According to its report, the Conference Board created the Commission to help address the causes of declining public and investor trust in companies, their leaders, and capital markets. The 12-member commission included a former Comptroller General of the United States and the current Secretary of the Treasury.

A176

and help ensure the exercise of independent judgment that is at the core of a board's oversight function. The 1970 FLETC MOU that established the Board allows for the expansion—and, implicitly, a change in its composition—of its membership by a majority vote of its members.

*Roles and Responsibilities*. The 1970 FLETC MOU, as amended, enumerates the Board's "final authority" over training policy, programs, criteria, and standards of FLETC for resolving matters of conflicting training requirements. This authority includes (1) establishing priority systems governing the scheduling of courses and use of training facilities; (2) establishing policy as to student residence requirements, leave, and other matters relating to student administration; (3) reviewing FLETC's budget as to whether it meets its mission and making budget recommendations to, now, the Secretary of DHS; and (4) evaluating the effectiveness of the overall training program. The Board also has authority to establish criteria for the selection of the FLETC Director and to approve the selection; it may also recommend the removal of the Director to, now, the Secretary of DHS.

Current FLETC officials have implemented the Board's roles and responsibilities under the MOU as pertaining only to training issues, and not operational issues concerning FLETC, such as the budget and the selection of the FLETC Director. In this regard, the current FLETC Director who was appointed by the Secretary of the Treasury was selected independently of the Board because, at the time, it was dormant. Under governance best practices, however, the selection and oversight of an organization's head is a board's paramount duty to help ensure competent and ethical operation. As discussed earlier, under the FLETC MOU, the Board has the authority to establish criteria for the selection of the FLETC Director and to approve the selection. Additional oversight responsibilities for boards include reviewing and monitoring the implementation of strategic plans; reviewing annual operating plans and budgets; advising management on significant issues facing the organization; reviewing and approving significant actions; and nominating directors, and overseeing effective governance, including the composition, structure, practices, and evaluation of the Board.

*Past Practices*. As discussed earlier, our review of minutes from past Board meetings showed that the Board did not meet for 5 years prior to its November 2002 meeting. The Board has not met since November 2002,

A177

pending a decision on its status.[29] In this regard, FLETC's own MOU stipulates that the Board shall meet quarterly, and at such other times as may be determined by a majority of the Board or its presiding officer. Further, governance best practices call for boards to meet as frequently as needed in order for members to discharge properly their responsibilities. In this regard, the "typical" board of a large publicly traded corporation meets about eight times a year.

Other than what is broadly described in the FLETC MOU, the Board's functions and processes implementing its roles and responsibilities are not documented. According to the relevant governance best practices, it is important that each board review its policies and practices on governance matters—the standard defers the formalization of such policies and practices in written form to the boards themselves, depending on the circumstances they face. On one hand, the standard points out that insufficient formalization often leads to a lack of clarity, while on the other hand, it cautions that over-formalization can lead to rigidity—emphasizing form over substance. GAO and OMB standards for internal and management control respectively, stress the need for written documentation. GAO's standards for internal control require that an agency's policies, directives, and operating procedures be clearly documented and available for examination. OMB's standards for management control state that an organization's authority, responsibility, and accountability should be defined and documented.

The Board did not periodically review its structure, functions, and processes. According to governance best practices, boards should, from time to time, review their own structure, governance principles, composition, agenda, and processes to consider whether they are functioning well in view of their responsibilities and help ensure sound governance and oversight. GAO and OMB standards broadly suggest that periodic external evaluations of, among other things, an organization's structure and functions help ensure that they are responsive to changing conditions. In this regard, FLETC is facing significant changes in its environment—the post-September 11 surge in demand for its services and its transition to DHS.

[29] FLETC officials said that at the conclusion of the Board's November 2002 meeting, a follow-up meeting was planned for January 2003. However, by early December 2002, the decision had been made to transfer FLETC to the newly created DHS. They said that taskings resulting from the transition delayed decisions regarding the Board. FLETC officials, however, said they would review the duties and purview of the Board.

A178

## DHS Has Begun to Provide Oversight and Guidance to FLETC

DHS has the opportunity to help FLETC face its challenges during the current period of transformational change. DHS officials said that other competing priorities, such as building the organizational structure of the new department and addressing its role in the ongoing war on terrorism, did not permit them to focus extensively on providing policy or other guidance to FLETC about planning, scheduling, and governance (e.g., oversight and accountability). A DHS official said that the department had recently started focusing on specific FLETC issues. In this regard, DHS plans to begin focusing on a broad range of issues, including the Master Plan and the FLETC Board of Directors.

With respect to the Master Plan, the DHS officials said that in general, they viewed the plan as a useful document but not as the department's guiding plan for the future of FLETC and its facilities. One official said that DHS was considering a new business plan for FLETC, one that would make DHS "more than just a landlord" regarding federal law enforcement training. This official further said—and a FLETC official separately corroborated—that DHS's vision for FLETC would include expanding its authority on decisions related to federal law enforcement training.

# Conclusions

Overall, FLETC and DHS find themselves at a crossroads for defining and planning for the future of federal law enforcement training. The demands placed on FLETC and DHS by the new security environment facing the country are considerable. Yet, we note that while demand for training continues to surge, the fiscal year 2004 budget request for FLETC is about $26 million less than the fiscal year 2003 enacted level; the request for staffing calls for about 120 fewer permanent positions than those enacted for fiscal year 2003. The decline in resources risks exacerbating FLETC's already-strained capacity to provide training.

To meet the demands placed upon them, collective planning and execution by FLETC and its many stakeholders, and active and sustained oversight and guidance by DHS, are necessary to

- achieve a proper balance between the surging demand for training and the necessary capacity to meet it;
- schedule vital training in an efficient and timely manner; and
- provide for effective governance and oversight that ensures that all stakeholders' interests are addressed.

Despite the capacity constraints, FLETC generally received good marks from POs about its ability to meet their basic training needs. However,

A179

FLETC is facing considerable challenges in responding to the demand for training in a systematic manner. For example, FLETC's overall planning effort is essentially reactive, rather than proactive. Specifically, FLETC does not currently have a formal contingency plan to help guide management decision-making with respect to capacity planning, although it has developed some planning documents (i.e., its 1989 Master Plan with updates and the current Master Plan). Although having an updated Master Plan to guide short- and long-term planning is a step in the right direction and may help provide some guidance to DHS, the final draft of the plan has methodological limitations and inaccurate cost estimates. In addition, FLETC has taken very limited action thus far in planning for the use of alternative training such as off-site training and e-learning.

FLETC's capacity challenges are likely to be compounded during its transition into DHS. This transformational change for FLETC and a number of its POs will likely bring considerable uncertainty, as the new department is equally likely to redefine the POs' missions to focus on homeland security. The redefined mission could result in the need for updated training programs and modules that, in turn, would require new or modified training facilities. A further uncertainty involves the type and scale of future terrorist attacks and the response by the federal government. A comprehensive planning process, encompassing, among other things, sound methodologies and contingency planning, is essential to help meet the current capacity challenges facing FLETC, and also will help position it to meet future challenges.

FLETC faces a challenge to automate the scheduling of training for its 75 POs. Notwithstanding its performance of certain important system acquisition functions, FLETC is not doing enough to ensure that it acquires a system that will optimally support its current and future mission needs. Without instituting a proactive risk management function, FLETC increases the risk that avoidable potential problems will become costly actual problems, meaning they would result in a less capable system being delivered late and/or over budget. Further, and equally important, delays in making both security and COTS-based acquisition best practices integral to its SASS project could exacerbate potential problems. Without adequately addressing both, FLETC increases the risk of the system not being adequately protected against unauthorized access and corruption, not being available when needed, and not performing as intended. It is important that FLETC address its SASS acquisition management weaknesses before the project advances much farther. Although FLETC is in the initial stages of acquiring SASS, we are encouraged that through in part our intervention, it is also in consultation with the Border Patrol

whether its ACMS, with some modification, might serve FLETC scheduling needs, thus saving an estimated $10 million cost over 5 years, while spending considerably less to adopt the ACMS.

Reconvening the FLETC Board of Directors in November 2002, albeit briefly, was a step in the right direction; however, the Board's status is unclear. Given FLETC's recent transition into DHS, the Board, consistent with its mandate under the FLETC MOU, needs to be retained in order to offer sustained governance and oversight to ensure transparency and accountability. In this regard, governance, in the form of boards of directors, has the important role of overseeing management performance and ensuring independent and objective decision-making. As FLETC considers revising its MOU, it has an opportunity to incorporate prevailing governance and internal and management control best practices about the functioning of the Board to help FLETC address its challenges and achieve transformational change.

## Recommendations for Executive Action

To address FLETC's capacity constraints and planning challenges, we recommend that the Secretary of Homeland Security instruct the Director of FLETC to

- develop a formal contingency plan that incorporates both physical and human resource solutions for at least the major potential constraints or choke points that can impede the law enforcement training delivery system;
- consider alternative approaches to estimating future facility construction needs in its Master Plan, including (a) specification of a range of training workload scenarios, and (b) after consultation with experts, application of risk analysis techniques; and
- develop plans for the use of alternative or additional law enforcement training campuses should circumstances limit or prohibit the use of available facilities.

To enable FLETC to monitor and reduce the risk associated with the degradation of FLETC facilities and infrastructure, we recommend that FLETC

- closely monitor overall facility conditions through establishment of periodic facility condition assessments of mission critical facilities and

A181

infrastructure and use of a computerized backlog of maintenance and repair and

- adopt a performance measurement, such as FCI, to monitor the trend of FLETC facilities condition and to also offer a benchmark indicator for comparison to industry standards.

To increase the chances of SASS success, we recommend that the Secretary of Homeland Security instruct the Director of FLETC to make proceeding with the SASS acquisition conditional upon improvements in SASS acquisition management activities. We further recommend that these improvements, at a minimum, include adding risk management as a SASS acquisition function and ensuring that this function provides for

- the identification and documentation of risks;
- the categorization of risk severity based on probability of occurrence and potential impact;
- the development and implementation of risk mitigation strategies; and
- the reporting of risk status, including progress in implementing mitigation strategies.

We further recommend that the improvements in SASS acquisition management activities should also

- treat known risks in acquiring COTS-based systems as SASS-specific risks, including volatility of the commercial market and an organization's resistance to the business process changes introduced by a COTS-based solution;
- ensure that security is made a clear, explicit, and visible component of system requirements in the SASS solicitation package; and
- ensure that COTS-based system acquisition best practices are made a clear, explicit, and visible aspect of all acquisition functions, particularly with respect to continuously assessing the tradeoffs among system requirements, FLETC's architectural environment, the project's cost and schedule constraints, and the commercially available system products and components.

To help provide sustained oversight and enhance accountability, we recommend that the Secretary of Homeland Security retain the FLETC

A182

Board of Directors. We further recommend that working with FLETC's POs, their parent departments and agencies, and the Board's current members, the Secretary of Homeland Security review the Board's mission, roles and responsibilities, and functions and practices to better align them with prevailing standards of governance and internal and management control.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Secretary of DHS and the Attorney General for comment. We received comments from the Under Secretary of DHS for Border and Transportation Security that are reprinted in appendix IV and discussed later. In addition to DHS's written comments, FLETC provided technical comments and clarifications, including updates on its SASS acquisition, which are incorporated in this report where appropriate. Justice did not provide formal written comments; the Associate Assistant Attorney General for Federal Law Enforcement Training submitted an email with two general comments about the issues of FLETC training capacity and governance, respectively.

