Homeland Security

# Fact Sheet: DHS and OPM Final Human Resource Regulations

Release Date: 01/26/05 00:00:00

The Department of Homeland Security (DHS) is establishing a new Human Resource Management System to ensure the Department can continue to attract, retain, and reward a workforce that is able to meet the critical mission entrusted to it by the American people. As outlined in the final regulations, issued jointly by the Secretary and the Director of the Office of Personnel Management (OPM), the system provides greater flexibility and accountability in the way employees are paid, developed, evaluated, afforded due process, and represented by labor organizations.

## The Case for Change

The DHS mission demands unprecedented organizational agility to stay ahead of determined, dangerous, and sophisticated adversaries. The mission demands that employees and supervisors work together as never before. Achieving such unity requires an integrated HR system for the Department—a system that assures maximum flexibility and accountability. That system must value and reward high performance, teamwork, commitment to learning and excellence, and selfless service. It must also facilitate communication and collaboration at all levels of the Department. The Secretary and the Director are committed to ensuring that these goals are met. This was the fundamental challenge faced in designing this new system — to strike a balance between mission-essential flexibility and protection of core civil service principles.

The new Human Resource Management System, referred to as MAXHR, will help DHS meet its critical mission needs by:

- Reinforcing the commitment to employees and the pledge to preserve fundamental merit principles, to prevent prohibited personnel practices, and to honor and promote veterans' preference;
- Implementing a pay-for-performance program that will replace the General Schedule with market-based pay bands, in which employee pay progression is solely driven by performance and/or competency attainment—not longevity;
- Benchmarking positions in new DHS occupational clusters with other similar positions in the marketplace to establish minimum and maximum rates of pay for pay bands—ensuring DHS' ability to compete for top talent. Annual compensation surveys will be used to establish ranges of pay for covered DHS employees;
- Training DHS managers to set clear performance expectations and to link employee performance objectives to organizational goals;
- Expanding management rights that are non-negotiable to ensure DHS' ability to respond to operational needs;
- Preserving collective bargaining but reducing the number of situations in which bargaining is required; and
- Streamlining adverse actions and appeals processes for DHS employees, ensuring the Department's ability to effectively deal with performance and conduct issues, including standard notification and response periods, while retaining due process protections.

## Key Elements of the Human Resource Management System

## Classification

- Simplified system
- Occupational clusters based on similarity of work, qualifications, marketplace and competencies
- Pay bands based on level of work within each cluster
- Pay ranges set by occupational cluster, band

## Compensation

- Performance replaces longevity as basis for individual pay increases
- Employees rated less than fully successful do not receive pay increases
- Pay ranges based on labor market (national and local), budget, etc.
- Compensation Committee (including union representatives) advises Secretary
- Additional detail provided for promotion, demotion, pay retention, etc.

A237

## Performance Management

- Individual expectations aligned with organizational goals
- Ratings will reflect meaningful distinctions in employee performance
- System results in improved organizational accountability
- Less emphasis on paper and more attention to manager-employee interaction
- Performance Improvement Periods no longer required

## Labor Relations

- Non negotiable management rights expanded to assure ability to act
- Bargaining on procedures prohibited, but management required to confer
- Limited bargaining on the impact of a management action
- Expedited collective bargaining with impasse resolution
- Homeland Security Labor Relations Board (HSLRB) established to ensure mission focus, provide one-stop dispute resolution
- Judicial review provided

## Adverse Actions

- Due process preserved
- Single process for performance and conduct
- Streamlined 15-day notice/10-day reply period
- Initial Service Periods (trial periods) of up to 2 years for designated positions
- Mandatory Removal Offenses (MRO) to be identified

## Appeals

- Due process preserved
- Merit Systems Protection Board (MSPB) and arbitration retained
- Burden of proof changed to single “preponderance” standard
- MSPB procedures streamlined
- Mitigation permitted only when penalty is wholly without justification
- Mandatory Removal Panel established for MROs to ensure mission focus
- Judicial review provided

## Important Facts

- Employees’ pay and benefits will not be reduced as a result of transition to the new system.
- Commitment to DHS employees to preserve fundamental merit principles, to prevent prohibited personnel practices, and to promote veterans preference is unchanged.
- Employees may grieve performance ratings and appeal unacceptable ratings that result in adverse actions.
- Employees’ right to organize and bargain collectively is retained.
- Process for continuing collaboration offers additional opportunities for employee representatives’ involvement and participation.
- Definitions of what constitutes an adverse action are retained.
- No changes have been made to EEOC-related appeals.
- Ongoing program evaluation will guide continuous improvement efforts and measure results.

## Who is Included in the Human Resource Management System?

The vast majority of DHS civilian employees (approximately 110,000) will be covered by most of the elements included in the Human Resource Management System. However, some employees in the Department will not be affected by

these new regulations, or will only be covered by certain elements:

- Transportation Security Administration is not included in any elements of the System.
- Emergency Preparedness & Response Stafford Act Employees are not included in any elements of the System.
- Secret Service is excluded from labor relations, and the Uniformed Division is not included in pay and classification elements of the System.
- Inspector General employees are not included in any elements of the System.
- Wage Grade employees are not included in pay and classification in initial implementation.

In addition, the Senior Executives (SES) will be covered by a government-wide pay-for-performance system.

*It is important to note that employees not included in the Human Resource Management System right now may be included at a future date.*

## Key Boards/Committees Established by the Regulations

- **DHS Compensation Committee** — Comprised of 14 members, this body is responsible for making recommendations to the Secretary on the allocation of budget resources in the new compensation system. On an annual basis, the Committee will recommend market adjustments across occupational clusters, locality-based adjustments by occupation and location, and will review pay-for-performance payouts. The Committee provides oversight and transparency to the compensation process. Four seats are reserved for DHS labor organizations and OPM serves as an ex officio member. The DHS Under Secretary for Management serves as the chair.

- **Homeland Security Labor Relations Board** (HSLRB) — The HSLRB resolves issues between management and employee representatives, including the scope of bargaining, duty to bargain in good faith, negotiation impasses, and exceptions to arbitration awards involving exercise of management rights. Decisions of the HSLRB are final and binding. The Board is a single entity for the resolution of these labor management disputes. The Board will be composed of at least three members, appointed by the Secretary. Members must be independent, distinguished citizens of the United States who are well known for their integrity, impartiality, and expertise in labor relations, law enforcement, or national/homeland security or other related security matters. DHS labor unions will be asked to provide nominees for the Secretary's consideration.

- **Mandatory Removal Panel** (MRP) — A standing panel of three members well known for their integrity, impartiality, and expertise in labor or employee relations, or law enforcement/homeland security matters. The MRP will review employee appeals of removal actions taken as a result of the MRO provisions. The Panel, dedicated to the Department of Homeland Security, will provide expeditious handling of these very critical issues. Employees may appeal MRP decisions to the MSPB. DHS labor unions will also be asked to provide nominees for the Secretary's consideration.

## Additional Key Program Aspects

- **DHS Communications Efforts** — DHS employees will be well-informed of program changes and when system changes are anticipated. The comprehensive communications program will include global emails, satellite broadcasts, and considerable use of DHS Web pages. An internal DHS newsletter provides a weekly update to all employees. Additionally, DHS leaders will be provided toolkits and other aids to facilitate discussions and interactions between management and employees on program changes.

- **Training and Leadership Development** — All DHS employees, supervisors, and executives will receive training on the new program throughout its implementation. HR professionals will also receive training on the deployment effort and new job skills that will be required over time as program changes take effect.

## What Has Not Been Decided?

DHS and OPM have intentionally patterned these regulations after the chapters in Title 5 they replace, providing broad policy parameters and leaving much of the detail to DHS implementing directives. Specific details of the Human Resource Management System that still need to be developed include:

- Identifying new occupational clusters and how DHS employees will be placed in these new job clusters;
- Establishing new pay ranges that will replace the current GS system;
- Establishing additional rules for performance management, pay administration and conversion of employees from the GS system;
- Identifying benchmark positions for which market surveys will be used to gauge DHS' competitiveness for purposes of establishing pay ranges;
- Drafting operating procedures for the Homeland Security Labor Relations Board; and
- Identifying Mandatory Removal Offenses.

These and other details will be addressed in DHS implementing directives. DHS employee representatives will have an opportunity to participate in this more detailed program design phase, as outlined under the "continuing collaboration" provisions of the regulations.

## Implementation Highlights

Using the framework established in the regulations, the new policies and procedures for labor relations, adverse actions, and appeals, including the formation of the Homeland Security Labor Relations Board, will occur after 30 but no later than 180 days from the issuance of the regulations. The DHS Secretary will make separate decisions regarding the effective dates of the rest of the regulations.

The new programs will be implemented in phases to allow ample time for training and program evaluation. In particular, the majority of employees will have more than one year under the new performance management system before their pay is affected by performance decisions.

### Early in 2005

- Communication outreach begins
- Detailed design work including continuing collaboration with employee representatives
- Meetings and focus groups held around the country

### Spring 2005

- Manager and supervisor training begins
- Labor relations, adverse actions and appeals portions of the program become effective for all covered employees

### Summer 2005

- Performance management training for managers, supervisors and employees

### Fall 2005

- New performance management process begins

### Early 2006

- DHS Headquarters, Information Analysis and Infrastructure Protection (IAIP), Science & Technology (S&T), Emergency Preparedness and Response (EP&R), and Federal Law Enforcement Training Center (FLETC) —

converted to new pay system; first rate range adjustment and performance pay-out scheduled for January 2007

## Early 2007

- U.S. Secret Service (USSS) and U.S. Coast Guard (USCG) — converted to new pay system; first rate range adjustment and performance pay-out scheduled for January 2008 (note USCG performance pay-out in summer of 2008)

## Early 2008

- U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (CIS) — converted to new pay system; first rate range adjustment and performance pay-out scheduled for January 2009

## Program Background Information/Timeline

These final regulations represent a major milestone in an inclusive design process that was initiated over two years ago.

- Homeland Security Act, November 25, 2002
- DHS/OPM HR Design Team, April-September 2003
- Senior Review Committee, July and October 2003
- Proposed Regulations, February 2004
- Public Comment Period, February-March 2004
- Meet and Confer Process, May-August 2004
- Final Regulations, January 2005

## Design Facts

- 80 DHS employees, supervisors, union representatives, and OPM representatives were members of the design team
- 64 nationwide focus groups and town hall meetings were conducted to gain input from employees in all major DHS components
- Over 65 public and private sector organizations and HR experts were contacted
- 52 options were created reflecting a range of alternatives, information, and ideas
- More than 3,800 public comments on the proposed regulations were received and analyzed by DHS and OPM staff before the regulations were finalized
- Over 30 days of “meet and confer” with employee representatives

###

This page was last modified on 01/26/05 00:00:00

# The Department of Homeland Security

**President George W. Bush**

**June 2002**

# THE DEPARTMENT OF HOMELAND SECURITY

The President's most important job is to protect and defend the American people. Since September 11, all levels of government have cooperated like never before to strengthen aviation and border security, stockpile more medicines to defend against bioterrorism, improve information sharing among our intelligence agencies, and deploy more resources and personnel to protect our critical infrastructure.

The changing nature of the threats facing America requires a new government structure to protect against invisible enemies that can strike with a wide variety of weapons. Today no one single government agency has homeland security as its primary mission. In fact, responsibilities for homeland security are dispersed among more than 100 different government organizations. America needs a single, unified homeland security structure that will improve protection against today's threats and be flexible enough to help meet the unknown threats of the future.

The President proposes to create a new Department of Homeland Security, the most significant transformation of the U.S. government in over a half-century by largely transforming and realigning the current confusing patchwork of government activities into a single department whose primary mission is to protect our homeland. The creation of a Department of Homeland Security is one more key step in the President's national strategy for homeland security.

Immediately after last fall's attack, the President took decisive steps to protect America from hardening cockpits and stockpiling vaccines to tightening our borders. The President used his maximum legal authority to establish the White House Office of Homeland Security and the Homeland Security Council to ensure that our federal response and protection efforts were coordinated and effective. The President also directed Homeland Security Advisor Tom Ridge to study the federal government as a whole to determine if the current structure allows us to meet the threats of today while anticipating the unknown threats of tomorrow. After careful study of the current structure coupled with the experience gained since September 11 and new information we have learned about our enemies while fighting a war the President concluded that our nation needs a more unified homeland security structure. In designing the new Department, the Administration considered a number of homeland security organizational proposals that have emerged from outside studies, commissions, and Members of Congress.

The Department of Homeland Security would make Americans safer because our nation would have:

- **One department whose primary mission is to protect the American homeland;**
- **One department to secure our borders, transportation sector, ports, and critical infrastructure;**
- **One department to synthesize and analyze homeland security intelligence from multiple sources;**
- **One department to coordinate communications with state and local governments, private industry, and the American people about threats and preparedness;**
- **One department to coordinate our efforts to protect the American people against bioterrorism and other weapons of mass destruction;**
- **One department to help train and equip for first responders;**
- **One department to manage federal emergency response activities; and**
- **More security officers in the field working to stop terrorists and fewer resources in Washington managing duplicative and redundant activities that drain critical homeland security resources.**

# THE ORGANIZATION OF THE DEPARTMENT OF HOMELAND SECURITY

The Department of Homeland Security would have a clear and efficient organizational structure with four divisions:

- **Border and Transportation Security**
- **Emergency Preparedness and Response**
- **Chemical, Biological, Radiological and Nuclear Countermeasures**
- **Information Analysis and Infrastructure Protection**

## BORDER AND TRANSPORTATION SECURITY

The Department would unify authority over major federal security operations related to our borders, territorial waters, and transportation systems. It would assume responsibility for operational assets of the Coast Guard, Customs Service, Immigration and Naturalization Service and Border Patrol, the Animal and Plant Health Inspection Service of the Department of Agriculture, and the recently created Transportation Security Administration allowing a single government entity to manage entry into the United States. It would ensure that all aspects of border control, including the issuing of visas, are informed by a central information-sharing clearinghouse and compatible databases.

## EMERGENCY PREPAREDNESS AND RESPONSE

The Department would oversee federal government assistance in the domestic disaster preparedness training of first responders and would coordinate the government's disaster response efforts. FEMA would become a central component of the Department of Homeland Security, and the new Department would administer the grant programs for firefighters, police, and emergency personnel currently managed by FEMA, the Department of Justice, and the Department of Health and Human Services. The Department would also manage such critical response assets as the Nuclear Emergency Search Team (Department of Energy) and the National Pharmaceutical Stockpile (Health and Human Services). Finally, the Department would integrate the federal interagency emergency response plans into a single, comprehensive, government-wide plan, and ensure that all response personnel have the equipment and capability to communicate with each other as necessary.

## CHEMICAL, BIOLOGICAL, RADIOLOGICAL AND NUCLEAR COUNTERMEASURES

The Department of Homeland Security would lead the federal government's efforts in preparing for and responding to the full range of terrorist threats involving weapons of mass destruction. To do this, the Department would set national policy and establish guidelines for state and local governments. It would direct exercises and drills for federal, state, and local chemical, biological, radiological, and nuclear (CBRN) attack response teams and plans. The result of this effort would be to consolidate and synchronize the disparate efforts of multiple federal agencies currently scattered across several departments. This would create a single office whose primary mission is the critical task of protecting the United States from catastrophic terrorism.

**Chemical, Biological, Radiological and Nuclear Terrorism.** The Department would be the lead agency preparing for and responding to chemical, biological, radiological, and nuclear terrorism, including agro-terrorism. The Department would unify three of America's premier centers of excellence in this field, including the Lawrence Livermore National Laboratory (Department of Energy). The Department would

also manage national efforts to develop diagnostics, vaccines, antibodies, antidotes, and other countermeasures.

**Science and Technology.** In the war against terrorism, America's vast science and technology base provides us with a key advantage. The Department would press this advantage with a national research and development enterprise for homeland security comparable in emphasis and scope to that which has supported the national security community for more than fifty years. The new Department would consolidate and prioritize the disparate homeland security related research and development programs currently scattered throughout the Executive Branch. It would also assist state and local public safety agencies by evaluating equipment and setting standards.

## INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION

**Intelligence and Threat Analysis.** The Department would fuse and analyze intelligence and other information pertaining to threats to the homeland from multiple sources including the CIA, NSA, FBI, INS, DEA, DOE, Customs, DOT and data gleaned from other organizations. The Department would merge under one roof the capability to identify and assess current and future threats to the homeland, map those threats against our current vulnerabilities, issue timely warnings, and immediately take or effect appropriate preventive and protective action. An important partner with the Department's intelligence and threat analysis division will be the newly formed FBI Office of Intelligence. The new FBI and CIA reforms will provide critical analysis and information to the new Department.

**Protecting America's Critical Infrastructure.** The Department would be responsible for comprehensively evaluating the vulnerabilities of America's critical infrastructure, including food and water systems, agriculture, health systems and emergency services, information and telecommunications, banking and finance, energy (electrical, nuclear, gas and oil, dams), transportation (air, road, rail, ports, waterways), the chemical and defense industries, postal and shipping entities, and national monuments and icons. Working closely with state and local officials, other federal agencies, and the private sector, the Department would help ensure that proper steps are taken to protect high-risk targets.

## OTHER KEY COMPONENTS

**State/Local Government & Private Sector Coordination.** The Department would consolidate and streamline relations with the federal government for America's state and local governments. The new Department would contain an intergovernmental affairs office to coordinate federal homeland security programs with state and local officials. This new Department would give state and local officials one primary contact instead of many when it comes to matters related to training, equipment, planning, and other critical needs such as emergency response.

**Secret Service**. The Department would incorporate the Secret Service, which would report directly to the Secretary. The Secret Service would remain intact and its primary mission will remain the protection of the President and other government leaders. The Secret Service would also continue to provide security for designated national events, as it did for the recent Olympics and the Super Bowl.

**The White House Office of Homeland Security and the Homeland Security Council.** The White House Office of Homeland Security and the Homeland Security Council will continue to play a key role, advising the President and coordinating a vastly simplified interagency process.

**Non-Homeland Security Functions.** The new Department would have a number of functions that are not directly related to securing the homeland against terrorism. For instance, through FEMA, it would be responsible for mitigating the effects of natural disasters. Through the Coast Guard, it would be responsible for search and rescue and other maritime functions. Several other border functions, such as drug interdiction operations and naturalization, and would also be performed by the new Department.

## INTERIM STEPS

The President using the maximum legal authority available to him created the Office of Homeland Security and the Homeland Security Council in the weeks following the attack on America as an immediate step to secure the homeland. Since then, the government has strengthened aviation and border security, stockpiled more medicines to defend against bio-terrorism, improved information sharing among our intelligence agencies, and deployed more resources and personnel to protect our critical infrastructure.

The White House Office of Homeland Security will continue to coordinate the federal government's homeland security efforts and to advise the President on a comprehensive Homeland Security strategy. The current components of our homeland security structure will continue to function as normal and there will be no gaps in protection as planning for the new Department moves forward.

Preliminary planning for the new Department has already begun. The formal transition would begin once Congress acts on the President's proposal and the President signs it into law. The President calls on Congress to establish the new Department by the close of their current session with full integration of the constituent parts occurring over a phased-in period.

## SPECIFIC EXAMPLES OF HOW THE NEW DEPARTMENT WILL MAKE AMERICA SAFER

### EXAMPLE: REMOVING BARRIERS TO EFFICIENT BORDER SECURITY

Currently, when a ship enters a U.S. port, Customs, INS, the Coast Guard, the U.S. Department of Agriculture, and others have overlapping jurisdictions over pieces of the arriving ship. Customs has jurisdiction over the goods aboard the ship. INS has jurisdiction over the people on the ship. The Coast Guard has jurisdiction over the ship while it is at sea. Even the Department of Agriculture has jurisdiction over certain cargoes. Although the Coast Guard does have the authority to act as an agent for these other organizations and assert jurisdiction over the entire vessel, in practice the system has not worked as well as it could to prevent the illegal entry of potential terrorists and instruments of terror.

Consider this scenario: if the Coast Guard stops a ship at sea for inspection and finds there are illegal immigrants on the ship, the Coast Guard relies on the INS to enforce U.S. immigration law and prevent their entry. If the Coast Guard finds potentially dangerous cargo, it relies on Customs to seize the dangerous cargo. Unfortunately, these organizations may not always share information with each other as rapidly as necessary.

So, instead of arresting potential terrorists and seizing dangerous cargo at sea, our current structure can allow these terrorists to enter our ports and potentially sneak into our society. The system might also allow the dangerous cargo to actually enter our ports and threaten American lives.

Under the President's proposal, the ship, the potentially dangerous people, and the dangerous cargo would be seized at sea by one Department that has no question about either its mission or its authority to prevent them from reaching our shores.

### EXAMPLE: PROTECTING OUR NATION'S CRITICAL INFRASTRUCTURE

Nearly five million Americans live within a five mile radius of the most hazardous chemical facilities in the nation. Right now there is no single agency in the government whose core mission is to protect against and respond to an attack on one of these major facilities.

Consider the current homeland security apparatus facing a non-citizen that intends to enter our nation and attack one of our chemical facilities. At our border, INS, Customs, Border Patrol, the Coast Guard, and others share jurisdiction over preventing this person's entry. These government organizations may or may not share information, which makes it possible that this potential terrorist might slip through the cracks.

Currently, at least twelve different government entities oversee the protection of our critical infrastructure. These many government entities may or may not share all information, and state and local governments must work with twelve separate contacts just to help protect their local infrastructure.

Under the President's proposal, the same Department that analyzes intelligence data on the potential terrorist who wants to attack the chemical plant would also be the same Department that can simultaneously alert our border security operatives, alert all of our hazardous materials facilities to ensure that they are prepared to meet this specific new threat from this specific terrorist, and alert all of the affected communities.

### EXAMPLE: COMMUNICATING TO THE AMERICAN PEOPLE

Currently, if a chemical or biological attack were to occur, Americans could receive warnings and health care information from a long list of government organizations, including HHS, FEMA, EPA, GSA, FBI, DOJ, OSHA, OPM, USPS, DOD, USAMRIID, and the Surgeon General not to mention a cacophony of state and local agencies.

There is currently no single organization with operational responsibility that could communicate with the American people in a clear, concise, and consistent voice.

Consider another recent example. Information was provided to local law enforcement entities by multiple U.S. government organizations about potential threats to the Brooklyn Bridge, apartment complexes, shopping malls, the Statue of Liberty, subways and public transit systems, our oil and gas infrastructure, and our financial system.

Under the President's proposal, a single government Department would communicate with the American people about a chemical or biological attack. The new Department would also be the organization that coordinates provision of specific threat information to local law enforcement and sets the national threat level. The new Department would ensure that local law enforcement entities and the public receive clear and concise information from their national government. Citizens would also have one Department telling them what actions if any they must take for their safety and security.

### EXAMPLE: INTELLIGENCE SHARING AND COMPREHENSIVE THREAT ANALYSIS

Multiple intelligence agencies analyze their individual data, but no single government entity exists to conduct a comprehensive analysis of all incoming intelligence information and other key data regarding terrorism in the United States. There is no central clearinghouse to collect and analyze the data and look for potential trends.

Under the President's proposal, the new Department would contain a unit whose sole mission is to assemble, fuse, and analyze relevant intelligence data from government sources, including CIA, NSA, FBI, INS, DEA, DOE, Customs, and DOT, and data gleaned from other organizations and public sources. With this big-picture view, the Department would be more likely to spot trends and would be able to direct resources at a moment's notice to help thwart a terrorist attack.

### EXAMPLE: DISTRIBUTION OF KEY PHARMACEUTICALS

Potassium Iodide (KI) is a drug that helps prevent thyroid cancer in the event of exposure to radiation. The drug must be taken within hours of exposure for maximum effectiveness.

Currently, if you live within a ten-mile radius of a nuclear power facility, the distribution of Potassium Iodide is regulated by the Nuclear Regulatory Commission (NRC). The NRC is responsible for getting people this crucial drug, even though the NRC's actual mission is to license nuclear facilities, not provide emergency supplies to the greater population. Outside the ten-mile radius of the nuclear facility, the Federal Emergency Management Agency (FEMA) is responsible for regulating the distribution of Potassium Iodide. The Department of Health and Human Services controls the national pharmaceutical stockpiles that are to be sent rapidly into emergencies. And other government agencies would control evacuation of the emergency zone. To make matters even more confusing, if you happen to live within a ten-mile radius of a nuclear weapons facility, the Department of Energy controls the distribution of the Potassium Iodide.

In the event of radiation exposure, states must currently work with three separate government organizations to distribute critical pharmaceuticals, organizations whose jurisdictions are divided by an invisible ten-mile border. Consider this possible scenario: the NRC and the state decide to distribute Potassium Iodide to everyone within the ten-mile radius. FEMA, however, disagrees with the state and decides against distributing the drug outside the ten-mile radius. In the middle of the NRC, FEMA and state decision process, the state and local governments decide to begin an evacuation. In the ensuing chaos, many exposed individuals might not receive the critical drugs they need.

Under the President's proposal, one Department would be responsible for distributing Potassium Iodide to citizens exposed   no matter where they live. There would no longer be an artificial ten-mile barrier to treatment. This same single Department would also be responsible for coordination with state and local officials on immediate evacuation from the emergency zone.

## BRIEF HISTORY OF GOVERNMENT REORGANIZATION

History teaches us that critical security challenges require clear lines of responsibility and the unified effort of the U.S. government. History also teaches us that new challenges require new organizational structures.

For example, prior to 1945, America's armed forces were inefficiently structured with separate War and Navy Departments and disconnected intelligence units. There were no formal mechanisms for cooperation. After World War II, the onset of the Cold War required consolidation and reorganization of America's national security apparatus to accomplish the new missions at hand.

America needed a national security establishment designed to prevent another attack like Pearl Harbor, to mobilize national resources for an enduring conflict, and to do so in a way that protected America's values and ideals. In December 1945, only months after America's decisive victory in World War II, President Harry Truman asked Congress to combine the War and Navy Departments into a single Department of Defense. President Truman declared, "it is now time to take stock to discard obsolete organizational forms and to provide for the future the soundest, most effective and most economical kind of structure for our armed forces of which this most powerful Nation is capable. I urge this as the best means of keeping the peace."

President Truman's goals were achieved with the National Security Act of 1947 and subsequent amendments in 1949 and 1958. The legislation consolidated the separate military Departments into the Department of Defense with a civilian secretary solely in charge, established a Central Intelligence Agency to coordinate all foreign intelligence collection and analysis, and created the National Security Council in the White House to coordinate all foreign and defense policy efforts.

This reorganization of America's national security establishment was crucial to overcoming the enormous threat we faced in the Cold War and holds important lessons for our approach to the terrorist threat we face today.

