# code of federal regulations

## Administrative Personnel

# 5

PARTS 1 TO 1199

**Revised as of January 1, 1983**

THE NATIONAL ARCHIVES OF THE UNITED STATES
LITTERA SCRIPTA MANET
1934

Sec.
610.304 Coverage.
610.305 Standards.
610.306 Supplemental regulations.

SOURCE: 33 FR 12474, Sept. 4, 1968, unless otherwise noted.

## Subpart A—Weekly and Daily Scheduling of Work

AUTHORITY: 5 U.S.C. 6101; sec. 1(1) of E.O. 11228, 3 CFR, 1964–1965 Comp., p. 317, unless otherwise noted.

**§ 610.101 Coverage.**

This subpart applies to each employee to whom Subpart A of Part 550 applies and to each employee whose pay is fixed and adjusted from time to time under section 5343 or 5349 of title 5, United States Code, or by a wage board or similar administrative authority serving the same purpose.

[42 FR 3297, Jan. 18, 1977]

**§ 610.102 Definitions.**

In this subpart:

(a) "Administrative workweek" means a period of 7 consecutive calendar days designated in advance by the head of an agency under section 6101 of title 5, United States Code.

(b) "Regularly scheduled administrative workweek," for full-time employees, means the period within an administrative workweek, established in accordance with § 610.111, within which these employees are required to be on duty regularly. For part-time employees, it means the officially prescribed days and hours within an administrative workweek during which these employees are required to be on duty regularly.

(c) "Basic workweek," for full-time employees, means the 40-hour workweek established in accordance with § 610.111.

(d) "Agency" means an Executive agency and a military department as defined by sections 105 and 102 of title 5, United States Code.

(e) "Head of agency" means the head of an agency or an official who has been delegated the authority to act for the head of the agency in the matter concerned.

(f) "Employee" means an employee of an agency to whom this subpart applies.

WORKWEEK

**§ 610.111 Establishment of workweeks.**

(a) The head of each agency, with respect to each group of full-time employees to whom this subpart applies, shall establish by regulation:

(1) A basic workweek of 40 hours which does not extend over more than 6 of any 7 consecutive days. Except as provided in paragraphs (b) and (c) of this section, the regulation shall specify the calendar days constituting the basic workweek and the number of hours of employment for each calendar day included within the basic workweek.

(2) A regularly scheduled administrative workweek which consists of the 40-hour basic workweek established in accordance with paragraph (a)(1) of this section, plus the period of overtime work, if any, regularly required of each group of employees. Except as provided in paragraphs (b) and (c) of this section, the regulation, for purposes of leave and overtime pay administration, shall specify by calendar days and number of hours a day the periods included in the regularly scheduled administrative workweek which do not constitute a part of the basic workweek.

(b) When it is impracticable to prescribe a regular schedule of definite hours of duty for each workday of a regularly scheduled administrative workweek, the head of an agency may establish the first 40 hours of duty performed within a period of not more than 6 days of the administrative workweek as the basic workweek, and additional hours of officially ordered or approved duty within the administrative workweek are overtime work.

(c) (1) When an employee is paid additional pay under section 5545(c)(1) of title 5, United States Code, his regularly scheduled administrative workweek is the total number of regularly scheduled hours of duty a week.

(2) When an employee has a tour of duty which includes a period during which he remains at or within the confines of his station in a standby status

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ X

ARTURO MORENO, JR., )
individually and on behalf)
of others similarly )
situated, ) No. 05-142C
) Judge Firestone
)
Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )

Defendant.

------------------------------ X

Telephonic Deposition of Jerome Mikowicz
Thursday, January 11, 2007
Washington, D.C.

Job No.: 9926
Pages 1 - 297
Reported by: Kathy Savich, RPR

Thursday, January 11, 2007
10:13 a.m.

Deposition of JEROME MIKOWICZ, held at:

U. S. Department of Justice
1100 L Street, Northwest
Fourth Floor
Washington, D.C. 20005

Pursuant to agreement of counsel, before Kathy Savich, Registered Professional Reporter and Notary Public for the District of Columbia.





APPEARANCES:

On Behalf of the Plaintiffs:
GETMAN LAW OFFICE (Via telephone)
9 Paradies Lane
New Paltz, New York 12561
(845) 255-9370 FAX (845) 255-8649
MSweeney@getmanlaw.com
BY: MICHAEL J.D. SWEENEY, Esquire

On Behalf of the Defendant, United States of America:
U.S. DEPARTMENT OF JUSTICE
1100 L Street, Northwest
Room 12018
Washington, D.C. 20005
(202) 353-7991 FAX (202) 514-8624
jeffrey.pease@usdoj.gov
BY: JEFFREY S. PEASE, Esquire





On Behalf of the Defendant, United States Office of Personnel Management:
U.S. OFFICE OF PERSONNEL MANAGEMENT
Office of the General Counsel
1900 E Street, Northwest
Room 7545
Washington, D.C. 20415
(202) 606-2079 FAX (202) 606-0082
mjwatson@opm.gov
BY: MELANIE J. WATSON, Esquire

On Behalf of the Defendant, United States Customs and Border Protection:
U.S. CUSTOMS AND BORDER PROTECTION
U.S. Department of Homeland Security
1300 Pennsylvania Avenue, Northwest
Suite 4.4-B
Washington, D.C. 20229
(202) 344-2978 FAX (202) 344-2950
arthur.rettinger@dhs.gov
BY: ARTHUR I. RETTINGER, Esquire





INDEX


EXAMINATION OF MIKOWICZ BY PAGE
Mr. Sweeney 06

MIKOWICZ DEPOSITION EXHIBITS: PAGE
Exhibit 29 - Timeline 99
Exhibit 30 - Internet, HRS PAYLEAVE email 101
Exhibit 31 - Deposition Discussion Topics 108
Exhibit 32 - Emails 11/7/02 to 11/18/02 RE: Draft Response to FLSA Question 138
Exhibit 33 - Handwritten List of Names of 3/27/03 Meeting 185
Exhibit 34 - 3/27/03 Handwritten Note 186
Exhibit 35 - Emails 3/21/03 to 3/24/03 RE: FLETC Training Overtime Issue 202
Exhibit 36 - Email of 3/24/03 From Bryce Baker RE: Regular Working Hours 219
Exhibit 37 - Email of 7/3/03 From Bryce Baker RE: FLSA, 6th Day Training FLETC 226
Exhibit 38 - RE: FLSA Overtime Pay for FLETC 240
Exhibit 39 - Email List 1/1/02 to 5/30/04 261

the day that it was decided to get rid of the FPM that there was actually a ceremony and a dumpster was brought to the front of OPM and people took wheelbarrows and wheeled out the FPMs. So I would say that would be my yes, it's obsolete and not official and blah, blah, blah because that's the way it happened.

