# EXHIBIT 32

VICKI L. DRAPER

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

COPY

- - - - - - - - - - - - - -x

ARTURO MORENO, JR., :

et al., : Civil Number

Plaintiffs, : 04-0899 (PLF)

vs. :

BUREAU OF U.S. :

CITIZENSHIP AND :

IMMIGRATION SERVICES, :

DEPARTMENT OF HOMELAND :

SECURITY, :

Defendant. :

- - - - - - - - - - - - - -x

DEPOSITION OF VICKI L. DRAPER

Washington, DC

Thursday, November 30, 2006

REPORTED BY:

VICTORIA L. WILSON

VICKI L. DRAPER

A My attorney told me that.

Q Okay. Ms. Draper, what is your current job title?

A Lead compensation specialist.

Q And is that within any particular subdivision within OPM?

A You mean the name of my office, my direct office?

Q Yes.

A Yes. Okay. Yes. I am in the Pay and Leave Administration Group.

Q Okay. And is that group within another subdivision of OPM?

A The Center for Pay and Leave Administration.

Q Okay. And is that group within another subdivision of OPM?

A Of course. The Strategic Human Resources Policy Division.

Q And is that division within another subdivision?

A Office of Personnel Management.

Q Okay. Thank you.

And how long have you held that job title?

VICKI L. DRAPER

A Five years tomorrow, December 1st.
Q Congratulations. Congratulations.
And before you had that job title, what was your title?
A Human Resources Specialist --
Q Okay.
A -- but not at OPM.
Q And where were you at Human Resources?
A Department of Defense.
Q And how long did you hold the job as human resource specialist at the Department of Defense?
A Seven years.
Q Before we go any further, I should have said this earlier, and I have a habit sometimes of doing this, too. If you let me finish my questions before you answer -- it is common to try and get the answer out and sometimes I may ask a question before you are finished with your answer. If that's the case, let me know.
A Okay.
Q Because it is important you say everything you have got to say. It is also important that the question gets out that is accurate.
A Okay.

VICKI L. DRAPER

Q Okay. What I would like to do now is walk through the process of discussing how any OPM guidance on that issue was developed. I have some documents that I think will help. But I think probably a lot of it took place in other ways that, hopefully, you will be able to talk about.

The first thing I would like to ask is do you know if anyone solicited advice from OPM regarding the obligation to pay overtime on the sixth day of basic training of FLETC?

A Yes.

Q And do you understand that at some point, the FLETC began implementing a six-day-a-week training schedule for basic training?

A Yes.

Q And do you know when that began?

A I don't know.

Q Do you have an idea when it began?

A I believe it began early in 2002.

Q And, again, did OPM receive a request for guidance on how they should pay for that sixth day of training a week?

A Yes.

Q And do you remember when OPM first

received a request for guidance on that?
A January 2002.
Q And do you know who that request came from?
A Gary Wilson from the Forest Service.
Q And do you know who that request came to at OPM?
A It came to our office.
Q And when you say, "came to our office," did --
A It was a phone call. He called.
Q Do you know who he called?
A He ended up talking to me.
Q And do you remember how the conversation went?
MR. RAYEL: Objection; vague.
THE WITNESS: Not verbatim. That was a little while ago.
BY MR. SWEENEY:
Q I appreciate that was a little while ago. Your best recollection as to how that conversation went?
A He asked if the sixth day of training constituted hours of work and whether or not they

were obligated to pay overtime pay.

Q And did he send anything in writing to you on the issue?

A No.

Q Just a telephone call?

A Right.

Q And that was in January of 2002?

A Correct.

Q And did you respond to him in that telephone call, that first telephone call?

A Not immediately, no.

Q What did you say to him in that first telephone call?

A I told him I wanted to read the regulations and that I would get back to him.

Q And what, in fact, did you do after that telephone call?

A I researched in Part 551 and read the regulations that were relevant to that issue.

Q Do you remember what regulations you read?

A 5 CFR 551.423(a)(3).

Q Any others?

A No.

Q This may be a surprise to you but I have a

VICKI L. DRAPER

copy of 551.423(a) I would like to show you and this has already been marked as Plaintiff's Exhibit 1.

(Witness reviewed the document.)

Q Is this the regulation that you reviewed after the conversation with Mr. Wilson?

A Correct; yes, it is.

