# EXHIBIT 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ X

ARTURO MORENO, JR., )
individually and on behalf)
of others similarly )
situated, ) No. 05-142C
) Judge Firestone
)
Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )

Defendant.

------------------------------ X

Telephonic Deposition of Jerome Mikowicz
Thursday, January 11, 2007
Washington, D.C.

Job No.: 9926
Pages 1 - 297
Reported by: Kathy Savich, RPR

initiated on our own.
On the other hand, somebody could call OPM, they could contact me, and they could do that by a letter, they could do it by an email, they could do it by phone, they could do it in person and could ask me a question. And I could be the purveyor of official guidance by saying, "Read what's on the website. Read our regulations. Read the law."
But they could also ask questions that apply to certain situations. And to the extent that my staff or I can understand the context of what their question is and answer it, we would. And we would be relying on the law, the regulation, and what's on the OPM website as the official guidance that OPM has.
**Q. And when you say you're relying on the law and the website, anything else that you rely on in giving those responses to individual requests for guidance?**
A. I think the question you are asking is very broad. I can answer it in a broad way, theoretically. Okay. We would rely on court cases, for example. We might rely on





looking at a comptroller general decision. We might look at previous federal personnel management issuances under a system that we formally have. We may look under past regulations. We may look in our files for letters. We may look at what people presented at governmentwide conferences.
I mean, we are trying to obtain knowledge from different sources. Our job is to sort of sort it out and determine what's applicable in any particular situation. But I also mention our hierarchy as we go back to the law. I should also mention executive order in some cases, too.
But the law, the regulations, and what OPM -- what we have cleared through our Office of Personnel Management and placed on our website would be our primary sources.
**Q. So just to make sure I have this right, the primary source is the law, the regs, and what's been cleared on the website. And then there's a myriad of other sources that someone at OPM could look to to gain some insight when they're looking to give guidance; is that right?**





A. Yes.
**Q. And you mentioned a number of different things, court cases, controller general decisions, and I think you mentioned FPM letters; is that right?**
A. Yes.
**Q. And, indeed, in this case there is a question regarding an OPM letter -- an FPM letter. There has been testimony that FPM letters were rendered obsolete at one point. Is that correct?**
A. I'm going to answer that question with a yes and no, because I think it requires both. And although it sounds contradictory, would you permit me to explain?
**Q. Absolutely.**
A. I can't remember the exact dates, but I'm going to guess somewhere around 1994 to 1995, OPM declared that it would no longer publish, maintain, update, or even keep a copy officially of the Federal Personnel Manual.
Now, that manual was extensive, and it was my personal Bible when I entered government in 1974. So, this was, I want you to understand, a major way that OPM would





communicate, and before that the Civil Service Commission, would communicate with agencies. For many reasons, it was decided to drop it; among them, that it was not maintained, it was not accurate, it was not up to date.
And if OPM were to be administering the programs, it should be relying on law and regulations and whatever published elsewise and guidance should be up-to-date. And it was determined, I think, that the cost and work to maintain that system and try to keep it parallel and totally consistent with law and regulations would be difficult.
So some parts of the FPM were out of date, some were irrelevant, some things had weird materials. Like, windchill charts were in there, for example, had no absolute meaning in federal personnel, but I loved looking at them to make me realize how cold I was on a certain day. Or we even had humidity-type charts for how uncomfortable you could be on hot days.
So it was a wonderful collection of history and thoughts, and some good and some bad, but it was decided -- and I remember on

overseas. I am not a law enforcement officer. I am not working in a small city or out in the country or traveling a lot.

So there are so many perspectives that bear on a decision. And so this is a major agency. It has a lot of law enforcement officers that are going into the training. They may or may not have had a different understanding, interpretation of the law.

I am going to assume that they did, they saw it some way differently, and that it was of enough concern that they wanted to meet with OPM and explain those concerns.

And I don't know where the concerns went in DHS; if they were in the personnel office alone, that's one layer of complexity; if they were in some parts of DHS. There were more than 20 agencies which were combined to form one system. Now, these people were trying to develop one policy for over 20 agencies that may have had different levels of expertise, different levels of understanding.

So they were, themselves, probably struggling to regularize their rules and make sure everybody follows the same way. And





plus, I don't know who handled their legal advice, and whether it was all centralized and one office maybe handled it or whether they had different general counsels from the various agencies that were part of the reorganization.

And I would personally think -- and this is my belief, not an OPM statement -- but I believe that this was more difficult than would meet the eye because of the coordination factor of a brand new entity formally composed of more than 20 that are trying to arrive with an answer on the payment of overtime for a new situation that never existed before on the sixth day, and probably there were different opinions on it.

