# EXHIBIT 37

WAYNE A. COLEMAN

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - -x

ARTURO MORENO, JR., et :

al., : No. 05-14210C

Plaintiffs, : (Judge Firestone)

vs. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - -x

30(b)(6) DEPOSITION OF WAYNE A. COLEMAN

Washington, DC

Thursday, November 2, 2006

REPORTED BY:

DONALD R. THACKER

WAYNE A. COLEMAN

**Department of Homeland Security?**

A Yes. And they are each a separate entity, but the idea was to try and maximize the return on investment by providing one personnel function for the three different components. So, that is why the questions would come from a number of places, not just the CBP itself.

**Q When you moved to the Department of Homeland Security now there is a very broad array of organizations?**

A The whole, right.

**Q When you were working with the Customs and Border Patrol what was your line of reporting?**

A I reported to a woman who was Chief of Classification and Compensation.

**Q And is that a person with the CBP?**

A Yes, Ronelle Rotterman, R-o-t-t-e-r-m-a-n.

**Q Do you know who she reported -- do you report directly to her?**

A I reported directly to her and she in turn reported to the director of human resources for Customs and Border Protection.

**Q Who was that?**

A At that time it was Robert M. Smith.





WAYNE A. COLEMAN

**Q Do you know how long he held that position?**

A Quite some time, probably in the area of 10 years, and he retired about, when did he retire -- it has been about a year or so ago that he retired.

**Q And who replaced him?**

A Fellow named Robin Hosenfeld, and I am going to guess at his spelling, I think it is H-o-s-e-n-f-e-l-d.

**Q Do you know who Mr. Smith -- strike. Do you know who the director of human resources for CBP reported to?**

A Yes, the commissioner of Customs, who is the head of CBP.

**Q Do you know who the commissioner of customs is?**

A No, not off the top of my head.

**Q Okay. Is this Commissioner of Customs a politically appointed job?**

A Yes.

**Q Would you consider the director of human resources for the CBP a political appointment?**

A No, he has been a career employee.





WAYNE A. COLEMAN

**Q And do you know where the Commissioner of Customs reports?**

A To the president. Well, actually that is not true. Commissioner of customs would actually report to the Secretary of the Department of Homeland Security.

**Q When you were a pay specialist with ICE what was your reporting structure?**

A I reported to John Ehrbar, E-h-r-b-a-r, he was the chief of classification -- I am sorry, Chief of Compensation Policy for ICE.

**Q Did you report directly to him?**

A Yes.

**Q Do you know who he reported to?**

A He reported to Rick Hastings, H-a-s-t-i-n-g-s.

**Q Do you know what his title was?**

A Director of Human Resources, I believe.

**Q Was that for ICE?**

A Yes.

**Q Do you know who Mr. Hastings reported to?**

A I think it is the executive assistant -- no, that is not right. It is the person who is in charge of the management within ICE, and I am sorry,





WAYNE A. COLEMAN

I don't remember the title.

**Q Do you remember the name?**

A No, I don't, as a matter of fact.

**Q But Mr. Hastings reported within the ICE structure?**

A Oh, yes, yes.

**Q And do you know if between Mr. Hastings there was a report, do you know who that report reported to?**

A The person who was in charge of management then reported directly to the assistant secretary for ICE, she is the director of ICE.

**Q Do you know who that is?**

A Julie Murphy -- Murray --

**Q If you don't --**

A I don't know. I can't, I have seen the name. I don't remember it right at the moment.

**Q A lot of knowledge to go. If at any point if you don't know that is a fine answer.**

A Okay.

**Q Although I would ask you, and I will make this request later, I would ask that the court reporter mark it, that if you do remember or can find out the name of that person between Rick**

WAYNE A. COLEMAN

**Q Oh, that they were owed, thank you.**

A Yes.

**Q How was the interest calculated?**

A The interest was calculated using a standard federal interest rate that the U.S. Office of Personnel Management identifies for back pay issues, and it was calculated from the time that they should have received the payment through the time that the payment was actually made.

