IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| Plaintiffs, | ) | No. 05-142C |
| v. | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| Defendant. | ) | |

**UNOPPOSED MOTION TO AMEND THE APPENDIX FILED WITH DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Appendix filed with our cross-motion for summary judgment and opposition to plaintiffs' motion for summary judgment be amended. It has come to the attention of the undersigned counsel that the electronic filing of the Appendix on December 21, 2007, inadvertently omitted Exhibit 32. Exhibit 32 consists of excerpts from the deposition of Wayne Coleman taken pursuant to Rule of the Court of Federal Claims 30(b)(6) on Nov. 2-3, 2006. Exhibit 32 is cited in footnote 8 of our brief and is cited extensively in the Defendant's Proposed Findings of Uncontroverted Fact and the Response to the Plaintiffs' Proposed Findings of Uncontroverted Fact.

Counsel for the plaintiffs, Matt Dunn, indicated today via electronic mail that the plaintiffs do not intend to oppose this motion.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Assistant Director

Of Counsel:
ARTHUR RETTINGER
Senior Counsel
Office of Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229
Tel: (202) 344-2978
FAX: (202) 344-2950

MELANIE WATSON
Attorney-Advisor
Office of Personnel Management
1900 E Street, NW
Washington, DC 20415
Tel: (202) 606-1700
Fax: (202) 606-0082

s/ Maame A.F. Ewusi-Mensah
MAAME A.F. EWUSI-MENSAH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0503
Fax: (202) 514-8624

June 10, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 8th day of June 2008, a copy of the foregoing "MOTION TO AMEND THE APPENDIX FILED WITH DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Maame A.F. Ewusi-Mensah

**EXHIBIT 32**

WAYNE A. COLEMAN

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - -x

ARTURO MORENO, JR., et :

al., : No. 05-14210C

Plaintiffs, : (Judge Firestone)

vs. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - -x

30(b)(6) DEPOSITION OF WAYNE A. COLEMAN

Washington, DC

Thursday, November 2, 2006

REPORTED BY:

DONALD R. THACKER

WAYNE A. COLEMAN

Deposition of WAYNE A. COLEMAN, called for examination pursuant to notice of deposition, on November 2, 2006, in Washington, DC, at the Offices of the U.S. Department of Justice, 1100 L Street, Northwest, 4th Floor Conference Room, at 9:00 a.m., before DONALD R. THACKER, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

MICHAEL J.D. SWEENEY, ESQ.
Getman Law Office
9 Paradies Lane
New Paltz, New York 12561
845-255-9370
845-255-8649
MSweeney@getmanlaw.com
On behalf of Plaintiff

-- continued --





WAYNE A. COLEMAN

APPEARANCES (Continued):

JEFFREY S. PEASE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, Northwest
Washington, D.C. 20005
and
ARTHUR I. RETTINGER, ESQ.
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, Northwest, Suite 4.4-B
Washington, D.C. 20229
On behalf of Defendant





WAYNE A. COLEMAN

P R O C E E D I N G S

Whereupon,

WAYNE A. COLEMAN

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SWEENEY:

**Q Good morning, Mr. Coleman.**
A Good morning.
**Q How are you this morning?**
A Oh, peachy.
**Q My name is Mike Sweeney, and I am an attorney and I represent the plaintiffs in this action, which is Arturo Moreno versus the United States.**
**I want to go over a couple of ground rules before we begin. Have you ever been deposed before?**
A Yes, I have.
**Q You should understand most of these. If you have any questions let me know.**
**The first one is, you are here today to testify as a representative of the United States government, do you understand that?**
A Yes, sir.





WAYNE A. COLEMAN

**Q I would ask you during the course of the deposition I am going to ask you questions, and we will ask you to respond to those questions, ask that your answers are audible. Right now you are nodding your head.**
A Yes.
**Q Hard for the reporter to record that.**
A Yes, okay.
**Q He will probably be good, sometimes I do that too, but he will probably be good at letting us know, but try to make the answers verbal.**
**When I ask you a question, if you don't understand it, if there is something there you don't understand, please just stop me, tell me you don't understand it. I will try to restate it in another way. The assumption will be, though, if you answer it that you understood it.**
A Okay.
**Q Okay. I would ask that you give complete answers?**
A Okay.
**Q And let me ask you, is there any reason you would not be able to answer questions fully and truthfully today?**

WAYNE A. COLEMAN

**brought up before.**

A Abbreviations.

**Q If there is one thing I am learning, there are a lot of acronyms here, and once we have said them that is fine, so, we are all on the same page we understand them, but if you are going to use them, or any technical terms, please let us know you are using it in case we are not aware, and we will try to define them so we are all working on the same page?**

A Okay.

**Q So, we have you Acting Deputy to CHCO, who again that was --**

A Gene, Sexton, G-e-n-e S-e-x-t-o-n.

**Q And that person is right directly below Marta Perez?**

A Yes.

**Q Who is --**

A Below Gene is Shawn Flynn, S-h-a-w-n F-l-y-n-n, and I am not sure what his title is, but he is one of the division directors within the office. The office is in the process of restructuring, has been for about six months, so it is not real clear what the titles are at this point.





WAYNE A. COLEMAN

**Q Okay.**

A Okay. And then working for him is Linda Oakey, that is O-a-k-e-y, she is my direct supervisor and she is Chief of Benefits and Compensation.

**Q And all these people serve the same bureaus and headquarters in DHS?**

A Yes.

**Q On your level, human resources specialist, how many people are on that level, how many people are human resource specialists?**

A Within the office, I would say probably around 50 people. I am not real sure, but I would say somewhere around 50 people.

**Q 50 people?**

A Yes. Now, they are not all working in the area of compensation. They work in a variety of areas, labor relations, employee relations, benefits, staffing, so on and so forth.

**Q And how many work in the area of, specialize in the overtime?**

A Actually I guess I am the primary person and our team leader, Steve Rumble, would be my back-up or is the back-up for that area.





WAYNE A. COLEMAN

**Q Is Steve Rumble someone you report to?**

A He is a team leader and he also works for Linda. As I say, with the restructuring it is not real clear whether we actually work for him or directly for Linda but --

**Q How long have you held this position as -- held your current position?**

A Current position, about two years.

**Q What were you before that?**

A Before that I was pay specialist with the Customs and Border Protection.

**Q And do you know when you began that job as the pay specialist?**

A Yes, we just did this a while ago, August 2004, up until early -- the middle part of last year, and I don't remember the exact date.

**Q Okay. So, about 6-05 is that, thereabouts?**

A That is chose.

**Q And then you said you were, you had your current title for two years?**

A About two years, it is probably not quite that long. It was the middle of last year. It was the middle of 2005, okay.





WAYNE A. COLEMAN

**Q Okay. So, just to get it straight, you began as a pay specialist with the Customs and Border Patrol in August of '04, and had that until about June '05. June of '05 you became the Human Resources Specialist?**

A Right.

**Q And you have held that title since then?**

A Right.

**Q Before you were the pay specialist at CBP what did you do?**

A I was the pay specialist at ICE, Immigration and Customs Enforcement.

**Q What period did you hold that position?**

A That was from March of 2003 until August of 2004.

**Q And before you were the pay specialist at ICE what did you do?**

A I was the pay specialist at the Immigration and Naturalization Service, which was part of the Department of Justice.

**Q And how long did you hold that?**

A That was from approximately 1999 until March of 2003. And the reason this looks this way is the Department of Homeland Security was created

and stood up in March of 2003. The Immigration and Naturalization Service was one of the organizations that was brought into the Department of Homeland Security from the Department of Justice, and so that was why there has been so many moves.

**Q And these -- well, before you were pay specialist for the INS what did you do?**

A Then I was with pay specialist with the U.S. Customs Service which is part of the Department of the Treasury.

**Q How long would that have been?**

A That would have been from the mid-'80s up until 1999.

**Q And before that position?**

A Before that I was a classification specialist, and let's see, where was I before I came to customs, with the office of -- Federal Transit Administration is what it is called now. It is part of the Department of Transportation.

**Q How long did you hold that position?**

A Oh, about three years. So, that would have been from the early '80s through the mid-'80s.

**Q And before that?**

A Before that I would have been a







classification specialist for the U.S. Naval Academy, and that would have been from the late '70s through the early '80s.

**Q Was that your first job with the government?**

A No, actually I had worked with the U.S. Department of Agriculture previous to that, but I had taken some time off and worked in the private sector between that job and then going to work for the academy.

**Q What did do you in the private sector?**

A I managed a tobacco shop.

**Q Change of pace?**

A Yes, totally unrelated.

**Q And the job before the tobacco shop, with the government was that also a human resources related job?**

A Yes.

**Q What was that?**

A Classification specialist also.

**Q Going back to your work as a pay specialist, how did your duties as -- well, what were your job duties as a pay specialist?**

A Pretty much the same thing we had talked







about earlier. We would normally have questions or claims from employees and managers related to premium pay issues, and we would try to resolve them, to determine whether or not there was entitlement for the employee to be paid, or if there was no entitlement. And if there was none, try to explain why that was the case.

**Q Okay.**

A We also put together training materials, wrote official policy documents, variety of things like that.

**Q So, how is your current position different from that of a pay specialist?**

A The biggest change I think was the fact that we are now working on this brand new pay system in the Department of Homeland Security, it is authorized to create. Previously we worked under the General Schedule and the Federal Wage System, which are two government wide pay systems, whereas the Department of Homeland Security eventually will have its own unique pay system, which is based on a pay for performance concept.

