# In the United States Court of Federal Claims

**No. 05-142C**
**(Filed: July 3, 2008)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| **ARTURO MORENO, JR., individually and on behalf of others similarly situated,** | * |
| **Plaintiffs,** | * **Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; Statute of Limitations for Willful Violations, 29 U.S.C. § 255(a); Summary Judgment; Disputed Issues of Fact; Credibility Determinations; Equitable Tolling.** |
| **v.** | * |
| **THE UNITED STATES,** | * |
| **Defendant.** | * |
| * * * * * * * * * * * * * * * * * * * | * |

*Michael J. D. Sweeney,* New Paltz, NY, for plaintiffs.

*Maame A. F. Ewsi-Mensah,* U.S. Department of Justice, Washington, DC, with whom were *Gregory G. Katsas, Acting Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *Arthur Rettinger*, U.S. Customs and Border Protection, and *Melanie Watson*, Office of Personnel Management, of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge*.

Pending before the court are the parties' cross-motions for summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").[1]

---

[1]The plaintiffs cite to Rule 56 of the Federal Rules of Civil Procedure. Pls.' Mot. Summ. J. at 18.

The plaintiffs, employees of the former United States Immigration and Naturalization Service ("INS"),[2] brought this suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2000), to recover unpaid overtime wages, liquidated damages, costs and attorneys' fees. The plaintiffs allege that the defendant, the United States ("government" or "defendant"), failed to pay them overtime wages at a rate of time and a half for the hours they worked over forty hours per week while attending a scheduled sixth day of training per week at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, between January 1, 2002 and August 23, 2003. As the majority of the plaintiffs have now received payments of FLSA overtime wages plus interest under the Back Pay Act,[3] 5 U.S.C. § 5596 (2001), the dispute on the merits now centers on the plaintiffs' entitlement to liquidated damages under the FLSA.

The government argues that the plaintiffs are not eligible for liquidated damages because the government acted in good faith based upon a reasonable interpretation of its obligations under the FLSA. In addition, the government argues that the plaintiffs' claims

---

[2]By March 2003, the former INS had been absorbed into the Bureau of Immigration and Customs Enforcement ("ICE"), Bureau of Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("CIS"), all of which were new agencies within the newly-created Department of Homeland Security ("DHS"). Def.'s Proposed Findings of Uncontroverted Fact ("DPFUF") ¶¶ 46-48.

[3]Approximately 737 people have joined the case. Decl. of Michael J.D. Sweeney, Esq., ¶ 26; cf. Tr. of Oral Arg. at 36:12-13 (plaintiffs' counsel indicated that there are total of 736 plaintiffs). Of those, nine plaintiffs submitted declarations stating, "I have still not received a payment." Pls.' Ex. 34, Decls. ¶ 6. The government, by contrast, asserts that the plaintiffs "have now all been paid back overtime wages and Back Pay Act interest." Def.'s Cross-Mot. at 4.

are time-barred because the government did not act willfully in violating the FLSA, and therefore a two-year limitations period applies under 29 U.S.C. § 255(a) (2000).[4] The government further argues that the plaintiffs' claims may not be equitably tolled. The plaintiffs respond that some of their claims for liquidated damages are timely under the three-year statute of limitations for willful violations of the FLSA.[5] The plaintiffs also argue that their claims are eligible for equitable tolling because the government induced or tricked them into allowing the filing deadlines for their liquidated damages claims to pass.

For the reasons set forth below, the court finds that disputed issues of fact as well as issues of credibility preclude a finding of summary judgment with regard to the willfulness of the government's action. In addition, the court finds that the statute of limitations on the plaintiffs' claims may not be equitably tolled. Accordingly, only those plaintiffs whose claims are potentially timely under the three-year FLSA statute of limitations may remain in the litigation. Moreover, until it can be determined whether any of the plaintiffs' claims are eligible for the three-year statute of limitations, the court defers ruling on the plaintiffs' entitlement to liquidated damages.

---

[4]Under 29 U.S.C. § 255(a), actions to recover unpaid overtime and/or liquidated damages under the FLSA

> may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

[5]At oral argument, plaintiffs' counsel indicated that approximately 110 plaintiffs have at least some claims falling within the three-year statute of limitations and that for approximately eighty plaintiffs, no training dates were given by the government. Tr. of Oral Arg. at 36:20-37:4.

## BACKGROUND FACTS

The following facts are taken from the parties' cross-motions for summary judgment, Proposed Findings of Uncontroverted Facts, and accompanying exhibits. The facts below are undisputed unless otherwise noted.

The plaintiffs were employees of the former INS who were required to attend "basic immigration law enforcement training" at FLETC between January 1, 2002 and August 23, 2003. After the events of September 11, 2001, in an effort to put more law enforcement agents in the field, FLETC replaced its schedule of five eight-hour days of training per week with a schedule of six eight-hour days of training per week.[6] As a result of the additional eight-hour day each week, the plaintiffs attended training for more than forty hours per week.

In late 2001 and early 2002, the United States Office of Personnel Management ("OPM") received requests for guidance from various federal agencies regarding the entitlement of FLETC trainees to overtime payment for the sixth day of training per week. See, e.g., Pls.' Resp. to DPFUF ¶¶ 22, 31; Def.'s Ex. 30, 91:21-93:16, 117:17-118:11 (Draper Depo.). Under 5 C.F.R. § 551.501(a) (2000), "[a]n agency shall compensate [a nonexempt] employee . . . for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and one-half times the employee's hourly regular rate of

[6]Employees from various federal law enforcement agencies were subject to the six-day FLETC training schedule during the period in question. However, this lawsuit concerns only employees of the former INS.

pay . . . ."[7] However, according to OPM pay specialist Vicki Draper ("Ms. Draper"), OPM determined based on 5 C.F.R. § 551.423(a)(3) (2000), which provides that "[t]ime spent in apprenticeship or other entry level training . . . outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods,"[8] that the sixth day of basic training at FLETC was not compensable at the overtime rate. Def.'s Ex. 30, 93:21-94:14 (Draper Depo.). At that time, according to Ms. Draper, "it had been OPM's long-standing interpretation that any hours outside the 40-hour work week for entry level training was not part of the . . . regular work hours."[9] Id. at

[7]This provision is subject to a number of exceptions, none of which are applicable here. 5 C.F.R. § 551.501(a)(1)-(8).

[8]By contrast, 5 C.F.R. § 551.423(a)(1) (2000) states that "[t]ime spent in training during regular working hours shall be considered hours of work," (emphasis added), and 5 C.F.R. § 551.423(a)(2) (2000) states that

> [t]ime spent in training outside regular working hours shall be considered hours of work if: (i) The employee is directed to participate in the training by his or her employing agency; and (ii) The purpose of the training is to improve the employee's performance of the duties and responsibilities of his or her current position.

(emphasis added).

[9]At that time, Ms. Draper also believed that "the only way [to] pay overtime pay [to the FLETC trainees] was to get an exception under [5 C.F.R. §] 410.402." Def.'s Ex. 30, 95:5-24, 97:18-23 (Draper Depo.). 5 C.F.R. § 410.402 (2000) pertains to premium pay under 5 U.S.C. §§ 5541-5550 (2000), rather than to overtime under the FLSA.

5 C.F.R. § 410.402(a) provides: "Except as provided by paragraph (b) of this section, an agency may not use its funds, appropriated or otherwise available, to pay premium pay to an employee engaged in training by, in, or through Government or non-government facilities." 5 C.F.R. § 410.402(b), in turn, provides inter alia: "(7) Agency exemption. An employee given training during a period not otherwise covered by a provision of this paragraph may be paid premium pay when the employing agency has been granted an exception to paragraph (a) of this section by the [OPM]."

In a memo to Robert F. Diegelman ("Mr. Diegelman") at the United States Department of

103:4-13 (Draper Depo.). Similarly, in early 2002, according to INS pay specialist Wayne Coleman ("Mr. Coleman"), INS "was getting questions from employees who were in training as to why they were not being paid," Pls.' Ex. 7, 126:5-7 (Coleman Depo.), but at that time INS "understood the regular working hours [in 5 C.F.R. § 551.423(a)(3)] to mean basic 40-hour work week that most federal employees are required to work."[10] Pls.' Ex. 7, 83:17-24 (Coleman Depo.). Thus, because "regular working hours" was assumed to refer

---

Justice ("DOJ") dated April 24, 2002, George H. Bohlinger ("Mr. Bohlinger"), Executive Associate Commissioner in the Office of Management for INS, requested that DOJ "seek an exception from [OPM] to the regulatory prohibition against paying overtime to employees attending basic training" at FLETC, as provided in 5 C.F.R. § 410.402(b)(7). Pls.' Ex. 18 (Bohlinger Memo.). Though the memo itself does not refer to the FLSA, the government alleges that INS sought this exemption "[b]ecause INS had determined that FLSA did not authorize overtime wages for FLETC trainees." DPFUF ¶ 34 (citing Pls.' Ex. 18); cf. Pls.' Resp. to DPFUF ¶ 34 ("The source cited does not indicated [sic] that the exemption was sought because of an INS determination regarding FLSA obligations. Section 410.402 is unrelated to the Government's FLSA obligations."). In a memo dated July 2, 2002, Mr. Diegelman responded that "we have decided not to seek OPM approval of an exception" under 5 C.F.R. § 410.402(b)(7) to allow premium pay for the FLETC trainees, citing budgetary and consistency concerns. Pls.' Ex. 19 (Diegelman Memo.).

