# In the United States Court of Federal Claims

### No. 05-142C
### (Filed: July 27, 2009)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **ARTURO MORENO, JR.,** | * |
| **individually and on behalf of** | * |
| **others similarly situated,** | * |
| | * **Fair Labor Standards Act, 29 U.S.C. §** |
| **Plaintiffs,** | * **201 et seq.; Statute of Limitations for** |
| | * **Willful Violations, 29 U.S.C. § 255(a);** |
| **v.** | * **Knowing and Reckless Disregard for** |
| | * **Overtime Requirement; Equitable** |
| **THE UNITED STATES,** | * **Tolling; Defective Pleading.** |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

*Michael J. D. Sweeney,* New Paltz, NY, for plaintiffs.

*Maame A. F. Ewsi-Mensah,* U.S. Department of Justice, Washington, DC, with whom were *Gregory G. Katsas, Acting Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *Arthur Rettinger,* U.S. Customs and Border Protection, and *Melanie Watson*, Office of Personnel Management, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge.*

The plaintiffs, current and former employees of the United States Department of

Homeland Security ("DHS") and one former employee of the United States Immigration

and Naturalization Service ("INS")[1] (Arturo Moreno ("Mr. Moreno"), the named plaintiff

in the case), brought this suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§

201-219 (2000), to recover unpaid overtime wages,[2] liquidated damages, costs and

attorneys' fees.  The plaintiffs allege that they are entitled to liquidated damages as a result

of the failure of the defendant, the United States ("government" or "defendant"), to pay

them overtime wages for the hours they worked while attending a scheduled sixth day of

training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.[3]

The government does not dispute that it violated the FLSA when it failed to pay the

---

[1]By March 2003, the former INS had been absorbed into the Bureau of Immigration and Customs Enforcement ("ICE"), the Bureau of Customs and Border Protection ("CBP"), and the United States Citizenship and Immigration Services ("CIS"), all of which were new agencies within the newly-created DHS.  Joint Stip. of Fact ("JSF") ¶¶ 8-9.  DHS officially began operations on January 24, 2003, and the process of absorbing INS was complete by March 1, 2003.  Id. at ¶¶ 6-8.

[2]Following the initiation of litigation by Mr. Moreno, the majority, if not all, of the plaintiffs received checks for their FLSA overtime wages plus interest under the Back Pay Act, 5 U.S.C. § 5596 (2001).  They did not, however, receive liquidated damages under 29 U.S.C. § 216(b).  In addition, the plaintiffs contend that some opt-in plaintiffs who completed all or part of their training after August 23, 2003 have not yet been paid their overtime or liquidated damages.  The exact amount of back pay and liquidated damages owed will be resolved in the next phase of this litigation.

[3]Under 29 U.S.C. § 207, employers, including federal agencies, are generally required to pay overtime wages at a rate not less than time and a half for hours over forty in a workweek.  An employer who violates 29 U.S.C. § 207 "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b) (emphasis added).
    However, under 29 U.S.C. § 260 (2000), "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [29 U.S.C. § 216]."

plaintiffs overtime wages.  Nonetheless, the government argues that the plaintiffs' claims were not filed within the two-year statute of limitations set forth in 29 U.S.C. § 255(a) (2000) of the FLSA, and therefore they are time-barred.[4]  The government contends that the plaintiffs cannot demonstrate that the government's FLSA violations were "willful," such that they would be entitled to an extended, three-year statute of limitations under 29 U.S.C. § 255(a).  The government also argues that, even if the plaintiffs' claims are found to be timely, the plaintiffs are not entitled to liquidated damages in any event, on the grounds that the government acted in "good faith" and based on "reasonable grounds" within the meaning of 29 U.S.C. § 260 of the FLSA.   On July 3, 2008, this court issued a summary judgment decision finding that, with the exception of Mr. Moreno, who filed his original case within two years in federal district court, only those plaintiffs who could establish that the government willfully violated the FLSA, resulting in a three-year statute of limitations on their claims, would remain in the case.  Moreno v. United States, 82 Fed. Cl. 387, 389, 395 n.19 (2008).  The court further found that disputed issues of fact and issues of credibility precluded summary judgment on the question of whether the

---

[4]Under 29 U.S.C. § 255(a), actions to recover unpaid overtime and/or liquidated damages under the FLSA

> may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

(emphasis added).

government acted willfully.  Id. at 389.  In addition, the court deferred ruling on the plaintiffs' entitlement to liquidated damages.  Id.

Accordingly, the case now centers on the claims of the approximately 148 plaintiffs who were required by DHS to attend six days of training per week at FLETC after approximately May 1, 2003, three years before the first consents to sue other than Mr. Moreno's were filed.[5]  In this post-trial opinion, the court now decides (1) whether the government's violations of the FLSA were willful, entitling the plaintiffs to a three-year statute of limitations, and (2) for any plaintiffs with timely-filed claims, whether those plaintiffs are entitled to liquidated damages under the FLSA.  In addition, the court in this opinion now addresses whether Mr. Moreno's claim was timely filed and, if so, whether Mr. Moreno is entitled to liquidated damages.

---

[5]Though the plaintiffs contend that Mr. Moreno and 148 other plaintiffs remain in the litigation, the parties have yet to agree on the precise list of plaintiffs.  See Sept. 8, 2008 Joint Status Report ("9/8/08 JSR") (Docket No. 157) (agreement by the parties as to only 102 plaintiffs having claims within a three-year statute of limitations period).  For purposes of simplicity in this opinion, the court will refer to the approximately 148 plaintiffs remaining in addition to Mr. Moreno and will use the approximate date of May 1, 2003 as a guidepost after which the remaining plaintiffs (other than Mr. Moreno) completed their training.  However, to be considered to have a timely claim, the plaintiffs (other than Mr. Moreno, whose claim is discussed separately, infra, and the 102 plaintiffs about whom the parties agree) will still need to demonstrate that they each filed a consent to sue within three years of the end of at least one pay period during which they were required to attend a sixth day of training but did not receive overtime compensation for it.  See Cook v. United States, 855 F.2d 848, 851 (Fed. Cir. 1988) (The "usual rule" is that "a claim for unpaid overtime under the FLSA accrues at the end of each pay period when it is not paid." (citing Beebe v. United States, 640 F.2d 1283, 1293 (Ct. Cl. 1981) ("[A] separate cause of action accrued each payday when the [employer] excluded the overtime compensation.")); 29 U.S.C. § 256(b) (2000) ("[I]n the case of a collective or class action instituted under the [FLSA] . . . , it shall be considered to be commenced in the case of any individual claimant [not named as a party plaintiff] . . . on the . . . date on which . . . written consent [to become a plaintiff] is filed in the court in which the action was commenced.").

A trial was held from April 28 to April 30, 2009, at which the court heard testimony from eight witnesses and admitted forty-two exhibits to answer these questions. Based on the testimony and other evidence received, and for the reasons set forth below, the court now **RULES** as follows:

First, with regard to the approximately 148 current and former employees of DHS in the suit who trained after approximately May 1, 2003, the court finds that the government's violation of the FLSA was willful. Accordingly, pursuant to 29 U.S.C. § 255(a), those plaintiffs' claims are governed by the three-year statute of limitations, and their claims are therefore timely. In addition, those plaintiffs are entitled to liquidated damages pursuant to 29 U.S.C. §§ 216(b) and 260.