In their comments, DHS and FLETC generally agreed with the information presented in the report and with our conclusions and recommendations, and outlined actions they either had taken or were planning to take to implement the recommendations. DHS noted, for example, that the issues related to capacity, scheduling, and governance discussed in the report were already being considered by the department and would be given its full attention. Regarding specific actions to implement our recommendations, FLETC said that it was developing a formal contingency plan to respond to future capacity constraints and choke points and to identify alternative or additional training assets that could help in this response. Also, FLETC indicated that it had taken action to reconstitute the Board of Directors; FLETC also indicated that it was taking action to determine the prospective membership, and roles and responsibilities of the reconstituted Board.

At the same time, FLETC expressed some concerns regarding the report. In its general comments, FLETC said, first, that it "strongly disagreed" with the report's title, asserting that it implied broader concerns about capacity planning and management oversight than the report's contents supported. We believe that the report clearly and exhaustively describes the challenges FLETC faces in planning for future capacity and articulates the importance of sustained management oversight of, among other things, the planning effort to help ensure its success, and that the report's title accurately reflects these challenges. Second, FLETC said that the report

A183

did not point out that the flow of federal law enforcement personnel was not constrained by training capacity, but by the inability of POs to recruit such personnel. We note that because it was beyond the scope of our work, the report did not address recruitment as a distinct issue, but did point out that shortfalls in POs' recruiting contributed to projected demand for training not materializing. We also note that the core issue is FLETC's ability to train those personnel who actually need to be trained. In this regard, the report clearly describes how FLETC's 5-day/8-hour capacity is strained; accordingly, additional recruits would only serve to exacerbate FLETC's capacity challenges. Third, FLETC said that the report did not adequately recognize the "extraordinary success" of FLETC and the POs in meeting critical law enforcement training requirements. We believe that the report clearly recognizes that FLETC has been able to generally meet its POs' demands for *basic* training during a time of constrained capacity and surging demand, and highlights the actions FLETC has taken to accomplish this. Fourth, FLETC said that projected workloads (i.e., demand for training) were so dynamic that some of those cited in the report were already obsolete and urged caution in their treatment. We note that during our work we repeatedly corroborated—through interviews with FLETC officials and related documentary verification—the currency and validity of the projected workloads as presented in the report; further, FLETC did not provide us with any updated workload projections as part of its written comments. Fifth, FLETC said that the report implied that it was accountable for variables beyond its control, such as the timeliness of recruitment, operational needs, class cancellations, shifts in training strategies, and funding, all of which impact capacity planning. We believe that the report adequately describes these factors as contributing to the level of training actual attendance, and does not imply that FLETC is accountable for them.

In its technical comments, FLETC acknowledged that its predominantly manual scheduling process was time-consuming and required modernization. FLETC questioned, however, that automating the scheduling process would result in significant increases in capacity. We note that, first, FLETC's own Master Plan indicated that if the scheduling process were to be automated, capacity efficiencies would likely result and the plan would need to be revised, and second, FLETC's documentation related to the SASS acquisition indicated that automation would result in capacity efficiencies. In commenting on our use of an example to illustrate the effect of choke points, FLETC said that resurfacing the Charleston campus' emergency response driving range did not result in the cancellation of any Border Patrol classes. We note that a FLETC official cited the resurfacing as a specific example of a capacity-

A184

constraining choke point that resulted in the cancellation of three Border Patrol classes, which have not been rescheduled. In commenting on the possible use of ACMS as an alternative to its proposed acquisition of SASS, FLETC said, among other things, that the evaluation of ACMS's scheduling component was in the preliminary stages. Accordingly, it was too early to tell whether ACMS's scheduling component would meet FLETC's requirements, and whether significant cost savings would be realized. We note that a FLETC official involved in the evaluation of ACMS, in responding to our questions, provided a written response, stating that if ACMS provided about 80 percent of the functionality sought by FLETC it could be adopted as the scheduling system at considerably less cost than the estimated $10 million cost of SASS.

In its comments, regarding training capacity, Justice stated that if FLETC's Glynco campus (as well as the Charleston) campus were used to provide basic training and the Artesia Campus was used to provide advanced and specialized training, then FLETC would be able to achieve a better balance in the utilization of its campuses and mitigate the capacity strains it is experiencing. Regarding governance, Justice stated that the FLETC Board of Directors would work well as currently configured, if it were allowed to function under its original mandate as defined in the MOU that created FLETC.

We are sending copies of this report to the Chairmen and Ranking Minority Members of the Senate and House Committees on Appropriations. In addition, we are sending copies to the Secretaries of Homeland Security and the Interior; the Attorney General of the United States; and the Director of OMB. We will also make copies available to others on request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov.

A185

If you have any questions about this report or wish to discuss it further, please contact me at (202) 512-8777 or Seto J. Bagdoyan, Assistant Director, at (202) 512-8658. Key contributors to this report are listed in appendix V.



Richard M. Stana
Director, Homeland Security and Justice Issues

A186

# Appendix I: Objectives, Scope, and Methodology

Given concerns about whether the Federal Law Enforcement Training Center (FLETC) can continue to meet the rising training demands of its 75 federal partner organizations (PO) following the September 11th attacks, the House Appropriations Committee asked us to develop information on the following topics:

- The extent to which FLETC is able to meet the current and projected demand for training, how FLETC is planning to meet the demand, and the associated costs and the extent to which FLETC coordinates or uses existing, non-FLETC government training assets, and any associated costs.

- FLETC's current organizational structures and processes for coordinating and scheduling training activities and whether FLETC plans any changes to these structures and processes.

- FLETC's oversight and governance structures and the extent to which these structures are providing guidance to FLETC as it addresses its capacity and planning challenges during a period of transformational change.

Overall, to develop the information in this report, we conducted our work at FLETC, the Office of Management and Budget (OMB), *Clark Nexsen* (the architectural/engineering firm retained by FLETC to develop a Master Plan for facilities development at FLETC-owned campuses), and at the following selected departments and agencies engaged in federal law enforcement training.

- The Department of Justice (the Immigration & Naturalization Service, the Border Patrol, the Federal Bureau of Prisons, and the U.S. Marshals Service),
- The Department of the Treasury (the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Internal Revenue Service, the U.S. Customs Service, and the U.S. Secret Service), and
- The Department of Transportation (the Transportation Security Administration, the Federal Air Marshals, and the U.S. Coast Guard).

The Department of Homeland Security (DHS) was created during our work. Many of the FLETC POs—identified above as components of other departments—moved to DHS' temporary headquarters after January 24, 2003—see appendix II for a listing of the POs now in DHS. We interviewed officials from DHS, including the Director of Operations for Border and Transportation Security. We also interviewed FLETC and PO officials in Washington, D.C., and at each of the four domestic training campuses

A187

where FLETC POs train: Brunswick, Ga. (commonly referred to as "Glynco," for Glynn County); Artesia, N. Mex.; Charleston, S.C.; and Cheltenham, Md. We reviewed applicable public laws and regulations; memorandums of understanding (MOU); best practices and guidelines related to facilities and information technology acquisition, governance, and management and internal control; various drafts of the Master Plan, and supporting documentation; budget submissions and justifications; training curriculum and accreditation documents; and various reports related to FLETC and federal law enforcement training.

We conducted our work between May 2002 and June 2003 in accordance with generally accepted government auditing standards. We requested comments on a draft of this report from the Secretary of Homeland Security and the Attorney General. (See appendix IV for DHS' comments.)

## Capacity, Planning, and Coordination

To determine the extent to which FLETC is able to meet the current and projected demand for training, how FLETC is planning to meet the demand, and the associated costs; and the extent to which FLETC coordinates or uses existing, non-FLETC government training assets, and any associated costs, we interviewed FLETC, OMB, Clark Nexsen, and department and component agency officials regarding specific training demand and availability issues, including agency training projections and the factors influencing these projections, physical and human resource "choke points" (or training obstacles) at the training campuses, agency satisfaction levels with the current delivery of training services, and the resources needed to meet future demands for training. We did not evaluate the quality or the effectiveness of the training programs nor reviewed how agencies assessed the training provided. We also reviewed the following documents obtained from FLETC and other officials:

- Aggregate agency training projections for both basic and advanced courses for fiscal years 1997-2008 and FLETC's adjustments to some of these projections.
- Agency training projections for FLETC participants interviewed during our site visits.
- The actual student attendance statistics at the FLETC training campuses for fiscal years 1983-2002.
- The 35-, 65-, 90-percent, and final draft submittals of FLETC's Master Plan.
- The June 1989 Master Plan and its April 1996 update.
- The latest FLETC 5-year construction plan allocation.
- FLETC, Treasury, and DHS budget documents and related justifications.
- FLETC research and development studies on particular training issues.

A188

In addition, we reviewed the extent to which FLETC's current infrastructure was supporting the delivery of training at each of the campuses and whether infrastructure (e.g., water supply, sewage, and power grid) concerns were being addressed in FLETC's Master Plan. We did this by reviewing relevant sections of the plan, conducting campus visits and observing infrastructure, and interviewing facilities management officials. We also determined whether Master Plan proposals regarding infrastructure were aligned with FLETC's Strategic Plan and recent budget enactments and requests. Further, we determined whether FLETC has any contingency plans to address potential sudden surges in demand for training (e.g., Border Patrol hiring in the mid-1990s and the recent PO training ramp-up following the September 11th attacks).

## Scheduling and Coordination of Training Activities

To determine FLETC's current organizational structures and processes for coordinating and scheduling training activities, and whether FLETC plans any changes to these structures and processes, we interviewed FLETC and PO officials in Washington, D.C., and at each of the four training campuses regarding their perceptions of the training programs and their views about FLETC's ability to schedule and coordinate training activities. In addition, we interviewed FLETC officials about the status of the computer automation process for scheduling training. We observed how FLETC staff perform their scheduling activities. Also, we reviewed the following documents:

- Provisions of the 1970 Treasury order creating FLETC.
- The Treasury and FLETC Strategic Plans of FY2000-2005, which identify FLETC's latest mission statements, goals, and objectives.
- FLETC's organizational chart.
- FLETC's request for proposals on computer automation.
- Records of interviews conducted by Clark Nexsen regarding POs' training needs.

Further, we reviewed FLETC's MOUs with several of the larger agencies to obtain an understanding of FLETC's formal management and coordination responsibilities with respect to the POs.

To determine whether FLETC has effective controls in place for acquiring a new student administration and scheduling system (SASS) by focusing on whether the center was performing five key acquisition management functions: acquisition planning, solicitation, requirements management, project management, and risk management. We reviewed these areas

A189

because they are critical to successfully acquiring systems. These practices were derived from the work and research of Carnegie Mellon University's Software Engineering Institute (SEI).[1] In addition, we reviewed whether FLETC was incorporating SEI best practices for acquiring COTS-based systems[2] in these five functions. In conducting our review, we interviewed SASS project officials and other FLETC staff involved in the acquisition, including staff from the information systems division, the procurement division, legal counsel, and the training analysis and coordination division. We also interviewed potential SASS users from two FLETC training divisions.

To determine whether FLETC was performing these acquisition management functions, we compared the center's actions to those defined by SEI as key in establishing at least basic acquisition management controls for the five functions. In addition, we compared the center's actions to those SEI has redefined as being key to effectively leveraging the COTS-based systems. To document FLETC's actions, in addition to interviewing staff, we reviewed documentation including SASS program documentation such as contractor reports; the SASS solicitation package, including the SASS software and database requirements; training model schedule templates; the 2002 master class schedule; information technology modernization 2004 capital asset plan; National Institute of Standards and Technology security publications; and fiscal year 2000 congressional reports.