# Organization of the Department of Homeland Security




*Legal / Congressional / Public Affairs included in Office of the Secretary

**Major Cabinet Departments and Agencies Involved in Homeland Security BEFORE Reorg.**




A251


Committees with Homeland Security Jurisdiction
SENATE
HOUSE
Commerce, Sc ence, & Transportat on
Aviation
Communications
Science Technology and Space
Oceans Atmosphere and Fisheries
Surface Transportation and Merchant Marine
Consumer Affairs Foreign Commerce & Tourism
Agr cu ture, Nutr t on, & Forestry
Research Nutrition and General Legislation
Marketing nspection and Product Promotion
Jud c ary
mmigration
Technology Terrorism and Government nformation
Env ronment & Pub c Works
Transportation nfrastructure and Nuclear Safety
Inte gence
Bank ng, Hous ng & Urban Affa rs
Financial nstitutions
Governmenta Affa rs
nternational Security Proliferation and Federal Services (USPS)
Oversight of Government Management Restructuring and the District
Energy & Natura Resources
Energy
National Parks
Water and Power
Armed Serv ces
Personnel
Emerging Threats and Capabilities
Hea th, Educat on, Labor, & Pens ons
Public Health
F nance
nternational Trade
Veterans Affa rs
Appropr at ons
Defense
nterior
Transportation
District of Columbia
Energy and Water Development
VA HUD and ndependent Agencies
Treasury Postal Service and General Government
Agriculture Rural Development FDA and Related Agencies
Commerce Justice State and the Judiciary
Labor Health and Human Services and Education
Transportat on & Infrastructure
Aviation
Railroads
Coast Guard
Economic Development Public Buildings & Emergency Management
Water Resources and the Environment
Agr cu ture
Livestock and Horticulture
Jud c ary
mmigration and Claims
Crime Terrorism and Homeland Security
Resources
National Parks Recreation and Public Lands
Armed Serv ces
Military Research and Development
Sc ence
Research
Energy
Government Reform
National Security Veteran's Affairs and nternational Relations
Energy & Commerce
Health
Energy and Air Quality
Oversight and nvestigations
Commerce Trade and Consumer Protection
F nanc a Serv ces
Capital Markets nsurance & Government Sponsored Enterprises
Inte gence
Terrorism and Homeland Security
Ways & Means
Trade
Veteran's Affa rs
Health
Appropr at ons
Defense
District of Columbia
Energy and Water Development
nterior
Transportation
VA HUD and ndependent Agencies
Treasury Postal Service and General Government
Agriculture Rural Development FDA and Related Agencies
Commerce Justice State and the Judiciary
Labor Health and Human Services and Education

A252

# Department of Homeland Security
# Major Components

The Department of Homeland Security would be funded within the total monies requested by the President in his FY 2003 budget already before Congress. There would be future savings achieved through the elimination of redundancies inherent in the current structure.

| | $(Millions) | FTE (1) |
|---|---|---|
| **Chemical, Biological, Radiological, and Nuclear Countermeasures** | | |
| Civilian Biodefense Research Programs (HHS) | 1,993 | 150 |
| Lawrence Livermore National Laboratory (DOE) | 1,188 | 324 |
| National BW Defense Analysis Center (New) | 420 | -- |
| Plum Island Animal Disease Center (USDA) | 25 | 124 |
| | **3,626** | **598** |
| **Information Analysis and Infrastructure Protection** | | |
| Critical Infrastructure Assurance Office (Commerce) | 27 | 65 |
| Federal Computer Incident Response Center (GSA) | 11 | 23 |
| National Communications System (DoD) | 155 | 91 |
| National Infrastructure Protection Center (FBI) | 151 | 795 |
| National Infrastructure Simulation and Analysis Center (DOE) | 20 | 2 |
| | **364** | **976** |
| **Border and Transportation Security** | | |
| Immigration and Naturalization Service (DOJ) | 6,416 | 39,459 |
| Customs Service (Treasury) | 3,796 | 21,743 |
| Animal and Plant Health Inspection Service (USDA) | 1,137 | 8,620 |
| Coast Guard (DOT) | 7,274 | 43,639 |
| Federal Protective Services (GSA) | 418 | 1,408 |
| Transportation Security Agency (DOT) **(2)** | 4,800 | 41,300 |
| | **23,841** | **156,169** |
| **Emergency Preparedness and Response** | | |
| Federal Emergency Management Agency | 6,174 | 5,135 |
| Chemical, Biological, Radiological, and Nuclear Response Assets (HHS) | 2,104 | 150 |
| Domestic Emergency Support Team **(3)** | -- | -- |
| Nuclear Incident Response (DOE) | 91 | -- |
| Office of Domestic Preparedness (DOJ) **(4)** | -- | -- |
| National Domestic Preparedness Office (FBI) | 2 | 15 |
| | **8,371** | **5,300** |
| **Secret Service** (Treasury) | **1,248** | **6,111** |
| **Total, Department of Homeland Security** | **37,450** | **169,154** |

Note: Figures are from FY 2003 President's Budget Request

**(1)** Estimated, final FTE figures to be determined
**(2)** Before fee recapture of $2,346 million.
**(3)** Interagency group currently mobilized by the Attorney General in response to major incidents
**(4)** Included in FEMA in FY 2003 President's Budget Request

# THE DEPARTMENT OF HOMELAND SECURITY

Terrorists today can strike at any place, at any time, and with virtually any weapon. This is a permanent condition and these new threats require our country to design a new homeland security structure.

The United States faced an enormous threat during the Cold War. We created a national security strategy to deter and defeat the organized military forces of the Soviet bloc. We emerged victorious from this dangerous period in our history because we organized our national security institutions and prepared ourselves to meet the threat arrayed against us. The United States is under attack from a new kind of enemy one that hopes to employ terror against innocent civilians to undermine their confidence in our institutions and our way of life. Once again we must organize and prepare ourselves to meet a new and dangerous threat.

Careful study of the current structure coupled with the experience gained since September 11 and new information we have learned about our enemies while fighting a war has led the President to conclude that our nation needs a more robust and unified homeland security structure.

**Mission of the New Department**

The mission of the Department of Homeland Security would be to:

- Prevent terrorist attacks within the United States;
- Reduce America's vulnerability to terrorism; and
- Minimize the damage and recover from attacks that do occur.

The Department of Homeland Security would mobilize and focus the resources of the federal government, state and local governments, the private sector, and the American people to accomplish its mission.

**Organization**

The creation of the Department of Homeland Security would empower a single Cabinet official whose primary mission is to protect the American homeland from terrorism. The Department of Homeland Security would have a clear, efficient organizational structure with four divisions.

- **Border and Transportation Security**
- **Emergency Preparedness and Response**
- **Chemical, Biological, Radiological, and Nuclear Countermeasures**
- **Information Analysis and Infrastructure Protection**

Even after creation of the new Department, homeland security will still involve the efforts of other Cabinet departments. The Department of Justice and the FBI, for example, will remain the lead law enforcement agencies for preventing terrorist attacks. The Department of Defense will continue to play a crucial support role in the case of a catastrophic terrorist incident. The Department of Transportation will continue to be responsible for highway and rail safety, and air traffic control. The CIA will continue to gather and analyze overseas intelligence. Homeland security will continue to require interagency coordination, and the President will still need a close adviser on homeland security related issues. Accordingly, the President intends a strong continuing role for the White House Office of Homeland Security and the Homeland Security Council.

# ORGANIZATION OF THE DEPARTMENT OF HOMELAND SECURITY




**Border and Transportation Security**

Securing our nation's air, land, and sea borders is a difficult yet critical task. The United States has 5,525 miles of border with Canada and 1,989 miles with Mexico. Our maritime border includes 95,000 miles of shoreline, and a 3.4 million square mile exclusive economic zone. Each year, more than 500 million people cross the borders into the United States, some 330 million of whom are non-citizens.

The Department of Homeland Security would be responsible for securing our nation's borders and transportation systems, which straddle 350 official ports of entry and connect our homeland to the rest of the world. The tasks of managing our borders and securing our transportation systems are directly related indeed, at our international airports and seaports they are inseparable.

The Department would manage who and what enters our homeland, and work to prevent the entry of terrorists and the instruments of terrorism while simultaneously ensuring the speedy flow of legitimate traffic. It would be the single federal Department in charge of all ports of entry, including security and inspection operations, and would manage and coordinate port of entry activities of other federal departments and agencies. The Department would lead efforts to create a border of the future that provides greater security through better intelligence, coordinated national efforts, and unprecedented international cooperation against terrorists, the instruments of terrorism, and other international threats. At the same time, it would help ensure that this border of the future better serves the needs of legitimate travelers and industry through improved efficiency.



A255

The Department would lead work toward a state-of-the-art visa system, one in which visitors are identifiable by biometric information that is gathered during the visa application process. It would ensure that information is shared between databases of border management, law enforcement, and intelligence community agencies so that individuals who pose a threat to America are denied entry to the United States. It would also lead efforts to deploy an automated entry-exit system that would verify compliance with entry conditions, student status such as work limitations and duration of stay, for all categories of visas.

To carry out its border security mission the Department would incorporate the United States Customs Service (currently part of the Department of Treasury), the Immigration and Naturalization Service and Border Patrol (Department of Justice), the Animal and Plant Health Inspection Service (Department of Agriculture), and the Transportation Security Administration (Department of Transportation). The Department would also incorporate the Federal Protective Service (General Services Administration) to perform the additional function of protecting government buildings, a task closely related to the Department's infrastructure protection responsibilities.

The Department would secure our nation's transportation systems, which move people from our borders to anywhere in the country within hours. The recently created Transportation Security Administration, which would become part of the new Department, has statutory responsibility for security of all modes of transportation and directly employs airport security and law enforcement personnel. Tools it uses include intelligence, regulation, enforcement, inspection, and screening and education of carriers, passengers and shippers. Its present focus on aviation security will not slow the government's pace in addressing the security needs of other transportation modes. The incorporation of TSA into the new Department will allow the Department of Transportation to remain focused on its core mandate of ensuring that the nation has a robust and efficient transportation infrastructure that keeps pace with modern technology and the nation's demographic and economic growth.

**United States Coast Guard.** In order to secure our nation's territorial waters, including our ports and waterways, the Department would assume authority over the United States Coast Guard, which would maintain its existing independent identity as a military organization under the leadership of the Commandant of the Coast Guard. Upon declaration of war or when the President so directs, the Coast Guard would operate as an element of the Department of Defense, consistent with existing law.

The U.S. Coast Guard is charged with regulatory, law enforcement, humanitarian, and emergency response duties. It is responsible for the safety and security of America's inland waterways, ports, and harbors; more than 95,000 miles of U.S. coastlines; U.S. territorial seas; 3.4 million square miles of ocean defining our Exclusive Economic Zones; as well as other maritime regions of importance to the United States.

The Coast Guard has command responsibilities for countering potential threats to America's coasts, ports, and inland waterways through numerous port security, harbor defense, and coastal warfare operations and exercises. In the name of port security specifically, the Coast Guard has broad authority in the nation's ports as "Captain of the Port." Recently the Coast Guard has worked to establish near shore and port domain awareness, and to provide an offshore force gathering intelligence and interdicting suspicious vessels prior to reaching U.S. shores.

**Immigration and Visa Services.** The new Department of Homeland Security would include the INS and would, consistent with the President's long-standing position, separate immigration services from immigration law enforcement. The Department would build an immigration services organization that

would administer our immigration law in an efficient, fair, and humane manner. The new Department would assume the legal authority to issue visas to foreign nationals and admit them into the country. The State Department, working through the United States embassies and consulates abroad, would continue to administer the visa application and issuance process. The Department would make certain that America continues to welcome visitors and those who seek opportunity within our shores while excluding terrorists and their supporters.

**Emergency Preparedness and Response**

We cannot assume that we can prevent all acts of terror and therefore must also prepare to minimize the damage and recover from attacks that do occur. As September 11 showed, the consequences of terrorism can be far-reaching and diverse. The Department of Homeland Security would ensure the preparedness of our nation's emergency response professionals, provide the federal government's response, and aid America's recovery from terrorist attacks and natural disasters.

To fulfill these missions, the Department of Homeland Security would build upon the Federal Emergency Management Agency (FEMA) as one of its key components. It would continue FEMA's efforts to reduce the loss of life and property and to protect our nation's institutions from all types of hazards through a comprehensive, risk-based, all-hazards emergency management program of preparedness, mitigation, response, and recovery. And it will continue to change the emergency management culture from one that reacts to terrorism and other disasters, to one that proactively helps communities and citizens avoid becoming victims.

In terms of preparedness, the Department would assume authority over federal grant programs for local and state first responders such as firefighters, police, and emergency medical personnel. Various offices in the Department of Justice, the Department of Health and Human Services, and the Federal Emergency Management Agency currently manage those programs. In addition, the Department would develop and manage a national training and evaluation system to design curriculums, set standards, evaluate, and reward performance in local, state, and federal training efforts.

The Department would continue FEMA's practice of focusing on risk mitigation in advance of emergencies by promoting the concept of disaster-resistant communities. It would continue current federal support for local government efforts that promote structures and communities that have a reduced chance of being impacted by disasters. It would bring together private industry, the insurance sector, mortgage lenders, the real estate industry, homebuilding associations, citizens, and others to create model communities in high-risk areas.

The Department would have responsibility for federal emergency response efforts. It would lead our national response to a biological attack, direct the Nuclear Emergency Search Teams, Radiological Emergency Response Team, Radiological Assistance Program, Domestic Emergency Support Team, National Pharmaceutical Stockpile, and the National Disaster Medical System, and manage the Metropolitan Medical Response System. The Department would also coordinate the involvement of other federal response assets such as the National Guard in the event of a major incident.

The consequences of a terrorist attack are wide-ranging and can include: loss of life and health, destruction of families, fear and panic, loss of confidence in government, destruction of property, and disruption of commerce and financial markets. The Department would lead federal efforts to promote recovery from terrorist attacks and natural disasters. The Department would maintain FEMA's procedures for aiding recovery from natural and terrorist disasters.

**Incident Management.** The Department would work with federal, state, and local public safety organizations to build a comprehensive national incident management system for response to terrorist incidents and natural disasters. This system would clarify and streamline federal incident management procedures, eliminating the artificial distinction between "crisis management" and "consequence management." The Department would consolidate existing federal government emergency response plans namely the Federal Response Plan, the National Contingency Plan, the U.S. government Interagency Domestic Terrorism Concept of Operations Plan, and the Federal Radiological Emergency Response Plan into one genuinely all-hazard plan. In time of emergency, the Department would manage and coordinate federal entities supporting local and state emergency response efforts.

**Interoperable Communications.** In the aftermath of any major terrorist attack, emergency response efforts would likely involve hundreds of offices from across the government and the country. It is crucial for response personnel to have and use equipment and systems that allow them to communicate with one another. The current system has not yet supplied the emergency response community with the technology that it needs for this mission. The new Department of Homeland Security would make this a top priority.

**Chemical, Biological, Radiological, and Nuclear Countermeasures**

The knowledge, technology, and material needed to build weapons of mass destruction are spreading inexorably. If our enemies acquire these weapons and the means to deliver them, they will use them potentially with consequences far more devastating than those we suffered on September 11.

The Department of Homeland Security would lead the federal government's efforts in preparing for and responding to the full range of terrorist threats involving weapons of mass destruction. To do this, the Department would set national policy and establish guidelines for state and local governments. It would direct exercises and drills for federal, state, and local chemical, biological, radiological, and nuclear (CBRN) response teams and plans. The result of this effort would be to consolidate and synchronize the disparate efforts of multiple federal agencies currently scattered across several departments. This would create a single office whose primary mission is the critical task of protecting the United States from catastrophic terrorism.

The Department would be responsible for several distinct capabilities and institutions that focus on specific elements of this mission. The Department would unify much of the federal government's efforts to develop and implement scientific and technological countermeasures to CBRN terrorist threats. The Department would also provide direction and establish priorities for national research and development, for related tests and evaluations, and for the development and procurement of new technology and equipment to counter the CBRN threat. The Department would incorporate and focus the intellectual energy and extensive capacity of several important scientific institutions, including Lawrence Livermore National Laboratory (currently part of the Department of Energy) and the Plum Island Animal Disease Center (Department of Agriculture).

The Department would unify our defenses against human, animal, and plant diseases that could be used as terrorist weapons. The Department would sponsor outside research, development, and testing to invent new vaccines, antidotes, diagnostics, and therapies against biological and chemical warfare agents; to recognize, identify, and confirm the occurrence of an attack; and to minimize the morbidity and mortality caused by any biological or chemical agent.

The Department would unify our defenses against agricultural terrorism the malicious use of plant or animal pathogens to cause disease in the agricultural sector. The Department would exclude agricultural pests and diseases at the border. It would strengthen national research programs and surveillance systems to shield agriculture from natural or deliberately induced pests or disease. Working with the Department of Agriculture and the Department of Health and Human Services, it would also that ensure rigorous inspection and quality assurance programs protect the food supply from farm to fork.

**Science & Technology Agenda.** In the war against terrorism, America's vast science and technology base provides us with a key advantage. The Department would press this advantage with a national research and development enterprise for homeland security comparable in emphasis and scope to that which has supported the national security community for more than fifty years. This is appropriate, given the scale of the mission and the catastrophic potential of the threat. Many of the needed systems would be potentially continental in scope, and thus the technologies must scale appropriately, in terms of complexity, operation, and sustainability.

This research and development would be driven by a constant examination of the nation's vulnerabilities, constant testing of our security systems, and a constant evaluation of the threat and its weaknesses. The emphasis within this enterprise would be on catastrophic terrorism threats to the security of our homeland that would result in large-scale loss of life and major economic impact. It would be aimed at both evolutionary improvements to current capabilities as well as the development of revolutionary new capabilities.

The following are examples of the types of research and development projects that the Department would pursue with its scientific assets.

- **Preventing importation of nuclear weapons and material.** The Department of Homeland Security would make defeating this threat a top priority of its research and development efforts. This nuclear denial program would develop and deploy new technologies and systems for safeguarding nuclear material stockpiles and for detecting the movement of those materials. In particular, it would focus on better detection of illicit nuclear material transport on the open seas, at U.S. ports of entry, and throughout the national transportation system.

- **Detecting bioterrorist attacks.** The anthrax attacks of October 2001 proved that quick recognition of biological terrorism is crucial to saving lives. The Department of Homeland Security would lead efforts to develop, deploy, manage, and maintain a national system for detecting the use of biological agents within the United States. This system would consist of a national public health data surveillance system to monitor public and private databases for indications that a bioterrorist attack has occurred, as well as a sensor network to detect and report the release of bioterrorist pathogens in densely populated areas.

The technologies developed must not only make us safer, but also make our daily lives better. While protecting against the rare event, they should also enhance the commonplace. Thus, the technologies developed for homeland security should fit well within our physical and economic infrastructure, and our national habits. System performance must balance the risks associated with the threat against the impact of false alarms and impediments to our way of life.

**Information Analysis and Infrastructure Protection**

The Department of Homeland Security would merge under one roof the capability to identify and assess current and future threats to the homeland, map those threats against our current vulnerabilities, inform the President, issue timely warnings, and immediately take or effect appropriate preventive and protective action.

**Threat Analysis and Warning.** Actionable intelligence is essential for preventing acts of terrorism. The timely and thorough analysis and dissemination of information about terrorists and their activities will improve the government's ability to disrupt and prevent terrorist acts and to provide useful warning to the private sector and our population. Currently, the U.S. government has no institution primarily dedicated to analyzing systematically all information and intelligence on potential terrorist threats within the United States, such as the Central Intelligence Agency performs regarding terrorist threats abroad. The Department of Homeland Security, working together with enhanced capabilities in other agencies such as the Federal Bureau of Investigation would make America safer by pulling together information and intelligence from a variety of sources.

The prevention of terrorist acts requires a proactive approach that will enhance the capability of policymakers and law enforcement personnel to preempt terrorist plots and warn appropriate sectors. The Department would fuse and analyze legally accessible information from multiple available sources pertaining to terrorist threats to the homeland to provide early warning of potential attacks. This information includes foreign intelligence, law enforcement information, and publicly available information. The Department would be a full partner and consumer of all intelligence-generating agencies, such as the Central Intelligence Agency, the National Security Agency, and the FBI. By obtaining and analyzing this information, the Department would have the ability to view the dangers facing the homeland comprehensively, ensure that the President is briefed on relevant information, and take necessary protective action.

The Attorney General recently revised the guidelines governing how the FBI gathers information and conducts investigations. The new guidelines reflect the President's commitment to preventing terrorism by allowing the FBI to intervene and investigate promptly, while also protecting American's constitutional rights, when information suggests the possibility of terrorism. The revised guidelines empower FBI agents with new investigative authority at the early stage of preliminary inquiries, as well as the ability to search public sources for information on future terrorist threats. The FBI can now identify and track foreign terrorists by combining information obtained from lawful sources, such as foreign intelligence and commercial data services, with the information derived from FBI investigations. In addition, the revised guidelines removed a layer of "red tape" by allowing FBI field offices to approve and renew terrorism enterprise investigations rather than having to obtain approval from headquarters.

The Department of Homeland Security would complement the FBI's enhanced emphasis on counterterrorism law enforcement by ensuring that information from the FBI is analyzed side-by-side with all other intelligence. The Department and the Bureau would ensure cooperation by instituting standard operating procedures to ensure the free and secure flow of information and exchanging personnel as appropriate.

The Department's threat analysis and warning functions would support the President and, as he directs, other national decision-makers responsible for securing the homeland from terrorism. It would coordinate and, as appropriate, consolidate the federal government's lines of communication with state and local public safety agencies and with the private sector, creating a coherent and efficient system for conveying

actionable intelligence and other threat information. The Department would administer the Homeland Security Advisory System and be responsible for public alerts.

The Department of Homeland Security would translate analysis into action in the shortest possible time a critical factor in preventing or mitigating terrorist attacks, particularly those involving weapons of mass destruction. Because of the central importance of this mission, the Department would build excellence in its threat analysis and warning function, not only in terms of personnel, but also in terms of technological capabilities.

This proposal fully reflects the President's absolute commitment to safeguard our way of life, including the integrity of our democratic political system and the essential elements of our individual liberty. The Department of Homeland Security will not become a domestic intelligence agency.

**Critical Infrastructure Protection.** The attacks of September 11 highlighted the fact that terrorists are capable of causing enormous damage to our country by attacking our critical infrastructure those assets, systems, and functions vital to our national security, governance, public health and safety, economy, and national morale.

The Department of Homeland Security would coordinate a national effort to secure America's critical infrastructure. Protecting America's critical infrastructure is the shared responsibility of federal, state, and local government, in active partnership with the private sector, which owns approximately 85 percent of our nation's critical infrastructure. The new Department of Homeland Security will concentrate this partnership in a single government agency responsible for coordinating a comprehensive national plan for protecting our infrastructure. The Department will give state, local, and private entities one primary contact instead of many for coordinating protection activities with the federal government, including vulnerability assessments, strategic planning efforts, and exercises.

The Department would build and maintain a comprehensive assessment of our nation's infrastructure sectors: food, water, agriculture, health systems and emergency services, energy (electrical, nuclear, gas and oil, dams), transportation (air, road, rail, ports, waterways), information and telecommunications, banking and finance, energy, transportation, chemical, defense industry, postal and shipping, and national monuments and icons. The Department would develop and harness the best modeling, simulation, and analytic tools to prioritize effort, taking as its foundation the National Infrastructure Simulation and Analysis Center (currently part of the Department of Energy). The Department would direct or coordinate action to protect significant vulnerabilities, particularly targets with catastrophic potential such as nuclear power plants, chemical facilities, pipelines, and ports, and would establish policy for standardized, tiered protective measures tailored to the target and rapidly adjusted to the threat.

Our nation's information and telecommunications systems are directly connected to many other critical infrastructure sectors, including banking and finance, energy, and transportation. The consequences of an attack on our cyber infrastructure can cascade across many sectors, causing widespread disruption of essential services, damaging our economy, and imperiling public safety. The speed, virulence, and maliciousness of cyber attacks have increased dramatically in recent years. Accordingly, the Department of Homeland Security would place an especially high priority on protecting our cyber infrastructure from terrorist attack by unifying and focusing the key cyber security activities performed by the Critical Infrastructure Assurance Office (currently part of the Department of Commerce) and the National Infrastructure Protection Center (FBI). The Department would augment those capabilities with the response functions of the Federal Computer Incident Response Center (General Services Administration). Because our information and telecommunications sectors are increasingly interconnected, the Department

would also assume the functions and assets of the National Communications System (Department of Defense), which coordinates emergency preparedness for the telecommunications sector.

**State, Local, and Private Sector Coordination**

The nature of American society and the structure of American governance make it impossible to achieve the goal of a secure homeland through federal Executive Branch action alone. The Administration's approach to homeland security is based on the principles of shared responsibility and partnership with the Congress, state and local governments, the private sector, and the American people.

The Department of Homeland Security would coordinate, simplify, and where appropriate consolidate government relations on its issues for America's state and local agencies. It would coordinate federal homeland security programs and information with state and local officials.

The Department would give state and local officials one primary contact instead of many, and would give these officials one contact when it comes to matters related to training, equipment, planning, exercises and other critical homeland security needs. It would manage federal grant programs for enhancing the preparedness of firefighters, police, and emergency medical personnel. It would set standards for state and local preparedness activities and equipment to ensure that these funds are spent according to good statewide and regional plans. To fulfill these preparedness missions, the Department of Homeland Security would incorporate the Department of Justice's Office of Domestic Preparedness, the Federal Bureau of Investigation's National Domestic Preparedness Office, and the Federal Emergency Management Agency's Office of National Preparedness.

**United States Secret Service**

The primary mission of the United States Secret Service is to protect the President, Vice President, and other national leaders. The Service also contributes its specialized protective expertise to planning for events of national significance (National Special Security Events). In addition, the Service combats counterfeiting, cyber-crime, identity fraud, and access device fraud, all closely tied to the terrorist threat. Under the President's proposal, the Secret Service would report directly to the Secretary of Homeland Security. While the Service would remain intact and not be merged with any other Department function, the Service's unique and highly specialized expertise would complement the core mission of the new Department.

**Non-Homeland Security Functions**

The Department of Homeland Security would have a number of functions that are not directly related to securing the homeland against terrorism. By incorporating the emergency management mission of FEMA, it would be responsible for natural disasters. Through the Coast Guard, it would be responsible for search and rescue and other maritime functions. By incorporating the INS, it would be responsible for immigration and naturalization services. Through the Secret Service, it would be responsible for fighting counterfeiters. And by incorporating the Customs Service it would be responsible for stopping drug smuggling.

**The New Department Would Improve Efficiency Without Growing Government**

The Department of Homeland Security must be an agile, fast-paced, and responsive organization that takes advantage of 21st-century technology and management techniques to meet a 21st-century threat.

The creation of a Department of Homeland Security would not "grow" government. The new Department would be funded within the total monies requested by the President in his FY 2003 budget already before Congress for the existing components. The cost of the new elements (such as the threat analysis unit and the state, local, and private sector coordination functions), as well as department-wide management and administration units, can be funded from savings achieved by eliminating redundancies inherent in the current structure.

Going forward, increased resources may be required to meet emerging challenges, but by minimizing duplication of effort and lack of coordination we can ensure that any growth is limited to what is absolutely required. By combining and integrating functions that are currently fragmented, the Department of Homeland Security would:

- **Enhance operational efficiencies** in field units with overlapping missions. For example, the deployment of a cross-trained work force would provide more cost efficient inspection activities at the ports of entry than exist today with three separate units. Integration would allow for a more productive workforce at the agent level and elimination of parallel overhead structures in the field, as well as at headquarters.

- **Reduce redundant information technology spending**. Development of a single enterprise architecture for the department would result in elimination of the sub-optimized, duplicative, and poorly coordinated systems that are prevalent in government today. There would be rational prioritization of projects necessary to fund homeland security missions based on an overall assessment of requirements rather than a tendency to fund all good ideas beneficial to a separate unit's individual needs even if similar systems are already in place elsewhere.

- **Effective management of research and development spending** would be facilitated by central control of research and development funding based, again, on overall homeland security priorities.

- **Better asset utilization** could be gained through consolidation and joint, comprehensive capital planning, procurement, and maintenance. This would pertain to boats, vehicles, and planes, as well as property management.

- **Consolidated, streamlined grant making** would promote targeted, effective programs at the state and local level, stretching the federal dollar further than is possible in the environment of multiple funding sources with sometimes overlapping missions.

In order to respond to rapidly changing conditions, the Secretary would need to have great latitude in re-deploying resources, both human and financial. The Secretary should have broad reorganizational authority in order to enhance operational effectiveness, as needed. Moreover, the President will request for the Department significant flexibility in hiring processes, compensation systems and practices, and performance management to recruit, retain, and develop a motivated, high-performance and accountable workforce. When a job needs to be done the Department should be able to fill it promptly, at a fair compensation level, and with the right person. Likewise, employees should receive recognition for their achievements, but in cases where performance falls short, should be held accountable. Finally, the new Department should have flexible procurement policies to encourage innovation and rapid development and operation of critical technologies vital to securing the homeland.

**Planning, Transition, and Implementation Process**

The planning process for the new Department has already begun. During this period, the Office of Homeland Security will maintain vigilance and continue to coordinate the other federal agencies involved in homeland security. Until the Department of Homeland Security becomes fully operational, the proposed Department's designated components will continue to operate under existing chains of command.

The formal transition process would begin once Congress acts on the President's proposal and the President signs it into law. Under the President's plan, the new Department would be established by January 1, 2003, with integration of some components occurring over a longer period of time. To avoid gaps in leadership coverage, the President's proposal contemplates that appointees who have already been confirmed by the Senate would be able to transfer to new positions without a second confirmation process.