On the other hand, I am aware that some court cases refer to them. I know that you have. I know that personnel management specialists and agencies still look at them. Why? Because they do tell a story. They reveal thinking. They show what OPM gave as guidance in the past on certain topics.

And some of that may or may not be relevant today, depending on the topic, depending on some things are written forever, some things change with the wind. So everything would have to be within a certain context.

I'm also aware, I used to be a subscriber to, I believe at the time it was called Personnet, I'm not sure what it's called now, but there was a source that you could subscribe and still see what copies of





the FPMs were. Some agencies still keep copies. And I believe there might still be a resource for that.

**Q. Wherein, if the FPM letter was contradictory to a regulation, which one would be authoritative?**

A. The law establishes the authorities. The regulations implement them. Our guidance then provides further interpretation that's on the website. So I don't cite FPMs as an authority, but I may look at them to understand history, to understand how things evolved.

**Q. Would it ever be proper for somebody at OPM to use an FPM letter as the only source for giving guidance?**

MR. PEASE: Objection, calls for speculation. You can answer.

MR. SWEENEY: You can respond.

A. Okay. Well, again, it's hard to respond theoretically because there's always a context. And if somebody provided that windchill chart, said this is a source of something you can use for your employees to determine whether you're going to have them





work outside, etcetera, etcetera, so maybe that would be an example of something that hasn't changed and may never change, but as far as looking at a long series of letters that we had about Fair Labor Standards Act, a long series of letters that we had on many, many other topics within the federal personnel system, you know, I cannot categorically say that they're good or they're bad.

I think people, in doing research, would go back and look, and they may find some thinking and some explanation that still is valid today, and in that case they may point back to them and say, "Well, this helps explain behind the regulations something that you don't see in the regulation, something that we didn't talk about in the supplementary information, and something that's not posted on the website."

So integrating it as a piece of knowledge with everything else, I would say yeah, there could be a role it could be used.

**Q. My question was --**

A. I'm sorry.

**Q. -- would it ever be proper for**





**somebody at OPM to use the FPM letter as a primary summary for giving guidance.**

A. I guess I still would have to know the exact case. It's hard for me to rule out that it would be improper in every particular case, except that it is not a system that OPM maintains, so it wouldn't be guidance or it wouldn't be binding on agencies unless it otherwise were so because of the law or a regulation.

**Q. So is it fair to say that someone from the OPM that's giving guidance, if they look to an FPM letter, would also be required to look at the regulations and the law in addition to the FPM letter?**

MR. PEASE: Objection, calls for speculation.

MR. SWEENEY: You can respond.

A. I believe that a person who is assisting an agency or trying to explain a policy or interpret would look at the law and the regulation and those would be the primary sources. So the FPM would not be the only source or an exclusive source, unless there was some specialized context that I can't

assume, again, they would take this and pay. It's possible they might have waited to see if there were going to be any further developments, but...

**Q. Did you ask Mr. Baker or Ms. Draper, in preparation for your deposition, if they knew what HUD did?**

A. No. That was getting into a lot of detail for what I was trying to absorb at my level.

**Q. And do you know, Mr. Mikowicz, have you ever seen a reason to argue in opposition to this opinion that Ms. Draper puts forward in this email?**

A. Yes. It would be the one that I explained earlier. I have run into people who read that narrowly, and they look at training, and they say, "Training is not work. You don't schedule training because training is not work. You schedule work. An employee who is full-time, has the five-day workweek, 8:30 to 5:00, that's 40 hours. And so if any training occurs within those 40 hours that's a regularly scheduled workweek, you can pay them."





And there are some people who had a different way of looking at this.

THE COURT REPORTER: Slow down a little bit.

THE WITNESS: I'm slowing down. Sorry.

**Q. That's all right.**

A. But there were some people that would have an interpretation that now we know is wrong, and we weren't challenged to have maybe a complete understanding as we had now.

Because, up to this date, I have never heard of federal employees doing training on -- eight hours on a Saturday. This is the federal government. And I'm saying that with a smile on my face, for the record.

And I'm just saying, the usual expectation would be that you have a normal five-day workweek. If we send you on training, it would be a normal five-day training, or it could be shorter.

**Q. But these guys stepped up to the plate, right, and they did training on a Saturday, the sixth day of work, right?**





A. Correct.

**Q. Mr. Mikowicz, have you ever seen a written argument contrary to Ms. Draper's here that cites regulation trying to support nonpayment?**

A. No. The thing that comes closest to it was that Exhibit 30 about the State Department where they quote 410. It's just a lost -- now I would say it's a lost focus looking at the wrong thing. But I have never seen anybody articulate -- it may exist, I'm just saying I'm not aware of it.

**Q. So you've never seen anyone articulate with reference to the regulations that argument that you just talked about, that training is not actually work?**

A. I'm sorry. I'm thinking so much of this -- the FLETC situation with the six days. You're really asking a more generic question; is that correct?

**Q. What I'm trying to figure out is if anyone has ever put forward -- strike that.**

**What I'm trying to figure out is since OPM put this opinion out in late 2002, did anyone or any agency come forward with a**





**written rational opposition to this interpretation that you know of?**

A. No, not that I know of.

**Q. Okay. Do you know if prior to -- if prior to the request from HUD regarding the sixth day of training, whether OPM had received any other inquiries regarding payment of overtime for the sixth day of training at FLETC?**

A. No.

**Q. But we have the State Department one; is that right, that was from December of 2001?**

A. I'm sorry. I thought you meant subsequent -- or after state, but before HUD.

**Q. I just wanted to clarify that. Thank you.**

A. Thank you.

**Q. That was a fine assumption. I just wanted to make sure.**

**So we had the State Department and HUD requests. Those are the only ones that you knew; is that right?**

A. That's correct.

**Q. There was also -- were you -- did**

position, but I was not there. I have asked others, including Bryce Baker, who I see his name is on this list, and he did not know of what those issues were.