Q Okay. And is the only part that you reviewed here 551.423(a)(3)?

A Yes.

Q You did not review (a)(1); is that right?

A Well, I read the entire thing but since he said it was entry level training, (a)(3) was applicable.

Q Okay. But did you review the entire 423(a) section?

A Yes.

Q Okay. Do you know if you reviewed the (b) and (c) sections, as well?

A I don't recall that I did.

Q And if you look at 423(a)(3), it references the Veterans Readjustment Act, 5 CFR Part 307. Did you review that in response to Mr. Wilson's call?

A No, because this was not training under

VICKI L. DRAPER

the VRA.

Q Okay.

A So it was not relevant.

Q It also references Section 410.402(b). Did you review that section?

A Yes, I did.

Q Okay. And what does that section refer to?

A That section refers to the exceptions for paying premium pay, including overtime, during training, while employees are in training.

Q But those exceptions are not under the Fair Labor Standards Act, are they?

A No. They are under Title 5.

Q Which is the --

A Which is --

Q Do you know the name of that statute? Is it the Federal Pay and Leave statute?

A Oh, that's the old name for it. FEPA, Federal Employees Pay Act.

Q Okay. So regulation 410.402(b) is an implementation of FEPA; is that correct?

A Correct.

Q It also references here Section 551.401.

VICKI L. DRAPER

Did you review that section when you reviewed (a)(3)?

A I don't recall.

Q Do you know what 551.401 refers to?

A I don't recall.

Q Did you refer to any other documents or resources in response to Mr. Wilson's call?

A I don't recall that I did, no.

Q Do you know if you looked at the statute, Title 5?

A No.

Q Do you know if you looked at the Fair Labor Standards Act?

A No.

Q Do you know if you looked in the filing cabinet for any historical documents with respect to this Section 551?

A No.

Q Do you know if you spoke to anyone else for advice on the issue?

A I believe I did speak with Jo Ann Perrini and Bryce Baker, yes.

Q And how long after Mr. Wilson's call did you speak with Jo Ann Perrini and Bryce Baker?

VICKI L. DRAPER

A That afternoon.
Q Okay. And who did you speak to first?
A I don't remember.
Q And did you speak to Ms. Perrini and Mr. Baker after you had reviewed this regulation section?
A Yes.
Q Were you involved in drafting this regulation?
A No. No.
Q Do you know if Mr. Baker was involved in drafting the regulation?
A Not to my knowledge, no.
Q Do you know if Ms. Perrini was involved in drafting --
A Not to my knowledge.
Q And do you remember the gravamen of what you said to Ms. Perrini?
A I said to her that I didn't believe that it was hours of work under the FLSA, our regulations, and that the only way they could pay overtime pay was to get an exception under 410.402.
Q What did Mr. Wilson explain to you was the situation with respect to the basic training?

VICKI L. DRAPER

THE WITNESS: No, the difference is -- I'm trying to differentiate work from training, from receiving training.

BY MR. SWEENEY:

Q Okay. So, just want to be clear. After you had the conversation, the initial conversation, with Mr. Wilson, you didn't look at the regulation 551.421, did you?

A I did not.

Q Did you look at the regulation 5 CFR 610.111?

A I did not.

Q Okay. So you didn't look to the regulations for a definition of "regular working hours"; is that right?

A No, I did not.

Q Okay. You relied on what you understood to be the regular interpretation.

A Correct.

Q And you believed that that regular interpretation is laid out in FPM letter 551.17; is that right?

A Dash 17.

Q Dash 17. Thank you. Is that right?

VICKI L. DRAPER

A Yes.

Q But 551-17 doesn't specifically say that regular working hours are limited to 40 hours; is that right?

A Does not.

Q Does it give a definition of "regular working hours"?

A It does not.

Q Okay. Is there anywhere else that you relied upon for the interpretation that regular working hours was limited to 40 hours in a week?

A No.

Q So this is the only document that you relied on; is that right?

A The CFR. I relied on the CFR.

Q And when you say, "the CFR," you mean Section 5 --

A The Code of Federal --

Q -- Section 551.423; is that right?

A (A)(3).

Q (A)(3).

A Correct.

Q And when you were looking at that and you were looking at the term "regular working hours," I

VICKI L. DRAPER

believe you said that you relied on a long-standing OPM interpretation that regular working hours were limited to 40 hours; is that right?