**Q. Well, Ms. Draper's opinion is pretty clear. It says that regular working hours that are in the regulations, in the regulations governing overtime for training, that phrase is defined in the regulations, and, indeed, it is. What's complicated about that issue, Mr. Mikowicz?**

A. Well --

MR. PEASE: Objection, vague. You





can answer.

A. Yeah. Ms. Draper, unfortunately, does not have the regulatory authority of the director of OPM or the authority to post information on a website.

If her inclination was, "I have seen the law, I have my interpretation, here is the regulation, I want to post it," she would then potentially write something up or have a game plan to tell her supervisor. That would go up the chain of command to the deputy associate director. That would go to the associate director. That might go to the general counsel.

There are things all along the way that bring in briefing new people. Some people might say, "I'm not going to clear this policy unless I have a briefing. You need to explain this to me." And then, "What is your schedule? When are you available?" Well, that might -- we can't do it today. We have to wait until next week.

So, yes, Vicki Draper was convinced, it was clear to her so much so that she advised another agency what she





interpreted and what she felt would be OPM's interpretation of the correct answer. And so things were put in motion to get this out to be a clarified document.

And the way we ultimately chose to do it was a question and answer. We could have chosen a CPM, a Compensation Policy Memo. We could have chosen a fact sheet. I suppose we could have even chosen to do a proposed regulation, or possibly an interim regulation, to make this even more clear in the regulations.

So there were a lot of decisions to be made and a lot of players in the process. And out of all of our customers at this time, DHS was a special customer, because we had a statutory role to work with them to develop regulations for their new human resources system.

So as they're thinking about their new human resources system they're confronting something in their existing system. A lot of moving parts. A lot people involved. These task forces had, you know, a lot of people on them, more people than were at this meeting,

what grounds an agency would argue cost when what guides us, or any attorney looking at this from DHS or OPM, is what does the Fair Labor Standards Act say, what does OPM's regulations say, what does the training law say, how does this all fit together.
None of those say cost is a consideration, except Part 410 there is an exception for cost, and there are times when you can pay premium pay if, overall, the cost of the training would be cheaper. So there is an exception in that sense, but nothing that would bear on this case. So, no, I don't know and can't imagine how that could be a factor.
**Q. Let me ask your counsel to present something to you. The document is marked Moreno 202 through 203. And we'll mark that, I guess, as Plaintiffs' -- what are we up to? 35?**
THE COURT REPORTER: Yes.
MR. SWEENEY: Thank you.
(Exhibit No. 35 marked for identification.)
A. It now has a sticker, and what would you like me to look at?
**Q. I'd just like you to look at one**





**line here. On the second email down is from Steve Cohen. Do you know who Steve Cohen is?**
A. Yes.
**Q. And who is he?**
A. Well, at one point he was my former boss. He was the -- an associate director at OPM. At this time, while I can't recall his exact title, he was a special advisor to the director of OPM, had a very high-profile position, and he was the point man, if I can use that term, in charge of getting OPM to work with the Department of Homeland Security to get a regulatory proposal to establish their new personnel system that the law gave them the opportunity to create.
**Q. And we know this is to Jo Ann Perrini and Don Winstead. We know -- we have already discussed who they are.**
A. Right.
**Q. Do you know who Kathie Whipple is?**
A. Yes.
**Q. And who is Kathie Whipple?**
A. She is a deputy to the general counsel at OPM.
**Q. Is she an attorney?**





A. Yes.
**Q. And James Green?**
A. He's also an attorney, and he is, I think, an associate general counsel at OPM.
**Q. And Steve Cohen says, "Please get back to Melissa Monday morning on this. She claims our change in position is going to cost them millions. I need to know if this is true."**
A. Uh-huh.
**Q. Why does he need to know if that's true if that's not relevant to the determination -- the proper determination of what the regulations say?**
A. Well --
MR. PEASE: Objection, calls for speculation. You can answer.
A. Well, I'm going to speculate, if I may, that it would be very relevant to his other job, which was to help DHS develop a new system.
And if they were encountering a personnel policy that would cost a lot of money, they probably would have to be concerned about paying for this change, and so





they may have to divert funds from other programs.
And second, as a speculation, as he was developing a new policy he may, you know, just want to know if this is true, so when they develop a new policy for a future system that they, you know, just take into account all the factors. And, of course, cost would be one.
They may propose for the future, after 9/11 cooled down, that they don't do training anymore on a six-day basis, or at least before it's approved it's a conscious decision because now the fact is it would cost more money.
So, as a bureaucrat, reading this myself, it doesn't surprise me at all, because we are always looking at program impact on whether it would be do we need more people, do we need more resources, is it going to cost, is it cheaper, then that would free up funds, so I would say that's a routine management concern, in my opinion.
**Q. And now you said -- well, the people that are copied on this, Don Winstead**