**Q Do you know when the payment was actually made?**

A No, I don't. By the time the payments were actually being made I had moved from Customs and Border Protection up to the Department of Homeland Security and I wasn't really part of the actual payout.

**Q Do you remember submitting a declaration for a case with the same title as this one, in the United States District Court for the District of Columbia?**

A Yes, I do.

**Q Do you remember in that declaration saying that ICE will be able to make payments to the approximately 3900 affected employees during pay**





**WAYNE A. COLEMAN**

**period 7 or pay period 9 of calendar year 2005? I can show you if you like.**

A No; yes, I believe I do remember that, and the only thing is I can't say, since I wasn't there, whether or not the payment actually took place at that period of time. That certainly was the plan, as I remember it.

**Q So, Ms. Smalls has submitted a statement in this case saying that people were paid in December of 2004. Do you have any reason to believe that is not right?**

A No.

**Q Have you ever reviewed the records of the payments?**

A No, I have not.

**Q Were you involved in the process of actually paying the people at all?**

A No, I was not.

**Q Okay. Were you --**

A Well, let me back that up. I was involved at the front end when we were trying to collect the rosters of employees who attended the training, and trying to determine the number of hours of time that they had put in on this 6th, regularly scheduled 6th





WAYNE A. COLEMAN

day of training.

But about that time or about the time that we completed those calculations, then I moved on to the Department of Homeland Security so I was not directly involved in how the actual payout was made.

**Q And just to flesh out a little bit the claims in this case, do you understand the claims in this case to be by people that performed basic training at the Federal Law Enforcement Training Center in Glencoe, Georgia?**

A Yes.

**Q What company what do you understand their claims for overtime to be based on?**

A Well, under the Fair Labor Standards Act itself and the fact that what we came to understand later, but not initially, was that OPM changed its mind or reinterpreted the regulations to mean that because the training was regularly scheduled for a 6th day of training, even though it was basic training, something equivalent to an apprenticeship training, it was a compensable time under the Fair Labor Standards Act and, therefore, we owed them the Fair Labor Standards Act overtime for that period of time.





WAYNE A. COLEMAN

**Q What did you owe them the overtime for? I am trying to get back to what created this whole issue of overtime.**

**You testified to it in your declaration, you testify here that there was a period of time, there was a point in time where FLETC changed its schedule for basic training, is that right?**

A Yes, that is right.

**Q What was the change?**

A The change was going from a 5-day training schedule to a 6-day training schedule.

**Q So, people that were doing basic training at what we can call the FLETC, Federal Law Enforcement Training Center in Glencoe?**

A That is correct.

**Q Were required to perform basic training for 6 days a week; is that right?**

A That is correct.

**Q 8 hours a day, is that correct?**

A That is correct.

**Q What was the reason for that change?**

A The purpose was of course this followed very closely on the heels of the attacks on September the 11th of 2001, and the goal was to get

WAYNE A. COLEMAN

the mid-'80s or so, had gone over to the Department of Defense where he did a very similar kind of job, he was chief of their compensation policy, and then came back again to INS in 2004 -- 2003? 2003.

**Q He came back to INS in 2003. Was he at INS when the decision was made not to pay?**

A Yes, he was back by that time.

**Q Well, so --**

A I guess I have some concern here. I am a little unclear about the dates. And before the final decision was made, yes, it would have been in 2003. It was in August of 2003 that he came back.

**Q And when was the final decision made to pay them overtime -- strike that.**

**When was the final decision not to pay them overtime made?**

A I don't know that I would consider it a decision. It was just that we could not find a provision in the regulations which allowed us to pay them, that authorized the payment of overtime to these people.

And that was during the spring of 2002, so that would be before John was there, and I had misspoken then. So, while we were doing these





WAYNE A. COLEMAN

discussions it would have been another person who was the head of the compensation policy. He retired then in early 2003. There was a hiatus and then John came to work in August of 2003 as the Chief of Compensation Policy.

So the person who would have been discussing this is Phil Seneschal, P-h-i-l S-e-n-e-s-c-h-a-l.