**Q And any other differences in your job as a human resources specialist and your job as a pay**







**specialist?**

A Just a wider variety of questions, I think. Since we have more agencies, previously I would deal with an agency, a component or a bureau. Now, since we have all of the components and bureaus within the Department we are responding to a wider variety of kinds of issues and questions.

**Q So, is it fair to say back when you were a pay specialist for instance for the INS, that you only answered questions within the INS?**

A That is correct.

**Q And when you were a pay specialist for the ICE you answered questions only for the ICE?**

A That is correct.

**Q When you were a pay specialist for Customs and Border Patrol you only answered questions with respect to the CBP?**

A With the CBP the job was a little broader in that Customs and Border Protection was the operating personnel office for three components; CBP itself, ICE and CIS.

**Q What is CIS?**

A Citizenship and Immigration Service.

**Q Were all of these organizations in the**

WAYNE A. COLEMAN

**Department of Homeland Security?**

A Yes. And they are each a separate entity, but the idea was to try and maximize the return on investment by providing one personnel function for the three different components. So, that is why the questions would come from a number of places, not just the CBP itself.

**Q When you moved to the Department of Homeland Security now there is a very broad array of organizations?**

A The whole, right.

**Q When you were working with the Customs and Border Patrol what was your line of reporting?**

A I reported to a woman who was Chief of Classification and Compensation.

**Q And is that a person with the CBP?**

A Yes, Ronelle Rotterman, R-o-t-t-e-r-m-a-n.

**Q Do you know who she reported -- do you report directly to her?**

A I reported directly to her and she in turn reported to the director of human resources for Customs and Border Protection.

**Q Who was that?**

A At that time it was Robert M. Smith.





WAYNE A. COLEMAN

**Q Do you know how long he held that position?**

A Quite some time, probably in the area of 10 years, and he retired about, when did he retire -- it has been about a year or so ago that he retired.

**Q And who replaced him?**

A Fellow named Robin Hosenfeld, and I am going to guess at his spelling, I think it is H-o-s-e-n-f-e-l-d.

**Q Do you know who Mr. Smith -- strike. Do you know who the director of human resources for CBP reported to?**

A Yes, the commissioner of Customs, who is the head of CBP.

**Q Do you know who the commissioner of customs is?**

A No, not off the top of my head.

**Q Okay. Is this Commissioner of Customs a politically appointed job?**

A Yes.

**Q Would you consider the director of human resources for the CBP a political appointment?**

A No, he has been a career employee.





WAYNE A. COLEMAN

**Q And do you know where the Commissioner of Customs reports?**

A To the president. Well, actually that is not true. Commissioner of customs would actually report to the Secretary of the Department of Homeland Security.

**Q When you were a pay specialist with ICE what was your reporting structure?**

A I reported to John Ehrbar, E-h-r-b-a-r, he was the chief of classification -- I am sorry, Chief of Compensation Policy for ICE.

**Q Did you report directly to him?**

A Yes.

**Q Do you know who he reported to?**

A He reported to Rick Hastings, H-a-s-t-i-n-g-s.

**Q Do you know what his title was?**

A Director of Human Resources, I believe.

**Q Was that for ICE?**

A Yes.

**Q Do you know who Mr. Hastings reported to?**

A I think it is the executive assistant -- no, that is not right. It is the person who is in charge of the management within ICE, and I am sorry,





WAYNE A. COLEMAN

I don't remember the title.

**Q Do you remember the name?**

A No, I don't, as a matter of fact.

**Q But Mr. Hastings reported within the ICE structure?**

A Oh, yes, yes.

**Q And do you know if between Mr. Hastings there was a report, do you know who that report reported to?**

A The person who was in charge of management then reported directly to the assistant secretary for ICE, she is the director of ICE.

**Q Do you know who that is?**

A Julie Murphy -- Murray --

**Q If you don't --**

A I don't know. I can't, I have seen the name. I don't remember it right at the moment.

**Q A lot of knowledge to go. If at any point if you don't know that is a fine answer.**

A Okay.

**Q Although I would ask you, and I will make this request later, I would ask that the court reporter mark it, that if you do remember or can find out the name of that person between Rick**

**WAYNE A. COLEMAN**
**Hastings and the Assistant Secretary that we fill that in.**
A Okay.
**Q Then the Assistant Secretary for ICE, do you know where she reports to?**
A Yes, she reports to the secretary of DHS.
**Q Is that job a political appointment?**
A Oh, yes.
**Q Do you know who currently --**
MR. PEASE: Excuse me. I don't have it on record. You requested, I just want to make a note for the record, any request you want for additional information I would like you to put in writing to us whether it is information or documents or so on, just so we have it in writing later on.
BY MR. SWEENEY:
**Q Do you know who currently is the Secretary?**
A Yes, Michael Chertoff.
**Q When you were working as a pay specialist with the INS what was your reporting chain?**
A Actually very similar, because Mr. Hastings and Mr. Ehrbar came over from INS to ICE so it was John Ehrbar, again, Rick Hastings, the





WAYNE A. COLEMAN
executive and associate director of administration, and --
**Q Slow down just -- Mr. John Ehrbar, what was his title?**
A Same, Director of Compensation Policy.
**Q You said before Chief of Compensation Policy, is that correct?**
A Chief of Compensation Policy.
**Q This time the only difference would be was that he was for the INS?**
A That is correct.
**Q Was Mr. Hastings the Director of Human Resources?**
A That is correct.
**Q INS. And do you remember who Mr. Hastings reported to at INS?**
A No, I don't. Again it is probably something we could get, but I don't have that off the top of my head.
**Q We would ask you to get that.**
**And do you know who that person reported to?**
A Yes, he reported to the Director of the Immigration and Naturalization service.





WAYNE A. COLEMAN
**Q Do you are he who that was at the time?**
A No, I don't. We have been through so many changes, it is difficult to keep up.
**Q When did you become the -- when did you begin to focus on overtime?**
A Late '80s, 1987, 1988.
**Q Is there anyone else within your office that focuses on overtime?**
A Currently, yes, as I said I think Steve Rumble would be my back up at this point.
**Q Anyone else?**
A Not really, no.
**Q How did you develop this specialty in overtime?**
A Mostly on-the-job experience and training. I went to work for a fellow who had been working with Fair Labor Standards Act and premium pay since the mid 70's and he taught me all he knew, and we continued to explore the subject by reading cases and going through the material that OPM has put out as guidance and that sort of thing. And I have found one or two classes that I have been able to take as well.
**Q So, what types of things do you do to keep**





**WAYNE A. COLEMAN**
**yourself, to develop this specialty in overtime?**
A I guess a lot of it has been very practical and on the job. As questions and issues arise a manager will ask, you know, I have this situation, what is the appropriate pay to compensate or the way to compensate the person, or I think we ought to be paying a certain kind of overtime for this, is that your understanding, is that something we can do under the regulations?
And I would do some research looking for not only the regulations but any guidance that the Office of Personnel Management may have put out, the decisions of the Comptroller General and other things like that, that we would go into, and try to find an answer for this.
**Q Did you have contacts at any of these offices that you recall for that?**
A We did have when I was with Customs and with INS, we had both the Department of the Treasury pay people and the Department of Justice pay people, that we could talk with, yes.
**Q Did that change when you went to ICE?**
A Yes, because at that point there were no pay specialists on the roles at DHS. It wasn't

WAYNE A. COLEMAN

**Q Oh, that they were owed, thank you.**
A Yes.
**Q How was the interest calculated?**
A The interest was calculated using a standard federal interest rate that the U.S. Office of Personnel Management identifies for back pay issues, and it was calculated from the time that they should have received the payment through the time that the payment was actually made.
**Q Do you know when the payment was actually made?**
A No, I don't. By the time the payments were actually being made I had moved from Customs and Border Protection up to the Department of Homeland Security and I wasn't really part of the actual payout.
**Q Do you remember submitting a declaration for a case with the same title as this one, in the United States District Court for the District of Columbia?**
A Yes, I do.
**Q Do you remember in that declaration saying that ICE will be able to make payments to the approximately 3900 affected employees during pay**





WAYNE A. COLEMAN

**period 7 or pay period 9 of calendar year 2005? I can show you if you like.**
A No; yes, I believe I do remember that, and the only thing is I can't say, since I wasn't there, whether or not the payment actually took place at that period of time. That certainly was the plan, as I remember it.
**Q So, Ms. Smalls has submitted a statement in this case saying that people were paid in December of 2004. Do you have any reason to believe that is not right?**
A No.
**Q Have you ever reviewed the records of the payments?**
A No, I have not.
**Q Were you involved in the process of actually paying the people at all?**
A No, I was not.
**Q Okay. Were you --**
A Well, let me back that up. I was involved at the front end when we were trying to collect the rosters of employees who attended the training, and trying to determine the number of hours of time that they had put in on this 6th, regularly scheduled 6th





WAYNE A. COLEMAN

day of training.
But about that time or about the time that we completed those calculations, then I moved on to the Department of Homeland Security so I was not directly involved in how the actual payout was made.
**Q And just to flesh out a little bit the claims in this case, do you understand the claims in this case to be by people that performed basic training at the Federal Law Enforcement Training Center in Glencoe, Georgia?**
A Yes.
**Q What company what do you understand their claims for overtime to be based on?**
A Well, under the Fair Labor Standards Act itself and the fact that what we came to understand later, but not initially, was that OPM changed its mind or reinterpreted the regulations to mean that because the training was regularly scheduled for a 6th day of training, even though it was basic training, something equivalent to an apprenticeship training, it was a compensable time under the Fair Labor Standards Act and, therefore, we owed them the Fair Labor Standards Act overtime for that period of time.