[10]INS pay personnel also consulted the Federal Personnel Manual ("FPM") Letter 551-17 in determining whether the plaintiffs were owed overtime wages for the time spent in training. Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact ("PPFUF") ¶ 18. The version reviewed by INS in 2002 was marked "OBSOLETE" on the first page, but was also marked "RETAIN UNTIL SUPERSEDED," pursuant to the "FPM Sunset Document" dated December 13, 1993. Def.'s Resp. to PPFUF ¶¶ 19-20; Pls.' Ex. 13. In addition to reiterating the standards from 5 C.F.R. § 423, FPM Letter 551-17 states:

> Agencies are cautioned that the regulations contained in 5 CFR 551.423 and the instructions provide [sic] in the attachment to this letter do not apply to time spent in training by employees during overtime hours under title 5. The prohibition on the payment of premium pay, including overtime pay, contained in 5 U.S.C. 4109 (a)(1) is applicable in the administration of premium pay under title 5.

See Def.'s Resp. to PPFUF ¶ 21.

to a forty-hour work week and the FLETC training was considered to be "entry level training," both OPM and INS initially determined that 5 C.F.R. § 551.423(a)(3) precluded the payment of overtime wages to the FLETC trainees for the sixth eight-hour day of training per week. See, e.g., Pls.' Ex. 7, 90:9-13, 93:22-94:4 (Coleman Depo.); Def.'s Ex. 30, 108:6-12 (Draper Depo.).

Both Ms. Draper and Mr. Coleman concede that, in making their initial determinations, they did not consult 5 C.F.R. § 551.421 (2000), which defines "regular working hours" as "the days and hours of an employee's regularly scheduled administrative workweek established under part 610 of this chapter." Pls.' Ex. 14, 106:6-20 (Draper Depo.); Pls.' Ex. 7, 102:14-17 (Coleman Depo.). Part 610, in turn, defines "regularly scheduled administrative work week" at 5 C.F.R. § 610.102 (2000) as "the period within an administrative workweek, [defined in the same section as "any period of 7 consecutive 24-hour periods designated in advance by the head of the agency"], established in accordance with [5 C.F.R.] § 610.111, within which the employee is regularly scheduled to work."[11] Similarly, 5 C.F.R. § 610.102 defines "regularly scheduled work" as "work that is scheduled in advance of an administrative workweek . . . in accordance with [5 C.F.R.] § 610.111." In addition, 5 C.F.R. § 610.111(a)(2) (2000) requires that "[t]he head of each agency . . . shall establish . . . [a] regularly scheduled administrative workweek that consists of the 40-hour basic workweek . . . plus the period

[11]By contrast, the "basic workweek, for full-time employees, means the 40-hour workweek established in accordance with § 610.111." 5 C.F.R. § 610.102.

of regular overtime work, if any, required of each employee." (emphasis added).

In the fall of 2002, Donald Bryce Baker ("Mr. Baker"), then Senior Advisor to the Assistant Director for Compensation Administration at OPM, conducted a review of OPM's regulations in 5 C.F.R. part 551 and "came across" the definition of "regular working hours" in 5 C.F.R. § 551.421. Def.'s Ex. 4 at ¶¶ 1-4. At that time, Mr. Baker "realized the connection to the use of 'outside regular working hours' in 5 C.F.R. § 551.423(a)(3), [and] advised . . . Ms. Draper . . . that [their] prior determination that overtime wages were not authorized for FLETC trainees may have been incorrect."[12] Def.'s Ex. 4 at ¶¶ 1-6; Pls.' Resp. to DPFUF ¶¶ 37-38. On December 18, 2002, in an e-mail to Gary Wilson ("Mr. Wilson"), Program Manager for Pay, Attendance and Leave for the United States Forest Service, Ms. Draper stated:

> Regrettably, our original determination was incorrect. We recently revisited this issue after realizing that the term 'regular working hours' is defined in 5 CFR 551.421. When we read the regulations at 5 CFR 551.423(a)(1) in conjunction with the [sic] 551.421, it is clear that if the nonexempt employees are scheduled in advance of the administrative workweek to attend a 6-day training class, those regularly scheduled training hours on the 6th day are 'regular working hours' and constitute hours of work for overtime pay purposes.

Pls.' Ex. 9, MOR-135. Ms. Draper further stated that 5 C.F.R. § 551.423(a)(3) did not, as

[12]The plaintiffs cite to the testimony of Jerome D. Mikowicz ("Mr. Mikowicz"), Deputy Associate Director for Pay and Leave Administration at OPM, for the proposition that Mr. Baker "rediscovered the definition of regular working hours" "a month or two preceding" November 2002, Pls.' Ex. 15, 138:1-5 (Mikowicz Depo.), fixing the date when OPM "positively knew that the FLSA obligated it to pay Plaintiffs overtime for the 6th day of training" as September 2002. PPFUF ¶ 54.

originally thought, apply, stating that, "because the regularly scheduled training hours on the 6th day are considered to be regular working hours (and the training will not occur outside regular working hours), it is irrelevant that this is an apprenticeship program and no productive work is being performed." Pls.' Ex. 9, MOR-135. Ms. Draper also noted that "this is not optional. If the training occurs during regular working hours, as discussed above, the time spent in training on the 6th day is considered hours of work and the employees are entitled to overtime pay. This also applies to the employees who formerly received training at [FLETC]." Id.

DHS officially began operations on January 24, 2003, though the reorganization of former agencies into the new agencies constituting DHS was not complete until March 1, 2003. DPFUF ¶¶ 46-47. On February 13, 2003, Mr. Wilson sent a copy of Ms. Draper's December 18, 2002 e-mail to Mr. Coleman, who contacted John Cahill ("Mr. Cahill"), Human Resources Director for DOJ, the parent agency of INS. DPFUF ¶¶ 43-44. On March 19, 2003, Steve Cohen ("Mr. Cohen"), "a special advisor to the director of OPM," Pls.' Ex. 36, 203:2-15 (Mikowicz Depo.), sent an e-mail to Melissa Allen, Acting Chief Human Capital Officer at DHS, indicating:

> [O]ur staff made a mistake in the original guidance we provided agencies . . . about 6-day training courses at [FLETC]. We are now attempting to correct that mistake. . . . Our new guidance will state that . . . nonexempt . . . employees are entitled to receive overtime pay for time spent in entry-level training on the sixth day of a 6-day training course if they are scheduled in advance of the administrative workweek to attend . . . .

Def.'s Ex. 14, A220-21.

On May 6, 2003, DHS Human Resources Management ("HRM") sent the following broadcast e-mail to its employees:[13]

> Recently, we have had many inquiries from employees regarding the payment of premium pay for a 6th day of training in a 6-day training week while at FLETC. These inquiries have been prompted by a memorandum from the Forest Service, a bureau of the Department of Agrigulture.
>
> Current regulations, see 5 CFR 551.423(a)(3) and 5 CFR 410.402(a), generally prohibit paying premium pay to those taking training, especially those attending basic training. The Forest Service memo reports that [OPM], the personnel policy maker for the Federal government, had changed its interpretations of these regulations.
>
> To date, however, we have had no official guidance from the OPM or [DHS] about this issue. We have been in contact with DHS who has contacted OPM asking for guidance. Until such guidance is received, we have no legal authority to pay any additional premium pay . . . . We have a complete listing of all employees who attended basic training since FLETC went to a 6-day training week. If guidance is received from OPM directing payment, we will work to identify funds, and undertake prompt and complete payment as required.

Pls.' Ex. 6; see also DPFUF ¶ 56. In July 2003, OPM posted on its website "Questions and Answers" ("Q&A") "explaining that FLSA authorized overtime wages to entry-level trainees," DPFUF ¶ 57; Pls.' Ex. 11, and "[o]n August 6, 2003, ICE received authority from DHS to pay FLSA overtime to legacy INS employees who had attended the six-day training schedule at FLETC." DPFUF ¶ 58.