Second, with regard to Mr. Moreno, the court finds that, because he completed his uncompensated overtime hours of training well before the government's willful conduct took place, his claim is subject to the two-year statute of limitations. Based on the Supreme Court's allowance for equitable tolling in circumstances of "filing a defective pleading during the statutory period," as set forth in Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 96 (1990), the court finds that Mr. Moreno's claim, which was originally filed in federal district court, will be considered timely. Furthermore, because the court has discretion to award liquidated damages even in cases where the government has acted in good faith and with reasonable grounds, the court concludes that Mr. Moreno is entitled to liquidated damages.

I.      **Pay Regulations at Issue**

In order to put the court's findings in context, the court will briefly summarize the

pay regulations at issue, which were in effect and remained unchanged during the relevant

time period in this case.  Under the Office of Personnel Management ("OPM") regulations

implementing the FLSA,[6] 5 C.F.R. § 551.501(a) (2000), "[a]n agency shall compensate [a

nonexempt] employee . . . for all <u>hours of work</u> in excess of 8 in a day or 40 in a

workweek at a rate equal to one and one-half times the employee's hourly regular rate of

pay." (emphasis added).  Under 5 C.F.R. § 551.423(a)(1) (2000), "<u>[t]ime spent in training</u>

<u>during regular working hours shall be considered hours of work</u>." (emphasis added).

However, 5 C.F.R. § 551.423(a)(3) (2000) provides that "<u>[t]ime spent in apprenticeship or</u>

<u>other entry level training . . . outside regular working hours shall not be considered hours</u>

<u>of work</u>, provided no productive work is performed during such periods." (emphasis

added).

Most significantly to this case, 5 C.F.R. § 551.421 (2000), which appears on the

same page of the Code of Federal Regulations as 5 C.F.R. § 551.423(a), <u>see</u> Joint Exhibit

("JX") 228, defines "regular working hours" as "the days and hours of an employee's

<u>regularly scheduled administrative workweek</u> established under part 610 of this chapter."

5 C.F.R. § 551.421 (emphasis added).  Part 610, in turn, defines "regularly scheduled

_____

[6]OPM is the federal agency charged with promulgating regulations regarding the
application of the FLSA to federal employers and with providing guidance to federal employers
regarding personnel matters, including pay.  JSF ¶ 11; <u>see also</u> 5 C.F.R. § 551.101 (2000).

administrative workweek" at 5 C.F.R. § 610.102 (2000) as "the period within an administrative workweek, [defined in the same section as 'any period of 7 consecutive 24-hour periods designated in advance by the head of the agency'], established in accordance with [5 C.F.R.] § 610.111, within which the employee is regularly scheduled to work." Similarly, 5 C.F.R. § 610.102 (2000) defines "<u>regularly scheduled work</u>" as "<u>work that is scheduled in advance of an administrative workweek . . . in accordance with [5 C.F.R.] § 610.111</u>."  (emphasis added).  In addition, 5 C.F.R. § 610.111(a)(2) (2000) requires that "[t]he head of each agency . . . shall establish . . . [a] regularly scheduled administrative workweek that consists of the 40-hour basic workweek . . . <u>plus the period of regular overtime work</u>, if any, required of each employee."  (emphasis added).  Thus, under OPM's regulations implementing the FLSA, an employee who has been scheduled in advance for entry level training for more than forty hours in a workweek <u>must</u> receive overtime pay.

In addition to the FLSA regulations detailed above, there are separate regulations that pertain to <u>premium</u> pay under 5 U.S.C. §§ 5541-5550 (2000) (referred to herein as "Title 5").  Specifically, 5 C.F.R. § 410.402(a) provides: "Except as provided by paragraph (b) of this section, an agency may not use its funds, appropriated or otherwise available, to pay premium pay to an employee engaged in training by, in, or through Government or non-government facilities."  In turn, 5 C.F.R. § 410.402(b) provides, <u>inter alia</u>: "(7) Agency exemption.  An employee given training during a period not otherwise covered by

a provision of this paragraph may be paid premium pay when the employing agency has

been granted an exception to paragraph (a) of this section by the [OPM]." Thus, under the

Title 5 regulations, premium pay for training is not available unless a regulatory exception

applies or an exemption is granted by OPM. However, it is not disputed that, in this case,

in which overtime pay was required under the FLSA, overtime had to be paid regardless of

whether premium pay was authorized under Title 5.

## II.      Findings of Fact

This case involves two distinct time frames during which the government's actions

must be evaluated. The first time frame is relevant to the claim of Mr. Moreno, who

completed his required sixth-day training at FLETC between June 12 and August 20,

2002, while he was an INS employee. 9/8/08 JSR Scheds. A & F. The second time frame

involves the claims of the other approximately 148 plaintiffs, who completed their

required sixth-day training after approximately May 1, 2003, while they were DHS

employees. The key distinction between the two time frames is that, unlike the DHS

employees who trained after May 1, 2003, Mr. Moreno completed his training for INS at a

time before pay personnel at INS and DHS were informed by OPM pay personnel that

overtime pay was required for sixth-day training. The findings of fact pertinent to each

time frame are set forth below.

### A.      INS Time Frame

After the events of September 11, 2001, in an effort to put more law enforcement

agents in the field, FLETC replaced its schedule of five eight-hour days of training per

week with a schedule of six eight-hour days of training per week.  Prior to this time,

FLETC had not operated a six-day schedule.  JSF ¶ 2.  INS required employees, including

Mr. Moreno, to attend the six-days-per-week "basic immigration law enforcement

training."  See JSF ¶ 3.

In the fall of 2001, OPM personnel mistakenly advised certain agencies that they

did not have to pay overtime for the sixth day of FLETC training.  Jerome Mikowicz ("Mr.

Mikowicz") was the Manager of the Salary and Wage Systems Division at OPM from

January 1999 until October 2006.  He testified that, in the fall of 2001, personnel at the

United States Department of State asked Vicki Draper ("Ms. Draper"), a compensation

specialist within the Pay and Leave Administration Group of the Center for Pay and Leave

Administration at OPM, whether the State Department could pay its FLETC trainees for

their sixth day of training under the Title 5 premium pay regulations set forth at 5 C.F.R. §

410.402.  The State Department did not ask about making payments under the overtime

requirements of the FLSA, as set forth in 5 C.F.R. Part 551.  Thus, responding to the

question asked, Ms. Draper told the State Department that the sixth day of training did not

meet any of the exceptions to the prohibition on premium pay for training under Title 5

and that agencies were therefore not required to pay premium pay for the sixth day of

training under Title 5.[7]  According to Ms. Draper, OPM would have to grant an exemption

---

[7]Mr. Micowicz testified that the State Department's narrow framing of the question to
Ms. Draper – seeking guidance regarding an exemption under Title 5 instead of regarding OPM's
FLSA regulations – contributed to the inaccuracy of her answer, in that it did not alert her to the

for the employees to receive premium pay.  None of the witnesses at trial could remember having seen written documentation of Ms. Draper's initial determination that premium pay was not owed under Title 5, nor of OPM's initial position regarding overtime pay.

INS pay specialist Wayne Coleman ("Mr. Coleman")[8] testified that, in early 2002, he was asked to determine whether INS could pay overtime to entry-level trainees attending six days per week of training at FLETC.  As discussed above, under the FLSA, overtime is owed for training if it is part of an employee's "regularly scheduled administrative workweek."  See 5 C.F.R. § 551.421.  At that time, however, Mr. Coleman mistakenly understood the phrase "regular working hours" in 5 C.F.R. § 551.423(a)(3) to mean the basic forty-hour workweek that most federal employees are required to work, and therefore he determined that overtime was not authorized for the sixth day of training. Mr. Coleman admitted that, in making his initial determination, he did not consult 5 C.F.R. § 551.421, which defines "regular working hours" as "the days and hours of an employee's regularly scheduled administrative workweek."  (emphasis added).  Thus, because the FLETC training was "entry level training," and "regular working hours" was wrongly assumed to refer to a forty-hour workweek, Mr. Coleman determined that 5 C.F.R. §

─────────────────────

possibility of other regulations under which the employees might be owed overtime pay for the sixth day of training.  Tr. 329-31.