## Governance and Oversight Structure and Guidance

To determine FLETC's oversight and governance structures and the extent to which these structures are providing guidance to FLETC as it addresses its capacity and planning challenges during a period of transformational change, we reviewed FLETC's 1970 MOU establishing, among other things, its Board of Directors, and governance and management and internal control best practices—these were the Business Roundtable's 2002 *Principles of Corporate Governance* and a 2003 report by the Conference Board's Commission on Public Trust and Private Enterprise titled *Findings and Recommendations*; and GAO's 1999 *Standards for Internal Control in the Federal Government* and OMB's 1995 *Circular No. A-123*,

[1]Software Engineering Institute, *Software Acquisition Capability Maturity Model ® Version 1.03*, CMU/SEI-2002-TR-010 (Pittsburgh, PA: March 2002).

[2]Software Engineering Institute, *Evolutionary Process for Integrating COTS-Based Systems (EPIC): An Overview*, CMU/SEI-2002-TR-009 (Pittsburgh, PA: July 2002).

A190

*Management Accountability and Control*. We drew from our August 2002 report on the governance of the U.S. Capitol Police, "*Information on Capitol Police Board Roles and Responsibilities, Operations, and Alternative Structures*." We discussed governance issues in general and the Board in particular, including its mission, roles and responsibilities, current and past practices, and its status with cognizant FLETC and DHS officials. We compared the governance and management and internal control best practices with those of the Board to determine the extent to which they were consistent.

# Appendix II: FLETC's 75 Partner Organizations

Following is a listing of the current (as of June 2003) Federal Law Enforcement Training Center (FLETC) partner organizations (PO).

**Agriculture**

Forest Service
Office of Inspector General

**Amtrak**

Northeast Corridor Police

**Central Intelligence Agency**

Office of Inspector General
Office of Security

**Commerce**

National Institute of Standards and Technology
National Marine Fisheries Service
Bureau of Industry and Security
Office of Inspector General
Office of Security

**Defense**

Pentagon Force Protection Agency
Naval Criminal Investigative Service
National Security Agency
Defense Criminal Investigative Service
Office of Inspector General
Air Force Office of Special Investigations

**Education**

Office of Inspector General

**Energy**

Office of Inspector General

A192

**Environmental Protection Agency**

Office of Criminal Investigations

**Federal Deposit Insurance Corporation**

Office of Inspector General

**General Services Administration**

Office of Inspector General

**Health and Human Services**

Food and Drug Administration
National Institutes of Health
Office of Inspector General

**Homeland Security**

Customs and Border Protection (includes Customs, INS, and Agriculture's Animal and Plant Health Quarantine inspectors, and the Border Patrol, a division of CBP)
Federal Emergency Management Agency
Immigration and Customs Enforcement (includes Federal Protective Service) Federal Protective Service)
Transportation Security Administration
U.S. Coast Guard
U.S. Secret Service
Office of Inspector General

**Housing and Urban Development**

Office of Inspector General

**Interior**

Bureau of Indian Affairs
Bureau of Land Management
Bureau of Reclamation
National Park Service
U.S. Park Police
Office of Inspector General
Office of Surface Mining, Reclamation and Enforcement
U.S. Fish and Wildlife Service

**Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives
Bureau of Prisons
Drug Enforcement Administration
Office of Inspector General
U.S. Marshals Service

**Labor**

Office of Inspector General

**National Aeronautics and Space Administration**

Office of Inspector General

**Nuclear Regulatory Commission**

Office of Inspector General

**Office of Personnel Management**

Office of Inspector General

**Railroad Retirement Board**

Office of Inspector General

**Small Business Administration**

Office of Inspector General

**Smithsonian**

National Zoological Park
Office of Protection Services

**Social Security Administration**

Office of Inspector General

**State**

Agency for International Development -
Office of Inspector General
Bureau of Diplomatic Security
Department of State—Office of Inspector General

**Supreme Court**

Supreme Court Police

**Tennessee Valley Authority**

TVA Police
Office of Inspector General

**Transportation**

Office of Inspector General

**Treasury**

Bureau of Engraving and Printing
Financial Crimes Enforcement Network
Internal Revenue Service
Office of Inspector General
Treasury Inspector General for Tax Administration
U.S. Mint

**U.S. Congress**

Government Printing Office—Office of Security
Library of Congress Police
Government Printing Office—Office of Inspector General
U.S. Capitol Police

**U.S. Postal Service**

Office of Inspector General
Postal Inspection Service—Postal Police

**Veterans Affairs**

Office of Inspector General

# Appendix III: Training Programs and Seminars Provided by FLETC

FLETC offers eight variations of training programs and seminars. A priority system is employed to fund, schedule, and deliver these training programs. FLETC basic training programs are delivered in two formats: Center Basic followed by an Agency-Specific Basic either on or off site, or a single Center Integrated Basic program that combines the Center Basic and Agency-Specific Basic concepts into one program. A Center Integrated Basic program is granted for those agencies that have such a unique mission that their training requirements cannot be met in a Center Basic program. The categories of training, in priority order, are:

1. Center Basic—law enforcement entry-level recruit training designed to meet the training needs for multiple agencies. The job tasks and course content are identified and validated by the participating agencies and 100 percent of the training is managed and delivered through FLETC staffing resources. These staffing resources are comprised of approximately 50 percent of FLETC's permanent staff and 50 percent of Partner Organization staff. The three Center Basic programs offered by FLETC are the Criminal Investigator Training Program, the Mixed Basic Police Training Program, and the Natural Resource Police Training Program.

2. Center Integrated Basic—–law enforcement entry-level training designed to meet the mission-specific or unique requirements of a single agency. The job tasks and course content are identified and validated by the user agency and the training is managed and delivered through the combined efforts of the agency and FLETC staffing resources. Like the Center Basic and Agency-Specific Basic, the Center Integrated Basic provides both the foundational knowledge, skills, and abilities and the specific mission requirements for that agency. FLETC is responsible for teaching the common basic recruit training and the agency is responsible for teaching the mission-specific courses. FLETC can and does provide instructional resources when the agency does not have sufficient staffing. FLETC currently offers 10 Center Integrated Basic programs. Some examples are the United States Border Patrol Integrated, the United States Park Police Integrated, and the United States Marshal Service Integrated.

3. Agency-Specific Basic—law enforcement entry-level training that supplements and follows Center Basic training programs for individual agencies. The job tasks and course content are identified by the user agency and the training is managed and delivered by agency staffing resources. However, FLETC does provide staffing resources as requested. The program builds on the foundational knowledge, skills, and abilities that were developed in the Center Basic program and

A197

focuses on the specific mission requirements of that law enforcement agency.

4. Center Advanced—center advanced training is developed, managed, and delivered through FLETC staffing resources by the individual training divisions to meet a specific or specialized need for instructor or mission-specific training. These programs address the specialized and instructor needs of the various Partner Organizations. Some examples of Center Advanced training include the Firearms Instructor Training Program, the Technical Investigative Equipment Training Program, and the Weapons of Mass Destruction Training Program.

5. Agency Advanced—agency advanced training is developed, managed, and delivered by the user agency and addresses the specialized training requirements for that agency. These training courses are generally conducted for mid- and senior-level law enforcement personnel.

6. State, local, and international training—state, local, and international training is primarily delivered on an off-site basis. FLETC collaborates with these entities to deliver a variety of training programs and in support of various law enforcement initiatives.

7. Agencies without Partner Organization status participate in training in a space available basis. Training programs are developed and delivered as appropriate.

8. Conferences, seminars, and non law enforcement training are also provided.

# Appendix IV: Comments from the Department of Homeland Security

U.S. Department of Homeland Security

July 18, 2003

Mr. Richard M. Stana
Director, Homeland Security Justice Issues
US Government Accounting Office
Washington, DC 20548

Dear Mr. Stana:

Thank you for the opportunity to review the draft Government Accounting Office (GAO) report 03-736, dated July 3, 2003, about capacity issues and related matters at the Federal Law Enforcement Training Center (FLETC) before it is issued in final form.

It is important to point out the U. S. Department of Homeland Security (DHS) and, particularly, the Border Transportation and Security Directorate (BTS), view FLETC as having a "flagship" role in the training being provided to all law enforcement personnel of the Department, and indeed, to other FLETC customer agencies of government. Their role already has been a stabilizing force in marshalling the entire law enforcement training efforts of the Department during a highly active transition period and formation of a new training approach to homeland security's daunting mission. To their credit, FLETC has continued to provide training services to its interagency customers during an extraordinary period of explosive growth and dynamic change for federal law enforcement in the post September 11, 2001 period. The flexibility shown by FLETC in partnering with the Transportation Security Administration (TSA) to quickly complete the training of thousands of Federal Air Marshals to meet time sensitive deadlines is but one demonstration of the positive impact FLETC has on law enforcement training.

There are, to be certain, many issues to be addressed by this Department in its stewardship of consolidated law enforcement training under FLETC's auspices. The major questions of capacity, scheduling, and governance of training raised in this GAO report are appropriate and justified. Some of these issues already were being considered and all areas discussed will be given our full attention.

While there is room for improvement, it is very satisfying to note that the respected reputation of FLETC for providing quality training for such a diverse federal law enforcement community is not disputed nor seriously impaired by the issues mentioned in the report.

Washington, D. C. 20528

A199

Enclosed are the specific comments to this report that have been compiled by FLETC. The Department endorses these comments and pledges to work with FLETC in carrying out the recommendations and responses presented.

Sincerely,

Asa Hutchinson
Undersecretary for
Border and Transportation

Enclosure

**THE FEDERAL LAW ENFORCEMENT TRAINING CENTER
COMMENTS TO THE GOVERNMENT ACCOUNTING
OFFICE REPORT 03-736**

Listed below are the comments by the Federal Law Enforcement Training Center (FLETC) regarding the draft Government Accounting Office (GAO) report (03-736), dated July 3, 2003, and entitled "Capacity Planning and Management Oversight Need Improvement." The FLETC's response is divided into three sections: General Comments, Responses to Recommendations for Executive Action, and Errata (specific suggested content changes to accurately reflect descriptive portions of the report from FLETC's standpoint). We appreciate the opportunity to comment on the proposed report and extend our acknowledgement to the GAO staff for their courteous efforts.

**I. General Comments:** FLETC does not disagree materially with the GAO recommendations for executive action contained in the draft report. The report and its findings are valued and will be afforded full consideration and implementation as indicated in our comments.

- FLETC strongly disagrees with the styling of the report by GAO entitled "Capacity Planning and Management Oversight Need Improvement." This title implies a much broader based concern than is actually the case or is supported in the report itself.

- FLETC believes the report fails to point out that the current constraint to the flow of new federal law enforcement officers and agents is not the training system. The constraint is recruitment. In a typical fiscal year, the FLETC's Partner Organizations (PO) are able to supply only about 75% of the trainees they project as requiring training. Since its inception over 30 years ago, the FLETC has successfully accommodated 100% of the actual basic law enforcement training requirement presented by its partners—even in today's challenging "surge" workload conditions.

- FLETC believes the study fails to adequately recognize the extraordinary success of the FLETC and its partners in dealing with a national exigency and meeting critical law enforcement training requirements. From our perspective, the key measure is the number of qualified officers and agents produced, and the timeliness of their deployment.

- The FLETC has graduated over 100,000 officers and agents since September 11, 2001; and the accelerated pace of training achieved via the 6-day training week and other capacity enhancements have resulted in the on-the-job presence of several thousand additional qualified law enforcement personnel for America on a reliable, but quickened pace.