# ADMINISTRATION HOMELAND SECURITY ACTIONS SINCE SEPTEMBER 11

| | |
|---|---|
| Sep 11 | America attacked |
| Sep 11 | Department of Defense begins combat air patrols over U.S. cities |
| Sep 11 | Department of Transportation grounds all U.S. private aircraft |
| Sep 11 | FEMA activates Federal Response Plan |
| Sep 11 | U.S. Customs goes to Level 1 alert at all border ports of entry |
| Sep 11 | HHS activates (for the first time ever) the National Disaster Medical System, dispatching more than 300 medical and mortuary personnel to the New York and Washington, D.C. areas, dispatching one of eight 12-hour emergency "push packages" of medical supplies, and putting 80 Disaster Medical Assistance Teams nationwide and 7,000 private sector medical professionals on deployment alert. |
| Sep 11 | Nuclear Regulatory Commission advises all nuclear power plants, non-power reactors, nuclear fuel facilities and gaseous diffusion plants go to the highest level of security. All complied. |
| Sep 11 | President orders federal disaster funding for New York |
| Sep 11 | FEMA deploys National Urban Search and Rescue Response team |
| Sep 11 | FEMA deploys US Army Corp of Engineers to assist debris removal |
| Sep 12 | FEMA deploys emergency medical and mortuary teams to NY and Washington |
| Sep 12 | FAA allows limited reopening of the nation's commercial airspace system to allow flights that were diverted on September 11 to continue to their original destinations |
| Sep 13 | President orders federal aid for Virginia |
| Sep 13 | Departments of Justice and Treasury deploy Marshals, Border Patrol, and Customs officials to provide a larger police presence at airports as they reopen |
| Sep 14 | President proclaims a national emergency (Proc. 7463) |
| Sep 14 | President orders ready reserves of armed forces to active duty |
| Sep 14 | FBI Releases List of Nineteen Suspected Terrorists |
| Sep 17 | Attorney General directs the establishment of 94 Anti-Terrorism Task Forces, one for each United States Attorney Office |

| | |
|---|---|
| Sep 18 | President signs authorization for Use of Military Force bill |
| Sep 18 | President authorizes additional disaster funding for New York |
| Sep 20 | President addresses Congress, announces creation of the Office of Homeland Security and appointment of Governor Tom Ridge as Director |
| Sep 21 | HHS announces that more than $126 million (part of $5 billion the President released for disaster relief) is being provided immediately to support health services provided in the wake of the attacks. |
| Sep 22 | President signs airline transportation legislation, providing tools to assure the safety and immediate stability of our Nation's commercial airline system, and establish a process for compensating victims of the terrorist attacks. |
| Sep 25 | The first of approximately 7,200 National Guard troops begin augmenting security at 444 airports |
| Sep 27 | The FBI releases photographs of 19 individuals believed to be the 9/11 hijackers |
| Sep | Coast Guard immediately mobilized more than 2,000 Reservists in the largest homeland defense and port security operation since World War II. |
| Oct 1 | FEMA declares over $344 million committed to New York recovery so far |
| Oct 4 | Robert Stevens dies of anthrax in Florida first known victim of biological terrorism |
| Oct 8 | President swears-in Governor Ridge as Assistant to the President for Homeland Security, and issues Executive Order creating OHS |
| Oct 9 | President swears-in General (Retired) Wayne Downing as Director of the Office of Combating Terrorism, and issues Executive order creating OCT. |
| Oct 10 | President unveils "most wanted" terrorists |
| Oct 12 | FAA restores general aviation in 15 major metropolitan areas |
| Oct 16 | President issues Executive Order establishing the President's Critical Infrastructure Protection Board to coordinate and have cognizance of Federal efforts and programs that relate to protection of information systems |
| Oct 21 | FAA restores general aviation in 12 more major metropolitan areas |
| Oct 22 | President issues Executive Order for HHS to exercise certain contracting authority in connection with national defense functions. |
| Oct 23 | U.S. Customs Service creates new Office of Anti-Terrorism |

Oct 25 Department of Treasury launches Operation Greenquest, a new multi-agency financial enforcement initiative bringing the full scope of the government's financial expertise to bear against sources of terrorist funding.

Oct 26 President signs the USA Patriot Act

Oct 29 President chairs first meeting of the Homeland Security Council. Issues Homeland Security Presidential Directive-1, establishing the organization and operation of the HSC, and HSPD-2, establishing the Foreign Terrorist Tracking Task Force and increasing immigration vigilance

Oct 30 FAA restricts all private aircraft flying over nuclear facilities

Nov 8 President announces that the Corporation for National and Community Service (CNCS) will support homeland security, mobilizing more than 20,000 Senior Corps and AmeriCorps participants

Nov 8 President Bush creates the Presidential Task Force on Citizen Preparedness in the War Against Terrorism to help prepare Americans in their homes, neighborhoods, schools, workplaces, places of worship and public places from the potential consequences of terrorist attacks.

Nov 15 FEMA announces Individual and Family Grant program for disaster assistance

Nov 28 HHS awards contract to produce 155 million doses of smallpox vaccine by the end of 2002 to bring the total of doses in the nation's stockpile to 286 million, enough to protect every United States citizen.

Nov 29 Attorney General Ashcroft announces Responsible Cooperators Program, which will provide immigration benefits to non-citizens who furnish information to help apprehend terrorists or to stop terrorist attacks.

Dec 3 FBI implements first phase of headquarters reorganization

Dec 10 U.S. Customs launches "Operation Shield America" to prevent international terrorist organizations from obtaining sensitive U.S. technology, weapons, and other equipment

Dec 12 Governor Ridge and Canadian Foreign Minister John Manley sign a "smart border" declaration and action plan to improve security and efficiency of the Northern border

Dec 19 FAA restores general aviation in 30 major metropolitan areas

Dec 28 President issues Executive Orders on succession in federal agencies

Jan 10 President signs $2.9 billion bioterrorism appropriations bill

Jan 11 FAA publishes new standards to protect cockpits from intrusion and small arms fire or fragmentation devices, such as grenades, requiring operators of more than 6,000 airplanes to install reinforced doors by April 9, 2003.

| | |
|---|---|
| Jan 17 | President issues Executive Order authorizing the Secretary of Transportation to increase the number of Coast Guard service members on active duty. |
| Jan 17 | U.S. Customs announces Container Security Initiative |
| Jan 17-18 | U.S. Border Patrol officials and other representatives of the INS meet with Native American leaders and law enforcement officials jointly strengthen security along the Southwest and Northern borders. |
| Jan 17 & Jan 25 | FBI releases information, photographs, and FBI laboratory photographic retouches on six suspected terrorists |
| Jan 18 | Department of Transportation meets mandate to submit plans for training security screeners and flight crews |
| Jan 23 | FBI announces new hiring initiative for FBI Special Agents |
| Jan 28 | Congress confirms appointment of John W. Magaw as Under Secretary of Transportation for Security |
| Jan 30 | President issues Executive Order establishing the USA Freedom Corps, encouraging all Americans to serve their country for the equivalent of at least 2 years (4,000 hours) over their lifetimes. |
| Jan 31 | HHS announces state allotments of $1.1 billion to help strengthen their capacity to respond to bioterrorism and other public health emergencies resulting from terrorism. |
| Feb 3 | United States Secret Service ensures security of Super Bowl XXXVI, a National Special Security Event |
| Feb 4 | President submits the President's Budget for FY 2003 to the Congress, directing $37.7 billion to homeland security, up from $19.5 billion in FY 2002. |
| Feb 6 | Attorney General Ashcroft announces rule change to Board of Immigration Appeals to eliminate backlog, prevent unwarranted delays and improve the quality of board decision-making while ensuring that those in our immigration court system enjoy the full protections of due process. |
| Feb 8-24 | United States Secret Service ensures security of the 2002 Winter Olympics, a National Special Security Event |
| Feb 25 | Soldiers of the U.S. Army National Guard begin to deploy to augment border security |
| Feb 26 | Nuclear Regulatory Commission orders all 104 commercial nuclear power plants to implement interim compensatory security measures, formalizing measures taken in response to NRC advisories since September 11, and imposing additional security enhancements as a result of on-going comprehensive security review. |

Mar 1 U.S. Customs Service announces action plan to ensure international air carrier compliance with regulations requiring passenger and crew information prior to arrival in the U.S. on flights from foreign locations.

Mar 5 Attorney General Ashcroft announces National Security Coordination Council to ensure seamless coordination of all functions of the Department of Justice relating to national security, particularly efforts to combat terrorism.

Mar 8 To date, the U.S. Coast Guard has conducted over 35,000 port security patrols and 3,500 air patrols; boarded over 10,000 vessels including over 2,000 "high interest vessels;" escorted 6,000 vessels in and out of ports including 2,000 escorted by Sea Marshalls; maintained over 124 security zones; and recalled 2,900 Reservists to active duty.

Mar 12 President establishes the Homeland Security Advisory System (HSPD-3)

Mar 19 President issues Executive Order establishing the President's Homeland Security Advisory Council

Mar 22 Secretary of State Powell and Mexico Interior Minister Santiago Creel sign a "smart border" declaration and action plan to improve security and efficiency of the Southern border

Mar 25 U.S. Customs officers begin partnership with Canadian Customs officers to inspect U.S.-bound cargo upon its first arrival in the ports of Montreal, Halifax, and Vancouver

Mar 25 Nuclear Regulatory Commission orders Honeywell International, Inc., a uranium conversion facility in Illinois, to immediately implement interim compensatory security measures.

Mar 29 HHS announces it will obtain more than 75 million additional doses of smallpox vaccine from Aventis Pasteur Inc., provided the supply, stored in a secure location since 1972, is proven safe and effective.

Apr 5 NRC forms Office of Security to streamline security, safeguards and incident response activities

Apr 8 INS implements rule changes governing an alien's ability to begin a course of study the period of time visitors are permitted to remain in the United States

Apr 16 U.S. Customs launches the Customs-Trade Partnership Against Terrorism

Apr 22 FBI Director Mueller announces key management positions in the counterterrorism division

Apr 30 Transportation Security Administration announces successful implementation of Federal passenger screeners at Baltimore-Washington airport

May 14 President Signs Border Security and Visa Entry Reform Act

May 19 TSA issues 180 day progress report to Congress

May 22 CIA creates new position of Associate Director of Central Intelligence for

Homeland Security, effective May 28.

May 24 Nuclear Regulatory Commission orders decommissioning of commercial nuclear power plants with spent fuel stored in water-filled pools and a spent nuclear fuel storage facility using pool storage to implement interim compensatory security measures for the current threat environment.

May 29 Attorney General Ashcroft and FBI Director Mueller announce reorganization of the FBI to achieve top priority of counter-terrorism and better coordination with the CIA

U.S. Immigration and Customs Enforcement

# About Us

Created in March 2003, Immigration and Customs Enforcement (ICE) is the largest investigative branch of the Department of Homeland Security (DHS). The agency was created after 9/11, by combining the law enforcement arms of the former Immigration and Naturalization Service (INS) and the former U.S. Customs Service, to more effectively enforce our immigration and customs laws and to protect the United States against terrorist attacks. ICE does this by targeting illegal immigrants: the people, money and materials that support terrorism and other criminal activities. ICE is a key component of the DHS "layered defense" approach to protecting the nation.



Fiscal Year 2006 Annual Report

## What we stand for

Our mission is to protect America and uphold public safety. We fulfill this mission by identifying criminal activities and eliminating vulnerabilities that pose a threat to our nation's borders, as well as enforcing economic, transportation and infrastructure security. By protecting our national and border security, ICE seeks to eliminate the potential threat of terrorist acts against the United States.

## How we work

Before 9/11, immigration and customs authorities were not widely recognized as an effective counterterrorism tool in the United States. ICE changed this by creating a host of new systems to better address national security threats and to detect potential terrorist activities in the U.S. We target the people, money and materials that support terrorist and criminal activity.

- We are the second largest federal law enforcement contributor to the Joint Terrorism Task Force.
- We dismantle gang organizations by targeting their members, seizing their financial assets and disrupting their criminal operations through our Operation Community Shield.
- We investigate employers and target illegal workers who have gained access to critical infrastructure worksites (like nuclear and chemical plants, military installations, seaports and airports) through our Worksite Enforcement Initiative.
- We help to identify fraudulent immigration benefit applications and fraudulent illegal document manufacture and target violators through our Identity and Benefit Fraud Program.
- We investigate the illegal export of U.S. munitions and sensitive technology through our Project Shield America Initiative.

- We help combat criminal organizations that smuggle and traffic in humans across our borders through our Human Smuggling and Trafficking Initiative.

- We ensure that every alien who has been ordered removed departs the U.S. as quickly as possible. We work to reduce the number of fugitive aliens in the U.S. through our National Fugitive Operations Program.

- We aggressively seek to destroy the financial infrastructure that criminal organizations use to earn, move and store illicit funds through our Cornerstone Initiative.

- We provide law enforcement and security services to more than 8,800 federal buildings that receive nearly one million visitors and tenants daily through our Federal Protective Service.

- We play a leading role in targeting criminal organizations responsible for producing, smuggling and distributing counterfeit products through our National Intellectual Property Rights Coordination Center.

- We support the law enforcement community through three units dedicated to sharing information and providing investigative support: the Law Enforcement Support Center, Forensic Document Laboratory, and the Cyber Crimes Center.

We fulfill all of these roles and many others, acting with courage, integrity and a high level of accountability while striving for excellence in everything we do. We aspire to the highest standards of performance, professionalism and leadership.

Last Modified: Wednesday, October 31, 2007

CUSTOMS AND BORDER PROTECTION TODAY

March 2003

MARCH 2003

IN THIS ISSUE

- *One team, one fight*

SENTRI: On guard at the southern border

Agriculture's now planted in the field

CSI Operational in Port of Yokohama

Illegal textile entries: a way to save a few bucks?

Training day at the airport

If it sounds too good to be true, it probably is

Customs and Border Protection employee awarded for service to his country

MVP of Super Bowl XXXVII

Third annual trade symposium: Partnering for Smart Borders and Secure Trade

Providing a link between Information Technology and Field Operations

Transition Management Office (TMO) Established

OTHER CBP NEWS

Federal agents foil smugglers' ploy to use look-a-like CBP border enforcement vehicles

# One team, one fight

*On March 1, we all reported as members of one team. The new team is the Department of Homeland Security. Same team, same fight, same enemy.*
-DHS Secretary Tom Ridge

It's an idea that's driven the public imagination for years, fueling the ruse Orson Wells perpetrated on the country during a broadcast of War of the Worlds and providing the plot for the film Independence Day a half-century later-an alien threat from outer space suddenly unites humanity, pulling nations engaged in centuries of warfare into a global alliance that proves what we have in common is always greater than what divides us.

Although an alien threat remains the stuff of fiction, we have before us now a single threat that is ferocious and widespread enough to engage the attention of the entire world and to detach nations and institutions from separate and often competing agendas.

September 11, 2001, opened the world's eyes to that threat, turning lukewarm allies into battle-ready partners, and erasing, within the federal government, institutional distinctions that the collapse of the World Trade Center had proved meaningless in any practical sense.

The whole-hearted and hands-on response of emergency personnel in that crisis made heroes out of men and women, firefighters, police officers, paramedical teams and other city personnel. When the dust settled in the hours and days following 9/11, "turf" that had existed between these groups and between federal government agencies responsible for securing our nation had disappeared, and in its place was a new determination to do whatever it takes to eliminate a common, global threat.

The consolidation of Customs, the Border Patrol, and the inspectional functions of the Immigration and Naturalization Service and the Agriculture and Plant

Bonner addresses Academy graduates

Pemaquid Point Lighthouse

Internet and Intranet: What's the difference?

Women's History Month 2003

Be sure everything's right

Are your beneficiary designations current?

Heart attacks - minutes matter!

About CBP Today

Send Us Feedback

Archived Issues

Health Inspection Service (APHIS) into a new parent organization called the Customs and Border Protection Bureau (CBP) is an extraordinary testament to the commitment of our country and of these organizations to winning the war against terrorism.

Born in very different circumstances, trained to pursue diverse missions, and bound to strong and separate traditions, these four organizations are now working aggressively to share their experience and expertise with one another and to build a new history of cooperation and accomplishment. CBP represents the unification of every federal agency tasked with border enforcement, protection, and inspection, as well as the resolve of 30,000 new employees to present "one face" at the border in one, shoulder-to-shoulder fight against terrorism.

**No easy task**

The challenge facing the new bureau is huge: our country shares a 5,525-mile border with Canada and a 1,989-mile border with Mexico, with a combined total of more than 300 international land-based ports of entry. Intertwined with our borders is a maritime system that includes 95,000 miles of coastline and navigable waterways and a global transportation network-with more than 300 seaports, 429 commercial airports, and several hundred thousand miles of highways and railroads-that connects to virtually every community in America.

It is estimated that 730 million people travel on commercial aircraft each year and that there are now more than 700 million pieces of baggage screened for explosives each year. Factor in 11.2 million trucks and 2.2 million rail cars that cross into the United States each year, along with 7,500 foreign flagships that make 51,000 calls in U.S. ports annually, and you've just begun to understand what lies ahead for CBP.

Right now, 17,000 inspectors and canine enforcement officers from the APHIS Agricultural Quarantine Inspection (AQI) program, INS inspection services, and the Customs Service are trading places on the front lines, tutoring one another in trade secrets and skills earned the hard way, through thousands of hours of time on the job. They are sharing information and working hand-in-hand to connect information systems and open up the channels of communication. And they are building trust, strengthening the sense of partnership that 9/11 imposed on them and their once-separate organizations. "It's the intent of the new

Homeland Security Department," says one CBP official, "to have us all inter-trained and working as one unit."

Ten thousand agents from the U.S. Border Patrol are also onboard, soon to be joined by 600 new hires. These men and women are bringing what they've learned from initiatives like Operation Gatekeeper, an approach that emphasizes deterrence, to the strategy sessions chaired by the Department of Homeland Security (DHS). They're also waiting to tailor their specific skills to a campaign that's expanded from a primary mission-preventing the illegal trafficking of people and contraband-to a complex, international effort. The agency, created more than 77 years ago, brings an astonishing record of success to CBP: since 1994, the Border Patrol has made more than 11.3 million apprehensions nationwide, more than the current populations of Iowa, Missouri, and Kansas, combined.

**Playing to win**

Commissioner Robert C. Bonner says he believes the infusion of new perspectives and expertise will make CBP exactly the kind of border agency this nation needs in a post-9/11 environment. The troops seem to agree; they may still be wearing different uniforms and carrying different credentials, but from all appearances, the men and women of CBP are ready and eager to show the world what can happen when America comes together. Integrating border functions is a necessary prerequisite to realizing the new bureau's goal: the construction of a global, multi-layered security system, one that can accommodate private sector initiatives within a larger federal framework and interface seamlessly with security efforts developed overseas by our allies and trading partners.

CBP's priority mission is keeping terrorists and terrorists weapons, including weapons of mass destruction, from entering the United States, and CBP will do this to the maximum extent possible without stifling the flow of legitimate trade and travel.

CBP has already suited up for this extraordinarily important mission. A new corps of inspectors drawn from four component organizations-Customs, U.S. Border Patrol, INS, and APHIS-now patrols our ports, on the lookout for terrorists and terrorist weapons. CBP is making sure that every primary-line inspector at every port is trained and equipped with a radiation

detector. Agricultural inspectors guard the nation against the importation of disease-infested agents that could imperil public health or sabotage American agriculture, destroying the world's richest economy in the process. Still other CBP officers focus on chemical threats, on making sure that VX, or ricin, or any other kind of death-in-a-vial doesn't make it past them and into America's communities.

Even the ranks of the Canine Enforcement Program have diversified: CBP is now home, not just to Labs and German shepherds, the kinds of larger dogs that Customs and INS liked to employ, but also to dozens of smaller breeds, including the small, feisty beagles that APHIS depends on to ferret out agricultural contaminants. It could make for a comic picture, this incongruous lineup of big and little hounds, each nose pointed toward some hidden threat, but CBP isn't laughing. And that's because we understand, as do the architects of the new Department of Homeland Security, just how important it is right now to have every dog in this fight.

**Bringing dollars to the fight**

In recent remarks to the National Association of Counties, Secretary Ridge emphasized the importance of protecting both the security of our borders and the integrity of our immigration laws.

"We're going to begin supporting the Bureau of Customs and Border Protection and the Bureau of Immigration and Customs Enforcement by an additional $36 million for border infrastructure upgrades," said Secretary Ridge. "And we see down the road, in the future, a combination of not only additional people, but more technology as we seal our borders and at the same time facilitate the flow of legitimate people and goods."

Secretary Ridge focuses on new technology's role in border security, creating a "smarter" border system with $10 million he says is earmarked for investigating thousands of alien fugitives who refuse to leave the country, and another $380 million for the continued development of a new, sophisticated entry/exit visa system.

Add an additional $400 million to the campaign to secure U.S. ports and borders-for more technology and additional personnel-and what the new DHS Secretary calls a "huge undertaking" assumes its proper fiscal proportions, an amount of money that

experts predict will continue to increase as our anti-terrorism efforts grow.

More financial resources for technology are on the way as well: more than $300 million this year for Automated Commercial Environment (ACE) and the International Trade Data System, and $45 million for non-intrusive inspection systems such as personal radiation detectors, isotope identifiers, handheld acoustical inspection systems, and mobile machines for inspection of rail containers.

**Cargo is key**

As important as technology and money are, creating "smart borders" depends as well on the willingness of our partners overseas and in the private sector to work hand-in-hand with CBP to prevent another terrorist attack. Both Secretary Ridge and Commissioner Bonner point to the emergence of international agreements to stop terrorism, citing our efforts with Canada and Mexico to create 21st century borders to keep terrorists out while letting legitimate goods and people through. The NEXUS program, already in operation at major crossings on the northern border, has become a model for reducing border delays when travelers are recognized by both sides as non-terrorists. C-TPAT works in a similar way to reduce border delays for cargo, an achievement that is much appreciated in border towns and cities whose economies depend on the successful processing of trade.

So far, 2,251 companies have joined C-TPAT, a program that Secretary Ridge believes provides incentives for self-policing at every step of the supply chain. Security guidelines for those who want expedited processing under C-TPAT have been developed jointly by CBP and the trade community, and CBP will be monitoring and measuring compliance with those guidelines.

**The future**

If you go to Dulles International Airport or LAX today, or to the border crossing at Otay Mesa or to the CBP's offices on the Ambassador Bridge, which links the United States to Canada, the men and women who work for CBP may tell you that things don't feel much different from the way they felt before March 1. But they will also tell you that, in the days and months ahead, they expect much to change, not just administratively or logistically, but in other, more important ways as well.

"Customs and the Border Patrol have always cooperated in a number of ways," says Border Patrol Agent Mario now stationed at headquarters. "But even when we worked together to make arrests and on important investigations, we always knew we were separate organizations. That isn't true anymore. And the people out in the field are picking up on that, that we're all one team, bigger, more powerful and more committed to stopping the enemy we know is out there waiting. This time, we're going to be ready."

*We want to prepare for an attack, but on the front side, most importantly, we want to prevent an attack . . . we think that's an important distinction to remember. It's also important to remember that part of this function begins at our very borders.*
-DHS Secretary Tom Ridge

Previous Article Next Article

# About Us

Welcome to U.S. Citizenship and Immigration Services.

On March 1, 2003, service and benefit functions of the U.S. Immigration and Naturalization Service (INS) transitioned into the Department of Homeland Security (DHS) as the U.S. Citizenship and Immigration Services (USCIS). USCIS is responsible for the administration of immigration and naturalization adjudication functions and establishing immigration services policies and priorities. These functions include:

- adjudication of immigrant visa petitions;
- adjudication of naturalization petitions;
- adjudication of asylum and refugee applications;
- adjudications performed at the service centers, and
- all other adjudications performed by the INS.
- Fifteen thousand (15,000) federal employees and contractors working in approximately 250 Headquarters and field offices around the world comprise the USCIS.

This About Us section of USCIS.gov (see the buttons on the left) provides information to introduce you to U.S. Citizenship and Immigration Services within the Department of Homeland Security. It also provides information about various administrative and management functions and responsibilities now within DHS that were once in the former Immigration and Naturalization Service.

From this section, Congressional offices can still find out how to file a request for information. You can also learn how to file an immigration-related Freedom of Information/Privacy Act (FOIA) request.

This page can be found at http://www.uscis.gov/aboutus



About the Office of Citizenship

Transformation Program Concept of Operations (730KB PDF)

USCIS Organizational Chart (13KB PDF)

USCIS Strategic Plan (1077KB PDF)

**Related Links:**

Listing of USCIS Career Opportunities on USAJOBS

**Take Our Survey:**

I found this information:

Useful

Slightly Useful

Not Useful

Don't Know

SUBMIT

# National Finance Center (NFC) History

The U.S. Department of Agriculture (USDA) has been the forerunner in the application of computer technology in managing administrative functions. Beginning in the early 1960's, USDA operated a centralized payroll and personnel system; in 1972, USDA established a centralized voucher and invoice processing center. In 1973, these organizations merged to become the National Finance Center. Today, NFC provides consolidated payroll, personnel, and voucher and invoice payment systems and services to numerous Government agencies. NFC also provides systems and support services for several Governmentwide processes, including the Federal Retirement Thrift Savings Plan. The organization has become an asset not only to the Government but to the Greater New Orleans area.

In the early 1980's, NFC was the leader in developing and operating efficient and cost effective administrative, financial and management information systems. By 1983, this distinction paved the way for NFC to begin cross-servicing (now known as franchising) other Federal departments and agencies.

Franchising proved to be an effective method for customers to reduce operating costs, increase efficiency, and avoid system development costs. Franchising has saved the Government, and ultimately the taxpayers, millions of dollars. These savings have been achieved through the sharing of automated systems and processing expertise.

## Franchising Activities

Franchising activities are conducted through fee-for-service contracts with customers. These reimbursement agreements between NFC and its customers incorporate conversion and on-going operating costs. Through franchising partnerships, NFC has steadily reduced unit costs while continuing to enhance systems and improve the quality of service to its customers.

Successful implementations, on schedule and under budget, quickly prompted additional Federal departments to seek NFC's services. With over 10 years of cross-servicing experience, NFC has grown both in numbers of customers and services provided. NFC currently provides administrative and financial services to more than 120 agencies. NFC services small and large customers alike. The smallest payroll/personnel customer has only two accounts; the largest customer has over 160,000 accounts.

The General Accounting Office (GAO) has recognized NFC as the most experienced and successful franchising service provider in Government and recommended that other departments consider NFC's services before planning to design and develop independent systems.

## Customer Service

NFC continually evaluates and enhances its services to ensure that existing systems are maintained and new systems are developed using state-of-the-art technology. We are dedicated to satisfying the expanding needs of our customers and staying current with the rapidly accelerating technological advances.

With today's changing environment and Government streamlining initiatives, NFC plays a vital role in helping its customers meet their objectives and accomplish their missions. NFC systems are specifically designed to readily accommodate requirements necessary to satisfy unique customer needs-in effect, to become a "Government that works better and costs less."

## Results

With a proven record of reducing costs while improving services for USDA and other customers, NFC has attracted interest throughout Government. Studies by GAO and others consistently show that NFC is among the most efficient and cost effective administrative service centers in the Federal Government. By using NFC's systems and services, agencies have reduced the cost of doing the Government's business. As a result, NFC has become one of the largest franchising providers of administrative and financial services in the Federal Government.