**Q. So would you assume that Bryce Baker was at this meeting, and yet didn't know what those issues were, that those issues were not raised at the 3/27/03 meeting?**

A. That would puzzle me, and I would maybe speculate that it was not raised or not explained from the DHS point of view.

**Q. If OPM -- well, strike that.**

**If DHS disagreed with OPM's interpretation, would that slow down OPM from providing that interpretation to other agencies?**

A. Are you asking me as a general question or applied to this situation?

**Q. Well, let's start as a general question.**

A. As a general question, if an agency called and had disagreed with the way we construct the general schedule, and this is an actual example, we wouldn't give them much of a say because we have sole authority to do





that.

And there have been some challenges about how we round it, for example, and we have authority to do it. So by somebody simply disagreeing with us would not necessarily mean that everything would stop. The President signs an executive order. We have 24 hours to issue it. That's just the way it goes.

Getting to this situation, that if DHS or any agency said it had a concern with an OPM interpretation and it would want to discuss that, OPM would discuss it because OPM wants to arrive at the right answer.

Now, what would be important is what the agency would say. It would be based on what their reasoning of the situation is; their knowledge of the statute; their research; maybe more facts to put it into context. Maybe OPM didn't understand the original situation in a particular event or something.

So these meetings are normal, and don't happen frequently, but it's expected that we give the right answer, but we also





consult with some of our stakeholders if there are indications of any potential issues or disagreements or just concerns that they want to discuss.

**Q. And is that what happened in this case, that DHS's concerns slowed the process of OPM posting the guidance on their website?**

A. I don't know that for a fact, but I would say that it certainly was one of the events that occurred between the time when we arrived at a staff interpretation until we issued a final official OPM policy guidance.

I would also add that there's a context here. The Department of Homeland Security was under enormous pressure to gear up and establish itself, reorganization, and establish a new personnel system.

And the people on the list, to the best of my knowledge, were the people who were -- most of them anyway, were the people who were dealing with the restructuring and reorganization of the Department of Homeland Security. We had a statutory role in that.

So what I'm saying is there might be multiple things happening at any point in





time with regard to a meeting, with regard to conduct of business, with regard to everything that happened in that time period.

**Q. Let me ask you, you know, back in December, Ms. Draper's email is pretty clear. In fact, she says she's clear.**

A. Yes.

**Q. There is no option that people have to pay.**

A. That's right.

**Q. And this is a policy that affects everyone that trained at the FLETC, lots of agencies. Why did it take OPM until July of 2003 to post guidance on its website?**

A. Because we wanted to be sure that we did it the right way, that the answer was correct, that we had any input into it to make sure that we understood the problem as it existed not only for one agency, but for all agencies.

And that's a huge complexity we always face at OPM. I can write a regulation about the world as I know it. I'm a commuter. I work Monday through Friday. That's my world. I am not in the foreign service

overseas. I am not a law enforcement officer. I am not working in a small city or out in the country or traveling a lot.

So there are so many perspectives that bear on a decision. And so this is a major agency. It has a lot of law enforcement officers that are going into the training. They may or may not have had a different understanding, interpretation of the law.

I am going to assume that they did, they saw it some way differently, and that it was of enough concern that they wanted to meet with OPM and explain those concerns.

And I don't know where the concerns went in DHS; if they were in the personnel office alone, that's one layer of complexity; if they were in some parts of DHS. There were more than 20 agencies which were combined to form one system. Now, these people were trying to develop one policy for over 20 agencies that may have had different levels of expertise, different levels of understanding.

So they were, themselves, probably struggling to regularize their rules and make sure everybody follows the same way. And





plus, I don't know who handled their legal advice, and whether it was all centralized and one office maybe handled it or whether they had different general counsels from the various agencies that were part of the reorganization.

And I would personally think -- and this is my belief, not an OPM statement -- but I believe that this was more difficult than would meet the eye because of the coordination factor of a brand new entity formally composed of more than 20 that are trying to arrive with an answer on the payment of overtime for a new situation that never existed before on the sixth day, and probably there were different opinions on it.

**Q. Well, Ms. Draper's opinion is pretty clear. It says that regular working hours that are in the regulations, in the regulations governing overtime for training, that phrase is defined in the regulations, and, indeed, it is. What's complicated about that issue, Mr. Mikowicz?**

A. Well --

MR. PEASE: Objection, vague. You





can answer.

A. Yeah. Ms. Draper, unfortunately, does not have the regulatory authority of the director of OPM or the authority to post information on a website.

If her inclination was, "I have seen the law, I have my interpretation, here is the regulation, I want to post it," she would then potentially write something up or have a game plan to tell her supervisor. That would go up the chain of command to the deputy associate director. That would go to the associate director. That might go to the general counsel.

There are things all along the way that bring in briefing new people. Some people might say, "I'm not going to clear this policy unless I have a briefing. You need to explain this to me." And then, "What is your schedule? When are you available?" Well, that might -- we can't do it today. We have to wait until next week.

So, yes, Vicki Draper was convinced, it was clear to her so much so that she advised another agency what she





interpreted and what she felt would be OPM's interpretation of the correct answer. And so things were put in motion to get this out to be a clarified document.

And the way we ultimately chose to do it was a question and answer. We could have chosen a CPM, a Compensation Policy Memo. We could have chosen a fact sheet. I suppose we could have even chosen to do a proposed regulation, or possibly an interim regulation, to make this even more clear in the regulations.

So there were a lot of decisions to be made and a lot of players in the process. And out of all of our customers at this time, DHS was a special customer, because we had a statutory role to work with them to develop regulations for their new human resources system.