A No. I think you might have misunderstood me. What I meant was the long-standing interpretation was that for employees in training in excess of 40 hours in the week, unless productive work was being performed or an exception was granted under Part 410, those hours do not constitute hours of work for overtime pay purposes, if it is entry level training, which is what this was.

Q And I believe you said that for that interpretation, you relied on FPM letter 551-117; is that right?

A I didn't rely on it, no. I relied on the CFR.

Q Okay. Well, I'm trying to figure out how you came up with that interpretation of "regular working hours."

A I didn't come up with it.

Q Who did?

A Bryce Baker.

Q Okay. So did you ask Mr. Baker what "regular working hours" mean?

VICKI L. DRAPER

A No. We discussed this issue. As I said, I went to Ms. Perrini and Mr. Baker when Mr. Wilson called and we discussed the issue and we all decided that an exception would be their best way to go, and then, subsequently, Mr. Baker was reviewing the entire Part 551, it was just a matter of, like, a week later, I believe, or two weeks later. I can't remember the exact time frame.

Q I want to make sure we are straight here. Before you went to Ms. Perrini and Mr. Baker, it was your opinion that the people that performed basic training for six days of work a week at FLETC were not entitled to overtime pay for the sixth day of work; is that correct?

A Correct.

Q Sixth day of training?

A Sixth day of training; correct.

Q Is that correct?

A Correct.

Q And in formulating that opinion, you used an interpretation of (a)(3)?

A Correct.

Q Of the term "regular working hours"; is that right?

VICKI L. DRAPER

training was not productive work?

A The fact that it is written in this regulation. Entry level training when no productive work is performed outside regular working hours is not hours of work.

Q So you went to Mr. Bryce?

A No, Mr. Baker.

Q Mr. Baker. I'm sorry. Bryce Baker.

A And Ms. Perrini.

Q And Ms. Perrini?

A Yes.

Q Did you go to them together?

A Yes.

Q Okay. And you presented Mr. Wilson's request for guidance; is that correct?

A Yes.

Q And you also gave them your opinion; is that right?

A Yes.

Q And how did they respond?

A I don't recall exactly. I believe that we all agreed that the only way to pay the sixth day of training would be to get an exception. I do recall that, that the ultimate outcome of the conversation

VICKI L. DRAPER

was that we were in agreement.

Q Do you know if you discussed the meaning of the term "regular working hours"?

A We did not.

Q Do you know if you discussed whether or not training constituted productive work?

A We did not.

Q Do you know if you discussed 551.423(a)(1)?

A No, we did not.

Q Why did you go to Ms. Perrini and Mr. Baker?

A Because I wanted to be sure before I gave advice to an agency that it was correct --

Q If --

A -- or that they agreed.

Q If you had to ensure that your advice was correct, would you have gone to Ms. Perrini and Mr. Baker?

A No.

Q So is it fair to say there was some concern on your part that you may not have gotten it right?

A Yes.

VICKI L. DRAPER

Q So you went to them for confirmation that you had gotten it right; is that right?
A Right. And I was new to OPM so I wanted to be sure.
Q When did you start at OPM?
A December 1st, 2001, so I had only been there about one month.
Q Okay. And do you know if Ms. Perrini or Mr. Baker discussed this issue with anyone else?
A I don't know.
Q Okay. And so you had this meeting with Ms. Perrini and Mr. Baker and there was general agreement that the interpretation was that FLSA overtime was not due for that sixth day of training; is that right?
A Right, unless they got the exception under Part 410.
Q And at that point had Mr. Wilson indicated that they had gotten an exception under 410?
A No.
Q What did you do after that?
A I called Mr. Wilson back.
Q And what did you tell him?
A I told him that it did not constitute

VICKI L. DRAPER

hours of work and that the agency would have to get an exception to pay it.

Q And what was his response to you?

A I don't recall.

Q Was any of this in writing?

A No.

Q Did you take any notes while you were doing the research on the issue?

A No.

Q Did you take any notes of your meeting with Ms. Perrini and Mr. Baker?

A No.

Q And that was early January of 2002; is that right?

A Correct.

Q Do you remember ever getting any other request for guidance on this issue?

A Not to me directly but I know that our office did.

Q Okay. And do you remember when the next request for guidance came?

A Not exactly, no.

Q Do you remember who that request for guidance went to?