**Q So, during the time when you were trying to figure out whether these people should be paid overtime or not in 2002, John Ehrbar wasn't there?**

A No.

**Q It was Phil Seneschal?**

A Yes.

**Q Did Phil Seneschal participate in that analysis?**

A He did.

**Q Did he have any particular specialty in overtime?**

A He had worked with human resources for a goodly number of years. I don't know that he had a very broad background in pay and compensation, I can't say that for sure.

He did have some understanding of it and





WAYNE A. COLEMAN

made some contribution to the conversation as well. I think he relied on Fred and I to sort of advise him though.

**Q And so is it fair to say that Fred and yourself were the two point people in doing the analysis, at least in 2002?**

A Yes.

**Q As to whether or not the people should be paid overtime for this scheduled 6th day of --**

A Yes.

**Q Do you remember what you did to make that determination?**

A Well, we went back and looked at the Fair Labor Standards Act regulation in Part 551 and Title V, and refreshed our memory on them. We went back and pulled copies of the Federal Personnel Manual letters that had been issued related to the Fair Labor Standards Act and looked at the ones related to training in particular. We probably looked, although I can't say that for sure, at this point, looked at some Comptroller General decisions to see what the Comptroller General had to say.

And we relied on the experience that we had in dealing with claims from employees over a





WAYNE A. COLEMAN

goodly number of period -- you know, goodly number of years.

**Q Did you contact OPM for guidance?**

A We did not, no.

**Q Do you know if you looked on the OPM web site for guidance?**

A We probably did, yes. It would have been a natural place to go.

**Q Do you know if you found any guidance there?**

A No, we did not find any.

**Q And you said you probably would have looked at the Comptroller General's opinions; right?**

A Yes.

**Q Did you find any guidance there?**

A Not a lot. There was some about overtime in training situations but nothing specific to, at least as I recall anyway, nothing specific to the basic training situation; more training in general.

**Q Did you say you looked at the civilian personnel law manual?**

A We didn't -- well, I don't know, we probably did. I don't know that we did that specifically, but it wouldn't be -- it would be a

issue and how much, how unusual it might be. Because there seemed to be general agreement among everybody that we talked with about that, there were no provisions to pay these people. I don't think that we felt that it was critical to make note of that.

**Q And when you say everyone you talked to, you have mentioned that Mr. Tingley, Ms. Smalls, yourself?**

A Right.

**Q Mr. Seneschal and this person at DOJ?**

A That is correct.

**Q Anyone else?**

A Not that I recall at that time, no.

**Q Anybody keep any -- well, let me ask this. How did you pass the advice on to Mr. Hastings?**

A It was probably done orally. I don't remember that we created a document for that. But I with was not in the meeting for whatever advice was provided him. I really don't know that for sure. I did not provide or prepare a document that would go forward.

**Q Who was in that meeting?**

A It would have been John Ehrbar.







**Q Is John Ehrbar with still with the INS?**

A No, he is retired.

**Q And did you provide any written notes or documents to Mr. Ehrbar for that meeting?**

A No, not that I recall, no. As I say, this was not an issue that was coming up for the first time. We had had questions in the past when employees, for whatever reason, believed that they had worked or been in class additional time beyond their basic 40-hour work week, and we had dealt with the issue of whether or not time spent in basic training was compensable and determined that it had not.

So, it really wasn't a new issue. It was the fact that this was FLETC's new policy now of having everybody go through this on a 6 day schedule.

**Q Well, this was a little different, right, because this training was scheduled, people were scheduled to work 6 days a week, and I think what you described just a moment ago was people, that was non-scheduled overtime hours is that right?**

A Some of it was scheduled, some of it was not.







**Q So, in the past with scheduled overtime for basic training did you, prior to this FLETC situation, did you do any research on whether or not that should be paid?**

A Yes, essentially the same kind of research we have just talked about.

**Q Can you tell me any specific instance in which that issue came up for you?**

A We had a number of questions for the people in basic training who were claiming that they should be paid overtime for time spent outside their regular eight-hour workday, at night, on exercises that were part of the basic training.