WAYNE A. COLEMAN

**Q What did you owe them the overtime for? I am trying to get back to what created this whole issue of overtime.**
**You testified to it in your declaration, you testify here that there was a period of time, there was a point in time where FLETC changed its schedule for basic training, is that right?**
A Yes, that is right.
**Q What was the change?**
A The change was going from a 5-day training schedule to a 6-day training schedule.
**Q So, people that were doing basic training at what we can call the FLETC, Federal Law Enforcement Training Center in Glencoe?**
A That is correct.
**Q Were required to perform basic training for 6 days a week; is that right?**
A That is correct.
**Q 8 hours a day, is that correct?**
A That is correct.
**Q What was the reason for that change?**
A The purpose was of course this followed very closely on the heels of the attacks on September the 11th of 2001, and the goal was to get

WAYNE A. COLEMAN

have under those regulations.

In addition to that, there is also guidance available on things like overtime and premium pay. So when would they be entitled overtime pay, when would they be entitled to premium pay for night work or Sunday work or holiday work or something like that.

**Q And where is that?**

A That is in Title V of the Code of Federal Regulations and the Title V overtime provisions are in part 550 of the Title V of the Code of Federal Regulations, the FLETC overtime is in Part 551 of Title V.

**Q FLETC is in 551, and what is in Title 550?**

A Title V. The pay that federal employees receive come under two things, the Federal Employees Pay Act which was passed in 1945, and the act created the General Schedule which was passed in 1949, and the Federal Employees Pay Act, the older of the two acts, provides -- provided at that time for some very basic things like overtime pay.

Over the years the Act has been amended a number of times, and things like night differential, Sunday differential, holiday differential have been





WAYNE A. COLEMAN

added to that; hazardous differential and a number of different things have been added to it. So Title V covers a variety of types of premium pay in addition to its own overtime system which is separate from FLETC.

**Q So, is it fair to say that Title V, Section 550 covers the Federal Employees Pay Act?**

A And its premium pay provisions, yes.

**Q And then Section 551 covers that Fair Labor Standards Act?**

A That is correct.

**Q What is your understanding as to how the two interact?**

A At this point if an employee is nonexempt then that employee is paid overtime under the provisions of the Fair Labor Standard Act.

**Q And you say at this point. Was that different at some time?**

A Yes, until 1993 that was not the case. Between 1974 and 1993 an employee's, actually the agency was responsible for calculating an employee's entitlement to overtime under the Fair Labor Standards Act and under FEPA, and paying the employee the larger of the two amounts. The Federal





WAYNE A. COLEMAN

Employees Pay Comparability Act of 1993 or FEPCA, which is really nasty, was passed and it amended Title V to provide that nonexempt federal employees would only be paid overtime under the provisions of the Fair Labor Standards Act.

**Q So, if there is an overtime issue that comes up and there is conflicting direction between Section 551 and Section 551, you would look to Section 551 as the primary guidance; is that right?**

A For nonexempt employees.

**Q And were the people that performed basic training down in FLETC, the INS, nonexempt employees?**

A They were nonexempt, yes.

**Q So, the Fair Labor Standards Act would be the primary law you would look to --**

A Yes, the only thing FEPA would provide for them would be if they had an entitlement to premium pay. The only entitlements the nonexempt employees, under FEPA, which is the abbreviation for the Federal Employee Pay Act or Title V, it is known both ways in the federal government.

If they had an entitlement for night work, for Sunday work, for holiday work, they would be





WAYNE A. COLEMAN

entitled to the premium pay that FEPA provides for or authorizes us to pay, but for overtime FLSA, unless they have some other overtime statute that applies to this them, FLSA would be the overtime law for nonexempt employees.

**Q So if -- let's take the example of when the regularly scheduled basic training at FLETC changed from 5 days a week to 6 days a week, were those INS employees that were performing basic training paid overtime for the 6th day?**

A No, they were not.

**Q Who made that determination that they would not be paid?**

A Those of us in the, on the compensation policy staff. We advised Rick Hastings and his supervisor that there was no provision, as we understood the regulations at that point, and as OPM told us what their understanding of the regulations were, there was no provision that authorized us to pay overtime to these employees for that 6th day.

**Q Okay. When you say the compensation policy staff at the INS, you are considering yourself as a pay specialist; is that right?**

A That is correct, and John Ehrbar.

WAYNE A. COLEMAN

the mid-'80s or so, had gone over to the Department of Defense where he did a very similar kind of job, he was chief of their compensation policy, and then came back again to INS in 2004 -- 2003? 2003.

**Q He came back to INS in 2003. Was he at INS when the decision was made not to pay?**

A Yes, he was back by that time.

**Q Well, so --**

A I guess I have some concern here. I am a little unclear about the dates. And before the final decision was made, yes, it would have been in 2003. It was in August of 2003 that he came back.

**Q And when was the final decision made to pay them overtime -- strike that.**

**When was the final decision not to pay them overtime made?**

A I don't know that I would consider it a decision. It was just that we could not find a provision in the regulations which allowed us to pay them, that authorized the payment of overtime to these people.

And that was during the spring of 2002, so that would be before John was there, and I had misspoken then. So, while we were doing these





WAYNE A. COLEMAN

discussions it would have been another person who was the head of the compensation policy. He retired then in early 2003. There was a hiatus and then John came to work in August of 2003 as the Chief of Compensation Policy.

So the person who would have been discussing this is Phil Seneschal, P-h-i-l S-e-n-e-s-c-h-a-l.

**Q So, during the time when you were trying to figure out whether these people should be paid overtime or not in 2002, John Ehrbar wasn't there?**

A No.

**Q It was Phil Seneschal?**

A Yes.

**Q Did Phil Seneschal participate in that analysis?**

A He did.

**Q Did he have any particular specialty in overtime?**

A He had worked with human resources for a goodly number of years. I don't know that he had a very broad background in pay and compensation, I can't say that for sure.

He did have some understanding of it and





WAYNE A. COLEMAN

made some contribution to the conversation as well. I think he relied on Fred and I to sort of advise him though.

**Q And so is it fair to say that Fred and yourself were the two point people in doing the analysis, at least in 2002?**

A Yes.

**Q As to whether or not the people should be paid overtime for this scheduled 6th day of --**

A Yes.

**Q Do you remember what you did to make that determination?**

A Well, we went back and looked at the Fair Labor Standards Act regulation in Part 551 and Title V, and refreshed our memory on them. We went back and pulled copies of the Federal Personnel Manual letters that had been issued related to the Fair Labor Standards Act and looked at the ones related to training in particular. We probably looked, although I can't say that for sure, at this point, looked at some Comptroller General decisions to see what the Comptroller General had to say.

And we relied on the experience that we had in dealing with claims from employees over a





WAYNE A. COLEMAN

goodly number of period -- you know, goodly number of years.

**Q Did you contact OPM for guidance?**

A We did not, no.

**Q Do you know if you looked on the OPM web site for guidance?**

A We probably did, yes. It would have been a natural place to go.

**Q Do you know if you found any guidance there?**

A No, we did not find any.

**Q And you said you probably would have looked at the Comptroller General's opinions; right?**

A Yes.

**Q Did you find any guidance there?**

A Not a lot. There was some about overtime in training situations but nothing specific to, at least as I recall anyway, nothing specific to the basic training situation; more training in general.

**Q Did you say you looked at the civilian personnel law manual?**

A We didn't -- well, I don't know, we probably did. I don't know that we did that specifically, but it wouldn't be -- it would be a

WAYNE A. COLEMAN

normal place for us to look.

**Q Do you remember finding any guidance there?**

A No, we didn't.

**Q Do you remember, I think you said you looked at the Federal Personnel Manual, is that right?**

A Yes.

**Q Do you remember finding any guidance there?**

A Yes, there is an FPM letter that deals with training, and I think I alluded to it in the declaration, I think it is 551-17.

**Q Did you look on the Cyberfed database?**

A We probably did, yes.

**Q Do you have a specific recollection of looking there?**

A I can't say specifically that we did but again it would be a normal place for us to look.

**Q Did you find anything helpful there?**

A No.

**Q Did you call the Chief Counsel's office at the INS?**

A I don't recall doing that. Phil Seneschal





WAYNE A. COLEMAN

may have contacted them. I can't say that for sure.

**Q Now, did you talk with anyone about this outside yourself, Mr. Tingley, Ms. Smalls and Mr. Seneschal?**

A We did talk with the pay person at the Department of Justice, and you are going to ask me that person's name and I don't remember who it was.

**Q Do you remember what the title was?**

A No. He would have been a counterpart to us. He was a human resources specialist who specialized in compensation.

**Q Why did you contact that person?**

A Well, he is the -- as the department, we are a bureau within the department, and typically an issue like this which is, could be controversial or could be sensitive, one of the things we would do would be to talk to the Department of Justice to see if they have put out any policy on this, if they have any interpretation that we should be following or any guidance that would help us.