From the August 24 – September 6, 2003 pay period forward, nonexempt ICE employees were paid FLSA overtime pay for the scheduled sixth day per week of FLETC

---

[13]The plaintiffs indicate that "[p]laintiffs still in Defendant's employ on May 6, 2003 would have received the e-mail." PPFUF ¶ 67 (citing Pls.' Ex. 7, 205:5-10 (Coleman Depo.)).

basic training "in accordance with the new interpretation" discussed above. Def.'s Ex. 28, MOR-154 (2004 Coleman Decl.). The process of retroactively paying those who had attended FLETC training between January 2002 and August 23, 2003 took longer, however, and involved "collecting data on trainees, compiling payment lists of trainees, calculating the amount of the payments, and making arrangements for payment through the National Finance Center" ("NFC"). DPFUF ¶ 61. "Over 4,000 legacy INS employees had attended FLETC during the time period in question." Id. at ¶ 64. As it was required to do, ICE sought assistance from DOJ in a memorandum dated February 3, 2004, id. at ¶ 69, and established an agreement for services with the NFC on September 10, 2004. Id. at ¶¶ 70, 72.

Approximately 3,900 legacy INS employees received payments of overtime wages plus Back Pay Act interest on or about December 7, 2004, and another approximately 300 employees were paid by June 2005. Id. ¶ 79; Def.'s Ex. 29, ¶ 17 (2006 Smalls Decl.). Some employees received an e-mail from CBP on July 14, 2005, indicating that "the retroactive payment for the 6th day of training will be direct deposited to your account . . . during the week of July 18, 2005."[14] Pls.' Ex. 26. Mr. Coleman indicated in a March 3, 2003 e-mail to Bill Kraus, Senior Labor Counsel at CBP:

---

[14]Named plaintiff Arturo Moreno, Jr., ("Moreno") received payment in February 2005. PPFUF ¶ 73; Pls.' Ex. 1 (Moreno Decl.). As noted above at n.3, the plaintiffs also claim that some of them never received any retroactive payment of overtime wages for the sixth day of training. See Pls.' Ex. 34, Decls. ¶ 6.

> We expect to continue taking claims from legacy INS employees until 30 August 2005, two years after the date on which we received authorization from DHS to pay overtime for those attending basic training on a 6th regularly schedule [sic] workday during a training week[,] coincid[ing] with the two years provided in the FLSA for filing a claim when willful violation is not involved.

Pls.' Ex. 23. Some legacy INS employees received a Statement of Earnings and Leave which reported the interest portion of the retroactive payment as "LIQ.DAMAGES/ INT.BACKPAY." Pls.' Resp. to DPFUF ¶ 81; Def.'s Resp. to PPFUF ¶ 77; Pls.' Ex. 28 (Earnings Statement for Thomas Porta (not a plaintiff in this case) from 2006); Def.'s Ex. 3, ¶ 3 (Benit Decl.).

Named plaintiff Moreno originally brought this action on behalf of himself and others similarly situated on June 1, 2004 in the United States District Court for the District of Columbia ("D.D.C."). The D.D.C. dismissed the case for improper venue on November 5, 2004. Moreno then filed his case in this court on January 21, 2005, filing a collective action notice motion on October 24, 2005. The court granted the motion on April 3, 2006 and ordered that the collective action notice in the case be sent to the putative class members by May 19, 2006, giving them until July 18, 2006 to file their consents to sue.[15] As noted above, approximately 737 people have joined the case.[16]

---

[15]The first consent to sue by a plaintiff other than Moreno was filed May 23, 2006. DPFUF ¶ 86.

[16]On January 18, 2008, the plaintiffs submitted some 350 affidavits which stated:

> I relied on the defendant's promise to fully compensate me as required under the law and did not bring legal action for the back pay. . . . Despite its representation that it

The plaintiffs filed a motion for summary judgment on the issue of liability on October 12, 2007, and the government filed a cross-motion for summary judgment on December 21, 2007. The plaintiffs contend that they are entitled to liquidated damages because the government's initial decision not to pay them overtime as required under the FLSA was not made in good faith nor predicated upon reasonable grounds, as evidenced by the government's failure to consult the regulations defining "regular working hours." In addition, the plaintiffs argue that their claims qualify for the three-year statute of limitations set forth in 29 U.S.C. § 255(a) because the government's failure to pay them overtime was willful in that the government first recklessly disregarded its obligations under the FLSA by failing to consider the regulations defining "regular working hours" and later knowingly violated the FLSA by continuing to withhold payment for a number of years after it discovered and conceded its error. Finally, the plaintiffs argue that the statute of limitations should be equitably tolled based on the government's alleged misrepresentation to the plaintiffs that they would receive "prompt and complete payment as required," which the plaintiffs contend implied that they would be paid liquidated

---

> would make complete payment, the payment that defendant sent to me was not complete payment for the 6th day of training each week at the FLETC. . . . I joined this action to recover the balance of the compensation that the defendant owes me after I realized that the defendant had not made complete payment to me and does not intend to fully compensate me as required under the law.

Pls.' Ex. 33, Decls. ¶¶ 5, 7, 8.

damages in addition to overtime, and on which the plaintiffs claim they relied.[17]

The government responds that the plaintiffs' claims are time-barred because they were not filed within the two-year statute of limitations set forth in 29 U.S.C. § 255(a) and they do not qualify for an extension to three years because the government's actions in failing to immediately pay overtime were not willful. In support of this argument, the government asserts that, as a matter of law, "willfulness" requires more than a failure to make an adequate inquiry into the requirements of the law, instead requiring "intentional" or "deliberate" conduct as set forth by the Supreme Court in McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).[18] The government further argues that equitable tolling of the limitations period is not available under the FLSA, because the statutory language itself indicates that Congress did not intend to allow for tolling beyond the three-year period specified for willful violations, and that even if tolling were allowed, the plaintiffs have failed to show that they relied on a misrepresentation which induced or tricked them not to sue for liquidated damages until the statute of limitations had passed. Finally, the

[17]The plaintiffs also argue for tolling of the limitations period based on the government's failure to maintain displays in the workplace apprising employees of their rights under the FLSA, based on delay arising out of the dismissal of the suit from the D.D.C. and refiling in this court, and based on delay in sending the collective action notice to prospective plaintiffs.

[18]As discussed infra, the state of mind required for willfulness was set forth by the Supreme Court in McLaughlin. 486 U.S. at 133. Under McLaughlin, to prove willfulness, the plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Id. Noting that "[i]n common usage the word 'willful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional,'" the Supreme Court held that "[c]onduct that is not merely negligent" is required for willfulness and that "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation," its action is not considered willful. Id. at 133, 135 n.13.

government argues that, even if any of the plaintiffs' claims can be found to be timely, the plaintiffs would not be entitled to liquidated damages in any event because the government acted in good faith and had reasonable grounds for believing it was in compliance with the FLSA.

Briefing on the pending cross-motions for summary judgment was completed on February 8, 2008. Oral argument was heard on June 16, 2008.

## DISCUSSION

### I. Standards of Review

According to Rule 56(c) of the RCFC, summary judgment is appropriate "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "an asserted issue of material fact is not 'genuine' in the sense of . . . Rule 56 if a reasonable [trier of fact] could only resolve the question for the moving party." Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., 212 F.3d 1377, 1381 (Fed. Cir. 2000). "[T]o determine whether a 'reasonable [trier of fact]' could disagree on [an issue of material fact], this court identifies facts posing a potential dispute and then examines those facts in the

context of the legal criteria by which a fact finder would resolve the dispute." Id.

In addition, "summary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of witnesses." Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1362 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 255); Fed. R. Civ. P. 56 advisory committee's note (1963 Amend.) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."); see also Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1192 n.13 (Fed. Cir. 2006) ("Credibility . . . become[s] an issue once a party offers a declarant's testimony in support or in opposition to summary judgment.").

Cross-motions for summary judgment do not constitute admissions that no genuine issues of material fact remain, see Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997), nor does the rejection of one party's motion necessarily allow that of the other party. ThermoCor, Inc. v United States, 35 Fed. Cl. 480, 485 (1996) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). Instead, "[w]here both parties move for summary judgment and allege an absence of any genuine issues of material fact, the Court still must determine independently the appropriateness of summary disposition in a particular case," Stout Rd. Assocs., Inc. v. United States, 80 Fed. Cl. 754, 757-58 (2008) (citing Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988)), "evaluat[ing] each motion on its own merits." ThermoCor, 35 Fed. Cl. at 485

(citing Prineville, 859 F.2d at 911). Moreover, "[e]ach party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Del Labs., 118 F.3d at 1573. Accordingly, the court must "draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

## II. The Court Cannot Determine the Willfulness of the Government's Actions in Violating the FLSA, Precluding Summary Judgment for Either Party.