    [8]From approximately 1999 until March 2003, Mr. Coleman was an INS pay specialist. From March 2003 until August 2004, Mr. Coleman was a pay specialist at ICE.  His job was to try to resolve premium pay issues raised by employees and managers, write official policy documents, and create training materials.  JSF ¶ 4.

551.423(a)(3) precluded the payment of overtime wages to the FLETC trainees for the sixth day of training per week.

Following his later-acknowledged misreading of the FLSA regulations, Mr. Coleman began an internal process for securing an exemption under Title 5 for INS employees who were required to take six days of training at FLETC.  His efforts culminated in a memorandum being sent from INS's Executive Associate Commissioner in the Office of Management, George H. Bohlinger ("Mr. Bohlinger"), to Robert F. Diegelman ("Mr. Diegelman"), the Acting Assistant Attorney General for Administration at the United States Department of Justice ("DOJ"), INS's parent agency.  In that correspondence, dated April 24, 2002, Mr. Bohlinger requested that DOJ "seek an exception from [OPM] to the regulatory prohibition against paying overtime to employees attending basic training" at FLETC, as provided in the Title 5 regulations at 5 C.F.R. § 410.402(b)(7).[9]  JX 219.  In a memo dated July 2, 2002, Mr. Diegelman responded to Mr. Bohlinger's memorandum, stating that "we [DOJ] have decided not to seek OPM approval of an exception" under 5 C.F.R. § 410.402(b)(7) to allow premium pay for the FLETC trainees.  Defendant's Exhibit ("DX") 309.  Noting that several DOJ components expressed "[s]trong opposition" to paying overtime for the sixth day of training, Mr.

---

[9]Joanne Simms ("Ms. Simms") served as Personnel Director within the Justice Management Division ("JMD") of DOJ from March 1998 through February 2002, after which she served as the Deputy Assistant Attorney General for Human Resources and Administration within the JMD of DOJ.  Ms. Simms testified that, at that time, she believed that the only way to pay overtime pay to the entry-level FLETC trainees for the sixth day of training was to get an exemption under 5 C.F.R. § 410.402.

Diegelman went on to state:

> We are reluctant to adopt a policy that would force all affected [DOJ] components to make additional unanticipated premium pay expenditures. Further, we believe it would be counterproductive to adopt a policy of offering or denying premium pay entitlements to [DOJ] employees in similar circumstances based solely on which component happens to employ them.

DX 309.

Shortly after DOJ's Administrative Office declined to seek a Title 5 exemption, an OPM personnel specialist determined that Ms. Draper's initial advice to the State Department had been incorrect and that trainees who had regularly-scheduled training for six days per week were entitled to overtime under the FLSA. Specifically, in late 2002, Bryce Baker ("Mr. Baker"), then Senior Advisor to the Assistant Director for Compensation Administration at OPM and a colleague of Ms. Draper, discovered the error and pointed out the definition of "regular working hours" in 5 C.F.R. § 551.421 to Ms. Draper.[10] Once she read that regulation, Ms. Draper agreed that OPM's FLSA regulations did require overtime pay for the sixth day of training at FLETC, because the sixth day of training was part of the employees' "regularly scheduled workweek."

Upon learning of her mistake, Ms. Draper decided to notify government personnel offices of her mistake so it could be corrected. On December 18, 2002, Ms. Draper sent an e-mail to Gary Wilson ("Mr. Wilson"), Program Manager for Pay, Attendance and

---

[10]In an e-mail dated March 24, 2003, Mr. Baker noted, "I have found in the old FLSA history files that OPM (Dwight Brown) interpreted the term 'regular working hours' to include regularly scheduled overtime pay as far back as 1976. The regulation in 551.421 wasn't modified to clarify this until 1983." Plaintiffs' Exhibit ("PX") 124.

Leave for the United States Forest Service, in which Ms. Draper explained her mistake and

identified the steps agencies needed to take to come into compliance with their FLSA

responsibilities.  Specifically, Ms. Draper stated:

> Regrettably, our original determination was incorrect.  We recently revisited
> this issue after realizing that the term "regular working hours" is defined in 5
> CFR 551.421.  When we read the regulations at 5 CFR 551.423(a)(1) in
> conjunction with . . . 551.421, it is clear that if the nonexempt employees are
> scheduled in advance of the administrative workweek to attend a 6-day
> training class, those regularly scheduled training hours on the 6th day are
> "regular working hours" and constitute hours of work for overtime pay
> purposes.

JX 202.  Ms. Draper emphasized in her e-mail that "[payment] is not optional.  If the

training occurs during regular working hours, as discussed above, the time spent in

training on the 6th day is considered hours of work and the employees are entitled to

overtime pay.  This also applies to the employees who formerly received training at

[FLETC]."  Id. (emphasis added).

On February 13, 2003, Mr. Wilson sent a copy of Ms. Draper's December 18, 2002

e-mail to Mr. Coleman at INS.[11]  Mr. Coleman testified that, as of February 2003, he was

---

[11]Mr. Coleman forwarded Mr. Wilson's e-mail to John Cahill ("Mr. Cahill"), a pay
specialist in the JMD of DOJ, the parent agency of INS.  JX 202.  Mr. Cahill's job was to
interpret pay policies, write guidance for department bureaus and generally provide technical
assistance when it was required.  JSF ¶ 5.  At the time, INS was a component of DOJ.  Within
INS, pay personnel were responsible for setting pay policy and for processing compensation.
However, INS could not act contrary to DOJ pay policy and therefore consulted pay personnel at
the JMD – the management arm of DOJ – on certain pay issues.

After Mr. Coleman forwarded Mr. Wilson's e-mail to Mr. Cahill, Mr. Cahill e-mailed
OPM and suggested that OPM either send a memo to all agencies or issue a Q&A ("Question and
Answer") on OPM's website.  JX 203.

aware of OPM's revised determination regarding overtime pay for the sixth day of training

at FLETC and that he fully agreed with OPM's analysis as set forth in Ms. Draper's e-mail

to Mr. Wilson.  Tr. 80-82.  He testified that, without question, the FLSA regulations

require overtime for the sixth day.  Tr. 92, 98.  Mr. Coleman further testified that, if INS

had accepted the requirement in the regulations as law, INS would have had the authority

to start paying overtime, and he would have expected INS to start doing so.  Tr. 89, 91-92.

### B.    DHS Time Frame

As noted above, DHS officially began operations on January 24, 2003, and the

process of absorbing INS was complete by March 1, 2003.  JSF ¶¶ 6-8.  Just as INS had

done, the newly-created DHS required the plaintiffs in this case who trained after May 1,

2003 to attend six days per week of "basic immigration law enforcement training" at

FLETC.  JSF ¶ 10.

Melissa Allen ("Ms. Allen") served as Acting Chief Human Capital Officer for

DHS from January 2003 through May 2003.  Ms. Allen testified that she had primary pay

authority for DHS employees during that time.  Kay Frances Dolan ("Ms. Dolan") joined

DHS as the Deputy Chief Human Capital Officer in March 2003.[12]  The issue of paying for

the sixth day of training had been a topic of some discussion once DHS was established.