- FLETC is perplexed that laudatory information in earlier drafts of the report (pertaining to law enforcement training accreditation activities and counter-terrorism

training, for example) has been excised from the final draft. These are impressive leadership areas that reflect positively upon FLETC and its partners.

- During the period that GAO studied FLETC, the organization and the needs of its partners evolved continuously. Major changes in management structure and leadership were made, the organization was transferred to the U.S. Department of Homeland Security (DHS), and constant adjustments in key processes (e.g. scheduling) were made to better meet the partners' needs. Specific to scheduling and capacity utilization, the processes described in the report have changed and the responsible organization has been reconfigured. Projected workloads are so dynamic that the information cited in the report in some instances will already be obsolete when published. FLETC therefore urges caution to all readers in relying on the specific numbers or process descriptions in the report.

- This report implies FLETC is accountable for variables which are beyond its control, such as timely recruitment, operational needs, class cancellations, shifts in training strategies, and funding considerations, all of which seriously impact capacity planning.

**II. Responses to Recommendations for Executive Action:**

Capacity Constraints and Planning

- Develop a formal contingency plan that incorporates both physical and human resource solutions for at least the major potential constraints or choke points that can impede the law enforcement training delivery system.
  **Concur. A contingency planning team is currently working to develop a formal contingency plan.**

- Consider alternative approaches to estimating future facility construction needs (in the Master Plan), including (a) specification of a range of training workload scenarios, and, (b) after consultation with experts, application of risk analysis techniques.
  **FLETC will consider alternative approaches and will examine the application of risk analysis techniques. Consultation with experts will be conducted as needs and resources dictate/permit.**

- Develop plans for the use of alternative or additional law enforcement training campuses should circumstances limit or prohibit the use of available facilities.
  **Concur. FLETC's Director is presently chairing a DHS/BTS working group that is addressing this issue, as well as broader training facility optimization issues. The contingency plan will also address the use of alternative or additional law enforcement campuses. FLETC already comprises a significant majority of the total federal facilities capacity.**

4

A202

Student Administration and Scheduling System (SASS)

[NOTE: ***The Information Technology Modernization Plan (of which the SASS is a component) has not yet been funded. Therefore, FLETC activities to date in this context have been necessarily limited. The comments below are offered with this reality in mind.***]

- Identify and document risks.
- Categorize risk severity based on probability of occurrence and potential impact.
- Develop and implement risk management strategies.
- Develop [reporting mechanism] on risk status, including progress in implementing mitigation strategies.
- Treat known risks in acquiring COTS-based systems as SASS-specific risks, including volatility of the commercial market and an organization's resistance to the business process changes introduced by a COTS-based solution.

➢ ***The FLETC developed a Project Risk Assessment Plan for the SASS in May 2003. This plan is a "living" document and will be modified as needed.***

- Ensure that security is made a clear, explicit, and visible component of system requirements in the SASS solicitation package.

➢ ***The FLETC is in the process of addressing the security concerns with the SASS. FLETC is using the National Institute of Standards and Technology Guidelines to ensure that adequate security is provided in the SASS. FLETC has hired a Security Manager to address this area of concern and who will be working with the project manager to ensure we comply with all security requirements.***

- Ensure that COTS-based system acquisition best practices are made a clear, explicit, and visible aspect of all acquisition functions, particularly with respect to continuously assessing the tradeoffs among system requirements, FLETC's architectural environment, the project's cost and schedule constraints, and commercially available system products and components.

➢ ***The FLETC followed the best practices in the software acquisition process as defined by the Software Acquisition Capability Maturity Model (SA-CMM). This process was not documented but will be in the future.***

Monitor and Reduce Risk-FLETC Facilities and Infrastructure

- Closely monitor overall facility conditions through establishment of periodic facility condition assessments of mission critical facilities and infrastructure and use of a computerized backlog of maintenance and repair.

**FLETC conducts periodic facility assessments and tracks maintenance and repair progress. However, in light of this recommendation, FLETC will examine these processes/programs to identify required enhancements.**

5

A203

- Adopt a performance measurement, such as FCI, to monitor the trend of FLETC facilities conditions and to also offer a benchmark indicator for comparison to industry standards.

  **Concur. The Facilities Condition Index (FCI) will be examined as an additional tool to monitor the condition of FLETC facilities.**

- Retain the FLETC Board of Directors.

  **Concur. A move is already underway to reconstitute the Board and a meeting is projected for August 2003.**

- Review the Board's mission, roles and responsibilities, and function and practices to better align them with prevailing standards of governance and management control.

  **Concur. FLETC already has under development an overview of prospective duties and responsibilities of a reconstituted Board of Directors. This will include making the FLETC director a voting Board member and drawing on the advice and expertise of a wide group of Board members. The Board will be involved in the discussions on its roles, responsibilities and membership.**

**III.** **Errata**

| **Cheltenham Comments** | **Pages(s) Highlights** | |
|---|---|---|
| | 4, 10, etc. | Generally, all comments regarding the Cheltenham campus being upgraded and not fully operational are correct. However, what is not correct is the reference on page 4 "(the US Capitol Police is conducting limited classroom training" when, in fact, the US Capitol Police are using the Cheltenham facility for vehicle traffic stop training, patrol practical exercises and physical training on several Cheltenham campus venues. A second GAO error was found on page 10; paragraph 1, which states "Currently, the US Capitol Police is the only PO using the campus." In fact, there are over 12 federal, state and local law enforcement agencies utilizing Cheltenham classroom space, the tactical village and road system for agency specific training. As early as February 2002, the renovation of several Cheltenham buildings enabled the FLETC to provide an early return on the government's investment by making available to area federal, state and local law enforcement agencies classroom space and tactical areas concurrent with on-going master plan construction.<br><br>Since then, Cheltenham has averaged 1,500 to 2,000 law enforcement officers attending training at the Cheltenham site per month. During FY02, Cheltenham provided training venues for over 12 law enforcement agencies, which represented 1,193 student weeks. Thus far in FY 03, as of June 30, 2003, Cheltenham has hosted 17,013 federal, state and local law enforcement officers for a total of 547.2 student weeks of training. |

| | | |
|---|---|---|
| | | On page 26 of the report, footnote 17 is inaccurate. Although the US Capitol Police conducts their agency specific and advanced training in FLETC assigned buildings at the Cheltenham site, they have agreed in a Memorandum of Agreement with the FLETC to report their daily student throughput to the FLETC Cheltenham Scheduling Office, as well as schedule use of the FLETC Cheltenham buildings and grounds. |
| | 19 | Text cites Cheltenham infrastructure problems as evidence of the effects of deferred maintenance driven by law enforcement training workload. Not a valid example—FLETC inherited the Navy facilities in 2001, has not yet substantially trained there, and is developing the site. |
| | 12 | Text suggests that Cheltenham's contribution to FLETC's throughput capacity is limited, while it is being developed. This is misleading. Current Congressional restrictions on the use of that facility will limit its predominate use to requalification activities.<br><br>That fact is salient in the context because the GAO report (and all of the capacity figures contained within it) address only basic and advanced training—not requalification activities. |
| **Workload Projections** | 13 | Text asserts TSA projected 49,000 student weeks of flight deck officer training. Incorrect. The projections (and subsequent cancellations) were predominantly for airport security officer training |
| | 13, 16 | The chart used to depict projected workload is misleading. It needs to be balanced with actual workload data (with the exception of a large amount of unprojected training conducted in 2002, actual training conducted in a fiscal year typically amounts to |

8

A206

| | | |
|---|---|---|
| | | approximately 75% of the projection). The chart is also obsolete, using inflated workload projections for FY's 2003 and 2004. |
| **Consolidated Training Economics** | 2 | Text suggests that most "economies of scale" savings accruing from FLETC operation are related to student per diem costs. Not true. Per Office of Management and Budget, consolidated training drives significant cost avoidance by negating the need for duplicative and redundant training facilities and shared staff and expertise. |
| **Training Quality** | 2, 12 | Text cites quotations and concerns about "relevance, quality, and timeliness" of FLETC training in the current "surge" environment. All available evidence (e.g. graduation rates and test scores) demonstrates that there are no significant differences. |
| **Deferral of Advanced Training** | 4, 18 | Text suggests that the FLETC cancelled PO's advanced training to meet basic training needs. Substantially untrue. A few (5%) advanced classes were rescheduled within the FY. |
| **Use of AlternativeTraining Assets** | 5, 12 | Text asserts that FLETC does not routinely employ alternative training assets. Not true. The FLETC routinely conducts advanced and state and local training at export sites around the country; and is responsible for the development and provision of distributed learning alternatives when appropriate. |
| **Inefficient Scheduling Process** | 5 | Text asserts that FLETC's current (partially manual) scheduling process does not make efficient use of training facilities. Not true. The process is laborious, time-consuming, and requires modernization. However, it is injudicious to suggest that automation of the |

9

A207

| | | |
|---|---|---|
| | | process in itself will result in a significant increase in throughput capacity. |
| | 27 | Text asserts that three classes must sit idle while a fourth class trains on the driving range. This is manifestly untrue. Neither the FLETC nor its partners would tolerate this occurring on a regular basis. |
| **Contingency Planning** | 12 | Text implies that FLETC is unable to react to mission exigencies because it lacks a formal contingency plan. While the FLETC has not yet published a plan to cover all possible mission contingencies, it must be observed that current (and successfully) FLETC operations are being conducted to meet all PO requirements in a highly dynamic environment. |
| **Charleston** | 15 | Text appears to suggest (as an illustration of the effect of choke points?) that the resurfacing of the Charleston emergency response range negatively impacted FY 2003 USBP training throughput. Not true. USBP training throughput (100% of actual demand) would have been the same whether or not the range was resurfaced. |
| **Basic Training Needs** | 18 | Text (and the title of the section) says that FLETC has "generally" met PO basic training needs. FLETC has meet 100% of actual basic training needs since its inception, even throughout the "surge" workload periods following the events of 9/11. No projected basic training has been deferred or cancelled by FLETC. |
| | 18, 19 | Text asserts that a former Treasury PO was obliged to defer basic training for 168 agents due to FLETC capacity constraints. The actual last-minute (unprojected) agency request was for 240 students. Some were accommodated immediately, and the remaining students were provided training slots in the following fiscal quarter. This performance is really a demonstration of |



A208

| | | |
|---|---|---|
| | | flexibility and responsiveness. The FLETC scheduled all of these 11 week programs (2,640 unprojected student weeks) to commence within 60 days of the unexpected request. |
| **Advanced** | 18 | Text quotes a May 2002 internal Justice Department Training Needs report that an agency was obliged to "cancel" all of its advanced training due to lack of space at FLETC. Substantially untrue. The agency was asked to shift its advanced training within the fiscal year, which it declined to do. Adjustments for training requests are a matter of routine business. In most instances, FLETC and the impacted partner agency work collaboratively and satisfactorily to make adjustments. |
| **SASS** | 27, 35 | Text refers consistently to a Statement of Work (SOW). FLETC is using a Statement of Objectives in the acquisition of the Student Administration and Scheduling System (SASS) not a SOW. As such we are asking industry to tell us what the best system is and what technology to use.<br><br>Text asserts that FLETC has not evaluated the Academy Class Management System (ACMS). FLETC examined the ACMS two years ago and again evaluated for the present purpose in June 2003. This system is not complete. The scheduling component is still in the development state. An operating version of the system is not yet available. We are requesting that USBP provide us copies of the project plan, risk assessment, implementation plan, security plan and cost figures to date. Once this information is furnished and the module is completed and tested we can further evaluate this product. This product is a proprietary system and may be costly and difficult to replace in the future. The system |

11

A209

will also be viewed in terms of whether it will accomplish other desired deliverables specific to FLETC. It is far too early to suggest what, if any, significant cost savings can be realized by using the ACMS. However, FLETC will remain vigilant to determine if any other automation approach is warranted consideration.