## Our Invitation To You

We invite you to visit our facility in New Orleans. We will be happy to discuss our systems and services, address your unique needs, and demonstrate how we can be your source for solutions. For more information about our systems and services please contact:

USDA, National Finance Center
ATTN: IC-696
P.O. Box 60000
New Orleans, LA 70160
(504) 255-5230
(504) 255-5525 (FAX)
www.nfc.usda.gov
email: nfc.webmaster@usda.gov

CLOSED, TRANSFERRED, TYPE-K

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:04-cv-00899-PLF

MORENO v. BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al
Assigned to: Judge Paul L. Friedman
Cause: 29:201 Fair Labor Standards Act

Date Filed: 06/01/2004
Date Terminated: 11/08/2004
Jury Demand: None
Nature of Suit: 710 Labor: Fair Standards
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**ARTURO MORENO, JR.**
*individually and on behalf of others similarly situated*

represented by **Dan Charles Getman**
LAW OFFICE OF DAN GETMAN
9 Paradies Lane
New Paltz, NY 12561
(845) 255-9370
Fax: (845) 255-8649
Email: getmanlaw@hvc.rr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY**
*formerly known as*
UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE

represented by **Peter S. Smith**
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
555 4th Street, NW
Eighth Floor
Washington, DC 20530-0001
(202) 514-7065
Fax: (202) 514-8779
Email: peter.smith@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**

represented by **Peter S. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2004 | 1 | COMPLAINT against BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA (Filing fee $ 150.) filed by ARTURO MORENO JR..(bm) (Entered: 06/04/2004) |

| | | |
|---|---|---|
| 06/01/2004 | | Summons (1) Issued as to BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY. (bm) (Entered: 06/04/2004) |
| 06/17/2004 | | SUMMONS Issued (2)as to U.S. Attorney General (bcs, ) (Entered: 06/17/2004) |
| 09/02/2004 | 2 | ATTORNEY APPEARANCE. (Smith, Peter) (Entered: 09/02/2004) |
| 09/22/2004 | 3 | MOTION to Stay *or, in the Alternative, for Enlargement of Time to Answer Complaint* by BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Smith, Peter) (Entered: 09/22/2004) |
| 09/28/2004 | 4 | SUPPLEMENTAL MEMORANDUM *in Support of Motion to Stay or, in the Alternative, for Enlargement of Time to Answer the Complaint and Modification of Proposed Order* from Defendants. (Attachments: # 1 Text of Proposed Order) (Smith, Peter) (Entered: 09/28/2004) |
| 10/13/2004 | 5 | RESPONSE to *Defendants' Motion for Stay, or in the Alternative, for Enlargement of Time to Answer Complaint and Cross Motion for the Production of the Names and Addresses fo Similarly Situated Employees* filed by ARTURO MORENO JR.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Text of Proposed Order Order)(Getman, Dan) (Entered: 10/13/2004) |
| 10/13/2004 | 6 | MOTION to Produce the Names and Addresses of Similarly Situated Employees by ARTURO MORENO JR. (Please see Document No. 5 for scanned images). (nmw, ) (Entered: 10/14/2004) |
| 10/15/2004 | 7 | Memorandum in opposition to motion re [6] filed by BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA. (Attachments: # 1)(Smith, Peter) (Entered: 10/15/2004) |
| 10/15/2004 | 8 | REPLY to opposition to motion re 3 filed by BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA. (Smith, Peter) (Entered: 10/15/2004) |
| 10/22/2004 | | NOTICE OF HEARING: Status Conference set for 11/5/2004 09:45 AM in Courtroom 17 before Judge Paul L. Friedman. (bm) (Entered: 10/22/2004) |
| 10/27/2004 | 9 | MOTION to Dismiss *or, in the Alternative, for Transfer or for Summary Judgment* by BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA. (Attachments: # 1 Affidavit # 2 Text of Proposed Order)(Smith, Peter) (Entered: 10/27/2004) |
| 11/03/2004 | 10 | REPLY to opposition to motion re 9 *Plaintiffs. reply to defendants' motion to dismiss or, in the alternative, for transfer or summary judgement* filed by ARTURO MORENO JR.. (Attachments: # 1 Declaration of Dan Getman# 2 Plaintiffs' LCvR 7.1(h) Statement of Material Facts with Respect to which there exists a Genuine Issue# 3 Text of Proposed Order)(Getman, Dan) (Entered: 11/03/2004) |
| 11/03/2004 | 11 | MOTION to Continue *STATUS CONFERENCE* by ARTURO MORENO JR.. (Attachments: # 1 Text of Proposed Order)(Getman, Dan) (Entered: 11/03/2004) |

| | | |
|---|---|---|
| 11/04/2004 | | MINUTE ORDER denying 11 plaintiff's motion to continue status conference for failure to comply with Local Civil Rule 7(m). Plaintiff's counsel shall appear by telephone. Signed by Judge Paul L. Friedman on November 4, 2004.(ma) (Entered: 11/04/2004) |
| 11/04/2004 | 12 | REPLY to opposition to motion re 9 filed by BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA. (Smith, Peter) (Entered: 11/04/2004) |
| 11/05/2004 | | Minute Entry for proceedings held before Judge Paul L. Friedman : Status Conference held on 11/5/2004, denying without prejudice 9 MOTION to Dismiss and granting motion to Transfer to the Court of Federal Claims filed by UNITED STATES OF AMERICA, BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY. (Court Reporter Cathryn Jones.) (bm) (Entered: 11/05/2004) |
| 11/08/2004 | 13 | Memorandum Opinion dismissing the case under 28 U.S.C. Section 1406 and Rule 12(b)(3) ofo the Federal Rules of Civil Procedure. An order consistent with this Memorandum Opinion shall issue this same day. Signed by Judge Paul L. Friedman on November 8, 2004. (ma) (Entered: 11/08/2004) |
| 11/08/2004 | 14 | ORDER that defendant's motion to dismiss or, in the alternative, for transfer of summary judgment 9 is granted in part and denied in part; this case is dismissed for improper venue, without prejudice, from the docket of this Court. Signed by Judge Paul L. Friedman on November 8, 2004. (ma) (Entered: 11/08/2004) |
| 11/19/2004 | | ENTERED IN ERROR.....Case transferred to the U.S. Court of Federal Claims at 717 Madison St., N.W. Washington, DC pursuant to order filed 11/5/04. (td, ) Modified on 12/21/2004 (cp, ). (Entered: 11/19/2004) |
| 11/19/2004 | | NOTICE OF CORRECTED DOCKET ENTRY: Previous entry regarding transfer of case was Entered in Error as transfer documents have been returned by the U.S. Court of Federal Claims due to premature transfer. (cp, ) (Entered: 12/21/2004) |
| 11/23/2004 | | RECEIPT and acknowledgement of transfer documents received 11/20/04 by U.S. Courts of Federal Claims. (cp, ) (Entered: 12/02/2004) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/16/2007 18:51:47 | | | |
| **PACER Login:** | dc4538 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:04-cv-00899-PLF |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

ECF

# US Court of Federal Claims
# United States Court of Federal Claims (COFC)
# CIVIL DOCKET FOR CASE #: 1:05-cv-00142-NBF

MORENO v. USA
Assigned to: Judge Nancy B. Firestone
Cause: 28:1491 Tucker Act

Date Filed: 01/21/2005
Jury Demand: None
Nature of Suit: 304 Civilian Pay - FLSA
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**ARTURO MORENO, JR.**
*and*

represented by **Michael J.D. Sweeney**
Law Office of Dan Getman
9 Paradies Lane
New Paltz, NY 12561
(845) 255-9370
Fax: (845) 255-8649
Email: msweeney@getmanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THOMAS C. PORTA**
*individually and on behalf of others similarly situated*
*TERMINATED: 04/03/2006*

represented by **Michael J.D. Sweeney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Maame A.F. Ewusi-Mensah**
U.S. Department of Justice, Civil Division
1100 L Street NW
Room 12000
Washington, DC, DC 20530
202.353.0503
Fax: 202.514.8624
Email: Maame.Ewusi-Mensah@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Pease**
U. S. Department of Justice
Civil Division - Commercial Litigation Branch
1100 L Street, NW

Room 12018
Washington, DC 20530
(202) 353-7991
Fax: (202) 514-8624
Email: jeffrey.pease@usdoj.gov
*TERMINATED: 04/11/2007*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/21/2005 | 1 | COMPLAINT against USA (O) ( Filing fee $150, Receipt number 062184), filed by ARTURO MORENO, JR.Answer Due by 3/22/2005. (lg1, ) (Entered: 01/26/2005) |
| 01/21/2005 | 2 | NOTICE of Assignment to Judge Marian Blank Horn. (lg1, ) (Entered: 01/26/2005) |
| 02/14/2005 | 3 | NOTICE of Appearance by Jeffrey Scott Pease for USA. Service: 2/14/2005.(mb2, ) (Entered: 02/17/2005) |
| 03/16/2005 | 4 | SCHEDULING ORDER: Amended Complaint due by 3/23/2005.Answer Due by 4/22/2005. Signed by Judge Marian Blank Horn. (mb2, ) (Entered: 03/18/2005) |
| 03/24/2005 | 5 | ORDER RETURNING UNFILED: Plaintiff's Consent to Sue Signed by Thomas Porta and Plaintiff's Amended Compaint received 3/21/2005 and 3/23/2005.Amended Complaint due by 4/4/2005. Answer to Amended Complaint due by 5/4/2005. Signed by Judge Marian Blank Horn. (mb2, ) (Entered: 03/28/2005) |
| 03/24/2005 | | Set Deadlines: Answer due 5/4/2005. (mb2, ) (Entered: 03/28/2005) |
| 04/11/2005 | 6 | AMENDED COMPLAINT against USA, filed by ARTURO MORENO, JR. Related document: [1] Complaint filed by ARTURO MORENO, JR. [FILED BY LEAVE OF THE JUDGE](mb2, ) (Entered: 04/13/2005) |
| 05/04/2005 | 7 | ANSWER to [1] Complaint, filed by USA. Service: 5/4/2005. JPSR due by 6/27/2005.(mb2, ) (Entered: 05/09/2005) |
| 06/27/2005 | 8 | MOTION for Leave to File Telefaxed Signature, filed by USA. Service: 6/27/2005. Response due by 7/14/2005. (mb2, ) (Entered: 06/28/2005) |
| 07/06/2005 | 9 | ORDER denying [8] Motion for Leave to File Telefaxed Signature. Joint Preliminary Status Report due by 7/13/2005. Signed by Judge Marian Blank Horn. (mb2, ) (Entered: 07/11/2005) |
| 07/13/2005 | 10 | JOINT PRELIMINARY STATUS REPORT. Service: 7/13/2005.(mb2, ) (Entered: 07/15/2005) |
| 08/01/2005 | 11 | STATUS CONFERENCE ORDER: Status Conference set for 8/15/2005 at 12:00 PM before Judge Marian Blank Horn. Signed by Judge Marian Blank Horn. Neither party shall file a dispositive motion before the status conference.(mb2, ) (Entered: 08/03/2005) |
| 08/16/2005 | 12 | ORDER severing plaintiffs; assigning plaintiff, Thomas C. Porta, a new docket number (05-14210C); and consolidating cases. Signed by Judge Marian Blank Horn. (dls) (Entered: 08/17/2005) |

| | | |
|---|---|---|
| 08/23/2005 | 13 | SCHEDULING ORDER:District Court Case Filed due by 8/26/2005. Dispositive Motion due by 10/19/2005. Discovery due by 3/21/2005. Status Report due by 9/15/2005, and every month thereafter. Joint Status Report due by 3/31/2006. Status Conference set for 4/11/2006 at 10:30 AM before Judge Marian Blank Horn. Signed by Judge Marian Blank Horn. (mb2, ) (Entered: 08/26/2005) |
| 10/11/2005 | 14 | MOTION for Leave to File Joint Status Report Out of Time, filed by ARTURO MORENO, JR, USA. Service: 10/7/2005. Response due by 10/24/2005. (mb2, ) (Entered: 10/13/2005) |
| 10/17/2005 | 15 | ORDER granting [14] Motion for Leave to File Joint Status Report Out of Time. ORDER RETURNING UNFILED: Plaintiff's Notice of Motion submitted October 6, 2005. Corrected Motion for a collective action due by 10/31/05; joint status report due 11/15/05. Signed by Judge Marian Blank Horn. (mb2, ) Modified on 10/18/2005 to correct due date for motion. (dls). (Entered: 10/18/2005) |
| 10/17/2005 | 16 | JOINT STATUS REPORT, by all parties. Service: 10/7/2005.(mb2, ) (Entered: 10/18/2005) |
| 10/17/2005 | | Set Deadline: Status Report due by 11/15/2005. (mb2, ) (Entered: 10/18/2005) |
| 10/24/2005 | 17 | MOTION to Certify Class, filed by ARTURO MORENO, JR. Service: 10/21/2005. Response due by 11/7/2005. (mb2, ) (Entered: 10/27/2005) |
| 11/07/2005 | 18 | RESPONSE to [17] MOTION to Certify Class , filed by USA. Reply due by 11/21/2005. Service: 11/7/2005.(mb2, ) (Entered: 11/09/2005) |
| 11/08/2005 | 19 | ORDER UNSEVERING the claims of Thomas C. Porta; reassigning them to this case; and directing the Clerk to close Thomas C. Porta v. United States, No. 05-14210C. Signed by Judge Marian Blank Horn. (dls) (Entered: 11/09/2005) |
| 11/09/2005 | 20 | MOTION to Certify Class, , filed by ARTURO MORENO, JR, THOMAS C. PORTA. [FILED BY LEAVE OF THE JUDGE] Service: 10/31/2005. Response due by 11/17/2005. (mb2, ) (Entered: 11/10/2005) |
| 11/15/2005 | 21 | JOINT STATUS REPORT, filed by all parties. Service: 11/15/2005. (mb2, ) (Entered: 11/17/2005) |
| 11/17/2005 | 22 | RESPONSE to [20] MOTION to Certify Class , filed by USA. Reply due by 12/5/2005. Service: 11/17/2005.(mb2, ) (Entered: 11/21/2005) |
| 11/23/2005 | 23 | REPLY to Response to Motion re [20] MOTION to Certify Class , filed by ARTURO MORENO, JR, Service: 11/21/2005.(mb2, ) Modified on 12/8/2005 to correct filer. (dls). (Entered: 11/29/2005) |
| 12/15/2005 | 24 | JOINT STATUS REPORT, filed by all parties. Service: 12/15/2005. (mb2, ) (Entered: 12/20/2005) |
| 01/09/2006 | 25 | ORDER reassigning case to Judge Margaret M. Sweeney. Signed by Judge Marian Blank Horn. (dls ) (Entered: 01/12/2006) |
| 01/09/2006 | 26 | NOTICE of Reassignment. Case reassigned to Judge Margaret Sweeney for all further proceedings. Judge Marian Blank Horn no longer assigned |

| | | |
|---|---|---|
| | | to case. (dls ) (Entered: 01/12/2006) |
| 01/13/2006 | 27 | JOINT STATUS REPORT, filed by all parties. Service: 1/13/2006.(mb2, ) (Entered: 01/19/2006) |
| 01/30/2006 | 28 | REPLY to Response to Motion re [20] MOTION to Certify Class , filed by THOMAS C. PORTA. [FILED BY LEAVE OF THE JUDGE] Service: 12/5/2005.(mb2, ) (Entered: 01/31/2006) |
| 02/15/2006 | 29 | JOINT STATUS REPORT, filed by all parties. Service: 2/15/2006.(mb2, ) (Entered: 02/21/2006) |
| 02/23/2006 | 30 | ORDER REASSIGNING CASE to Judge Nancy B. Firestone. Signed by Judge Margaret M. Sweeney. (dls ) (Entered: 03/01/2006) |
| 02/23/2006 | 31 | NOTICE of Reassignment. Case reassigned to Judge Nancy B. Firestone for all further proceedings. Judge Margaret M. Sweeney no longer assigned to the case. (dls ) (Entered: 03/01/2006) |
| 03/15/2006 | 32 | MOTION for Leave to File Telefaxed Signatures , filed by USA. Service: 3/15/2006. Response due by 4/3/2006. (mb2, ) (Entered: 03/16/2006) |
| 03/21/2006 | 33 | ORDER granting [32] Motion for Leave to File Telefaxed Signatures. Signed by Judge Nancy B. Firestone. (mb2, ) (Entered: 03/23/2006) |
| 03/21/2006 | 34 | JOINT STATUS REPORT, filed by all parties. Service: 3/15/2006.(mb2, ) (Entered: 03/23/2006) |
| 03/21/2006 | 35 | MOTION for Extension of Time to Complete Fact Discovery , filed by ARTURO MORENO, JR, THOMAS C. PORTA, USA. Service: 3/15/2006. **Response due by 4/7/2006.**(mb2, ) (Entered: 03/23/2006) |
| 03/22/2006 | 36 | NOTICE of Filing Original Signatures, filed by USA. Service: 3/22/2006. (mb2, ) (Entered: 03/24/2006) |
| 03/24/2006 | 37 | STATUS CONFERENCE ORDER: **Status Conference set for 3/30/2006 at 2:00 PM before Judge Nancy B. Firestone.** Signed by Judge Nancy B. Firestone. (mb2, ) (Entered: 03/27/2006) |
| 04/03/2006 | | Set/Reset Transcript Deadlines: Transcript due by 4/13/2006. (vp1, ) (Entered: 04/03/2006) |
| 04/03/2006 | 38 | ORDER: Severing the claims of Mr. Moreno and Mr. Porta. Designating this case ECF. **Discovery due by 9/1/2006. Joint Proposed Notice due by 4/17/2006.** Signed by Judge Nancy B. Firestone. (mb2, ) (Entered: 04/05/2006) |
| 04/03/2006 | 39 | NOTICE of Designation of Electronic Case. (mb2, ) (Entered: 04/05/2006) |
| 04/11/2006 | 40 | ORDER re [38] Scheduling Order Signed by Judge Nancy B. Firestone. (cvhj, ) (Entered: 04/11/2006) |
| 04/13/2006 | 41 | TRANSCRIPT of Proceedings held on March 30, 2006 before Judge Nancy B. Firestone. (dw1) (Entered: 04/17/2006) |
| 04/17/2006 | 42 | NOTICE, filed by USA re [38] Scheduling Order (Attachments: # 1 Proposed Collective Action Notice)(Pease, Jeffrey) (Entered: 04/17/2006) |

| | | |
|---|---|---|
| 04/18/2006 | 43 | NOTICE, filed by ARTURO MORENO, JR *Plaintiff Consent to Defendant's Proposed Collective Action Notice* (Sweeney, Michael) (Entered: 04/18/2006) |
| 04/18/2006 | 44 | ORDER re 43 Notice (Other) filed by ARTURO MORENO, JR., 42 Notice (Other) filed by USA, **Notice of Compliance due by 5/19/2006.** Signed by Judge Nancy B. Firestone. (cvhj, ) (Entered: 04/18/2006) |
| 05/19/2006 | 45 | NOTICE, filed by USA re [38] Scheduling Order, 44 Order *NOTICE OF COMPLIANCE* (Pease, Jeffrey) (Entered: 05/19/2006) |
| 05/23/2006 | 46 | NOTICE, filed by Wylly T. Jordan *Consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/23/2006) |
| 05/24/2006 | 47 | NOTICE, filed by Valerie Whittaker *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/24/2006) |
| 05/24/2006 | 48 | NOTICE, filed by Dominick Merced, Sr *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/24/2006) |
| 05/25/2006 | 49 | NOTICE, filed by Terence J. Scott *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 50 | NOTICE, filed by Tracie D Ghostlaw *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 51 | NOTICE, filed by Robyn Brown *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 52 | NOTICE, filed by Suzanne DeJoseph *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 53 | NOTICE, filed by Robert E Brooks *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 54 | NOTICE, filed by Michael S Messina *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 55 | NOTICE, filed by DONNELL GRIFFIN *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 56 | NOTICE, filed by Alicia M. Knox *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/25/2006 | 57 | NOTICE, filed by John Samp *consent to be a plaintiff in this FLSA case* (Sweeney, Michael) (Entered: 05/25/2006) |
| 05/26/2006 | 58 | NOTICE, filed by ARTURO MORENO, JR *filing of consent to sue of Josefina Barton, Charles E. Bell, Revathi Muneer, Chamaiporn Carey, Anthony Pantalone, Dana Golson, Gail Simmons, David A. Tibbs, Ruben H. Pratt Jr., Timothy Danek, Hector Arredondo, Martin A. Airey, John Steven Milian, Clarice Hsieh, Saul D. Roe, Flora P. Almadova, Gaston L. Lara, William R. Brannen, Timothy G. Borden, Joseph K. Egan, Stanley D. Grosswald, James A. Bitterman, Scott A. Murphy, Michael Marciano, Octavio A. Serrano IV, Ashfa N. Mirza, Jerome Bria, William Sansone, Jeri Quinkert, and Mary Coombs Sansone.* (Attachments: # 1 consent to sue of Josefina Barton, Charles E. Bell, Revathi Muneer, Chamaiporn |

| | | |
|---|---|---|
| | | Carey, Anthony Pantalone, Dana Golson, Gail Simmons, David A. Tibbs, Ruben H. Pratt Jr., Timothy Danek, Hector Arredondo, Martin A. Airey, John Steven Milian, Clarice Hsieh, Sa)(Sweeney, Michael) (Entered: 05/26/2006) |
| 06/02/2006 | 59 | NOTICE, filed by ARTURO MORENO, JR *Consents to sue of Melissa Lyons, Paul F. Fields, Yesenia Roman, James R. Stuhr, Laarni B. Oviedo, James Gamoa, Michael Boyer, Robert G. Kennedy, David Daugman, Wayne Lindstrom, Gloria Jean Bailey, Steven E. Shelly, Warren Cornelius Guillory, Kenneth C. Weir, Lance Edmonds, TheodoreJ. Gauthier, Conrado G. Torres, Jr., Abel Samaniero, Anthony Ruggiero, Jose A. Contreras, Dennis A. Lee, Walter F. O?Keefe, Gary M. Ward, Rene Mora, Peter A. Parlik, Ed L. Schwaigert, Susana Yvellez, Ener L. Lopez, Harry E. Ackroyd, Reinfrido Areo Ayson, Gilberto Cua, Alhaji Tunkara, Sally Hiller, Hernando Aguirre, William David Jones, Ernest A. Verina, George Cosme, Efren A. Cruz, David L. Pippen, Bogdan Koszarycz, Jonathan D. Hill, Rex D. Werking, Hushang Rad, Sherry J. Johnson, Carol Muidrow, Justin C. Gellert, Mark Moser, Manuel M. Gomez, Renee E. Smith, Jose L. Bayanilla, Rudy M. Faz Jr., Jeffrey L. Racht, Joseph M. Pedro III, Jose C. Luna, Erika Gutierrez, Benjamin E. Hayhurst, Angel L. Rivera, Sandra R. Gamez, Marcel Paul Belinsky, Jaunita Guajardo Reyes, Duane A. Austria, Julie Dicks, Paul Carter, Mark Edwin Summers, Jennifer Nielsen, Cynthia Christensen, Norma Ambriz, Elizabeth Munns, Melvin B. Salvador, Marta V. Ruvalcaba, Heath A. Clemens, Lois Hunter, Lawrence Wozniak, Brett D. Kynard, Frank Muzio, Walter Odinokow, Judith A. Bruels, Hal Queyor, Bievenido Bragas Jr., Arlo S. Arcinas, Monica A. Dafforn, Michael D. Rathsack, Syed Fazl Rab, Timothy M. Bowers, Michael H. Cherry, Ike S. Chang, David O?Denius, Cheridan Abelkader, Kermit Tilford, Samuel Avkyan, John A. Pignatelli, Miguel J. Duarte, Steven Durino, Mariano Garay-Ortiz, Odette E. Mendez, Clarence Mcwhinnie, Stephen Mudd, Adam Cobb, Vintonne Williams, Ruben M. Fojas, James C. Mann, Jacqueline Garzasty, Jennifer Hood, Joseph Iannaccone, Thomas David Valade, Mark Annotti, Vincent Martin, Wanda Royall, Dennis Arnaboldi, John Cleere, George McGreal, Salvatore Gemma, Andre Martone, Daniel Wells, Larry Ketzel, Mary Zapplac, Bradley Goshorn, Nelson Almeida, Jon M. McCurdy, Kenneth S. Piegari, Frederick N. Tracey, Don D. Powe, Eileen Hart, Robin Louis Bellamy, Dianna L. Fiskin, Matthew DuFresne, Richard V. Lovell, Katiuska Tapia, Jose F. Fscalera, Deric D. Jordan, Melissa Ann Carrillo, Michael Rigg, Errol McIver, Neil N. Ali, Eric Gershon, Celester A. Knee, Niurka Y. Calchito, Dawn Wisniewski, Michael A. Rigsby, Jesus Lopez, Jr., Rhona L. Stanley, Ronald Nelson, Paul J. Kelly, Boris M. Tsypis, Michael Kaneris, Laura Marshall, Carol Opdahl, JoAnn Shyrock, David Shyrock, Kathleen A. Hewson, Julia C. Bokelman-Kennedy, Ron C. Oda, George H. Wilson, Mark Haturi, Norma A. Ramirez, Rafael Corro, Franklin Oria, Jerry G. Chamberlain, Eva Pedersen* (Attachments: # 1 Consents to sue# 2 Consents to sue# 3 Consents to sue# 4 Consents to sue# 5 Consents to sue# 6 Consents to sue# 7 Consents to sue# 8 Certificate of Service)(Sweeney, Michael) (Entered: 06/02/2006) |
| 06/09/2006 | 60 | NOTICE, filed by ARTURO MORENO, JR *Notice of Filing of consent to sue of Erika B. Gamboa, John J. Brehm, Shelly Lannan, Sonia Bulter, Raul De Loera Jr., Earl W. Fullerton, Gregory Keir Pelissero, Sandra L.* |

| | | |
|---|---|---|
| | | *Villarreal, Savoeurt Dul, Norma V. Garcia, Ellen J. D?Amato, Jose DiBene Jr., Warren Becher, Elliott McDougald, Erie J. Hopkins, Pedro V. Duran, Dong Hun Yim, Ramona C. Escontrias, Liugean Singleton, Michael A. Renfeldt, Thomas Nolan, Shelley Beaulieu, Hassen A. Abadico, Gordon McMurray, Tatiana Snitkovskaia, Michael A. Webb, Javier A. Ramoner, Ayda Lopez, Nghiem Van Nguyen, Maria S. Oh, David Clark, Veronica Perez-Taghizadeh, Sultan Farakhan, Cindy S. Dennis Schappe, Emmanuel Arambulo, Roy C. Pechous, Susan W. Pruitt, David Srein, Ronald W. Potter, James P. Hansen, Gilbert S. Hernandez, Angelica Cruse, Jeffery Craig Theriot, Anthony L. Adams Sr., Gerald M. Goldstein, Alba L. Arguilez, Hadley Newgent, Steve Nguyen, David J Dambrosio, Steven K. Ash, Brain A. Turek, Wendy Fu, Francis J. Hinnegan, Andrew Cacley, Reynaldo A. Saldivar, David M. Sweeney, Dale D. Taylor, Carlos R. Barro- Villahermosa, Trady L. Goethe, Jeffrey A. Girven, Diana E. Canta, Steve Huang, Elizabeth Kafati, Brenda Watkins, Reophi Medina, Darlene A. Bonaparte, Sandra L. Dixon, Karin Pepper, Michael P Radeus, Wilfredo P. Yee, Carl E. Hance, Margaret J. Paradowski, Ian Cole, Ronda Archer, Lonnie L. Hall, Marie Theresa Vara, Antonia M. Snyder, Todd Bellew, Abdel R. Ruiz, Ling P. Moser, Linda R. Martin, Rosa Elia Murillo, Francis D. Meo, Laura Smaczniak, Kyisha Jones, Gilbert Owens, Raymond Pinto, Margaret Wilson, Ruben Berrios-Burgos, Michael J. Ahern, Cecilia Arredondo, Michael Luker, Jorge Quinones, Elizabeth Lipponen, Steven Kindrock, Eugene Russell, Pete Florendo, Jon Blankman, Lucent Hadnot-Jacobs, Elizabeth Machuca, Jennifer Bertsch, Arturo Vasquez, Teutusi Satele, Karen Buckiney, Jerald Ard, Julie Mossar, Johanna Bonfiglio, Carlos Esquer, Mark Stokes, Luz Delgado, Gary Tober, James King, Loris Goodwin, Alexander Quirante, Julia Sarich, Matthew Gilbertson, Trevor Thomas, Daron L. Browder, Roderick Harville, Robert Reilley, James J. Miller, Richard Babcock, Laurie Chu, Gabriela Avelar, Hector A. Vargas, Sharon L. Johnson, James H. Burford, Michael Kraft, Jay McKinnon, Eric Dedicatoria, Myriam I. Rosado, Tyronda Lee, Gerald E. Racht, Jr., Egle Fox, Pamela D. McKue, Perla V. Jarquin, Nazario baez-Zamdrano, Roy D. Esponoza, Jacob Abraham, Johnny Williams, Marilyn Hills, Elizabeth Garman, Shane Musgrave, Natalie Wu, Ruben A. Cruz-Lugo and Ruth Eklund.* (Attachments: # 1 consent to sues# 2 consent to sue continues# 3 consent to sue continues# 4 consent to sue continues# 5 consent to sue continues)(Sweeney, Michael) (Entered: 06/09/2006) |
| 06/16/2006 | 61 | NOTICE, filed by ARTURO MORENO, JR *Notice of Filing of Consent to Sue* (Attachments: # 1 consent to sues# 2 consent to sue continue# 3 consent to sue continue# 4 consent to sue continue# 5 consent to sue continue)(Sweeney, Michael) (Entered: 06/16/2006) |
| 06/22/2006 | 62 | NOTICE, filed by ARTURO MORENO, JR *NOTICE OF FILING OF CONSENT TO SUE (Rodolfo R. Murillo, Arnold T. Reola, Savatore J. Castellitto, Annmarie Lopez, Robert F. Cauley, Paul A. Todd, Cynthia V. Camacho, Daniel G. Zepeda, Andrew X. Chen, Clifton M. Gladney, Trevor S. Thomas, Datra Surul, Debbie Rodriques, Elzbieta Suitalski, Gregory Lewis, Beth Passanante, Ethel J. Herring, Aida Morales, Cory Lee Carlyle, Peter Mailloux, Marcella Goforth, George w. Joyal, Trent E. Darsey, William Snyder, Matthew Silcore, Jason Wolf, Dave L. Chai, Pamela Hutchings, Raymond Heffer, Jonathan Cruz-Camacho, Kimiko* |