So as they're thinking about their new human resources system they're confronting something in their existing system. A lot of moving parts. A lot people involved. These task forces had, you know, a lot of people on them, more people than were at this meeting,

for example. So it wasn't that simple.
And I understand your frustration of looking at this from the outside because you say we have an answer, but I really have to look at it from how we do our work, and the complications and clearances.
And when we get to the question and answer, there are even issues like we have to make it Section 508 compliant, which means that when OPM posts something on its website that it has to be able to be read by someone who is blind or has a special type of machine that can decode that.
And sometimes that can add -- I'll be frank, it's only going to add maybe a day or two at the end. But there are all types of reasons, from very substantive discussions to procedural and stylistic, that at one point or another come into play.
**Q. And all this time, the people on the ground, the law enforcement officers, are working Saturday, giving up their Saturday to train, and not getting paid anything for it; is that right?**
MR. PEASE: Objection,





argumentative. You can answer it.
A. Well, to the extent they were paid wrong, they were paid wrong, and the agencies who did not decide to act on their own -- I don't know if anybody did act on their own -- but if they were waiting for quote, "an official OPM policy" posted on our website, then they would have waited until we had done it.
If we had these discussions, as I indicate we have with DHS, and we're meeting with people who represent the general counsel, and we have lawyers looking at it, I have to say that it is my belief that this possibly could have come out the other way.
How? I don't know, because I haven't seen a legal argument or reasoning for it to come out, but what I'm saying is, in my career, I have seen a lot of things that I thought were right and this was a definitive answer.
And when we get either more information from an agency or the field or from the headquarters or when we get more attorneys looking at pieces and advising us, I





find that sometimes staff interpretations change. So until it became official, this remained to be a staff interpretation. It turns out, in retrospect, it was a sound and defensible interpretation, but unfortunately that's not always the case.
**Q. And what arguments did DHS raise against this policy -- this guidance being issued?**
MR. PEASE: Objection, asked and answered. You can answer the question again.
A. As I mentioned earlier, I don't know.
**Q. Well, who would know? Bryce Baker, you said, wouldn't know, Vicki Draper wouldn't know. Who is going to know?**
A. My predecessor, Don Winstead, who is now retired, was -- he was my predecessor. He would have been a manager of this situation or this problem and he was also on the DHS task force.
It's possible that he was involved in some discussions that were with the higher up -- the principals on this. There might have been separate discussions. I just don't





know.
We have no record or information indicating additional meetings or the arguments or the discussions or even a paper outlining what DHS felt.
It's that we felt, at the OPM level, that we had a correct interpretation, which led us to develop a letter so that we could convey OPM's position in writing so that they could see it as clear as possible.
And this is a letter that would be approved by our general counsel. So it's not only human resources people like Vicki or Jerry Mikowicz or Bryce Baker -- well, it wasn't me at the time, but people like me -- that would be saying what we believe but it would be what officially OPM would say, backed up by the Office of General Counsel.
**Q. Do you know if one of DHS's objections to this guidance being released was that it would cost DHS a lot of money?**
MR. PEASE: Objection, asked and answered. You can answer if you can.
A. I have never heard cost raised as an objection to this policy, and I don't know

concluded at 7:17 p.m.)





ACKNOWLEDGMENT OF DEPONENT

I, JEROME MIKOWICZ, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed by me.

Date Signature





REPORTER'S CERTIFICATE

I, Kathy Savich, the undersigned Registered Professional Reporter and Notary Public for the District of Columbia, do hereby certify that the above-named witness, after having been first duly sworn to testify to the truth, did testify as set forth in the foregoing pages, that the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript.

I further certify that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

SUBSCRIBED AND SWORN TO under my hand.

My Commission Expires: 1/1/2012

Kathy Savich, RPR
Notary Public in and for the
District of Columbia





ERRATA SHEET

Case Name: Moreno v USA
Witness Name: Jerome Mikowicz
Deposition Date: January 11, 2007
Job No.: 9926
Page No. Line No. Change

Signature Date

108th Congress, 1st Session – – – – – – – – – – – – – – House Document 108–32

# REORGANIZATION PLAN MODIFICATION FOR THE DEPARTMENT OF HOMELAND SECURITY

---

## COMMUNICATION

FROM

## THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

A REORGANIZATION PLAN MODIFICATION FOR THE DEPARTMENT OF HOMELAND SECURITY, PURSUANT TO PUB. L. 107–296, SEC. 1502

FEBRUARY 4, 2003.—Referred to the Committee on Homeland Security (Select) and ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

19–011 WASHINGTON : 2003

THE WHITE HOUSE,
*Washington, January 30, 2003.*

Hon. J. DENNIS HASTERT,
*Speaker of the House of Representatives,*
*Washington, DC.*

DEAR MR. SPEAKER: Pursuant to section 1502 of the Homeland Security Act of 2002 (Public Law 107–296) (the "Act"), I submit herewith the enclosed Reorganization Plan Modification for the Department of Homeland Security (DHS), which represents a modification of certain aspects of the DHS Reorganization Plan I submitted to you on November 25, 2002. The modification involves organizational units within the DHS Border and Transportation Security Directorate. The enclosed Reorganization Plan Modification provides information concerning the elements identified in section 1502(b), and is itself subject to modification pursuant to section 1502(d) of the Act. In accordance with section 1502(a) of the Act, please transmit this Reorganization Plan Modification to the appropriate congressional committees.

Sincerely,

GEORGE W. BUSH.

**REORGANIZATION PLAN MODIFICATION FOR THE DEPARTMENT OF HOMELAND SECURITY**
**January 30, 2003**

**Introduction**

This Reorganization Plan Modification is submitted pursuant to the Homeland Security Act ("the Act") of 2002. All elements of the Department of Homeland Security Reorganization Plan of November 25, 2002 ("the Plan") remain as submitted except for those modifications addressed herein.

**Purpose of Modification**

This modification of the Plan is to establish and specify organizational units within the Border and Transportation Security Directorate. This modification presents a structural change, but does not consolidate, discontinue, or diminish transferred agencies' current operations in the field.

**Plan Modifications**

**(a)** Rename the **"Bureau of Border Security"** the **"Bureau of Immigration and Customs Enforcement."** As required by the Act, this Bureau will be headed by an Assistant Secretary who will report directly to the Undersecretary for Border and Transportation Security.

This Bureau will include Immigration Naturalization Service (INS) interior enforcement functions, including the detention and removal program, the intelligence program, and the investigations program. At the same time, pursuant to this modification, the interior enforcement resources and missions of the Customs Service and the Federal Protective Service will be added to this Bureau. The mission of the Bureau is:

1. To enforce the full range of immigration and customs laws within the interior of the United States; and,

2. To protect specified federal buildings.

The Assistant Secretary will:

1. Establish and oversee the administration of the policies for performing the detention and removal program, the intelligence program, and the investigation program functions as are --

(a) transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act and delegated to the Assistant Secretary by the Under Secretary for Border and Transportation Security; or

(b) otherwise vested in the Assistant Secretary by law.