And we looked at that with an eye to finding out if it was an appropriate way to compensate the employee for that time. The determination was that under Part 410 of Title V of the Code of Federal Regulations there are exceptions to the general prohibition to paying premium pay to federal employees who are taking training.

One of those exceptions is that the employee is taking training at night because what they have to learn can only be learned at night. For example, if you are learning how to use a night







vision device, the only time it is effective to do that kind of training is at night. So, that time that would be regularly scheduled for the employee, we could pay the person night differential for those hours.

**Q So, do you remember when that happened?**

A Oh, it happened a number of times over the course of the time I was with INS and when I was with Customs.

**Q So, it was your understanding that if someone had regularly scheduled overtime at night for training that could only be done at night, they got overtime pay for that, right?**

A No, they got night differential pay for it. The Part 410 regulations are separate from the Fair Labor Standards, they are part of the Federal Employees Pay Act. They are -- within that Act it covers a number of topics. One of them is training for federal employees.

The provisions that talk about training say generally you will not pay an employee, a federal employee who is taking training, premium pay, and that includes overtime.

**Q I am sorry, that was regulation 410?**

WAYNE A. COLEMAN

MR. SWEENEY: I would be happy with the representation that a DHS Broadcast goes out to all the employees at this time --

MR. PEASE: I think you are better off asking Mr. Coleman about that, since this is a 30(b)(6) that is probably the best way to go about it.

BY MR. SWEENEY:

**Q Who does a DHS Broadcast go out to?**
A As has been said, all employees.
**Q Within DHS?**
A Yes, I am sorry.
**Q So, would you have received this at this time?**
A Yes.
**Q Now, this says it is forwarded on behalf of The Human Resources Management?**
A Yes.
**Q Who is Human Resources Management?**
A The Office of Human Resources Management for ICE; by this time it would be ICE.
**Q So, this is the human resources for ICE, not for all of DHS?**
A No. But what you have to understand is





WAYNE A. COLEMAN

that when the Department of Homeland Security was stood up, employees who had been part of the Immigration and Naturalization Service and the Department of Justice were in fact split out to three of the organizations that became part of the Department of Homeland Security; Customs and Border Protection, Citizen and Immigration Services and Immigration and Customs Enforcement.

And in addition to that, since we had people who were training at FLETC, throughout several of the authority components, we felt it only appropriate to notify all employees so that everybody had the same information at the same time, and then it wouldn't be any question as to what was being said to whom.

**Q And at this point you were working at ICE; is that right?**
A That is correct.
**Q Was ICE taking the lead on this issue?**
A Yes.
**Q So ICE was making decisions for Customs and Border --**
A ICE was making decisions for legacy INS employees.





WAYNE A. COLEMAN

**Q So ICE was making decisions for anyone who had trained for a 6th day at FLETC as an INS employee?**
A That is right.
**Q And ICE was also making decisions going forward for ICE employees, is that right?**
A That is right.
**Q Was ICE making decisions going forward for Customs-CBP?**
A No.
**Q Was it making decisions going forward for anyone else other than that?**
A I believe that because some of the employees from the INS had also ended up in Citizenship and Immigration Services that we were providing them direction. They did not have a personnel staff of their own, human resources staff of their own at that point, so we were providing lead for that, since those people previously had been under our human resources office as part of the INS.
**Q And the first line of this says, "Recently, we have had many inquiries from employees regarding the payment of premium pay for a 6th day**





**WAYNE A. COLEMAN**

**training in a 6-day training week while at FLETC." Was that your experience, that you were getting a lot of --**
A Yes.
**Q How were the inquiries coming in?**
A Some of them would be telephone, some of them would be e-mail.
**Q And any other way?**
A Not that I recall. Now, we may have had a couple of faxes that would have come in also.
**Q Any written letters?**
A No.
**Q And when these came in were they put in some central file?**
A No, as I recall we responded to each one as they came in.
**Q Was your office the one tasked with responding to them?**
A Yes.
**Q So, if an e-mail came in you would respond directly to that person?**
A Yes.
**Q And did you have a set response that you gave them?**