**Q And did that person give you any guidance?**

A They pretty much agreed with us, that based on our understanding of the regulations and their understanding of the regulations there was no





WAYNE A. COLEMAN

authority to pay these people.

**Q And did they give you that opinion in writing?**

A No. It was done via conversation on the phone.

**Q Do you have any notes memorializing that?**

A I don't, no.

**Q Do you know if anyone does?**

A I really don't know.

**Q Could you search for any notes that someone may have taken?**

A Not specifically for that, no.

**Q If Mr. Tingley had taken notes do you know where they would be?**

A Well, if he took notes and if they were not thrown out when we moved twice after he retired, they would be among the files that are at the Customs and Border Protection at this point.

**Q Do you know if anyone has searched those files?**

A I believe they have.

**Q Do you know who searched them?**

A I believe Alethea has.

**Q Do you know if she came up with anything?**





**WAYNE A. COLEMAN**

A I don't believe so. I spoke with her the other day and asked if she remembered seeing any notes from Fred and she said no, she did not.

**Q Do you know what search she performed for the notes?**

A No, I can't tell you that. She did say she went through the files and looked for everything relevant that was there.

**Q When you say looked through the files, exactly what files would she be looking through?**

A I don't know how to describe that.

**Q Do your best.**

A Like any bureaucratic organization we keep files of documents that we create, and including if there are things like memorandums to the record, but also letters that we would send to employees, letters that we would send out of the office to other organizations within customs or within INS or wherever we happen to be, and so we would keep those kinds of hard copy files.

**Q Typically if you had sought guidance from someone, had a conversation with them, would you keep notes of that conversation in such a file?**

A We did sometimes. It would depend on the

WAYNE A. COLEMAN

paying premium pay while an employee is in training unless they meet one of the exceptions that are listed in the regulations, and that training did not meet any of those exceptions.

**Q Okay. And let's, so there are two issues here. One is whether they meet one of the exceptions of the Federal Employees Pay Act, right?**

A Right.

**Q And other one is whether they should be paid overtime under the Fair Labor Standards Act?**

A That is right.

**Q And if either of those indicates you should pay the overtime then the government would have paid overtime to these people; is that right?**

A That is correct.

**Q And when you were making this determination what section of the CFR did you look to for guidance?**

**And let me limit this even further, make it easier. When you were making this determination under the Fair Labor Standards Act, let's leave the Federal Employees Pay Act aside for now, what section did you look to for guidance?**

A The hours of work provisions, and I think





WAYNE A. COLEMAN

the one on training are at 551.423.

**Q It is going to shock you but I have a copy of that regulation with us.**

A Really?

**Q So, look at that. I will give you a copy of this, and ask you to take a look at it and see if you recognize it?**

A Yes, I do.

**Q I am going to have this marked as Exhibit 1, Plaintiff's Exhibit 1.**

**(Plaintiff's Exhibit 1 identified.)**

**BY MR. SWEENEY:**

**Q Mr. Coleman, would this have been the regulation that you looked to, to determine whether or not people should have gotten paid for that regularly scheduled 6th day of basic training at FLETC?**

A Yes, it would.

**Q Now, the first line of this, 551.423 says, "Time spent in training, whether or not it is under the purview of Part 410 of this chapter, shall be administered as follows." Do you see that?**

A Yes.

**Q Do you know what Part 410 of the chapter**





WAYNE A. COLEMAN

**refers to?**

A Yes.

**Q What is that?**

A It is the training regulations under Title V.

**Q Okay. So, is it your understanding that this regulation trumped the regulations in Part 410?**

A We have always looked at it a little more broadly than that. We feel that the employee has two possibilities for compensation. One would be here, and the other would be under the Part 410 regulations.

So, our normal practice would be to look at both sets of regulations to see if the employee can be paid under either one, and then whichever would be larger would be what the employee is paid.

**Q So, it was your understanding that this regulation provided for the payment of overtime and the employee should have been paid overtime; is that right?**

A That is correct.

**Q If we look at Section 551.423(a)(1), it says, "Time spent in training during regular working hours shall be considered hours of work."**





WAYNE A. COLEMAN

A That is correct.

**Q If the training was considered hours of work was it your understanding that the employee should have been paid for those hours of work?**

A If it had been considered hours of work, yes.

**Q Was the 6th day of training, of basic training at the FLETC, regular working hours?**

MR. PEASE: Objection; calls for legal conclusion.

BY MR. SWEENEY:

**Q For purposes -- well, in your experience -- well, strike that.**

**The way you read this regulation now, would you consider the 6th day of training at FLETC to be regular working hours?**

MR. PEASE: Objection; calls for legal conclusion.

BY MR. SWEENEY:

**Q You can respond.**

A Based on OPM's change to their interpretation of these regulations, I would now consider that 6th day of regularly scheduled training time to be hours of work under the Fair

WAYNE A. COLEMAN

Labor Standards Act, yes.
**Q So, as we sit here today it is your understanding that the time that people worked -- sorry, the time that people trained during the 6th day of FLETC was to be considered hours of work, is that correct?**
MR. PEASE: Objection; calls for legal conclusion.
BY MR. SWEENEY:
**Q You can respond.**
A As I say, based on the change in OPM interpretation of these regulations, yes. But I would also point out that we focused on (a)(3) as being the equivalent of apprenticeship training and, therefore, the hours, all the hours spent there were not considered hours of work under the Fair Labor Standards Act. Any that would have exceeded their basic 40-hour work week we would not have been authorized to pay them overtime.
BY MR. SWEENEY:
**Q Okay. Let's look at (3), if we look down at (a)(3); (a)(3) said, "Time spent in apprenticeship or other entry level training, or internship or other career related work study**





**WAYNE A. COLEMAN**

**training, or training under the Veterans Readjustment Act outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods, except as provided" in various spots.**
**Did you consider basic training an apprenticeship?**
A We considered it the equivalent of apprenticeship or other entry level training, yes. It was providing the basic knowledge and skills the employee needed to do his or her job.
**Q But the employee had already been hired in a particular position; is that right?**
A Yes.
**Q And was their position changed as a result of the basic training?**
A The position wasn't, no.
**Q Was their salary changed as a result of the basic training?**
A No.
**Q Was their pay grade changed as a result of the basic training?**
A No.
**Q Was their position changed as a result of**





**WAYNE A. COLEMAN**

**the basic training?**
MR. PEASE: Objection; vague.
THE WITNESS: I am not sure what you mean by that. The training that they received at FLETC, the basic training, provided them with the basic knowledge and skills they needed to do their job. That is described in their position description, okay.
Prior to that time they had enough to qualify basically to be hired for the position, but they were not expected to have the full range of knowledge or skills that they would need to do their job, as an immigration inspector, as an adjudications officer or whatever.
BY MR. SWEENEY:
**Q Do you know if any of the people that were hired by the United States actually did work in the position that they were hired in before they went to basic training?**
A That was not the usual practice. The only time that might have occurred is if there was difficulty scheduling training classes, and then they would not have been given the same kind of authority and responsibility as somebody who had





WAYNE A. COLEMAN

been through the basic training had received.
They would have had somebody more experienced working with them to guide them through the process, to guide them through whatever the work is that they were doing.
**Q So, they would have been supervised through the work, is that right?**
A Yes, closely.
**Q And was there any prohibition on employees performing work in the job they were hired for before they went to basic training?**
A There, I believe there are some provisions in the regulations which would have prohibited them from doing some sorts of law enforcement work without having been through this training, so at least those kinds of functions, yes.
**Q What types of things are you talking about?**
A Things like use of deadly force or non-deadly force, arresting a suspect, things that a normal law enforcement officer might be called upon to do.
**Q And there are regulations that is prohibit someone from carrying out those job duties before**

**they go through basic training?**
A Yes.
**Q Where are those regulations?**
A I believe you will find them in Title VIII of the Code of Federal Regulations.
**Q And Title VIII is a big title?**
A Yes, it is, and I am sorry I don't have a reference for you.
**Q Are those regulations that you work with regularly?**
A No, they are not.
**Q And are those regulations that you remember seeing?**
A Yes. In talking with the training folks that was one of the issues that a goodly number of the occupations we have like criminal investigator, for example, an employee really is not able to carry out those functions until they have been through the basic training at FLETC.
So, it was critical that they would go through that first, and typically an employee might have been on board a couple of days before they would be transferred to FLETC for training. It would be extremely unusual for them to spend a long







period of time in their port or their station prior to the training, actually performing some of the functions that they might otherwise perform.
**Q Did you consider basic training an apprenticeship?**
A We considered it an equivalent to that, yes.
**Q Did you consider it an internship?**
A No.
**Q Did you consider it career related work study training?**
A No.
**Q Was it training under the Veterans Readjustment Act?**
A No, it was not.
**Q 423 (a)(3) also applies to work outside the regular working hours, is that right?**
A That is right.
**Q What are the regular working hours?**
A Prior to OPM reinterpreting this portion of the regulations we understood the regular working hours to mean basic 40-hour work week that most federal employees are required to work.
**Q And you talk about OPM reinterpreting**







**this, where was the initial interpretation that you relied upon to equate regular working hours with only 40 hours in a week?**
A It would be based on the documents that I have referred to in the declaration, I think. One of them would be the FPM letter which talked about training. It would be looking at this regulation, it would be in the experience that I have developed over the years in looking at cases. I don't know that there is anything specific I can point to that would say that.
**Q Well, then why do you think OPM reinterpreted the regulation if there is nothing specific out there giving an interpretation to the contrary?**
A I can't tell you that. I don't know.
**Q Do you have any interpretation from OPM that regular working hours are limited to 40 hours in a week?**
A I don't think I could point you to anything like that, no.
**Q And just so we are clear, let me give you a copy of your declaration in the District Court case.**







**And a copy here for you, Art. I actually have another copy if I want. I am sorry, I didn't bring 4 --**
MR. RETTINGER: I probably have one somewhere.
BY MR. SWEENEY:
**Q Do you recognize this document?**
A Yes.
**Q What is this document?**
A This is a document that I was asked to put together to kind of talk about what happened in relation to the 6th day of training and our efforts to assure that the employees were properly paid for that time.
**Q Who asked you to put the document together?**
MR. PEASE: Do you want to put this into evidence before we go into more detail?
MR. SWEENEY: I will, but do you want it before we talk about it? It will go in; we will.
MR. PEASE: All right.
THE WITNESS: It appears from my signature block that I was still working with the Immigration and Customs Enforcement.