As discussed below, the court finds that material issues of disputed fact and credibility exist which preclude a finding of summary judgment for either party with regard to the willfulness of the government's actions in this case. Willfulness is a threshold question in this case because, with the possible exception of Moreno,[19] none of the plaintiffs' claims are timely under the two-year statute of limitations set forth in 29 U.S.C. § 255(a) and because the court finds that equitable tolling is not available here, as

---

[19]Based on his June 1, 2004 filing in the D.D.C., the plaintiffs argue that Moreno brought suit within two years of his training at FLETC on Saturdays from June 15 – August 17, 2002. Pls.' Mot. for Summ. J. at 34; Pls.' Ex. 3, MOR-4592; Tr. of Oral Arg. at 82:22-83:1 ("Mr. Moreno would be in if the statute of limitations is tolled from when he file[d] his consent to sue . . . with the [D.D.C.]"). However, Moreno's complaint and consent to sue in this court were filed on January 21, 2005, more than two years (but less than three years) after the overtime hours were worked. At oral argument, counsel for the government indicated that "with respect to which Plaintiffs are in or out, it's [the government's] understanding that Plaintiff Moreno would be the one Plaintiff who would fall within the two-year statute of limitations." Tr. of Oral Arg. at 88:19-22. It is not clear whether the government's statement was a concession that Moreno's claim is timely under a two-year statute of limitations. Because of this confusion, and because if the plaintiffs can show willfulness, Moreno's claims will likely be found to be timely as well, the court defers ruling with regard to Moreno's unique circumstances at this time.

discussed below. Therefore, only the approximately 110 plaintiffs who filed their consents to sue within three years of working a sixth day per week at FLETC have a chance to remain in this suit, and those plaintiffs will only be eligible for a three-year statute of limitations under 29 U.S.C. § 255(a) if they can show that the government acted willfully. Because the question of willfulness must be resolved in order to determine whether any plaintiffs will remain in the case in the first instance, the court also finds that it would be premature to rule on the merits of the plaintiffs' claims for liquidated damages under the FLSA at this time. Accordingly, the court defers ruling on the government's good faith and/or reasonable grounds for believing it was complying with the FLSA.

### A. Standards for Establishing Willfulness Under the FLSA

Under 29 U.S.C. § 207, employers, including federal agencies, are generally required to pay overtime wages at a rate not less than time and a half for hours over forty in a workweek. An employer who violates 29 U.S.C. § 207 "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."[20] 29 U.S.C. § 216(b).

---

[20]However, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [29 U.S.C § 216]." 29 U.S.C. § 260 (2000).

"The burden rests on the government to establish its good faith and the reasonable grounds for its decision." Bull v. United States, 479 F.3d 1365, 1379-80 (Fed. Cir. 2007) (quoting Adams v. United States, 350 F.3d 1216, 1226 (Fed. Cir. 2003)). "[A] presumption of regularity attaches to the actions of Government agencies," Adams, 350 F.3d at 1228 (quoting United States Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001)), but "the government . . . must

According to 29 U.S.C. § 255(a), actions to recover unpaid overtime and/or liquidated damages under the FLSA

> may be commenced within two years after the cause of action accrued,[21] and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.[22]

Thus, a two-year statute of limitations inheres except where the employer's violation of the

---

provide actual evidence to satisfy [its burden and] cannot simply rest on the presumption of regularity to satisfy [it]." Adams, 350 F.3d at 1228 n.6; see also Cook v. United States (Cook II), 855 F.2d 848, 849 (Fed. Cir. 1988) (invoking the "presumed good faith of government officials" (citing Union Pac. R.R. Co. v. United States, 847 F.2d 1567, 1571 (Fed. Cir. 1988))).

To demonstrate good faith, the employer must show "an honest intention to ascertain what the [FLSA] requires and to act in accordance with it." Beebe v. United States, 640 F.2d 1283, 1295 (Ct. Cl. 1981) (quoting Addison v. Huron Stevedoring Corp., 204 F.2d 88, 93 (2d Cir. 1953), cert. denied, 346 U.S. 87 (1953)). The good faith standard "necessitates a subjective inquiry," and "[o]bviously, such a subjective inquiry involves the presentation of testimony." Id. In contrast to "good faith," the "reasonable grounds" inquiry under 29 U.S.C. § 260 "involves an objective standard." Beebe, 640 F.2d at 1295.

[21]The standards for establishing the accrual date of an FLSA cause of action are discussed in the section regarding equitable tolling, below at n.37.

[22]In addition, 29 U.S.C. § 256 (2000) states:

> for purposes of [29 U.S.C. § 255], an action commenced . . . under the [FLSA] . . . shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the [FLSA] . . . , it shall be considered to be commenced in the case of any individual claimant –
>
> > (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
> >
> > (b) if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written consent is filed in the court in which the action was commenced.

FLSA was willful. The burden of proving the willfulness of the employer's FLSA violation for purposes of the statute of limitations falls on the employees. Bull v. United States, 68 Fed. Cl. 212, 228 (2005) (quoting Adams, 350 F.3d at 1229), aff'd, 479 F.3d at 1365.

To prove willfulness, the plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin, 486 U.S. at 133, cited in Bull, 479 F.3d at 1379; Adams, 350 F.3d at 1229. "Conduct that is not merely negligent" is required, and "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation," its action is not considered willful.[23,24] McLaughlin, 486 U.S. at 133, 135 n.13. Thus, "[i]t is easier for a

---

[23]Similarly, if an employer "acts reasonably in determining its legal obligation, its action cannot be deemed willful" for purposes of the statute of limitations inquiry under 29 U.S.C. § 255(a). McLaughlin, 486 U.S. at 133, quoted in Bull, 479 F.3d at 1379. At the opposite end of the spectrum, employer conduct that is found to have been willful for statute of limitations purposes will necessarily fail to meet the good faith/reasonable basis standard for purposes of awarding liquidated damages. Doyle v. United States, 931 F.2d 1546, 1549 (Fed. Cir. 1991) ("[A] trial court must grant the victims of a willful violation liquidated damages.").

[24]According to OPM regulation, "[r]eckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104 (2000). However, such OPM regulations are "secondary to the actual prescription of the Supreme Court in McLaughlin." Angelo v. United States, 57 Fed. Cl. 100, 109 (2003) (citing Bankers Trust New York Corp. v. United States, 225 F.3d 1368, 1375 (Fed. Cir. 2000) (The Supreme Court's "interpretation of a statutory provision trumps a subsequent agency interpretation that is inconsistent with the Court's precedent.")). Thus, this court is bound by the McLaughlin standard requiring more than unreasonable or "merely negligent" conduct (which would include a "failure to make adequate inquiry") for willful violations of the FLSA, instead requiring "intentional" or "deliberate" conduct. See McLaughlin, 486 U.S. at 133-35 & n.13. But see Bull, 68 Fed. Cl. at 272-74 (applying the "adequate inquiry" standard in 5 C.F.R. § 551.104).

plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims." Bull, 68 Fed. Cl. at 275 (quoting Bankston v. Illinois, 60 F.3d 1249, 1254 (7th Cir. 1995)). Whether an employer "acted recklessly, as opposed to unreasonably, is a question of fact . . . ." Bull, 479 F.3d at 1379 (citing Adams, 350 F.3d at 1229).

### B. The Summary Judgment Record Does Not Provide a Sufficient Basis from Which to Determine the Willfulness of the FLSA Violations in this Case.

In their summary judgment motion, the plaintiffs argue that their claims are eligible for the three-year statute of limitations for willful violations of the FLSA under 29 U.S.C. § 255(a) for two reasons. First, the plaintiffs contend that, in the time leading up to the discovery of the error in the fall of 2002, the government's failure to consult all of the applicable regulations, particularly those defining "regular working hours," demonstrated reckless disregard for its obligations under the FLSA; second, the plaintiffs contend that, once the error was discovered by OPM in the fall of 2002, the government's failure to make the required overtime payments until more than two years later, in December 2004 – July 2005, amounted to a knowing violation of the FLSA.[25]

The government, in its cross-motion for summary judgment, responds that the

[25]The plaintiffs contend, based on evidence of discussions among OPM staff members, that the government was on notice as early as September 2002 that its interpretation of its FLSA obligations was erroneous, see, e.g., PPFUF ¶ 54, despite the evidence that officials at the former INS and its parent agency, DOJ, were not informed of the error until February 2003. See, e.g., DPFUF ¶¶ 43-44.

plaintiffs' claims are time-barred because the government's actions in violating the FLSA were not willful, and therefore a two-year statute of limitations applies under 29 U.S.C. § 255(a). The government argues that, for INS' actions to rise to the level of willfulness, "intentional" or "deliberate" conduct is required, as set forth by the Supreme Court in McLaughlin, 486 U.S. at 133, and that the conduct in this case did not amount to a reckless or knowing disregard of INS' obligations under the FLSA. Specifically, the government contends that, before the error was discovered, INS pay personnel based their interpretation that overtime was not owed on their years of experience and expertise working with – and their conscientious reading of – the statutes and regulations at issue and the past guidance of OPM. The government further argues that, though pay personnel of the former INS were made aware of the correct interpretation in February 2003, DPFUF ¶ 43, the newly-formed DHS' decision to wait for formal guidance from OPM (issued in July 2003) before setting about paying overtime was appropriate and that the massive agency reorganization giving rise to DHS prolonged the payment process.