Apparently in response to questions raised about OPM's corrected analysis, Mr. Steven

---

[12]Ms. Allen and Ms. Dolan testified that they were charged with establishing a human resources organization for each DHS component and with developing (cooperatively with OPM) a statutorily-required human resources system eventually known as "Max HR."

Cohen ("Mr. Cohen"), who was Senior Advisor for Homeland Security to the Director of

OPM from October 2002 until March 2005, JSF ¶ 12, and served as a liaison between

DHS and OPM, sent an e-mail to Ms. Allen on March 19, 2003, detailing OPM's

determination that under OPM's long-standing regulations, DHS was obligated to pay for

the sixth day of training at FLETC under the FLSA.  The e-mail, marked "Importance:

High," stated as follows:[13]

> [O]ur staff made a mistake in the original guidance we provided agencies in
> response to specific questions we received in the fall of 2001 about 6-day
> training courses at [FLETC]. We are now attempting to correct that mistake.
> In fact, we were planning to post a Q & A on our Web site today to address this
> issue (copy attached).  The draft Q & A has been reviewed and approved by
> OGC [Office of General Counsel] staff (Jim Green). . . .
>
> This question arose as a result of FLETC's decision to expand its training
> courses to accommodate agencies' increased demands for training of law
> enforcement officers as a direct result of the attacks on September 11.  In
> response to questions we received at the time, we responded that FLSA-
> nonexempt employees are NOT entitled to receive overtime pay for time spent
> in entry-level training on the sixth day of a 6-day training course, because time
> spent in apprenticeship or other entry-level training outside regular working
> hours is not considered hours of work under 5 CFR 551.423(a)(3).
>
> However, time spent in training during "regular working hours" is considered
> hours of work (5 CFR 551.423(a)(1)), and "regular working hours" is defined
> in our regulations as including the days and hours of an employee's regularly
> scheduled administrative workweek, which is scheduled in advance of the
> administrative workweek.
>
> Our new guidance will state that FLSA-covered (nonexempt) employees are
> entitled to receive overtime pay for time spent in entry-level training on the
> sixth day of a 6-day training course if they are scheduled in advance of the

---

[13]Mr. Cohen testified that he did not write the e-mail but that it was drafted by OPM's
compensation staff.

administrative workweek to attend the 6-day training class for a specified number of hours (e.g., 8 hours).  Those regularly scheduled training hours on the sixth day are "regular working hours" and are considered hours of work for overtime pay purposes.

Agencies will be responsible for determining whether an employee is entitled to receive overtime pay for regularly scheduled training hours under these conditions and will likely need to recompute affected employees' overtime pay entitlements and provide back pay and interest under 5 CFR part 550, subpart H.

JX 201 (emphasis added).

Mr. Cohen testified that he understood that OPM could have posted the Q&A that same day, as stated in the e-mail, but that, in order to address DHS's concerns about the Q&A, it was not posted.  Mr. Cohen could not, however, recall the nature of DHS's concerns.  Indeed, no witness could recall what objections, if any, DHS had to the analysis of the existing regulations set forth in the Q&A.  The evidence established that, upon receiving Mr. Cohen's e-mail, Ms. Allen simply forwarded it to a number of people within DHS's sub-organizations, including human resource people at CBP and ICE.  Ms. Allen did not indicate that she had any questions regarding the correctness of OPM's position on the requirement to pay overtime for the sixth day of training under the FLSA.  Instead, in her forwarding e-mail, Ms. Allen stated that "[t]his issue [payment for the sixth day of training] was raised during the HR Directors meeting on Tuesday.  OPM has now provided clarification of their guidance which they are posting on their Web site."  JX 201 (emphasis added).  In fact, Ms. Allen testified that she had no reason at the time to believe that OPM's analysis of 5 C.F.R. § 551.421 was incorrect and that she did not read the

regulation nor did she remember asking anyone else to go and read it.  Tr. 185, 190.  Allen

testified that she could not remember what basis anyone at DHS had for the position that

the regulations did not require overtime pay for the sixth day of training and that she did

not remember looking into the basis for such a position.  Tr. 189-90.  Ms. Allen also

testified that she could not remember if anyone at DHS gave her an analysis of the

regulation.  Tr. 185-86.  Mr. Cohen testified that Ms. Allen never told him that OPM's

analysis in the Q&A was incorrect.  Tr. 630.

Nonetheless, DHS was successful in stopping publication of the Q&A and

continued to require employees to train for six days per week without paying them

overtime.  The evidence established that DHS personnel took steps to delay issuance of the

Q&A.  In this connection, several contemporaneous e-mails were introduced at trial

regarding OPM's efforts to resolve DHS's apparent budget concerns so that the Q&A

could be issued.  For example, on March 21, 2003, in response to an internal e-mail chain,

Mr. Cohen e-mailed two OPM employees, Don Winstead ("Mr. Winstead"), a senior pay

executive at OPM who was Mr. Cohen's and Mr. Mikowicz's boss, and Jo Ann Perrini

("Ms. Perrini"),[14] stating that "Melissa [Allen] . . . claims our [OPM's] change in position

is going to cost them [DHS] millions.  I need to know if this is true."  PX 119 (emphasis

added).

_____

[14]Ms. Perrini worked in pay and leave administration at OPM.  Tr. 317-18.

On March 24, 2003, Mr. Cohen received an e-mail marked "Importance: High"

from Mr. Winstead in response.  Id.  Mr. Winstead's e-mail stated:

> I'm confused about whose court this ball is in right now.  We told Melissa
> Allen last week that we would be happy to meet with her legal staff on this
> issue.  In the meanwhile, it is clear that there have already been telephone
> conversations between DHS legal staff and OPM legal staff (Faisal Gill) . . ..
>
> In response to your question about whether it is true that OPM's change in
> position will cost DHS millions of dollars, I don't think anyone at OPM is in
> a position to confirm or deny this.  We simply don't know how many employees
> might be affected, especially since . . . it appears Customs has already paid
> overtime on the sixth day of a 6-day training class.

Id. (emphasis added).

On March 27, 2003, a meeting regarding "DHS – FLETC – 6[th] day of training" was

held with OPM staff and DHS's attorneys and human resource managers, including Mr.

Baker and Mr. Winstead of OPM, and Ms. Allen of DHS.  JSF ¶ 13; JX 218.  Mr.

Mikowicz testified that it was his understanding that during that meeting, OPM staff

summarized their legal reasoning regarding the legal obligation to pay overtime for the

sixth day of training under the FLSA.  Tr. 404-05.  Mr. Mikowicz testified that DHS did

not provide any rationale for disputing OPM's explanation of the regulatory requirements.

Tr. 405, 407.  Mr. Mikowicz further testified that, when Mr. Baker came out of the

meeting, he told Mr. Mikowicz that he did not know what DHS's issues were with the

Q&A.  Tr. 408-09.  Nonetheless, at the meeting, DHS staff requested time to review the

matter further before OPM issued a formal written policy.  PX 121; PX 123.