# Appendix V: GAO Contacts and Staff Acknowledgments

## GAO Contacts

Richard M. Stana (202) 512-8777
Seto J. Bagdoyan (202) 512-8658

## Staff Acknowledgments

In addition to those named above, the following teams and individuals contributed to this report: Wendy C. Simkalo, Jared Hermalin, Nettie Richards, Elizabeth Lessmann, Grace A. Coleman, Brenda Rabinowitz, R. Rochelle Burns, Kim Hutchens, Homeland Security and Justice; Terrell Dorn, Physical Infrastructure; Carl L. Higginbotham, Dave Hinchman, Information Technology; Susan Ragland, K. Scott Derrick, Trina Lewis, Strategic Issues; Kenneth Bombara, Leo Barbour, Donna L. Miller, Evan Gilman, Applied Research & Methodology; Jan B. Montgomery, Geoffrey Hamilton, General Counsel; Susan Conlon, Shirley A. Perry, Product Assistance Group.

## GAO's Mission

The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.

Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to e-mail alerts" under the "Order GAO Products" heading.

### Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. General Accounting Office
441 G Street NW, Room LM
Washington, D.C. 20548

| | | |
|---|---|---|
| To order by Phone: | Voice: | (202) 512-6000 |
| | TDD: | (202) 512-2537 |
| | Fax: | (202) 512-6061 |

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Public Affairs

Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800
U.S. General Accounting Office, 441 G Street NW, Room 7149
Washington, D.C. 20548



PRINTED ON RECYCLED PAPER

Lotus cc:Mail for Wayne Coleman

**Date:** 2/13/2003 1:44 PM
**Sender:** Wayne A Coleman
**To:** john.p.cahill@usdoj.gov
**Priority:** Urgent
**Subject:** Fwd: FLSA and training

John,

As promised

Wayne Coleman
202-305-0117
Check out the Pay Wizard at
http://powerport.ins/hrd/paywizard/index.htm
Also when you need answers to your pay questions
e-mail them to the Pay Questions cc:mail box

Forward Header
Subject: RE: FLSA and training
Author: gwilson@fs.fed.us
Date: 2/13/2003 1:32 PM

Here is Vicki's response to my questions.

$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$
Gary M. Wilson
Program Manager for Pay, Attendance & Leave
e-mail: gwilson@fs.fed.us
phone: (703) 605-0865
fax: (703) 605-5105
$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$
----- Forwarded by Gary Wilson/WO/USDAFS on 02/13/2003 01:29 PM -----

"Draper, Vicki L."
To: "'Gary Wilson'" <gwilson@fs.fed.us>
<VLDRAPER@opm.go
cc:

Subject: RE: FLSA and training

12/18/2002 10:34 AM

Gary,

Regrettably, our original determination was incorrect. We recently revisited this issue after realizing that the term "regular working hours" is defined in 5 CFR 551.421. When we read the regulations at 5 CFR 551.423(a)(1) in conjunction with the 551.421, it is clear that if the nonexempt employees are scheduled in advance of the administrative workweek to attend a 6-day training class, those regularly scheduled training hours on the 6th day are "regular working hours" and constitute hours of work for overtime pay purposes.

According to 5 CFR 551.423(a)(3), time spent in apprenticeship or other entry level training outside regular working hours shall not be considered hours of work provided no productive work is performed during such periods. However, because the regularly scheduled training hours on the 6th day are considered to be regular working hours (and the training will not occur outside regular working hours), it is irrelevant that this is an apprenticeship program and no productive work is being performed.

In response to your last question, this is not optional. If the training occurs during regular working hours, as discussed above, the time spent in training on the 6th day is considered hours of work and the employees are entitled to overtime pay. This also applies to the employees who formerly received training at the Federal Law Enforcement Training Center.

I sincerely apologize for any inconvenience our previous determination may have caused.

Vicki Draper
Team Leader, Premium Pay and Hours of Work
Pay and Leave Administration Division
Office of Compensation Administration
(202) 606-2858

-----Original Message-----
From: Gary Wilson [mailto:gwilson@fs.fed.us]
Sent: Wednesday, December 18, 2002 8:55 AM
To: Draper, Vicki L.
Subject: RE: FLSA and training

Vicki--

Thank you for sending me a copy of your opinion on Mr. Stribling's questions. Our letter was issued in February 2002 and was based on our discussions ( I talked to you 2 months before our first class under the new 6-day schedule) last January. I see by your current determination that overtime is now appropriate. This is a class that each law enforcement officer or special agent must pass or they are out of the law enforcement job. So this was looked upon as an apprenticeship program. The trainees report to the FLETC before they are assigned to their first post of duty.

But we do know that they will be in basic training for 6 days a week. Was the original determination wrong? Is it optional, so that we can change our policy and start the overtime at the next class or is this a retroactive decision, and we should be paying overtime from the beginning? These trainees are not producing any "productive" work while at the school.

"Productive" meaning they are not performing work for the agency during these weeks, it is strictly training. Thanks for your help on this.

$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$

Gary M. Wilson
Program Manager for Pay, Attendance & Leave
e-mail: gwilson@fs.fed.us
phone: (703) 605-0865
fax: (703) 605-5105

$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$

"Draper, Vicki L." <VLDRAPER@opm.go
To: "Claude Stribling (cstribling@fs.fed.us)" <cstribling@fs.fed.us>
cc: "Bracey, Shirley J." <SJBracey@opm.gov>, "Gary Wilson (GWilson@fs.fed.us)"

Subject: RE: FLSA and training

12/17/2002 03:30 PM

Mr. Stribling,

This responds to your inquiry regarding time spent in entry level training as hours of work for FLSA-nonexempt employees.

Under 5 CFR 551.423(a)(3), time spent in apprenticeship or other entry level training....outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods, except as provided by 5 CFR 410.402(b). Under 5 CFR 551.423(a)(1), time spent in training during regular working hours shall be considered hours of work.

However, the regulations at 5 CFR 551.421 clarify that, for purposes of part 551, "regular working hours" means the days and hours of an employee's regularly scheduled administrative workweek established under 5 CFR part 610. The phrase "regularly scheduled administrative workweek" is defined in 5 CFR 610.102 as the period within an administrative workweek within which an employee is regularly scheduled to work. Also see the definition of "regularly scheduled work" in 5 CFR 610.102, which hinges on whether the work was scheduled in advance of the administrative workweek.

This means that, when FLSA-nonexempt employees are scheduled in advance of the administrative workweek to attend a 6-day training class for a specified number of hours (e.g., 8 hours), those regularly scheduled training hours on the 6th day are "regular working hours" and are considered hours of work for overtime pay purposes.

Vicki Draper
Team Leader, Premium Pay and Hours of Work
Pay and Leave Administration Division
Office of Compensation Administration
Office of Personnel Management
(202) 606-2858

---Original Message-----

From: Claude Stribling [mailto:cstribling@fs.fed.us]

Sent: Tuesday, December 17, 2002 1:21 PM
To: payleave@opm.gov
Cc: Laura Giovannini

Subject: RE: FLSA and training

Please see my original message (attached), also the reply and recommendation from Shirley Bracey, OPM Raleigh. Can you provide guidance on this issue? We may be going full circle, because the memo in question references OPM input on this decision. Thank you.

Wilt Stribling, US
Forest Service

----- Forwarded by Claude Stribling/R8/USDAFS on 12/17/2002 01:16 PM -----

"Bracey, Shirley J."
To: "'Claude Stribling'" <cstribling@fs.fed.us>
<SJBracey@opm.go
cc:

Subject: RE: FLSA and training

12/17/2002 08:51 AM

I've spoken with my Deputy Director about your issues and he recommends that you contact our pay policy people in DC. They can be reached at (202) 606-2858 or you may e-mail them at payleave@opm.gov. If I can be of further assistance, please let me know.

Shirley Bracey
Office of Personnel Management
Human Resources Specialist
Phone: 919-790-2817
Fax: 919-790-2722

-----Original Message-----

From: Claude Stribling [mailto:cstribling@fs.fed.us]
Sent: Thursday, December 12, 2002 5:52 PM
To: sjbracey@opm.gov
Cc: Claude Stribling

Subject: FLSA and training

Thank you so much for your time today. In response to your request, I am sending this message of explanation regarding our conversation.

I am a US Forest Service Law Enforcement Officer, stationed on Pisgah National Forest in Hot Springs, NC. I am a member of a national committee (Multicultural Advisory Group, or MAG), which is an advisory committee to the Director of Law Enforcement for the US Forest Service.

We accept issues from the field and attempt to aid in resolution by making recommendations to the Director, after due research.

One issue which we are currently exploring is this: We have GS 5 and GS 7 non exempt employees who are required to attend the Federal Law Enforcement Training Center (FLETC) in Brunswick, GA, immediately after they are hired, for basic law enforcement training. FLETC is the training center for most

federal enforcement entities, and is operated by the Treasury Department.

Our trainees are GS5, GS 7, and GS 9 employees, in the GS 1802 series. Since the massive influx of trainees in the Air Marshals' training since 9/11, FLETC has gone to a six day per week training schedule to expedite training duration and put more people in the field more quickly. Our basic training now stands at 17 weeks based on 5 day weeks, so the 6 day weeks should be reducing that to approximately 14 weeks.

Our agency Human Resources Director has ruled that these trainees are not entitled to overtime compensation for the 6th day each week.

Without repeating his entire memo, I will give pertinent exerpts. I will fax the memo if needed. The memo is on official letterhead from the United States Forest Service Headquarters in Washington, DC.

Opening sentence of the memo is (all following are direct quotes): "You have asked this office for guidance regarding several pay related matters. In consultation with the Office of Personnel Management, here is our guidance:"

"Question: Will expanding to 6 days a week from the traditional 5 days cause any change in our pay policy for training? Will we have to pay overtime for the extra day per week?"

"Answer " **(here there is a paragraph related to exempt employees, then the following...) "The second group of employees is covered by the FLSA. These employees are usually in the GS 462 (Forestry Technician) or GS 1802 (Law Enforcement Officer) series. The regulation that addresses the earning of premium pay for FLSA covered employees while on a training assignment is found in 5 CFR 551.423."

"In order to apply this regulation we have to determine if the employee is being directed to the training in order to improve the employee's performance of the duties and reponisibilities in his/her current position. If this is the case then all hours spent in training are considered hours of work and are compensable."

"If, however, the time spent is considered apprenticeship or entry-level training, hours outside his/her regularly scheduled working hours are not considered hours of work (not compensable), provided no productive work is performed during this period. In other words, if an employee is allowed to work on a case or answer mail from the employee's home unit, then overtime must be paid."

"Question: Are employees currently receiving annual premium pay under administratively uncontrollable overtime (AUO) to continue receiving AUO during basic training?"

"Answer: No. Administratively uncontrollable overtime is not appropriate when training is longer than 60 workdays or exceeds an aggregate of 60 workdays in a year. Therefore, any employee who attends the basic training course (which is longer than 60 days) must be taken off AUO during the training period (5 CFR 550.162(c)(2) ). Since the employee is not receiving AUO, the time spent in basic training will not be counted in the quarterly computation review." END QUOTE. The memo is signed, Steve Nelson, Director of Human Resources Management. (Washington DC)

It is my understanding that other agencies, such as the National Park Service (Dept of Interior), and Bureau of Land Management (Dept of Interior) are paying their trainees overtime for the sixth day, so there

are discrepancies within a given class group, since the classes are composed of a variety of land management enforcement agencies, such as US Fish and Wildlife Service, Tennessee Valley Authority, etc.