| | | |
|---|---|---|
| | | *Hamaya, Khanh Mong, Richard Reyes, Ariel Diaz, Susanna Lai David, Mari Elaine Piechowicz, Claudia Macias, Jay Schaeffer, Shawn Lindseth, Randy L. Lasar, Steven L. Lang, Justin Burnham, Cahrlotte Bartholomew, Edward Voluntad, David Gomez, Melody A. Thibault, Jeffery Scott Tetrault, David L. Ceglowski, Danyang Zhang, Glenda A. Swanson and Erik Teschner.)* (Attachments: # 1 consent to sues# 2 consent to sues continues# 3 consent to sue continued# 4 consent to sue continued# 5 consent to sue continued)(Sweeney, Michael) (Entered: 06/22/2006) |
| 06/30/2006 | 63 | NOTICE, filed by ARTURO MORENO, JR *Notice of filing of consent to sue of Kelvin N. Rodriguez-Torres,, Kimberley Hughes Vogt, Thomas G. Danielkiewicz, Travis R. Wong, Alicia Lara, June Liu, Thad Jacobsen, Paul Brower, Melvin S. Diaz, Israel Persales Jr., Eileen Kenny, Harvey R. Deering, Jerald H. Walters, Timothy Michael Allison, Jack E. Manning, Cristina Baez Freyre, Charles V. Clark Jr., Tamara R. Wissmueller, Loren Plymate, Barbara J. Martin, Mirta Flores, Abel D. Bravo, Jessica Reeves, Darius L. Reeves, John Tuffly, Eric Donaldson, David L. Marshall, Christyke R. Yates, Kenneth K. Hong, Jose David Melendez, Gerardo Estrada, Catherine Ventura, Angel S. Garcia, Bennett Hong, William L. Cline, Jason W. Wilkes, Robert A. Munoz, Sandra S. Stapleton, Andrea Coffey, Pamela Roth, Kenneth A. Nygarrd, Marlin Jenkins, Greata Burgert, Richard L. Longoria II, Peter Fitlpatrick, John T. Reynolds, Roger Backen, Craig Finistein, Miguel Cadena, Oladele Adaramola, Carolton Cooper, Joseph Hernandez, Teresa Richardson, Donald J. Katz, Evaneline Chapman, John Stanley, Sarah Posvar, Theodore A. Walkey, Quanshateshia Pitts, Jmaes Nielsen, Rober B. Rye, Claudette J. Garcia, Carlos O. Rodriguez Diaz, Sultan D. Sewell, Jesus Hernandez, Carlos Miller and Sarah C. Garcia.* (Attachments: # 1 cosent to sue# 2 consents to sue continued# 3 consents to sue continued# 4 consents to sue continued# 5 consents to sue continued# 6 consents to sue continued) (Sweeney, Michael) (Entered: 06/30/2006) |
| 07/07/2006 | 64 | NOTICE, filed by ARTURO MORENO, JR *Notice of Filing of consent to sue of Wendell Jackson, George Harvey Jr., Gilbert Vasquez, Polly E. Kaiser, Andrew MIchael Orton, Mark A. Schofield, Lynn M. Pope, Bernadine Leslie Flores, Jack Lippard, Dorothy M. Johnson, Lance Kovac, James A. Brantley, Lyke Boelens, Jonathan Garcia -Martinez, Catherine Cole, Anthony Rivera, John R. Drane, Shineka Scott, Gordon Miller, George Caraccioli, Ramon L. Villaflor Jr., Alfredo Vela, Maureen Kwiatkowski, Nathan Whatley, James Donald Ghee II, John Dubski, Luis R. Garcia, Martha J. Beckett Gordon, Jacob J. Ogbe, Carter Smith, Paulette G. Delisle, Chilet Angsantikul, Steven C. Finn, Samuel Colon-Ruiz, Raymundo Guzman, Richard A. Stone, Michael N. New, Richard Parent, Brian C. Casterline and Edward J. Kelly.* (Attachments: # 1 consent to sue# 2 consent to sue continue# 3 consent to sue continue) (Sweeney, Michael) (Entered: 07/07/2006) |
| 07/13/2006 | 65 | MOTION for Extension of Time until August 4, 2006 to RESPOND TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, PLAINTIFFS' FIRST SET OF INTERROGATORIES, AND PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS ACCOMPANYING ITS NOTICE OF DEPOSITION OF WAYNE COLEMAN (OUT OF TIME), |

| | | |
|---|---|---|
| | | filed by USA.**Response due by 7/31/2006.**(Pease, Jeffrey) (Entered: 07/13/2006) |
| 07/17/2006 | 66 | NOTICE, filed by ARTURO MORENO, JR *Notice of Filing of Consent to Sue of Carl Cooper, Alma O. Teran, Steven Milnes, Lara C. Brainard, Alan G. Bennett, Robert Lombardi, Segundo S. Manzano, Alejandra Diaz, Jose R. Trujillo, Efren Garcia Sr., Dennis R. Smyth, Doris E. Morris, Oscar R. Donado, Juan P. Virgen, Timothy J. McCarthey, Jerry L. Dickey, Robert A. Sanders, Leonard J. Bogdanski, Galoane Taulau, Jwana Smith, Karen Bruce, James G. Daniels, Mau Zuder, Ruth A. Hartwell, Abraham D. Aninzo, Heather Lagacy, Allison Y. Marable, Lisa Gomez, Antonio Alvarado, Charene Johnson, Timothy Benz, Hector Gomez,Diane Doran, Kevin R. Owens, Tanh Tan Tran, Kavita S. Mane, Norma P. Roman, Herbert F. Grofcsik, Warren Kerschbaum, Nnamdi F. Aneke, John A. Stocker, R. Robinson Chance Jr., Pamela DiMeo, Micah L. Acox, Leopoldao Aguirre, Maria J. Alvarez, Angelica Campos, Dawn Caress Cox, Andrew George Coleman, Lyle M. Conley, Matthew Davies, Liliana Julien, Kevin Laird, David H. Lease, Melina Malbon, John Masciarelli, John Mirandona Jr., Abraham Narvaez, Tri Thanh Nguyen, Michael A. Ortiz, Connie L. Stephens, Helen Stillman, Floyd L. Wilder, Michael Fernandez, Walter Preston Leroy, Nicole Jarzniecki, Erik Andern, Rebecca Lippa, Robinette D. Brown, Raquel Smith and Gary L. Byrd, Joel M. Bialke, Joanne Lee, Melissa Gonzalez, Joe Davis, Marjorie Norman, Voncilla Frankin, Judith Hospedales, Gloria Tellez, David A. Ragsdale, Noel D. Angeles, Shenna Anderson, Andrew Turla, Max W. Pulley, Charles Tennison, Frank Mendiola, Ulises G. Solorio, Arnold Goodridge, Leonard J. Davis, Jerry A. Willeford, Lawernce Void, Jr., Araceli Vital-Trvino, Roberto J. Abella, Cheryl L. Fair, Cecilia M. Melchor, Eduardo Saucedo, Richard Culpepper, Fidel D. Reyes, Scott R. Masters, Brenntt Robert Streetman, Juan Lopez, Juan Molinar, Laura J. Burau, John H. Wilkes, Michael Branch, Jaine J. Garcia, Juan A. Muniz Cardona, Sandra J. Holt, Mark D. Rodrigez, Mark Cozine, Datza Valcarcel* (Attachments: # 1 consent to sue# 2 consent to sue# 3 consent to sue# 4 consent to sue# 5 consent to sue# 6 consent to sue# 7 consent to sue# 8 consent to sue# 9 consent to sue)(Sweeney, Michael) (Entered: 07/17/2006) |
| 07/18/2006 | 67 | NOTICE, filed by ARTURO MORENO, JR (Attachments: # 1 Consent to Sue# 2 Consent to Sue)(Sweeney, Michael) (Entered: 07/18/2006) |
| 07/19/2006 | 68 | ORDER granting 65 Motion for Extension of Time for Defendant to Respond to Plaintiffs' Discovery Requests.**Notice of Compliance due by 8/4/2006.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 07/19/2006) |
| 08/04/2006 | 69 | NOTICE, filed by USA re 68 Order on Motion for Extension of Time to File *DEFENDANT'S NOTICE OF COMPLIANCE* (Pease, Jeffrey) (Entered: 08/04/2006) |
| 08/11/2006 | 70 | MOTION TO FILE CONSENTS TO JOIN PLAINTIFFS OUT OF TIME, filed by ARTURO MORENO, JR.**Response due by 8/28/2006.** (Attachments: # 1 Consent to sues of Ceceli M. Hill, Claude Hendrick Lee, Douglas W. Bates, Victore Araujo, Rosa E. Rivas, John Costello, Joey S.Loeffler, Angelia Chavis, Richard Holicki, Linnea Stuart, Rudy |

| | | |
|---|---|---|
| | | Duran, Terrance A. Hart, Lynnette Hall, Rose I. Magiera, Gwendolyn) (Sweeney, Michael) (Entered: 08/11/2006) |
| 08/21/2006 | 71 | ORDER granting 70 Motion leave to file out of time the Consent to Sue notices for 19 additional plaintiffs. Signed by Judge Nancy B. Firestone. (dpk) (Entered: 08/21/2006) |
| 08/29/2006 | 72 | NOTICE, filed by ARTURO MORENO, JR *NOTICE OF FILING OF CONSENT TO SUE of eceli M. Hill, Claude Hendrick Lee, Douglas W. Bates, Victore Araujo, Rosa E. Rivas, John Costello, Joey S.Loeffler, Angelia Chavis, Richard Holicki, Linnea Stuart, Rudy Duran, Terrance A. Hart, Lynnette Hall, Rose I. Magiera, Gwendolyn R. Moss, Jay Roberts, Susan Hrastar and Vincenza Pizzo* (Attachments: # 1)(Sweeney, Michael) (Entered: 08/29/2006) |
| 09/21/2006 | 73 | STATUS CONFERENCE ORDER: **Status Conference set for 9/28/2006 10:30 AM in Chambers (Telephonic) before Judge Nancy B. Firestone.**Signed by Judge Nancy B. Firestone. (dpk) (Entered: 09/21/2006) |
| 09/21/2006 | | Set Deadlines/Hearings: Status Conference set for 9/28/2006 10:30 AM in Chambers (Telephonic) before Judge Nancy B. Firestone. (bre,) (Entered: 09/21/2006) |
| 09/22/2006 | 74 | MOTION for Extension of Time,until 12/01/2006, to Complete Discovery, filed by ARTURO MORENO, JR.**Response due by 10/10/2006.** (Sweeney, Michael) (Entered: 09/22/2006) |
| 09/25/2006 | 75 | MOTION TO POSTPONE TELEPHONE STATUS CONFERENCE re Set Deadlines/Hearings, 73 Status Conference Order, filed by USA.**Response due by 10/12/2006.**(Pease, Jeffrey) (Entered: 09/25/2006) |
| 09/28/2006 | 76 | ORDER granting 74 Motion to extend the discovery deadline. Discovery on liability will close on Friday, December 1, 2006. Signed by Judge Nancy B. Firestone.(dpk) (Entered: 09/28/2006) |
| 09/28/2006 | 77 | ORDER granting 75 Motion postpone for one week the status conference scheduled for September 28, 2006. Defendant shall contact the court when he returns to the office in order to reschedule the status conference. Signed by Judge Nancy B. Firestone. (dw1) (Entered: 09/29/2006) |
| 10/06/2006 | 78 | STATUS CONFERENCE ORDER: **Status Conference set for 10/11/2006 02:00 PM in Chambers (Telephonic) before Judge Nancy B. Firestone.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 10/06/2006) |
| 10/06/2006 | | Set Deadlines/Hearings: Status Conference set for 10/11/2006 02:00 PM in Chambers (Telephonic) before Judge Nancy B. Firestone. (bre, ) (Entered: 10/10/2006) |
| 10/27/2006 | 79 | NOTICE, filed by USA *DEFENDANT'S NOTICE OF NEW TELEPHONE NUMBER* (Pease, Jeffrey) (Entered: 10/27/2006) |
| 11/27/2006 | 80 | Unopposed MOTION for Extension of Time,until January 15, 2006, to |

| | | |
|---|---|---|
| | | Complete Discovery *on Liability*, filed by USA.**Response due by 12/14/2006.**(Pease, Jeffrey) (Entered: 11/27/2006) |
| 11/28/2006 | 81 | ORDER granting 80 Motion for Extension of Time to Complete Discovery **Fact Discovery on Liability shall Close on 1/15/2007.** Signed by Judge Nancy B. Firestone.(dpk) (Entered: 11/28/2006) |
| 01/17/2007 | 82 | MOTION for Protective Order *(PLAINTIFFS' MOTION TO ADOPT PROTECTIVE ORDER)*, filed by ARTURO MORENO, JR.**Response due by 2/5/2007.** (Attachments: # 1 Exhibit A - Joint Stipulated Protective Order)(Sweeney, Michael) (Entered: 01/17/2007) |
| 01/19/2007 | 83 | ORDER granting 82 Motion for Protective Order Signed by Judge Nancy B. Firestone. (Attachments: # 1 Joint Stipulated Protective Order) (dpk) (Entered: 01/19/2007) |
| 01/22/2007 | 84 | STATUS CONFERENCE ORDER: **Status Conference set for 1/30/2007 02:00 PM in Chambers (Telephonic) before Judge Nancy B. Firestone.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 01/22/2007) |
| 01/26/2007 | 85 | MOTION to Compel *the Production of Documents*, filed by ARTURO MORENO, JR.**Response due by 2/12/2007.** (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M# 14 Exhibit N# 15 Exhibit O# 16 Exhibit P# 17 Exhibit Q# 18 Exhibit R# 19 Exhibit S# 20 Exhibit T# 21 Exhibit U# 22 Exhibit V# 23 Exhibit W# 24 Exhibit X# 25 Exhibit Z# 26 Exhibit Y)(Sweeney, Michael) (Entered: 01/26/2007) |
| 01/26/2007 | 86 | AFFIDAVIT re 85 MOTION to Compel *the Production of Documents* by ARTURO MORENO, JR. (Sweeney, Michael) (Entered: 01/26/2007) |
| 01/31/2007 | 87 | SCHEDULING ORDER: **Defendant's response due by 2/12/2007. Plaintiff's reply due by 2/26/2007. In addition, as an attachment to their breifs, the parties shall include a list of citations to Fair Labor Standards Act cases on the issue of willfulness.**Signed by Judge Nancy B. Firestone. (dpk) (Entered: 01/31/2007) |
| 02/06/2007 | 88 | MOTION for Extension of Time until 03/29/2007 to File Response or Reply as to 87 Scheduling Order,, 85 MOTION to Compel *the Production of Documents*, filed by USA.**Response due by 2/23/2007.**(Pittman, Mark) (Entered: 02/06/2007) |
| 02/06/2007 | 89 | RESPONSE to 87 Scheduling Order, *providing citations regarding FLSA willfulness*, filed by USA. (Pittman, Mark) (Entered: 02/06/2007) |
| 02/09/2007 | 90 | RESPONSE to 88 MOTION for Extension of Time until 03/29/2007 to File Response or Reply as to 87 Scheduling Order,, 85 MOTION to Compel *the Production of Documents*, filed by ARTURO MORENO, JR.**Reply due by 2/23/2007.** (Sweeney, Michael) (Entered: 02/09/2007) |
| 02/09/2007 | 91 | ORDER granting 88 Motion for Extension of Time to File Response/Reply **Response due by 3/29/2007.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 02/09/2007) |

| | | |
|---|---|---|
| 03/29/2007 | 92 | RESPONSE to 85 MOTION to Compel *the Production of Documents*, filed by USA.**Reply due by 4/12/2007.** (Attachments: # 1 Exhibit Defendant's Exhibit A)(Pease, Jeffrey) (Entered: 03/29/2007) |
| 04/11/2007 | 93 | NOTICE of Appearance by Maame A.F. Ewusi-Mensah for USA. (Ewusi-Mensah, Maame) (Entered: 04/11/2007) |
| 04/12/2007 | 94 | REPLY to Response to Motion re 85 MOTION to Compel *the Production of Documents*, filed by ARTURO MORENO, JR. (Attachments: # 1 Declaration of Michael J.D. Sweeney, Esq.# 2 Exhibit AA# 3 Willfulness Citations)(Sweeney, Michael) (Entered: 04/12/2007) |
| 04/30/2007 | 95 | STATUS CONFERENCE ORDER: **Status Conference set for 5/3/2007 11:00 AM in Chambers (Telephonic) before Judge Nancy B. Firestone.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 04/30/2007) |
| 05/03/2007 | | Set/Reset Transcript Deadlines: Transcript due by 5/8/2007. (vp1, ) (Entered: 05/03/2007) |
| 05/04/2007 | 96 | ORDER granting in part and denying in part 85 Motion to Compel:(1) Denied as to documents identified by the defendant as covered by attorney-client privilege; and (2)Granted for documents that remain in dispute subject to limitations discussed. Defendant shall produce documents by June 4, 2007. Plaintiff shall file a motion for partial summary judgment by July 13, 2007. Remainder of briefing schedule shall be in accordance with the Rules of the USCFC. Signed by Judge Nancy B. Firestone. (dpk) (Entered: 05/04/2007) |
| 05/04/2007 | | Set/Reset Deadlines: 1. Schedule for briefing on a partial summary judgment- plaintiff files motion for partial summary judgment brief due by 7/13/2007. 2.The government shall produce documents in dispute (requests 3(a),(d), (e), (f), (g), (h), (j), and (k) due by 6/4/2007. If unable to meeet deadline, it shall request an enlargement of time by 5/25/2007.Notice of Compliance due by 6/4/2007. (bre,) (Entered: 05/07/2007) |
| 05/08/2007 | 97 | TRANSCRIPT of Proceedings (pages 1-62) held on May 3, 2007 before Judge Nancy B. Firestone. (dw1) (Entered: 05/09/2007) |
| 05/24/2007 | 98 | First MOTION for Extension of Time,until July 19, 2007, to Complete Discovery, filed by USA.**Response due by 6/7/2007.** (Attachments: # 1 Affidavit Declaration of Maame A.F. Ewusi-Mensah# 2 Affidavit Declaration of Arthur I. Rettinger# 3 Affidavit Declaration of William R. Kraus)(Ewusi-Mensah, Maame) (Entered: 05/24/2007) |
| 05/25/2007 | 99 | SCHEDULING ORDER: **Status Conference set for 5/30/2007 01:30 PM in Chambers (Telephonic) before Judge Nancy B. Firestone.** Signed by Judge Nancy B. Firestone. (cvhj) (Entered: 05/25/2007) |
| 07/11/2007 | 100 | MOTION to Stay Briefing Schedule, filed by ARTURO MORENO, JR.**Response due by 7/30/2007.**(Sweeney, Michael) (Entered: 07/11/2007) |
| 07/16/2007 | 101 | ORDER granting 100 Motion to Stay partial summary judgment briefing until after the July 19, 2007 discovery deadline. Plaintiff shall move the |

| | | |
|---|---|---|
| | | court for a revised briefing schedule once discovery is completed. Signed by Judge Nancy B. Firestone. (dpk) (Entered: 07/16/2007) |
| 08/07/2007 | 102 | STATUS REPORT ORDER Signed by Judge Nancy B. Firestone. (cvhj) (Entered: 08/07/2007) |
| 08/22/2007 | 103 | JOINT STATUS REPORT, filed by USA. (Ewusi-Mensah, Maame) (Entered: 08/22/2007) |
| 08/24/2007 | 104 | SCHEDULING ORDER: **BRIEFING SCHEDULE on Plaintiffs' Motion to Amend Complaint: Plaintiffs' Motion due by 8/28/2007; Response due by 9/18/2007; Briefing Reply due by 9/25/2007; BRIEFING SCHEDULE on Cross-Motions: Plaintiffs' Motion due by 10/25/2007; Defendant's Cross Motions due by 11/30/2007; Plaintiffs' reply/response due by 12/28/2007; Defendant's reply due 1/18/2008.** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 08/24/2007) |
| 08/27/2007 | 105 | SCHEDULING ORDER: **AMENDING August 24, 2007 Order: Plaintiff's motion for summary judgment on liability due by 10/5/2007** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 08/27/2007) |
| 08/28/2007 | 106 | First MOTION to Amend Pleadings - Rule 15 *a*, filed by ARTURO MORENO, JR.**Response due by 9/14/2007.**(Sweeney, Michael) (Entered: 08/28/2007) |
| 09/18/2007 | 107 | RESPONSE to 106 First MOTION to Amend Pleadings - Rule 15 *a*, filed by USA.**Reply due by 10/1/2007.** (Ewusi-Mensah, Maame) (Entered: 09/18/2007) |
| 09/25/2007 | 108 | REPLY to Response to Motion re 106 First MOTION to Amend Pleadings - Rule 15 *a*, filed by ARTURO MORENO, JR. (Attachments: # 1 Exhibit) (Sweeney, Michael) (Entered: 09/25/2007) |
| 09/27/2007 | 109 | Unopposed MOTION for Extension of Time until October 12, 2007 to Plaintiffs' Motion for Summary Judgment, filed by ARTURO MORENO, JR.**Response due by 10/15/2007.**(Sweeney, Michael) (Entered: 09/27/2007) |
| 10/01/2007 | 110 | ORDER granting 109Motion for Extension of Time **Plaintiff shall file its motion for summary judgment by 10/12/2007** Signed by Judge Nancy B. Firestone. (dpk) (Entered: 10/01/2007) |
| 10/02/2007 | 111 | ORDER granting in part and denying in part 106 the plaintiffs' Motion to Amend Complaint. **Amended Complaint due by 10/12/2007.** Signed by Judge Nancy B. Firestone. (jo) (Entered: 10/02/2007) |
| 10/12/2007 | 112 | SECOND AMENDED COMPLAINT against. (Attachments: # 1 Certificate of Service)(Sweeney, Michael) (Entered: 10/12/2007) |
| 10/12/2007 | 113 | **SEALED** MOTION for Summary Judgment, filed by ARTURO MORENO, JR.**Response due by 11/13/2007.** (Attachments: # (1) Affidavit Michale J.D. Sweeney Declaration# (2) Errata Exhibit 1# (3) Exhibit Exhibit 2# (4) Exhibit Exhibit 3# (5) Exhibit Exhibit 4# (6) Exhibit Exhibit 5# (7) Exhibit Exhibit 6# (8) Exhibit Exhibit 7# (9) Exhibit Exhibit 8# (10) Exhibit Exhibit 9# (11) Exhibit Exhibit 10# (12) Exhibit Exhibit 11# (13) Exhibit Exhibit 12# (14) Exhibit Exhibit 13# (15) Exhibit Exhibit 14# |

| | | |
|---|---|---|
| | | (16) Exhibit Exhibit 15# (17) Exhibit Exhibit 16# (18) Exhibit Exhibit 17# (19) Exhibit Exhibit 18# (20) Exhibit Exhibit 20# (21) Exhibit Exhibit 20# (22) Exhibit Exhibit 21# (23) Exhibit Exhibit 22# (24) Exhibit Exhibit 23# (25) Exhibit Exhibit 24# (26) Exhibit Exhibit 25# (27) Exhibit Exhibit 26# (28) Exhibit Exhibit 27# (29) Exhibit Exhibit 28# (30) Exhibit Exhibit 29# (31) Exhibit Exhibit 30# (32) Affidavit)(Sweeney, Michael) (Entered: 10/12/2007) |
| 10/12/2007 | 114 | **SEALED**MEMORANDUM re: [113] Motion for Summary Judgment,,,, filed by ARTURO MORENO, JR. (Sweeney, Michael) (Entered: 10/12/2007) |
| 10/12/2007 | 115 | **SEALED**PROPOSED FINDINGS of Uncontroverted Fact RE: [113] MOTION for Summary Judgment, filed by ARTURO MORENO, JR. (Sweeney, Michael) (Entered: 10/12/2007) |
| 10/26/2007 | 116 | ANSWER to Amended Complaint, filed by USA.JPSR due by 12/20/2007. (Ewusi-Mensah, Maame) (Entered: 10/26/2007) |
| 11/02/2007 | 117 | Unopposed MOTION for Extension of Time until 12/28/07 to Motion for Summary Judgment Briefing Schedule, filed by USA.**Response due by 11/19/2007.**(Ewusi-Mensah, Maame) (Entered: 11/02/2007) |
| 11/02/2007 | 118 | Corrected MOTION for Extension of Time until 12/21/07 to Motion for Summary Judgment Briefing Schedule *(Unopposed)*, filed by USA.**Response due by 11/19/2007.**(Ewusi-Mensah, Maame) (Entered: 11/02/2007) |
| 11/06/2007 | 119 | ORDER granting 118 Motion for Extension of Time **Defendant's Opposition & Cross-Motion due by 12/21/2007; Plaintiffs' Response/Reply to Cross-Motions due by 1/18/2008; Defendant's Reply due by 2/8/2008** Signed by Judge Nancy B. Firestone.(dpk) (Entered: 11/06/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/16/2007 18:49:45 | | | |
| **PACER Login:** | dc4538 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cv-00142-NBF |
| **Billable Pages:** | 10 | **Cost:** | 0.80 |

GETMAN LAW OFFICE
Gets Employees Paid






# Case Information

## Moreno v. BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES and U.S.A.

Plaintiff was a former law enforcement officer assigned to six day per week training at the Federal Law Enforcement Training Center. A variety of federal agencies used the facility for six day training. The practice of the U.S. was not to pay overtime pay at the rate of time and one half for the 6 weeks of training. The case is brought as a collective action on behalf of all individuals who did not receive proper overtime pay for their weeks at the training center. Since the U.S. government paid some individuals back pay, but not an equal amount of "liquidated damages" people who have already been paid back pay may still be due an equal amount in damages. The case seeks such damages as well as back pay. The case is currently pending in the U.S. Court of Federal Claims in the District of Columbia.

## Status Reports

**Posted on Tuesday, March 8 2005 at 4:59pm**

Click here to review a copy of the plaintiff's Complaint (complaint, Moreno.pdf 42KB). Anyone who trained at the United States training facility in Glynco, GA for more than 40 hours in a week without being paid overtime can join this action by signing and submitting a "Consent to Sue". If you would like to join, contact the Getman Law Office at 845-255-9370.

Click here to review the defendant's Answer (Moreno Answer.pdf 238KB).