1

2. Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau that may affect the Bureau of Citizenship and Immigration Services established under subtitle E of the Act, including potentially conflicting policies and operations.

(b) Rename the **"Customs Service"** the **"Bureau of Customs and Border Protection."** This Bureau will be headed by the Commissioner of Customs and will report to the Under Secretary for Border and Transportation Security.

The Bureau will include the resources and missions relating to borders and ports of entry of the Customs Service, the INS, including the Border Patrol and the inspections program, and the agricultural inspections function of the Agricultural Quarantine Inspection program.

The Commissioner will:

1. Establish and oversee the administration of the policies for performing the Border Patrol and inspections program functions as are --

(a) transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act and delegated to the Commissioner by the Under Secretary for Border and Transportation Security; or

(b) otherwise vested in the Commissioner by law.

2. Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau that may affect the Bureau of Citizenship and Immigration Services established under subtitle E of the Act, including potentially conflicting policies and operations.

**IMPLEMENTATION DATE**

March 1, 2003

**ELEMENTS REQUIRED BY THE ACT TO BE SUBMITTED WITH MODIFIED PLAN**

**(1) Identification of any functions of agencies transferred to the Department pursuant to this Act that will not be transferred to the Department under the plan.**

None.

**(2) Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among**

**officers of the Department in order to permit the Department to carry out the functions transferred under the plan.**

See plan modifications above.

**(3) Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.**

The table attached at Tab A provides estimates of the funds available to the agencies affected by this modification that will be transferred to the Department by operation of the Act. The table includes total funding (mandatory and discretionary including fees) and discretionary funding net of fees. The table provides the President's requested levels for 2003.

Because of the current state of the 2003 budget process, information concerning the funds that will be available to each transferring agency on the date of the proposed transfers is not currently available. As additional information becomes available, it will be provided as may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

**(4) Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.**

The table attached at Tab B provides updated estimates of the unobligated balances as of September 30, 2002, for the agencies affected by this modification that will be transferred to the Department. Since October 1, 2002, these agencies have been operating under continuing resolutions, and, as such, have been spending these balances to maintain current operations. As additional information becomes available, it will be provided as may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

**(5) Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.**

There is no intention to dispose of property, facilities, contracts, records, and other assets and obligations of agencies transferred under this modification. All such assets and obligations will transfer with each agency pursuant to Section 1511(d)(1) of the Act.

**(6) Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.**

The functions of the agencies affected by this modification that are not directly related to securing the homeland will continue to be performed by the bureaus formed by this planned reorganization.

## Department of Homeland Security -- Major Components*

(budget authority in millions of dollars)

| | FY 2003 Budget |
|---|---|
| **Border and Transportation Security -- Total Funding** | |
| Customs and Border Protection | |
| Immigration and Naturalization Service (DOJ) | 3,387 |
| Customs Service (Treasury) | 2,784 |
| Animal and Plant Health Inspection Service (USDA) | 224 |
| Total Funding, Customs and Border Protection | 6,395 |
| Immigration and Customs Enforcement | |
| Immigration and Naturalization Service (DOJ) | 1,248 |
| Border-related Detention Funding (DOJ/Detention Trustee) | 615 |
| Customs Service (Treasury) | 429 |
| Federal Protective Service (GSA) | 411 |
| Total Funding, Immigration and Customs Enforcement | 2,703 |
| **Border and Transportation Security -- Net Discretionary Funding** | |
| Customs and Border Protection | |
| Immigration and Naturalization Service (DOJ) | 2,809 |
| Customs Service (Treasury) | 2,454 |
| Animal and Plant Health Inspection Service (USDA) | 45 |
| Total Funding, Customs and Border Protection | 5,308 |
| Immigration and Customs Enforcement | |
| Immigration and Naturalization Service (DOJ) | 942 |
| Border-related Detention Funding (DOJ/Detention Trustee) | 615 |
| Customs Service (Treasury) | 380 |
| Federal Protective Services (GSA) | 411 |
| Total Funding, Immigration and Customs Enforcement | 2,348 |

* Note: Component totals to not match estimates included in the original reorganization plan (dated 11/25/2002) due to revised estimates of discretionary and mandatory collections and revised expectations of programmatic splits between INS enforcement and services activities.

## Department of Homeland Security -- Unobligated Balances

(agency estimates of unobligated balances as of September 30, 2002 in millions of dollars)

| | FY 2003 Estimated |
|---|---|
| **Border and Transportation Security** | |
| Customs and Border Protection | |
| Immigration and Naturalization Service (DOJ) | 185 |
| Customs Service (Treasury) | 894 |
| Animal and Plant Health Inspection Service (USDA) | --- |
| Total Unobligated Balances, Customs and Border Protection | 1,079 |
| Immigration and Customs Enforcement | |
| Immigration and Naturalization Service (DOJ) | 96 |
| Border-related Detention Funding (DOJ/Detention Trustee) | --- |
| Customs Service (Treasury) | 162 |
| Federal Protective Service (GSA) | 10 |
| Total Unobligated Balances, Immigration and Customs Enforcement | 268 |

O

PROPERTY OF THE LIBRARY
U. S. CUSTOMS SERVICE
WASHINGTON, D. C. 20229

# United States Code
# Congressional Service

Laws of
80th Congress

First Session

---

Convened January 3, 1947
Adjourned Sine Die December 19, 1947

St. Paul, Minn. West Publishing Co.
Brooklyn, N. Y. Edward Thompson Co.

The purpose of this bill is to effect certain changes in the organization of the American National Red Cross which will result in giving it a more democratic base on which to operate and enabling it to function more effectively in the proper discharge of its duties.