WAYNE A. COLEMAN

BY MR. SWEENEY:

**Q So who would have asked you to do this?**

A I am assuming -- well, I really don't remember at this point. It might have been John Ehrbar who would be my supervisor, it might have been the ICE attorney who was working on the case at that point.

**Q Did you execute this document on October 14th, 2004?**

A Yes.

**Q Was Fred Tingley working at the -- working for the government at that time?**

A No, he retired, I believe, earlier in the year.

**Q Do you know why you were asked to put this declaration together?**

A I was the most experienced person there having worked on the case or on the question.

**Q Most experienced person with respect to this issue?**

A Yes.

**Q And this issue being the issue of overtime payment for the 6th day of training at FLETC basic training?**





**WAYNE A. COLEMAN**

A Yes.

MR. SWEENEY: I would like to enter into evidence Exhibit 2.

(Plaintiff's Exhibit 2 identified.)

BY MR. SWEENEY:

**Q If you would, Mr. Coleman, turn back to the 5th page which is marked as Exhibit 1, is this the FPM letter that you referred to before?**

A Yes, it is.

**Q Were you relying on this letter when you made your determination that people should not be paid for this 6th day of basic training?**

A This is one of the things, yes.

**Q And is this, do you know when this letter was issued?**

A The date on it is January 28, 1981.

**Q Do you know if this letter was superseded in any way?**

A Not that I am aware of, no.

**Q And it says up in the top left-hand corner there, says FPM Letter 551-17 obsolete?**

A Yes.

**Q Do you know what that refers to?**

A Yes.





WAYNE A. COLEMAN

**Q What is it?**

A The U.S. Office of Personnel Management went through an exercise in 1993, I believe it was, in which they destroyed, eliminated, terminated the use of the Federal Personnel Manual, and as a result of that they issued what they called a sunset document which essentially terminated huge parts of the Federal Personnel Manual which covered a variety of topics, labor relations, benefits, you know, a whole raft of things, as well as overtime and premium pay.

One of the things that was kept on a temporary basis was this, and several of the other FPM letters issued on the Fair Labor Standards Act, and it eventually became obsolete simply because nobody has updated these documents since then.

**Q So, was it your understanding at this time that this letter was obsolete?**

A No, it was my understanding that at that time it was still good guidance. And that is something that we have, that I have discussed with Bryce and with Vicky Draper since then, in the last couple of months, talking about these FPM letters, as to whether or not OPM considers them still to be





WAYNE A. COLEMAN

current guidance, and they do.

**Q And you relied, at least in part on this letter in making your determination --**

A Yes.

**Q -- your recommendation to Mr. Hastings that people should not be paid overtime, is that right?**

A That is correct.

**Q Was it marked as obsolete at that time?**

A Yes.

**Q Did you contact OPM to figure out whether or not this letter was still good guidance?**

A I don't remember doing that.

**Q Can you point to anywhere in this letter that states a position by OPM that regular working hours are limited to 40 hours in a work week?**

A I don't believe I can, no.

**Q Again, is there any document you could point to that would show an OPM document that would determine the regular work week to be limited to 40 hours?**

A No.

**Q When you were making this determination back in 2002 for the advice you passed on to**

WAYNE A. COLEMAN

that I have worked in since 1987 or '88 at this time, would it have been sometime during that period, every time when we talked about how do you interpret this, what do you expect this to cover or not to cover, and it would have been in line with questions that we would have received from employees or managers on whether or not an employee had worked in training outside their 40 hours basic work week, was entitled to any overtime.

**Q Do you know if this legislation 551.421 was in effect from January 1, 2002?**

A Yes, it was.

**Q So in January 2, 2002 you did not look to 551.421 for a definition of regular working hours; is that correct?**

A That is correct.

**Q And you did not call OPM and ask for guidance on what the definition of regular working hours was; is that correct?**

A We did not.

**Q I give you another document that we will mark as Plaintiff's Exhibit Number 4.**

**(Plaintiff's Exhibit 4 identified.)**

**BY MR. SWEENEY:**





WAYNE A. COLEMAN

**Q Mr. Coleman, do you recognize this document that has been marked as Exhibit Number 4?**

A Yes, I do.

**Q Can you tell me what it is?**

A It is the regulations that guide federal managers in establishing work schedules for employees.

**Q And there is under Section 610.111 is that right?**

A That is correct.

**Q And if we go back to Exhibit 3 where it says, "For purposes of this part 'regular working hours' means the days and hours of an employee's regularly scheduled administrative workweek established under part 610 of this chapter." Is this regulation part of part 610?**

A Yes, it is.

**Q And if you look at the section that is (a)(2), it says, the "regularly scheduled administrative workweek that consists of the 40-hour basic workweek established in accordance with paragraph (a)(1) of this section, plus the period of regular overtime work, if any, required of each employee." Is that your understanding of what a**





WAYNE A. COLEMAN

**regularly scheduled workweek is?**

MR. PEASE: Objection; argumentative, legal conclusion.

BY MR. SWEENEY:

**Q You may answer. Is that your understanding?**

A Yes, that would be my understanding.

**Q I just want to make sure I cover this completely, but do you have any documents that have not been produced in this case that were produced as part of the work that was done by your group in determining that people should not be paid for a 6th day of basic training at the FLETC?**

MR. PEASE: Objection; compound question.

MR. SWEENEY: We can do it the harder way. That is okay, there is another way to do it. You are right, that may well be the better way to do it.

(Plaintiff's Exhibit 5 identified.)

BY MR. SWEENEY:

**Q I am handing you, Mr. Coleman, what has been marked as plaintiff's Exhibit No. 5. Do you recognize this document?**

A Yes.

**Q Have you ever seen this document before?**





WAYNE A. COLEMAN

A Yes.

**Q Do you understand what this document does?**

A I understand it to request that we produce documents.

**Q And did you go over this document?**

A Yes, I believe I did.

**Q Did you produce all documents that you had or that you were able to get that were responsive to this Request for Production of Documents?**

MR. PEASE: Objection; vague.

THE WITNESS: I am not sure when this was filed, but whatever documents had been collected at Customs and Border Protection where we finally ended up after all the reorganizations, yes, I believe that all the documents that we had collected have been made available.

BY MR. SWEENEY:

**Q Since then have you collected any additional documents?**

A I have not, no.

**Q Do you know if anyone has collected any additional documents?**

A No, I don't.

**Q Was there anyone else involved in checking**

WAYNE A. COLEMAN

MR. SWEENEY: I would be happy with the representation that a DHS Broadcast goes out to all the employees at this time --

MR. PEASE: I think you are better off asking Mr. Coleman about that, since this is a 30(b)(6) that is probably the best way to go about it.

BY MR. SWEENEY:

**Q Who does a DHS Broadcast go out to?**

A As has been said, all employees.

**Q Within DHS?**

A Yes, I am sorry.

**Q So, would you have received this at this time?**

A Yes.

**Q Now, this says it is forwarded on behalf of The Human Resources Management?**

A Yes.

**Q Who is Human Resources Management?**

A The Office of Human Resources Management for ICE; by this time it would be ICE.

**Q So, this is the human resources for ICE, not for all of DHS?**

A No. But what you have to understand is





WAYNE A. COLEMAN

that when the Department of Homeland Security was stood up, employees who had been part of the Immigration and Naturalization Service and the Department of Justice were in fact split out to three of the organizations that became part of the Department of Homeland Security; Customs and Border Protection, Citizen and Immigration Services and Immigration and Customs Enforcement.

And in addition to that, since we had people who were training at FLETC, throughout several of the authority components, we felt it only appropriate to notify all employees so that everybody had the same information at the same time, and then it wouldn't be any question as to what was being said to whom.

**Q And at this point you were working at ICE; is that right?**

A That is correct.

**Q Was ICE taking the lead on this issue?**

A Yes.

**Q So ICE was making decisions for Customs and Border --**

A ICE was making decisions for legacy INS employees.





WAYNE A. COLEMAN

**Q So ICE was making decisions for anyone who had trained for a 6th day at FLETC as an INS employee?**

A That is right.

**Q And ICE was also making decisions going forward for ICE employees, is that right?**

A That is right.

**Q Was ICE making decisions going forward for Customs-CBP?**

A No.