The court finds that it cannot make a determination with regard to the willfulness of the government's actions for purposes of the three-year statute of limitations in 29 U.S.C. § 255(a) on this record. The inquiry into willfulness is heavily fact-driven, see Bull, 479 F.3d at 1379, and requires a state of mind determination. See McLaughlin, 486 U.S. at 133-34. The Supreme Court has indicated that, for an employer to have knowingly or recklessly disregarded its FLSA obligations, its actions must tend toward "intentional" or

"deliberate" conduct. McLaughlin, 486 U.S. at 133. Something more than unreasonable or "merely negligent" conduct is required. Id. at 133, 135 n.13. Thus, the state of mind of the government actors must be explored, and the court must have an opportunity to assess the credibility of those testifying about that state of mind. The court is not permitted to resolve such credibility issues at the summary judgment stage, and therefore a trial is necessary to explore the state of mind of the decision makers in this case. See Leggett & Platt, 285 F.3d at 1362 ("[S]ummary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of witnesses.") (citing Anderson, 477 U.S. at 255) . In addition, as discussed below, the facts surrounding which government officials were involved in the decision-making process both before and after the error was discovered, the nature and extent of their responsibility, what was said in discussions among them, and the motivations behind their actions are disputed and cannot be discerned from the evidence before the court.

For example, the plaintiffs emphasize the fact that in his deposition, INS pay specialist Wayne Coleman, whom the government designated to testify on its behalf pursuant to RCFC 30(b)(6), indicated that in early 2002 he did not directly ask OPM for advice specifically regarding the entitlement to overtime of the FLETC trainees. Pls.' Ex. 7 at 89:24-90:5, 93:22-94:6 (Coleman Depo.). The plaintiffs contend that this fact, among others, demonstrates a reckless disregard for the law. The government counters that, while Mr. Coleman did not consult OPM, he did consult his colleagues and those in his chain of

command. In his 2007 declaration, Mr. Coleman stated that he "discussed the matter with [his] colleagues on the compensation policy staff, who agreed, and [they] advised the Director, Compensation Policy Branch and his supervisor, the Director of Human Resources, of [their] determination." Def.'s Ex. 1, ¶ 17. Mr. Coleman also stated that he and the Director of the Compensation Policy Branch "consulted human resources personnel at [DOJ, who] confirmed [their] understanding." Id. at ¶ 18. Whether Mr. Coleman consulted individuals with knowledge about overtime pay for training under the FLSA is not clear from this record.[26] Similarly, whether Mr. Coleman should have initially consulted OPM is not clear, given the government's claim that former INS officials later had to await formal OPM guidance before authorizing payment. Indeed, it is not clear from this record exactly who at INS, DOJ, or DHS had the ultimate responsibility for developing and/or changing the former INS' pay policies.[27] Without such information,

---

[26]In addition, exactly how the inquiries received by the government officials presented the question of entitlement to overtime is relevant to the government's knowing or reckless disregard of its FLSA obligations. For instance, it is relevant whether the inquiries made clear that the hours of training on the sixth day per week were scheduled in advance, thereby invoking 5 C.F.R. § 610.102, which defines "regularly scheduled administrative workweek" to include work "designated in advance by the head of the agency" and "work that is scheduled in advance." However, the summary judgment record provides few details on this point. For example, Mr. Coleman is quoted as saying merely that he was asked "is there a way to pay [the FLETC trainees], or is it proper not to pay them, . . . what would be the proper thing to do" by a "Ms. Arndt," who in turn was "getting questions from employees who were in training as to why they were not getting paid." Pls.' Ex. 7, 126:2-127:21 (Coleman Depo.). Such generalities provide little basis for assessing the credibility, reasonableness, or intent of the officials' responses to the inquiries they received, and thus the officials' knowing or reckless disregard of the requirements of FLSA cannot be determined.

[27]The government insists that the proper focus is on the state of mind and actions of INS alone, as the "employing agency," Def.'s Cross-Mot. at 29, in part because the other agencies

the court also cannot properly explore the state of mind of the government actors for purposes of determining willfulness.

Likewise, the government's financial motives in deciding not to pay for the sixth day per week of training are in dispute yet highly probative of willfulness. For example, the plaintiffs suggest that comments regarding budgetary constraints in a memo from DOJ denying the exemption sought by INS from the prohibition on premium pay under 5 C.F.R. § 410.402(b)(7) indicate the willfulness of the government in violating the FLSA. The government, for its part, suggests the opposite: the INS, in seeking the exemption, was diligently attempting to find some way to pay the plaintiffs because it sincerely believed it was not able to pay them under the FLSA. Def.'s Cross-Mot. at 21-22. Without assessing the credibility of the actors involved, the court cannot determine how, if at all, financial concerns factored into their decisions.

---

cited by the plaintiffs did not supervise or control the plaintiffs' work schedules or determine rates and methods of payment. Id. at 30-31. However, the precise relationships and division of responsibility among the agencies involved in the overtime pay decisions at issue in this suit are unclear from the record.

For example, the government argues that INS pay specialists were responsible for the initial decision not to pay overtime, and that it was reasonable for them to reach that decision without consulting OPM, but that those same people were later compelled to wait for official guidance from OPM before reversing the policy once the error was discovered. See, e.g., Pls.' Ex. 6 (May 6, 2003 DHS broadcast e-mail) ("We have been in contact with DHS who has contacted OPM asking for guidance. Until such guidance is received, we have no legal authority to pay any additional premium pay . . . ."). Without more information regarding the chain of command in this case, the court is unable to evaluate these apparently conflicting contentions.

Thus, though the state of mind of the INS staff is of primary importance, it cannot be considered in a vacuum. Because of the apparent role of OPM in guiding and regulating INS' pay policies, the nexus and interactions between OPM and INS must be examined, to determine what constraints were placed upon INS' decision-making authority. Likewise, the role of DOJ, as INS' parent agency, in the pay decision-making process must be examined. Until these linkages can be explored, summary judgment on the question of the government's willfulness is not appropriate.

Similarly, the plaintiffs contend that INS had the authority to pay the overtime promptly upon discovery of the interpretation error. Pls.' Mot. for Summ. J. at 12 (citing Pls.' Ex. 7, 95:7-96:12 (Coleman Depo.)). The plaintiffs point to Mr. Coleman's testimony that if INS had reached the correct conclusion regarding overtime pay, the [only] "question would have been, where do we find the money to do this?," Pls.' Ex. 7, 96:5-6 (Coleman Depo.), and that the cost could have been easily absorbed within existing budgets. Pls.' Mot. for Summ. J. at 12. By contrast, the government insists that in actuality the process of securing funding was complex and time-consuming, especially given the massive agency reorganization, and that the INS decision-makers were prudent to proceed with caution because of the scale of impact of the correction. Def.'s Cross-Mot. at 12, 27. Thus, the facts regarding the availability of funds are in dispute and, again, the analysis of the state of mind behind the government's actions after the error was discovered requires a determination of the credibility of those involved, which cannot be made from this summary judgment record.

In sum, because there are disputed issues of fact regarding who was responsible for the pay decisions and why the INS delayed payment after it learned from OPM that compensation was owed for the sixth day of training per week, the court cannot determine willfulness on summary judgment in this case.[28] A trial will be needed to both resolve

[28]In Cook II, the Federal Circuit held that, in the limited circumstances in which a federal agency conceded that it made a mistake in following the erroneous advice of the Secretary of Labor but "no litigant ha[d] suggested it was not a good faith mistake," "a new per se rule" was in order: "[G]iven these facts, that any mistake in responding to the demands of the FLSA is not

these factual disputes and test the credibility of the government witnesses. Accordingly, the court **DENIES** both parties' motions for summary judgment with respect to the willfulness of the government's FLSA violations.[29]

## III. Equitable Tolling is Not Available to Extend the Statutory Limitations Period for the Plaintiffs' Claims in this Case.

Because most of the plaintiffs in this case did not file their consents to sue until after even the three-year statute of limitations for willful violations had run, the plaintiffs also argue that their claims should be equitably tolled. The plaintiffs contend that they were misled into not filling suit because, in May 2003, the government promised to make

---

willful." 855 F.2d at 850. The Cook II court therefore granted summary judgment to the government on the issue of willfulness, finding that "[i]t is not at all apparent what triable issue would remain" and that "a remand is [not] needed to conduct a factual inquiry." Id. Noting that the Supreme Court in McLaughlin had "emphatically rejected" the willfulness standard set forth in Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir. 1971) ("Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture?"), cert. denied, 409 U.S. 948 (1972), as amounting to a "per se rule that every violation is willful," Cook II, 855 F.2d at 850, the Federal Circuit in Cook II found that "summary judgment remains available on the willfulness issue, if at all only for the employer, not the employee as it was under Jiffy June." Cook II, 855 F.2d at 850 (emphasis added).