Although Ms. Allen testified that there would have been funds to begin paying new

trainees overtime on a current basis in March 2003, it is clear from the evidence as a whole

that DHS was concerned with the budget impact of having to make back pay awards to

those who had already trained at FLETC for six days per week, and therefore DHS paid

neither the new trainees nor those who were owed retroactive payments overtime.  For

example, on March 28, 2003, Mr. Coleman (by then a DHS employee) noted in a "Memo

to the Record" entitled "Budget Estimates to Cover Cost of Back Overtime Pay for

Attending 6th Day of Training of a 6 Day Training Week at FLETC" that he had been in

touch with people in "Budget" to obtain an estimate of the overtime costs for the affected

individuals.  JX 214.  Attached to the memo was "a listing of INS employees apparently

affected by the back overtime payments that will result if OPM changes its interpretation

of the regulations covering the payment of overtime to FLSA nonexempt employees in

basic training."  Id.  In addition, a June 24, 2003 e-mail indicated that DHS had alerted the

staff of the Office of Management and Budget ("OMB") regarding the cost implications of

OPM's Q&A.  PX 112 ("DHS apparently has already alerted OMB staff to this issue, so

we [OPM] need to give OMB a heads up about the cost implications before issuing our

opinion.").  As noted, this concern over budget implications did not, however, stop DHS

from requiring a sixth day of training.  Rather, while DHS gathered budget information, it

continued to send trainees to FLETC for six days per week of regularly scheduled training

without paying them overtime.

The evidence from OPM personnel confirmed that OPM believed that DHS was

unreasonably delaying issuance of the Q&A without justification.  Before OPM released

the Q&A, Mr. Winstead apparently met again with Ms. Allen and Ms. Dolan, as he

explained in a June 24, 2003 e-mail:[15]

> We discussed this issue with Melissa Allen and Kay Frances Dolan yesterday
> afternoon.  They say they need an official OPM legal opinion to which their
> General Counsel can react.  I think this is a way of covering for the fact that
> nothing has happened since our policy and legal staffs met with theirs on this
> issue in March, despite attempts by OPM's General Counsel to reach out to
> DHS.  (Steve says they never returned our calls.)

PX 112 (emphasis added).  Mr. Cohen testified that, as of June 2003, he believed the Q&A

process had been "dragging on too long."  Tr. 631-35.

 In response to DHS's request for a formal OGC opinion, OPM prepared a draft

letter that Ron Sanders ("Mr. Sanders"), the Associate Director for Strategic Human

Resources Policy at OPM, shared with Ron James ("Mr. James"), the Chief Human

Capital Officer at DHS, on July 9, 2003.  PX 114; PX 120; PX 123.  The letter stated, in

pertinent part:

> The enclosed Q and A is the same written guidance that we provided to DHS
> staff in March 2003.  At the request of DHS, OPM staff met with DHS
> attorneys and human resources officials to discuss the issue on March 27, 2003.
> At that meeting, OPM staff reviewed the legal rationale for the policy.  DHS
> staff requested time to review the matter further before OPM issued a formal
> written policy.  We have received no additional information from DHS that
> would cause us to change our policy determination.
>
> . . . After careful review, we have concluded that the meaning of OPM's
> regulations with respect to the sixth day of training issue is clear.  OPM's

---

[15]Mr. Winstead did not testify at the trial.  However, his e-mails are admissible as
admissions by a party-opponent.  See Fed. R. Evid. 801(d)(2)(D); Globe Sav. Bank v. United
States, 61 Fed. Cl. 91, 97 (2004) ("The Rule expressly concerns the declarant's relationship with
the party-opponent, which in this case is the United States, not a particular agency.").

> General Counsel concurs in this conclusion.  A number of agencies have been
> waiting for several months for OPM to issue formal guidance.  We can no
> longer delay issuance of that guidance.  We will be posting the enclosed Q and
> A on our Web site on July 11, 2003.

PX 123 (emphasis added); see also PX 114.

The Q&A was finally posted on the OPM website on July 23, 2003.  OPM had apparently notified OMB in advance, and OMB cleared the Q&A on July 17, 2003.  PX 121.

In finding that DHS acted indifferently to its obligation when it sought to delay issuance of the Q&A, the court notes that DHS's behavior stands in marked contrast to DOJ's behavior, as discussed by Ms. Simms of the JMD of DOJ.  Ms. Simms testified that, as of March of 2003, around the time that Ms. Simms received notice that OPM had determined that overtime was owed for the sixth day of training, DOJ pulled its trainees out of the six-day training schedule at FLETC, thereby complying with the FLSA.  Tr. 506; cf. PX 135 (March 13, 2003 e-mail to Ms. Simms informing her of OPM's revised determination).  Ms. Simms further testified that, "[i]f we had found out while we still had individuals working the sixth day going forward that OPM now says we are obligated to pay, and we did not take them out of that situation, we would have paid."  Tr. 507.

## C.       Post-Q&A Publication

Following the July issuance of the Q&A, DHS began paying its employees FLSA overtime on a current basis for the sixth day of training per week at FLETC in August 2003.  See JX 208.  DHS did not, however, provide back pay to those legacy INS and ICE

employees who were owed retroactive overtime payments for the sixth day per week of

training conducted between January 2002 and August 2003 until after this litigation was

filed.  In particular, DHS did not begin to pay retroactive overtime wages plus Back Pay

Act interest to legacy INS employees until December 2004, after Mr. Moreno originally

brought this action on behalf of himself and others similarly situated on June 1, 2004 in the

United States District Court for the District of Columbia ("D.D.C.").

The district court dismissed the case for improper venue on November 5, 2004.  Mr.

Moreno re-filed his case in this court on January 21, 2005.  Mr. Moreno received his

retroactive payment of overtime wages in February 2005.  Back payments to legacy INS

employees continued through June or July of 2005.  However, none of the employees

received payments of liquidated damages as prescribed by 29 U.S.C. § 207.

Mr. Moreno filed a collective action notice motion in this action on October 24,

2005.  This court ordered that the collective action notice in the case be sent to the putative

class members by May 19, 2006, giving them until July 18, 2006 to file their consents to

sue.  Approximately 737 people joined the case, but that number was reduced to

approximately 148 plus Mr. Moreno as a result of the court's July 3, 2008 summary

judgment ruling on the statute of limitations, as described above.

## III.   Applicable Legal Standards

### A.      Standards for Willful Violations of the FLSA

As noted above, under 29 U.S.C. § 255(a), in actions to recover unpaid overtime

and/or liquidated damages under the FLSA, a two-year statute of limitations inheres,

"except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  The burden of proving an employer's willfulness falls on the employees.  Adams v. United States, 350 F.3d 1216, 1229 (Fed. Cir. 2003).  The state of mind required for willfulness under the FLSA was set forth by the Supreme Court in McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  Under McLaughlin, the plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Id., cited in Bull v. United States, 479 F.3d 1365, 1379 (Fed. Cir. 2007), and Adams, 350 F.3d at 1229. In this connection, a willful violation occurs when an employer shows "evident indifference" to the FLSA's requirements.  Martin v. Selker Bros., Inc., 949 F.2d 1286, 1296 (3d Cir. 1991).  However, if an employer "acts reasonably in determining its legal obligation, its action cannot be deemed willful" for purposes of the statute of limitations inquiry under 29 U.S.C. § 255(a).  McLaughlin, 486 U.S. at 135 n.13.  Moreover, "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation," its action is not considered willful.  McLaughlin, 486 U.S. at 135 n.13.  Finally, if an employer's conduct is found to have been willful for statute of limitations purposes, it will necessarily fail to meet the good faith/reasonable grounds standard for purposes of awarding liquidated damages under 29 U.S.C. § 260.  Doyle, 931 F.2d at 1549 ("[A] trial court must grant the victims of a willful violation liquidated damages.").