My purpose is not to initiate a formal grievance or complaint. My purpose is to determine if this is an appropriate ruling, based on OPM's understanding of FLSA. Forest Service management has indicated that they are not opposed to paying the trainees overtime if the present ruling is incorrect. If OPM's opinion on this issue is contrary to the present ruling, then management will very likely voluntarily make backpayments for the affected trainees and initiate proper application of FLSA for future trainees, without a formal grievance process being initiated.

Thank you very much for your consideration of this matter. I look forward to hearing from you.

Wilt Stribling, US Forest Service
ofc phone 828 622 3202, x4012

------------------------------

-- Even though this E-Mail has been scanned and found clean of
-- known viruses, OPM can not guarantee this message is virus free.

------------------------------

-- This message was automatically generated.

------------------------------

Thank you for your comments. We will take appropriate action.
Jo Ann

-----Original Message-----
From: Cahill, John P [mailto:John.P.Cahill@usdoj.gov]
Sent: Wednesday, February 19, 2003 4:02 PM
To: 'Perrini, Joanne (OPM)'
Cc: Krumsiek, Paul; Chris Cejka (E-mail); Elizabeth Daly (E-mail); Yvette.Ross@atf.gov; Smith, Sue; Coleman, Wayne A
Subject: Training at FLETC

Joanne--

You asked for my view on the best way for OPM to communicate a change in its position on the payment of FLSA overtime pay for entry-level training at the FLETC.

It is apparent that OPM has, in the past, given verbal advice to several agencies on this topic, and that agencies have relied on that advice for several months. Should OPM decide to change that advice, it must be done in a way that speaks for OPM officially. (A staff E-mail to a sub-component of one agency just does not cut the mustard when millions of dollars are involved.)

Since a policy change on the meaning of OPM's regs is not specific to agencies that happen to use the FLETC, but rather has potentially an impact on every agency, I would prefer that OPM send a memo to all agencies. Short of such a memo, a Q &A on OPM's Web site would be second best. In either case, I presume that your GC would sign off.

John P. Cahill
U.S. Department of Justice
Personnel Staff
1331 Pennsylvania Ave., NW
Room 1110
Washington, DC 20530

Voice: (202) 616-3712
FAX: (202) 514-6827
E-mail: john.p.cahill@usdoj.gov
Web: http://www.usdoj.gov/jmd/ps

-------------------------------
-- Even though this E-Mail has been scanned and found clean of
-- known viruses, OPM can not guarantee this message is virus free.
-------------------------------
-- This message was automatically generated.
-------------------------------

**Lemko, Patty**

**From:** Hyde, David
**Sent:** Thursday, March 20, 2003 8:02 AM
**To:** lst-G-WPC
**Subject:** FW: FLSA and training--proposed response to steve cohen
**Importance:** High

Updated pay guidance for employees in training.

*David C. Hyde*
*Chief, Office of Civilian Personnel*
*Commandant, G-WPC*
*United States Coast Guard*
*202-267-0921*

-----Original Message-----
**From:** Allen, Melissa [mailto:Melissa.Allen@DHS.GOV]
**Sent:** Wednesday, March 19, 2003 4:52 PM
**To:** Victor Cerda; Guhman, Betty; Nicholson, David; Deborah Spero; Doug Browning; Rossides, Gale; Johnson, Harvey RADM; Camillo, Mark; Mike Becraft; Irving, Paul; Ron Castleman; McHale, Stephen; Allen, Thad VADM; Brooks, Vicki; Barbara Saliunas; Bob Smith; Cheryl Concepcion; Hyde, David; Deborah Short; Whitford, Richard; Doug Fehrer; Ellen King; Lil Stewart; Rick Hastings; Fisher, Thomas
**Cc:** Hale, Janet; Carnes, Bruce; Clark, Lucy
**Subject:** FW: FLSA and training--proposed response to steve cohen
**Importance:** High

This issue was raised during the HR Directors meeting on Tuesday. OPM has now provided clarification of their guidance which they are posting on their Web site.

Melissa J. Allen
Acting, Chief Human Capital Officer
Department of Homeland Security
(202)-786-0061
Melissa.Allen@dhs.gov

-----Original Message-----
**From:** Cohen, Steve [mailto:SRCOHEN@opm.gov]
**Sent:** Wednesday, March 19, 2003 3:36 PM
**To:** Allen, Melissa
**Subject:** FW: FLSA and training--proposed response to steve cohen
**Importance:** High

our staff made a mistake in the original guidance we provided agencies in response to specific questions we received in the fall of 2001 about 6-day training courses at the Federal Law Enforcement Training Center (FLETC). We are now attempting to correct that mistake. In fact, we were planning to post a Q & A on our Web site today to address this issue (copy attached). The draft Q & A has been reviewed and approved by OGC staff (Jim Green). We apologize for any inconvenience the new guidance may pose for all involved

Background:

This question arose as a result of FLETC's decision to expand its training courses to accommodate agencies' increased demands for training of law enforcement officers as a direct result of the attacks on September 11. In response to questions we received at the time, we responded that FLSA-nonexempt employees are NOT entitled to receive overtime pay for time spent in entry-level training on the sixth day of a 6-day training course, because time spent in apprenticeship or other entry-level training outside regular working hours is not considered hours of work under 5 CFR 551.423(a)(3).

However, time spent in training during "regular working hours" is considered hours of work (5 CFR 551.423(a)(1)), and "regular working hours" is defined in our regulations as including the days and hours of an employee's regularly scheduled administrative workweek, which is scheduled in advance of the administrative workweek.

Our new guidance will state that FLSA-covered (nonexempt) employees are entitled to receive overtime pay for time spent in entry-level training on the sixth day of a 6-day training course if they are scheduled in advance of the administrative workweek to attend the 6-day training class for a specified number of hours (e.g., 8 hours). Those regularly scheduled training hours on the sixth day are "regular working hours" and are considered hours of work for overtime pay purposes.

Agencies will be responsible for determining whether an employee is entitled to receive overtime pay for regularly scheduled training hours under these conditions and will likely need to recompute affected employees' overtime pay entitlements and provide back pay and interest under 5 CFR part 550, subpart H.

**Time Spent in Training as Hours of Work for FLSA-Covered Employees**

**Question #1:** Are employees covered by the Fair Labor Standards Act (FLSA) entitled to receive overtime pay for time spent in entry-level training on the sixth day of a 6-day training course?

**Answer #1:** FLSA-covered (nonexempt) employees are entitled to receive overtime pay for time spent in entry-level training on the sixth day of a 6-day training course under the conditions specified below.

Time spent in apprenticeship or other entry-level training **outside regular working hours** is not considered hours of work, provided no productive work is performed during such periods (see 5 CFR 551.423(a)(3)). However, under 5 CFR 551.423(a)(1), time spent in training **during regular working hours** is considered hours of work. The regulations at 5 CFR 551.421 clarify that, for purposes of part 551, "regular working hours" means the days and hours of an employee's regularly scheduled administrative workweek established under 5 CFR part 610. The phrase "regularly scheduled administrative workweek" is defined in 5 CFR 610.102 as the period within an administrative workweek within which an employee is regularly scheduled to work. Also, see the definition of "regularly scheduled work" in 5 CFR 610.102, which hinges on whether the work was scheduled in advance of the administrative workweek.

When FLSA-covered employees are scheduled in advance of the administrative workweek to attend a 6-day entry-level training class for a specified number of hours (e.g., 8 hours), those **regularly scheduled training hours** on the sixth day are "regular working hours" and are considered hours of work for overtime pay purposes. For example, an FLSA-covered employee who is required to attend a 6-day training session at the Federal Law Enforcement Training Center (FLETC) is entitled to overtime pay for the sixth day of training, since the employee was scheduled in advance of the administrative workweek to attend the FLETC training course. Because the regularly scheduled training hours on the sixth day are considered to be "regular working hours" (and the training will not occur outside regular working hours), it is irrelevant that the FLETC training is entry-level training and that no productive work is being performed.

Agencies are responsible for determining whether an employee is entitled to receive overtime pay for regularly scheduled training hours under the conditions specified above. Agencies may need to recompute an employee's overtime pay entitlement and provide back pay under 5 CFR part 550, subpart H, for overtime hours that occurred during regularly scheduled training.

**Question #2:** May an employee receive compensatory time off in lieu of overtime pay for attending an extended training session or course?

**Answer #2:** No. By law, compensatory time off may be approved instead of overtime pay for irregular or occasional (unscheduled) overtime hours of work. See 5 U.S.C. 5543(a). If an employee is scheduled in advance of his or her administrative workweek to attend an

extended training course, such training would not be irregular or occasional (unscheduled) overtime hours. Therefore, the employee may not receive compensatory time off instead of overtime pay for the extended training hours. Please see OPM's fact sheet on compensatory time off for further guidance (http://www.opm.gov/oca/pay/HTML/COMP.HTM).

(Note: Employees on flexible work schedules may earn compensatory time off for regularly scheduled overtime hours, as provided in 5 U.S.C. 6123(a)(1) and 5 CFR 550.114(b) and 551.531(b). However, employees usually are not on flexible work schedules during periods of training.)

*Office of Workforce and Information Management*

U.S. Department of Homeland Security
800 K Street, NW
Washington, DC 20536

U.S. Immigration and Customs Enforcement

SEP 10 2004

MEMORANDUM FOR MOSE LINDSAY
CHIEF PAYROLL OPERATIONS BRANCH
NATIONAL FINANCE CENTER
USDA

FROM: Christine Greco
Director
Human Resources

SUBJECT: Request for Calculation and Payment of the 6th day of Training

The Bureau of Immigration and Customs Enforcement (ICE) Human Resources requests that the National Finance Center calculate and pay retroactive FLSA OVERTIME payments to approximately 3300 legacy Immigration and Naturalization Service employees (see attached memo dated February 3, 2004).

These employees were assigned and attended basic training on a 6th day between January 1, 2002 to August 23, 2003. Calculations will be based on the employees and number of additional days of overtime owed as identified by Human Resources. These payments are OVERTIME payments and should NOT be included in the calculations made to determine if an employee has exceeded the overtime cap.

Attached is the documentation required to process and pay retroactive overtime under the Fair Labor Standards Act (FLSA) to employees of the former Immigration and Naturalization Service. The documentation includes:

AD343- Payroll Action Request
Reimbursement Agreement Between Agencies
Employee Name and Social Security Number
Findings, Certification and Determination form

We expect that additional discussions may be required to move the process forward. Mr. Wayne Coleman, Compensation Policy Specialist (202) 305-0117, and Ms. Alethea Smalls, Compensation Policy Specialist (202) 514-3968 are available to provide additional information as required.

PROCESS AS FLSA OVERTIME. Payments are not to be calculated in the Overtime Cap.

**INS Interagency Agreement No: NFC-04-1484**

# FINDINGS, CERTIFICATION, AND DETERMINATION

**SUBJECT: Proposed Interagency Agreement Under the Economy Act of 1932**

**Based on the following information, the Bureau of Immigration and Customs Enforcement (ICE) intends to enter into an Interagency Agreement (IAA) with:**

**NATIONAL FINANCE CENTER (NFC)**

**[ AGENCY, DIVISION, OFFICE ]**

**FINDINGS:**

**1. The Service has a requirement for the following product(s)/service(s): [ Use Separate, additional sheets, if necessary ]**

The Bureau of Immigration and Customs Enforcement, Human Resources, requests that the National Finance Center calculate and pay retroactive FLSA overtime payments to approximately 3300 legacy Immigration and Naturalization Service employees. These employees attended basic training on a 6th day between January 1, 2002 and August 23, 2003. Calculations will be based on the employees and number of additional days of overtime owed as identified by Human Resources These payments are OVERTIME payments and should NOT be included n the calculations made to determine if an employee has exceeded the overtime cap.