*last edited on Wednesday, June 7 2006 at 11:06am*

---

**Posted on Friday, May 12 2006 at 4:31pm**

This case was transferred to Judge Nancy B. Firestone on February 23, 2006. Judge Firestone severed Mr. Moreno and Mr. Porta's claims into separate actions.

On March 30, 2006, Judge Firestone granted the Plaintiff's motion to send notice of the action and the ability to join the case to similarly situated current and former employees, that is, legacy INS employees who trained at the FLETC for 6 days a week from January 1, 2002 to August 23, 2003 but were paid for only 5 days. She ordered the government to mail the notice by May 19, 2006. Click here to view a copy of the Notice (FinalNotice.pdf 73KB).

While you should receive notice in the mail if you are or were a legacy INS employees that trained at the FLETC for 6 days a week from January 1, 2002 to August 23, 2003 but were paid for only 5 days, you may not. There are many reasons mail may not arrive as intended. Nevertheless, you may still be able to join the action if we receive a completed Consent to Sue by June 16, 2006. Click here for the Consent to Sue (Consent to Sue.pdf 31KB).

---

**Posted on Monday, June 25 2007 at 12:12pm**

Notice went out to the class in this matter on May 19, 2006. 736 people have joined the action.

The Government claims that it has paid the Plaintiffs their back overtime wages plus interest since Mr. Moreno filed this claim in the U.S. District Court for the District of Columbia. (If you have already joined this action but were not paid your back overtime wages plus interest for the 6th day of training at the FLETC in Glynco, GA, please contact us using the "Contact Us" link at the bottom of this page.)

The litigation continues for liquidated damages, which are an amount equal to the back wages owed. Liquidated damages are required under the FLSA when an employer violates the Act. They are not a penalty, simply a predetermined amount to compensate for the loss of having the wages when they were due.

The current phase of the litigation, "discovery" is when the parties gather and exchange information about the case. Judge Firestone ruled that initial discovery

Complete a 3 minute on line questionnaire to see if you were unlawfully denied overtime pay. If so, you might have a claim for DOUBLE BACK PAY!



would go to the government's legal liability, that is whether or not it is required to pay liquidated damages. Once that issue is resolved, the Parties will conduct discovery on damages, that is, we will ask for information about each plaintiff's damages.

The discovery deadline for the initial discovery stage was January 15, 2007. Despite the end of discovery, the Government has still not produced all the information sought. On May 3, 2007, at the Plaintiffs' request, the Court ordered the Government to produce the information. The Government did not meet the Court-ordered deadline for producing the information. Instead, it asked the Court for additional time to produce the information. The Court granted it additional time, the extent of which is yet to be determined.

After discovery is over, the Parties will brief the Court on several legal issues. First, the Plaintiffs will ask the Court to find that the Government is liable to pay liquidated damages as required by the Fair Labor Standards Act for its failure to pay overtime wages to the Plaintiffs for their 6th day of training at the FLETC in Glynco, GA. Second, the Plaintiffs will ask the Court to apply a 3-year statute of limitations in this case because the Government knew the law required it to pay overtime, but failed to do so. Third, the Plaintiffs will ask the Court to exclude several periods of time from the statute of limitations (effectively extending it) based on the Government's actions and omissions. The amount each Plaintiff is owed will be determined once the Court rules on the legal issues.

*last edited on Monday, June 25 2007 at 12:13pm*

---

## Information Request

- [x] Please send me more information about this case.
- [ ] I worked for this defendant also. Tell me how I can join this case.

All inquiries for possible representation are treated as privileged information and will be used only to contact you for that purpose.

**Name:** (required)

**Email:** (required)

**Phone:** (required)

Request Information

Getman Law Office
9 Paradies Lane
New Paltz, NY 12561

845-255-9370
fax: 845-255-8649
Contact Us

Our Location
Employment Opportunities

Web site by Adirondack Custom Programming

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARTURO MORENO, JR., et. al., Plaintiffs, v. BUREAU OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, Defendant. | ) | Civil No. 04-0899 (PLF) |

**DECLARATION OF WAYNE COLEMAN**

1. I, Wayne Coleman, declare that I am a Senior Compensation Policy Specialist, employed by the United States Bureau of Immigration and Customs Enforcement (hereinafter ICE), United States Department of Homeland Security.
2. **OPM's Early Policy.** Since the civilian federal workforce was covered by the Fair Labor Standards Act on May 1, 1974, it has been the understanding of the various Federal Agencies that federal employees attending training that provided them with the basic skills and knowledge needed to perform their jobs were not entitled to overtime for any hours that exceeded 40 in a work week. This interpretation is based on the guidance issued by the U.S. Office of Personnel Management (OPM) in Federal Personnel Management (FPM) manual Letter #551-17, dated January 28 1981 (Attached as Exhibit 1). To the best of my knowledge this interpretation was given because the basic training did not meet the requirements outlined in 5 CFR § 551.423(a)(2). It also was consistent with long standing federal policy related to training, codified at 5 CFR § 410.402, which generally prohibits the payment of premium pay to those attending training paid for from appropriated funds.
3. The decision for trainees to attend a regularly scheduled 6th day during basic training at the Federal Law Enforcement Training Center (FLETC) at Glynco, Georgia was made by FLETC shortly after the tragic events of September 11, 2001, in order to move trainee

law enforcement employees through basic training more quickly and to enable FLETC to train more law enforcement employees in a shorter period of time. All of the federal agencies with employees in law enforcement related occupations that utilize FLETC for basic training were affected by this decision to go to a six-day training week. Based upon OPM's original guidance, employees who did not meet one of the enumerated exemptions (as set out in 5 C.F.R. §551.423) were not paid for this additional eight hours of training. Employees in entry-level training, such as Plaintiff, did not meet any of the enumerated exemptions.

4. **INS/ICE Efforts to Rectify the Situation.** On April 24, 2002, the Immigration and Naturalization Service (INS) sent a memorandum to the Department of Justice (DOJ was the parent agency for INS at that time) requesting DOJ to go forward to OPM to request an exemption from the prohibition against paying overtime in training found in 5 CFR § 410.402 for those attending training on a regularly scheduled 6th day. On July 18, 2002, the INS notified its management team that DOJ was unwilling to go forward with this request. This prevented INS from paying its employees overtime for attending a 6th day of training. These memoranda are attached as Exhibits 2 and 3.

5. **OPM's Recent Policy Reinterpretation.** In the middle of 2003, OPM provided a new interpretation of an employee's entitlement to FLSA overtime during basic training, specifically with regard to those nonexempt employees attending a regularly scheduled 6th day in a basic training week. Their interpretation was provided on their website in a question and answer format, which is undated, but was issued during the month of June 2003, to the best of my recollection (http://www.opm.gov/oca/pay/HTML/TrainQA.asp) (Exhibit 4). As I understand OPM's new position, the employees are now entitled to overtime pay for certain hours spent in basic training because of the guidance provided at 5 CFR § 551.421, which states that all regularly scheduled hours of duty are hours of work for FLSA purposes and, therefore, compensable. When such regularly scheduled hours, (e.g., a regularly scheduled 6th day of training), exceed the basic 40-hour workweek, nonexempt employees would be entitled to FLSA overtime pay during training under this new interpretation.

6. I conducted a review of the compensation policy memoranda (CPM) issued during 2003 and 2004, which were available on the OPM website. I did not find a CPM being issued

notifying agencies of this change (see http://www.opm.gov/oca/compmemo/index.asp). The CPM is the standard method for notifying federal agencies of an official change in OPM policy.

7. On August 6, 2003, ICE received authority from the Department of Homeland Security to pay FLSA overtime to legacy Immigration and Naturalization Service (INS) employees who were assigned and attended basic training on a regularly scheduled 6th day during a basic training week after January 1, 2002. Beginning with pay period 17-03 (that ran from August 24 through September 6, 2003) nonexempt ICE employees attending basic training were to be paid FLSA overtime in accordance with the new interpretation discussed in the preceding paragraph. Field timekeepers were authorized to begin coding the hours actually spent in training on a regularly scheduled 6th training day during a basic training week on August 24, 2003. A copy of the e-mail notifying management of this decision is attached as Exhibit 5.

8. Beginning on August 24, 2003, ICE compensation policy staff began to collect the names of those employees and former employees who attended training between January 1, 2002 and August 23, 2003, and to identify the number of days the employees attended sessions on a regularly scheduled 6th day of training. In addition, the compensation policy staff began working with the U.S. Department of Justice, Justice Management Division to establish a reimbursable agreement (RA) with our payroll provider [U.S. Department of Agriculture, National Finance Center (NFC), New Orleans, LA]. The compensation policy staff also reached out to the ICE Office of Budget and the ICE Office of Finance to ascertain that funds were available to make the payments for back overtime and to identify the budget account codes that NFC will charge the payments against. A decision was made early in 2004 to pay the affected employees both the amount owed for the overtime hours spent in training, and applicable interest at the standard federal rates. Interest will be paid from the date the employee worked the additional hours until the payment is made. During the week of September 13, 2004 all of these efforts were completed with the establishment of the RA with NFC. This will enable ICE to make the payments to the approximately 3,900 affected employees during pay period 7 or pay period 9 (i.e., late April or early May) of calendar year 2005. The delay in payment is caused by the end of year workload faced by the National Finance

Center (e.g., production of W2 forms) and the large number of back payments NFC has been asked to make.

9. **Total Cost of Back Overtime Payments Owed.** Based on the rough calculations performed by the compensation policy staff, the estimated cost of the back overtime payments including interest for the approximately 3,900 affected employees is over $10,000 dollars.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on 24 September 2004.**

Wayne Coleman
Senior Compensation Policy Specialist
Bureau of Immigration and Customs Enforcement
Department of Homeland Security

FPM Letter 551-17 **OBSOLETE**

Subject: Time Spent in Training as Hours of Work Under FLSA
FPM Letter 551-17

Subject: Time Spent in Training as Hours of Work Under FLSA

---

Inquiries: Compensation Group, Office of Pay and Benefits Policy, Advisory Services Unit, (202) 632-5582

Code: 551, Pay Administration under the Fair Labor Standards Act Distribution: FPM

Letter Issued: January 28, 1981

---

---

RETAIN UNTIL SUPERSEDED

---

Heads of Departments and Independent Establishments:

This FPM Letter rescinds the guidance contained in FPM Letter 551-3, August 29, 1974, dealing with the prohibition on the payment of overtime pay for a period of training for nonexempt employees under the Fair Labor Standards Act (FLSA).

Section 4109(a)(1) of title 5, United States Code, prohibits premium pay, including overtime pay, for time spent in training. In 1974, OPM determined that this prohibition applied to overtime pay under the FLSA as well. This guidance was promulgated in FPM Letter 551-3.

However, reexamination of this OPM determination in light of (1) a better understanding of the differences between title 5 and the FLSA, and (2) relevant decisions by OPM in resolving conflicts between title 5 and the FLSA since 1974, suggested that the original determination be reversed.

It has been OPM's position, endorsed by GAO, that the two laws are to be administered separately and independently, with nonexempt employees being paid under whichever law provides them the greater overtime pay benefit. Consistent with that position, we have modified our original determination to provide that time spent in training outside regular working hours is compensable as hours of work under the FLSA if certain stipulated criteria are met. These criteria are specified in section 551.423 of the regulations in Part 551 of title 5, Code of Federal Regulations.

The instructions contained in the attachment to this letter provide supplemental guidance for the treatment of time spent in training as hours of work by nonexempt employees under the FLSA.

These instructions are effective prospectively on the effective date of the final regulations for 5 CFR Part 551.

Agencies are cautioned that the regulations contained in 5 CFR 551.423 and the instructions provide in the attachment to this letter do not apply to time spent in training by employees during overtime hours under title 5. The prohibition on the payment of premium pay, including overtime pay, contained in 5 U.S.C. 4109 (a)(1) is applicable in the administration of premium pay under title 5.

Jule M. Sugarman
Deputy Director

Attachment

Attachment to FPM Letter 551-17

TIME SPENT IN TRAINING OR ATTENDING A LECTURE, MEETING, OR CONFERENCE

a. Time Spent in Training

(1) Introduction. In general, a Federal employee is paid for all time spent learning the duties and responsibilities of his or her current position. This includes any time spent by an employee in remedial training or training in revised procedures, products, or processes that is required for the continued performance of the duties of his or her current position.

Therefore, if an employee is directed to participate in such training, the training is primarily for the benefit of the agency, and the time spent in training is hours of work under FLSA. On the other hand, if an employee voluntarily attends a training program to improve his or her performance, or attends a training program to enhance his or her opportunity for reassignment to another position or advancement to a higher grade, such training is primarily for the benefit of the employee. Time spent in this type of training is not hours of work under FLSA.

(2) Exclusion of "Trainees" from Coverage under FLSA

(a) Persons who receive training for their own benefit at Federal activities or in Federal programs are "trainees", and are not employees of the Federal Government for purposes of the FLSA. The definition of "trainee" is contained in 5 CFR 551.102.

(b) The following persons are considered "trainees", and are not subject to OPM's administration of the FLSA:

(i) Persons employed by a State or local government under the Comprehensive Employment and Training Act (CETA) or Work Incentive Program (WIN);

(ii) Persons employed by a college or university under a College Work Study Program;

(iii) Student-employees assigned or attached to a government hospital primarily for training (5 CFR Part 534); and

(iv) Any other person who receives training at a Federal activity or in a Federal program under a similarly constituted program.

(3) Time Spent in Training as Hours of Work

(a) If an agency schedules an employee to attend training during regular working hours, the time spent by the employee in such training is hours of work, unless the employee's attendance is during a period of paid leave or leave without pay.

(b) Training required by the agency for the following purposes meets the criteria specified in 5 CFR 551.423 (a)(2), and the time spent in such training outside regular working hours is hours of work (see Table 1):

(i) Training to meet identified deficiencies in an employee's performance of his or her current position. Such training is designed to bring the employee's performance up to an acceptable level as determined by the agency.

(ii) Training to provide an employee the knowledge or skills to perform new duties or responsibilities required in his or her current position.

This is training in revised procedures, products, or processes so that the employee may perform the duties and responsibilities of his or her current position at an acceptable level.

(c) Training for the following purposes does not meet the criteria in 5 CFR 551.423 (a)(2), and the time spent in such training outside regular working hours is not hours of work under FLSA (see Table 1):

(i) Training to improve an employee's performance in his or her current position above an acceptable level, provided such training is undertaken with the knowledge that the employee's performance or continued retention in his or her current position will not be adversely affected by nonenrollment in the training program. This includes training at an independent school, college, or independent trade school, or training at a Federal activity which corresponds to training offered by an independent institution of learning.

(ii) Training to provide an employee with additional knowledge or skills for reassignment to another position or advancement to a higher grade.

This includes any developmental training or upward mobility training, even if such training is directed by the agency.

Note: Whether time spent in training shall be considered hours of work is a separate and independent determination under FLSA. The fact that an agency has authorized the expenditure of government funds for an employee's attendance at such training under FPM Chapter 410 has no bearing on this determination.

(4) Apprenticeship or Internship Training or Training Under the Veterans Readjustment Act. For employees engaged in an apprenticeship program or other entry level training programs, an internship program or other career related work study programs, or employees appointed under the Veterans Readjustment Act (5 CFR Part 307) time spent in productive work or performance of regular duties is hours of work.

This includes any training scheduled during an employee's regular working hours. However, any related supplemental training or preparatory time for attendance at such training which is performed outside regular working hours is not hours of work, provided no productive work is performed during such periods.

b. Preparatory Time for Training

(1) Allowance for Preparatory Time. An agency may allow employees reasonable time to prepare for their attendance at a training program, if such preparation is closely related to and is indispensable to satisfactory completion of the training program.

If an agency or training facility determines that an allowance for preparatory time is appropriate, it is good practice for employees who are scheduled to attend such training to be advised of the time allowed for preparation before commencement of the training program. They should also be advised that any additional time spent in preparation for the training program is their own time and is not worktime under the FLSA.

(2) Preparatory Time as Hours of Work. Time spent by an employee within an agency's allowance for preparatory time shall be considered hours of work, provided the requirements of 5 CFR 551.423 (c) are met (see Table 1):

(a) If an agency allows an employee preparatory time during regular working hours, such time actually spent by the employee within the allowance of preparatory time is hours of work. However, if an employee takes paid leave or leave without pay to prepare for his or her attendance at a training program, such time is not hours of work under FLSA.

(b) Preparatory time outside the employee's regular working hours is hours of work only when the purpose of the training meets the requirements of 5 CFR 551.423 (a)(2) -- i.e., the employee is directed to participate in the training and the purpose of the training is to improve the employee's performance of the duties and responsibilities of his or her current position.

Time spent by an employee for this purpose within an agency's allowance of preparatory time is hours of work. An employee may voluntarily spend additional time in preparation for training; however, such additional time in excess of the agency's allowance is not hours of work.

Note: Even though an agency may allow an employee to attend training during regular working hours, this fact alone does not make the preparatory time for attendance at the training program compensable as hours of work under FLSA. The purpose of the training must meet the requirements of 5 CFR 551.423 (a)(2) for preparatory time outside regular working hours to be considered hours of work.

c. Time Spent Attending a Lecture, Meeting, or Conference Time spent attending a lecture, meeting, or conference during regular working hours is hours of work. However, if an

employee's attendance at such an activity is during a period of paid leave or leave without pay, such time is not hours of work under FLSA.

For the time spent in attendance at such an activity outside regular working hours to be considered hours of work, the conditions specified in 5 CFR 551.423 (d)(2) must be met.

TABLE 1 IS TIME SPENT OUTSIDE REGULAR WORKING HOURS IN THE FOLLOWING ACTIVITIES HOURS OF WORK UNDER FLSA?*1

| Type of Training: | Training Time | Prep Time |
|---|---|---|
| Training to bring an employee's performance up to an acceptable level in his or her current position (see paragraph a(3)(b)(i) of this Attachment). | YES | YES*2 |
| Training to provide an employee the knowledge or skills to perform new duties or responsibilities required in his or her current position (see paragraph a(3)(b)(ii) of this Attachment). | YES | YES*2 |
| Training to improve an employee's performance above an acceptable level in his or her current position (see paragraph a(3)(c)(i) of this Attachment).*3 | NO | NO |
| Training to provide an employee additional knowledge or skills for reassignment to another position or advancement to a higher grade (see paragraph a(3)(c)(ii) of this Attachment). | NO | NO |
| Training in an apprenticeship program, an internship program, or training under the Veterans readjustment Act (see paragraph a(4) of this Attachment.*4 | NO | NO |

------------------------------------------------------------------------------

1. Time spent in training or in preparation for training during regular working hours is hours of work, unless the employee is on paid leave or leave without pay.

2. Time actually spent by an employee within an agency's allowance for preparatory time is hours of work. Any additional time spent by an employee in preparation for training is not hours of work.

3. Such training must be undertaken with the knowledge that the employee's performance or continued retention in his or her current position will not be adversely affected by nonenrollment in the training program.

4. Any period of productive work during such training shall be considered hours of work.

----------------------------------------------------------------------------------------

Attachment to FPM Letter 551-17,
TIME SPENT IN TRAINING OR ATTENDING A LECTURE, MEETING, OR CONFERENCE
Letter Issued: January 28, 1981

(b) Training required by the agency for the following purposes meets the criteria specified in 5 CFR 551.423 (a)(2), and the time spent in such training outside regular working hours is hours of work (see Table 1) [and, therefore, is compensable time]:

(i) Training to meet identified deficiencies in an employee's performance of his or her current position. Such training is designed to bring the employee's performance up to an acceptable level as determined by the agency.

(ii) Training to provide an employee the knowledge or skills to perform new duties or responsibilities required in his or her current position.

This is training in revised procedures, products, or processes so that the employee may perform the duties and responsibilities of his or her current position at an acceptable level.

(c) Training for the following purposes does **not** meet the criteria in 5 CFR 551.423 (a)(2), and the time spent in such training outside regular working hours is **not** hours of work under FLSA (see Table 1) [and, therefore, is not compensable time]:

(i) Training to improve an employee's performance in his or her current position above an acceptable level, provided such training is undertaken with the knowledge that the employee's performance or continued retention in his or her current position will not be adversely affected by nonenrollment in the training program. This includes training at an independent school, college, or independent trade school, or training at a Federal activity which corresponds to training offered by an independent institution of learning.

(ii) Training to provide an employee with additional knowledge or skills for reassignment to another position or advancement to a higher grade.

This includes any developmental training or upward mobility training, even if such training is directed by the agency.

Note: Whether time spent in training shall be considered hours of work is a separate and independent determination under FLSA. The fact that an agency has authorized the expenditure of government funds for an employee's attendance at such training under FPM Chapter 410 has no bearing on this determination.

Exhibit 2

U.S. Department of Justice
Immigration and Naturalization Service

HQHRD 100/10.4

Office of the Executive Associate Commissioner

*425 I Street NW*
*Washington, DC 20536*

APR 2 4 2002

MEMORANDUM FOR ROBERT F. DIEGELMAN
ACTING ASSISTANT ATTORNEY GENERAL
FOR ADMINISTRATION

FROM: George H. Bohlinger, III
Executive Associate Commissioner
Office of Management

SUBJECT: Overtime on the Sixth Day of Training

The purpose of this memorandum is to request you to seek an exception from the U.S. Office of Personnel Management (OPM) to the regulatory prohibition against paying overtime to employees attending basic training at the Immigration Officer Academy (IOA). We are requesting this authority retroactive to January 1, 2002.

In order to accommodate the additional training needs of various agencies in response to the events of September 11th, the Federal Law Enforcement Training Center (FLETC) mandated a 6-day week for all trainees beginning January 1, 2002. This move to a 6-day training week compresses all current class schedules at the IOA. For example, the traditional 18-week Immigration Officer Basic Training Course (IOBTC) will be shortened to 15 weeks. All other courses will be shortened as well.

For the Immigration and Naturalization Service (INS) instructors and trainees at the IOA, the scheduling of training over a 6-day workweek raises the issue of compensation for the overtime hours on the 6th day. Under the regulations governing the payment of overtime, the instructors must be paid overtime for the hours they work on the 6th day. This overtime pay will be in addition to any administratively uncontrollable overtime pay or law enforcement availability pay they may receive.

For those employees attending the training, however, this situation creates tremendous inequities. Under current OPM regulations, employees attending basic training may not be paid overtime unless one of six exceptions listed at 5 C.F.R. 410.402(b) applies, or an exception to the prohibition is granted by OPM.

Under the compressed IOBTC training schedule, trainees (principally Immigration Inspectors) are working 14 8-hour days of overtime to complete the basic Immigration Officer and Spanish training programs. Based on our hiring estimates, we anticipate training approximately 1,320 new employees through the IOBTC. We also anticipate training approximately 480 new Adjudications Officers, who will be required to work 4 8-hour days of overtime to complete the basic course; and approximately 216 Detention Enforcement Officers, who will be required to work 6 8-hour days of overtime. The employees not being paid are GS-5 and GS-7 trainees; the instructors being paid are GS-12 and GS-13 employees.

While the INS can stand behind the prohibition in the regulations to defend not paying the trainees, the resultant inequities will speak louder to our new employees and any future employees than any regulatory defense we might make. Given the number of employees we must hire to meet our hiring goals and the investments we have made in our new employees prior to basic training, we cannot afford the risk of losing new recruits because of the requirement that they put in overtime during training for no compensation.

Current OPM regulations specifically provide that an agency may seek an exception to the prohibition on payment of premium pay where circumstances warrant. The INS requests an exception be sought under this provision because we must make every effort to stay competitive in our bid to attract highly talented candidates who are also being drawn to other Federal agencies with homeland security missions.

We have determined that the majority of components at FLETC are not paying basic trainees overtime in accordance with the prohibition in the regulations. These components include the Bureau of Prisons, Bureau of Alcohol, Tobacco, and Firearms, Internal Revenue Service, Secret Service, Customs Service, and Forest Service. We have been able to confirm that three organizations are paying basic trainees overtime. The agencies are the National Park Service Park Police, the Capitol Police and the U.S. Mint.

Despite the practices of other agencies, we believe it is important to move forward with this request. INS is among the largest users of FLETC and is facing numerous challenges in filling critical border protection positions. In some cases, employees are refusing to attend training, where it is voluntary. In addition, INS has received a grievance related to this issue, to which we must respond. Given the extraordinary and exigent circumstances requiring implementation of the 6th-day of training, and the impact such demands are having on potential applicants for positions INS is mandated to fill, we believe it is critical that this effort move forward expeditiously. The estimated $3.2 million cost of the overtime is available within existing INS resources.

As a result of our concern for equity for the employees and our concern about INS' ability to attract and retain well-qualified individuals to these critical homeland security jobs, we request that you seek an exception from OPM. This exception will authorize INS to pay overtime for those employees attending a 6th day of basic training at the IOA retroactive to January 1, 2002.

**Exhibit 3**

**U.S. Department of Justice**
Immigration and Naturalization Service

HQHRB 100/10

Office of the Executive Associate Commissioner

*425 I Street NW*
*Washington, DC 20536*

JUL 18 2002

MEMORANDUM FOR THE MANAGEMENT TEAM

FROM: George H. Bohlinger, III
Executive Associate Commissioner
Office of Management

SUBJECT: Overtime Compensation for the Sixth Day of Training

We have received a reply from the Department of Justice (DOJ) responding to our request that they seek Office of Personnel Management (OPM) approval for the Immigration and Naturalization Service to pay overtime to those attending basic training at the Federal Law Enforcement Training Center (FLETC). The FLETC adopted a 6-day week for all trainees beginning January, 2002, so that they could accommodate the additional training needs of various agencies in response to the events of September 11, 2001. Under current OPM regulations, Federal employees attending basic training may not be paid overtime unless one of 6 exceptions listed at 5 C.F.R. 410.402 (b) applies, or an exemption is granted by OPM. We requested DOJ to seek an OPM exemption.

The DOJ decided not to seek OPM approval, citing strong opposition by other Department components who felt they would be forced to make additional unanticipated overtime expenditures if INS was granted this authority. Additionally, DOJ considered it to be counterproductive to adopt a policy of offering or denying such entitlements to Department employees in similar circumstances based solely on which component happens to employ them.

We regret that the response to our request on behalf of all our basic trainees was not more favorable. While we do not share DOJ's point of view in this matter, we nevertheless wanted to make you aware of the status of our request.

Questions may be directed to Mr. Phillip Seneschal, Chief, Compensation Policy, Human Resources and Development, at (202) 307-6869.

**Exhibit 4**



# QUESTIONS AND ANSWERS ON TIME SPENT IN TRAINING AS HOUR WORK FOR FLSA-COVERED EMPLOYEES

### Q1: Are employees covered by the Fair Labor Standards Act (FLSA) entitled to recei overtime pay for time spent in entry-level training on the sixth day of a 6-day traini course?

A1: FLSA-covered (nonexempt) employees are entitled to receive overtime pay for time spent in entry-level trai the sixth day of a 6-day training course under the conditions specified below.

Time spent in apprenticeship or other entry-level training **outside regular working hours** is not considere of work, provided no productive work is performed during such periods (see 5 CFR 551.423(a)(3)). However, u 5 CFR 551.423(a)(1), time spent in training **during regular working hours** is considered hours of work. Th regulations at 5 CFR 551.421 clarify that, for purposes of part 551, "regular working hours" means the days and of an employee's regularly scheduled administrative workweek established under 5 CFR part 610. The phrase "regularly scheduled administrative workweek" is defined in 5 CFR 610.102 as the period within an administra workweek within which an employee is regularly scheduled to work. Also, see the definition of "regularly sched work" in 5 CFR 610.102, which hinges on whether the work was scheduled in advance of the administrative wo

When FLSA-covered employees are scheduled in advance of the administrative workweek to attend a 6-day ent training class for a specified number of hours (e.g., 8 hours), those **regularly scheduled training hours** on sixth day are "regular working hours" and are considered hours of work for overtime pay purposes. For exampl FLSA-covered employee who is required to attend a 6-day training session at the Federal Law Enforcement Tr Center (FLETC) is entitled to overtime pay for the sixth day of training, since the employee was scheduled in a of the administrative workweek to attend the FLETC training course. Because the regularly scheduled training on the sixth day are considered to be "regular working hours" (and the training will not occur outside regular w hours), it is irrelevant that the FLETC training is entry-level training and that no productive work is being perf

Agencies are responsible for determining whether an employee is entitled to receive overtime pay for regularly scheduled training hours under the conditions specified above. Agencies may need to recompute an employee' overtime pay entitlement and provide back pay under 5 CFR part 550, subpart H, for overtime hours that occu during regularly scheduled training.