The first Federal charter of the American Red Cross was obtained in 1900 and revised in 1905. The 1905 charter, with minor revisions, is the charter under which the Red Cross now functions. In view of the tremendous growth and expansion of the agency since that time, Mr. Basil O'Connor, chairman of the Red Cross, appointed an advisory committee of 27 members on March 4, 1946, to study its structure and organization and to make appropriate recommendations. As announced by Mr. O'Connor, the purpose of this committee was twofold:

> **First to make certain that all the American people who constitute the American National Red Cross have adequate representation in shaping the policies of the national organization; and second, to review the corporate structure of the American National Red Cross to insure the most effective handling of programs.**

The present legislation incorporates, in the main, the recommendations of the advisory committee. Among other things, the membership of the governing board is enlarged and the method of selecting its members is made more democratic. The local chapters of the Red Cross are officially recognized as the local units of the corporation in the States and Territories of the United States and the importance of their role in the organization is augmented. The legislation is designed to reorganize the American National Red Cross as an administrative machine and does not involve any new international commitments for the United States.

On February 25, 1947, the Foreign Relations Committee heard witnesses on the bill representing both the national headquarters and the local chapters of the Red Cross. Since there seems to be no opposition to these proposals from any quarter the committee has no hesitation in recommending the bill to the Senate for its approval.

## PORTAL-TO-PORTAL ACT OF 1947

*For text of Act see p. 81.*

### HOUSE COMMITTEE ON THE JUDICIARY

*House Report No. 71, Feb. 25, 1947*

THE Committee on the Judiciary, to whom was referred the bill (H. R. 2157) to define and limit the jurisdiction of the courts, to regulate actions and proceedings arising under certain laws of the United States, and for other purposes, having considered the same, report favorably thereon, with the recommendation that the bill do pass.

Public hearings were held before Subcommittee No. 2 of the Judiciary Committee on the general subjects involved in the recommended legislation. At that time H.R. 584 and House Joint Resolution 91 were given consideration.

### GENERAL STATEMENT

H.R. 2157 may be divided into two parts. One part deals with certain claims, actions, and proceedings concerning alleged wages and overtime

compensation, based on activities not at the time in question considered compensable, either (1) by express agreement between employer and employee, or (2) by custom or practice at the time and place of employment. These are popularly known as portal-to-portal claims or suits, although the term is not entirely accurate. The other part relates generally to claims, causes of action, actions, and proceedings under the Fair Labor Standards Act, the Walsh-Healey Act, and the Bacon-Davis Act.

## PART I. CLAIMS BASED ON ACTIVITIES NOT AT THE TIME CONSIDERED COMPENSABLE BY EXPRESS AGREEMENT OR BY CUSTOM OR PRACTICE

### 1. NATURE OF THE PROBLEM

The Fair Labor Standards Act requires the payment to all employees under the act of a certain minimum wage, together with overtime compensation at a rate not less than one and one-half times the regular rate at which each is employed. Section 16 (b) provides that any employer who violates these provisions—

> shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

Provision is made for an action by any employee in behalf of himself and other employees similarly situated, in which attorney fees may also be taxed as part of the costs against the employer.

The Fair Labor Standards Act does not define "work" or "workweek" and does not prescribe what preliminary or incidental activities shall be compensable under the provisions of the law. That was left to be settled by the employer and employee, either by express agreement or by implied agreement, based on the custom or practice in that particular place of employment. That had been the general situation for many years prior to the passage of the act.

In Anderson v. Mt. Clemens Pottery Co. the Supreme Court had before it important issues "concerning the proper determination of working time for purposes of the Fair Labor Standards Act." Involved was the question whether time spent in walking on the employer's premises to the work station and time spent in certain preliminary and incidental activities must be included in the compensable workweek.

The Court said:

> It follows that the time spent in walking to work on the employer's premises, after the time clocks were punched, involved "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business" (Tennessee Coal Co. v. Muscoda Local, 321 U.S. 590, 598; Jewell Ridge Co. v. Local No. 6167, 325 U.S. 161, 164-166). Work of that character must be included in the statutory workweek and compensated accordingly, regardless of contrary custom or contract.

A similar conclusion was reached in regard to the preliminary activities.

The far-reaching result of this new doctrine may be demonstrated by applying it to a concrete situation.

For example, suppose an employee receiving a 70-cent regular hourly rate and who had already worked during that week the statutory maximum number of hours had also put in 30 minutes each day in the walking or other incidental activities referred to by the Court. For a 5-day week, such employee could recover under section 16 (b) $2.625 in addition to the wages previously agreed upon between him and his employer either by express agreement or by custom or practice. Assuming he worked 50 weeks in the year, the recovery for that period would be $362.50. There being no Federal statute of limitations covering the Fair Labor Standards Act, the claimant's right of recovery would extend back to the beginning of his employment, limited only by the effective date of the act (June 25, 1938), and by any applicable State statute of limitations. If the latter were 4 years, the liability of the employer would be $1,050, plus attorney fees and costs. Multiply that figure by the number of employees similarly situated and an idea will be obtained of the employer's potential liability. Apply these calculations to the total number of employers under the act and an idea will be gained as to the seriousness of the threat to the national economy.

It must be remembered also that the action for liquidated damages under the wage-hour law cannot be waived or compromised by agreement between the employer and employee (Brooklyn Savings Bank v. O'Neil, 323 U.S. 698).

Nor can the Court avoid the assessment of the full amount of liquidated damages, regardless of the good faith of the employer.

Is this provision of the law as to liquidated damages mandatory or discretionary? Since the act has been violated in good faith in this case, we would indeed like to hold that it is discretionary. It seems a keen injustice for employers bewildered by strange legislation and confused by divergent authority in the courts to be subjected to such a measure. Yet no matter how much we lament its harshness, the section appears to be mandatory, and virtually all the courts have so construed it (Missel v. Overnight Transportation Co., 316 U.S. 572).

## 2. EXTENT OF THE PROBLEM

Following the decision in the Mount Clemens Pottery case, many suits were filed in all parts of the country seeking to recover large amounts claimed to be due under the formula laid down in that case.

The quarterly report of the Director of the Administrative Office of the United States Courts, dated February 13, 1942, points out that between July 1, 1946, and January 31, 1947, 1,913 such cases were filed in the Federal district courts. Of this number, 398 did not claim a definite amount but left the court to establish how much was due. The remaining 1,515 cases claimed a total of $5,785,204,606. Sixty-two percent of the 1,913 cases commenced during the 7-month period were filed the last month thereof, January 1947.

The report, of course, does not include the number of similar cases filed in the State courts.