**Q Was it making decisions going forward for anyone else other than that?**

A I believe that because some of the employees from the INS had also ended up in Citizenship and Immigration Services that we were providing them direction. They did not have a personnel staff of their own, human resources staff of their own at that point, so we were providing lead for that, since those people previously had been under our human resources office as part of the INS.

**Q And the first line of this says, "Recently, we have had many inquiries from employees regarding the payment of premium pay for a 6th day**





**WAYNE A. COLEMAN**

**training in a 6-day training week while at FLETC." Was that your experience, that you were getting a lot of --**

A Yes.

**Q How were the inquiries coming in?**

A Some of them would be telephone, some of them would be e-mail.

**Q And any other way?**

A Not that I recall. Now, we may have had a couple of faxes that would have come in also.

**Q Any written letters?**

A No.

**Q And when these came in were they put in some central file?**

A No, as I recall we responded to each one as they came in.

**Q Was your office the one tasked with responding to them?**

A Yes.

**Q So, if an e-mail came in you would respond directly to that person?**

A Yes.

**Q And did you have a set response that you gave them?**

WAYNE A. COLEMAN

A Essentially it was the same sort of words we would use for an e-mail. It would depend on how the question was phrased by the employee, but we generally tried to share the same information with each person who asked.

**Q And did your group have an agreed upon response?**

A I don't know that there was a set paragraph that we used. I don't think we formalized to it that extent.

**Q Set language that you used?**

A Again, it would be the same concepts that we would try to get across. Again, depending on how the employee would ask the question you might phrase the response a little differently.

**Q What was the concepts that you were getting across?**

A Essentially what we have here, that as we understood the regulations under 551.23(a)(3) and under the Federal Employees Pay Act 410.402, we did not have the legal authority to go ahead and make payments to these employees, even though they were scheduled to be in class 6 days a week.

**Q Did you go on to tell people that you have**





WAYNE A. COLEMAN

**not received any official guidance from the OPM about the issue?**

A We probably did. I can't say that I remember specifically.

**Q Okay. And it says here that "If guidance is received from OPM directing payment, we will work to identify funds, and undertake prompt and complete payment as required." Was that showing that you would share with people that contacted you?**

A Absolutely.

**Q Okay. When you got these e-mails would you physically store them in some area, print them out on a piece of paper and physically store them somewhere?**

A I wouldn't, no. There were just too many of them.

**Q And would these e-mails have been on your he e-mail at work?**

A If they hadn't been deleted, yes, they might have been. The way the e-mail system is set up it periodically goes through and purges documents that are older than a certain amount of time.

And since I was not saving these individual inquiries and I don't believe any of my





WAYNE A. COLEMAN

colleagues were either, I don't know that any of us put them aside into a folder where that didn't occur, so as that time came up those e-mails would have been purged.

**Q Do you know what the purging policy is?**

A I think mine was set up for three or four months. Each employee had the ability to affect that themselves or modify that themselves. Some of them kept longer and others kept them shorter.

**Q So, at the time you submitted your declaration in the District Court case were you still getting inquiries from employees regarding the 6th day of training and overtime payment for it?**

A Yes.

**Q Were you still responding to those?**

A Yes.

**Q And did you go ahead and delete those through the purging process?**

A Yes.

**Q We he would make a request that those e-mails be searched, particular since there was notice of the impending litigation in District Court and in fact, if those e-mails were purged --**

MR. RETTINGER: Excuse me, what is the





WAYNE A. COLEMAN

date of this? What is the date of the District Court action?

MR. PEASE: That is all right.

MR. SWEENEY: Particularly if those were purged at a time when there was notice that the litigation was going on, then I think we have got a question of whether or not evidence was deleted that should not have been.

I would like to check on that and we would make a request for those e-mails, not only Mr. Coleman's, being one that is in the group.

MR. PEASE: Same requirement, that you make a written request and it is subject to privilege.

(3:01 p.m. -- recess -- 3:14 p.m.)

BY MR. SWEENEY:

**Q Let's get back to Exhibit Number 11, since we are still here.**

A Okay.

**Q Mr. Coleman, going back to Exhibit Number 11, in the third paragraph it says to date, however -- wait, I am sorry, second paragraph says, "Current regulations, see 5 CFR 551.423 (a)(3) and 5 CFR 410,402 (a), generally prohibit paying premium**

WAYNE A. COLEMAN

Regional Forester's and also says in the second line that OPM is regarding a change in their earlier advice to Forest Service, I am assuming he was Director of Human Resources for Forest Service. I certainly can't guarantee that. I can't say that I heard the man's name before, actually.

**Q Have you ever seen this memo before?**

A I would say probably yes, I would imagine it is something Gary shared with me.

**Q And does this refresh your recollection as to when, at least the Forest Service began paying overtime for the 6th day of basic training?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: I guess I don't see a specific date in here that says they were beginning to pay the employees.

BY MR. SWEENEY:

**Q Okay. Well, this refreshes your recollection as to whether or not the Forest Serviced decided to pay overtime for the 6th day of training by February 4th of 2003?**

A Yes.

**Q And do you remember when you would have**





WAYNE A. COLEMAN

**seen this memorandum?**

A I would have assumed somewhere around the same time that the e-mail traffic between Gary and I, so February 2003.

**Q If I can just hand you a document that is marked MOR-51 to 52. Mark this as Plaintiff's Exhibit 13.**

**(Plaintiff's Exhibit 13 identified.)**

**BY MR. SWEENEY:**

**Q Let me know when you have had a chance to look at it?**

A Okay, yes.

**Q Do you recognize this document?**

A Yes.

**Q What is it?**

A It is an e-mail going out to staff indicating that, primarily HR staff, indicating that -- let's see, what have we got here?

Yes, indicating that beginning of the pay period 17-03 that employees would be paid for time spent in training on a regular scheduled 6th day of training in the basic training, and that we would begin making efforts to gather information to make sure that employees were paid back overtime, and I





WAYNE A. COLEMAN

am not sure if the term interest is included in here, but we decided to pay interest as well on that money.

**Q Were you copied on this e-mail?**

A No, I was not.

**Q But Mr. Tingley was; is that right?**

A Yes, that is correct.

**Q And Ms. Small was?**

A Yes.

**Q Is there a reason you wouldn't be copied?**

A At that time I was working on a special team that had been pulled together at the Department Of Homeland Security to begin looking at how we would design a new pay system for the department, and so I was actually working in the departmental offices and not at ICE at this point.

**Q You said a moment ago that there was a decision to make retroactive payments; is that right?**

A That is correct.

**Q And to make the payments with interest; is that right?**

A That is correct.

**Q When was that decision made?**





WAYNE A. COLEMAN

A After the guidance was received from DHS in August.

**Q So, the decision was made after August 6, 2003, is that right?**

A Yes.

**Q Do you know who made that decision?**

A Well, I think you may be used to how things work outside the federal government. As my counsel here has, I think indicated, no decision is made by an individual, or unlikely that the decision is made by an individual.

Again, we would have provided the information to Rick Hastings, Rick Hastings would have discussed it with Mr. Bohlinger, the Executive Associate Commissioner for Administration, who in turn would have discussed it probably with his budget officer, and perhaps his Deputy Commissioner for Immigration, to determine how, when, so on and so forth.

Again, this would be a major expenditure with the number of people that ICE had going through basic training at any one time, and also it would be a basic or very large expenditure because it would represent a year and a half's worth of people who

WAYNE A. COLEMAN

A Part of the problem was that there was no central training system that tracked INS or ICE employees as they went through training. Class rosters were created for each and every class section that went through the training center and those rosters had to be found, in some cases they were with individual instructors or individual supervisory instructor's computer system, in others they were centrally located in the training staffs office.

So, it took a great deal of effort to find those. In addition we found that there were some class sections that were no automated rosters at all, that actually had to go back through hard copy files and find the rosters.

And in addition, of course the training staff down there was already working at a very high level in order to make sure that the training proceeded, because we certainly had to maintain that while they were doing everything else.

So, this kind of was fitted in around their major task of making sure that training was provided to the trainees as they were coming through.





WAYNE A. COLEMAN

**Q So, is it your testimony that it took from September '03 until December of '04 to get the roster lists together?**

A I would say that certainly was the major part of it. There was also a question then of who was going to pay for the overtime. Since the employees were now spread through three different components, the concern was which one of the components or how would the burden be spread among the three components.

**Q When you say the three components, you mean ICE, CBP --**

A And CIS.

**Q And CIS. And could those employees that had left the employment of the federal government, was there a question as to how that payment was going to be spread?**

A There was some question about that, yes.

**Q And how did that question get resolved?**

A To the best of my knowledge they, the decision was that the component that ended up with the occupation that the employee had been in would take care of the cost of paying that overtime for that individual.





WAYNE A. COLEMAN

So, if they had gone through or started through basic training for Immigration Inspector, for example, Immigration Inspectors had moved to Customs and Border Protection, so that particular individual would then be the responsibility of CBP. The money would come from CBP to take care of them.

**Q Who was involved in make that decision?**

A The staffs of the three components, and the Department of Homeland Security.

**Q Were each of the three components under the Department of Homeland Security?**

A I am sorry?

**Q Were each of the three components under the Department of Homeland Security?**

A Yes.

**Q Were those three components all under the Department of Homeland Security?**

A Yes.