In this case, by contrast, the plaintiffs have vigorously argued that the federal agency's mistake was not in good faith. Moreover, as discussed above, the plaintiffs have raised a number of factual disputes regarding the agency's state of mind in determining and carrying out its obligations under the FLSA. Without clear evidence regarding who the decision-makers were and what motivated their actions, the court is unable to find at the summary judgment stage that the government did not act willfully. Accordingly, this case does not fit within the per se rule set forth in Cook II.

[29]As noted above, the court defers ruling on the good faith/reasonable grounds of the government's interpretation of the FLSA for purposes of liquidated damages. However, the court notes that if the plaintiffs are able to establish willfulness at trial, they will likely be granted liquidated damages as a matter of course. Doyle, 931 F.2d at 1549 ("[A] trial court must grant the victims of a willful violation liquidated damages."). If they cannot establish willfulness, on the other hand, the remaining plaintiffs' claims will be found to be time-barred. Thus, the willfulness determination is the crux of this case.

them "prompt and complete payment as required," and the plaintiffs assert that they believed based on this representation that the payment would include liquidated damages. The plaintiffs submitted some 350 affidavits stating that they "relied on the defendant's promise to fully compensate [them] as required under the law" and joined this suit only after they realized that the payment they received did not include liquidated damages. Pls.' Ex. 33, Decls. ¶¶ 5, 7, 8. The government responds that equitable tolling of the limitations period is not available under the FLSA, because the statute itself indicates that Congress did not intend to allow for tolling beyond the three-year period for willful violations, and that even if tolling were allowed the plaintiffs have failed to show how the government induced or tricked them into not suing for liquidated damages until the statute of limitations had passed.

The court finds that, regardless of whether equitable tolling is allowed under the FLSA, under the facts and circumstances of this case, the plaintiffs are not entitled to equitable tolling of their FLSA claims. Accordingly, only those plaintiffs who filed their consents within three years of attending six-day training at FLETC may remain in this litigation. See 29 U.S.C. §§ 255-256.

**A. Availability of Equitable Tolling Under the FLSA**

The plaintiffs argue that all of their claims should be included in this litigation based on principles of equitable tolling. The question of whether equitable tolling is allowed under the FLSA has not been resolved by the Supreme Court or the Federal

Circuit. With regard to equitable tolling of statutes of limitations generally, the Supreme Court in Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 95-96 (1990), found that "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." However, the Supreme Court also cautioned that "the time limits imposed by Congress in a suit against the Government involve a waiver of sovereign immunity" and stressed that "[f]ederal courts have typically extended equitable relief only sparingly." Id. at 96; see also O'Connell v. Sec'y of Health & Human Servs., 63 Fed. Cl. 49, 63 (2004). For example, tolling has been allowed "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period,[30] or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."[31] Irwin, 498 U.S. at 96. However, courts are "generally . . . much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his

---

[30]The Irwin court cited the following examples of tolling for "defective pleading:"

> Burnett v. New York Central R. Co., 380 U.S. 424 . . . (1965) (plaintiff timely filed complaint in wrong court); Herb v. Pitcairn, 325 U.S. 77 . . . (1945) (same); American Pipe & Construction Co. v. Utah, 414 U.S. 538 . . . (1974) (plaintiff's timely filing of a defective class action tolled the limitations period as to the individual claims of purported class members).

Irwin, 498 U.S. at 96 n.3.

[31]As examples of tolling for inducement or trickery, the Irwin court cited "Glus v. Brooklyn Eastern Dist. Terminal, 359 U.S. 231 . . . (1959) (adversary's misrepresentation caused plaintiff to let filing period lapse); Holmberg v. Armbrecht, 327 U.S. 392 . . . (1946) (same)." Irwin, 498 U.S. at 96 n.4.

legal rights." Id. (citing Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984)).

In the recent Supreme Court case, John R. Sand & Gravel Co. v. United States, 128 S.Ct. 750, 752-54 (2008) (finding that the six-year time limit on claims in the United States Court of Federal Claims under 28 U.S.C. § 2501 (2000) is "jurisdictional," "requiring a court to decide a timeliness question despite a waiver" and "forbidding a court to consider whether certain equitable considerations warrant extending [it]"), the Court upheld Irwin but stated that "[s]pecific statutory language, for example, could rebut the presumption [of equitable tolling] by demonstrating Congress' intent to the contrary. And if so, a definitive earlier interpretation of the statute, finding a similar congressional intent, should offer a similarly sufficient rebuttal." John R. Sand, 128 S.Ct. at 755-56.

With regard to the FLSA in particular, the Federal Circuit has stated in dicta that "[w]hen and if the time comes, the district court will presumably apply the doctrine of equitable tolling consistently with Congress' intent in enacting the particular statutory scheme set forth in FLSA." United States v. Cook (Cook I), 795 F.2d 987, 994 (Fed. Cir. 1986). However, "[t]his court and its predecessor . . . have stated only in dicta whether congressional intent supports the application of equitable tolling to the FLSA."[32] Corrigan

[32]The plaintiffs cite a number of non-FLSA cases in support of the statement that "FLSA claims against the United States are subject to equitable tolling." See Pls.' Opp. Br. at 10 (citing, inter alia, Kirkendall v. Dept. of Army, 479 F.3d 830, 837 (Fed. Cir. 2007) (finding that the Veterans Employment Opportunities Act of 1998, 5 U.S.C. § 3330a (2000), allows equitable tolling); Esch v. United States, 77 Fed. Cl. 582 (2007) (examining equitable tolling under 28 U.S.C. § 2501 prior to John R. Sand decision, discussed above); Bailey v. West, 160 F.2d 1360

v. United States, 70 Fed. Cl. 665, 669 (2006). In Corrigan, the court summarized the relevant cases in this court comprehensively as follows:

> Compare Doyle v. United States, 20 Cl. Ct. 495, 499-500 (1990) (stating that equitable tolling is unavailable for willful violations because Congress has already provided an extension of the limitations period for those violations), aff'd . . . 931 F.2d 1546, 1549-50[, cert denied, 502 U.S. 1029 (1992)] with Christofferson v. United States [(Christofferson I)], 64 Fed. Cl. 316, 326 (2005) (stating that 'the weight of authority favors equitable tolling of FLSA claims'); see also Ewer v. United States, 63 Fed. Cl. 396, 402 (2004) (stating that 'the FLSA limitations period is not a statute of repose; thus, the principles of equitable tolling apply' but declining equitably to toll the statute). The court has once held in an unpublished order, repeated in a published decision, that the FLSA is subject to equitable tolling. Hickman v. United States, 43 Fed. Cl. 424, 427 (1999).

Corrigan, 70 Fed. Cl. at 670 (finding that "[t]he court need not decide whether the FLSA is subject to equitable tolling, however, because plaintiff has not pleaded facts that would entitle him to equitable tolling of the statute"); see also Udvari v. United States, 28 Fed. Cl. 137, 139 (1993) (finding that, though "[c]ourts have recognized . . . that under certain circumstances equitable tolling of the [FLSA] statute of limitations is justified," "the facts of this case do not justify tolling").[33] Thus, though most of the cases in this court have

---

(Fed. Cir. 1998) (finding that tolling is available against the Board of Veterans Appeals under 38 U.S.C. § 7266 (1994))). Because none of these cases involve the FLSA, none is relevant here.

[33]With regard to the government's contention that the provision in 29 U.S.C. § 255(a) for a three-year statute of limitations where an employer willfully violates the FLSA amounts to congressional intent to preclude equitable tolling, the cases are divided. As the government notes in its briefing, the trial court in Doyle stated that, "in the case of willfulness, Congress eliminated the need for equitable tolling by expressly providing that the statute of limitations is extended to three years. 29 U.S.C. § 255(a). Consequently plaintiffs are adequately protected under the FLSA." 20 Cl. Ct. 495, aff'd 931 F.2d 1546.

However, by contrast, the trial court in Christofferson I reached the opposite conclusion, finding that the FLSA did not meet the standard set forth by the Supreme Court in United States

found that equitable tolling may be available under the FLSA, the vast majority have declined to apply it, finding that the circumstances of the individual cases do not justify equitable tolling.

As discussed below, this court reaches a similar result, finding that even if equitable tolling is available under the FLSA, it would not be warranted in any event, given the circumstances in this case.