### B.     Standards for Good Faith & Reasonable Grounds

As noted above, under 29 U.S.C. § 207, employers, including federal agencies, are

generally required to pay overtime wages at a rate not less than time and a half for hours

over forty in a workweek.  An employer who violates 29 U.S.C. § 207 "shall be liable to

the employee or employees affected in the amount of their . . . unpaid overtime

compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C. §

216(b).  However,

> if the employer shows to the satisfaction of the court that the act or omission
> giving rise to such action was in good faith and that he had reasonable grounds
> for believing that his act or omission was not a violation of the [FLSA], the
> court may, in its sound discretion, award no liquidated damages or award any
> amount thereof not to exceed the amount specified in [29 U.S.C § 216].[16]

29 U.S.C. § 260 (emphasis added).

In contrast to willfulness, "[t]he burden rests on the government to establish its

good faith and the reasonable grounds for its decision."  Bull, 479 F.3d at 1379-80

(quoting Adams, 350 F.3d at 1226).  "[A] presumption of regularity attaches to the actions

of Government agencies," Adams, 350 F.3d at 1228 (quoting United States Postal Serv. v.

Gregory, 534 U.S. 1, 10 (2001)), but "the government . . . must provide actual evidence to

satisfy [its burden and] cannot simply rest on the presumption of regularity to satisfy [it]."

Adams, 350 F.3d at 1228 n.6.

---

[16]"Liquidated damages under the FLSA are considered compensatory rather than punitive
in nature."  Reich v. So. New Eng. Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997) (citing
Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 707 (1945); Martin v. Cooper Elec. Supply Co.,
940 F.2d 896, 907 (3d Cir. 1991)).

To demonstrate good faith, the employer must show "an honest intention to ascertain what the [FLSA] requires and to act in accordance with it." Beebe, 640 F.2d at 1295 (quotation omitted).  The good faith standard "necessitates a subjective inquiry," and "[o]bviously, such a subjective inquiry involves the presentation of testimony." Id.  In contrast to "good faith," the "reasonable grounds" inquiry under 29 U.S.C. § 260 "involves an objective standard." Id.

## IV.    Conclusions of Law

### A.    As of May 2003, DHS Knew Its Failure to Pay Overtime Was Prohibited and Acted Willfully in Avoiding Its Obligation to Pay.

The court finds that, with regard to the approximately 148 current and former employees of DHS in the suit who trained after approximately May 1, 2003, the plaintiffs have met their burden of proving that the government's violation of the FLSA was willful. Under McLaughlin, to prove willfulness, the plaintiffs must show that an employer "knew . . . its conduct was prohibited by the statute," but continued to act in violation of its payment obligation.  486 U.S. at 133.  Furthermore, to the extent the government contends that they were seeking to clarify their "legal" obligation, the plaintiffs must show that the employer acted "recklessly . . . in determining its legal obligation." McLaughlin, 486 U.S. at 135 n.13.

The evidence at trial established that, in March 2003, the persons responsible for pay decisions at DHS received actual notice and an explanation of the binding legal requirement on DHS to pay overtime under the FLSA for the sixth day of training per

week, and therefore DHS pay personnel "knew" of their obligation to pay overtime in March 2003.  The evidence also established that, despite this knowledge, DHS continued to require a sixth day of training per week without overtime pay.  The evidence further established that DHS's decision not to begin paying overtime or stop requiring a sixth day of training after the meeting with OPM in March 2003, while DHS allegedly sought to clarify its legal obligation to pay, demonstrated a "reckless disregard" for DHS's obligations under the FLSA.  See McLaughlin, 486 U.S. at 133.  Therefore, DHS's decision not to pay overtime for the sixth day of training until OPM issued its official Q&A constituted a "willful" violation of the FLSA.

Proof of actual knowledge was established by the e-mail Ms. Allen received from Mr. Cohen on March 19, 2003, in which OPM unambiguously explained that overtime pay was required for the sixth day of FLETC training.[17]  JX 201.  As discussed above, that e-mail and the draft Q&A attached thereto included a lengthy and unequivocal legal explanation of the overtime regulations with regard to the sixth day of training at FLETC. In addition, to the extent DHS personnel might not have understood OPM's position or the plain words of the regulations from the e-mail, the evidence established that Ms. Allen and other DHS officials received an oral briefing from OPM regarding the legal requirements set forth in the regulations at a meeting with OPM held on March 27, 2003.  Significantly,

---

[17]Ms. Allen and Ms. Dolan testified that they understood that DHS is bound by OPM regulations.  Ms. Allen testified that OPM regulations are "stronger than" formal OPM guidance, Tr. 184, and Ms. Dolan testified that OPM regulations can be considered "the most formal" type of OPM guidance, Tr. 152.

DHS never questioned OPM's analysis regarding the substance of those legal requirements.  Indeed, Ms. Allen testified that she did not recall asking for or receiving a review of the Q&A and had no recollection as to what objections DHS might have had to OPM's position.  As OPM's Mr. Mikowicz testified, there is no other way to interpret the regulations besides requiring overtime for the sixth day of training.  Tr. 358 ("Q: Is it your understanding that those regulations require overtime to be paid for training that's conducted during regular working hours?  A: Yes.  Q: And indeed that's pretty clear from the face of the regulation, isn't it?  A: I think it's explicit." (emphasis added)), 368, 375.

The evidence also established that the steps DHS officials took to delay issuance of the OPM Q&A after March 2003 were not related to resolving outstanding "legal" issues between DHS and OPM regarding overtime pay for the sixth day of training.  Instead, the evidence showed that the only issues raised by DHS in connection with issuing the Q&A concerned the budgetary impact on DHS of paying the overtime wages.  The DHS employees who testified could not identify any legal issues or disagreements they or anyone in the department had with OPM's reading of the plain requirements of the overtime regulations, other than that it would "cost them millions" to pay the overtime.[18,19]

---

[18]While it is not unreasonable for a federal agency to consider the budget impacts of a pay requirement, the fact that this was the only identifiable reason for DHS's failure to comply with its pay obligation underscores the finding that, contrary to the government's contention, the agency was not engaged in deliberations regarding whether it was, in fact, legally obligated to pay.

[19]The court notes that it is not relevant to the willfulness determination that the witnesses indicated that they did not intend to harm the plaintiffs by withholding overtime payments.  The

See PX 119.

In view of the foregoing, the government's contention that DHS did not act

willfully in not paying overtime until OPM issued its final Q&A in July 2003 is not

supported.  While it is true that, under McLaughlin, an employer's actions cannot be

deemed willful where the employer was reasonably seeking to determine its legal

obligations, 486 U.S. at 135 n.13, the evidence in this case showed that DHS recklessly

sought to delay compliance with the clear obligations of which it had been informed by

OPM, and DHS's actions were therefore willful under McLaughlin.  Waiting for the

issuance of OPM's final Q&A did not help DHS determine its legal obligations, because

the DHS officials already actually knew of their legal obligation many months before

OPM issued the Q&A in July 2003.  Not only was the final Q&A virtually the same as the

draft Q&A which DHS received – and which OPM was ready to issue – in March of 2003,

but the Q&A also did nothing more than point the employing agencies to the unambiguous

FLSA regulations that applied to the FLETC six-day training program, which had not

changed throughout the relevant time period and which were, as the DHS employees who

---

court is convinced that the DHS employees involved were dealing with large, time-consuming
responsibilities during the time in question, including the development of Max HR.  However,
the press of other responsibilities does not affect the statutory duty of employers, including the
government, to comply with the FLSA, nor can it excuse their conduct in this case.  Once DHS
knew of its legal obligation in March 2003, DHS had to begin paying overtime for the sixth day
of training or stop requiring a sixth day of training.  Willfulness under the FLSA does not require
bad faith nor intent to harm on the part of the employer, but rather only knowing or reckless
disregard for whether the conduct was prohibited by the statute.  See McLaughlin, 486 U.S. at
133; see also Martin, 949 F.2d at 1296 (A willful violation occurs when an employer shows
"evident indifference" to the FLSA's requirements.).

testified admitted, at all times binding on DHS regardless of the Q&A.