**2. The obligation, herein proposed, complies fully with the Economy Act of 1932, as amended (31 U.S.C. 1535) and the Federal Acquisition Regulation (FAR), Subpart 17.5.**

**3. The procurement of this product/service does not conflict with the authority of any other agency.**

**4. The nature of the work to be performed under the instant requirement precludes OMB Circular A-76 implications (reference: FAR subpart 7.3, Contractor Versus Government Performance).**

**5. Each task or phase to be performed under this IAA or modification is within ICE's authority. Identification of multiple tasks within a basic or initial IAA does not obligate ICE to place subsequent tasks with the Servicing agency. Subsequent tasks will be identified and supported with a separate justification, other appropriate documentation, and funding. If this action pertains to a modification to an existing IAA, the required performance is within the scope of the original IAA.**

PROCESS AS FLSA OVERTIME. Payments are not to be calculated in the Overtime Cap.

**6. Unless otherwise noted in supporting documentation, committed ICE funds are one year monies and shall be obligated within the fiscal year in which the funds are appropriated. In the acquisition of severable services, the period of performance on the obligation document may, in accordance with statutory authorization (41 U.S.C. 2531 as amended by Section 1073 of the Federal Acquisition Streamlining Act of 1994 (Public Law 103-355)) and the regulatory authorization (Federal Acquisition Regulation 32.703-3(b)), extend beyond the fiscal year in which the funds are appropriated and obligated provided that the period of performance does not and shall not extend beyond one year.**

**7. The benefits to be accrued from entering into this interagency agreement are:**

Entering into an Interagency Agreement with the aforementioned agency is beneficial to ICE in that the proposed agency has the manpower, means and knowledge to accomplish this task while ICE does not. In addition, the NFC has qualified staff personnel available, experienced in the subject matter, and capable of completing the task.

**CERTIFICATION:**

**I hereby certify that, to the best of my knowledge and belief, the foregoing FINDINGS are actual, accurate, and complete.**

[signature] 9/13/04
**Signature** for DIR HRM **Date**

**Title** **Chief, Employee & Labor Relations**

**[NOTE: Must be signed at the Branch/Section Chief level or higher.]**

**DETERMINATION:**

**Based on the foregoing Findings, as certified to by the appropriate program official, Determination is hereby made that entry into an Interagency Agreement with**

**The Department of Agriculture, National Finance Center**
**[Name of Agency / Division / Office]**

**for the purpose(s), and under the conditions, stated above, is, in fact, in the best interest of the Government.**

**John A. Russo, Jr.** **Date**
**Chief, IT Branch**
**Headquarters Procurement Division**

## Ehrbar, John J

**From:** Ehrbar, John J

**Sent:** Wednesday, September 03, 2003 1:29 PM

**To:** Arndt, Jill

**Cc:** Hastings, Rick; Baer, Robert K; Aira, Margie; Smalls, Alethea; Baptiste-Robinson, Eulalia; Higgins, John J; Nogami, Glenda; Waldstreicher, Sid; Lowell, Cynthia; Ellis, Karen M; Park, Steve A; Bergeron, Pauline A; Bartlett, Pamela L; Smith, Kent ; Walker, Glenda F; Hanner, Christine S; Brown, Gwen L; Adams, Denise J; Brown, Phil G; Hunn, Mindy G; Crevonis, Gary E; Tingley, Frederick W; Ehrbar, John J

**Subject:** Payment for Sixth (6th) Day of Training

On August 6, 2003, we received authority from the Department of Homeland Security (DHS) to pay Fair Labor Standards Act (FLSA) overtime to legacy Immigration and Naturalization Service (INS) students who were assigned and attended basic training for a 6th day after January 1, 2002. Effective this pay period (17-03) these employees are to be paid overtime under FLSA provisions. Retroactive payments will be processed, as discussed below.

As other DHS Bureaus have employees affected by this decision, coordination with these organizations was necessary. Through that process, the effective date of the current pay period, 17-03, August 24 through September 6, 2003 was established to start payment of the overtime on a current basis. This message serves as your authorization to do so. The overtime is to be coded into the system as TC 13/17 – FLSA Training, in the applicable week1/week2 fields.

As this is an FLSA overtime payment, the only time that may be credited is for hours actually worked. Time may not be credited for time not worked on the 6th day of basic training for employees who were excused from attending all or any part of the 6th day. The overtime credit is to be limited to hours in attendance. Absences from the scheduled class for all or any significant portion of the training day (an hour or more) may not be included in the overtime payment. For example, if a student attended the morning portion of the 6th day but was excused from the afternoon portion, he or she would only be credited with 4 hours of FLSA hours of work for that workweek.

We understand that a 6th day of basic training per week started on or shortly after January 1, 2002 and included the following occupations:

- Adjudication Officers
- Application Adjudication Officers
- Asylum Officers
- Criminal Investigators
- Deportation Officers
- Detention Enforcement Officers
- Immigration Enforcement Officers, and
- Immigration Inspectors.

Processing retroactive payments will be started as soon as possible. We will need to issue input instructions to employees and timekeepers to ensure uniform procedures are followed so that the payments are correctly computed, recorded and tracked. A specific budget/accounting designation will be established to correctly charge the payment to the proper budget. Current charges will be made to the same accounting code that covers the non-overtime hours of the student as reported on the time card.

Please provide this office with copies of the class rosters of employees eligible for retroactive overtime so that necessary control procedures may be established. Send them to:

Fred Tingley
Office of Human Resources Management
DHS/ICE
800 K Street NW, Room 5000
Washington, D.C. 20536.

A227

Please ensure that necessary Federal Law Enforcement Training Center officials are informed. The

Personnel Officers in the field and headquarters units are receiving copies of this message. Please refer questions to Mr. Fred Tingley at (202) 305-9865.

John J. Ehrbar
Chief, Compensation Policy Section
Office of Human Resources Management
Bureau of Immigration and Customs Enforcement

Office of Workforce and Information Management
U.S. Department of Homeland Security
800 K Street, NW
Washington, DC 20536

U.S. Immigration and Customs Enforcement

FEB - 3 2004

MEMORANDUM FOR TERANCE L. COOK
ASSISTANT DIRECTOR
JUSTICE MANAGEMENT DIVISION
DEPARTMENT OF JUSTICE

FROM: C. Rick Hastings
Director
Workforce Management

SUBJECT: Request for Calculation and Payment of the 6th day of Training

This is a request that you initiate a process to compute and pay retroactive overtime under the Fair Labor Standards Act (FLSA) for the attached listing of 3,344 employees of the former Immigration and Naturalization Service (INS). A number of them are now employees of the Bureau of Immigration and Customs Enforcement (ICE), while a number have left Federal Service or moved to other agencies. The attachment is in electronic form on a single disk. We believe this list to be almost complete, however in the event that there are additional employees who will need to be added to the list at a later time, we request your assistance in processing those as well. Our best estimate of the number of additional employees who are not on this list is approximately 120. Contents for each individual are:

Social Security Number (SSN)
Name (last, first, initial),
Start Date (start date of the class for the 6th day of training)
End Date (end date of the class for the 6th day of training)
Total 6th Day Count (count of the number of Saturdays during the period)

Our requirement to pay retroactive overtime is a result of a new interpretation of the regulation by the Office of Personnel Management. On August 6, 2003, we received authority from the Department of Homeland Security (DHS) to pay FLSA overtime to students who were assigned and attended basic training for a scheduled 6th day after January 1, 2002.

The ICE has a requirement for calculation and payment of the 6th day of training for employees enrolled in class during the period of January 2002 through pay period 16/03. The request is made to compensate students for FLSA overtime for participating in training on a scheduled 6th day of a workweek. Interest should also be included for that period.

We seek to enter into a reimbursable agreement with the NFC to accomplish the re-calculation and payment of any back pay due for the period of January 2002 through pay period

A229

Memorandum for Terance L. Cook
Subject: Request for Calculation and Payment of the 6th day of Training

16-03 along with interest from the date payment should have been made to present for the individuals listed in the attachment. We expect that the following steps will be required:

a) Calculate the FLSA overtime, which would have been due to the employees and the interest, using the rates established by the Secretary of the Treasury under 26 USC 6621(a)(1), from date overtime should have been paid to date of payment.
b) Pay employees FLSA overtime due, by separate check by direct deposit.
c) Provide a report of the results to the agency, in electronic form, the calculation for each student, and
d) Sort all reports and information by SSN, in ascending order.

We expect that additional discussions may be required to move the process forward. Mr. John Ehrbar, Chief, Compensation Policy Staff (202) 307-6859, and Mr. Wayne Coleman, Compensation Policy Specialist (202) 305-0117, are available to provide additional information as required.

cc: SHRO pay specialists

S:\HRGROUPS\Comp FY04-On\6THDAY\NFC Request.doc

FILE COPY

01/03/2005 12:31 5044269722 USDA NFC FMD PAGE 01/02

08/2004 14:15 5044269722 USDA NFC FMD PAGE 03/07

National Finance Center
Office of the Chief Financial Officer, U.S. Department of Agriculture
P.O. Box 60000, New Orleans, LA 70160-0001

## Agreement to Reimburse the National Finance Center for Services

Authorized by 7 U.S.C. 2235

1. (a) AGREEMENT No.: NFC-04-1484
(b) AMENDMENT No.:
(c) GESD Project No.: 40321

2. EFFECTIVE FROM 04/28/2004 THROUGH Completion

3. NFC ACCOUNT REPRESENTATIVE: (a) Deidre Charlot
(b) Telephone: 504-426-0289
(c) Telefax: 504-253-5297

4. CUSTOMER INFORMATION:
(a) Dept. Name: U.S. Department of Homeland Security
(b) Agency Name: Bureau of Immigration and Customs Enforcement
(c) Address: 800 K Street. N.W., Room 5097
(d) Address:
(e) City: Washington
(f) State: D.C.
(g) Zip: 20536
(h) Account Representative: John Ehrbar
(i) Telephone: 202-307-6869
(j) Telefax: 202-514-4200

5. SERVICES TO BE PERFORMED:
to calculate and pay Fair Labor Standards Act (FLSA) overtime and interest adding appropriate FLSA training hours and using the "DJ" calculation method for up to 3,344 employees of the Bureau of Immigration and Customs Enforcement who were formerly Justice Immigration and Naturalization Service staff

6. REFERENCES RELATIVE TO THIS WORK:
Memorandum from Terence L. Cook entitled "Special Agency Request for Homeland Security (formerly DJ/IN) Calculate and Pay Fair Labor Standards Act Overtime & Interest" dated February 21, 2004

7. ESTIMATED AMOUNT
(a) Current Year: 2004 (b) Amount: $60,700
(c) Future Year: (d) Amount: $0
(e) Total $60,700

8. FINANCIAL (CUSTOMER)
(a) Treasury Symbol: 70040540
(b) Agency Location Code (ALC/Vendor No.): ~~70011515~~ 70191515
(c) Agency Code: ~~DB~~ 70
(d) Accounting Code: 0H-99-00-000
(e) Accounting Station: NONE 000
(f) Object Class: 2500
(g) Common Agree No.:
(h) Miscellaneous Obligation (MO) No.:
(i) Reference Line No./Mgmt. Code:

9. FINANCIAL (USDA)
(a) Treasury Symbol: 12X4609
(b) Agency Location Code (ALC/Vendor No.): 12400002
(c) Agency Code: 90
(d) Accounting Code: 049NRA11484
(e) Accounting Station: 0010
(f) Object Class: 0130 (USDA) or 0120 (other)
(g) Fund Code: NC
(h) Miscellaneous Obligation (MO) No.:
(i) Reference Line No./Mgmt. Code:

Billing Information and Inquiries Item 7 is an estimate; we will collect actual charges monthly. Please direct questions about this agreement to your NFC account representative

### Approvals

| For Customer | For USDA |
|---|---|
| Name: [signature] ILIR M. TSUNGU | Name: Patricia E. Healy |
| Title: ACTING FOR DIR HR ICE | Title: Deputy Chief Financial Officer |
| Signature and Date: [signature] 9/10/04 | Signature and Date: [signature] 6/4/04 |

A231

NFCO-2
1/89

National Finance Center Cost Estimate
Date prepared: May 25, 2004
Prepared for: Department of Homeland Security Bureau of Immigration and Customs Enforcement (ICE)
Purpose: Calculate and produce payment reports for Fair Labor Standards Act overtime and interest for 3,144 ICE employees using the DJ calculation method
Estimated completion date:
Required completion date:
Reimbursement Agreement No.: NFC-04-1484, GESD Project Number 40321
Analyst: Deidre Charlot, 504-426-0289 (voice) and 504-253-5297 (fax)

| Organization (Division, Branch) | Task | Staff Hours Regular | Staff Hours Over-time | Grade | Step | Benefits | Total Salary Including Benefits | Other Direct Costs | Subtotal | Indirect Costs | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NFC Costs | | | | | | | | | | | |
| Design/Development (D) | | | | | | | | | | | |
| GESD PASB | Develop/Design System Requirements | 240 | | 13 | 6 | $ 5,058 | $ 14,418 | $ - | $ 14,418 | $ 4,249 | $ 18,667 |
| GESD PASB | Code/Modify Computer Programs | 420 | | 13 | 6 | $ 8,852 | $ 25,232 | $ - | $ 25,232 | $ 7,436 | $ 32,668 |
| GESD PASB | Conduct System Testing | 120 | | 13 | 6 | $ 2,529 | $ 7,209 | $ - | $ 7,209 | $ 2,124 | $ 9,333 |
| | Total | 780 | 0 | | | $16,439 | $ 46,859 | $ - | $ 46,859 | $ 13,809 | $ 60,668 |

Rounded Total $ 60,700

1484cost 05-25-04





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

09/23/2004 01:52 5044263722 USDA NFC FMO PAGE 02/03

SEP-23-2004 14:57 INS HRB 202 514 4200 P.03

Bar Code

U.S. Department of Homeland Security

# Reimbursement Agreement Between Agencies

**Parties to the Agreement:**

| Provider Agency | | | Customer Agency | |
|---|---|---|---|---|
| Provider Cost Center | RCN | RCN Description | Customer Contact<br>Gwen Brown | Phone<br>202-514-3964 |
| Provider Contact<br>Deidra Charlot | Phone<br>504-426-0295 | | | |
| Customer Number | Customer Alias<br>ICE | | | |
| Provider Name<br>USDA National Finance Center | | | Customer Name (if billing address is different, specify on reverse side)<br>Bureau of Immigration and Customs Enforcement | |
| Address<br>P O Box 6000 | | | Address<br>800 K Street NW Rm 5000 | |
| | | | Applies to NFC -01-1-184 | |

| City | State | Zip | City | State | Zip |
|---|---|---|---|---|---|
| New Orleans | LA | 70160-0001 | Washington | DC | 20536 |

**Duration:**

This agreement shall become effective on ______ and shall continue through ______

**Provide the Following Services or Goods:**

*Brief explanation of work or services to be performed and basis for determining cost:*
Calculate and pay retroactive FLSA overtime payment to approximately 3300 legacy Immigration and Naturalization Service students

Appropriations:

| NFC Code | FY 02 Est Amt | NFC Code | FY 03 Est Amt |
|---|---|---|---|
| 2 BA 8 OPS 1213 000 | $1,586,358 | 3 BA 8 OPS 1213 000 | $2,834,896 |
| 2 BA 8 OPS 1221 000 | $31,306 | 3 BA 8 OPS 1221 000 | $42,156 |
| 2 BA 8 PGM 1231 000 | $106,761 | 3 BA 8 PGM 1231 000 | $159,671 |
| 2 BA 8 OPS 1231 000 | $279,595 | | |
| 2 BA 8 OPS 1251 000 | | 3 BA 8 OPS 1251 000 | $89,535 |
| 2 BA 8 OPS EF99 000 | $429,117 | 3 BA 8 OPS EF99 000 | $5,596 |
| 2 BA 8 OPS EF99 000 | $17,253 | 3 BA 8 OPS EF99 000 | $1,865 |
| 2 BA 8 OPS OH99 000 | $64,343 | 3 BA 8 OPS OH99 000 | $1,865 |
| 2 BA 8 OPS OH98 000 | $540 | | |

*(Attach additional sheet for continuation of explanation, if necessary.)*

| Fund Certification (Signature and Date) | Estimated Amount |
|---|---|
| [signature] 9/22/04 | $5,650,857 |

**Customer Financing:**

*(Customer agency will indicate accounting data to be charged by completing applicable blocks. Federal agencies will be billed by OPAC except for billings among the OBD's and USMS, billings within an organization, and billings to the Department of Defense.)*

A233



SEP-23-2004 15:24 5044263722 93% P.03

| Agency Location Code 70191515 | Appropriation Symbol | AFC | PE | Cost Center | Document No. | Obl Month | Obl SOC | Pay SOC |
|---|---|---|---|---|---|---|---|---|

Other Accounting Information *(Where applicable, multiple Obligation Month and SOC data should be identified in this block. Customers not using the FMIS may use this block to describe unique data required for their accounting system.)*

**Approvals:**

*(See reverse side of form.)*

| Approved for Provider Office: | Approved for Contracting Officer |
|---|---|
| Organization<br>USDA Financial Management Office | Organization<br>Bureau of Immigration and Customs Enforcement |
| Signature<br>[signature] | Signature<br>[signature] |
| Title<br>See attached USDA NFC Agreement No. NFC-04-1484 | Title<br>Director, Human Resources |

**When Intrafund billing data are manually submitted to the billing office, the Provider Intrafund Data block on the reverse side must be completed by the provider of the goods or service.*

DHS Form 710-1 (11-03)

The total of agreement NFC-04-1484 is $60,700.

A234

National Finance Center
Office of the Chief Financial Officer, U.S. Department of Agriculture
P.O. Box 60000, New Orleans, LA 70160-0001

## Agreement to Reimburse the National Finance Center for Services

Authorized by 7 U.S.C. 2235

1. (a) AGREEMENT No.: NFC-04-1484
   (b) AMENDMENT No.:
   (c) GESD Project No.: 40321

2. EFFECTIVE FROM 04/28/2004 THROUGH Completion

3. NFC ACCOUNT REPRESENTATIVE: (a) Deidre Charlot
   (b) Telephone: 504-426-0289
   (c) Telefax: 504-253-5297

4. CUSTOMER INFORMATION:
   (a) Dept. Name: U.S. Department of Homeland Security
   (b) Agency Name: Bureau of Immigration and Customs Enforcement
   (c) Address: 800 K Street. N.W., Room 5097
   (d) Address:
   (e) City: Washington
   (f) State: D.C.
   (g) Zip: 20536
   (h) Account Representative: John Ehrbar
   (i) Telephone: 202-307-6869
   (j) Telefax: 202-514-4200

5. SERVICES TO BE PERFORMED:
to calculate and pay Fair Labor Standards Act (FLSA) overtime and interest adding appropriate FLSA training hours and using the "DJ" calculation method for up to 3,344 employees of the Bureau of Immigration and Customs Enforcement who were formerly Justice Immigration and Naturalization Service staff

6. REFERENCES RELATIVE TO THIS WORK:
Memorandum from Terence L. Cook entitled "Special Agency Request for Homeland Security (formerly DJ/IN) Calculate and Pay Fair Labor Standards Act Overtime & Interest" dated February 21, 2004

7. ESTIMATED AMOUNT
   (a) Current Year: 2004 — (b) Amount $60,700
   (c) Future Year: — (d) Amount: $0
   (e) Total: $60,700

8. FINANCIAL (CUSTOMER)
   (a) Treasury Symbol: 70U 40540
   (b) Agency Location Code (ALC/Vendor No.): ~~70011515~~ 70191515
   (c) Agency Code: ~~BB-50~~ BB
   (d) Accounting Code: OH-99-00-000
   (e) Accounting Station: NONE 000
   (f) Object Class: 2500
   (g) Common Agree No.:
   (h) Miscellaneous Obligation (MO) No.:
   (i) Reference Line No./Mgmt. Code:

9. FINANCIAL (USDA)
   (a) Treasury Symbol: 12X4609
   (b) Agency Location Code (ALC/Vendor No.): 12400002
   (c) Agency Code: 90
   (d) Accounting Code: 049NRA11484
   (e) Accounting Station: 0010
   (f) Object Class: 0130 (USDA) or 0120 (other)
   (g) Fund Code: NC
   (h) Miscellaneous Obligation (MO) No.:
   (i) Reference Line No./Mgmt. Code:

Billing Information and Inquiries: Item 7 is an estimate; we will collect actual charges monthly. Please direct questions about this agreement to your NFC account representative

## Approvals

| For Customer | | For USDA | |
|---|---|---|---|
| Name: | [signature] KIR M. TSUDGU | Name: | Patricia E. Healy |
| Title: | ACTING FOR DIR HR ICE | Title: | Deputy Chief Financial Officer |
| Signature and Date: | [signature] 9/10/04 | Signature and Date: | [signature] 6/4/04 |

A235

FMCO-2
1/89

National Finance Center Cost Estimate
Date prepared: May 25, 2004
Prepared for: Department of Homeland Security Bureau of Immigration and Customs Enforcement (ICE)
Purpose: Calculate and produce payment reports for Fair Labor Standards Act overtime and interest for 3,344 ICE employees using the DJ calculation method
Estimated completion date:
Required completion date:
Reimbursement Agreement No.: NFC-04-1484, GESD Project Number 40321
Analyst: Deidre Charlot, 504-426-0289 (voice) and 504-253-5297 (fax)

| Organization (Division, Branch) | Task | Staff Hours Regular | Staff Hours Over-time | Grade | Step | Benefits | Total Salary Including Benefits | Other Direct Costs | Subtotal | Indirect Costs | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NFC Costs | | | | | | | | | | | |
| Design/Development (D) | | | | | | | | | | | |
| GESD PASB | Develop/Design System Requirements | 240 | | 13 | 6 | $ 5,358 | $ 14,418 | $ - | $ 14,418 | $ 4,249 | $ 18,667 |
| GESD PASB | Code/Modify Computer Programs | 420 | | 13 | 6 | $ 8,352 | $ 25,232 | $ - | $ 25,232 | $ 7,436 | $ 32,668 |
| GESD PASB | Conduct System Testing | 120 | | 13 | 6 | $ 2,525 | $ 7,209 | $ - | $ 7,209 | $ 2,124 | $ 9,333 |
| | Total | 780 | 0 | | | $16,239 | $ 46,859 | $ - | $ 46,859 | $ 13,809 | $ 60,668 |

Rounded Total $ 60,700

1484cost 05-25-04

1 of 1

A236

TH-09-2004 16:18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MOR-4570