### Q2: May an employee receive compensatory time off in lieu of overtime pay for atte an extended training session or course?

A2: No. By law, compensatory time off may be approved instead of overtime pay for irregular or occasional (unscheduled) overtime hours of work. See 5 U.S.C. 5543(a). If an employee is scheduled in advance of his or h administrative workweek to attend an extended training course, such training would not be irregular or occasi (unscheduled) overtime hours. Therefore, the employee may not receive compensatory time off instead of over pay for the extended training hours. Please see OPM's fact sheet on compensatory time off for further guidance (http://www.opm.gov/oca/pay/HTML/COMP.HTM).

(Note: Employees on flexible work schedules may earn compensatory time off for regularly scheduled overtime as provided in 5 U.S.C. 6123(a)(1) and 5 CFR 550.114(b) and 551.531(b). However, employees usually are not o flexible work schedules during periods of training.)

A317
MOR 168

Office of Personnel Management
1900 E Street NW, Washington, DC 20415-1000 | (202) 606-1800 | TTY (202) 606-2532

**Site**

**Contact Us** | **Forms** | **FAQ's** | **Products & Services**

A318
MOR 169

**Exhibit 5**

## Coleman, Wayne A

**From:** Ehrbar, John J

**Sent:** Wednesday, February 04, 2004 7:46 AM

**To:** Coleman, Wayne A

**Subject:** FW: Payment for Sixth (6th) Day of Training

-----Original Message-----
**From:** Ehrbar, John J
**Sent:** Wednesday, September 03, 2003 1:29 PM
**To:** Arndt, Jill
**Cc:** Hastings, Rick; Baer, Robert K; Aira, Margie; Smalls, Alethea; Baptiste-Robinson, Eulalia; Higgins, John J; Nogami, Glenda; Waldstreicher, Sid; Lowell, Cynthia; Ellis, Karen M; Park, Steve A; Bergeron, Pauline A; Bartlett, Pamela L; Smith, Kent ; Walker, Glenda F; Hanner, Christine S; Brown, Gwen L; Adams, Denise J; Brown, Phil G; Hunn, Mindy G; Crevonis, Gary E; Tingley, Frederick W; Ehrbar, John J
**Subject:** Payment for Sixth (6th) Day of Training

On August 6, 2003, we received authority from the Department of Homeland Security (DHS) to pay Fair Labor Standards Act (FLSA) overtime to legacy Immigration and Naturalization Service (INS) students who were assigned and attended basic training for a 6th day after January 1, 2002. Effective this pay period (17-03) these employees are to be paid overtime under FLSA provisions. Retroactive payments will be processed, as discussed below.

As other DHS Bureaus have employees affected by this decision, coordination with these organizations was necessary. Through that process, the effective date of the current pay period, 17-03, August 24 through September 6, 2003 was established to start payment of the overtime on a current basis. This message serves as your authorization to do so. The overtime is to be coded into the system as TC 13/17 – FLSA Training, in the applicable week1/week2 fields.

As this is an FLSA overtime payment, the only time that may be credited is for hours actually worked. Time may not be credited for time not worked on the 6th day of basic training for employees who were excused from attending all or any part of the 6th day. The overtime credit is to be limited to hours in attendance. Absences from the scheduled class for all or any significant portion of the training day (an hour or more) may not be included in the overtime payment. For example, if a student attended the morning portion of the 6th day but was excused from the afternoon portion, he or she would only be credited with 4 hours of FLSA hours of work for that workweek.

We understand that a 6th day of basic training per week started on or shortly after January 1, 2002 and included the following occupations:

- Adjudication Officers
- Application Adjudication Officers
- Asylum Officers
- Criminal Investigators
- Deportation Officers
- Detention Enforcement Officers
- Immigration Enforcement Officers, and
- Immigration Inspectors.

Processing retroactive payments will be started as soon as possible. We will need to issue input instructions to employees and timekeepers to ensure uniform procedures are followed so that the payments are correctly computed, recorded and tracked. A specific budget/accounting designation will be established to correctly charge the payment to the proper budget. Current charges will be made to the same accounting code that covers the non-overtime hours of the student as reported on the time card.

Please provide this office with copies of the class rosters of employees eligible for retroactive overtime so

A319
MOR 170

that necessary control procedures may be established. Send them to:

Fred Tingley
Office of Human Resources Management
DHS/ICE
800 K Street NW, Room 5000
Washington, D.C. 20536.

Please ensure that necessary Federal Law Enforcement Training Center officials are informed. The Personnel Officers in the field and headquarters units are receiving copies of this message. Please refer questions to Mr. Fred Tingley at (202) 305-9865.

John J. Ehrbar
Chief, Compensation Policy Section
Office of Human Resources Management
Bureau of Immigration and Customs Enforcement

UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, JR., et al., Plaintiffs, | ) | |
| v. | ) | No. 05-142C<br>Judge Firestone |
| UNITED STATES Defendant | ) | |

**DECLARATION OF ALETHEA SMALLS**

1. I, Alethea Smalls, am a Human Resources Specialist with the Department of Homeland Security, US Customs and Border Protection (CBP).

2. I have worked at CBP for two years (beginning August 22, 2004).

3. Prior to that time, I was employed as a Human Resources Specialist with Immigration and Customs Enforcement (ICE), legacy Immigration and Naturalization Service, for 2 years (March 10, 2002 until August 21, 2004).

4. After the tragic events of September 11, 2001, the Federal Law Enforcement Training Center (FLETC) and various enforcement agencies, particularly the Immigration and Naturalization Service, made the decision for FLETC trainees to attend a regularly scheduled 6th day during basic training in order to move trainee law enforcement employees through basic training more quickly and enable FLETC to train more law enforcement employees in a shorter period of time.

5. As explained in the September 24, 2004, Declaration of Wayne Coleman, it was long-standing Federal policy (consistent with Federal Personnel Management (FPM) Letter #551-17, dated January 28, 1981, and 5 C.F.R. § 410.402, that employees undergoing such basic training were not entitled to overtime payments for any hours that exceeded 40 in a workweek.

6. In the middle of 2003, the Office of Personnel Management provided a new interpretation of an employee's entitlement to FLSA overtime during basic training, specifically with regard to those non-exempt employees attending a regularly scheduled 6th day in a basic training week.

7. On August 6, 2003, ICE received authority from the Department of Homeland Security to pay FLSA overtime to legacy INS employees who were assigned and

attended basic training on a regularly scheduled 6th day during a basic training week after January 1, 2002. Beginning with pay period 17-03 (that ran from August 24 through September 6, 2003) non-exempt ICE employees attending basic training were to be paid FLSA overtime in accordance with the new OPM interpretation.

8. As part of my responsibilities as a Human Resources Specialist, I was tasked by my ICE supervisor, John Ehrbar, Director, Compensation, to coordinate the overtime payment for employees who attended the FLETC and were required to participate in training more than 5 days in a given workweek. This included gathering trainee data from FLETC, and establishing an agreement for services with the National Finance Center.

9. Around October, 2004, ICE Human Resources employees including the Compensation Policy Branch were transferred to U.S. Customs and Border Protection. My new supervisor, Ronelle Rotterman, and I discussed how to best implement payment to those employees who worked the 6th day during training. We decided that in order to make the payments in a timely fashion and to avoid underpaying any employee, it would be in the best interest of the agency and the employee to use the highest locality rate in the nation to compensate these employees who had not been paid for the 6th day of training.

10. This decision was arrived at based on several factors. a) The timeframe established by the U.S. Department of Agriculture National Finance Center (our paying agent) to make individual determinations for each employee would have extended the payment schedule into the latter part of CY 2005. The agency felt that for the length of time that had already expired since the 6th day schedule began in 2001, the number of employees, that timeframe was not reasonable. b) The cost of providing the services was taken into account along with other significant obligation of funds. c) The agency believed that the small additional cost to the agency for using the San Francisco locality table outweighed the inconvenience to the employees if they had to wait for the time it would have taken to compute each employee's pay on an individual basis.

11. In 2003, the highest locality based payment was for San Francisco, CA.

12. At the same time that the decision was made to use the maximum possible locality pay for the ICE employees, the agency made two other significant decisions with regard to the FLSA overtime back pay.

13. The agency chose to use step 5 of the individual's grade for all employees in steps 1-5 as the standard pay schedule. Any employees who were step 6 or above were paid at their actual step level.

14. The decision was made to add interest to the payments dating from the time the money was earned until it was paid. Interest was calculated and paid in the same manner as provided under the Back Pay Act (5 U.S.C. § 5596).

15. Class rosters were gathered from FLETC, which provided the names of the students who attended the classes during the 6th day training period. These rosters were used to compile a list of employees for payment of overtime on the 6th day.

16. As part of the process, the list created from the rosters was verified by Jill Arndt at FLETC to determine the length of time students attended the training. The completed list was then sent to the National Finance Center for payment of the calculated amount plus interest.

17. Approximately 3,900 employees were paid by these methods on or about December 7, 2004.

18. After these employees were paid, we received notice that there were other employees who were not on the original list who were not paid.

19. After researching ourselves and responding to particular requests from employees, up to an additional 300 employees were paid by June 2005.

20. As of the date of this Declaration, I am aware of only two employees who have not received full payment for the 6th day of training. One of these employees attended two training classes and received an initial payment for only one class. Her payment for the second class is pending. She will also receive additional interest to compensate her for the delay in payment. The other employee notified us late. FLETC verified the training dates for this employee and his payment is pending as well.

21. To the best of my knowledge, the Government has attempted to make payment for the 6th day of training (plus interest) to all employees who are possible plaintiffs in this action, whether or not they have joined in the action. I do note that some trainees moved and/or left the Government and their checks have been returned to the National Finance Center.

22. Based on the above, I believe that all employees who are possible plaintiffs in this action who were eligible to be paid for the 6th day of basic training have been paid or that their pay is pending, with the exception of those who could not be located.

The above information is true and correct to the best of my information, knowledge, and belief.

August 4, 2006

Althea Smalls
ALETHEA SMALLS

VICKI L. DRAPER

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - -x

ARTURO MORENO, JR., :

et al., : Civil Number

Plaintiffs, : 04-0899 (PLF)

vs. :

BUREAU OF U.S. :

CITIZENSHIP AND :

IMMIGRATION SERVICES, :

DEPARTMENT OF HOMELAND :

SECURITY, :

Defendant. :

- - - - - - - - - - - - -x

DEPOSITION OF VICKI L. DRAPER

Washington, DC

Thursday, November 30, 2006

REPORTED BY:

VICTORIA L. WILSON

VICKI L. DRAPER

Deposition of VICKI L. DRAPER, called for examination pursuant to agreement of counsel, on Thursday, November 30, 2006, in Washington, DC, at the United States Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., at 9:06 a.m., before VICTORIA L. WILSON, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

MICHAEL J.D. SWEENEY, ESQ.
Getman Law Office
9 Paradies Lane
New Paltz, New York 12561
(845) 255-9370
MSweeney@getmanlaw.com
On behalf of Plaintiffs

-- continued --





VICKI L. DRAPER

APPEARANCES: (Continued)

WILLIAM P. RAYEL, ESQ.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W., Room 12018
Washington, DC 20005
(202) 353-7991
jeffrey.pease@usdoj.gov
On behalf of the United States

MELANIE J. WATSON, ESQ.
U.S. Office of Personnel Management
Office of the General Counsel
1900 E Street, N.W., Room 7545
Washington, DC 20415
(202) 606-2079
mjwatson@opm.gov
On behalf of the U.S. Office of Personnel Management and the Witness

-- continued --





VICKI L. DRAPER

APPEARANCES: (Continued)

ARTHUR I. RETTINGER, ESQ.
Office of Chief Counsel
U.S. Customs and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, N.W., Suite 4.4-B
Washington, DC 20229
(202) 344-2978
arthur.rettinger@dhs.gov
On behalf of the U.S. Customs and Border Protection





VICKI L. DRAPER

P R O C E E D I N G S

Whereupon,

VICKI L. DRAPER

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SWEENEY:

**Q Good morning, Ms. Draper. Would you state your name and your business address for the record, please?**
A Okay. It is Vicki L. Draper, 1900 E Street, Northwest, Washington, D.C. 20415.
**Q And that was your business address. And what is the organization that you work for?**
A I'm sorry. The Office of Personnel Management.
**Q I want to introduce myself. My name is Mike Sweeney. I'm an attorney and I represent a group of plaintiffs in this case, which is Porta and Barth versus the United States.**
**Have you ever been deposed before?**
A No, I have not.
**Q Okay. So let me explain some stuff just so you have an understanding of what's going to go**

VICKI L. DRAPER

A Correct.

Q Okay. And if Mr. Green's office responded to the memo in kind with another memo, would that memo go into that file, as well?

A Yes.

Q Okay. So we were talking about historical documents and you had talked about previous letters from OPM or the Civil Service --

A Civil Service Commission.

Q Civil Service Commission?

A Uh-huh.

Q And also these written memos that might go back and forth between your office and the legal department.

A Right.

Q Those would be in there, as well; right?

A Yes.

Q And those would be historical documents that you could refer to?

A Correct.

Q Any other historical documents that you could use in developing your guidance?

A No.

Q If you had previously sought advice in an





VICKI L. DRAPER

e-mail and advice came back, you had sought advice from Mr. Green's office in an e-mail and they e-mailed you back, would that e-mail go into that filing cabinet?

A It may or it may just stay with the specialist who is working the case. In my case, I have separate files in my office that I maintain.

Q Okay. And when that case is done, you resolve whatever the case is, what happens to that file?

A I keep it.

Q Okay. So the e-mail -- and do you keep in that file any e-mails that you get from Mr. Green's office --

A Yes. Yes.

Q -- with respect to the issue?

A Yes.

Q And when do you pass those e-mails -- what's the criteria for whether or not you pass those e-mails from your file to the more general filing system?

A That would never happen.

Q Okay. So the filing cabinets that we talked about that have these historical documents in





VICKI L. DRAPER

there would not have your e-mails in them; is that right?

A That's correct. They are only for letters and memos.

Q Only for letters and memos?

A Correct.

Q And are the CPMs kept in there, too?

A We have a separate file just for CPMs.

Q Okay. And what about the Q and As that are posted on the Web site, are they -- hard copies kept in the file?

A No.

Q And if a Q and A -- well, what about the fact sheets that are kept on the Web site, are those kept in that file?

A No.

Q Okay. Are the Q and As kept anywhere other than on the Web site?

A No.

Q And if a Q and A changes, does OPM keep a historical copy of the previous Q and A?

A Not to my knowledge.

Q Okay. And if a fact sheet changes, does OPM keep a historical copy of the prior fact sheet?





VICKI L. DRAPER

A No.

Q So I want to recap here a minute. So I think what you testified to is that if someone called you or e-mailed you seeking advice, someone from an agency, you would do some research in the CFR -- you would do some research, and you had available to you, if you thought you needed to go there, the CFR, the statute, Title 5, the historical documents, you could ask the attorneys for guidance. Any other resources that you had in doing that research to develop guidance?

A The former FPM guidance --

Q Okay.

A -- that has now been sunset.

Q And would you explain to me what the former FPM guidance is?

A Okay. OPM used to publish Federal Personnel Manuals and Federal Personnel Bulletins prior to 1994 and they helped agencies understand the regulations. They were -- it is additional guidance to assist agencies in implementing OPM's regulations and they were written in plain English, they were very easy to understand, unlike the regulations in some cases, but they were all sunset

VICKI L. DRAPER

function; is that right?
A It is writing the policy, the regulations themselves.
Q And are the regulations binding on the various agencies?
A Yes.
Q So when you draft a regulation, you are drafting binding authority --
A Correct.
Q -- on the agencies?
A Correct.
Q Agencies are required to follow that; is that correct?
A Correct, if they are covered by Title 5.
Q Okay. What I would like to do now is go -- do you understand that this case has to do with claims regarding overtime payments --
MR. RAYEL: Objection; legal conclusion.
BY MR. SWEENEY:
Q -- for the sixth day of training during a week at the FLETC?
MR. RAYEL: Objection; legal conclusion.
THE WITNESS: Yes.
BY MR. SWEENEY:





VICKI L. DRAPER

Q Okay. What I would like to do now is walk through the process of discussing how any OPM guidance on that issue was developed. I have some documents that I think will help. But I think probably a lot of it took place in other ways that, hopefully, you will be able to talk about.
The first thing I would like to ask is do you know if anyone solicited advice from OPM regarding the obligation to pay overtime on the sixth day of basic training of FLETC?
A Yes.
Q And do you understand that at some point, the FLETC began implementing a six-day-a-week training schedule for basic training?
A Yes.
Q And do you know when that began?
A I don't know.
Q Do you have an idea when it began?
A I believe it began early in 2002.
Q And, again, did OPM receive a request for guidance on how they should pay for that sixth day of training a week?
A Yes.
Q And do you remember when OPM first





VICKI L. DRAPER

received a request for guidance on that?
A January 2002.
Q And do you know who that request came from?
A Gary Wilson from the Forest Service.
Q And do you know who that request came to at OPM?
A It came to our office.
Q And when you say, "came to our office," did --
A It was a phone call. He called.
Q Do you know who he called?
A He ended up talking to me.
Q And do you remember how the conversation went?
MR. RAYEL: Objection; vague.
THE WITNESS: Not verbatim. That was a little while ago.
BY MR. SWEENEY:
Q I appreciate that was a little while ago. Your best recollection as to how that conversation went?
A He asked if the sixth day of training constituted hours of work and whether or not they





VICKI L. DRAPER

were obligated to pay overtime pay.
Q And did he send anything in writing to you on the issue?
A No.
Q Just a telephone call?
A Right.
Q And that was in January of 2002?
A Correct.
Q And did you respond to him in that telephone call, that first telephone call?
A Not immediately, no.
Q What did you say to him in that first telephone call?
A I told him I wanted to read the regulations and that I would get back to him.
Q And what, in fact, did you do after that telephone call?
A I researched in Part 551 and read the regulations that were relevant to that issue.
Q Do you remember what regulations you read?
A 5 CFR 551.423(a)(3).
Q Any others?
A No.
Q This may be a surprise to you but I have a

VICKI L. DRAPER

copy of 551.423(a) I would like to show you and this has already been marked as Plaintiff's Exhibit 1.

(Witness reviewed the document.)

Q Is this the regulation that you reviewed after the conversation with Mr. Wilson?

A Correct; yes, it is.

Q Okay. And is the only part that you reviewed here 551.423(a)(3)?

A Yes.

Q You did not review (a)(1); is that right?

A Well, I read the entire thing but since he said it was entry level training, (a)(3) was applicable.

Q Okay. But did you review the entire 423(a) section?

A Yes.

Q Okay. Do you know if you reviewed the (b) and (c) sections, as well?

A I don't recall that I did.

Q And if you look at 423(a)(3), it references the Veterans Readjustment Act, 5 CFR Part 307. Did you review that in response to Mr. Wilson's call?

A No, because this was not training under





VICKI L. DRAPER

the VRA.

Q Okay.

A So it was not relevant.

Q It also references Section 410.402(b). Did you review that section?

A Yes, I did.

Q Okay. And what does that section refer to?

A That section refers to the exceptions for paying premium pay, including overtime, during training, while employees are in training.

Q But those exceptions are not under the Fair Labor Standards Act, are they?

A No. They are under Title 5.

Q Which is the --

A Which is --

Q Do you know the name of that statute? Is it the Federal Pay and Leave statute?

A Oh, that's the old name for it. FEPA, Federal Employees Pay Act.

Q Okay. So regulation 410.402(b) is an implementation of FEPA; is that correct?

A Correct.

Q It also references here Section 551.401.





VICKI L. DRAPER

Did you review that section when you reviewed (a)(3)?

A I don't recall.

Q Do you know what 551.401 refers to?

A I don't recall.

Q Did you refer to any other documents or resources in response to Mr. Wilson's call?

A I don't recall that I did, no.

Q Do you know if you looked at the statute, Title 5?

A No.

Q Do you know if you looked at the Fair Labor Standards Act?

A No.

Q Do you know if you looked in the filing cabinet for any historical documents with respect to this Section 551?

A No.

Q Do you know if you spoke to anyone else for advice on the issue?

A I believe I did speak with Jo Ann Perrini and Bryce Baker, yes.

Q And how long after Mr. Wilson's call did you speak with Jo Ann Perrini and Bryce Baker?





VICKI L. DRAPER

A That afternoon.

Q Okay. And who did you speak to first?

A I don't remember.

Q And did you speak to Ms. Perrini and Mr. Baker after you had reviewed this regulation section?

A Yes.

Q Were you involved in drafting this regulation?

A No. No.

Q Do you know if Mr. Baker was involved in drafting the regulation?

A Not to my knowledge, no.

Q Do you know if Ms. Perrini was involved in drafting --

A Not to my knowledge.

Q And do you remember the gravamen of what you said to Ms. Perrini?

A I said to her that I didn't believe that it was hours of work under the FLSA, our regulations, and that the only way they could pay overtime pay was to get an exception under 410.402.

Q What did Mr. Wilson explain to you was the situation with respect to the basic training?

VICKI L. DRAPER

MR. RAYEL: Objection; vague.

THE WITNESS: I really don't recall. He just told me it was entry level training, that FLETC had initiated a sixth day of training to escalate the entire training process after 9/11.

BY MR. SWEENEY:

**Q And did he tell you that the sixth day of training was a regularly scheduled day of training?**

A He did not, no.

**Q Did he tell you that the sixth day of training -- based on the conversation with Mr. Wilson, was it your understanding that the sixth day of training was a regularly scheduled day of training?**

A No.

**Q What was your understanding about the sixth day of training after your conversation with Mr. Wilson?**

A That it was outside regular working hours.

**Q And why did you come to that conclusion?**

A Because they weren't scheduled to work six days in their normal work schedule.

**Q And what was their normal work schedule?**

A Five days a week.





VICKI L. DRAPER

**Q And why did you think their normal work schedule was five days a week?**

A He told me they were full-time employees, which would mean they work 40 hours a week.

**Q And did he tell you that during the training at FLETC, they were scheduled to work six days a week?**

A Well, they weren't working. That's the difference. They were in training.

**Q Did he tell you that during basic training at FLETC, that they were scheduled to train for six days a week?**

A Yes.

**Q And was it your understanding that they would train for six days a week each week that they were at FLETC?**

A Yes.

**Q And what was your understanding about how many weeks they would be doing basic training at FLETC?**

A I don't recall.

**Q Did you understand it to be a single week?**

A Oh, no.

**Q Understood it to be more than that?**





VICKI L. DRAPER

A Multiple weeks but I don't remember the exact number.

**Q Do you know if you understood it to be more than ten weeks?**

A I don't recall.

**Q But it was your understanding at that time that the employees were scheduled to perform basic training for six days a week before the training began; is that right?**

A Yes.

**Q Okay. To bring this back to when you spoke to Ms. Perrini and the gravamen of your discussion with her, did you tell her what your interpretation of the regulations were?**

A Yes.

**Q And what did you tell her?**

A I told her that I believed that unless they got an exception, they would not be able to pay the overtime for the sixth day.

**Q And, again, why was that?**

A Because it was training, basic training, entry level training, no productive work was being performed, and it was outside their regular work hours.





VICKI L. DRAPER

**Q Okay. And if we look at 551.423(a)(3), it talks about not paying overtime -- I'm sorry -- it talks about work outside the regular working hours shall not be considered hours worked; is that right?**

A Correct.

**Q Do you understand that term "regular working hours" to have a specific meaning?**

A I do now.

MR. RAYEL: Objection; legal conclusion.

THE WITNESS: I do now.

BY MR. SWEENEY:

**Q Did you at the time --**

A No.

**Q -- Mr. Wilson called?**

A No.

**Q Did you at that time do any research into the regulations to determine whether "regular working hours" had a special meaning?**

A No.

**Q Did you look into the regulations to see if "regular working hours" was defined?**

A No.

**Q And you said you have a different understanding now; is that right?**

VICKI L. DRAPER

A Right.

**Q What's your understanding now?**

A That it does constitute regular working hours if it is scheduled in advance of the administrative work week.

**Q And how did you come to that understanding?**

A Actually, it was Mr. Baker's realization.

**Q Okay. And do you know how he came to that realization?**

A He was reviewing Part 551 for a complete rewrite and he happened to realize that in 551.421, "regular working hours" was defined.

**Q And how is it defined?**

A I believe it is defined to mean -- it is part of your regular working hours if the hours are scheduled in advance of the administrative work week, the employee's administrative work week.

**Q And was that a regulation, 421, in effect in January 1st of 2002?**

A Yes.

**Q So if "regular working hours" was defined in the regulations at that time, how did you miss it?**





VICKI L. DRAPER

MR. RAYEL: Objection; argumentative.

BY MR. SWEENEY:

**Q Well, let me ask you this: Did you miss the definition of "regular working hours"?**

A I didn't miss it because it had been OPM's long-standing interpretation that any hours outside the 40-hour work week for entry level training was not part of their regular work schedule. It was outside the regular work hours.

**Q And --**

A That had been a long-standing interpretation.

**Q And how did you find out about that long-standing interpretation?**

A The old FPM letters.

**Q Okay. And which old FPM letter states that?**

A I believe it is 551-17.

**Q Surprise you again. I'm going to ask you to take a look at a document that's been designated as Plaintiff's Exhibit 2 in this matter and I'm going to ask you to go back to the fifth page. And is this --**

A Exhibit 1?





VICKI L. DRAPER

**Q Is this the FPM letter that you are referring to?**

A Yes, it is.

**Q Can you show me in this letter where it says that regular working hours are limited to 40 hours?**

A Not verbatim, no. It is not going to be spelled out in plain English like that.

**Q But it was spelled out in the regulations, though, wasn't it, that regular working hours includes any regularly scheduled hours even if they are over 40; is that right?**

A Well, it actually says that it is hours of work as scheduled under Part 610, and then you have to go to part 610 of the CFR and that's where it says that it is regularly scheduled work, and "regularly scheduled work" is defined in Part 610 to mean work that is scheduled in advance of the administrative work week.

**Q That's right. I think that's right. And, in fact, if you look at 610, also includes a specific reference to plus the period of regular overtime work, if any, required of each employee.**

A But this wasn't work. This was training.





VICKI L. DRAPER

See, the difference is training as opposed to work. These employees were not working, they were in training. They were producing no productive products, no productive work products. That's the difference.

**Q And does OPM define "work" to exclude training anywhere?**

MR. RAYEL: Objection; legal conclusion.

THE WITNESS: I think 551.423(a)(3), "provided no productive work is performed during such periods." If you are in training, you are not doing productive work; you are receiving training.

BY MR. SWEENEY:

**Q Okay. And where it says there that -- in (a)(3), it refers to "outside the regular working hours shall not be" -- I'm sorry -- it says, "Time spent outside regular working hours shall not be considered hours of work provided no productive work is performed"; is that right?**

A Right.

**Q Is it your understanding that productive work is part of the definition of regular working hours?**

MR. RAYEL: Objection; legal conclusion.

VICKI L. DRAPER

THE WITNESS: No, the difference is -- I'm trying to differentiate work from training, from receiving training.

BY MR. SWEENEY:

Q Okay. So, just want to be clear. After you had the conversation, the initial conversation with Mr. Wilson, you didn't look at the regulation 551.421, did you?

A I did not.

Q Did you look at the regulation 5 CFR 610.111?

A I did not.

Q Okay. So you didn't look to the regulations for a definition of "regular working hours"; is that right?

A No, I did not.

Q Okay. You relied on what you understood to be the regular interpretation.

A Correct.

Q And you believed that that regular interpretation is laid out in FPM letter 551.17; is that right?

A Dash 17.

Q Dash 17. Thank you. Is that right?





VICKI L. DRAPER

A Yes.

Q But 551-17 doesn't specifically say that regular working hours are limited to 40 hours; is that right?