Considerable evidence has been presented as to the impact of these suits in particular industries. For example, one listing of suits filed in all parts of the country shows 395,223 employees claiming a total of $775,705,800, or an average of over $1,900 for each claimant. One

incident is known where the amount claimed for a single employee is $10,000. The fact that the time period involved includes the war years when wages were high with many hours worked over the statutory maximum, has greatly increased the potential liability. Then, too, the coverage of the Fair Labor Standards Act has been greatly extended since its effective date in 1938. The Administrator estimated as of October 4, 1945, that the act applied to 21,000,000 workers.

The serious nature of these claims is illustrated by the largest settlement reported to date. Under this settlement, an employer agreed to pay a total of $4,656,000 to 4,200 employees and covering a period from September 9, 1940, to September 9, 1946, or an average of $1,108 per employee.

The procedure in these suits follows a general pattern. A petition is filed under section 16 (b) by one or two employees in behalf of many others. To this is attached interrogatories calling upon the employer to furnish specific information regarding each employee during the entire period of employment. The furnishing of this data alone is a tremendous financial burden to the employer.

One employer testified that he had been called upon to furnish information concerning 462 claimants. The data called for included job classification for each of 425 weeks, the scheduled starting and quitting time, total number of hours for which compensation was paid, the regular hourly rate paid, number of hours for which payment had been made at overtime rates, number of hours shown on their cards between punching the time clock in and out. In all, 4,123,050 items would need to be listed separately at a total estimated cost of $80,000. The same witness estimated the total cost to supply data for all employees, plus the cost of defending the suit, would be $300,000.

In addition to the financial problem, the suits constitute a serious threat to industrial relations and to the principle of collective bargaining. In some cases the time now sought to be declared compensable had been the subject of collective-bargaining agreements.

One good illustration will be found in the coal industry. For many years, both coal miners and operators generally agreed that "traveltime" was not worktime. Wages were adjusted on that basis. In fact, it was the subject of collective-bargaining agreements between the operators and the union. In accordance with this understanding, the Wage and Hour Administrator ruled that such traveltime was not worktime under the act. Thereafter, in the case of Jewell Ridge Coal Co. v. Local No. 6167, United Mine Workers (322 U.S. 756), the Supreme Court of the United States held that, notwithstanding the collective-bargaining agreement, traveltime was worktime. This decision had the practical effect of creating new and unforeseen contingent liabilities which both parties had deliberately attempted to avoid.

The successful prosecution of these suits will cost the Federal Government a staggering sum of money. The amounts paid by employers having cost-plus-fixed-fee contracts, together with litigation expenses, are all chargeable against the Government. The Comptroller General has so decided (Comptroller General Decision B-38642, 23 Comp.Gen. 439).

Case 1:05-cv-00142-NBF Document 120-7 Filed 12/21/2007 Page 23 of 26



There will also be a loss of revenue through deductions and refunds in taxes.

Cost-plus-a-fixed-fee contracts in the War Department during the period 1941 to 1946 totaled between forty and forty-five billion dollars. As of February 14, 1947, claims had been asserted under these contracts of about $600,000,000. It was estimated by Under Secretary Kenneth C. Royall at the hearings that the maximum potential liability could go as high as $1,400,000,000.

Attention was also called to the fact that during the period 1941 to 1946 the War Department also awarded approximately $100,000,000,000 in lump-sum contracts. While the Government would not have the same legal liability as attachés in the cost-plus-fixed-fee type of contract, nevertheless there might be a moral obligation, the discharge of which would add another huge amount.

There might also be an additional, although apparently limited loss, in connection with renegotiation proceedings.

As of February 5, 1947, the Maritime Commission had received notification from 18 contractors of the filing of portal-to-portal suits against them. In five of the suits the amount claimed was $128,500,000. The witness for the Commission estimated the additional liability as between $50,000,000 and $150,000,000.

> The greatest potential liability would undoubtedly arise under the ship construction contracts. To a lesser extent, liability will presumably arise under ship repair contracts, stevedoring contracts, terminal contracts, and miscellaneous contracts of a cost-plus-a-fixed-fee nature.

The Honorable W. John Kenney, Assistant Secretary of the Navy, pointed out in his statement to the committee the effect of the portal-to-portal pay problem on the Navy Department. He said:

> There are four fields in which the Navy has an interest. First, cost-plus-fixed-fee contracts; second, fixed-price contracts containing provision for escalation in price by reason of increased labor costs; third, terminated fixed-price contracts; and fourth, renegotiation.

Mr. Kenney estimated a potential liability in cost-plus-fixed-fee contracts of $720,000,000. In the field of fixed-price contracts with escalation clauses, he declined to make an estimate but said the liability "will probably be substantial, as the great bulk of contracting done by the Navy Department during the war was on a fixed-price basis, and many contracts contained escalation clauses of this character." In regard to terminated fixed contracts and renegotiation, there was also the possibility of liability but apparently in smaller amounts.

The Walsh-Healey Act also concerns itself in its field with minimum wages and overtime compensation. The Bacon-Davis Act has provisions relating to minimum wages and other conditions of employment. These two acts are therefore affected by the Mount Clemens decision. The situation described herein as to the Fair Labor Standards Act applies to that existing under the Walsh-Healey Act and the Bacon-Davis Act. The same necessity exists there for remedial legislation.

The witnesses for the Government departments called attention to the serious administrative burden placed upon the departments "in maintaining such controls and review as are necessary to safeguard the best



A395

interests of the Government." It was admitted generally that the expense involved here would be tremendous, whether the various suits were successfully prosecuted or not.

The evidence is conclusive that the maintenance of these suits or the attempts to prosecute them further is a serious threat to the welfare of the Nation. The cost would bankrupt many employers and seriously retard the activities of many others. The amount claimed in some suits is more than the value of the employer's plant. The aircraft industry reports that the suits against it amount to more than its present net worth.

The uncertainty of the present situation with its tremendous threat is seriously interfering with efforts to return to a peacetime economy with full and efficient production; it has clogged the courts with new and expensive litigation; it interferes with the right of collective bargaining; it threatens to add greatly to the cost of goods and services bought by the Government, while at the same time reducing the Federal revenue; it is a serious burden on interstate commerce.

Pay for the activities and time in question was not contemplated when the contract of employment was made. As stated by Under Secretary William C. Foster, of the Department of Commerce, at the hearings:

> Businessmen have indicated to the Department that when they worked out employment agreements, the rates of pay which were set were regarded as compensating the employee for all work done for the employer's benefit.