**Q The money eventually came from the Department of Homeland Security, it is just which of the individual budgets it would be allocated to; is that right?**

A The money actually came from the budgets from the individual components. The appropriation





WAYNE A. COLEMAN

for the Department of Homeland Security is divided out specifically by component. And there is a certain amount of money that is allocated to each of the components each year, and there is usually some guidance from the U.S. Congress as to how, at least parts of that money, will be spent.

So, it was a question of where the money would come from, did the components have the money that they could use to make this back payment.

**Q And did making that decision delay the payment?**

A There was a great deal of discussion and concern about it among the three components in the Department, yes.

**Q I understand there is a great deal of discussion but could that delay payment?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: It certainly didn't help to speed the process up.

BY MR. SWEENEY:

**Q Do you know if it delayed the process?**

A I would assume so. If there are significant discussions between people at executive

WAYNE A. COLEMAN

levels and below that, that usually takes some time to work through.

**Q And were there any other things that led to the slowing of the payment?**

A One of the other concerns was that we had planned to ask the USDA National Finance Center to do the computations for us, for the back payment, and that required that we put a reimbursable agreement into place, and again, until the budget questions were resolved it wasn't possible for us to put the reimbursable agreement into place.

**Q What is a reimbursable agreement?**

A It is essentially a contract between DHS and the National Finance Center which says we are asking you to do something special for us. Here is what the task is, and there is a negotiation or discussion between the two agencies to determine what the cost of that special project is.

**Q Is there anything else that slowed the process of the payment down?**

A Beyond those three things, no, I would say that was, those were the primary things. If there were others, I don't know that any of them were significant.





WAYNE A. COLEMAN

**Q Do you know if there was any consideration given to paying people their retroactive pay as their roster information became available?**

A I believe in discussing that we found that would be more expensive than it would be to make the payment at one time.

**Q And why?**

A Sending one list of people and having NFC do the calculations all at one time simply turned out to be more economical than to send them a number of lists over a period of time.

The other concern was that in working with the National Finance Center, particularly as you get to the end of the calendar year, they provide payroll services for millions of federal employees, and they need to do other things that an employer needs to do like produce W-2 forms and so forth for employees at the end of each calendar year.

So that with those types of things, there is also the reprogramming of their computers, the general schedule normally receives some kind of an adjustment each year, that needs to be programmed into the computers so that beginning, starting in the first pay period of the new calendar year the





WAYNE A. COLEMAN

employee is paid at the proper rate of basic pay.

That takes some time. So, all of these things happen towards the end of the calendar year, and we were concerned that if we dribbled and drabbed these things in there during that period of time, they wouldn't get done any faster than if we waited until after those projects were done and then provided them to them after the first of January, and let them do them all at one time.

**Q And then this whole process took approximately 15 months; is that right?**

A Yes.

**Q If you look back at Plaintiff's No. 13, at the bottom of the page marked 51 and into 52, Mr. Ehrbar asks people to please ensure that the FLETC officials are informed and that personnel officers in the field and headquarters are receiving copies of the message. Do you see that?**

A Yes.

**Q Do you know if that happened?**

A Since this is addressed to Jill Arndt and she I believe was the Deputy Director of Training, she would have notified the staff at FLETC.

**Q What was the purpose for notifying the**





**WAYNE A. COLEMAN**

**staff at FLETC?**

A So, they could respond to employees' questions as to when we are going to get paid, why we are not being paid, all of the things that the employees normally ask about when they believe they are owed money.

**Q Would the people of FLETC be asking -- would the people at FLETC get questions only from those people that were currently doing basic training?**

A Yes, as far as I know, anyway.

**Q So, if people that had done basic training before had questions about this where would they bring their questions?**

A They would be contacting Fred or Alethea or John at this time.

**Q At this time would Fred or Alethea or John share this information with them, the information in this memo?**

A Yes, as far as I know, yes. I mean, there wouldn't be any reason not to.

**Q At this time would they tell the people that they were going to receive back wages plus interest?**

WAYNE A. COLEMAN

A Uh-huh.

Q Says, "Interest should also be included for that period." Is it safe to assume that at this point, February 3rd, 2004 the decision had been made --

A Yes.

Q -- to include interest with the back payment?

A Yes.

Q Why would this request for calculation of payment of the 6th day of training not come until February 3rd of 2004, if authority had been received in August of 2003?

MR. PEASE: Objection; asked and answered.

THE WITNESS: I think we have gone over this, but part of the effort here was that first we had to collect the names of the individuals who were going to be paid, and determine how much time each one of them had spent in their class and, therefore, how much time, how much money would be owed, or how many hours would need to be recalculated for the overtime.

BY MR. SWEENEY:

Q So, in the first line of this is says,





WAYNE A. COLEMAN

there is "attached listing of 3344 employees of the former INS; is that right?

A That is correct.

Q So, at this point can we assume that the list at least of those 3344 had been compiled?

A It certainly appears to be the case, yes.

Q So that first part of the delay that you had talked about, getting the roster list together, was resolved by February 3rd, 2004; is that right?

A Evidently for most of the employees. I think we eventually paid closer to 3900 employees. So, there were a continuing number of employees contacting us, asking us whether or not they had been included in the list, and if not we then went back to the FLETC staff and said we have had an employee come in, claims he or she was a part of training class whatever it was, we need a roster for that because we do not have that at this point. So there were additional people who we identified after this memo would have gone out.

Q And would that have affected the progress from this memo --

A No.

Q -- which requested here?





WAYNE A. COLEMAN

A No.

Q So, this would have gone forward at least for these 3344 people?

A Because it is dated and signed, yes. That would be an indication that it did go forward.

Q What was the process then from February 3rd, 2004 to December of 2004 to pay these people, if the roster list had been resolved?

A Well, again there was still budget issues, as far is I know at this point. And the second thing was, to actually get the reimbursable agreement in place with the National Finance Center, and there was discussion back and forth about how it was going to be done; was each one going to be calculated individually, were we going to use some other method?

There were a number of, I guess I would call it, technical questions or calculation questions, that still had to be ironed out. And again at this point, Rick's memo is going from the Department of Homeland Security, a component within the Department of Homeland Security, to a component within the Department of Justice who in turn was going to contact a component within the U.S.





WAYNE A. COLEMAN

Department of Agriculture. Bureaucracies being what they are, the mere communication takes time.

Q Okay. I show I you another document here that is marked MOR, I believe this is Moreno-49. I tried to do the math on it.

(Plaintiff's Exhibit 16 identified.)

(3:12 p.m. -- recess -- 3:18 p.m.)

BY MR. SWEENEY:

Q Have you had a chance to look through Exhibit 16?

A Yes, as a matter of fact.

Q What is this?

A Cheryl Cotton was on Terance Cook's staff and she was the main liaison between Justice Management Division and the USDA National Finance Center, so if there were a special requirement that the Department of Justice had or one of its components, she would be the primary point person to actually contact NFC and to begin working with them to get the reimbursable agreement in place, determine what the costs would be, what kind of information they would need from us, and that sort of thing. So that is essentially what this is.

This would, I would take it, was placed

WAYNE A. COLEMAN

**Q And when you discussed that -- well, who was involved in the discussion of the cutoff date?**

A It would have been our computation policy staff.

**Q Yourself?**

A Right.

**Q Was Mr. Tingley still there?**

A Yes.

**Q Ms. Smalls?**

A Ms. Smalls.

**Q John Ehrbar?**

A Right.

**Q Anyone else?**

A I think that would have been it.

**Q And could you explain to me the reasoning as to why the August 2005 date was selected?**

A We felt that we had been notified in August of 2003 of the change in the interpretation of the regulations, and, therefore, the employees under the Fair Labor Standards Act regulation has up to two years from the date that it was determined that they were owed overtime to make a claim for it.

Again, whether or not there was a hard and fast rule that we said somebody who showed up on





WAYNE A. COLEMAN

September 1st, 2005, no we are not going to pay you, no, I really can't say that.

**Q I think this is as good a place as any to stop. It is around 5:00.**

**I would appreciate starting at 9:00 tomorrow morning and hopefully we will get you out early.**

MR. PEASE: Are we going to do more 30(b)(6) tomorrow?

MR. SWEENEY: Yes, I have a couple more areas to cover.

MR. PEASE: I have a couple questions, I don't know whether you want me to do them now or later.

MR. SWEENEY: Why don't you save them for the end.

MR. PEASE: Just for the record, and for the court reporter, we don't waive the review/approval.

(Whereupon, at 4:57 p.m., the deposition was recessed, to be reconvened at 9:00 a.m., on November 3, 2006.)