**B. Equitable Tolling Is Not Warranted in this Case.**

As noted above, the plaintiffs argue that they were "induced or tricked" into allowing the filing deadlines to pass by various misrepresentations and false promises by the government.[34] See, e.g., Pls.' Mot. for Summ. J. at 27; Irwin, 498 U.S. at 96. In

---

v. Brockamp, 519 U.S. 347 (1997), for rebutting the presumption of tolling on the basis of congressional intent. Christofferson I, 64 Fed. Cl. at 326. Specifically, the Christofferson I court found that 29 U.S.C. § 255(a) did not "set out the limitations period in a 'highly detailed technical manner[,]' . . . provid[ing] for 'very specific exceptions' that 'linguistically speaking, [could not] be read as containing implicit exceptions,'" nor would tolling under the FLSA "create 'serious administrative problems.'" Id. (quoting Brockamp, 519 U.S. at 350-52).

Because the Doyle decision predated the Supreme Court's decision in Brockamp, this court is inclined to agree with the reasoning of the Christofferson I court instead. However, because the court finds that equitable tolling is not justified by the facts of this case in any event, as discussed below, the court need not decide the question of whether Congress intended to allow for tolling under the FLSA.

[34]Except for plaintiff Moreno, the plaintiffs do not (and cannot) argue that their claims should be tolled as a result of "filing a defective pleading during the statutory period." Irwin, 498 U.S. at 96. Only Moreno's claims may warrant tolling on that basis, given his previous filing in – and dismissal for improper venue from – the D.D.C. As noted above at n.19, however, the court defers ruling on the timeliness of Moreno's individual claims until the question of willfulness is resolved. If willfulness is found, Moreno's claims will likely be timely without tolling. If not, his will be the only potential claims remaining, and the court will address the tolling arguments unique to him at that time.

particular, citing the May 6, 2003 broadcast e-mail from DHS HRM, the plaintiffs claim that the government promised to make "prompt and complete payment as required" under the FLSA, which the plaintiffs say implied that they would be paid back wages plus liquidated damages under 29 U.S.C. § 216(b). Pls.' Opp. Br. at 12 (citing Pls.' Ex. 6 (May 6, 2003 DHS broadcast e-mail)), 13. "When Defendant promised 'complete payment,'" argue the plaintiffs, "it knew that the FLSA required it to pay the back wages plus liquidated damages," Pls.' Mot. Summ. J. at 14, and thus the plaintiffs contend that the DHS broadcast e-mail amounted to a promise to pay liquidated damages. Id. at 15; Pls.' Opp. Br. at 13. In addition, more than 350 of the plaintiffs submitted declarations stating the following:

> I relied on the defendant's promise to fully compensate me as required under the law. . . . I joined this action to recover the balance of the compensation that the defendant owes me after I realized that the defendant had not made complete payment to me and does not intend to fully compensate me as required under the law.

Pls.' Ex. 33, Decls. ¶¶ 5, 8.

The court is not persuaded by the plaintiffs' arguments for equitable tolling. First, the DHS broadcast e-mail contains no reference whatsoever to liquidated damages.[35]

---

[35]Because the plaintiffs were eventually paid back wages with interest, the only remaining issue in the suit is entitlement to liquidated damages. In order to toll the statute of limitations for the plaintiffs' claims for liquidated damages, therefore, only those misrepresentations related to entitlement to or payment of liquidated damages are relevant here.

In addition to the May 6, 2003 DHS broadcast e-mail, the plaintiffs also list a number of later promises to pay made in e-mail exchanges with employees. Pls.' Mot. Summ. J. at 13-14. Like the DHS broadcast e-mail, however, none of these exchanges refer in any way to liquidated damages, and therefore none are relevant to tolling the limitations period for the plaintiffs'

Instead, the e-mail merely states that "[t]o date, we [DHS HRM] have had no official guidance from the OPM or [DHS]," and that "[u]ntil such guidance is received, we have no legal authority to pay any additional premium pay for those who attended a 6th day of training in a 6-day training week." Pls.' Ex. 6. The "promise" the plaintiffs claim they relied upon is phrased as a conditional statement in the e-mail: "If guidance is received from OPM directing payment, we will work to identify funds, and undertake prompt and complete payment as required." Id. (emphasis added). No mention is made of what such payment would include, and no mention is made of liquidated damages. Id.

In the absence of any express statement to the contrary, it is simply unreasonable to assume, as the plaintiffs do, that the government conceded that it acted in bad faith or had no reasonable grounds for believing it was in compliance with the FLSA, thereby warranting liquidated damages. See 29 U.S.C. § 260. The government has since agreed that an error was made with regard to paying the plaintiffs overtime, but nothing in the record – particularly not in the DHS broadcast e-mail – indicates that the government believed it owed liquidated damages, nor that the government would not assert a good

liquidated damages claims.

Moreover, in arguing that equitable tolling is justified here, the plaintiffs also rely on statements by the government to the plaintiffs to the effect that the law prohibited payment of overtime. See, e.g., Pls.' Mot. for Summ. J. at 29-39. Such statements are not a basis for tolling the statute of limitations in this case. See Christofferson v. United States (Christofferson II), 72 Fed. Cl. 541, 543-44 (2006) ("The very nature of litigation over [entitlement to FLSA overtime] assumes that the agency and the plaintiffs disagree on a point of law. . . . If the fact that the agency expresses a position which turns out to be incorrect is a warrant for tolling, the limitations period would be suspended indefinitely."). Instead, such statements are properly considered as part of the analysis of the government's state of mind in determining willfulness and in determining liquidated damages.

faith/reasonable grounds defense to paying such damages. In fact, the e-mail gives rise to an inference directly counter to that asserted by the plaintiffs: it tends to show that DHS HRM believed they were not permitted by law to pay additional premium pay. Though incorrect, that belief was likely to lead, in turn, to the government asserting a good faith/reasonable grounds defense to liquidated damages, as it has done.[36]

Thus, instead of being a promise to pay liquidated damages as the plaintiffs argue, the DHS broadcast e-mail served a different function entirely: it provided notice to the plaintiffs who received it that the matter was disputed and that their employer was not going to pay them at that time. Cf. Doyle, 20 Cl.Ct. at 501 ("By that time, at the latest, plaintiffs were clearly on actual notice of their potential claims and very much in a position to seek further recovery as liquidated damages if they so chose to inquire about their individual claims. The burden of seeking further relief fell on plaintiffs once they received this notice."); Christofferson I, 64 Fed. Cl. at 327 ("It was plainly not inherently unknowable that the government would refuse to pay overtime. To the contrary, the facts alleged show that the government gave plaintiffs notice that it would not do so.").

Specifically, the e-mail indicated that at least one other agency (the Forest Service) had information indicating that OPM had "changed its interpretation of [the] regulations"

---

[36]As with the willfulness inquiry, discussed above, determining whether this belief was held in good faith requires an assessment of the state of mind and credibility of those involved. See Beebe, 640 F.2d at 1295 (The good faith standard "necessitates a subjective inquiry," and "[o]bviously, such a subjective inquiry involves the presentation of testimony."). As stated above, the court defers ruling on the plaintiffs' entitlement to liquidated damages on the merits. The above-stated inference merely demonstrates that the government did not concede its own bad faith in the DHS broadcast e-mail, contrary to the plaintiffs' position.

pertaining to overtime pay for the sixth day per week of FLETC training, but that DHS HRM still believed they had "no legal authority to pay any additional premium pay" for the sixth day and would continue not to pay unless "guidance is received from OPM directing payment." Pls.' Ex. 6; cf. Christofferson II, 72 Fed. Cl. at 544 ("Plaintiffs were aware of the litigation, so they presumably understood that others did not take the agency's legal position at face value. They simply elected not to test the matter."). It is undisputed that, upon receipt of the e-mail, any plaintiffs who believed they were entitled to liquidated damages still had time to file suit within both the two- and three-year statutes of limitations under 29 U.S.C. § 255(a). Without doing so, they "failed to exercise due diligence in preserving [their] legal rights."[37] Irwin, 498 U.S. at 96.

---

[37]Moreover, even if the court were to toll the accrual date of the plaintiffs' claims until the May 6, 2003 e-mail, as the date when the plaintiffs were on notice that DHS HRM believed it did not owe them additional pay for the sixth day of FLETC training, the three-year statute of limitations would still have run on May 6, 2006, before the earliest consents to sue besides Moreno's were filed, beginning May 23, 2006.

A brief discussion of tolling as it relates to the accrual date of FLSA claims is in order. The Federal Circuit has stated that the "usual rule" is that "a claim for unpaid overtime under the FLSA accrues at the end of each pay period when it is not paid. Cook II, 855 F.2d at 851 (citing Beebe, 640 F.2d at 1293 ("[A] separate cause of action accrued each payday when the [employer] excluded the overtime compensation.")). Under 29 U.S.C. § 255(a), the statute of limitations begins to run when the claim accrues.