Indeed, there was no evidence to show that DHS spent the period between March 2003 and July 2003 deliberating over the legal issues in the Q&A, nor that DHS was endeavoring to determine its legal obligations under the FLSA.  To the contrary, OPM's e-mails indicate that DHS's request for an official legal opinion from OPM in June 2003 was actually "a way of covering for the fact that <u>nothing has happened</u> since [OPM's] policy and legal staffs met with [DHS's] on this issue in March [2003], despite attempts by OPM's General Counsel to reach out to them."  PX 112 (emphasis added).  Similarly, a letter from OPM to DHS in July of 2003 indicated that, after the March 27, 2003 meeting between OPM and DHS, at which DHS requested more time to review the matter, OPM "<u>received no additional information from DHS</u> that would cause [OPM] to change [its] policy determination."  PX 123 (emphasis added); <u>see also</u> PX 114.  In these circumstances, in which it was <u>DHS</u> that sought to delay the issuance of the final Q&A, and there was no evidence suggesting any legitimate reason for DHS's request, DHS acted recklessly in insisting upon the issuance of that final Q&A before it started paying overtime for the sixth day of training.[20]

---

[20]The court recognizes that it is not the government's burden to show that the government did <u>not</u> act knowingly or recklessly, and therefore the lack of evidence of a specific countervailing legal position is not, by itself, dispositive.  <u>See</u> <u>Wyland v. District of Columbia</u>, 728 F. Supp. 35, 37 (D.D.C. 1990) ("While it is true that the District has never explained in detail how it reached its decision concerning sergeants, plaintiffs bear the burden of proving willfulness. The District is not required to demonstrate that its belief that sergeants were exempt was not reckless.").  However, in this case, DHS pay personnel had an actual discussion of the unambiguous existing regulations with OPM in March 2003 but then failed to comply with the

Accordingly, the court concludes that the plaintiffs met their burden of proving "willfulness" under the standards set forth in <u>McLaughlin</u>.  Therefore, in accordance with 29 U.S.C. § 255(a), the plaintiffs' claims are subject to a three-year statute of limitations and are therefore timely.

Based on these same facts, the court finds that DHS did not act in good faith nor with reasonable grounds when it failed to pay overtime after it received notice and an explanation of the relevant FLSA regulations.  Accordingly, these plaintiffs are entitled to liquidated damages pursuant to 29 U.S.C. §§ 216(b) and 260.  Indeed, as the Federal Circuit held in <u>Doyle</u>, "a trial court <u>must</u> grant the victims of a willful violation liquidated damages."  931 F.2d at 1549 (emphasis added).

---

regulations.  Where, as here, the plaintiffs have established that the implementing agency expressly pointed out and explained the law to the employer, the employer's reliance on an unidentified, nebulous objection to the regulatory requirements to justify its decision not to pay overtime is insufficient to prevent a finding that the employer acted recklessly in determining what the law required.

Similarly, this case does not come under the rule set forth in <u>Cook v. United States</u>, in which the Federal Circuit stated, "As regards the case of a federal agency that has in good faith accepted and followed the advice of the Secretary of Labor, we think a new per se rule is now appropriate; given these facts, that any mistake in responding to the demands of the FLSA is not willful."  855 F.2d at 850.  In <u>Cook v. United States</u>, the agency relied on a mistaken determination by the Secretary of Labor regarding overtime compensation.  855 F.2d at 849.  However, unlike <u>Cook v. United States</u>, this case concerns the willfulness of the actions of a federal agency <u>after</u> OPM corrected its mistaken determination regarding overtime pay and informed the agency of the correct regulatory obligations.  This is not a case in which OPM "in good faith accepted and followed the advice of" OPM.  <u>See</u> <u>Cook v. United States</u>, 855 F.2d at 850.  To the contrary, the agency delayed following OPM's clear advice – and the legal requirements laid out in the regulations to which OPM directed the agency – for many months.  Accordingly, the per se rule in <u>Cook v. United States</u> does not apply.

**B.      Mr. Moreno's Claim May Be Equitably Tolled As a Timely Filed Defective Pleading Under Irwin.**

Next, the court turns to Mr. Moreno's claim.  The court found in its summary judgment opinion that it need not decide whether the FLSA allowed for equitable tolling for the plaintiffs other than Mr. Moreno because such tolling would not be appropriate for those plaintiffs in any event.  Moreno, 82 Fed. Cl. at 400.  However, with regard to the possibility of tolling for Mr. Moreno on the basis of a defective pleading, the court deferred ruling on the issue.  Id. at 402 n.34. The court now rules that, though Mr. Moreno is not subject to the three-year statute of limitations for willful violations of the FLSA because he completed his uncompensated overtime hours long before the willful government conduct in this case, his claim will nonetheless be considered timely based on his timely filed defective pleading, as described in Irwin.  See Irwin, 498 U.S. at 95-96.

The plaintiffs argue that Mr. Moreno should be considered to have timely filed this suit within two years of his training at FLETC on Saturdays from June 15 to August 17, 2002, based on his June 1, 2004 filing in the D.D.C.[21]  As noted above, the D.D.C. dismissed Mr. Moreno's case for improper venue on November 5, 2004, and Mr. Moreno filed his complaint and consent to sue in this court on January 21, 2005 (more than two but less than three years after the overtime hours Mr. Moreno worked).  The government argues that equitable tolling of the statute of limitations is not available under the FLSA, because the statutory language itself indicates that Congress did not intend to allow for tolling beyond the three-year period specified for willful violations.

---

[21]The court assumes, for purposes of this discussion, that Mr. Moreno filed his consent to sue in the D.D.C. on the same day as he brought his suit there – June 1, 2004.  Accord Tr. of Oral Arg. at 82-83 ("Mr. Moreno would be in if the statute of limitations is tolled from when he file[d] his consent to sue . . . with the [D.D.C.]").

1.      **Equitable Tolling for a Timely Filed Defective Pleading is
Permissible Under the FLSA.**

Under the statute of limitations set forth in 29 U.S.C. § 255(a), actions to recover

unpaid overtime and/or liquidated damages under the FLSA

> may be commenced within two years after the cause of action accrued, and every
> such action shall be forever barred unless commenced within two years after the
> cause of action accrued, except that a cause of action arising out of a willful
> violation may be commenced within three years after the cause of action
> accrued.

With regard to commencement of an FLSA action, 29 U.S.C. § 256 states:

> for purposes of [29 U.S.C. § 255], an action commenced . . . under the [FLSA]
> . . . shall be considered to be commenced on the date when the complaint is
> filed; except that in the case of a collective or class action instituted under the
> [FLSA] . . . , it shall be considered to be commenced in the case of any
> individual claimant--
>
>> (a) on the date when the complaint is filed, if he is specifically
>> named as a party plaintiff in the complaint and his written consent
>> to become a party plaintiff is filed on such date in the court in
>> which the action is brought; or
>>
>> (b) if such written consent was not so filed or if his name did not
>> so appear--on the subsequent date on which such written consent
>> is filed in the court in which the action was commenced.

The question of whether equitable tolling is allowed under the FLSA has not been

resolved by the Supreme Court or the Federal Circuit.  With regard to equitable tolling of

statutes of limitations generally, the Supreme Court in Irwin found that "the same

rebuttable presumption of equitable tolling applicable to suits against private defendants

should also apply to suits against the United States."  498 U.S. at 95-96.  However, the

Supreme Court also cautioned that "the time limits imposed by Congress in a suit against

the Government involve a waiver of sovereign immunity" and stressed that "[f]ederal

courts have typically extended equitable relief only sparingly." Irwin, 498 U.S. at 96.  For

example, tolling has been allowed "where the claimant has actively pursued his judicial

remedies by filing a defective pleading during the statutory period, or where the

complainant has been induced or tricked by his adversary's misconduct into allowing the

filing deadline to pass." Id.  The Irwin court cited the following examples of tolling for

"defective pleadings:"

> Burnett v. New York Central R. Co., 380 U.S. 424 . . . (1965) (plaintiff timely
> filed complaint in wrong court); Herb v. Pitcairn, 325 U.S. 77 . . . (1945) (same);
> American Pipe & Construction Co. v. Utah, 414 U.S. 538 . . . (1974) (plaintiff's
> timely filing of a defective class action tolled the limitations period as to the
> individual claims of purported class members).

Irwin, 498 U.S. at 96 n.3.  However, courts are "generally . . . much less forgiving in

receiving late filings where the claimant failed to exercise due diligence in preserving his

legal rights." Id. (citing Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151

(1984)).  In the recent Supreme Court case, John R. Sand & Gravel Co. v. United States,

128 S.Ct. 750, 752-54 (2008), the Court upheld Irwin but stated that "[s]pecific statutory

language, for example, could rebut the presumption [of equitable tolling] by demonstrating

Congress' intent to the contrary." John R. Sand, 128 S.Ct. at 755-56.

    With regard to the FLSA in particular, the Federal Circuit has stated in dicta that

"[w]hen and if the time comes, the district court will presumably apply the doctrine of

equitable tolling consistently with Congress' intent in enacting the particular statutory

scheme set forth in FLSA." United States v. Cook, 795 F.2d 987, 994 (Fed. Cir. 1986).  In

the U.S. Court of Federal Claims, "the weight of authority favors equitable tolling of FLSA

claims." Lange v. United States, 79 Fed. Cl. 628, 631-32 (2007) (citing, e.g., Ewer v.

United States, 63 Fed.Cl. 396, 402 (2005) ("Plaintiffs correctly note that the FLSA

limitations period is not a statute of repose; thus, principles of equitable tolling apply.");

Hickman v. United States, 43 Fed. Cl. 424, 427 (1999) (ruling that FLSA is subject to

equitable tolling), aff'd 232 F.3d 906 (Fed. Cir. 2000) (Table); Udvari v. United States, 28

Fed. Cl. 137, 139 (1993) (assuming equitable tolling of FLSA is permissible but declining

to do so)); Christofferson v. United States, 64 Fed. Cl. 316, 326 (2005).  But see Doyle v.

United States, 20 Cl. Ct. 495, 499-500 (1990) (stating that equitable tolling is unavailable

for willful violations because Congress has already provided an extension of the limitations

period for those violations),[22] aff'd 931 F.2d 1546 (Fed. Cir. 1991), cert. denied, 502 U.S.

1029 (1992).

---

[22]As the government notes, the trial court in Doyle stated that, "in the case of
wil[l]fulness, Congress eliminated the need for equitable tolling by expressly providing that the
statute of limitations is extended to three years.  29 U.S.C. § 255(a).  Consequently plaintiffs are
adequately protected under the FLSA."  20 Cl. Ct. at 500, aff'd 931 F.2d at 1546.
    However, the trial court in Christofferson reached the opposite conclusion, finding that
the FLSA did not meet the standard set forth by the Supreme Court in United States v.
Brockamp, 519 U.S. 347 (1997), for rebutting the presumption of tolling on the basis of
congressional intent.  Christofferson, 64 Fed. Cl. at 326.  Specifically, the Christofferson court
found that 29 U.S.C. § 255(a) did not "set out the limitations period in a 'highly detailed
technical manner[,]' . . . provid[ing] for 'very specific exceptions' that 'linguistically speaking,
[could not] be read as containing implicit exceptions,'" nor would tolling under the FLSA "create
'serious administrative problems.'"  Id. (quoting Brockamp, 519 U.S. at 350-52).
    Because the Doyle decision predated the Supreme Court's decision in Brockamp, this
court agrees with the reasoning of the Christofferson court instead.

In light of the foregoing authority, the court finds no evidence in 29 U.S.C. §§ 255 or 256 of congressional intent to rebut the presumption that equitable tolling may be allowed in circumstances of timely filed defective pleadings.  The provisions for commencement of a collective or class action under the FLSA at 29 U.S.C. § 256 refer to the date the consent to sue is filed "in the court in which the action is brought," 29 U.S.C. § 256(a), or the date the consent to sue is filed "in the court in which the action was commenced," 29 U.S.C. § 256(b).  This emphasis on the court in which the action is "brought" or "commenced" is consistent with an allowance for tolling as a result of timely filed pleadings filed in the wrong court, as contemplated by Irwin.  Irwin, 498 U.S. at 96 & n.3 ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period . . . . Burnett . . . , 380 U.S. [at] 424 . . . (plaintiff timely filed complaint in wrong court); Herb . . . , 325 U.S. [at] 77 . . . (same); American Pipe & Construction . . . , 414 U.S. [at] 538 . . . (plaintiff's timely filing of a defective class action tolled the limitations period as to the individual claims of purported class members).").  Accordingly, the court finds that equitable tolling for timely filed defective pleadings is available under the FLSA.

> **2.      Mr. Moreno's Filing in the D.D.C. Qualifies as a Defective Pleading Subject to Equitable Tolling Under Irwin.**

In Mr. Moreno's case in particular, the court finds that equitable tolling is warranted on the basis of his defective pleading timely filed in the wrong court – specifically, in the D.D.C.  Mr. Moreno was the only plaintiff in the present action who filed his case and his

consent to sue in any court within two years of the overtime hours he worked.  Thus, the

court finds that Mr. Moreno "exercise[d] due diligence in preserving his legal rights" under

Irwin.  498 U.S. at 96.  As a result, Mr. Moreno's claim shall be considered to have been

timely filed within two years of his training at FLETC.[23]

Finally, it is important to note that until Mr. Moreno filed suit in the D.D.C., DHS

had not paid sixth-day overtime to any of the ICE and legacy INS law enforcement officers

who had been trained before August 2003.  Also, it was because of the action taken by Mr.

Moreno to preserve his rights that other similarly situated federal law enforcement

employees were put on notice that they, too, were entitled to join the action to recover

damages for the sixth day training that they performed at FLETC in the wake of September

11, 2001.  Thus, the court will exercise its discretion under 29 U.S.C. § 260 to award

liquidated damages to Mr. Moreno.

## CONCLUSION

In accordance with the above findings of fact and conclusions of law, the parties

shall submit a joint status report proposing a schedule for the damages phase of this

litigation on or before **August 17, 2009.**

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[23]This ruling is consistent with the court's prior ruling at the summary judgment stage that the plaintiffs' delay in filing their consents to sue would not be excused, see Moreno, 82 Fed. Cl. at 405 & n.40, because as the court noted in its summary judgment opinion, Mr. Moreno is the only plaintiff in the suit who is eligible for tolling on the basis of a defective pleading under Irwin.  Moreno, 82 Fed. Cl. at 402 n.34.