A Does not.

Q Does it give a definition of "regular working hours"?

A It does not.

Q Okay. Is there anywhere else that you relied upon for the interpretation that regular working hours was limited to 40 hours in a week?

A No.

Q So this is the only document that you relied on; is that right?

A The CFR. I relied on the CFR.

Q And when you say, "the CFR," you mean Section 5 --

A The Code of Federal --

Q -- Section 551.423; is that right?

A (A)(3).

Q (A)(3).

A Correct.

Q And when you were looking at that and you were looking at the term "regular working hours," I





VICKI L. DRAPER

believe you said that you relied on a long-standing OPM interpretation that regular working hours were limited to 40 hours; is that right?

A No. I think you might have misunderstood me. What I meant was the long-standing interpretation was that for employees in training in excess of 40 hours in the week, unless productive work was being performed or an exception was granted under Part 410, those hours do not constitute hours of work for overtime pay purposes, if it is entry level training, which is what this was.

Q And I believe you said that for that interpretation, you relied on FPM letter 551-117; is that right?

A I didn't rely on it, no. I relied on the CFR.

Q Okay. Well, I'm trying to figure out how you came up with that interpretation of "regular working hours."

A I didn't come up with it.

Q Who did?

A Bryce Baker.

Q Okay. So did you ask Mr. Baker what "regular working hours" mean?





VICKI L. DRAPER

A No. We discussed this issue. As I said, I went to Ms. Perrini and Mr. Baker when Mr. Wilson called and we discussed the issue and we all decided that an exception would be their best way to go, and then, subsequently, Mr. Baker was reviewing the entire Part 551, it was just a matter of, like, a week later, I believe, or two weeks later. I can't remember the exact time frame.

Q I want to make sure we are straight here. Before you went to Ms. Perrini and Mr. Baker, it was your opinion that the people that performed basic training for six days of work a week at FLETC were not entitled to overtime pay for the sixth day of work; is that correct?

A Correct.

Q Sixth day of training?

A Sixth day of training; correct.

Q Is that correct?

A Correct.

Q And in formulating that opinion, you used an interpretation of (a)(3)?

A Correct.

Q Of the term "regular working hours"; is that right?

VICKI L. DRAPER

A No.

Q Okay. So what is it that you were interpreting in (a)(3) that limited the amount of pay to 40 hours?

MR. RAYEL: Objection; legal conclusion.

THE WITNESS: It was entry level training --

BY MR. SWEENEY:

Q Okay.

A -- no productive work was performed --

Q And --

A -- and it was outside their regular working hours.

Q And why are you saying no productive work was performed?

A Because they were receiving training.

Q And training is not -- required training is not productive work?

A Correct.

Q And why do you believe it is not productive work? The people are required to be there, aren't they?

A They are required to be there.

Q They are required to do certain things,





VICKI L. DRAPER

aren't they?

A I don't know.

Q They are required to read things?

A I don't know.

Q Required to do certain training activities?

A I'm not a training expert so I really don't know.

Q Well, if you don't know what they are doing, then why do you think that they were not doing any productive work?

MR. RAYEL: Objection; argumentative.

THE WITNESS: Typically, when you are in training, you are not performing productive work.

BY MR. SWEENEY:

Q But you didn't know what these guys were doing; is that right?

A No.

Q Why did you believe that training was not productive work?

A Because, typically, it is not productive work.

Q Is there a definition in the Code of Federal Regulations for "productive work"?





VICKI L. DRAPER

A No.

Q Is there a definition that OPM uses for "productive work"?

A The training people may. I don't know.

Q Okay. So when you took the position that training was not productive work, was it your understanding that that was OPM's position?

A Yes.

Q And where did you get that understanding?

A From this regulation.

Q And, again, explain to me from this regulation where it says that training is not productive work.

MR. RAYEL: Objection; asked and answered.

THE WITNESS: It doesn't say that.

BY MR. SWEENEY:

Q So explain to me then the process that you went through in deciding that training was not productive work.

A I think it is a long-standing interpretation that when you are in training, you are not performing productive work; you are receiving instruction, you are not performing work.

Q I appreciate that. And what I am trying





VICKI L. DRAPER

to figure out is where you got the long-standing interpretation. Is it written down somewhere? Did somebody tell you that? How did you develop that belief that it was a long-standing OPM interpretation that training was not productive work?

MR. RAYEL: Objection; compound.

THE WITNESS: It is not written down, to my knowledge, just passed down through the years in my training.

BY MR. SWEENEY:

Q Okay. And did someone tell you that?

A I don't recall. They may -- they probably did.

Q Okay. So people may have told you during your work with OPM that training was not productive work; is that right?

A I don't recall.

Q Okay. But you don't know of any written OPM policy or guidance that says training is not productive work; is that right?

A I'm not aware of any.

Q So what was it that gave you the idea that it was a long-standing OPM interpretation that

VICKI L. DRAPER

**training was not productive work?**

A The fact that it is written in this regulation. Entry level training when no productive work is performed outside regular working hours is not hours of work.

**Q So you went to Mr. Bryce?**

A No, Mr. Baker.

**Q Mr. Baker. I'm sorry. Bryce Baker.**

A And Ms. Perrini.

**Q And Ms. Perrini?**

A Yes.

**Q Did you go to them together?**

A Yes.

**Q Okay. And you presented Mr. Wilson's request for guidance; is that correct?**

A Yes.

**Q And you also gave them your opinion; is that right?**

A Yes.

**Q And how did they respond?**

A I don't recall exactly. I believe that we all agreed that the only way to pay the sixth day of training would be to get an exception. I do recall that, that the ultimate outcome of the conversation





VICKI L. DRAPER

was that we were in agreement.

**Q Do you know if you discussed the meaning of the term "regular working hours"?**

A We did not.

**Q Do you know if you discussed whether or not training constituted productive work?**

A We did not.

**Q Do you know if you discussed 551.423(a)(1)?**

A No, we did not.

**Q Why did you go to Ms. Perrini and Mr. Baker?**

A Because I wanted to be sure before I gave advice to an agency that it was correct --

**Q If --**

A -- or that they agreed.

**Q If you had to ensure that your advice was correct, would you have gone to Ms. Perrini and Mr. Baker?**

A No.

**Q So is it fair to say there was some concern on your part that you may not have gotten it right?**

A Yes.





VICKI L. DRAPER

**Q So you went to them for confirmation that you had gotten it right; is that right?**

A Right. And I was new to OPM so I wanted to be sure.

**Q When did you start at OPM?**

A December 1st, 2001, so I had only been there about one month.

**Q Okay. And do you know if Ms. Perrini or Mr. Baker discussed this issue with anyone else?**

A I don't know.

**Q Okay. And so you had this meeting with Ms. Perrini and Mr. Baker and there was general agreement that the interpretation was that FLSA overtime was not due for that sixth day of training; is that right?**

A Right, unless they got the exception under Part 410.

**Q And at that point had Mr. Wilson indicated that they had gotten an exception under 410?**

A No.

**Q What did you do after that?**

A I called Mr. Wilson back.

**Q And what did you tell him?**

A I told him that it did not constitute





VICKI L. DRAPER

hours of work and that the agency would have to get an exception to pay it.

**Q And what was his response to you?**

A I don't recall.

**Q Was any of this in writing?**

A No.

**Q Did you take any notes while you were doing the research on the issue?**

A No.

**Q Did you take any notes of your meeting with Ms. Perrini and Mr. Baker?**

A No.

**Q And that was early January of 2002; is that right?**

A Correct.

**Q Do you remember ever getting any other request for guidance on this issue?**

A Not to me directly but I know that our office did.

**Q Okay. And do you remember when the next request for guidance came?**

A Not exactly, no.

**Q Do you remember who that request for guidance went to?**

VICKI L. DRAPER

A In our office?

**Q Yes.**

A Oh. No, I don't recall.

**Q Do you know what the guidance was that was given in response to that request?**

A It was the same guidance we gave to Mr. Wilson.

**Q And do you know what agency that guidance was?**

A State Department.

**Q And do you know the general time frame as to when that guidance went out?**

A I don't remember. I don't recall.

**Q And were you consulted?**

A No.

**Q Do you know of any other agencies that requested guidance on the issue?**

A I don't recall any others.

**Q At the time of Mr. Wilson's call, did you know that other agencies had people at FLETC going through a sixth day a week basic training?**

A No.

**Q Did you ask Mr. Wilson whether the sixth day a week schedule was a FLETC imposed or whether**





VICKI L. DRAPER

**it was a Forest Service?**

A He told me it was FLETC imposed.

**Q So was it your understanding that all the groups that were doing basic training at FLETC were going to a sixth day a week training?**

A All the law enforcement officers, yes.

**Q So was it your understanding that people from organizations other than the Forest Service were going through the sixth day a week training at the FLETC?**

A Yes.

**Q Did you do any research as to how the other agencies that were sending people for the sixth day a week training at FLETC were compensating?**

A No.

**Q Do you know if any other organizations that were sending people to FLETC for basic training were actually paying overtime for the sixth day of work?**

A I don't know.

**Q Did you know at the time?**

A No.

**Q Do you know now?**





VICKI L. DRAPER

A I believe they are paying it but I don't know.

**Q Do you know as you sit here today if during that period, January of 2002, there were other organizations that were paying their employees overtime for the sixth day of basic training at FLETC?**

A I did not know that and I don't know.

**Q Do you know if the State Department's request for guidance was a written request?**

A I don't know. No, I'm not sure.

**Q And you don't know who it went to?**

A I don't recall.

MR. SWEENEY: Okay. We have made a request for OPM documents with respect to any request for guidance on this issue, so if there are any documents that had to do with guidance on this issue from the State Department -- certainly Ms. Draper has testified that there are no documents with respect to Mr. Wilson's request --

THE WITNESS: Right.

MR. SWEENEY: -- but for the State Department request, those are documents that we would expect production of, indeed, have requested





VICKI L. DRAPER

the production of. If you are not going to produce them, please tell us. If they don't exist, please tell us. If you are going to raise an objection to them, please tell us that, too. We think that they are relevant and would like to get ironed out any problems with the production of them as quickly as possible.

And, again, that same instruction; if you would mark on the transcript where these requests are made.

While we are at it, I would also request any documents in the filing cabinet that Ms. Draper described that have historical documents for the OPM. I think there were CPM memos and letters from -- Civil Service Commission letters, right, were kept in those files.

BY MR. SWEENEY:

**Q What do you call those files?**

A Subject matter files.

**Q Subject matter files.**

A Uh-huh.

MR. SWEENEY: Okay. I would ask the production of any documents in the subject matter files that have to do with Part -- Section 551.423,

**VICKI L. DRAPER**

A I don't know.

**Q Conferences in the trainings?**

A I don't know.

**Q Well, if you didn't know, why did you rule out 551.423(d)(2)?**

A Because in my experience in interpreting this regulation, entry level training is addressed specifically in (a)(3) and we use that paragraph. This is for individuals who are attending a lecture, a meeting, or a conference. Doesn't specifically say, "while in entry level training." If it meant it to cover that, I think it would have said that.

MR. SWEENEY: That's all the questions I have.

MR. RAYEL: Okay.

MR. SWEENEY: Thank you, Ms. Draper, for coming.

THE WITNESS: You are welcome.

(Whereupon, at 2:23 p.m., the deposition was concluded.)





VICKI L. DRAPER

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X

Notary Public

My commission expires:





VICKI L. DRAPER

C O N T E N T S


| WITNESS | EXAMINATION |
|---|---|
| VICKI L. DRAPER | |
| by Mr. Sweeney | 5, 202 |
| by Mr. Rayel | 205 |


E X H I B I T S


| PLAINTIFFS' DEPOSITION EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| Exhibit 23 - 12/18/02 e-mail chain | 126 |
| Exhibit 24 - 5/13/03 e-mail chain | 155 |
| Exhibit 25 - 6/24/03 e-mail chain | 159 |
| Exhibit 26 - 7/10/03 e-mail chain | 172 |
| Exhibit 27 - 7/17/03 e-mail chain | 183 |
| Exhibit 28 - 2/13/04 e-mail chain | 189 |

| PLAINTIFF'S EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| Exhibit 1 - 551.423 | 94 |
| Exhibit 2 - Coleman declaration | 103 |
| Exhibit 10 - 3/20/03 e-mail chain | 147 |


REQUESTS FOR INFORMATION

Pages 78, 120-122





VICKI L. DRAPER

CERTIFICATE OF NOTARY PUBLIC & REPORTER

I, VICTORIA L. WILSON, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

--------------------------

Notary Public in and for the
District of Columbia

My Commission Expires: January 31, 2009

NAME OF CASE: MORENO v. BUREAU OF U.S. CITIZENSHIP
DATE OF DEPOSITION: NOVEMBER 30, 2006
NAME OF WITNESS: VICKI L. DRAPER
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________

______________________

## Watson, Melanie J

**From:** Brennan, Richard M - ESA [rmb@fenix2.dol-esa.gov]

**Sent:** Wednesday, March 26, 2003 4:39 PM

**To:** 'Baker, Bryce'; Brennan, Richard M - ESA

**Cc:** Draper, Vicki L.; Perrini, Jo Ann; Watson, Melanie

**Subject:** RE: Regular working hours

Bryce -

Your mention of "one who accepts a job with a basic training requirement is agreeing to the required training voluntarily" brought one additional issue to mind. In the case Chao (Sec. of Labor) v. Tradesmen International (2002 WL 31527264 (6th Cir. (Ohio)), the issue was whether an employee's attendance at a 10-hour OSHA-certified general construction safety course given outside regular working hours was voluntary. The course was a precondition of employment that the employer required employees to complete within a reasonable time after they commenced employment (within the first 60 days of employment). If not completed, the employee was effectively terminated. DOL argued that because the course was required by the employer and largely benefited the employer, and because nonattendance led to termination, attendance was involuntary. The district court held that employee attendance was involuntary and that the employer was required to compensate employees for the time spent attending the course. On appeal, the Sixth Circuit reversed the district court on the rationale that the training class was a fully disclosed precondition to permanent employment - thus, fulfillment of the requirement struck the appeals court as being voluntary within the meaning of the DOL regulations.

Good luck with your deliberations.

Rick

-----Original Message-----
**From:** Baker, Bryce [mailto:DBBAKER@opm.gov]
**Sent:** Wednesday, March 26, 2003 4:00 PM
**To:** 'Brennan, Richard M - ESA'
**Cc:** Draper, Vicki L.; Perrini, Jo Ann; Watson, Melanie
**Subject:** RE: Regular working hours

Rick: Thanks for responding on short notice. This is very helpful. Just to clarify, we are not talking about training connected to establishment of the new Department of Homeland Security. We are dealing with regular basic training courses at FLETC for employees of agencies that have been transferred to DHS. This training was going on before and after DHS was established.

The OPM regulation at 5 CFR 551.423(a)(3) dealing with entry-level or basic training dates back to the original OPM regulations, which were published in 1980 (well before my time). From our files, I know that OPM consulted with DOL staff extensively back then. OPM staff must have felt that a broader rule for entry-level training could be justified within FLSA principles. Of course, our regulations in implementing FLSA can be different at times. I think someone could argue that any one who accepts a job with a basic training requirement is agreeing to the required training voluntarily. I still see that 29 CFR 785.29 distinguishes between "training for another job" vs. "directly related to the employee's job." From one perspective, they don't really have the job until the training is complete.

Anyway, I think we are holding the line on the fact that the training in question was within regular working hours and therefore must be treated as FLSA hours of work. Bryce

-----Original Message-----
**From:** Brennan, Richard M - ESA [mailto:rmb@fenix2.dol-esa.gov]
**Sent:** Wednesday, March 26, 2003 2:19 PM

**To:** 'Baker, Bryce'; Brennan, Richard M - ESA
**Cc:** Perrini, Jo Ann; Draper, Vicki L.
**Subject:** RE: Regular working hours

Bryce -

I have been away from my office in an off-site meeting for the past two days, and just returned.

First, 29 CFR 785.32 dates back to the early 1960's. That policy was intended to apply to the time spent by apprentices (only) employed in the more traditional "blue-collar" crafts and trades in supplemental classroom training related to their craft or trade. Such classroom training was in addition to (i.e., supplemental) to the time the apprentice would spend in hands-on work on the job while training under the direction of a journeyperson. "Supplemental" does not mean or imply that the training must take place outside regular working hours. Rather, such training was specifically different from the apprentice's regular duties as an apprentice while on the job (e.g., an apprentice tool-and-die maker who attended supplemental classroom training in how to read blueprints or in shop mathematics, which were considered critical related skills necessary for the apprentice to later become a full-fledged tool-and-die maker at the journeylevel). It is not necessary that such activities take place outside regular working hours to be excludable if all the criteria are otherwise met. We do not consider that section of the regulations to be applicable to the type of training that takes place in a classroom for an entire week, where such attendance becomes the individual's primary and regular duty for that week.

With respect to your question whether the DOL would interpret "regular working hours" to mean nonovertime hours, we specifically do NOT interpret the term that way.

Further, 29 CFR 785.29 is intended to give guidance for interpreting 29 CFR 785.27(c). Training that is instituted for the bona fide purpose of preparing an employee for advancement through upgrading skills to a higher level, to be able to perform a different job than the employee's regular (present) job, is not considered "directly related to the employee's job." However, all the remaining criteria in 29 CFR 785.27 (a), (b) and (d) must also be met in order for the training time to be considered noncompensable.

I am not clear on what you mean when you refer to entry-level or basic training, or training that is necessary to obtain a new job in the context you have presented for employees transitioning to the new Department of Homeland Security. If the employees are already currently employed by an employer, and they are being trained or retrained by their current employer to perform the job that they will be expected to perform for their employer once trained, I would think the training would be considered directly related to the employee's job. If there are any adverse consequences to an employee for not attending any part of the training, then attendance would not be considered voluntary (see 29 CFR 785.28). Training that is scheduled between the hours of 8:15 AM to 4:45 PM Monday through Saturday would in my view be considered to take place during "regular working hours" for purposes of 29 CFR 785.27(a). So, I don't see how the time could be excluded from compensable work time when the circumstances seem to fail three out of the four criteria which must all be met for the exception to apply, at least if applied to a private sector employer.

For state and local governments as employers, we have a special exception related to training time required by law for certification to perform the job, e.g., emergency medical or rescue workers - see 29 CFR 553.226. But, again, the training must occur outside regular working hours and if the training is scheduled at an academy, for example, the scheduled training becomes the regular working hours for the attendees while they attend the training academy.

Rick

> -----Original Message-----
> **From:** Baker, Bryce [mailto:DBBAKER@opm.gov]
> **Sent:** Tuesday, March 25, 2003 8:59 AM
> **To:** 'Brennan, Richard M - ESA'
> **Cc:** Perrini, Jo Ann; Draper, Vicki L.
> **Subject:** RE: Regular working hours

Rick: Department of Homeland Security officials have set up a meeting with us Thursday morning to go over this issue. If at all possible, we would very much appreciate a further response from you by close of business on Wednesday. Bryce

-----Original Message-----
**From:** Baker, Bryce
**Sent:** Monday, March 24, 2003 8:34 AM
**To:** 'Brennan, Richard M - ESA'
**Cc:** Perrini, Jo Ann; Draper, Vicki L.
**Subject:** RE: Regular working hours

Rick: Thank you very much for checking this out. As I mentioned in my last email, we are focusing on entry-level or basic training--i.e., training that is necessary to obtain a new job. Presumably, there is no productive work performed during the training. OPM regulations cover this at 5 CFR 551.423(a)(3). This OPM regulation seems to be inspired by 29 CFR 785.32 but is broader in its application. Also 29 CFR 785.29 seems to say that "training for another job" is different than "training directly related to the employee's job."

While 29 CFR 785.32 does not expressly say that we are dealing with apprenticeship training outside regular working hours, it does speak of it as "supplemental" training, which implies the training is outside regular working hours. Other sections on training (785.27, 785.29-31) make clear that the issue is training outside regular working hours. It looks that the Department of Homeland Security (which houses several agencies affected by the 6th day of training issue) is going to meet with us and I expect they will want to argue that OPM's definition of "regular working hours" is inconsistent with the intent of the FLSA law. So the question becomes what the Department of Labor would think about interpreting "regular working hours" to be nonovertime hours (which is what these agencies want).

If the 6th day of training is outside regular working hours, then we are left with the issue of whether it is appropriate to exclude entry-level/basic training that involves no productive work and that prepares the employee for a new job. OPM regulations would allow exclusion of these hours. Would DOL allow exclusion of such hours for a non-Federal employer?

Since it looks like we will be meeting with Department of Homeland Security officials this week, we would appreciate any other insights you have about the above. What would DOL say if the issue involved a non-Federal employer?

Bryce

-----Original Message-----
**From:** Brennan, Richard M - ESA [mailto:rmb@fenix2.dol-esa.gov]
**Sent:** Friday, March 21, 2003 1:18 PM
**To:** 'Baker, Bryce'; Brennan, Richard M - ESA
**Cc:** Perrini, Jo Ann; Draper, Vicki L.
**Subject:** RE: Regular working hours

Bryce -

I consulted with our legal staff here in the Solicitor's Office at DOL and was told that they could find no court decision bearing on the FLSA and "normal working hours" or "regular working hours". These two terms also appear in the statute, at 29 USC 207(e)(5), concerning premium payments. Remarkably, no case to date involving that subsection of the law defines or interprets the terms either.

Our references to the terms in agency-issued opinion letters do no more than just refer to the concept, without further definition.

With respect to matters within the jurisdiction of DOL, if an employer required attendance at a particular training session and the training was directly related to the employee's job, we would consider the time compensable hours worked. See the principles discussed in 29 CFR 785.27 through 785.31.

Rick

-----Original Message-----
**From:** Baker, Bryce [mailto:DBBAKER@opm.gov]
**Sent:** Thursday, March 20, 2003 11:53 AM
**To:** 'Brennan, Richard M - ESA'
**Cc:** Perrini, Jo Ann; Draper, Vicki L.
**Subject:** RE: Regular working hours

Rick:

Sorry to bother you again, but there is some more activity on the "regular working hours" issue and getting your input is more time sensitive than I orginally thought. First, let me give you some additional background details. We have some agencies who started providing employees with basic/entry-level training on a 6-day schedule (instead of the traditional 5-day schedule) to speed up training and increase the number of employees trained by a particular facility (the Federal Law Enforcement Training Center). They thought OPM's regulation at 5 CFR 551.423(a)(3) allowed them to not pay employees for the 6th day of training since those hours were viewed as outside "regular working hours" and did not involve productive work. However, as I noted in my last email, we have a regulation at 5 CFR 551.421 that defines "regular working hours" as any hours in the regularly scheduled administrative workweek--i.e., any hours scheduled in advance of the workweek. Thus, any hours on the 6th day of training that are scheduled in advance of the workweek are considered regular working hours under OPM regulations. Under 5 CFR 551.423(a)(1), time spent in training during regular working hours must be considered hours of work for FLSA overtime pay purposes.

We think our regulations are clear but some agencies are now challenging our position and requesting a meeting. Obviously, a major focus of the discussion will be the "regular working hours" concept. I am sure that DOL regulations at 29 CFR 785.27 and 785.32 will be brought up. So I would appreciate any additional insights you can provide regarding the regular working hours issue from the DOL perspective.

Thanks for your help. Bryce

-----Original Message-----
**From:** Baker, Bryce
**Sent:** Friday, March 14, 2003 3:00 PM
**To:** 'Brennan, Richard M - ESA'
**Subject:** RE: Regular working hours

Rick:

I gather that under DOL regulations regular working hours are not necessarily limited to the nonovertime hours (e.g., 40-hour basic workweek). For example, an employee may have a regular weekly tour of 48 hours that includes 8 overtime hours. What if an employee's regular working hours change for a temporary period? For example, a 40-hour employee is placed on a 48-hour schedule for 2 months. Does the 48-hour schedule become the regular working hours in applying FLSA rules during that 2-month period? The reality of work schedules may not always be as simple or basic as the original drafters thought. I would think there would be some case law.

Let me explain why I am inquiring. Since 1983, OPM's FLSA regulations have defined

regular working hours as hours in the regularly scheduled administrative workweek, as defined in 5 CFR part 610--i.e., any hours scheduled in advance of the workweek are deemed to be regularly scheduled (done for ease of administering various title 5 pay entitlements tied to term "regularly scheduled"). Obviously, we may include hours that aren't really regular/normal/recurring, which works to the employee's benefit. An issue came up recently and we are taking a look at the whole issue, so we wanted to understand how DOL applies the concept in administering the FLSA for non-Federal workers.

Bryce

-----Original Message-----
**From:** Brennan, Richard M - ESA [mailto:rmb@fenix2.dol-esa.gov]
**Sent:** Friday, March 14, 2003 2:29 PM
**To:** 'Baker, Bryce'
**Subject:** RE: Regular working hours

Bryce -

I apologize. I mistakenly presumed your question concerned distinguishing "regular" working hours from overtime hours, which the FLSA regulations do not do.

We do not separately define "regular working hours" in the regulations, except by an occasional explanatory example (e.g., 29 CFR 785.39, wherein "regular working days during normal working hours" is followed by an example of an employee who "regularly works" 9:00 am to 5:00 pm Monday through Friday). But the concept is straightforward - whatever the usual or normal work schedule or typical work experience would be used as the reference point. It originates from the earliest days of implementing the FLSA, when some of the first questions were raised on what constitutes working time. It seems the concept was assumed to be so basic that no one felt it necessary to separately define it.

We seem to have perpetuated the same concept under the Family and Medical Leave Act regulations as well. (See 29 CFR 825.205.)

Sorry for the confusion on my part.

Rick

> -----Original Message-----
> **From:** Baker, Bryce [mailto:DBBAKER@opm.gov]
> **Sent:** Friday, March 14, 2003 1:23 PM
> **To:** 'Brennan, Richard M - ESA'
> **Subject:** RE: Regular working hours
>
> Rick:
>
> See 29 CFR 785.27(a) where "regular working hours" is used in dealing with training time.
>
> See also 29 CFR 785.39 which talks about travel that cuts across the employee's "workday" or "corresponding hours." It would appear that you have to define an employee's regular working hours to implement this provision.
>
> See related title 5 FLSA regulations in 5 CFR 551.422(a)(1) and 551.423(a)(1).
>
> See also use of term "normal working hours" in 29 CFR 785.43 dealing with medical attention and in 29 CFR 785.44 dealing with charitable work.

A341

See use of term "regular working hours" in 29 CFR 785.45 dealing with work on suggestions.

So I assume you must have some kind of definition of the concept of regular or normal working hours .

Bryce

-----Original Message-----
**From:** Brennan, Richard M - ESA [mailto:rmb@fenix2.dol-esa.gov]
**Sent:** Friday, March 14, 2003 12:58 PM
**To:** 'Baker, Bryce'
**Subject:** RE: Regular working hours

Bryce -

You won't find any term like "regular working hours" in the FLSA or its regulations. FLSA regulations on "Hours Worked" (defining what is compensable work time for purposes of meeting minimum wage and overtime obligations) are at Title 29 CFR Part 785. As discussed in Secs. 785.6 & 785.7, "employ" is defined in law to include "to suffer or permit to work" and courts have had to construe that concept in judicial decisions. If the activity involved is work, it is counted as work time; then, any hours worked past 40 per week (for non-exempts) are treated as overtime in most cases (regardless of whether they were "regular" or something else), and any hours worked up to 40 per week are considered non-overtime hours. But, "regular" working hours don't really have any foundation in the FLSA or its regulations.

Call me (or write) if need be!

Rick

202-693-0517

> -----Original Message-----
> **From:** Baker, Bryce [mailto:DBBAKER@opm.gov]
> **Sent:** Friday, March 14, 2003 10:59 AM
> **To:** 'Richard Brennan'
> **Subject:** Regular working hours
>
> Rick:
>
> I can't seem to find a definition of "regular working hours" in DOL's FLSA regulations. Is there a regulatory definition? If not, do you have a working definition based on court decisions and DOL rulings?
>
> Thanks in advance for your help.
>
> Bryce

A342

-- Even though this E-Mail has been scanned and found clean of
-- known viruses, OPM can not guarantee this message is virus free.
--------------------------------
-- This message was automatically generated.
--------------------------------mo