The amounts recovered are purely a windfall to the persons recovering them.

## 3. THE REMEDY PROPOSED IN H.R. 2157

The claims and suits heretofore described are dealt with directly in sections 3 and 4 of this bill. These sections prohibit the maintenance of such suits in any of the courts of the United States, either Federal or State, and declare that such courts shall have no jurisdiction to proceed with such actions. These sections apply to actions commenced prior to the effective date of the act as well as those commenced thereafter.

The sections apply to all actions and proceedings of every kind based on the activities in question, including all suits for wages, damages, or penalties, actions for injunctions and criminal prosecution.

## 4. CONSTITUTIONALITY

The constitutional questions involved have been carefully considered by the committee. No attempt will be made here to review the many cases bearing on the subject. We call attention however to the following propositions:

A. Congress has the power to regulate the jurisdiction of the Federal district courts and may withdraw entirely the right of such courts to proceed with suits based on rights created by a Federal statute (Kline v. Burke Construction Co., 260 U.S. 226).

B. It also has the power to withdraw from the State courts the right to adjudicate causes arising out of Federal statutes (Bowles v. Willingham, 321 U.S. 503).

C. Claims for minimum wages, overtime compensation, liquidated damages and penalties are not vested property rights within the protec-

tion of the fifth amendment. They are purely statutory rights which may be withdrawn by the Congress at any time before they have ripened into a final judgment from which appeal cannot be taken (16 C.J.S., sec. 254; Norris v. Crocker, 13 How. 429; U. S. ex rel. Rodriquez v. Weekly Publication, Inc., 144 F.2d 186; National Carloading Corporation v. Phoenix-El Paso Express, Inc., 142 Tex. 141; In re Joseph T. Hall, 167 U.S. 38; Western Union Telegraph Co. v. L. & N. R. R. Co., 258 U.S. 13; Maryland v. B. & O. R. R. Co., 3 How. 534).

D. Even if the right to recover overtime compensation, etc., is a vested property right, it could nevertheless be abrogated by Congress in the exercise of its constitutional duty to regulate interstate commerce (Norman v. B. & O. R. R. Co., 294 U.S. 240; Louisville & Nashville R. R. Co. v. Mottley, 219 U.S. 467; Second Employer's Liability cases, 223 U.S. 1; Philadelphia B. & W. R. Co. v. Schubert, 224 U.S. 603; North American Co. v. Securities & Exchange Comm., 327 U.S. 686; American Power & Light Co. v. Securities & Exchange Comm., 67 Sup.Ct. 133).

## PART II. PROVISIONS AFFECTING ALL CLAIMS, CAUSES OF ACTION, AND ACTIONS UNDER THE FAIR LABOR STANDARDS ACT (29 U.S.C., SEC. 201, 219), THE WALSH-HEALEY ACT (41 U.S.C. SECS. 35, 45), AND THE BACON-DAVIS ACT (40 U.S.C. SECS. 276a TO 276c)

### 1. STATUTE OF LIMITATIONS

Actions for the recovery of wages, overtime compensation, penalties, or damages (actual, liquidated, or compensatory) must be commenced within 1 year after the cause of action accrued. This provision applies to actions accruing both before and after the effective date of this act. Causes of action which had accrued more than 1 year prior to the effective date of the act may nevertheless be commenced within 6 months after said effective date. As to the individual claimant, the action is deemed to be commenced when he is named as a party to the action. In other words, the commencement of an action does not stop the running of the statute for all those who later become parties. Causes of action which on the effective date of the act are already barred by any applicable State statute of limitations are not revived but remain barred. In computing the 1-year or 6-month period, the period or periods of time during which a defendant is not found within the United States so that process may be served on him, will be excluded.

The limitation herein provided applies only to the statutory actions or proceedings set forth in the acts enumerated in section 5 of H.R. 2157. Actions under the common law, or under State statutes for recovery of wages are not affected.

The desirability of a uniform Federal statute of limitations has often been pointed out. In the absence of such a statute, courts are required to enforce the State statute deemed to be applicable. (See U. S. Code, title 28, sec. 725.) This has caused confusion and a lack of uniformity throughout the Nation.

## 2. THE "GOOD FAITH" PROVISION

The purpose of this provision is to protect the employer against the retroactive effect of changes in administrative regulations, etc. It is not limited to regulations of the Wage and Hour Administration. On the contrary, the protection extends to all regulations, etc., of the executive branch of the Government which affect the liability of the employer in the three statutes set out in section 5. Included also is a decision of a court of record to which the employer was a party in interest.

The defense must be pleaded and proved by the employer. It is a permissible defense in any action pending on the effective date of this act or commenced any time thereafter. It applies to causes of action regardless of the time when they may have accrued.

Congress has the power to provide protection to employers who have complied in good faith with administrative regulation, interpretation, or enforcement practices. (See Graham & Foster v. Goodsell, 282 U.S. 409; Skidmore v. Swift & Co., 323 U.S. 134.)

## 3. SETTLEMENT OF CLAIMS

Section 2 (b) provides that any claim, cause of action, or action may be settled or released. This provision applies to settlement both before and after the effective date of the act. To be valid, however, such a settlement must be free from fraud or duress.

Assignment of such claims, causes of action, action, or interest therein, is prohibited.

## 4. ASSESSMENT OF DAMAGES

In Missel v. Overnight Transportation Co. (316 U.S. 572) the court expressed regret that the imposition of the full amount of liquidated damages under section 16 (b) of the Fair Labor Standards Act was mandatory. Section 2 (g) of this act would remedy that situation. Under its provision, the court could award liquidated damages or penalties for a violation of the law only if it found that the violation was in bad faith and without reasonable ground. In that event, the amount awarded would be in the discretion of the court but not of course in excess of the maximum specified in the law under which the action arose.

# BIG BEND NATIONAL PARK—U. S. COMMISSIONER

*For text of Act see p. 33.*

## HOUSE COMMITTEE ON PUBLIC LANDS

*House Report No. 100, March 6, 1947*

THE Committee on Public Lands, to whom was referred the bill (H. R. 490) providing for the appointment of a United States commissioner for the Big Bend National Park in the State of Texas, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 1 line 9, strike out the comma and all thereafter in line 9.

Page 1 line 10, strike out all of line 10 except the word "appoint".