WAYNE A. COLEMAN

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires:





WAYNE A. COLEMAN

CONTENTS


| WITNESS | EXAMINATION |
|---|---|
| WAYNE A. COLEMAN | |
| By Mr. Sweeney | 4, 146 |
| By Mr. Pease | 144 |


EXHIBITS


| EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| Plaintiff's Exhibit No. 1 | 75 |
| Plaintiff's Exhibit No. 2 | 87 |
| Plaintiff's Exhibit No. 3 | 96 |
| Plaintiff's Exhibit No. 4 | 102 |
| Plaintiff's Exhibit No. 5 | 104 |
| Defendant's Exhibit No. 1 | 144 |
| Defendant's Exhibit No. 2 | 144 |
| Plaintiff's Exhibit No. 6 | 170 |
| Plaintiff's Exhibit No. 7 | 176 |
| Plaintiff's Exhibit No. 8 | 185 |
| Plaintiff's Exhibit No. 9 | 190 |
| Plaintiff's Exhibit No. 10 | 194 |
| Plaintiff's Exhibit No. 11 | 202 |
| Plaintiff's Exhibit No. 12 | 226 |
| Plaintiff's Exhibit No. 13 | 231 |


-- continued --

WAYNE A. COLEMAN

EXHIBITS (Continued)

| EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| Plaintiff's Exhibit No. 14 | 247 |
| Plaintiff's Exhibit No. 15 | 249 |
| Plaintiff's Exhibit No. 16 | 253 |
| Plaintiff's Exhibit No. 17 | 254 |
| Plaintiff's Exhibit No. 18 | 259 |
| Plaintiff's Exhibit No. 19 | 264 |

REQUEST LOG

| PAGE | LINE |
|---|---|
| 55 | 20 |
| 109 | 23 |
| 120 | 15 |
| 134 | 9 |
| 151 | 23 |
| 152 | 13 |
| 172 | 4 |
| 174 | 6 |
| 174 | 20 |
| 204 | 7 |
| 206 | 2 |
| 249 | 3 |
| 264 | 12 |





WAYNE A. COLEMAN

CERTIFICATE OF NOTARY PUBLIC & REPORTER

I, DONALD R. THACKER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

--------------------------

Notary Public in and for the
District of Columbia

My Commission Expires: MAY 14, 2011





NAME OF CASE: MORENO vs. THE UNITED STATES

DATE OF DEPOSITION: NOVEMBER 2, 2006

NAME OF WITNESS: WAYNE A. COLEMAN

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________

______________________

WAYNE A. COLEMAN

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - -x

ARTURO MORENO, JR., et al., : No. 05-14210C

Plaintiffs, : (Judge Firestone)

vs. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - -x

30(b)(6) DEPOSITION OF WAYNE A. COLEMAN

VOLUME II

Washington, DC

Friday, November 3, 2006

REPORTED BY:

DONALD R. THACKER

WAYNE A. COLEMAN

Deposition of WAYNE A. COLEMAN, called for further examination pursuant to agreement of counsel, on Friday, November 3, 2006, in Washington, DC, at the offices of the U.S. Department of Justice, 1100 L Street, Northwest, 4th Floor Conference Room, at 9:02 a.m., before DONALD R. THACKER, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

MICHAEL J.D. SWEENEY, ESQ.
Getman Law Office
9 Paradies Lane
New Paltz, New York 12561
845-255-9370
845-255-8649
MSweeney@getmanlaw.com
On behalf of Plaintiff

-- continued --





WAYNE A. COLEMAN

APPEARANCES (Continued):

JEFFREY S. PEASE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, Northwest
Washington, D.C. 20005
and
ARTHUR I. RETTINGER, ESQ.
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, Northwest, Suite 4.4-B
Washington, D.C. 20229
On behalf of Defendant





WAYNE A. COLEMAN

PROCEEDINGS

Whereupon,

WAYNE A. COLEMAN

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. SWEENEY:

**Q Good morning, Mr. Coleman.**
A Good morning.
**Q Thank you for coming again this morning. You understand that you are still under oath?**
A Yes, I to.
**Q Thank you.**
**I wanted to touch on a couple of things of a little bit broader nature than we have been talking about earlier. The first thing I wanted to talk about a little bit was the stature of the change from a 5-day a week to a 6-day a week training at FLETC. I mean, in your mind was that a big change?**
A Yes.
**Q And why?**
A Simply because the employees were being





WAYNE A. COLEMAN

asked to spend another day in training.
**Q Had you ever seen a change like that happen before?**
A No.
**Q How long have you worked in the government as a pay specialist?**
A Well, as a pay specialist for just about, let's see, almost 20 years, I guess.
**Q And then your time before that?**
A Yes, my total years are about 32 altogether.
**Q Was the INS compensation group, if I can refer to the group that you and Ms. Smalls and Mr. Tingly and Mr. Seneschal and Mr. Ehrbar were part of, were they consulted prior to January 1st of 2002 as to the effect, the change to a 6-day work week, would have on compensating INS employees?**
A No, they were not.
**Q Do you know if the INS in any way addressed the issue of compensating for that 6th day of basic training prior to January 1st of 2002?**
A Not that I am aware of, no.
**Q When was the first time that you became aware that the INS employees doing basic training at**

WAYNE A. COLEMAN

not an OPM requirement, so there is no poster, as there is Department of Labor-covered employees, that needs to be posted.

**Q And it is your understanding that it is not posted, is that what you are saying?**

A Well, since there is no requirement to do that, federal employers do not so far as I know. I know that within the INS facilities I have visited personally there is no posting like that.

**Q Have you ever visited the FLETC?**

A Yes, I have.

**Q And do you know if there is a posting of those posters at FLETC?**

A Not that I saw. Now, I would say that the training that supervisors receive typically includes information about overtime and premium pay under the federal regulations. So, the supervisors are made aware of these authorities and the entitlements that employees have.

We would expect in turn that they would share that information with the employees that they supervise. So, it is more of that sort of diffusion of the knowledge rather than something being broadcast in a written format.





WAYNE A. COLEMAN

**Q And do you or are the supervisors charged with disseminating FSLA information to employees?**

A When you say charged --

**Q I am just trying to figure out if there is any way that INS affirmatively tells its employees about its FLSA rights. You just said supervisors are trained in that way. Are they told then to impart that information to their supervisees or is that information simply in case there is a question asked?**

A I don't know that there is a direct order given to these folks to brief their employees on this, but clearly overtime and premium pay is an issue that is of interest to employees. And, along with things like their benefits, for example, supervisors would normally make them aware of that as issues came up.

**Q Would a supervisor make them aware of those rights if the employee didn't ask about them?**

MR. PEASE: Objection; calls for speculation.

THE WITNESS: I really can't say. Some supervisors probably did, some didn't. Supervisors vary in their practices across the agency.





WAYNE A. COLEMAN

BY MR. SWEENEY:

**Q Is there a requirement that supervisors tell employees about their FSLA rights regardless of whether the employees ask?**

A No.

**Q When you say the supervisors are trained with respect to the Fair Labor Standards Act, what does that training consist of?**

A I can't speak personally to that. I know that there is some information provided in the basic supervisory course that supervisors go through down in Dallas, and the specifics of it I have not seen, but I understand that there is a module that deals with premium pay and overtime.

One of the things that really isn't relevant here, is the fact that employees under the Immigration and Naturalization Service were entitled to a special separate overtime provision, which provided them a double overtime payment on a basic time period basis, rather than on an hourly basis, and employees were much more concerned with that overtime system than they were with anything else, because it was such a generous system that it kind of overtook all of the other entitlements that they





WAYNE A. COLEMAN

might have had under overtime.

**Q Would you explain the double overtime system?**

A The 1931 act provided for double overtime payment for employees who were performing Immigration Officer work, and it was paid on a period basis. So, for every period there was 2 hours or less, or up to 2 hours in length they were paid for 4 hours worth of overtime.

**Q Would that apply during basic training?**

A If they had performed Immigration Officer work, yes. I mean, there was a definite definition of what that work entailed in the statute that established this provision.

**Q And did people at FLETC doing basic training typically perform that type of work?**

A No, they did not. It would have required that they would have at a minimum been through and passed the basic training before they would have been entitled to perform those duties, number one, have been able to perform those duties, and therefore, begin to earn that kind of overtime.

**Q So, would it be your assumption that the people that are, were training at FLETC during their**

WAYNE A. COLEMAN

belongs to the Customs and Border Protection, to do the actual calculations.

MR. SWEENEY: Unless your counsel has any questions for you that I need to follow up, I think I am finished with my questioning of you, Mr. Coleman. Thank you for coming. Thank you for your patience.

THE WITNESS: You are quite welcome.

MR. PEASE: If we could just take 5 minutes so we can talk for a minute.

MR. SWEENEY: Sure.

(Recess.)

MR. PEASE: We don't have anything further. Thank you very much, Mr. Coleman.

THE WITNESS: You are quite welcome.

(Whereupon, at 11:01 a.m., the deposition was concluded.)





WAYNE A. COLEMAN

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires:





WAYNE A. COLEMAN

CONTENTS


| WITNESS | EXAMINATION |
| --- | --- |
| WAYNE A. COLEMAN | |
| By Mr. Sweeney | 284 |


EXHIBITS


| EXHIBIT NUMBER | IDENTIFIED |
| --- | --- |
| Plaintiff's No. 20 | 327 |
| Plaintiff's No. 21 | 335 |
| Plaintiff's No. 22 | 341 |


REQUEST LOG

| PAGE | LINE |
| --- | --- |
| 313 | 5 |
| 322 | 23 |
| 324 | 6 |
| 334 | 25 |
| 337 | 19 |





WAYNE A. COLEMAN

CERTIFICATE OF NOTARY PUBLIC & REPORTER

I, DONALD R. THACKER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

--------------------------

Notary Public in and for the
District of Columbia

My Commission Expires: MAY 14, 2011

NAME OF CASE: MORENO vs. THE UNITED STATES
DATE OF DEPOSITION: NOVEMBER 3, 2006
NAME OF WITNESS: WAYNE A. COLEMAN
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________

________________________