However, in Cook II, the Federal Circuit recognized a delayed accrual date in the unique circumstances in which "the right of fire fighters to statutory overtime depended on a condition precedent, the performance of [a] study [by the Secretary of Labor]." 855 F.2d at 851. In that case, the court tolled the accrual date until the study was completed, because the plaintiffs' cause of action did not actually come into existence until that time. Id. ("Under these circumstances, the trial court rightly held that claims did not accrue before [the date the study was completed], and as they could not have been sued on, they did not start the limitation period running.").

Here, by contrast, the plaintiffs clearly could have sued any time after the pay periods during which they worked a sixth day per week at FLETC but did not receive overtime for it. The plaintiffs were entitled to FLSA overtime, and, potentially, to associated liquidated damages,

The plaintiffs also argue that the government "actively tried to hide the fact that it was not paying the liquidated damages," inducing the plaintiffs not to file suit. Pls.' Mot. for Summ. J. at 16. In support of this argument, the plaintiffs point to the one reference to liquidated damages which was communicated to the plaintiffs, the "LIQ.DAMAGES/ INT.BACKPAY" notation on the earnings statements of some of the plaintiffs when they received payments of back FLSA overtime wages and Back Pay Act interest.[38,39] PPFUF ¶ 77 (citing Pls.' Ex. 28 (Statement of Earnings and Leave for Thomas Porta (not a plaintiff in this case) from 2006)). However, the earnings statement notation is not sufficient, by itself, to show that the defendant "actively tried to hide the fact that it was not paying the liquidated damages," as the plaintiffs argue. Pls.' Mot. for Summ. J. at 16.

As an initial matter, the court notes that any of the plaintiffs who received earnings statements containing this reference after the statute of limitations had already run could

---

once they worked the hours and were not paid, so a cause of action to recover those wages plus liquidated damages under the FLSA was available to the plaintiffs immediately following those pay periods, when it was clear that their paychecks included neither overtime pay nor liquidated damages. See id., 855 F.2d at 851. Thus, there is no basis for tolling the claim accrual date in this case.

[38]Along the same lines, the plaintiffs also stress that no accounting was provided with the payments to indicate what they were for or how they were calculated when payments were made. Pls.' Mot. for Summ. J. at 16.

[39]Besides the earnings statements, discussed below, the only other reference in the record to liquidated damages is one line in an internal e-mail from Cheryl A. Cotton at DOJ to Athleta Smalls at DHS, referring to "[t]he request for FLSA and Liquidated Damages that was sent to [NFC]." Pls.' Ex. 27. In a rather over-reaching argument, the plaintiffs contend that this reference amounts to an "acknowledge[ment] that [the government's] FLSA violations inherently incurred liability for liquidated damages." PPFUF ¶ 75. Regardless, because there is no evidence that this statement was communicated to the plaintiffs, they could not have relied on it for purposes of equitable tolling.

not have relied upon it in allowing the filing deadline to pass, and therefore the reference is an irrelevant fact with regard to tolling for such plaintiffs. However, even if it was received in time to cause some plaintiffs to refrain from bringing suit, the plaintiffs have not presented any evidence that any plaintiffs actually did rely on the notations in their earnings statements in that way. The plaintiffs were on notice that the government disputed their reliance on both the DHS broadcast e-mail and the earnings statements, Def.'s Cross-Mot. at 18-19, but submitted no evidence to support their position with regard to the earnings statements, despite submitting over 350 declarations indicating reliance on the government's alleged promise to make complete payment, as discussed above, in the same time frame. Moreover, because these earnings statement notations were received by the plaintiffs after the May 6, 2003 e-mail notifying them that their entitlement to overtime pay was disputed, as discussed above, any reliance on the earnings statements by the plaintiffs would have been misplaced in any event.

Finally, the government has offered an explanation for the "LIQ.DAMAGES/INT.BACKPAY" notation, indicating that it is a "global line item" used by the NFC, Def.'s Cross-Mot. at 18, and that it is the "only coding currently available in the system" for reporting "all non-earned ([IRS Form] 1099-type) income related to back pay, whether it is "Back Pay Act" interest or liquidated damages." Def.'s Ex. 3 ¶ 12 (Benit Decl.). This explanation suggests that the earnings statement notations did not constitute "misconduct" designed to induce or trick the plaintiffs into allowing the

deadline to pass without filing. Irwin, 498 U.S. at 96. Without countervailing "evidence of concealment or secretive conduct which prevented plaintiffs from becoming aware of the alleged injury," therefore, the notation on the plaintiffs' earnings statements is not enough to warrant tolling of the statute of limitations. Christofferson I, 64 Fed. Cl. at 327 (citing Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States, 178 Ct. Cl. 630, 634 (1967)).[40]

---

[40] The plaintiffs also argue that the statute of limitations should be tolled as a result of the "extraordinary delay" in mailing the collective action notice to the potential plaintiffs in this suit, as well as during the period after the suit was dismissed from D.D.C. and refiled in this court (November 5, 2004 to January 21, 2005). Pls.' Mot. for Summ. J. at 33 (citing Lee v. ABC Carpet & Home, 236 F.R.D. 193, 200 (S.D.N.Y. 2006) (tolling while the collective action certification was pending); Owens v. Bethlehem, 630 F.Supp. 309, 312 (S.D.W.Va. 1986) (tolling where ruling on class certification was pending for five months "[t]hrough no fault of the Plaintiffs or the Defendant").

However, as noted above, such tolling is not available when the plaintiffs themselves "failed to exercise due diligence in preserving [their] legal rights." See Irwin, 498 U.S. at 96. Though the plaintiffs correctly note that this case was transferred to different judges within this court twice after the suit was filed on January 21, 2005, they fail to explain why plaintiffs' counsel did not file a motion to certify the class until October 24, 2005, more than nine months after the suit was brought. Because of the requirement in 29 U.S.C. § 256 that, in a collective action under the FLSA, the action is considered to have commenced for each individual plaintiff only after he or she files notice of consent to sue, due diligence in prosecuting the case requires that counsel move to notify the putative collective action members expeditiously. Similarly, the two-month delay between dismissal from the D.D.C. and refiling in this court was not the result of inequitable circumstances but was rather within the control of plaintiffs' counsel. In fact, at oral argument, plaintiffs' counsel conceded that "on the part of counsel, there may well be some fault for not filing soon enough." Tr. of Oral Arg. at 82:14-16.

Moreover, in light of the finding, above, that the plaintiffs were not induced or tricked into missing the filing deadlines in this case, none of the procedural delays above affected the ability of the plaintiffs to bring suit on their own. As one court put it recently,

> The fact that Plaintiffs did not receive notice of the pendency of a collective action prior to the expiry of the limitations period was not the consequence of "inequitable circumstances." Any of the Plaintiffs could have brought individual actions within the three year time period allowed by the FLSA. These opt-in Plaintiffs were not hindered due to fraud or misrepresentation from discovering that they might have a

Thus, the court finds that the plaintiffs have not put forth any evidence to show misconduct by the government with regard to liquidated damages upon which the plaintiffs relied in allowing the filing deadlines to pass, and therefore equitable tolling would not be warranted in this case regardless of whether tolling is allowed under the FLSA. Accordingly, the court **GRANTS** summary judgment on the issue of equitable tolling in favor of the government, and those plaintiffs who did not file a consent to sue within three years of their FLETC training must be dismissed from the case.

## CONCLUSION

In light of the foregoing, the court **ORDERS** the following: the plaintiffs' motion for summary judgment is **DENIED**; the government's cross-motion for summary judgment is **DENIED-IN-PART** and **GRANTED-IN-PART**. The parties shall submit a joint status report on or before **Friday, July 18, 2008**, indicating specifically which plaintiffs will remain in the litigation if the three-year statute of limitations under 29 U.S.C. § 255(a) is found to apply. In addition, in the joint status report, the parties shall describe the circumstances surrounding the nine plaintiffs who submitted declarations indicating that they "have still not received a payment," Pls.' Ex. 34, Decls. ¶ 6, and the

---

> colorable claim for relief. Indeed, with diligence, any of these Plaintiffs could have filed individual (or collective) actions within the limitations period. . . . Without a showing that the individual, time-barred Plaintiffs could not have know[n] about or asserted their rights even with diligence, equitable tolling is inappropriate.

Pendlebury v. Starbucks Coffee Co., 2008 WL 700174, at *4 (S.D. Fla. Mar. 13, 2008) (footnote omitted). Accordingly, plaintiffs' claims do not warrant tolling for these procedural delays.

eighty plaintiffs for whom plaintiffs' counsel indicated that no training dates were given by the government. Tr. of Oral Arg. at 37:2-4. Upon receipt of the joint status report, the court will schedule a status conference to set a trial date and arrange a schedule for pre-trial proceedings.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge